1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      RICHMOND DIVISION

 3    ----------------------------------------

 4    TRUSTEES OF COLUMBIA UNIVERSITY IN THE
      CITY OF NEW YORK
 5                              Plaintiff;
      v.                                 Civil Action
 6                                        3:13CV808

 7    SYMANTEC CORPORATION,

 8
                                 Defendant.
 9    ----------------------------------------

10                      September 4, 2014
                        Richmond, Virginia
11                         9:00 a.m.

12                      MARKMAN HEARING

13    BEFORE:         HONORABLE JAMES R. SPENCER
                      United States District Judge
14

15    APPEARANCES:    DANA D. McDANIEL, ESQ.
                      GAVIN SNYDER, ESQ.
16                    JASON G. SHEASBY, ESQ.
                      RICHARD M. BIRNHOLZ, ESQ.
17                    DAVID I. GINDLER, ESQ.
                              Counsel for Plaintiff;
18

19                    DABNEY J. CARR, IV, ESQ.
                      DAVID A. NELSON, ESQ.
20                    ALEXANDER RUDIS, ESQ.
                      NATHANIEL A. HAMSTRA, ESQ.
21                            Counsel for Defendant.

22

23

24

25                      JEFFREY B. KULL
                      OFFICIAL COURT REPORTER
```

```
 1                     P-R-O-C-E-E-D-I-N-G-S

 2           THE CLERK:  Case Number 3:13CV808:  Trustees of

 3   Columbia University in the City of New York versus

 4   Symantec Corporation.  The plaintiff is represented by

 5   Dana McDaniel, Gavin Snyder, Jason Sheasby, Richard

 6   Birnholz, and David Gindler.  The defendant is represented

 7   by Dabney Carr, David Nelson, Alexander Rudis and

 8   Nathaniel Hamstra.  Are counsel ready to proceed?

 9           MR. NELSON:  We are ready, Your Honor.

10           MR. McDANIEL:  We are ready.  Your Honor, I'll

11   just take a brief second.  Dana McDaniel on behalf of

12   Columbia University.  And I wanted to introduce the folks

13   who will be presenting today:  Jason Sheasby, who has been

14   previously introduced to the Court, Gavin Snyder, and Rich

15   Birnholz.  With them at counsel table are David Gindler

16   and Xinlin Lee.  Here on behalf of Columbia University is

17   Jeffrey Sears, their Associate General Counsel and Chief

18   Patent Counsel.  Thank you, Your Honor.

19           THE COURT:  All right.  Mr. Carr?

20           MR. CARR:  Good morning, Judge.  On behalf of

21   Symantec today, speaking will be David Nelson, sitting

22   here, Alex Rudis, and Nathan Hamstra, Nate Hamstra.  And

23   with us in the courtroom we have from Symantec David

24   Majors.  Thank you, Your Honor.

25           THE COURT:  All right.  Let's get started.
```

1    Trustees of Columbia?

2            MR. SHEASBY:  Your Honor, the structure the

3    parties have agreed to today is, both will give a short

4    introduction; after that we will go patent family by

5    patent family; and within the patent family we will go

6    term by term ping-ponging.  We will present our

7    construction of a term, Columbia, and Symantec will

8    respond to that, and we will bring it to a head at that

9    point if Your Honor is agreeable with that.

10           THE COURT:  That's fine.

11           MR. SHEASBY:  Madam Courtroom Officer, could I

12   have the slide presentation?

13           So Your Honor, there are three families of

14   patents that are at issue in the litigation.  The first

15   family of patents relates to the analysis of executable

16   e-mail attachments.  We will hear a lot about that today,

17   but in terms of claim construction, the central issue that

18   we will be discussing is the type of information that is

19   extracted from an executable.  An executable being the

20   attachment that you receive on an e-mail.  You extract

21   very particularized types of information from that e-mail,

22   and by doing that you are able to make determinations as

23   to the danger associated with that e-mail.  What you

24   extract is described as a feature.  We will hear a lot

25   about features discussed today.

1            The second family of patents relates to

2    detecting anomalous registry accesses.  That family of

3    patents, the '084 family of patents involves an analysis

4    of a model and divergence from that model to detect

5    something that's potentially malicious.

6            The third family of patents, the '115 family of

7    patents, relates to anomaly detection as well, detection

8    of something that diverges from normal.  But that patent

9    focuses on, for purposes of claim construction, a very

10    unique process for selectively analyzing portions of the

11    code for efficiency purposes, and then a type of

12    distributing computing that allows for the efficient

13    updating or creation of models.

14            So all three families come out of the work of

15    Professor Stolfo and Professor Keromytis.  They are

16    Columbia professors.  They have been Columbia professors

17    for many, many years.  Professor Keromytis is now on

18    leave, now at the National Science Foundation and soon to

19    move to the Department of Defense where he is doing

20    computer security research.

21            What I want to start with, I want to set the

22    stage in terms of the technology.  What I mean by that is

23    I want to talk about the state of the art in which the

24    inventors were working.  So historically, the standard way

25    of detecting malicious programs, detecting danger, was

1    known as a signature list.  The focus was exclusively on

2    what was evil, learning and cataloging all the evil that

3    had appeared before, and making sure that you kept an

4    exhaustive list of that evil so that when you saw it

5    again, you could stop it from ever hurting you.  In other

6    words, a signature list was created.

7         And the signature list is very much like a

8    thumbprint, a fingerprint, like an officer would use to

9    log and catalog a criminal.  Of course, your logging and

10   cataloging of criminals was only as good as your list of

11   fingerprints.  Here is a classic example of how signature

12   matching would work.  So you have a signature of a

13   malicious program, and you are looking for programs that

14   are coming across your computer.  And when one matches the

15   signature, you know there is a danger.

16        Now, the failure of this type of system, because

17   it is so focused only on that which was evil, that which

18   was bad, is it had no way of understanding and dealing

19   with new evils that were to appear, new malicious programs

20   that were different than what had come before.  They were

21   no less malicious, but they didn't have the same

22   fingerprint, they didn't have the same thumbprint.  These

23   are sometimes referred to as Zero-Day attacks.  The

24   ultimate failure of this focus exclusively on that which

25   was, focus exclusively on that which was evil was that you

1  would never be able to use the signatures to detect that

2  which was new.

3          So this is an example of the failure.  So all

4  these are new viruses.  And they are slightly different

5  from what had come before.  And, of course, they can't be

6  detected because the signatures don't match.

7          Well, a number of research laboratories across

8  the country, led by the Columbia research laboratories,

9  began experimenting with the use of machine learning to

10 try to deal with these Zero-Day attacks, to depart from

11 this exclusive focus on only that which was bad.  Machine

12 learning really has three pieces to it.  The first is you

13 collect a massive amount of data.  You then train a model

14 with the data.  Training a model, creating a model, in

15 this case, for example, a model of that which is normal so

16 that you can detect divergences from it, for example, you

17 apply that model.

18         So I'm not going to talk about it in the

19 computer science context to begin with.  I'm going to talk

20 about it in an abstracted way.  Imagine you want to create

21 a model of apples.  I want a model of what it is to be an

22 apple.  Because when I encounter fruit, I want my machine

23 to pick out when I encounter something that's not an apple

24 because all I want is apples.  I only want apples and I

25 want to exclude everything else that's not an apple.  What

1    you can do is you can extract features from that apple.

2    What are the features of the apple?  Well, its shape.  It

3    is round.  What are the features of the apple?  It has

4    seeds.  What are the features of the apple?  It grows on a

5    tree.  These features that you extracted from the apple

6    allow a computer to begin learning what it means to be an

7    apple and what it means to not be an apple.

8            Now, there is a problem with constructing your

9    model of apples if you focus exclusively and solely on

10   apples.  That is, the features you select to define that

11   apple may be features that are shared by other fruits.

12   For example, oranges.  They have a rounded shape, they

13   have seeds, they grow on a tree.  And so focusing slowly

14   on those three features from the apple, what would

15   actually create a bad model, a model in which you treat an

16   orange as an apple, because the features match.  But what

17   you can do is by extracting as much information as you can

18   about what makes an apple an and he will and how an apple

19   is different from an orange, for example, you can yes

20   create a more robust model.  Don't just focus on the

21   shape, don't just focus on the seeds, don't just focus on

22   what grows on the tree.  Focus on the color.  Oranges's

23   color is different from apples.  Oranges are red.  Focus

24   on the thickness of the skin, the juice content.  All of

25   these are features that tell you about what makes

1    something an apple and what makes an apple different from

2    other fruits.  The idea is not to blind yourself to data.

3         So after collecting all this data, you can begin

4    to train a model.  You can begin to construct a model that

5    allows your machine to start to think, to start to

6    distinguish from its natural environment.  So when the

7    machine encounters a fruit that it has never seen before,

8    it will say what's its shape?  Is it round or is it

9    crescent?  Does it have seeds?  Does it grow on a tree?

10   What color is it?  What does its skin look like, thick or

11   thin?  What's its juice content?  These features that have

12   been extracted from the data allow the machine to create a

13   model that defines what it is to be an apple and defines

14   what it means to be not an apple or to be different from

15   an apple.

16        And so if you do this analysis, you can detect

17   an apple.  And what's elegant about this is this analysis

18   can actually exclude things that maybe look like apples in

19   certain ways, have some of the same features, but are

20   different.  So for example, a litchi fruit.  A litchi

21   fruit has many of the characteristics of an apple that I

22   list up here.  It's round, it has seeds, it grows on

23   trees, it has red skin, but it is very thick skin, not a

24   thin skin.  And so this process of extracting as many

25   features as you can to learn not just what makes an apple

1    an apple but how apples are different from other fruits by

2    actually considering other fruits in the training process,

3    you can create a model of appleness.

4            Now, I talked about apples and oranges.  But I

5    want to now bring it back to what we are focused on, which

6    is computer learning.  So instead of extracting

7    characteristics of fruits, think of extracting thousands

8    and thousands of features from normal malicious programs.

9    You create this massive dataset of how normal programs

10   act, how malicious programs act, and how that distinction

11   creates meaning.

12           You use these features to train a model, create

13   a model that detects divergence from normal.  You

14   obviously have to start with the apple.  You have to start

15   with that which is normal, because by doing so, you begin

16   to create your model.  But you don't blind yourself to

17   everything that exists.  The whole essence of the machine

18   learning process that Professors Stolfo and Keromytis

19   described is this massive extraction of information.  So

20   the three families of patents that we are going to be

21   speaking about all relate to this machine learning

22   strategy at a very basic level.  But they all present

23   very, very important improvements over machine learning to

24   make as efficient, as accurate, as fast models as possible

25   to detect that which is dangerous.  And that's what we are

1    going to be discussing today, Your Honor.

2              So at this point, I believe Symantec is going to

3    give an opening presentation as well, and then we will

4    turn to the individual patents.  Is that correct,

5    Mr. Nelson?

6              MR. NELSON:  Yes.

7              THE COURT:  All right.

8              MR. NELSON:  Thank you, Your Honor.  David

9    Nelson on behalf of Symantec.  Good to see you again.

10             THE COURT:  Good to see you.

11             MR. NELSON:  So we don't have a big problem with

12   what we just heard.  I don't think that's really where the

13   dispute lies.  There is one additional fact, I think, that

14   counsel contrasted what the claimed inventions are in the

15   three families of patents here to signatures, looking for

16   the actual fingerprints and things you have seen before.

17   And although the patents do discuss that, it is not quite

18   accurate to lay the groundwork to say that what we are

19   looking at now is an invention that in the past only these

20   signature systems exist.

21             There is another very important type of system

22   that existed, and they call these misuse systems.  In

23   fact, they are called in the patents, there's various

24   citations we have in the brief talking about that.  And

25   these misuse systems, what they did, for example, was they

1    collected information on bad activities, the kinds of

2    things that bad programs might do.  For example, like if

3    you have a program that comes on to a machine and

4    immediately copies all of the contents of another file

5    into its program space that it is operating on, things

6    like that that normal programs really don't do.  And those

7    kinds of systems existed out there, no question about it.

8    Frankly, the kinds of systems we are talking about looking

9    for normal behavior existed as well, but I'm just talking

10   about now for purposes of MARKMAN what the patents

11   describe and the environment we are looking in..

12           So those kinds of systems that knew about bad

13   behavior and looked for patterns of bad behavior, you

14   know, for example, if you liken this to a home alarm

15   system, you know, somebody that's going to protect

16   security in your house, say, "Well, wait a minute, if

17   somebody, if I see somebody climbing over the fence at

18   night or somebody trying to open a garage at 2 o'clock in

19   the the morning," or something like that, "these are

20   things that we have looked at and decided those are bad

21   behaviors.  We will monitor for those things and if we see

22   them we will assume that whatever is trying to do those is

23   acting maliciously."

24           That's not what these patents are about.  And

25   the patents themselves say that.  It is an important thing

1    when we get into some of the claim construction issues

2    later in the case.  So I just want to lay that additional

3    piece of foundation, but not really dispute a lot of what

4    you heard from counsel.  I don't think that's where our

5    dispute really lies.  Rather, and let me go to the

6    particular patents.  If I could have Slide 2 of our

7    presentation.  And we have copies of these we will pass up

8    to Your Honor here before we get into it, really start

9    going through the claim construction issues.  But that has

10   to do with, the claim construction issues are really what

11   systems did you claim, right?  What we are seeing from

12   Columbia, we believe, and you see some of this reflected

13   in the brief, is an attempt to say, "Well, we have claimed

14   the whole universe.  We have claimed the general category

15   of these things."  And when we get into these claim

16   construction issues you will see that's not the case, that

17   we are talking about much more specific things, which is

18   typically what you see out of patents.

19            So in this first family of patents that counsel

20   described, that's the '544, ''907, that's the one about

21   filtering e-mail attachments.  We will get into those.  I

22   think it is actually the first set.  There, at least in my

23   mind from going through the brief, the real issue there is

24   counsel said you are going to go in, look at the

25   attachments, there are executable, things that the

1    computer can run, that are attached to e-mails.  And you

2    are going to go in and look at particular features, like

3    for example with a person, you could look at their

4    features, say, well, for the person we are going to look

5    at their hair color, their eye color and how tall they

6    are, various things like that.  And we can just have those

7    be features of a person.  So you can do the same thing,

8    according to these patents, with e-mail attachments.  I'm

9    going to go in and look at various components of these

10   executables and pull out information so that I can create

11   this basically list, this category of features.

12          The real claim construction issue there is the

13   claims themselves, at least the claims that are asserted

14   here, they focus on a particular type of feature.  So

15   sticking with my example, you know, hair color would be a

16   particular type of feature if I'm looking at a person.

17   That's what these claims really focus on.  But what we are

18   seeing from Columbia is an attempt to rewrite that claim

19   and say, "No, no, no, what we claim there is not a

20   particular type of feature; it is all features in

21   general."  And that's the real issue that we are going to

22   see with respect to the claim construction issue in that

23   patent and that's what I, at least from our side, that's

24   what we are going to focus on primarily.

25          Now, the next set of patents, if I go to Slide

1   21, this is the '084 and '306.  Counsel described these,

2   these are the ones where you create this model of normal

3   behavior, you know, I am going to observe what a computer

4   system does for, you know, take a bunch of data, a lot of

5   data, and I'm going to create a model.  This is normal.

6   This is what it does.  So when I start monitoring I'm

7   going to look and see, wait a minute, what it is trying to

8   do now, what something is trying, in this particular one,

9   access the operating system registry, for example, that's

10  not normal.  That's something strange.  So I'm going to

11  assume that that's bad behavior and I'm going to shut that

12  down.

13          So the main dispute that we have there is, what

14  data do I use to create this model?  Right?  Is it a model

15  of normal behavior, like the patents say, and we will get

16  into these details, in other words, it doesn't include

17  attacks.  For example, if the system is out there running

18  when I'm trying to collect this data, it is being attacked

19  a bunch of times, then that data would not be data about

20  the normal operation system because it is being attacked.

21  So that really becomes the claim construction dispute, is,

22  well, this model, the primary one, there's a couple other

23  issues that are related, but the primary one, does this

24  model that we are talking about, in order to create the

25  normal baseline, is that normal data, attack-free data, or

1  does it include attack data as well?  That's going to be a

2  primary issue with respect to the claim construction on

3  those two patents, Your Honor.

4         Now, the last family of patents, this is Slide

5  53, these are the '115 and '322, I'm not sure why I give

6  the numbers because I've been living with this case for

7  eight months, nine months now, I can't remember the

8  numbers.  I remember them by what these patents do.  So

9  this one, as counsel described, is the one where I'm

10  looking at a particular program and what the calls that

11  are made to that particular program, function calls that

12  are made to or by that particular program, you know,

13  things that it is trying to do.  And what is the normal

14  activity again there, what does this program normally try

15  to do?  What calls are normally made and what calls are

16  normally made to it?  And here, a primary focus, I mean,

17  one is the issue I just talked about with respect to the

18  other patent is what data goes into creating the baseline

19  that we decide what is normal.

20         But there's another issue, too, because when I

21  get these programs, let's say I get an unknown program,

22  Your Honor, that I don't know something about.  Well, if I

23  just let it run on the system, you know, have access to

24  your computer basically, and it is malicious, something

25  bad could happen to your system.  It could wipe out your

1    hard drive, take all your passwords for your bank

2    accounts, whatever, that kind of thing, before I catch it

3    and know that it is bad.  So one of the things that I

4    might want to do is run this on an emulator.  In other

5    words, so the program thinks it is running on the system,

6    that it has access to all the system resources, the

7    computer, but it really doesn't, because I've created this

8    virtual environment, fake environment, that kind of thing.

9    So the program thinks it's running on the system when it

10   really isn't.  An example of this might be back in the old

11   days when WordPerfect, for example, was a word processing

12   program, only ran on certain types of systems, wouldn't

13   run on the Apple McIntosh platform, and so you would

14   create an emulator so it would emulate a Windows system,

15   and so now you could run that program because that program

16   thought that it was running on a Windows system instead of

17   the Apple McIntosh system.  So that, it becomes an issue

18   in this patent as well, is what is an emulator.  And

19   that's going to be the real definition.  What is an

20   emulator.

21           We believe Columbia is trying to define what you

22   might use an emulator for, but not what an emulator is.

23   And so that is going to be, in addition to this idea of

24   what data is used to create the model, that's going to be

25   an issue for claim construction with respect to these two

1    patents, Your Honor.

2            So with that, we will get right into it and get

3    into the terms and start getting you the information, Your

4    Honor.

5            THE COURT:  All right.  Thank you very much.

6            MR. BIRNHOLZ:  Good morning, Your Honor.

7    Richard Birnholz of Irell & Manella.

8            THE COURT:  Good morning.

9            MR. BIRNHOLZ:  I have a set of the slides for

10   the '544 and ''907 patent, also a copy of the introduction

11   slides.  If I could hand them to the security officer.

12           THE COURT:  Sure.

13           MR. BIRNHOLZ:  I've given a copy to opposing

14   counsel.

15           So Your Honor, of course, is free to follow

16   along on the book or the screen or both, whatever your

17   pleasure.  I'm going to be talking this morning about the

18   '544 and '907 patents.  Now, this family of patents, while

19   in the same general space as the other patents, has some

20   different characteristics.  Now, this patent is called

21   System and Methods for Detection of New Malicious

22   Executables.  So I use the '544 patent as the base

23   reference, because the '905 patent is a continuation, so

24   the disclosure is the same, although the claims are

25   slightly different.  But for purposes of claim

1    construction, the issues coincide with one another.  So

2    the '544 patent is really our reference.

3           The patent deals with the issue of malicious

4    e-mail attachments.  And let me provide a little

5    background which will help put the patent, the invention,

6    and the claim construction issues in some context.

7           So in the early 2000's and late 1990's, e-mail

8    proliferated.  And with the proliferation of e-mail it

9    allowed for the ease of transmission of e-mail attachments

10   that contained programs.  So not just any attachment to an

11   e-mail, not a document or a piece of text, but an

12   executable, a program that could be attached to an e-mail.

13   And this patent deals with the issue of executable

14   attachments.  So I put on the screen two examples of

15   executable e-mail attachments that were viruses.  One

16   example was from the May of 2000 time frame, the ILOVEYOU

17   virus.  The subject line said, "I love you," there was an

18   attachment, and if you clicked on it, the program did some

19   harm to your computer, might have erased some files, and

20   then as if that wasn't enough, it replicated itself and

21   sent itself out to everyone in your contact list.  So it

22   caused a lot of havoc.

23           Another example of the attachment called

24   message.zip, and it was this MyDoom virus, and it

25   replicated and sent to a particular server which could

1    overwhelm a server and cause a denial of service attack.

2    So these could cause significant problems for yourself

3    personally as well as the community at large.  How did the

4    prior art detect these viruses?  Generally, you waited to

5    find one, and once you saw it you developed a signature

6    and you said, you created the fingerprint.  You said,

7    "That's the ILOVEYOU virus."  And so when it showed up

8    again you could detect it.  But what if it was different?

9    If it was different, you would have trouble picking it up.

10   The signatures wouldn't work because you hadn't seen it

11   before.  And so the inventors in the Columbia labs were

12   working on applying their techniques in machine learning

13   to detect malicious e-mail attachments.

14          Now, the background of the '544 patent sets this

15   up, which says, "The invention relates to systems and

16   methods for detecting malicious executable programs, and

17   more particularly to the use of data mining techniques to

18   detect such malicious executables."  So we are talking

19   about the use of machine learning techniques to detect

20   things that you hadn't seen before.

21          Let me provide a little context for machine

22   learning in the context of these patents.  So the first

23   general principle is you want to collect information about

24   the executable.  You want to look at the features of the

25   file without running it.  You want to collect features

1    about the file so you can build a rule that you can then

2    apply the features in the new file to to determine whether

3    it is malicious or benign.  Even though you haven't seen

4    it before, you build a model based on features of a

5    training dataset that you have seen before, you see the

6    new file, and then you run it through your model to

7    determine whether it is malicious or benign.

8              So you have the information collection stage,

9    the rule set development stage, and then ultimately the

10   comparison to the rule set.

11             The principles of the work reduced to several

12   key concepts that are reflected in the patent disclosure

13   and in the claims.  So the first step that's described is

14   you filter the e-mail attachment.  Then you extract byte

15   sequence features.  The features that we are talking about

16   being collected from this large set of data and from the

17   files that are being inspected are referred to in the

18   patents as byte sequence features.

19             The next thing you do is you build your rule set

20   based on the features that you have collected.  And then

21   you classify the file as malicious or benign by comparing

22   the features to the rule set.

23             Now, these are the general principles that, and

24   I'll repeat them because they are set out specifically in

25   the claims, and it will highlight the specific claim

1    construction issues that are before the Court.  On Slide

2    22, you can see an example claim, which is from Claim 1 of

3    the '544 patent.  And the claim relates to a method for

4    classifying an executable attachment.  So we are talking

5    about executables that are attached to an e-mail.  Step A,

6    you filter said executable attachment.  There is no claim

7    construction issue here with regard to the filtering step.

8    Element B:  Extracting a byte sequence feature from said

9    executable attachment.  Byte sequence feature is at the

10   heart of the dispute for the parties today, so this is,

11   Element B is a key claim element we will be talking about

12   in more detail.  Element C is broken up really into two

13   parts, where after you have done the filtering and

14   extracting, you classify the executable attachment by

15   comparing the byte sequence feature to the model that you

16   have created using your machine learning techniques.

17          Then the claim in its last clause contains

18   another element that goes with Element B, which is that

19   the byte sequence feature that gets extracted, for

20   purposes of Claim 1, cannot be anything, it needs to

21   include a byte string representative of resources

22   referenced by said executable attachment.  In general,

23   what that is referring to is you can extract features from

24   the file, but in Claim 1, you need to at least include a

25   byte string representative of resources that are

1    referenced by the file. "Resources" refers generally to

2    operations that the file may perform, resources that the

3    file may call on in a system to perform, such as if a file

4    has a link to another routine that's in the operating

5    system, it is sometimes referred to as a Dynamic Link

6    Library or DLL. You might see in your computer in an

7    attachment, this is .dll and you are wondering what that

8    might be. A DLL is a call to another library in the

9    operating system. So that might be an example of a

10    resource that's referenced by the executable. Claim 1

11    talks about extracting the byte sequence feature, and it

12    requires this last component that it include a byte string

13    representative of resources.

14          We are going to talk about in more detail about

15    those points in the context of the claim construction

16    disputes.

17          There are three basic disputes. The first two

18    relate to the byte sequence feature and this byte string

19    representative of resources element. We are going to

20    address those two together. The parties have agreed to

21    address them together, because they are intertwined.

22    Symantec may address them in another order than I do, but

23    we are going to address the wherein clause, the

24    representative of resources point first, because the

25    arguments on that element inform the understanding of what

1    a byte sequence feature is.

2           So let me highlight what the parties' competing

3    positions are on this point.  So Columbia's construction

4    of the wherein clause is simply to confirm what the claim

5    says:  That the byte sequence feature includes a byte

6    string representative of resources referenced by the

7    executable attachment.  The claim is talking about

8    extracting a byte sequence feature, and it is talking

9    about including at least a certain kind of byte sequence

10   feature, one that includes a byte string representative of

11   resources.  That's Columbia's construction of this term.

12          Symantec's position is that the claim is

13   indefinite.  Now, it is not your usual indefiniteness

14   argument.  I'm not entirely convinced it is an

15   indefiniteness argument.  But Symantec's position is not

16   that there is a claim term such as that the claim requires

17   something to be blue, and you are not really sure if it is

18   blue because people might have different understandings of

19   what blue is.  That's not their argument.  The argument is

20   that the claim is internally inconsistent because it

21   claims two different embodiments.  That the byte sequence

22   feature in Element B is mutually distinct and mutually

23   exclusive from what I am referring to as Element D, this

24   representative of resources element.  And that the claim,

25   therefore, is internally inconsistent, and therefore,

1    should be indefinite.

2            Symantec, in making this argument, has gone off

3    track right from the start.  When you read the entirety of

4    the disclosure, it is clear from the way the invention is

5    described from the beginning to the end that a byte

6    sequence feature includes as an example a byte string

7    representative of resources referenced by the executable.

8    That this is an example of one of the kinds of byte

9    sequence features that you can extract from the file.

10           Let me try to explain it graphically.  The point

11   of the invention is that you create a dossier about the

12   file.  You collect the features that might be pertinent to

13   your analysis to determine whether it is going to be

14   malicious or benign.  And I've displayed a folder called

15   "Byte Sequence Features."  And the byte sequence feature

16   folder which you can pull out of the file can include the

17   instructions the file might perform.  It might include

18   more particular information, such as resource information,

19   the DLL that I mentioned earlier as an example.  Or it can

20   include plain text from the file.  So there are different

21   parts of a file, and you can include any of those pieces

22   of information can be extracted from the file and they are

23   byte sequence features.  They are described this way in

24   the patent.

25           So you can create this dossier in the file, they

1   are all byte sequence features and examples of byte

2   sequence features.  Now, Symantec's position starts from

3   an incorrect premise, which is that byte sequence features

4   are only one kind of feature, and that everything else is

5   something completely different and that when the patent

6   mixes the concept, it has gone astray and there is

7   something wrong with the claim.  That's completely

8   inconsistent with the disclosure.  So you see on the

9   screen, Symantec puts each embodiment in a different box,

10  byte sequence features, which it says are only a certain

11  kind of information, it is only the machine code, that's

12  Symantec's construction.  There is resource information.

13  That's entirely separate, not a byte sequence feature

14  according to Symantec.  That's wrong.  Encoded string

15  features.  They are saying that's not a byte sequence

16  feature.  That's wrong.  So Symantec, this is the entirety

17  of their -- the entire basis for their argument and it is

18  flawed from the start.

19          Let me explain the patent, how it describes byte

20  sequence features.  You can start from the Abstract, the

21  beginning of the patent.  It says, "Byte sequence features

22  are extracted from the executable."  That is a core of the

23  patent.  It is a core principle of the patent.  And it is

24  developed step by step when you go through the disclosure.

25  So moving from the Abstract, which lays out this basic

```
 1    principle, I go to the Summary.  The Summary of the
 2    Invention explains how the byte sequence features that are
 3    extracted comprise extracting static properties of the
 4    executable.  The point of the '544 patent is I don't have
 5    to run the file.  I'm going to put a magnifying glass over
 6    the file contents and extract static properties from the
 7    file and those static properties in the patent are
 8    referred to as the byte sequence features.
 9              The Summary also gives examples of extracting
10    the byte sequence features.  I can extract the entirety of
11    the bytes in the file.  I can take the file and I can
12    convert the executable attachment from binary format, 1's
13    and 0's, to hexadecimal format, which is a base 16 format,
14    and a different set of -- different way to represent the
15    1's and 0's.  But it is just translating the 1's and 0's
16    into hexadecimal format.  I can do that for the entirety
17    of the file.  That's one option.  Or I don't have to
18    extract the entire file.  I can extract a byte string
19    representative of resources.  I can just extract DLL
20    information, as an example.  That's another embodiment.
21    So the Summary of the Invention gives the basic
22    explanation.  I extract the static properties just
23    on -- going back one, Slide 32, extract static properties,
24    and then continuing on, I can convert the file to
25    hexadecimal, the whole file, or I can extract a byte
```

1    string representative of resources.  These are examples.

2    Symantec is critical of this argument by saying the

3    Summary just references the claims, just repeats the

4    claims and should be given no weight.  Number one, as a

5    legal matter, the cases say that there is no reason that

6    the Summary of the Invention does not get as much weight

7    as the rest of the disclosure.  Number two, it is

8    incorrect.  The Summary is more than the claims.  It

9    provides the context for explaining what the invention is.

10            Now, if I continue from the Summary, the

11   detailed description builds this out further, this

12   extraction process, extracting the features.  The

13   extracting of the features are from, referred to as Step

14   20 in the patent.  It says, "The next step of the method

15   is to extract features," and it is referred to as Step 20.

16   That begins the discussion from Column 5, at the bottom of

17   Column 5 of the patent.  And when you look at the patent

18   itself, this extracting the features discussion goes from

19   the bottom of Column 5, Line 57, and it goes all the way

20   through Column 6 and through the end of Column 7.  And

21   that's describing this feature extraction in much more

22   detail.  So it is Step 20 and it says:  "Features in a

23   data mining framework are defined as properties extracted

24   from each example program in the dataset, e.g., byte

25   sequences."  So it is referring to the features that are

1    extracted as byte sequences.  This is -- the entirety of

2    the disclosure is referring to the extraction of byte

3    sequence features.

4            Let me continue because -- with the detail

5    that's in the specification.  So Figure 1 is just a

6    graphic illustration of this Step 20, which is the

7    extraction process.  And then the text says that there are

8    lots of ways you can do this Step 20, you can do this

9    feature extraction.  And it describes the kinds of things

10   that you can extract.  So let me continue just to walk

11   through the detailed description, how it matches with the

12   Summary of the Invention.  So the Summary of the Invention

13   gives us one option that you can convert the executable

14   attachment from binary to hex.  You can do this extraction

15   of the entire file.  And in Column 6, this is described in

16   more detail.  You can do this by using a known utility

17   called hexdump, and hexdump will extract all the contents

18   of the file and output them into hexadecimal strings.  So

19   you can extract the entirety of the file.  This is one

20   embodiment.  And then, so that's going to include

21   everything.  It is going to include the instructions, the

22   resource information, plain text, the entirety of the

23   file.  And the patent talks about why there are some

24   advantages of that.

25           Now, this is one example of byte sequence

1    features, the entirety of the file, of course.  Then

2    another example from the summary mapped to the disclosure

3    is you can create a byte string representative of

4    resources that are referenced by the executable.  And then

5    if you continue in Column 6, it says, "Additional methods

6    of feature extractions are also useful to carry out this

7    same Step 20."  I don't have to extract the entirety of

8    the file.  I can extract a part of it.  And I can extract

9    resource information from the binary that provides insight

10   to its behavior.  But the point of this disclosure is that

11   I can extract the entirety of the file, or I can extract

12   resource information, and the resource information is a

13   kind of byte sequence feature.  It is an example.  It is

14   not an entirely separate animal that has nothing to do

15   with the byte sequence features that are extracted from

16   the file.  The disclosure refers to the extraction of all

17   the bytes in the binary, all the bytes in the file, or you

18   can extract a portion of it.  And it discusses the

19   extraction of resource information.

20          An example of resource information is depicted

21   in Figure 3, which it says if I just extract resource

22   information as the byte sequence feature, this is what it

23   might look like, if I pull out the dll's and I can create

24   a string that captures just the dll's, it might look like

25   something in Figure 3.  And all Figure 3 really is is, it

1    is a conversion of the bytes that are in the file

2    representing this information.  I've translated the 1's

3    and 0's into text that I now can understand, and I can

4    represent the bytes as ASCII text, so numbers and letters,

5    and create a string that represents the dll's.  So this is

6    an example in Figure 3 of a byte sequence feature that is

7    representative of resources.  It is one example provided

8    by the patent.

9            This concept of byte sequence features being an

10   example of -- I'm sorry -- this concept of a byte string

11   representative of resources referenced by the executable

12   as being an example of a byte sequence feature is not

13   something that claim out of the blue and is not some

14   strange creature.  It has been in the application process

15   from the beginning.  The original application included

16   claims that were to the same effect.  The originally filed

17   Claim 1 was you extract byte sequence feature, and then

18   you have, there's dependent, originally filed dependent

19   claim, wherein you extract the particular kind of byte

20   sequence feature, this byte string representative of

21   resources.  So the inventors have regarded the resource

22   information as an example since the beginning.

23           One argument I'd like to address preemptively is

24   Symantec in their briefs argue that Claim 28 shows that

25   byte sequence features and resource information are

1    different things.  And if you look at Claim 28, this is a

2    system claim, Claim 1 is a method claim, and so Claim 28

3    requires a feature extractor.  And the feature extractor

4    requires you to extract a byte sequence feature, and it

5    also requires that it is further configured to create a

6    byte string representative of resources.  Symantec says,

7    "Well, those are two completely different things.  I don't

8    have a problem with this claim, because they are two

9    different things and it is claiming them separately."  And

10   I would disagree.  As we explained a moment before, the

11   byte string representative of resources is an example of a

12   byte sequence feature; the feature extractor in this claim

13   simply needs to be configured to be able to do that, to

14   extract -- to create a byte string representative of

15   resources.  But more to the point on why Symantec is wrong

16   is, if a byte sequence feature does not include resource

17   information, then Step C, which is what you do with the

18   byte sequence features, would do nothing with this

19   information that's representative of resources.  So you

20   would extract the byte sequence feature, you would be

21   configured to create a byte string representative of

22   resources, and then when you are doing the meat of the

23   comparison to determine whether you are malicious or not,

24   you would do nothing with this resource information,

25   because all the claim says is you compare said byte

1   sequence feature to the rule set.

2          So if byte sequence feature doesn't include

3   resource information, then this claim doesn't make sense

4   under Symantec's view.  And it all stems from Symantec's

5   misinterpretation of the entirety of the patent.  When

6   Symantec puts byte sequence feature in one box, resource

7   information in another box, and print the string

8   information, other types of information, in another box,

9   they have gone off track.  And the byte sequence feature

10  is the dossier about the file, and the instructions, the

11  resource information, and plain text information, those

12  are all examples of byte sequence features.

13          THE COURT:  Let me interrupt you for just a

14  second.  I have a jury out and I'm checking to see if they

15  are here.

16          MR. BIRNHOLZ:  I completely understand, Your

17  Honor.

18          THE COURT:  All right, we will go down for a few

19  minutes and get set up in my other case.  All I have to do

20  is bring the jury in and send them back out and then we

21  will get back to you all.  So we will take a break, get

22  the McDonnell folks in here.

23          (Recess taken from 9:50 a.m. to 10:01 a.m.)

24          THE COURT:  All right.  What happened to our

25  audience?  I guess nobody is interested in the patents.

1          MR. BIRNHOLZ:  I lost all my fans.

2          THE COURT:  All right.  Go ahead.

3          MR. BIRNHOLZ:  Thank you, Your Honor.  To bring

4     us back to this discussion, I wanted to highlight what was

5     on Slide 29 and to wrap up this particular section.  The

6     indefiniteness argument as far as this resources

7     referenced by the attachment.  It fails from the starting

8     gate because of a fundamental misconception of what a byte

9     sequence feature is.  And I think this is a useful image

10    to keep in mind, that the byte sequence feature is the

11    dossier of the file, and it can contain a variety of kinds

12    of information, and it can contain instructions from the

13    file, resource information about the resources that are

14    referenced by the file, plain text information that can

15    also provide very useful information about the file's

16    behavior.  Those are all examples of byte sequence

17    feature.

18         And so with that context, our construction

19    reflects that the last element, this is Slide 41 at the

20    end of this particular section, is "wherein the byte

21    sequence feature includes a byte string representative of

22    resources referenced by the executable attachment."  I

23    think that it is consistent with the claim language, it is

24    consistent with the disclosure, the description of the

25    invention, and there is no indefiniteness problem.

1           Let me move to the next element, which is

2   related, which is actually the parties' competing position

3   on what a byte sequence feature, how that should be

4   construed.  And it is really -- the reason that we are

5   having this dispute is because of a limitation that

6   Symantec wishes to read into the claims and to limit that

7   to a particular kind of example of byte sequence feature.

8   And let me go right into that.

9           So Claim 1 again, we are talking about Element B

10  for this particular issue, "Extracting a byte sequence

11  feature."  The parties' positions on this are at Slide 44,

12  which is, Columbia provides a construction of byte

13  sequence feature as "a property or attribute of a sequence

14  of bytes which may take on a set of values."  And the

15  parties are similar in terms of what a feature is, but we

16  haven't defined "feature" separately like Symantec does.

17  Symantec says that's "a property or attribute of data,

18  which may take on a set of values."  Then they provide a

19  separate construction of byte sequence feature which they

20  then use "feature" again.  It is "A representation of

21  machine code instructions of the executable."

22          So Symantec has limited byte sequence feature to

23  "only a representation of machine code instructions."  So

24  they are reading in that particular example to the claims.

25  They are trying to import that particular example and

1    limit the claims to that particular embodiment.  And let

2    me describe some attributes of a file generally which

3    might help put this in further context as well.  So first,

4    as a general matter, a file can have different components.

5    It can have a header portion, it can have data, and it can

6    have instructions.  And the image is meant to depict a

7    typical format for what's called a portable executable

8    format file.  It is an example of an executable.  And

9    there are specific sections of the file.

10           But when you step back from what's in the file,

11   there are different components, the general components:

12   header, data, and instructions.  And there is really no

13   dispute about this particular point, that files contain

14   different components.  And the experts have submitted

15   Declarations on this issue which, at the next slide, which

16   explain that the Windows PE files include a header that

17   contains information about the file, such as the file

18   size, the names of dynamically-linked libraries, those

19   DLL's that I talked about which can call other functions,

20   and this is Symantec's expert.  So this is not an area of

21   dispute.  And then Columbia's expert, Professor Szajda,

22   says that a file can contain the instructions that are

23   performed by the CPU, but it is not the only thing that's

24   in a file.  You can have DLL information, which are an

25   example of resource information.  You can have plain text.

1    The point is that there are different parts of a file.

2    And this is important for the claim construction because

3    when you go to the claim language, where it says

4    "extracting a byte sequence feature."

5              So my first point on the construction is the

6    claims are not limited to machine code instructions.  This

7    just says "byte sequence feature."  So number one, there

8    is no machine code limitation in the claim language

9    itself.  And then when we go to the specification, we also

10   see that the specification does not limit a byte sequence

11   feature to machine code instructions.  Part of that I

12   explained earlier.  But let me focus on this particular

13   point in the specification from Column 5, which says "a

14   feature is a property or attribute of data such as byte

15   sequence feature which may take on a set of values."  So

16   Columbia's construction is drawn right from the

17   specification at Column 5, Lines 57 to 64.

18             If the Court is unsure as to what "which may

19   take on a set of values" means, that's going to be the

20   attributes that are specific to the particular feature,

21   such as if you looking at an apple, how thick the skin is,

22   how much juice comes out, how round is it.  So the values

23   are just the particulars of the properties or attributes.

24   So Columbia has drawn its language right from the

25   specification.  It is clear from the specification that

1    byte sequence features may be extracted from all or a part

2    of the file.  Now, Symantec is trying to limit the

3    construction to only machine code instructions.  And

4    again, I'll quickly walk through the specification on this

5    point that makes this clear:  "that the byte sequence

6    features may be extracted from all or a portion of the

7    executable."

8            In the Objects of the Invention that are

9    described in the Summary in Column 3, one object is to

10   "provide a data mining technique which examines the entire

11   file, rather than a portion of the file, such as a

12   header."  We talked about that earlier.  You can examine

13   the entire file or you can examine a portion.  And the

14   patent describes ways of examining the entire file and

15   ways of examining just a portion.  They are all extracting

16   these byte sequence features from the file.

17           Then when you go into the detail in the

18   Specification, Column 6, where there is this discussion of

19   the extraction process and the options that are available

20   to extract byte sequence features, one is you can examine

21   a subset of the data.  So this is describing some methods

22   where you can extract the particular resource information

23   alone or you can extract information about the entire

24   file.  So Option 1 is the entire file, Option 2 is a

25   portion of the file.  And this is addressed at Column 6,

1    Lines 2 to 23.  And then it continues with another example

2    of portions of the file.  Well, you might want to just

3    extract what are called plain text headers.  Now those are

4    also byte sequence features.  And these are the features

5    that can be extracted from files that are not in that

6    Windows portable executable format, so you can apply this

7    method to a variety of different kinds of files.  So you

8    can extract the plain text headers, and the plain text

9    headers might include resource information as well.  But

10   they can include a variety of information about the file.

11   So all or portion of the file can constitute the byte

12   sequence features.

13          Where does Symantec get its construction from,

14   what are they relying on?  There is a paragraph in the

15   Specification which describes one exemplary embodiment,

16   which is this concept of looking at the entire file as

17   your byte sequence features.  And it is at Column 6, Lines

18   7 to 22, and I've reproduced it here on Slide 53, which is

19   in the exemplary embodiment, hexdump was used in the

20   feature extraction step.  Hexdump is this utility that can

21   extract all the contents of the file and output them in

22   these hexadecimal strings which you can then analyze.

23   Symantec says -- well, let me read what this says.  I'm

24   going to rely on this sentence:  "The byte sequence

25   feature is informative because it represents the machine

1    code in an executable."  That one line is the linchpin for

2    Symantec's argument.  They say, "Okay, it says it is

3    informative because it represents the machine code."

4    Therefore, then, Symantec makes the incorrect leap to,

5    "Well, a byte sequence feature has to represent machine

6    code instructions, and only machine code instructions."

7         Well, that's just completely wrong.  The

8    paragraph itself says it is informative because it

9    represents the machine code.  Okay.  So it represents the

10   machine code.  But it doesn't anywhere say it represents

11   only the machine code instructions.  In fact, we know this

12   from Professor Szajda's Declaration and from it being well

13   known in the art about what hexdump does, this hexdump

14   utility.  It extracts the entire file, including machine

15   code instructions and the other components of the file.

16   And I think in the second line on this slide, it says,

17   "Hexdump as is known in the art."  So hexdump is not a

18   creature of the invention; it is a known utility you can

19   use to extract the entire file.

20        And the specification itself further explains

21   this in Column 13, when we are talking about this process

22   in more detail, when you are actually performing the

23   classification by looking at these new files.  You can

24   transform the binary files in the attachment into a byte

25   sequence of hexadecimal characters.  It is referred to as

1    transforming the entire binary into hex characters.  It

2    says, "This approach involves analyzing the entire binary,

3    the entire file, rather than portions such as headers."

4    So you can look at the entire file, which includes the

5    machine code instructions and everything else, or you can

6    look at a portion.  So there is nowhere in the

7    specification that limits what a byte sequence feature is

8    to machine code instructions.  Symantec is merely reading

9    that in.

10             One argument that we saw in the briefs and you

11   may hear about today is that all of this should be

12   overridden by what's in the provisional application, and

13   that the discussion in the patent really doesn't mean what

14   it says, because of their interpretation of the

15   provisional application.  And the provisional application

16   in this case was a paper, a research paper that the

17   inventors worked on.  They published the paper and also

18   filed it as the provisional and then the full application

19   was developed.  The provisional is entirely consistent

20   with the position that I have articulated; that you have

21   the options of looking at the entire file or portions of

22   the file.  And you look, one of the sections in the

23   provisional which describes this feature extraction talks

24   about how you can use a certain utility and extract some

25   particular DLL-type information, or you can extract

1    strings.  But then the last section in the section is
2    called "Byte sequences using hexdump."  So we have talked,
3    the provisional provides examples of these byte sequence
4    features.  And then it says, "You can also use hexdump,"
5    which we have explained is a tool that transforms the file
6    into hexadecimal files.  And it says, "Analyzing the
7    entire binary gives more information because you have
8    extracted the entire file."  And it is another option to
9    extract byte sequence features.  You can extract the
10   particular resource information or a string or you can use
11   hexdump and use the entirety of the file.
12           And so the provisional is consistent with our
13   position, and it is also consistent with the exemplary
14   embodiment in the specification.  And when you go back to
15   the specification, at the end of the paragraph that
16   Symantec relies on about this hexdump embodiment and the
17   machine code instruction, the machine code reference, that
18   paragraph itself ends:  "Each byte sequence in the program
19   is used as a feature."  And that's consistent with the
20   concept that hexdump outputs the entire file.  So for
21   Symantec to argue that byte sequence feature is limited to
22   just machine code instructions is inconsistent with the
23   entirety of the disclosure, including the provisional.
24           Now, the last point on this section is Symantec
25   is going to say, well, and I think Symantec's counsel said

1   this in their introduction, in their introductory remarks,

2   "We just want to claim a feature."  And the essence of

3   that argument is, "We are just rendering the words byte

4   sequence superfluous.  We are reading those out of the

5   claim."  That is also incorrect.  When you look at

6   Columbia's construction, it says "a property or attribute

7   of a sequence of bytes, which may take on a set of

8   values."  And when you read this in the context of the

9   claim, it must be based on a sequence of bytes from the

10  executable.  It is not extraneous information, like who

11  sent the e-mail that had the attachment, who received the

12  e-mail that had the attachment, who received the e-mail

13  that had the attachment, what time was the attachment

14  sent, how many copies of the e-mail did you receive?  That

15  information would not be derived from the executable.  And

16  so the construction is consistent with the disclosure.  It

17  does not read in any improper limitations, doesn't read

18  out anything from the disclosure.

19          And so I'll close this section by saying that

20  the byte sequence features are not limited to machine code

21  instructions, and the structure of the claim has integrity

22  and is faithful to the disclosure and is not indefinite.

23          Thank you, Your Honor.

24          THE COURT:  All right.

25          MR. RUDIS:  Good morning, Your Honor.  Alex

1    Rudis on behalf of Symantec.  I'll pass these up.  So Your

2    Honor, we proposed constructions for "feature" and "byte

3    sequence feature," because they are two different terms.

4    And "feature" is the more generic of the two terms, which

5    is why we construed it as a property or attribute of data

6    which may take on a set of values.  As counsel said, I

7    don't think we actually disagree on the general definition

8    of "feature."  That construction comes straight out of the

9    specification.  So the patent does actually describe three

10   different methods of extracting features.  One of those

11   methods extracts byte sequence features, which the patents

12   very clearly describe as a representation of machine code

13   instructions.

14          The other two types of features they don't.

15   They extract either resource information or encoded

16   strings.  And we will get into some of the slides that

17   counsel showed you in particular, the slide with the

18   folder that said "byte sequence feature" and the three

19   different things within it were "instructions," I think

20   the second one was "encoded strings," and then "resource

21   information."  Our problem with their construction is,

22   they have just replaced "byte sequence feature" -- or

23   "feature" with "byte sequence feature."  My point is,

24   "feature" is the generic term.  So you have feature, and

25   that's as we have construed it, "a property or attribute

1    of data which may take on a set of values," and then there

2    are types of features.  One is a byte string feature,

3    which is what is in the claims and what is the dispute

4    here.  And then there are other types of features.  And in

5    that folder, the other types of features was the resource

6    information.  That's a different type of feature, and we

7    will see that in the specification.  And then the third

8    one is an encoded string, which is a different type of

9    feature.  I'm going to pick up where counsel left off,

10   which is starting to talk about the byte sequence feature

11   construction, and then come back to the indefiniteness.

12          Let's first talk about our construction for byte

13   sequence feature.  Go to Slide 6, please.  So you saw,

14   Your Honor saw this Figure 1 in counsel's slides, and we

15   think it is a good starting point.  If you see Box 20,

16   "Extract features from data."  And that's "features," the

17   general features, right?  So we see in the highlighting

18   here "A feature is a property or attribute of data which

19   may take on a set of values."  So the parenthetical is,

20   "such as byte sequence feature."  Counsel pointed that out

21   to you.  What they want to say is, wherever you see

22   "feature," it is a "byte sequence feature."  But no, "such

23   as byte sequence feature."  If we look up a little bit,

24   the second sentence, "Features in a data mining framework

25   are defined as properties extracted from each example

1    program in the dataset, e.g., byte sequences."  So "For

2    example, byte sequences."  Not "Features are byte

3    sequences," but "One example of features are byte sequence

4    features."  So this permeates both parties' briefs, quite

5    frankly, and the dispute is, well, are byte sequence

6    features features, or are byte sequence features one type

7    of feature and that you have these other types of

8    features, which quite frankly aren't claimed, and if they

9    are in the same wherein clause, it is indefinite, because

10   they are different.

11         So I don't think either party really believes

12   that there is a plain and ordinary meaning for byte

13   sequence feature, so we need to go into the specification

14   to see where we would find support for a construction.

15         Let's go to Slide 7.  And this is what counsel

16   pointed out to you, which is part of the basis for our

17   construction, what we will see here, the patent says:

18   "The byte sequence feature is informative because it

19   represents the machine code in an executable."

20         So we heard a lot about hexdumps.  And what

21   hexdumps does basically is it converts a binary file into

22   a hexadecimal file.  And it does that to the entire file.

23   So you have some binary, and then you have hexadecimal.

24   So what happens then?  After the hexdumps are created,

25   features are produced in the form illustrated in Figure 2

1     in which each line represents a short sequence of machine

2     code instructions.  And then later, down the last sentence

3     here, which isn't highlighted, I'm sorry, "Each byte

4     sequence in the program is used as a feature."  Counsel

5     pointed that out as well, to make the point, "Well, it is

6     the entire file, so it can't just be the machine

7     instructions."  But that's what we are saying.  We don't

8     really dispute that hexdump creates conversion of the

9     binary to the hexadecimal of the entire file.  What

10    happens is, after that's created, after hexdumps are

11    created, features are produced in the form of Figure 2 in

12    which each line represents a short sequence of machine

13    instructions.  Those are the byte sequence features.

14            And the patents tell us precisely why byte

15    sequence features are helpful.  Let's go to the next

16    slide.  This is just the same portion of the

17    specification, but what it says is, "In the analysis, a

18    guiding assumption is made that similar instructions were

19    present in malicious executables that differentiated them

20    from benign programs, and the class of benign programs had

21    similar byte code that differentiated them from the

22    malicious executables."  So what this is saying is, the

23    machine code instructions, in whatever format, but in this

24    format they are hexadecimal, the ones we have chosen as

25    byte sequence features, those are the most helpful for us.

1    There are other portions of the file that you have in

2    hexdump or binary, the portable executable file that

3    counsel showed you.  Yes, sure, there are other things in

4    the file.  But what's most helpful for you are the machine

5    code instructions.

6              So you take these byte string sequences, or you

7    take these byte sequence features, which represent the

8    machine code instructions, and those are the most helpful

9    for you.  It says it right here.

10             So then the patent goes on to talk about other

11   types of features that you can extract.  So again, when

12   counsel was explaining these other things like resource

13   information and encoded strings, he was swapping the words

14   "feature" and "byte sequence feature" to say, "Well, these

15   are other examples of byte sequence features."  But no,

16   these are other examples of features.  "Many additional

17   methods of feature extraction are also useful."  According

18   to another approach to feature extraction is to extract

19   resource information, right?  So remember counsel's Slide

20   29, which was the folder, right?  So really, it is

21   features, and one is instructions, which is byte sequence

22   feature.  The next one, "Many additional methods of

23   feature extraction is to extract resource information."

24   So that's the second one.  That's a separate type of

25   feature, and that's what we are looking at here.

1           So let's go to the next slide.  So the patent

2    also, it goes on to talk about how these are alternative

3    methods of feature extraction.  And the first portion of

4    this is now talking about byte sequence feature, and then

5    juxtaposing that to the other types.  "This byte sequence

6    is useful because it represents the machine code of an

7    executable."  That is byte sequence feature.  It goes on

8    to say, "It is understood that the feature extraction

9    step," not byte sequence feature extraction step, "herein

10   is alternatively performed with a binary profiling method

11   in another embodiment as described above and illustrated

12   in Figures 3 and 4."  And that is a byte string

13   representative of resources.  That's the resource

14   information, what we are talking about here in the bottom

15   of the column.

16           So the third type of feature, or method of

17   feature extraction in this patent, is encoded string.  So

18   it is plain text.  That's not really in dispute here.  It

19   is another -- it might be disputed that that is a type of

20   byte sequence feature or not from Columbia's perspective,

21   but from our perspective it is just a third type of

22   feature that's disclosed in the patent.  And that, again,

23   looking at Columbia's Slide 29, that's the plain text.  So

24   this would be features, not byte sequence features.  And

25   in each folder, each little file in that folder would be

1    byte sequence features which aren't machine code

2    instructions or representations of machine code

3    instructions.  The next one would be resource information,

4    and the third would be plain text.

5           So we heard a little bit about the provisional

6    application to these '544 and '907 patents.  And we don't,

7    actually, I don't think we ever said that they were any

8    different.  They are entirely consistent from one another.

9    So let's go to Slide 11.  So the first point, and it is an

10   important point, is that this '622 application, which is

11   one of the provisional applications to the '544 and the

12   '907 patent, that was incorporated in its entirety,

13   incorporated by reference in its entirety into these

14   patents.  Right?  And Your Honor might see some cases

15   cited by Columbia in their responsive brief talking about,

16   "Well, it is not the provisional that matters, it is the

17   as-filed specification."  In fact, the patent in that case

18   that Columbia cited, that wasn't actually incorporated by

19   reference.  So that's distinguishable right there.  But

20   the point is, here, we have the '622 application, which

21   was incorporated by reference in its entirety into these

22   patents.  That makes it part of the intrinsic record.  We

23   don't think the two are different as it relates to what we

24   are talking about here, the claim construction issues for

25   byte sequence feature.

1              So let's go to the next slide.  And there's a
2    lot of information on this slide, but really this is just
3    to show that the description, I'm looking at Slide 12 now,
4    the description of how resource information is extracted
5    from the provisional on the left of the slide is the same
6    as it is in the specification.  For the next slide, again,
7    for the description in the provisional application, the
8    '622 provisional about using hexdump to get byte sequence
9    features, which are machine code instructions, is the same
10   as it is in the specification.  So there isn't much
11   difference between the two.
12             And I'm not sure if we have made that statement,
13   but as we can see, the provisional says the same thing as
14   the '544 application says as it relates to byte sequence
15   feature resource information, which is, they are different
16   features, different types of features.
17             Let's go to Slide 14.  So this is what the
18   provisional application, the '622 provisional application
19   says about feature extraction.  And again, this is part of
20   the intrinsic record, because it was incorporated in its
21   entirety into the '544 and the '907 patents.  So first it
22   says:  "We statically extracted different features," not
23   "different byte sequence features," "We statically
24   extracted different features that represented different
25   information contained within each binary."  Then the next

1    portion of the '622 provisional application says:  "The

2    byte sequence feature is the most informative because it

3    represents the machine code in an executable instead of

4    resource information."  So resource information isn't a

5    type of byte sequence feature, it is a different type of

6    feature.

7                So the '622 application, consistent with

8    Symantec's claim construction, it clearly defines byte

9    sequence feature as representations of machine code

10   instructions, and it contrasts byte sequence features with

11   resource information.

12               That sort of segues us to the indefiniteness

13   portion of this, which -- well, let me, before I go there,

14   the main problem with Columbia's construction, again, is

15   that everywhere they see "feature" in the specification,

16   they want to say, "Well, it actually means byte sequence

17   feature."  Right?  And what they say is, "Well, we have

18   changed the construction a little bit because we added

19   sequence of bytes."  But every program ultimately boils

20   down to a sequence of bytes.  Right?  Professor Szajda's

21   second Declaration, that's to their responsive brief, if

22   you look at it, he basically says, "Well, there are many

23   ways to display sequences of bytes and any sequence of

24   bytes is a byte sequence feature.  You know, some of them

25   could be machine code instructions, some of them could be

1    a portion of the PE header, some of them can be in plain
2    text."  But, "Hey, anything can be a sequence of bytes in
3    a program."  So you follow that logic, if anything in a
4    program, and in this case a potentially malicious
5    executable, can be boiled down to a sequence of bytes,
6    well, then anything can be a byte sequence feature.  But
7    that's not what we have here.  We have "features," and we
8    have "byte sequence features" which were fairly explicitly
9    defined in the specification, and you have other types of
10   information that could be a feature.
11           So we start with the construction for byte
12   sequence feature, because we believe it informs why this
13   wherein clause is indefinite.  So let's go to Slide 15.
14   Now, we have already seen this, but just to highlight, the
15   '544 and the '907 patents are very clear and very explicit
16   that these are additional methods of feature extraction.
17   One is byte sequence feature, another is resource
18   information, and another is encoded strings.  Let's go to
19   the next slide.  And so we have seen the provisional
20   application, we have seen this slide before, right?  We
21   statically extracted different features that represented
22   different information.  And again, in this second quote,
23   "The byte sequence feature is the most informative because
24   it represents the machine code in an executable instead of
25   resource information."

1          So let's go to the next slide.  So this slide in

2    the bottom wherein clause is what we are asserting is

3    indefinite, is you have these two different types of

4    features.  "Byte sequence features" and "Byte string

5    representative of resources" referenced in the same clause

6    here.  And it is nonsensical.  So we had, I think in the

7    beginning of the tutorial, we had, well, you are looking

8    for -- from Columbia's tutorial, you are looking for fruit

9    and you can look for different -- so that's feature, the

10   general class.  But then you are looking for types of

11   features, so you have, I think it was seeds, does it come

12   from a tree, what color is it, right?  So, well, this is

13   saying, well, you have -- you are looking for a fruit and

14   the color also includes the seed, wherein the color is a

15   seed.  That's what this is saying according to that

16   example.

17          Or another, well, you have mammals, right,

18   that's a type of feature, the general class.  And then you

19   have types of mammals.  You have humans and you have

20   dolphins.  This clause here is saying, wherein a human,

21   wherein one type of human happens to be a dolphin.  These

22   two things are sub-classes of feature, but somehow here,

23   resources happens to be a sub-class of byte sequence

24   feature.  And it is nowhere in the specification.

25          Now, counsel pointed you to the Summary of the

1    Invention, and then everywhere else in the detailed

2    description of the embodiment, you don't find anywhere

3    where you see "resources" meaning it is a type of byte

4    sequence feature.  "Resources," or "Representative of

5    resources," might be a type of feature, but nowhere in the

6    detailed description of the embodiment or of the invention

7    here do you see those two things meaning, well, you could

8    have resources that are part of a byte sequence feature.

9    It is only in the Summary of the Invention.  And you can

10   dismiss the Summary of the Invention where it parrots the

11   claim language verbatim.  We have seen cases that say

12   that, and it is cited in our brief.  So if their only

13   evidence for saying, "Well, resources are a type of byte

14   sequence feature" is in the Summary of the Invention and

15   all the other evidence that we have shown you that says

16   they are different, they are different, they are different

17   in the actual detailed description of the invention, well,

18   we think the evidence weighs in favor of saying that they

19   are different.  And that's both in the specification and

20   the intrinsic record, which would be the '622 provisional

21   application, which was incorporated by reference in its

22   entirety.

23            So I think with that, we can probably move on.

24            THE COURT:  All right.

25            MR. BIRNHOLZ:  Brief rebuttal, Your Honor?

1                    THE COURT:   Sure.   Go ahead.

2                    MR. BIRNHOLZ:   Thank you.   A couple of brief

3      points because I know we have a lot to cover today.   So

4      first, once you run this hexdump utility and convert the

5      file into hexadecimal format, there is no way of

6      determining what are the machine code instructions and

7      what are the other parts of the file.   The hexdump just

8      dumps everything in the file.   So opposing counsel's

9      argument is really a mischaracterization of that one

10     passage in the specification.   And when you look at Column

11     6, Lines 31 to 32, it repeats, it says, "Each byte

12     sequence in the --" "Each byte sequence in the executable

13     is used as a feature."   And so that line itself completely

14     undermines the argument that a byte sequence feature is

15     limited to just machine code instructions.

16                    The points, if I could bring up Slide 72.   So

17     counsel said how strings, that's a completely separate

18     embodiment, he made that point.   And that's part of the

19     argument how you have these separate boxes that they are

20     making.   You've got strings and resources and byte

21     sequences and they are all their own boxes unrelated to

22     each other.   Table 1 in the patent is a list of strings

23     that can be executed, that can be extracted from a file.

24     And when you look at the strings that can actually be

25     pulled out of a file that are listed in Table 1, there are

1    examples of things that are resources.  So this advapi

2    that's listed in Table 1, that's also the name of a DLL,

3    which is a resource.  There are text strings that say

4    "Create File A" or "Write File."  Those are resources.  So

5    they are examples of instructions, resource information,

6    and plain text are all examples of byte sequence features.

7    And when counsel said "Every program boils down to a

8    sequence of bytes," I would absolutely agree with that.

9    And those sequence of bytes can be represented in

10   different ways.  They can be represented as instructions,

11   as resource information, as strings, and they are all

12   examples of byte sequence features.

13            And that is clear from the Summary of the

14   Invention, which was not in the provisional application,

15   the detailed description as well, and the provisional

16   itself.  When counsel said, "Well, the provisional is

17   distinguishing byte sequence features from the other

18   information," again, it says that the -- it said, "The

19   byte sequence feature is the most informative because it

20   represents the machine code in an executable instead of

21   resource information like libBFD features."  So all that

22   sentence is saying is that the byte sequences and the byte

23   sequence features that are extracted from hexdump, which

24   is the entirety of the file, is the most informative

25   because it represents the machine code instead of only

1    resource information.  Hexdump is the entirety of the

2    file.  There are other examples in the provisional that

3    are parts of the file.  And the provisional is consistent

4    with the disclosure.  And the Summary of the Invention

5    specifically describes resource -- "byte strings

6    representative of resources" as an example of the byte

7    sequence features that can be extracted.  It is the words

8    "byte sequence feature" and "byte string representative of

9    resources" are used together to describe that embodiment

10   in the Summary of the Invention, and it is explained in

11   great detail in the detailed description.

12           So with that, I think I would urge the Court to

13   adopt our construction that the machine code instructions

14   are nowhere to be found in the construction, and should

15   not be read into the construction of byte sequence

16   feature.  It is a property or attribute of a sequence of

17   bytes, which may take on a set of values, and the claim is

18   logical and makes perfect sense in light of the

19   disclosure.  Thank you, Your Honor.

20           THE COURT:  All right.

21           MR. RUDIS:  May I?

22           THE COURT:  Go ahead, extremely brief.

23           MR. RUDIS:  So the only thing I wanted to add

24   was, counsel said, well, the Summary of the Invention

25   wasn't in the provisional.  Our position is the Summary of

1    the Invention just parrots the claim language.  So it

2    makes sense that the Summary of the Invention wasn't in

3    the provisional because the provisional actually didn't

4    have any claims.  So there was nothing to parrot.  That's

5    all I wanted to add.

6                THE COURT:  All right.

7                MR. BIRNHOLZ:  No surrebuttal or

8    sur-surrebuttal.

9                THE COURT:  Let's move on.

10               MR. BIRNHOLZ:  I realized we have another term.

11   So the last term in this is "e-mail interface."  We

12   believe that the parties' constructions of "e-mail

13   interface" reveal a pretty fundamental dispute that we

14   think is easy to resolve in our favor.  Columbia's

15   construction of "e-mail interface" is hardware or software

16   that interacts with e-mail traffic and other e-mail

17   processing components.  It is a definition that is

18   consistent with the words "e-mail interface" and how it is

19   described in the patent.

20               Symantec's position, you can see, reads in this

21   requirement that the component that reintegrates filtered

22   e-mail back into normal traffic, that it has to do this

23   reintegration function.  Let me explain why this is

24   incorrect.  So first, "Interface."  "Interface" is a term

25   that's used to refer to something that communicates

1    between two things.  In the dictionary, you look up

2    interface, "Some form of electronic device that enables

3    one piece of gear to communicate with another or control

4    another."  "Interface" is something that enables

5    communication.

6            In the context of an "e-mail interface," how

7    might that be understood?  It is something that's going to

8    sit between e-mail traffic and components that will

9    process that e-mail traffic.  And that's how the term

10   e-mail interface is used in the patent.  When you look at

11   the patent specification, Figure 9, Figure 9 in Box 232,

12   which I've highlighted, is "an e-mail interface that sits

13   between e-mail traffic and the rest of the processing

14   components."  And the arrows that go back and forth show

15   multiple functions.

16           The specification describes the different

17   functions that are possible from the e-mail interface.  It

18   can reintegrate filtered e-mails, it can send the model

19   generator, each attachment, it can add warnings to the

20   e-mail, it can quarantine the e-mail, or send copies of

21   attachments to the filter interface.  So these are things

22   I've highlighted on Slide 65 that are examples of what the

23   e-mail interface can do.

24           Now, Symantec's construction just says it has to

25   reintegrate filtered e-mail back into normal traffic.  It

1    is clear that the e-mail interface is not limited to only

2    reintegration.  Sure, that's one function it can perform,

3    but that's not the only function it must perform, because

4    here is an example.  You can quarantine the e-mail after

5    you analyze it.  That's the opposite of reintegrating.  So

6    Symantec's construction would be improperly limited to one

7    embodiment.  And quarantining is the opposite of

8    reintegrating.

9              Symantec says that, "Well, there are other

10   functions that can be performed" and that they need to be

11   set out in the claims and they need to be set out in the

12   construction.  Well, the claims define additional

13   functions that the e-mail interface provides, Claims 32,

14   41, and 42 are examples of additional functions that are

15   spelled out for the e-mail interface.  And it would be

16   inappropriate to read in this reintegration limitation to

17   the claim.  So Columbia's construction is consistent with

18   the ordinary meaning of the term and the disclosure, that

19   it is "hardware or software that interacts with e-mail

20   traffic and other e-mail processing components."  And we

21   would urge the Court to adopt that construction and reject

22   Symantec's much narrower construction limited to only a

23   particular embodiment.

24             THE COURT:  All right.  Thank you.  Symantec?

25             MR. BIRNHOLZ:  If I may, I don't know if we gave

1    a set of our slides to the Clerk.

2            THE COURT:  Sure, go ahead.

3            MR. RUDIS:  Let's go to 19.  I'll be brief with

4    this one, Your Honor.  Columbia doesn't actually use

5    anything in the intrinsic record to support its

6    construction.  All they are using is a dictionary

7    definition and that's simply for "interface."  Our

8    construction, Symantec's construction comes straight from

9    the specification.  And it is the only thing in the

10   specification that is actually done by the e-mail

11   interface.  Maybe it does other things, maybe it could do

12   other things.  The specification is actually pretty clear

13   that it may do things.  But this, the component that

14   reintegrates filtered e-mail back into normal e-mail

15   traffic is the only thing that it actually says it must

16   do.

17           So let's go to the next slide.  And this is

18   where we see a portion of the specification that we are

19   relying on for our construction.  "The results of this

20   analysis," which is the analysis of is it safe or not,

21   "may be sent to the e-mail interface which reintegrates

22   filtered e-mail back into normal e-mail traffic."  So

23   that's what it does if it is safe.  "And which may send

24   the model generator 240 each attachment to be analyzed

25   further."  It may add warnings.  All those other things

1   that counsel pointed out to you, it may do.  If it is in a

2   dependent claim, fine, it may also do that.  But the

3   e-mail interface, the only thing it actually does as set

4   forth in the patent here, is that it reintegrates the

5   filtered e-mail back into normal e-mail traffic.

6            So Columbia's construction is sort of just, you

7   know, "We will find some helpful definition that's sort of

8   hopelessly broad and could mean anything."  But it is not

9   really grounded in the specification.  Our construction,

10  we believe, is, based on this passage of the

11  specification.  That's really all we have on this.

12           THE COURT:  All right.

13           MR. BIRNHOLZ:  Very briefly.  They pointed to

14  the specification, Your Honor, and the one example of what

15  the e-mail interface can do is quarantining.  Quarantining

16  is not reintegrating, so the claim should not be limited

17  to that one element.  Thank you, Your Honor.

18           THE COURT:  All right.  Let's move on to the

19  next family of patents.

20           MR. SHEASBY:  Your Honor, if I may, I have

21  copies of the slides that I am going to show, if I can

22  approach.

23           THE COURT:  Sure.

24           MR. SHEASBY:  Good morning, Your Honor.

25           THE COURT:  Good morning.

1            MR. SHEASBY:  The second family of patents that

2    we are going to discuss, the '084, '306 patents, STEM from

3    the work in the Columbia lab.  And they are actually an

4    interesting set of patents, because they have as their

5    premise that some of the earlier work done at the lab was

6    not as good as it could be.  And I'm going to discuss the

7    historical genesis of these patents because I think it

8    really informs a lot of the claim construction disputes

9    that we are going to hear today on these patents.

10            So we spoke about this tutorial that one of the

11   standard prior art systems for analyzing viruses was to

12   focus exclusively on malicious data.  And there is

13   actually two ways that you can focus exclusively on

14   malicious data.  One of those ways is the signature

15   approach.  And that's what the patentees are discussing in

16   the background of their invention on this Slide 2.  If a

17   virus scanner's database does not contain a signature for

18   a malicious program, the virus scanner is unable to detect

19   or protect against that program.  The prior art signature

20   method is focusing exclusively on evil, exclusively on the

21   bad.

22            There is another type of prior art system that

23   counsel for Symantec pointed out, it is called, what they

24   describe as a misuse system.  I think that's the phrase

25   they use.  Now, a misuse system is also discussed in the

1     background of the prior art.  And what the inventors say

2     about that system is it has the same failing, that what it

3     ultimately collapses into is a focus exclusively on that

4     which is evil.  And if you haven't encountered the evil

5     before, you are not going to be able to detect it if it

6     appears anew.  So we have this prior art construct,

7     whether you use a signature, a fingerprint, whether you

8     use some type of misuse system detection in

9     which -- misuse system detection, the focus of this type

10    of research was "Let's look at that which is evil and

11    let's try to make sure it never appears again."

12            The patent talks about the fact that there is a

13    group of researchers led by Professor Stolfo and others,

14    actually, that spoke to the need to focus in a different

15    direction.  Not to blind yourself, to focus on what makes

16    normal programs normal, what distinguishes normal programs

17    from abnormal programs, and using that so that when you

18    encounter something that you have never seen before, you

19    are allowed, you are able to make a determination that

20    this seems abnormal; this doesn't seem like how normal

21    programs act.  And because of that, because I'm suspicious

22    of this, I'm going to flag it.

23            Creating a model of normal behavior to detect

24    anomalies.

25            Now, what the inventors say, quite bluntly, is

1    that these programs, these anomaly detectors, these models

2    of normal behavior that have been developed, that have

3    been developed by their lab, in fact, between the text on

4    Slide 4 and Slide 5 they actually give the list of the

5    publications that had developed these first generations of

6    anomaly detectors, and many of those publications are

7    actually by the lab itself.  And what they say is, those

8    fail in very important ways.  And they list two in the

9    specification.

10           The first one they list is computational

11   overhead.  The anomaly detection systems are so complex,

12   they take so much resources to run, they run so slowly,

13   that they are just too costly to be effective.  And the

14   second aspect of anomaly detection is that it is actually

15   not as easy as you think to understand how normal programs

16   act differently from abnormal programs.  And the reason

17   why it is actually quite difficult is because even normal

18   programs act in a very irregular manner.  It is tough to

19   create a model of normalcy because there is not a

20   recurrent pattern in computer system activity.

21           So what the inventors proposed, they proposed a

22   number of strategies, but for our purposes today at claim

23   construction, there are actually two strategies that I

24   want to focus on.  The first is that using a series of

25   very elegant experiments, and by "elegant," I mean

1   stripped down, very basic, they were able to determine

2   something quite important.  They were able to determine

3   that focusing on a very, very particular location in a

4   computer allowed you to effectively and efficiently

5   distinguish that which is good from that which is evil.

6   And that location is called the operating system registry.

7   It is a unique structure in the program, unique structure

8   in the operating system.

9           The second strategy that they focused on is

10  something that involves probability.  So what the

11  inventors realized is that simply because you have never

12  seen something before doesn't make it evil.  It may just

13  be new.  And so what their system did is, when something

14  that was not seen before appeared, they were able to

15  assign a probability to it as to what the likelihood of it

16  being evil was.  So let me give you an example.  If I see

17  a program and it has a one in one-billionth chance of

18  being malicious, well, that's a pretty low chance.  So

19  maybe I'm not going to shut down a computer system simply

20  because I've seen something new before that has such a low

21  chance of being malicious.

22          So now let's flip it over.  What if I see

23  something new that has a one in one-fourth chance of being

24  malicious?  That's actually a pretty high chance, and we

25  know that malicious programs can do very serious damage.

1    We think of this as someone trying to get your bank

2    account number.  And for an individual, that's a very

3    serious issue.  But this goes beyond that.  In other

4    words, these systems are used to protect the Department of

5    Defense, to protect our nation's secrets.  This is serious

6    as a heart attack for our nation as a whole.  So a one in

7    four chance is just too high to take so you will stop it.

8    So these two strategies, focusing on these unique, unique

9    structure in the computer system, creating this very

10   elegant probabilistic model, allowed you to both create

11   robust models, because the operating system registry was

12   this perfect environment to be able to distinguish bad

13   from good to what normal computer systems do, and it also

14   allows you to make very intelligent decisions.  Just

15   because something is new, I'm not going to run away from

16   it.  I'm going to make a reasoned decision as to whether

17   given it's new, do I need to be afraid of it.  These are

18   the insights that animate the '084 and and '306 patents.

19          One of the things that I think is neat about

20   this family is, it is not -- you see that this is an

21   academic lab that is doing the research.  In other words,

22   they see this failing, they see this problem, and they

23   attack it directly.  In other words, in the claims

24   themselves, the solutions that they specify are there.

25   "Gathering records of registry accesses."  "Focusing on

1    this unique structure."  "Generating a probabilistic

2    model."  The insights that improve the old anomaly

3    detection systems that they themselves created are in the

4    claims.

5              So there are three terms that are at issue.  We

6    are going to do a ping-pong, so I'm just going to focus on

7    the first term right now, "probabilistic model of normal

8    computer system usage," and then "normal computer system

9    usage" occurs subsequently in the claim, so Symantec, as

10   is their right, would like construction of that as well.

11             There are two competing constructions of this

12   term.  And by competing instructions, it is really two

13   ships passing in the night.  So no party believes that

14   terms that maybe have some jargon associated with them,

15   what's a model, need additional construction.  We feel

16   that's something for right now that the experts are going

17   to be able to inform the jury about.  Columbia believes

18   that the term ultimately and unfortunately that may need

19   some additional construction is "probabilistic."  Because

20   during the meet and confer process it became apparent to

21   us that there may be a dispute there, and we don't think

22   there should be any kicking of the can down the road.

23             Symantec, in contrast, doesn't really want any

24   additional construction of "probabilistic."  What they

25   want is to replace the word "normal" with "typical,

```
 1    attack-free."  Columbia doesn't believe that claim
 2    construction should involve just replacing words with
 3    alleged synonyms, and we don't believe additional
 4    construction of "normal" is necessary.  "Normal" is not a
 5    term laden with technical jargon.  "Normal" is a term that
 6    has a meaning to folks in their everyday lives.  It is not
 7    used in an idiosyncratic way in the patent.  It is not to
 8    suggest that the challenge of determining whether a given
 9    system is normal or not is going to be easy or it is going
10    to be something that a jury is going to be able to do
11    without an expert explaining the system to them, but it is
12    not really about claim construction.  It is about
13    something else.  It is about comparing the system and the
14    nature of that system to the understanding of the term.
15              So let's jump right into the three
16    disagreements.  The disagreement on "probabilistic."
17    Symantec's original position was that "probabilistic"
18    meant something called "based on a probability density
19    function."  The problem with that is it once again kicks
20    the can down the road.  I actually don't know what is
21    meant by a "probability density function."  And it is just
22    going to create another debate the morning of expert
23    reports.  And we pointed out to Symantec in the meet and
24    confer process, we really didn't think that was right.  We
25    proposed what we thought was a correct construction of
```

1  "probabilistic" and Symantec responded to us and said,

2  "Okay, let's just say it is the plain meaning and move

3  on." We said, "That's okay, we have no problem with that.

4  But are you saying, do you think the plain meaning is a

5  probabilistic density function?" They say, "We reserve

6  the right to say the plain meaning is a probability

7  density function." I think that's a recipe for dispute.

8  I do think we need to engage it if that's in fact where

9  the dispute is going to lie. "Probabilistic" as used in

10  the intrinsic record is consistently described as a model

11  that provides probability. I don't think that is subject

12  to great debate. "Probability" also is not a term that

13  has an idiosyncratic meaning in the specification. This

14  is a standard accepted definition of "probability" on

15  Slide 13. And if you look in the specification you see

16  the resonance to that standard accepted definition. You

17  see the consistent repetition of the probabilistic model

18  creating a likelihood. So Columbia believes that its

19  construction shows fidelity to the specification. And the

20  probability density function proposal, our concern is that

21  that just delays to a later point in time some fight about

22  what that language is going to mean.

23         So I want to jump to the second area of dispute.

24  I'm now on Slide 17, Your Honor. This relates to

25  redrafting the claim by replacing "normal" with "typical,

1   attack-free."

2          So there are portions in the specification that

3   uses the words "typical" or uses the words "attack-free."

4   What's significant is that we know the inventors knew how

5   to write the words "typical, attack-free" because they do

6   it in discussing certain embodiments in the specification.

7   What they did not do is use the phrase "typical,

8   attack-free" in the claims.  In the claims, they make

9   reference to a "model of normal behavior."  Not a "model

10  of typical, attack-free behavior."

11         And this is another symptom of, I think, kicking

12  the can down the road.  Replacing "normal" with "typical,

13  attack-free" doesn't do anything.  It doesn't add clarity.

14  It doesn't resolve any debate.  It just leads to a further

15  fight about what "typical, attack-free" means, in

16  particular, what does "typical" mean, and in what context,

17  as to whom.  We are not really engaging in anything

18  substantively; we are just replacing words.  The Federal

19  Circuit is actually pretty conscious of this.  If you read

20  the C.R. BARD decision, this is one of many, one of the

21  things the Federal Circuit is not shy about reminding

22  courts of is that claim construction is not claim

23  redrafting.  The process of replacing one word with an

24  alleged synonym doesn't advance the claim construction

25  process.  All it does is, it fails to show fidelity to the

1    primary source of claim construction, which is the claim

2    itself.  If we need to have a discussion about what

3    "normal" means, let's have a discussion.  Let's not have a

4    discussion about what the words "typical, attack-free"

5    mean because those aren't in the claims.

6              The Federal Circuit also points out this

7    challenge in the PPG decision.  Claim construction is not

8    the process of setting out the test that's going to be

9    used to assess infringement.  Some words only have a

10   certain amount of precision associated with them, and the

11   Federal Circuit recognizes that.  The step of taking that

12   to the infringement analysis is for the jury, not the

13   judge.  And this is a standard that I don't think is

14   always applicable, but I think it may be applicable here.

15   In other words, "normal" is used consistently in the

16   specification.  There is not a test that says this is the

17   definitive test for normal in the specification.  It has

18   its plain and ordinary meaning.  And the task of applying

19   that plain and ordinary meaning is really for the jury.

20   It is not a question of claim construction.

21             So now let's go to the third dispute, which is

22   Symantec's request for negative limitation excluding any

23   consideration of abnormal access information.  Let me

24   unpack this.  So what Symantec appears to be saying is,

25   and I think the reason why they want the "typical,

1    attack-free" language to be put in the claim, is they are

2    going to subsequently say, "And typical, attack-free, if

3    your model is a model of what is typical and attack-free,

4    you will never, ever, ever consider any other data in

5    constructing that model other than data on normal

6    activity.  You will blind yourself to everything else.

7            When we spoke earlier this morning I spoke about

8    the fact that creating a model of what it means to be an

9    apple, how much more robust and meaningful that model can

10   be when you think about not just what an apple is but how

11   an apple is different from an orange.  It creates a more

12   meaningful model.  And what Symantec is saying is that the

13   inventors somehow told the workers who would read this

14   patent, "We want you to blind yourself on every other type

15   of data.  You can consider data based on normal activity,

16   but do not consider any supplemental data on abnormal

17   accesses when constructing the model."  The standard for

18   importing this type of negative limitation, the claim

19   involves manifest exclusion, a clear disavowal, a clear

20   and unmistakable disclaimer.  None of this appears in the

21   patent.  And this is not a "Gotcha."  This is not saying

22   "Ha Ha, we didn't disclaim it all the way."  The reason

23   why none of this appears in the patent is this patent is

24   not about whether you consider supplemental abnormal

25   information.  It has nothing to do with this patent.  This

1    patent is about very important scientific observations

2    about the nature of the operating system registry and

3    about the powers of probabilistic models.  And those

4    important insights can be applied whether you use 100

5    percent normal data or whether you supplement your normal

6    data with abnormal data.

7         So let me tell you what I mean.  Let's assume

8    that you have a training set data with three programs.

9    All those programs are normal.  Function A, Function A,

10   Function A are all performed by those programs.  Think of

11   the Function A as a feature of what the program is doing.

12   You can say, "I'm going to create a model of normal

13   behavior and that model of normal behavior is that if you

14   perform Function A you are normal."  What if you have a

15   Program 4, and that Program 4 is abnormal?  It performs

16   Function A, but it also performs Function 1.  Having that

17   information about how supplemental abnormal programs work

18   allows you to create such a more meaningful model of

19   normal operation and your model of normal operation is

20   that Function A is normal as long as it is not in

21   combination with Function 1.

22        So that's really the dispute.  That's, I think,

23   the bidding.  Symantec is saying the inventors clearly and

24   unequivocally told workers to blind themselves totally and

25   completely to anything other than this.  Even though it is

1    absolutely undisputed that the prior art made clear, the

2    publications of these own inventors, that there is meaning

3    and power to considering supplemental abnormal data.  And

4    even though this patent has nothing whatsoever to do with

5    excluding supplemental abnormal data.

6          So I think what Symantec is doing is really

7    confusing two questions.  The first question, and it is an

8    important question:  What is the subject of your model?

9    The second question:  What what is the information you use

10   to construct that model?  They are distinct.  Question 1,

11   what is the subject of the model in the patents?  The

12   claims answer this.  A model of normal computer system

13   usage.  Question 2:  What information is mined to

14   construct the model on normal computer system usage?

15   Well, the patent is also explicit about that.  If you are

16   constructing a model of normal system usage, you, of

17   course, have to consider the normal operations of

18   programs.  That's of essence.  And the specification makes

19   that clear, that you need to do that.  And in particular,

20   you need to determine a very, very particular type of

21   normal activity.  The specification says, "I want you to

22   consider normal activity that relates to accesses to the

23   registry," that unique feature that is animating the

24   research that led to this patent.

25          But what the claims don't do, the claims don't

1    say, "And I want you to exclude all other information."

2    Claims list what must be present.  Claims don't list

3    the -- the fact that they list something that must be

4    present doesn't mean that other things are excluded.

5           So in Symantec's responsive brief, I think they

6    did something interesting.  What Symantec said is, "Well,

7    we are not arguing there is a disclaimer.  We are not

8    arguing that there is any statement that says you can't

9    consider supplemental abnormal data in constructing your

10   model.  Our problem is there is no embodiment that exists

11   in the specification that uses supplemental abnormal

12   data."

13          So the Federal Circuit has also spoken clearly

14   on that issue.  What the Federal Circuit has said, en

15   banc, in PHILLIPS, is if you assume that every single

16   embodiment in the specification, every single one said

17   openly and clearly, "I want you to exclude all

18   supplemental abnormal data, when you are creating your

19   model of apples, you look just at apples and you blind

20   yourself to oranges," if every embodiment in the

21   specification said that, what the Federal Circuit en banc

22   in PHILLIPS has said is, that is not a basis for importing

23   that limitation into the claims.

24          Once again, this is not a gotcha.  This reflects

25   how patent attorneys write patents.  The purpose of a

1    patent is not to lay out all the different ways in which

2    these new inventions can be applied to the prior art.  It

3    is not to list all the different anomaly systems that can

4    take advantage of the probabilistic models, that can take

5    advantage of tracking registry system accesses.  It is to

6    give to the public, give to the world, that which is

7    novel, that which is important and is new.  That's

8    reflected in the claims.

9           Registry system access.  Probabilistic model.

10   The inventors of this patent did not give to the public

11   the idea of blinding yourself to supplemental abnormal

12   information.  That's not their invention, and it is not

13   what they are teaching.

14          So Symantec makes another interesting argument.

15   They say the ordinary meaning of the term "model of normal

16   behavior" is the exclusion of any supplemental abnormal

17   information.  So I think what's interesting about this is

18   what Symantec has ended up doing is they have ended up

19   conflating those two questions that I spoke about earlier

20   today.  Symantec's proposal for the construction of model

21   of normal behavior is a model of typical, attack-free

22   behavior.  Even their discussion, their construction, is

23   defining what the model is.  Their construction doesn't

24   define what the model includes, what is used to create the

25   model.  And so for them to say, "Well, our argument is

1    about the plain and ordinary meaning of a model of normal

2    behavior" doesn't really answer the question, because

3    that's about what the model is.  It is not about what is

4    used to construct the model.

5              So there are, I think, three points that I think

6    address this argument about the normal, ordinary meaning

7    of a model of normal behavior.  The first is the

8    inventions do not exclude supplemental abnormal

9    information.  We will talk about why that's the case.  The

10   second thing we will talk about is the prosecution history

11   makes absolutely clear that systems that use supplemental

12   abnormal information, in addition to normal information,

13   to construct their models, are covered by the claims.  And

14   the specification actually teaches that supplemental

15   abnormal information can be used.

16             So let's jump right in.  I showed this slide

17   previously, but I think it is really important to

18   emphasize.  The drawbacks, the failings in the prior art

19   that are described in the specification have nothing to do

20   with the use or absence of supplemental abnormal

21   information.  Nor for that matter do the insights that are

22   described in the specification.

23             When the specification talks about prior art,

24   whether it is the signature method or whether it is the

25   intrusion method, the failing of those methods is because

1    they blinded themselves to normal information.  They

2    focused exclusively on abnormal information.  That was the

3    failure.  That was what they thought was deficient.  The

4    inventors never said, "Oh, we think it is horrible to

5    supplement your normal information with abnormal

6    information in every single situation."  There are

7    situations in which it may be appropriate not to use

8    supplemental abnormal information.  There are certain

9    stripped-down algorithm designs in which your algorithm

10   can't actually handle supplemental abnormal information.

11   It is not complex enough.  But to say there are designs in

12   which you would not supplement has nothing to do with a

13   clear and unmistakable disclaimer of that strategy in

14   every single situation which the Federal Circuit

15   specifies.

16        So one of the things that Symantec does and they

17   do it in each phase of their argument for the families is

18   that the original provisional applications for these

19   specifications, they weren't fancy, written provisional

20   applications.  They were in most situations just

21   manuscripts that the inventors had written, that they were

22   excited about, that they wanted to file a patent on, so

23   they wanted to get it filed.  This was very important

24   because in Europe, the standards for anticipation are much

25   different than in the United States.  And in many, many

1   situations, as soon as the work was done, Professors

2   Stolfo and Keromytis were on a plane to present the work

3   at a conference.  So that would be a problem in Europe, so

4   they filed these manuscripts.

5          What I think is neat about these manuscripts is

6   they weren't written by patent attorneys, they weren't

7   written by people looking to define terms or do the stuff

8   you need to do to make a good patent application.  They

9   were just written with the science in them.  And if you

10  look at the conclusion of this provisional application,

11  the conclusion of this provisional application, this

12  article, what they were excited about was the power of the

13  registry access.  In fact, they were so excited about it,

14  they said, "We think you can do this, this anomaly

15  detection, looking only at registry access information."

16  What they did not say in the conclusion is to blind

17  yourself to supplemental abnormal information.  Because

18  that's not their invention.  That's not the intent of this

19  patent.

20         In fact, they were blunt.  They said, "We used

21  very unsophisticated algorithms in performing these

22  experiments."  And they did.  But what they also said is,

23  "We expect that you will do a much fancier job of this

24  than we did.  Because our goal was to capture the insight,

25  not to use all the different embodiments -- not to

1   disclose all the different embodiments that could practice

2   this insight."

3              Let's talk about the prosecution history now.

4   So during the prosecution of the patent, the Patent Office

5   rejected our claims over a reference called Chong.  And if

6   you read Symantec's brief, they say, "Well, Chong is an

7   interesting reference because Chong actually uses mixed

8   data.  It uses normal data, it supplements it with

9   abnormal data, you use all the data to construct a model."

10  And they said the fact that the Patent Office allowed our

11  claims over Chong shows that our claims don't cover the

12  mixed data situation.  But there is something very

13  interesting, and it relates to what actually happened.

14  The PTO allowed our claims over Chong not based on this

15  issue of supplemental abnormal data.  To the contrary, the

16  PTO felt that the fact that Chong used supplemental

17  abnormal data that he knows that it was within the scope

18  of the claims, which would only be possible if those

19  claims covered the use of supplemental abnormal data.  The

20  PTO allowed the patent over Chong because Chong didn't

21  disclose tracking registry accesses.  That was the basis

22  for the allowance.

23              The insight, what made them so excited when they

24  wrote that conclusion in that manuscript, was the basis

25  for the allowance.  Chong was not anticipating because it

1    didn't track registry system access.  There was nothing,

2    no statement that the claims didn't cover Chong because

3    Chong used supplemental abnormal data by the Patent

4    Office.  In fact, the Patent Office concluded, we were out

5    of luck on that limitation.

6           So let's dive in and get a little more

7    information.  So when Columbia received a rejection based

8    on Chong, its immediate reaction is that, "Well, Chong is

9    really only considering attack data.  If you read the

10   specification, it is really focused on just considering

11   attack data.  And that is different from the claims.  The

12   claims require you to consider normal data."  Absolutely.

13   But the PTO said, "You know what?  We disagree with that.

14   We think Chong covers both abnormal and normal data

15   together."  And Symantec said this as clear as anyone.

16   They said, "The dataset in Chong used to generate the

17   models includes data representing both typical network

18   behavior and attacks."  That's Symantec's position.  Chong

19   was rejected, the claims were rejected as anticipated,

20   which means each limitation must have been in the Chong

21   reference over Chong, even though this is what Chong

22   disclosed, mixed data.

23          The PTO's conclusion was impossible if the

24   claims didn't cover normal and abnormal data.  What the

25   PTO said right there, that's the basis for allowance.  Not

1    mixed data being outside the scope of the claims.

2            Registry access.  So let's jump into the third

3    section of our discussion, which is what the specification

4    says.  So there are embodiments in the specification that

5    clearly use abnormal information to build out the model.

6    There are incorporated articles in the specification which

7    discuss the construction of anomaly detectors, models of

8    normal behavior with mixed data.  And of course the

9    incorporated '342 application uses abnormal information as

10   well.  I want to focus in the first instance on the first

11   bullet point, because I think the last two are discussed

12   at length in the specification -- in the briefing.  I want

13   to give two examples.

14           So one of the passages that Symantec quotes from

15   extensively is this construction of an embodiment in which

16   in the first steps they are only using clean data, 100

17   percent clean data, to build out the model.  And Symantec

18   quotes from that saying, "See, Aha, they are only using

19   clean data.  That's what the claims are limited to."  Then

20   Symantec quotes this sentence at the top of Slide 46,

21   "Anomaly detectors do not operate by looking for malicious

22   activity directly."  And they are right.  That's not how

23   anomaly detectors models of normal behavior work.  They

24   try to understand how normal divergence from malicious in

25   order to make a determination.

 1              But then the inventors go on to discuss a

 2    problem with the model they are constructing, this model

 3    that only used clean data in the first instance.   What

 4    they say is, "Well, one thing we have noticed is that we

 5    are tracking the registry, and when new programs are added

 6    to the registry, when new programs are added on to a

 7    computer, the registry activity is intense, and that is

 8    going to appear as an anomaly, because it really doesn't

 9    occur very often with 100 percent clean data."   And we

10    have a problem with that.   And the problem we have with

11    that is that there are many instances in which perfectly

12    benign activity will add new programs to the computer.   So

13    when you plug in a Sony phone into your computer for the

14    first time, you will get what's called an Install Wizard

15    saying, "I'm going to add a driver to the program."   So

16    that is a graphical representation of something that's

17    occurring in the registry.   An alarm has gone off in the

18    registry, saying, "I'm adding a new program."

19              So what the inventors pointed out is that if

20    they just stopped there, left the model just focused on

21    100 percent clean data, they would always be triggering as

22    malicious the addition of new drivers to the program,

23    which means no one could ever use the computer, because

24    every time I plug in my phone, a new phone or a new

25    camera, the computer would shut down as detecting a

malicious attack.

So what they say is, "Here is what we have
noticed.  We are going to look at how malicious programs
act differently from normal programs.  Malicious programs
often install quietly so that the user does not know the
program is being installed."  So they have seen the
problem, they have seen the failure with their model, a
model that focuses only on 100 percent normal data, and
they said, "We are going to adjust the model to take into
account the differences between normal and abnormal.  And
the difference that we have seen is malicious programs
install quietly, so we are going to create a new rule, and
that new rule is that in our exemplary embodiment, the
algorithm is programmed to ignore alarms while the install
program is running."  If the install program is running it
is not a quiet installation.  Everyone knows the program
is being added.  And that's not dangerous.  The ones you
are scared of are the ones that are secret.

This is a very stripped down example, because
remember, the inventors were doing this purely for the
purpose of creating a design that they could test a
hypothesis with.  But even in this stripped down example,
they are not blinding themselves to abnormal data.  They
didn't write the specification and say, "Well, we
constructed a model of normal behavior and it is really

1    not very good because it catches every time you plug in

2    your new camera to a computer.  Oh, well."  They said,

3    "No, we are going to enrich this model, we are going to

4    enrich this model with information on malicious behavior."

5    This is one example.  It is one example.  It is not a

6    massive example.  This is not a massive experiment.  It is

7    a very, very small experiment.

8              But this shows something.  You don't blind

9    yourself.  They looked at apples, then they looked at

10   oranges, and they said, "How are oranges different from

11   apples?"  And they used that to make the model more

12   robust.

13             Let me give you another example.  The design in

14   the specification, very stripped down design, set

15   thresholds, probability thresholds.  If you are above the

16   threshold, the risk of you being malicious is so great we

17   are going to cut you off.  If you are below the threshold,

18   we are going to let you through.  So once again, they are

19   originally constructing the model using clean data, and

20   you will see a lot of references to that in Symantec's

21   presentation, is my expectation.  And that's right, they

22   usually start with clean data in their stripped down

23   embodiment.  But what they do is, they then test the model

24   to adjust it.  They expose the model to normal and attack

25   data, data they know is normal and data they know is an

1    attack.  And they run the analysis.  You see those numbers
2    on Slide 50?  Those are really setting thresholds,
3    probability thresholds.  And what they are experimenting
4    with is they are experimenting with is, "Where should we
5    set the threshold on the model."  I'm on Slide 51.  You
6    can see this expressly.  They are texting mixed data and
7    using that information that they gather from the mixed
8    data to refine the model, to adjust the thresholds.  It is
9    once again a very minor example, but it is an example in
10   which you don't blind yourself to data.
11          So the reason why these are such minor examples
12   is not hard to gather.  The purpose of these experiments,
13   the purpose of this patent, is not about whether you use
14   mixed data or 100 percent clean data all the time, whether
15   you supplement, whether you adjust, whether you blind
16   yourself.  That's not what these experiments are about.
17   These experiments are about defining core principles of
18   the power of probability in this system, about the power
19   of the registry system accesses.
20          So two other points:  Incorporated articles use
21   abnormal information.  I won't go into this in great
22   detail because it is extensively set out in the briefing
23   unless Your Honor would like me to address it in greater
24   detail.  I think it is important to point out what the
25   inventors did is they said you can build anomaly detectors

1    based on models of normal behavior, and we are going to

2    give you a ton of ways you do that.  They cited their own

3    articles.  Many of those articles discuss the efficacy of

4    using mixed data.  That's a completely different area of

5    research, and the inventors are actually one of the

6    forebears in presenting the power of mixed data.  But they

7    are not going to touch it because it is not what this

8    patent is about.  This patent is about something

9    different:  Whether you used mixed registry access data,

10   100 percent clean registry access data, the key for the

11   inventors is you have to look at the registry.  The same

12   holds for the '342 application, once again, I won't repeat

13   what's in there, Your Honor, unless you would like me to

14   address it in any particular detail.

15            So I think with that, what I would like to do at

16   this point is save a very short period of time in rebuttal

17   and pass the podium off to my colleague.

18            THE COURT:  All right.  We will take ten

19   minutes.

20            (Recess taken from 11:31 a.m. to 11:46 a.m.)

21            THE COURT:  All right.

22            MR. NELSON:  Thank you, Your Honor.  Dave Nelson

23   on behalf of Symantec again.  So let me get right to this

24   first construction issue.  We can go to Slide 23.  In the

25   book we gave you all the slides together so everything

1    should be there that we are referencing for the most part

2    today.

3         So let me address this, the first issue, what I

4    think is the more critical by a long shot issue with this

5    construction, and that's the definition of "a model of

6    normal computer system usage."  Now, what Columbia is

7    saying is that doesn't need to be defined.  "A model of

8    normal computer system usage" requires no construction,

9    because everybody knows what it is.  It is just normal and

10   everybody knows what normal is.  That's a problem.  We've

11   got a big problem in the briefing and the argument you saw

12   here leads you right to what that problem is, Your Honor.

13   Because the goal is not in claim construction, well, if I

14   use words that somebody in context -- I mean out of

15   context might know what it is in some certain context,

16   then there is no need to define it.  That's not what the

17   exercise of claim construction is.  What we are supposed

18   to to be doing is looking at the terms that are used in

19   the context of the description of the invention that's

20   provided by the specification.

21        So what we have here, and you can see from the

22   argument and from the briefing, we have what I would call,

23   because patent lawyers always abbreviate cases, it is an

24   02 MICRO issue.  O2 MICRO is the Federal Circuit case that

25   says when there's an issue of claim scope, it is up to the

1    Court to resolve that issue.  And I think we have a very

2    fundamental issue of claim scope here.  Because with

3    respect to the Symantec construction and what we believe a

4    model of normal computer system usage is, it is one that

5    doesn't include attack data.  It is based on normal

6    computer system usage, which is attack-free, typical,

7    attack-free data.

8           What do you hear from Columbia?  You don't hear

9    anything because they don't want it to be construed.  But

10   they say, "Well, it can include attack-free data, or

11   excuse me, attack data.  It can include anything as long

12   as I can have an expert sit up there and say, 'Well, it is

13   normal, it has some normal data in there,'" and that is a

14   claim construction issue, Your Honor.

15          So let's go to the next slide, 24.  Columbia,

16   they are trying to turn around what's really going on here

17   and trying to say that we, Symantec, are arguing for a

18   disavowal.  In other words, that they disavowed the use of

19   attack-free data, or excuse me, attack data when creating

20   a model of normal computer system usage.  That's not what

21   is going on here at all.  What we are trying to do is in

22   the context of the intrinsic record look at how the

23   inventors themselves described and defined what a model of

24   normal computer system usage is.  That's the issue here.

25   There is no disavowal being argued.  So that is an attempt

1    to turn around what's going on here, to try to support

2    their position that, Your Honor, I think the term used by

3    my colleague was "kick the can down the road."  That's

4    exactly what they are asking you to do.  "Kick this can

5    down had road so I can have an expert sit up on the stand

6    and say, 'Hey, I know normal when I see it, and this is

7    it.'"  So this is not a disavowal situation at all.

8            So now let's talk about, if we go to the next

9    slide here, what it is we are doing.  Because as I said,

10   Your Honor, and you see we have a few cases, they are

11   highlighted in the brief, but what we are trying to do in

12   the context of claim construction is to look at how the

13   inventors described their invention.  Look what it is,

14   look how they use these terms in the context of the

15   specification, and give those terms a meaning in that

16   context.  Not just divorced from the specification, not in

17   the air so somebody can come along and argue later, "Well,

18   this is normal."  That's what we are trying to do here,

19   Your Honor.

20           So let's go now and start looking at some of the

21   ways that the specification talks about the invention,

22   which is an anomaly detection algorithm.  I don't think

23   there is any dispute there.  That's what both of us said

24   in the background argument.  So here, this is from Column

25   2, Lines 34 to 37 of the patent, and this is, our

1     citations, Your Honor, are to the '084 patent in these

2     slides.  The specifications are pretty much identical, and

3     therefore, we didn't cite to both of the -- the '306 is a

4     continuation, so it is primarily where the differences are

5     maybe in some of the claim language.  So that's why the

6     citations are that.  But here we see, "Anomaly detection

7     algorithms may build models of normal behavior in order to

8     detect behavior that deviates from normal behavior."

9     That's what they are trying to do.  That's the way the

10    inventors set up their particular system and distinguish

11    if from some of these other signature-based systems,

12    misuse systems you heard talked about earlier today.

13          So here then, if we go to Column 7, "Anomaly

14    detectors, such as Anomaly Detector 16," if you look in

15    the patent, that is just a block diagram of the

16    description of the invention here, "do not operate by

17    looking for malicious activity directly.  Rather, they

18    look for deviations from normal activity."  So that's the

19    way these systems work.  Let's figure out what's normal,

20    and then let's look for deviations from that normal

21    activity to determine if something is an anomaly, in other

22    words, in this instance, an attack.

23          So the patents also talk about, if we go to the

24    next slide, how you do that.  This is from Column 6, Lines

25    26 to 32.  And it says:  "If a model of the normal

1   registry behavior is trained over clean data, then these

2   kinds of registry operations will not appear in the model,

3   and can be detected when they occur."  So in other words,

4   I look at the clean data, I look at the data to create my

5   model of this is the normal behavior for this system.  If

6   I see something different from that, then I detect that as

7   an anomaly.  That's the way these systems work.

8           So let's go to Slide 29.  And here, in the

9   example that's provided, this is in Column 15, 4 through

10  16, about how that model was created, it is specifically

11  stated to be generated by clean, meaning attack-free

12  dataset.  This is approximately 500,000 records that were

13  used here.  So that's the example that's given in the

14  specification.

15          Now, you heard counsel at the end of his

16  argument say, "Well, there's some other systems that talk

17  about using abnormal data in order to create the model."

18  No, no, that's not right.  If you go in and look at the

19  patent, and you'll see this from the briefing, when they

20  talk about creating the model, it is clean, attack-free

21  data.  What counsel was talking about was the second step

22  when you are doing the comparison of some observed

23  activity, you can adjust the threshold.  That's

24  determining how unlikely the event is going to be.

25  Because remember, it is not just a simple yes, no.  There

1    is this probability that's associated with it.  And so the

2    things that counsel was citing to were directed towards

3    that, the adjustment of this threshold when you are doing

4    the comparison to see what kind of behavior you are going

5    to tolerate before you trigger an alarm that there is an

6    attack, not to creating the model that's used to establish

7    the baseline to which the observed activity is compared.

8              So now, let's go to Slide 30.  And this may

9    require a little bit of background.  There was some talk

10   of this during counsel's argument, but let me provide a

11   little background here.  There may be a question in your

12   mind, Your Honor, why the parties are talking about a '342

13   application, why the parties are talking about perhaps an

14   earlier provisional application.  Let me give you a little

15   bit of background.  Both this '342 application, it was an

16   application that was filed the same day as the application

17   that eventually gave rise to the '084, and then as a

18   continuation, the -- I'm forgetting the number -- '306.

19   Six numbers is too many to keep in my head for me, Your

20   Honor, I'm sorry.  The '306.  So it was filed the same

21   day.  It is also incorporated by reference, and you saw an

22   earlier citation in the argument of how that was done.  So

23   this description was incorporated into reference, the

24   '342, so it becomes part of the intrinsic record.  It is

25   part of the things you want to look at when you are trying

1    to figure out what the inventors told those of ordinary

2    skill in the art about the invention and how they

3    described some of these terms.

4              The provisional application, the same.  So, you

5    know, sometimes, Your Honor, with a provisional

6    application, you may file it, and then within that year

7    period, you go ahead and file the full utility application

8    with the claims and everything, and you can just cite back

9    to that provisional application and say, "Well, I'm

10   claiming priority back to that date."  Then there may be a

11   dispute about exactly what is supported and what's

12   disclosed.  That's one way you can do it.

13             And there was some cases cited by Columbia

14   saying, "Well, don't look to that provisional because

15   there could be lots of changes."  Well, those are cases in

16   that, when we read those cases, in that context where

17   there may be a number of changes to the final document,

18   and there's discrepancies between the way the final patent

19   specification discussed the invention or described certain

20   terms, and the way it is done in the provisional.  This is

21   a different situation, because we actually have the

22   provisional as well as this '342 application incorporated

23   by reference.  So in other words, they are telling the

24   public, "Go back, if you need more description of these

25   things, and look at these applications because they will

1   provide you additional description about some of the

2   things that we are using."

3            So in its brief, this is in the response brief,

4   Columbia looks, they cite a number of things from this

5   '342 application, the one that's filed the same day.  And

6   one of the things they do is to say, "Well, of course,

7   Symantec must be wrong, because that '342 application

8   describes a data warehouse."  In other words, where all

9   these records are maintained.  And if you look at the face

10  of the '084 patent, for example, you will see, Your Honor,

11  for example, Box 18 that's labeled a "data warehouse."

12  There is no dispute there.  That is where information is

13  taken from in order to create these models, in this case,

14  the model of normal computer system usage, so that you can

15  later do the comparison of the observed activity.

16           Well, what Columbia says is, "In that

17  application," the '342 application in this context, "that

18  data warehouse is described to have both clean data and

19  attack data."  No dispute there.  It is.  But that same

20  '342 application is also very clear, and if we go to the

21  next slide, 31, this is Paragraph 69, what it is teaching

22  is that in order to build certain models, and we see right

23  here the paragraph I have highlighted, different types of

24  model building algorithms require different types of data.

25  And I'll go into this a little bit more, but the '342

1    application, it says explicitly, "Okay, a data warehouse,

2    I have a whole bunch of records in there.  But the records

3    that I use in order to create a model have to be tuned,

4    selected, filtered," what term you want to use, "to the

5    particular algorithm that I am going to use in order to do

6    my detection."

7            So the fact that the '342 application may talk

8    about a data warehouse that has other records in it is

9    really irrelevant to the question.  And in fact, the '342

10   application is very clear that the particular type, the

11   anomaly detection algorithm that we are talking about here

12   in the '084 patent requires clean, attack-free data.  And

13   let me explain that a little bit more.

14           So here, Your Honor, if we go to Slide 32, this

15   is also from that same '342 application incorporated by

16   reference.  It says that "Anomaly detection algorithms

17   train over normal data to create a model of normal

18   activity.  These algorithms need to train over data that

19   contains no intrusions."  "No intrusions."  In other

20   words, no attacks.

21           So it says that explicitly.  Now, does that same

22   '342 application describe other systems?  Sure.  It

23   describes things like unsupervised anomaly detection

24   systems.  Another one in there that "may use clean and

25   dirty data."  But that's a different system from the one

1    claimed in the '084 patent.  And I will show you that

2    Columbia agrees with that in a moment, Your Honor.  So

3    that's a different system.  They talk about misuse

4    detection systems.  That was one that both myself and

5    Columbia's counsel described as being something that the

6    inventors talked about in the prior art.  I think during

7    Columbia's argument they said one of the criticisms of

8    these misuse detection systems was that they were

9    computationally intensive, I think was the citation they

10   had.  And that that was a problem.

11        Well, if we look at Paragraph 102, and you

12   actually don't have this slide, we will get this to you,

13   Your Honor, but this is Paragraph 102.  This is describing

14   one of those misuse detection algorithms.  Not what's

15   claimed in the '084 patent, but a different one that

16   everybody agrees is prior art.  What does it say?  It

17   says, "Misuse detection algorithms train over normal and

18   attack data.  Using this data, these algorithms build a

19   model that can discriminate between attack records and

20   normal records."

21        But if you look down, it talks about those

22   disadvantages, the same disadvantages that counsel pointed

23   to.  This data is very expensive to obtain; it may not be

24   portable; it requires labeling; training in data.  In

25   other words, computationally intensive.  So yes, there are

1   misuse detection systems that are described here that use

2   both norm normal and attack data, but that's not the

3   system that's claimed.  In fact, that's one of the systems

4   that the inventors criticized in the prior art because it

5   required this computationally-intensive approach in order

6   to obtain.  Yet, Columbia would tell you that we could do

7   exactly those things with the model of normal computer

8   system usage, it contained normal and attack data.  But

9   that's what they criticize the prior art having.  So what

10  we want to focus on is the anomaly detection system,

11  because that's what's claimed here in the '084 patent.

12          If we go to the next slide, 33, back in the

13  slides that you have, Your Honor, you will see that

14  Columbia agrees with this point.  This is from Page 20 of

15  their response brief.  And this is in reference to that

16  same '342 application that we were discussing, Your Honor.

17  It says:  "The '342 application confirms that its diverse

18  datasets can support a wide variety of different intrusion

19  detection systems."  I talked about that.  Sure, the '342

20  application talks about that.  But let's focus on the

21  specific one that's being claimed here in the '084 patent.

22  One example is the Registry Anomaly Detection, RAD,

23  system, which is described in greater detail in the '084

24  and '306 patents.  That's Columbia itself, the RAD system,

25  that's the one to focus on.  It is the anomaly detection

1    system.  If you look actually in Column 4 of the '084

2    patent towards the bottom right when we begin the detailed

3    description of exemplary embodiments, it makes the same

4    reference to that RAD, Registry Anomaly Detection system

5    as well, just as further confirmation.

6           So I pointed to you a minute ago, Your Honor,

7    and that was in Slide 32, that this is from the '342

8    application, that "Anomaly detection algorithms,"

9    according to this '342 application of which this registry

10   anomaly detection system is one, "train over normal data

11   to create a model of normal activity.  These algorithms

12   need to train over data that contains no intrusions."  So

13   the application, the '342 application, is very specific

14   that the system we are talking about, the anomaly

15   detection system, this one specific to the registry,

16   trains over data that contains no intrusion.  That's how

17   the model is created.

18          Now, I also talked about this provisional

19   application which is incorporated by reference.  That's

20   the '857 application.  If we go to Slide 34, Your Honor.

21   Now here, this talks specifically, uses the RAD term,

22   right, and it says, "RAD generates a model of normal

23   registry activity."  And then further down in the

24   application, it says, "In order to evaluate the RAD

25   system, we gathered data by running a registry sensor on a

1    host machine.  We used only attack-free data for

2    training."  So very explicit.  In the provisional

3    application that's incorporated by reference, that this

4    RAD system, which Columbia agrees is the one that's

5    described in the '084 patent, is one where attack-free

6    data was used for training.

7            Now that, Your Honor, is the reason, that, what

8    I have just gone through, the reason why you do have a

9    serious claim construction dispute here and one that the

10   Court needs to resolve.  Because there is no dispute

11   between the parties at all that you can have different

12   systems, different types of detection systems that may use

13   different types of data to create a model.  They might use

14   dirty data -- or excuse me, they might use attack data,

15   they might use clean data, those kind of things.  But the

16   one we are talking about here, the one that creates a

17   model of normal computer system usage, the Registry

18   Anomaly Detection system, is one that's trained on

19   attack-free data.  That's a claim construction issue.

20   Columbia disputes that.  They want to be able to argue

21   down the road, "No, it can include attack data as well."

22   That's why we have the claim construction issue, Your

23   Honor.

24           Let me go to Slide 35.  Counsel mentioned, and

25   this is covered in the briefs, but counsel mentioned that

1    there were also additional papers, this particular paper

2    is one that Dr. Eskin is one of the named inventors on the

3    '084 and the '306 patents.  So this article is also

4    incorporated by reference.  Many things were incorporated

5    by reference.  This article was.  And so what Columbia has

6    argued in its briefs is, "Well, this paper recognizes that

7    we can create certain anomaly detection systems that

8    train, in other words, create their model, using both

9    attack data and clean data."  Right?  The problem and the

10   reason why we cited this paper is, we are not arguing that

11   nobody could have done that.  That's not the point.  We

12   are trying to figure out what was claimed here in this

13   particular patent, the '084 and the '306 patent, not what

14   somebody could have done or what they had the capability

15   of doing outside the four corners of this patent.  That's

16   not relevant to the discussion.

17          But what this paper does do is show very clearly

18   that the inventors knew the difference between clean data

19   and noisy data, in other words, data that included attack,

20   and on the other hand, the attack-free, the clean data.

21   So, and why does the paper explain, so if we go to the

22   next slide, the paper explains why it is important to use

23   the clean data in these anomaly detection systems because

24   it says, "If there is an intrusion hidden in the training

25   data, the anomaly detection method will assume that it is

1   normal and not detect subsequent occurrences."  So in

2   other words, you have to know, to train the system to

3   create the baseline, that you really are doing what's

4   normal.  If you include a whole bunch of attack data,

5   then, according to this paper, that's going to be viewed

6   as normal activity so that when you go out there again,

7   now you are running the system out in the field, and what

8   you are trying to do is prevent attacks.  Well, you are

9   going to see another attack but since that was in your

10  training data to create your model, you are going to think

11  that's normal.  According to the paper, that's no good

12  because now you are not going to detect that, you are

13  going to be attacked.

14          So go to the issue that I just talked about.  It

15  is Paragraph 37.  So here, it talks about "Traditional

16  anomaly detection techniques focus on detecting anomalies

17  in new data after training on normal (or clean) data."  So

18  right here in the paper it is incorporated by reference.

19  Normal data as understood by these inventors is used

20  consistently in the specification, used consistently in

21  the applications that are incorporated by reference, and

22  is used here in this paper that's incorporated by

23  reference, to mean clean data.  Right.

24          When they go down further and in this paper, we

25  don't dispute that, they present a different method.  "We

1  present a mixture model."  So in other words, explaining

2  the presence of anomaly in the data.  It is not normal.

3  They describe it as a mixture model.  Earlier in the title

4  they talk about it being noisy data when it includes

5  attack and clean data.  So normal, according to all of

6  these references that we looked at, means clean.  Our

7  definition, attack-free.  We think that's -- and you saw

8  plenty of citations that I gave you where it is described

9  to be attack-free.  But that's what "clean" means in this

10 context.

11         That's the terminology that the inventors chose

12 to use in their claim, right?  They could have said, you

13 know, "creating a mixture model," or "creating a model of

14 computer system usage using noisy data" had they described

15 those things.  They didn't.  They used "model of normal

16 computer system usage."  And according to all these

17 references, that means exactly what we say it means, which

18 is free from attacks, Your Honor.

19         Now, go to Slide 39.  Here is another issue.

20 This is why I do think it is a claim construction issue.

21 But from the argument you heard from counsel and as well

22 as what we see here in the briefs, what Columbia is

23 saying, and this came across, I think, particularly

24 starkly when they were arguing about the prior art in the

25 prosecution history and how that was distinguished and

1   what the basis of that distinguishing was of the prior

2   art, and what Columbia says in their brief and what I

3   heard here in the argument today is, "Well, see, that was

4   distinguished because it only included abnormal or attack

5   data.  Our model, it is not solely based on that.  It also

6   has normal data in it."

7          Well, think about that, Your Honor.  So how do

8   we decide what's an acceptable amount?  So if I have a

9   model that has one record that's normal, attack-free, and

10  99 -- I use percentages, it is easier -- one

11  percent normal and 99 percent attack data, well, according

12  to the argument you heard they distinguished the prior

13  art, that would be a normal computer usage system model

14  because it is not completely based on abnormal records.

15  Two percent, three percent, four percent?  How do you

16  define how much normal data needs to be there, under their

17  argument about what normal computer system usage is, to

18  decide what normal computer system usage is?  It is

19  completely boundless.

20         There is no way that one, and under the NAUTILUS

21  standard, that's the Supreme Court case that came down on

22  indefiniteness, both the claim and the claim construction

23  have to tell those of ordinary skill in the art not only

24  what's inside, but what's outside, where the bounds are.

25  They have to reasonably tell you that.  With this

1    construction or the argument that Columbia is making for

2    you, you don't know what it is.  You know it is somewhere

3    between one record and 100 percent of records.  But where

4    that line is drawn, who knows?  And the HALLIBURTON case

5    we cited here bears a little bit of discussion, Your

6    Honor.  That's 514 F.3d 1244.

7              But the issue there was one where claim

8    construction was proposed, and they wanted to have the

9    construction of fragile gel, what fragile gel was.  And

10   the construction that was offered didn't provide any

11   guidelines of when a gel became fragile, you know, what

12   was the requisite degree of fragileness, is what they

13   said.  That's the same issue we have here with the

14   argument that Columbia is making.  The line is very bright

15   under Symantec's construction.  It is consistent with the

16   specification, it is consistent with the way the inventors

17   have chosen to use that term in the context of their

18   invention, and also consistent with the way the inventors

19   have distinguished other systems than the ones that are

20   claimed here.  Columbia, on the other hand, we don't know.

21   We don't know where that line is.  And that's a further

22   problem, Your Honor.  Now, the last -- and I have a

23   citation on Slide 40 that just highlights that again, but

24   I think it is apparent from the argument.  But the point

25   being that it can include additional data.  But how much

1    additional data, we don't know.

2              Now, probabilistic.  That was the last, if I go

3    to Slide 42, Your Honor, that was the last piece of this.

4    I don't think we have a major dispute with respect to

5    this, the probabilities, the likelihood that the event

6    will occur or condition will be present.  You know,

7    probability.  I think the only -- we have offered the

8    construction if you look at the whole term which would be

9    based on a probability, which is what this invention

10   describes.  Columbia offers this construction of "employs

11   probability."  Here is the problem that I have with that,

12   Your Honor.  And you may say that this is patent lawyers,

13   you know, how many angels can dance on the heads of a pin

14   or whatever the analogy is.  Those sound similar to me.

15   But here is the problem I have with what I think we may

16   hear down the road based on some of the infringement

17   contentions we have seen in this case.

18             "Employs probability" conveys the idea that as

19   long as probability is used somewhere in the

20   determination, then it employs probability.  But that's

21   not what this is.  This invention is you create your

22   baseline model of normal computer usage, you observe the

23   activity, compare it to that baseline, and then based on

24   that probability, on a probability determination, the

25   comparison of how likely that event is to be normal, you

1    make your determination as to whether something is an

2    attack.  So the way I would look at this, Your Honor, so

3    let's say you have a baseball manager out there, major

4    leagues, and you know how baseball is a game of statistics

5    and everybody is always looking at how does this guy do

6    against lefties and all of those kind of things.  So he

7    has a situation, the manager has a situation where he

8    looks down the bench to see who he has got because he is

9    not going to let the guy who is supposed to go up there to

10   bat bat.  He is putting somebody new in a game situation.

11   He looks, "Okay, what's this guy's average," he asks the

12   coach, "What's this guy's average against this pitcher?"

13   In other words, the probability that he will get a hit.

14   "Well, he is, you know, one out of three.  333."  "How

15   about this other guy?"  "He is 250."  So he is less.  Well

16   now, the manager, if he was making that decision based on

17   probability, he would say, "Okay, this guy, he has the

18   better chance, given history, he has the better chance to

19   get a hit.  I'm going to put that guy in, the 333 hitter."

20   But that's not what the manager does.  The manager is

21   like, "Oh, it is not that big a difference and I just have

22   the feeling that this 250 hitter is going to have a good

23   day, the gut feeling."  He says, "I'm going to put that

24   guy in."  He goes with that guy.  Well, that's not a

25   decision that's based on probability.  In fact, it is

1    contrary to what the probability evidence would say.  But

2    it certainly employed probability in the decision process

3    because he wanted to see how these two things are.

4            And that's the problem that I have with their

5    construction, Your Honor.  I think it is too amorphous.  I

6    think it invites the idea that this decision doesn't have

7    to be determined based on a probability comparison.  It

8    just has to be somewhere in the process.  And so that's

9    the reason and that's the basic dispute, I believe, that

10   we have on that term, Your Honor.

11           So I'll turn it over to my colleague.  I think

12   that's all I have to say on this, and I thank you for your

13   attention, Your Honor.

14           THE COURT:  All right.

15           MR. SHEASBY:  So I think when we listen to

16   argument, sometimes it is most important to remember

17   what's not addressed in argument as opposed to what is

18   addressed.  And I think that -- give me one second, Your

19   Honor -- I think the first thing that you didn't hear is,

20   you didn't hear any discussion whatsoever about the fact

21   that during the prosecution of this patent, the

22   reference -- the claims were rejected over Chong, Chong

23   disclosed the missed system -- mixed system, excuse me,

24   that mixed system was found to be anticipated and the

25   claims were allowed not based on the presence or absence

1    of a mixed system, they were allowed based on a registry

2    access.  You heard no argument whatsoever from counsel for

3    Symantec addressing that point.

4         He brought up Chong, I give you that.  He

5    brought up Chong as part of a new indefiniteness argument

6    which you will find nowhere in any of the briefing.  But

7    what he didn't do is, he didn't dispute the critical

8    undisputed fact.  The inventors, the PTO, everyone

9    realized had this covered mixed data.  That was the basis

10   on which Chong served as prior art.  That was the basis

11   for the anticipation rejection.  And it was overcome not

12   because this claim arbitrarily blinds scientists to

13   considering supplemental abnormal data.  It was overcome

14   because Chong did not reference registries.

15        So one of the things that counsel said was, "We

16   have an 02 MICRO issue."  He is right.  We do have an 02

17   MICRO issue.  The 02 MICRO issue is that counsel wants to

18   import a negative limitation into the claim excluding

19   blinding the use of supplemental abnormal data.  We agree

20   that issue should be addressed in this claim construction

21   process.  And the Court should conclude that that negative

22   limitation is improper.

23        The second question, though, particular question

24   is, are we advancing the ball in any way by changing

25   normal to typical, attack-free, even though the inventors

1    did not use those phrases in the claims.  We are not.

2          Let's talk about Symantec's new indefiniteness

3    argument, an argument that doesn't appear in the 30 pages

4    of their opening brief, does not appear in the 30 pages of

5    their responsive brief.  It is a new argument that is

6    designed to reflect, I think, a real basic

7    misunderstanding of what the patent is about.  If you

8    remember from my presentation, I spoke a lot about

9    Question 1 and Question 2.  Question 1, what is the model;

10   Question 2, what data do you use to construct the model.

11   And I think the problem is, Symantec is saying we don't

12   know how much normal data you need to use.  In fact, I

13   think I got their quote pretty accurately.  "Is it one

14   percent abnormal data that you have to use to construct

15   your model or is it 100 percent abnormal data you have to

16   use to construct your model?"  What the patent says is you

17   must base the model on records of plurality of processes

18   that access the operating system and that are indicative

19   of normal computer system usage.  That's what you must

20   have.  It doesn't say that's the only thing you have; it

21   is what you must have.  And it is plural, so under the

22   patent law, you would need to have multiple normal process

23   access data points in the construction of your model to

24   satisfy it.  But that relates to what the data is used.  I

25   don't hear Symantec saying that it would be shocking if

1    they thought the word "normal" was indefinite or what

2    model of normal behavior was indefinite.  A model of

3    normal behavior requires you to construct an understanding

4    of what is normal and how it is different from abnormal,

5    just like the apple and the oranges.

6              Let's go to Slide 28 of Symantec's presentation,

7    actually.  If you look at Slide 28 of Symantec's

8    presentation, they point to a portion of the specification

9    that says, "If a model of normal registry behavior is

10   trained over clean data, certain things happened."  Notice

11   the contingent:  "If."  Notice the reference to "clean

12   data."  What doesn't appear in the claims of the patent?

13   The word phrase "clean data" does not appear in the terms

14   of the claims of the patent.

15             Counsel spoke about the -- in my presentation, I

16   gave two very clear definitive instances in which mixed

17   data was used.  I talked about the fact that they adjusted

18   the model to take into account the fact that malicious

19   programs are silent when they add, and they also talk

20   about threshold adjustment.  I heard nothing whatsoever

21   from counsel about the program addition, use of malicious

22   data, and I think the reason for that is because it is

23   quite clear that program addition data that's used to

24   construct the model did in fact involve malicious

25   behavior.

1          As to the threshold point, what he said was,

2    "Well, that's not about creating the model; that's about

3    training the model or adjusting the model or making the

4    model how you want it to be."  Well, the claims don't say

5    you have to train the model using normal behavior.  Let me

6    see if I have that right.  He said it relates to creating

7    the model.  But the claims don't say, "Well, you have to

8    use normal data to create the model."  They use a

9    different phrase.  They just say, "The model must be based

10   on X."  I think that makes a lot of sense.  If you look at

11   the claim, the claim is agnostic in terms of everything

12   you will use.  It tells you what you have to use.  You

13   have to use registry system access information.  That's

14   representative of normal.  It doesn't exclude using other

15   type of information, so Symantec could just as easily come

16   up and say, "We want a construction that says, 'You can

17   only use registry access information.'"  But that would

18   make no sense.  Because that language in yellow

19   highlighting isn't limiting what you use.  It is

20   describing what you have to use.

21          Let's turn to the discussion of the '342

22   application.  Can I have Slide 62, please?  So one of the

23   things that I think is important is to read documents in

24   context.  And it is a frustration of oral argument that

25   sometimes when you show up a slide, you show up a quote,

1    you don't really get the entire context.  I'm going to try

2    to give some context in the '342 application.  These are

3    not slides that were shown by counsel or passages that

4    were shown by counsel.

5              One of the things that the application speaks

6    about is it says, "Most of these anomaly detection

7    algorithms in the prior art require that the data used for

8    training is purely normal."  Two important points:

9    "Most," not all.  And it is talking about the prior art.

10   It is talking about what came before the work of the

11   inventors.  What's interesting, of course, is what words

12   don't appear in the claims.  "Purely normal" does not

13   appear in the claims.  The inventors clearly knew how to

14   say, "We know about systems that use purely normal data."

15   They didn't put it in the claims.

16             Let's go to Slide 63.  What the application does

17   say is that "We think it is valuable to include mixed

18   data, data that includes information on intrusions, as

19   well as information on normal processes."  And this is a

20   passage from Paragraph 106 that Symantec doesn't engage in

21   its briefs, doesn't show in its presentation.  It is an

22   example of using an using anomaly detection algorithms

23   that involve mixed data.  Here is what Symantec says.

24   They say, "There is a difference between supervised and

25   unsupervised anomaly detections."  So let's go back to our

1    metric.  What words appear in the claim.  We talked about

2    the fact that "100 percent clean data" doesn't appear in

3    the patent.  Guess what else doesn't appear in the patent?

4    "Supervised."  The claims aren't limited to supervised

5    anomaly detection system.  They know how to write

6    "supervised anomaly detection system" and they didn't

7    write it into the claims.  Instead, they incorporate an

8    application that doesn't just suggest you can use

9    supplemental abnormal data, it describes a robust

10   algorithm that allows you to use it.

11          One of the things Symantec says when they talk

12   about the discussion of misuse algorithms in the '342

13   application, that that's criticizing that system for being

14   computationally defective or computationally deficient.

15   Those phrases, of course, don't appear in Paragraph 102 of

16   the application that Symantec showed you.  If you look at

17   the '084 patent, they are criticizing misuse detectors

18   that focus exclusively on abnormal data.  That's what they

19   are dissatisfied with.

20          Let's go to Symantec's Slide 34.  I know, Your

21   Honor, you may have it in front of you.  I don't have it

22   on the screen.  So, to me, this is pretty neat.  And it

23   goes back to something we said.  Symantec shows this

24   section from this article that became the provisional

25   application for the '084 patent and they quote language

1    saying, "We used only attack-free data for training."

2    They said, "Aha, see, they say in our experiments, we used

3    only attack-free data for training."  Interesting point.

4    Two, in fact.  Guess what phrase doesn't appear in the

5    claims?  "Attack-free data for training."  Second

6    interesting point, and why don't we go to our slide, 37.

7    In that same article, they said, "We use very weak

8    algorithms.  We don't use sophisticated algorithms here.

9    We don't use algorithms that can handle mixed data."

10   Which they disclose in the '342 application, for example.

11   And so to say -- what they are saying here is, "More

12   sophisticated algorithms can be used, because algorithms

13   do exist in the art, that reference that application, have

14   the ability to handle mixed data."  Of course, this

15   article doesn't discuss mixed data, and the reason it

16   doesn't discuss mixed data is because the algorithm they

17   happened to be using to perform their experiments didn't

18   have that capability.

19        So Symantec Slide 36 discusses a paper by Dr.

20   Eskin.  And they quote a passage where they say, "If there

21   is an intrusion hidden in the training data, the anomaly

22   detection method will assume that it is normal and not

23   detect subsequent occurrences."  They say, Your Honor,

24   that this proves that you can't used mixed data in anomaly

25   detection.  But I think it is worth going to our rebuttal

1    Slide 1.  What's neat about that quote is that they

2    actually cropped it, because what the quote says in full

3    context is, "There's these typical approaches that require

4    training over clean data, normal data containing no

5    anomalies."  Once again, notice what doesn't occur in the

6    claims.  Clean data and no anomalies.  They didn't show

7    this passage of the article to you.  What Dr. Eskin is

8    saying there is, "There's these junky old methods that

9    only use clean data.  And now I'm going to describe a

10   method of detecting anomalies, anomaly detection," which

11   is what is claimed in the '084 patent, "that doesn't

12   require the use of clean data."

13           Once again, the frustration of oral argument is

14   that sometimes when slides are shown, you don't see the

15   complete context of the claim.

16           So the last thing I'd like to do is, why don't

17   we go to the '115.  So one of the things that Symantec's

18   counsel said, and I think I got it close, but forgive me

19   if it is not exact, is "normal data" is used consistently

20   to mean "clean data."  Two interesting points.  One, the

21   phrase "normal data" doesn't appear in the claims.  What

22   the claims say is we want you to include registry access

23   information that is normal -- that is representative of

24   normal processes.  So the phrase "normal data" doesn't

25   appear, so even if "normal data" did mean 100 percent

1    clean data, that would say nothing about the claims.

2            But here is a more interesting point.  So

3    Symantec is very focused on provisional applications and

4    articles the inventors wrote and using designs in those

5    articles to try to limit the claims.  But in the

6    provisional application for the '115 patent, which also

7    references anomaly, that provisional application actually

8    attaches a design document in which a model of normal data

9    is created, and that model of normal data, guess what it

10   uses?  "It can include good data, potentially harmful

11   data, and noise."  This is the '115 provisional

12   application.

13           Now, there was some confusion in that Symantec

14   submitted the '115 provisional application in its

15   briefing.  But what we have noticed, and it was not clear

16   to us why this was the case, was Symantec actually

17   excluded this portion of the provisional application from

18   the exhibit.  So what we have done, Your Honor, is we

19   filed a supplemental motion to Your Honor seeking to add

20   to the record the complete provisional application.  I

21   believe this was Exhibit 12, if that's correct, to the

22   Symantec brief.  So we filed a new version of Exhibit 12

23   which includes the omitted portion of the provisional

24   application, making clear that you can create a model of

25   normal data that involves mixed datasets.

1    Symantec's last point is, once again, a new

2    argument.  It is not an argument you hear in their

3    briefing.  They want "based" to mean something different

4    than "employed."  Well, I wish they would have told us

5    that so we could have briefed it as opposed to having to

6    do it here without the benefit of full analysis and

7    information.  But from what I can tell, what they really

8    are trying to do is to say, "Based on" means you can only

9    use a probability to make your decision.  And I think that

10   that is the implication of what they mean by "based on."

11   So once again, that would be a negative limitation,

12   saying, "In your probabilistic model, you have to use

13   probability and you can't use anything else whatsoever to

14   make your decision.  And we want you to import that

15   negative limitation in the claim by using this phrase

16   'based on.'"

17        And I'm grateful that now we do know what they

18   mean by "based on" so we can address it.  But once again,

19   there is nothing in the specification, nothing in the

20   claims, that say you can't consider other information

21   beyond probability.  What the claims say, what the

22   specification says, is that you must consider probability.

23        So with that, Your Honor, I'll now turn to the

24   "anomaly" term, which will be very, very short.  It is the

25   next term.

1          THE COURT:  All right.

2          MR. SHEASBY:  So the term "anomaly," the dispute

3     regarding "anomaly" is relatively constrained, and it

4     repeats many of the same arguments that we have heard

5     regarding the discussion of "normal."  That's on 67.

6     So -- let's go to 68.  So the dispute regarding what

7     "anomaly" means really recapitulates this desire to have a

8     "model of typical, attack-free" imported into the

9     definition of "anomaly."  And the reason why they want to

10    import that language into the definition of "anomaly" has

11    nothing to do with how "anomaly" is described in the

12    specification.  An anomaly is deviation from normal

13    behavior which may correspond to an attack.  That is

14    consistently how the phrase is used in the specification.

15    In fact, the definition of "anomaly" that we have proposed

16    is absolutely consistent with the specification as well.

17    In the sense that -- excuse me, it is absolutely

18    consistent with the extrinsic record.  If you look at the

19    definition of "anomaly" in the extrinsic record, it also

20    speaks about deviation from models of normal.

21          So why do they want to put in the phrase "model

22    of typical, attack-free behavior" into the definition of

23    anomaly?  Well, the reason why they want to do that is

24    because we know now that they want to take the phrase

25    "typical, attack-free," which they say defines the model,

1    and use it to import a negative limitation about the data

2    that you can include.  You must blind yourself, without

3    doubt, 100 percent, to anything other than purely normal

4    data.  Even though, and the reason they want to do that is

5    because the phrase "anomaly" occurs in a different patent.

6    It also a course in the '115 patent.  And so they stick

7    the concept of "typical, attack-free" into the definition

8    of "anomaly" from the '084 patent.  They are then going to

9    use that to import the same limitation, negative

10   limitation, you must blind yourself to any data other than

11   100 percent normal, pure data so that they can have that

12   limitation in the '115 patent as well.  And we can talk

13   about that issue later today when we discuss the '115

14   patent.

15            I think that's what I have to say on "anomaly,"

16   Your Honor.

17            THE COURT:  All right.

18            MR. NELSON:  So, Your Honor, I'm going to resist

19   the urge to go ahead, I believe what you heard was trying

20   to respond point by point to what I had said.  I said what

21   I said, and I think Your Honor heard what I said.  Me

22   going back through and articulating those things again and

23   trying to use the Court's time, we can't be here forever

24   going back point/counterpoint, so please don't take my

25   silence as the fact that I agree with anything, but I

1    recognize as a lawyer that at some point we have to stop

2    talking, even though I only used less than half the time

3    of my co-counsel.  But I think I'll try to put that in the

4    bank and use that maybe down the road one time, Your

5    Honor.

6              So just get to the point with "anomaly."

7    "Anomaly," sure, we have the issue because we are

8    comparing to the "normal computer system usage," so we

9    have the definition of "normal computer system usage."

10   There is no question about that.  But I don't need to

11   rearticulate thsoe arguments.  That's what you are doing

12   in the context of the claim.  And if we look at Slide 46,

13   Your Honor, you see as an example, and counsel went

14   through these steps, you generate this probabilistic model

15   of normal computer system usage, and then you analyze

16   features from the record of a process that accesses the

17   operating system registry to detect deviations from normal

18   computer system usage to determine whether the access to

19   the operating system is an anomaly.

20             So if we look at the next slide, we can see, and

21   this is consistent with what everybody has talked about

22   throughout in describing these inventions, is that here it

23   is an object of the invention to generate a model, and

24   then the model is used by the anomaly detector to decide

25   whether each new registry access should be considered

1    anomalous.  So the way you determine an "anomaly,"

2    according to the claim language, and according to the

3    description of the invention that we have all agreed with,

4    is by making a comparison of the observed behavior, the

5    currently observed behavior, to that model of normal

6    computer system usage.  That's why we have the model in

7    there.

8              Now, Columbia's construction just omits that.

9    So you don't, according to them, even the way we have all

10   described this, in order to detect something is an

11   anomaly, you don't even need to use the model that you

12   generated.  According to their construction, they leave it

13   out.  It is just any behavior that deviates from normal.

14   So the model is something that you generate, according to

15   them in their claim constructions, and then never use

16   again, apparently, or at least you don't have to use it

17   again.  That's not the way this invention is described.

18   So that's the reason why we have the construction that

19   incorporates the idea that it is a deviation from that

20   model of normal computer system usage, because that's the

21   way the invention is described, that's the structure of

22   the claim, and that's the way it is consistently used;

23   therefore, it should be construed that way, not some other

24   random, undescribed determination of whether something is

25   normal or not normal, Your Honor.  So that's the reason

1    for the construction.  And I don't have anything more than

2    that on "anomaly," Your Honor.

3              THE COURT:  All right.  Thank you.

4              MR. SHEASBY:  Your Honor, we have one more term

5    for the '084 patent.

6              THE COURT:  All right.

7              MR. SHEASBY:  Your Honor, the next term in the

8    '084 patent is "operating system registry."  The essence

9    of the dispute between the parties regarding "operating

10   system registry" is that Columbia is trying to define the

11   nature of the unique operating system registry, that

12   unique structure in the computer that is the focus of the

13   specification.  Symantec is proposing a broad, generic

14   definition which would include not just the operating

15   system registry, but basically any file system that

16   exists.  At least, I think that's the intent of the

17   construction.  Even though the specification makes clear

18   that the operating system registry is a unique species

19   with unique features distinct from the file system.

20              So this is what the specification says.  It

21   speaks about the fact in the summary that its focus is "to

22   generate a model of normal access to the Windows

23   Registry."  There is no artifice here.  It is the Windows

24   registry.  They are fixated with it.  They are so fixated

25   with it that they actually define what they mean by

1    "registry."  They pull no punches.  They say, "Well, you

2    can create the system monitors programs to access the file

3    system of the computer.  One example of the file system

4    is, of course, the Microsoft Windows Registry, hereinafter

5    referred to as the Windows Registry or the Registry.  The

6    Microsoft Windows TM Registry is the registry."

7            So the answer to the question, What is the

8    "operating system registry" that's referred to in the '084

9    patent?  It is actually not difficult.  In other words,

10   this should be one of the easier terms in the day to

11   address.  It is the Windows Registry.  What we tried to

12   do, and apparently I think that is what has caused this

13   chaos to begin with, is as opposed to saying just the

14   Windows Registry, we ended up trying to identify for your

15   Court what are the key features that distinguish the

16   Windows Registry from just a generic file system.

17           And what I think should resolve this is the

18   extrinsic record.  If you look at how folks in the

19   industry define the Windows Registry and how they make

20   clear that the Windows Registry is distinct from generic

21   file systems, they consistently say, "The Windows Registry

22   is a hierarchical database.  It contains keys and values."

23   If you see our proposed construction, that's exactly what

24   our construction says is the Windows Registry.  Microsoft

25   itself says what its registry is.  "The registry is a

1    hierarchical database.  The data is structured in tree

2    format.  It has keys and values."  The essence of

3    Columbia's construction is these features.

4              Now, what Symantec does, it has two strategies.

5    First, it says, "Well, if you are going to agree with

6    Columbia, we want you to take everything in that

7    paragraph, just shove it all into the definition of

8    Windows Registry."  This is a paragraph from the

9    specification that discusses the Windows Registry.  But

10   the problem with that is that various portions of that

11   paragraph discuss things that may be present, may not be

12   present, that are generally present.  The touchstones,

13   what's always present, is that it has configuration

14   information, it is hierarchical, and it has keys and

15   values.  So we are very uncomfortable with the strategy of

16   putting all the information that paragraph because it

17   doesn't necessarily reflect things that necessarily are

18   always going to be present, except for keys, values, and

19   hierarchy.  Here is an example of that structure.  Here is

20   the tree on the left-hand side.  On the right-hand side is

21   the keys and the values.

22             So one of the things the specification makes

23   crystal clear is that there is generic things known as

24   file systems, but file systems are different than

25   registries.  Registries are unique.  And so the

1    specification says, for example, LINUX and UNIX systems

2    have file systems and you may be able to extract some

3    important information by looking at that.  But that's not

4    a registry.  They are definitive about that.  A file

5    system is not a registry.  A file system is a broader

6    concept.  What it really is, it is a Russian doll.  The

7    file system is the broad generic term, and within that is

8    the concept of an operating system registry.

9              So the challenge that I have with Symantec's

10   construction, and it may be that there's just ships

11   passing in the night, is when you propose a database of

12   information about a computer's configuration, aren't you

13   really just merging together the concept of files and

14   operating systems?  The reason why I say that is because I

15   don't think it is disputed, LINUX and UNIX file systems

16   have configuration data in them.  That's undisputed.  So

17   what Symantec's construction is doing is it is not showing

18   fidelity to the specification.

19             So Symantec has this argument that it makes, and

20   it makes it repeatedly, where we are just asking for the

21   moon.  We want these claims to be completely untrammeled.

22   But the truth is, we are not asking for a broad

23   construction, we are not asking for a narrow construction.

24   We are just asking for the right construction.  This is

25   what it says.  "The essence of a Windows Registry is

1    hierarchy, trees, keys, and values."  And that's what we

2    are trying to show fidelity to.  Thank you, Your Honor.

3            THE COURT:  All right.  Response?

4            MR. NELSON:  All right.  Yes, Slide 49.  So here

5    is the problem with this, Your Honor.  I think you just

6    heard it.  So they want it to be -- the definition

7    basically to be the Windows Registry.  Right?  That's it.

8    The Windows Registry.  They would like that to be the

9    case.  Of course that's not what the claim says.  We have

10   heard that, tried to turn it around on us 500 times, you

11   know, that that's not in the claim.  So the claim is not

12   limited to that.

13           But there is an even bigger problem than that.

14   Because, look, this claim, this patent, this provisional

15   goes back to 2002, the application that led directly to

16   the '084, for example, was filed in 2003.  Well, Windows

17   changed over time.  We know they bring out new operating

18   systems, completely revamp things, tell us Windows 7 is

19   way different than Windows XP and some of the versions

20   that came before that.  So how do we know that the Windows

21   Registry hasn't changed over time?  Right?

22           So they want to hedge their bets.  They want to

23   say, "Well, it is just kind of this general stuff."  So we

24   described in the patent, and that was our problem with

25   this, if we go to Slide 50, what we did is, we took the

1  topical sentence, which is the general statement of what a

2  registry is, "As is known in the art, the registry is a

3  database of information about a computer's configuration."

4          Now, this section then goes on to describe a

5  number of other things that are specific about the Windows

6  Registry, not a general statement, but specific about the

7  Windows Registry.  "Registry contains information that's

8  continually referenced by many different programs."  If we

9  go to the next slide, we see, this comes from something

10 that Columbia wants included, "It is organized

11 hierarchically as a tree.  Each entry in the registry is

12 called a key and has an associated value."  But if we go

13 to the next slide, we see here is another, you know,

14 statement equally, "The registry is also the storage

15 location for all security information such as security

16 policies, user names, and passwords."  So these are all

17 specific things, properties, that the Windows Registry at

18 the time this patent is filed has.

19          So now, but they don't want that, because the

20 Windows Registry changes over time.  So now they are going

21 to come in and say, "Wait a minute, Windows changed its

22 registry, now it is not the storage location for all

23 security information such as security policies," so they

24 say, "Oh, that doesn't matter, it is still a key."  So

25 they want to have their cake and eat it, or eat it and

1    have it, or however you want to say that phrase.  Because

2    they want it to be very limited.  They don't want the

3    general statement of what a registry is, the topical

4    sentence, that it is the database of information about a

5    computer's configuration.  Rather, they want it to be,

6    well, specific to Windows, but since we know that registry

7    has changed over time, it is only specific about certain

8    things that that Windows Registry had.  So that's the game

9    that they are playing here.  And that's the problem that

10   we have with the definition.

11          So that's why we think it is helpful, it is the

12   topical sentence in that paragraph, a general statement

13   about what the registry is.  These other things are

14   specifics.  If we are going to include one of the

15   specifics about the Windows Registry, remember, as of 2003

16   when this patent is filed, if they want it to be specific

17   to that, because there is no way they can claim Windows

18   Registry in 2005 because they don't even know what it is

19   at the time the patent is filed, so there is no way that

20   could be described, then let's include everything.  That's

21   our point.  You want to have it limited to Windows

22   Registry, then let's freeze it in time the way it should

23   be and have everything that you described about that.

24   That's not what we are trying to do.  We have tried to

25   provide this look at the general definitional statement.

1          As to that's the problem with it.  You can't

2    have it both ways on this construction, Your Honor.  And

3    we think, that's exactly what Columbia is trying to do

4    here.

5          THE COURT:  All right.  Any brief rebuttal on

6    this point?

7          MR. SHEASBY:  Very brief.  Your Honor, I don't

8    think this is game playing.  In other words, the purpose

9    of claim construction is to struggle with an issue, what

10   is a registry, what are the essence -- what is the essence

11   that makes a registry a registry.  And in my mind, the

12   answer to this question is not something that needs to be

13   debated by either you or -- either myself or my colleague

14   telling you what a registry is or what's important in a

15   registry.  It can be answered by what's in the record.

16   And what the record consistently says, the references, the

17   patent:  Hierarchy, keys, and values.  And that's what we

18   have tried to reflect in the specification.  Thank you,

19   Your Honor.

20         THE COURT:  All right.  I think we should stop

21   now for lunch.  And if you all could come back, let's make

22   it 2:15, we will get started with the afternoon session.

23      (Luncheon recess taken from 12:56 p.m. to 2:15 p.m.)

24         THE COURT:  All right.  Let's move on to the

25   third family of patents.

1        MR. SNYDER:  I have copies of slides for the

2    Court.

3        THE COURT:  All right.

4        MR. SNYDER:  Your Honor, the '115 and '322

5    patents are the last family of patents at issue in this

6    case.  The '115 is the parent patent and the '322 patent

7    is the continuation.  They are both entitled "Methods,

8    Media, and Systems for Detecting Anomalous Program

9    Executions" and they relate to work by Columbia Professors

10   Stolfo and Keromytis and their graduate student, Stelios

11   Sidiroglou.

12       The main problem that the '115 and '322 patents

13   are directed to is that sometimes malicious programs

14   cannot be detected until they are run.  When we talked

15   earlier today about the '544 and '907 patents, there was

16   the term "static analysis" or "static features."  Those

17   are attributes of a file that you can discern without

18   executing the file or the program.  This patent family is

19   talking about something different, attributes that you can

20   only discern if you actually run a program.

21       The way that you actually gain insight into the

22   program behavior is you look at something called function

23   calls.  What's a function call?  Well, when somebody is

24   writing a piece of software, they don't want to reinvent

25   the wheel every time.  For example, if they want to talk

1  across the network and they don't reimplement the TCP/IP

2  network stack.  Instead, they use code that other people

3  have already written to do common functions.  This can be

4  writing a file, this can be talking across the network, it

5  can be creating a user interface window.  All of those are

6  traceable to function calls.  So they give insight --

7              THE COURT:  Excuse me.  (Court conferring with

8  Clerk.)  Go ahead, I'm sorry.

9              MR. SNYDER:  Because the important things that a

10  program do correspond to the function calls.  If you track

11  and analyze the function calls that are made by a program,

12  you can gain insight into its behavior, and that's what

13  these patents are about.  Here is Claim 1 of the '115

14  atent and its exemplary.  It is "A method for detecting

15  anomalous program executions, comprising:  Executing at

16  least a part of a program in an emulator."  "Emulator" is

17  one of the terms that's up for construction today.

18              The next element is "Comparing a function call

19  made in the emulator to a model of function calls for the

20  at least a part of the program."  This shows how the

21  emulator is being used.  You are executing the program in

22  the emulator, and it gives you visibility into the

23  function call.  That is, the emulator is the component

24  that actually let's you see what function calls are being

25  made.  If you don't have an emulator or you are just

1    executing a program regularly on your own computer, you

2    can see some things that it does like if it pops up a

3    window, but you don't normally understand the function

4    call that's being made.  You have to have another software

5    component or program that's running alongside the main

6    program that lets you actually inspect the function calls.

7          The next element is "Identifying the function

8    call as anomalous based on the comparison."  "Anomalous"

9    is another claim term at dispute.  This is when you detect

10   that the function call is indicative of doing something

11   bad.  The program is a virus or the program has been

12   infected.  Then "Upon identifying the anomalous function

13   call, notifying an application community that includes a

14   plurality of computers of the anomalous function call."

15   This is what you do after you discern that the program

16   might be malicious or it is exhibiting anomalous behavior.

17   An "application community" here is members of a community

18   running the same program.

19          So there are three terms in dispute in this

20   patent family.  I'll be discussing the emulator term and

21   my colleague, Jason Sheasby, will be discussing the other

22   two terms.

23          Columbia's construction of emulator is

24   "Software, alone or in combination with hardware, that

25   permits the monitoring and selective execution of certain

1    parts, or all, of a program."  Symantec's construction is,

2    "Software, alone or in combination with hardware, that

3    simulates a computer system."

4            And in many respects, the dispute about this

5    term is a dispute about which evidence to look to.

6    Columbia's construction is grounded in the specification

7    and how the specification describes the emulator.

8    Symantec's construction, on the other hand, is mostly

9    based on extrinsic evidence and one particular embodiment

10   in the specification.  Just going by the PHILLIPS

11   hierarchy, Columbia's construction adheres most truly to

12   the proper meaning of the term.

13           There are two questions that need to be answered

14   with respect to the term emulator.  The first is, what is

15   an emulator in the patents.  Here, both Columbia and

16   Symantec agree that it is software, alone or in

17   combination, with hardware.  The second question is where

18   there is a dispute.  It is, what is the role of an

19   emulator in the patents?  Symantec says that it simulates

20   a computer system and Columbia says it permits the

21   monitoring and selective execution of certain parts, or

22   all, of a program.

23           Columbia's construction is based in the role of

24   the emulator as described in the specification.  The

25   emulator is described as software that operates alone or

1    in combination with hardware, in Column 13.  In numerous

2    places in the specification the emulator is described as

3    monitoring another program.  Furthermore, all or selected

4    parts of the program may be monitored.  Lastly, the

5    emulator permits the selective execution of the monitored

6    program.  And all of these attributes are replete

7    throughout the specification and applied to every single

8    disclosed embodiment.

9           Here are some citations for the monitoring

10   functionality.  It shows "an application that monitors

11   other applications."  This is how you get insight into the

12   function calls that the program is making.  Another

13   citation says that you are "monitoring and analyzing

14   application-level program function calls."  Another cite

15   is "The use of an emulator allows the system to detect

16   and/or monitor a wide array of software failures."  So you

17   are looking at another program and trying to gain insight

18   into what it is doing by examining the other program's

19   function calls.

20          The other key aspect is selective execution.

21   Using an example from one embodiment, called STEM, it was

22   a program that was developed at Columbia, and it

23   interoperates with something called the Valgrind emulator.

24   And yes, I had to look that up.  STEM is described as

25   "permitting the selective execution of certain parts, or

1    all, of a program."

2          Symantec criticizes Columbia for supposedly

3    importing the selective execution limitation from the STEM

4    embodiment into the overall definition of emulator.  But

5    that's simply not correct.  Every single disclosed

6    embodiment in the specification also does selective

7    execution.  Furthermore, the patent makes pains to say

8    that "any other suitable technique for emulation can be

9    used."  It is trying to avoid being limited to one

10   particular narrow version of emulator.

11         The important part of the specification that is

12   crucial to the claim construction discussion for emulator

13   is Columns 13 through 16 of the '115 patent specification.

14   So it is four columns, it is two pages.  There's

15   discussion earlier on in the specification about an

16   emulator, and also a discussion afterwards.  But this is

17   where the patentee really digs into what an emulator is

18   and what it can do.  It also discloses several different

19   embodiments of an emulator.  There is an embodiment that

20   is "an instrumented version of an application."  This is

21   at the top of Column 13.  There is another that utilizes

22   something called a sandbox, which we will discuss later.

23   That's towards the bottom of Column 13.  There are

24   embodiments that are compiled into the code or linked at

25   Column 14.  And there is also embodiment that is invoked

1   in a manner similar to a debugger at Column 14, 10 through

2   15.

3         Every single embodiment here does monitoring and

4   selective execution, but the embodiments differ.  If you

5   read these columns of the specification, the impression

6   that you get is that the patentee was trying to encompass

7   several different varieties of emulator.  They weren't

8   limited to a simulator, they weren't limited to a sandbox,

9   and they weren't limited to any other embodiments.  They

10  were claiming multiple embodiments.

11        What's the problem with Symantec's construction?

12  It improperly replaces "emulate" with "simulate."  This is

13  in consistent with the specification because it excludes

14  several embodiments.  It is also not helpful to a jury.

15  If you take that "emulator" is not a term that a layperson

16  would really know and replace it with "simulator" or

17  "simulates," you are not really providing any further

18  clarity to the jury.  You are simply guaranteeing there's

19  going to be another dispute down the road between Columbia

20  and Symantec about what it means to emulate a computer

21  system.  That is not helpful to the jury and is not the

22  right way to do claim construction.

23        Simulation is explicitly not emulation.  There

24  are three particular reasons I'm going to go into today.

25  The first is that simulation as described in the patents

1    in the way the patents use it is "an optional feature that

2    occurs after an anomaly has been detected."  Let's dig

3    into that a little bit more.  Here is a portion of the

4    specification at Column 15, and there is a red box and a

5    blue box.  In the red box, it describes an anomaly already

6    having happened.  So you monitor for failures prior to

7    executing instructions, you can revert memory changes, and

8    store memory modifications.  Then you can do something

9    else after you have detected an anomalous function call,

10   and that's the blue box.  After you have detected the

11   anomalous function call, you can also simulate an error

12   return from the function.  This is sometimes referred to

13   herein as error virtualization.  This is how the patents

14   talk about "simulation."  The word "simulator" never

15   occurs in the specification or the claims.  The only

16   occurrence is the word "simulate."  It happens twice, one

17   in Column 13, one in Column 15.  And in both situations,

18   it is describing the error virtualization feature.  So if

19   you are going by the patent's own language, when it talks

20   about simulation, it is talking about error

21   virtualization.

22        The interesting thing here is that there are

23   dependent claims that claim error virtualization.  Here it

24   is generating a virtualized error in Dependent Claim 5.

25   This claim depends on Independent Claim 1, which we saw a

1   little bit earlier.  Claim 1 has "emulator," but it

2   doesn't disclose error virtualization.  You have to go all

3   the way to the dependent claim.  This is a textbook

4   example of importing an optional embodiment into all the

5   claims.  This is explicitly a dependent claim if you go by

6   the patent's own interpretation of what it means to

7   simulate.

8          Another interesting thing here is that Columbia

9   raised this issue twice.  We raised it in our opening

10  brief, we also raised it in our reply brief.  And Symantec

11  never addresses this.  They don't have any explanation for

12  why this error virtualization feature isn't how the patent

13  is considering simulation.

14         There is another important reason why simulation

15  is not emulation.  It is that the disclosed emulator

16  embodiments are not quote/unquote fake.  Where is this

17  word "fake" coming from?  It is coming from the extra

18  gloss that Symantec is trying to put onto their own

19  construction.  This is Symantec's opening brief.  "Those

20  of ordinary skill at the time would have considered the

21  plain and ordinary meaning of emulator to require program

22  execution that is fake or simulated."  This is Symantec's

23  expert, Dr. Ford.  This proposed construction omits what I

24  consider to be the key requirement of an emulator, that it

25  executes a program in a manner that is fake or simulated,

1    not real.  These extra interpretations or glosses on top

2    of their construction aren't helpful.  We are going to

3    argue over what it means to be fake or not real.

4           Furthermore, even taking them at their word that

5    this is what stimulation means, that it implies that you

6    are executing a program in a manner that is fake or

7    somehow not real, what this most closely approximates is

8    one particular embodiment in the '115 patent.  This is at

9    Column 14 at Lines 47 through 50.  It is describing

10   something called a "sandbox."  "A sandbox generally

11   creates an environment in which there are strict

12   limitations on which system resources the instrumented

13   application or a function of the application may request

14   or access."

15          You will notice it talks about the instrumented

16   application.  An instrumented application itself is only

17   one particular embodiment, and this quote is talking about

18   putting the instrumented application into a sandbox.  So

19   it is one variation of one particular embodiment.  Now,

20   what does a sandbox do?  It says, "It creates an

21   environment in which there are strict limitations on which

22   system resources the instrumented application or a

23   function of the application may request or access."  So

24   the idea of a sandbox is trying to get to is you don't

25   want to let the program interact directly with the

1    computer system or the operating system.  For example, you

2    don't want to let the program create a real file on the

3    hard drive, or if the program is trying to make a network

4    transaction or a network request.  You don't want them to

5    actually make a real request.  You just want to give them

6    some fake information that makes them believe that they

7    have made a real request, but they actually haven't.

8            So that's what this sandbox embodiment is

9    talking about and that's the closest thing you can

10   actually find in the specification to Symantec's idea that

11   the program execution has to be fake or not real on the

12   cited emulator.  The problem is a sandbox is just one

13   particular embodiment.  It doesn't describe the other

14   embodiments.  In fact, there are three specific

15   embodiments that are exclusively not fake and execute on a

16   real operating system and interact with a real computer.

17   The three embodiments are "debugging functionality," at

18   Column 14, Lines 6 through 15; "instrumented code," Column

19   13, 3 through 13, and a "compiled instruction-level

20   emulator" at Column 14, Line 45 through Column 15, Line 5.

21   Dr. Szajda discusses in his second Declaration at

22   Paragraphs 22 through 23 each example of these emulators

23   and explains why they are interacting with a real computer

24   and are not executing in a fake manner.

25            Let's talk about the debugging functionality

 1    embodiment.  This is what the specification says.  "In

 2    another suitable embodiment the instruction-level emulator

 3    may be invoked in a manner similar to a modern debugger

 4    when a particular program instruction is executed."

 5    What's a debugger?  It is a tool for software programmers

 6    to use when they are writing a new program.  They write

 7    some source code, they have a working version of the

 8    program, and they want to run their intermediate version

 9    and see how it behaves.  So they run the program that they

10    are developing, and they also attach a second program to

11    it called a debugger.  The debugger lets the programmer

12    see what the program that they were writing is doing.  It

13    lets them step through the instructions one by one in the

14    debugged program.

15            This portion of the specification is saying that

16    you can use an emulator in a manner similar to a debugger

17    where you have a regular program that is executing, and

18    then you attach the emulator to it, you look inside at the

19    other program and see what it is doing, and you can

20    selectively execute it.  There is nothing about a debugger

21    that prevents the debugged program from affecting the real

22    computer system.  It is not fake.  It is not simulated.

23            Here is a particular source that was cited in

24    Columbia's briefing.  This is from a description of a

25    program called GDB, which is a well-known debugger in

1    LINUX/UNIX systems.  It says, "The purpose of a debugger

2    such as GDB is to allow you to see what is going on inside

3    another program while it executes or what another program

4    was doing at the moment it crashed."  Professor Szajda

5    explains in his Declaration that this is describing real

6    execution, not fake execution.

7             There is another embodiment that is also real

8    and not fake.  It is the instrumented code embodiment

9    described at the top of Column 13.  The specification

10   says, "The system may generate an instrumented version of

11   the application.  For example, an instrumented version of

12   the application may be a copy of a portion of the

13   application's code or all of the applications's code.  The

14   system may observe instrumented portions of the

15   application."

16            So what this is talking about here is that you

17   have a program that already exists.  It could execute

18   outside an emulator, but you are deciding to put it inside

19   an emulator.  And you copy the actual program code so you

20   are still executing the actual program code.  The actual

21   program code is still directly affecting the operating

22   system.  This is not a fake execution.

23            There is a third embodiment, which is an

24   instruction-level emulator, and there are two examples

25   at the top of Column 14.  You can link it with an

1    application or you can compile it into the code.  When the

2    specification is talking about linking and compiling here,

3    it is talking about different ways to integrate two

4    different programs together.  When you are doing linking,

5    you are talking about making a connection or a reference

6    between two separate program files.  When you are talking

7    about compiling into the code, you are talking about

8    combining two different program files into one so you have

9    a chimera program.

10        Both of these still have the regular application

11   executing, not in a fake environment.  The program is

12   actually making real transactions and talking to the

13   operating system just like a program that would not

14   execute in an emulator is doing.

15        There is a third major reason why simulation is

16   not emulation.  It is that Symantec's extrinsic evidence

17   contradicts its claim construction.  If you look at

18   Symantec's briefing, they have about a page of different

19   extrinsic evidence sources.  So much of their rationale

20   for their construction is from extrinsic evidence which

21   they claim defines what an emulator is.  The problem is,

22   their definitions don't say what Symantec is saying they

23   say.  Here is one definition that's from Symantec's brief.

24   It is the Dictionary of Computer Science Engineering and

25   Technology.  What you see on the screen here in Slide 33

1    is the definition that Symantec gave in their brief.

2    "(1), the firmwear that simulates a given machine

3    architecture."  So there is an immediate question here.

4    What is this term "machine architecture" even doing here?

5    In our case, in this patent, we are talking about

6    emulating all or part of a program.  Where is this term

7    "machine architecture" coming from?  It seems like maybe

8    this is for emulator in a different context.

9         The other thing is that Symantec leaves off the

10   second definition for emulator.  The second definition

11   doesn't mention simulation.  In fact, it ends with

12   "compare with simulator."  So this definition that they

13   used is saying there are some types of emulators that are

14   not simulators.  It is as simple as that.  The same

15   dictionary, when it is defining the term "emulation" says,

16   "Contrast with simulation."  This is an even stronger

17   signal than "compare."  It says, "Contrast with

18   simulation."  Their own definitions are not supporting

19   their own claim construction.

20        Here is a dictionary definition that Columbia

21   cited.  The McGraw-Hill Electronics Dictionary.  It says

22   that "Emulation should be distinguished from simulation."

23   So even given all this effort that they put into their

24   essentially wholly random extrinsic evidence definitions

25   together to try and support their claim construction, the

1    extrinsic evidence doesn't really support them.  There are

2    emulators that are not simulators.  They are just cherry

3    picking the extrinsic evidence.  What this really comes

4    down to is the specification.  If you look at Columns 13

5    through 16, you will see that the specification defines

6    different types of emulators and describes them all as

7    doing monitoring and selective execution.

8            Symantec's position is mainly extrinsic

9    evidence.  They also talk about something called a virtual

10   processor.  Virtual processor, even if it is a limitation,

11   is only a limitation of one embodiment, which is the

12   instruction-level emulator.  Further, they don't even link

13   virtual processor to the concept of simulation.  They just

14   say, "Look, it says 'virtual processor' in the

15   specification.  This is talking about simulation."  But

16   they don't really explain it.

17           Columbia's construction adheres to the

18   specification and describes what the emulator is actually

19   doing in the context of the claims.

20           THE COURT:  All right, we are going to have to

21   take a break.  I have to deal with this jury.  We will

22   take a break until we get set up on this other case and

23   then we will get back to you guys.

24           (Recess taken from 2:41 p.m. to 3:20 p.m.)

25           MR. HAMSTRA:  Your Honor, Nathan Hamstra for

1    Symantec Corporation.

2          THE COURT:  All right.

3          MR. HAMSTRA:  Go to Slide 56.  So in the claims

4    of the '115 and '322 patents, the emulator is a particular

5    structure that's recited in the claims.  That particular

6    structure has particular plain and ordinary meaning.  An

7    emulator is simply software that simulates a computer

8    system.  Just looking at the text of Claim 1, we see that

9    Columbia's construction has a couple problems.  So the

10   first element of the claim reads "executing at least a

11   part of a program in an emulator."  But Columbia's

12   construction of "emulator" is just something that allows

13   for the execution of part or all of a program.

14          Similarly, the second limitation simply recites

15   comparing a function call made in the emulator to a model.

16   In other words, the second limitation is talking about

17   monitoring or analyzing a function call.  But again,

18   Columbia's proposed construction of "emulator" is

19   something that permits the monitoring of all or part of a

20   program.  So in other words, Columbia isn't trying to

21   construe what an emulator is.  Columbia is rather simply

22   construing various uses an emulator is put to.  And that's

23   telling, because they aren't attempting to construe

24   emulator here.

25          Now, the '115 and '322 patents use the term

 1   "emulator" consistent with the plain and ordinary meaning.

 2   Turn to Slide 57.  So this portion of the specification

 3   here is discussing the emulation of a piece of code of a

 4   program.  And it discusses how, when the emulation starts,

 5   execution switches to the program executing on the virtual

 6   processor.  And then when it reaches to the end of the

 7   portion of the program that is being emulated, the

 8   execution changes from the virtual processor to the actual

 9   processor.  And that process is completely transparent to

10   the program being emulated.  It doesn't know it is being

11   emulated.

12           Here, this portion expressly contrasts the

13   virtual processor of the emulator and the actual processor

14   of the system, which is precisely the point of Symantec's

15   claim construction.  Now, Columbia quibbles a little bit

16   about "virtual" versus "simulated," but Columbia really

17   hasn't articulated any particular distinction between

18   those terms.  And what's clear from the weight of the

19   evidence is that an emulator must be a simulated or

20   virtual or fake environment.  And therefore, an emulated

21   program is a program that's running in that simulated or

22   fake or virtual environment.

23           Next slide.  Now, Columbia cited some prior art

24   patents to the Patent Office during prosecution of the

25   '115 and '322 patents.  As we noted in our briefing, these

1  patents that are cited to the PTO during the prosecution

2  form part of the intrinsic record, and consistent with

3  Symantec's proposed construction, this first patent, U.S.

4  Patent Number 5,978,917, defines "'emulation' means

5  running a computer program in a simulated environment."

6  Similarly, the second patent cited here, U.S. Patent

7  Number 6,952,776, describes an emulation step "that

8  executes the current object," that is, the program, "in a

9  virtual environment."

10          Next slide.  Symantec also cited a bunch of

11  treatises from the computer security art in its briefing,

12  and these treatises are likewise consistent with

13  Symantec's proposed construction.  For instance, the first

14  book is a book entitled The Art of Computer Virus Research

15  and Defense, and it is discussing code emulation.  For

16  code emulation, it says, "A virtual machine is implemented

17  to simulate the CPU."  Similarly, the next book is a book

18  about virus and antivirus software entitled Malicious

19  Mobile Code.  And this book talks about an emulation

20  engine that loads a file into a protected area of memory

21  and then simulates the computer's operating environment.

22  The last citation here, Virus Bulletin, is a magazine

23  devoted to computer security and particular virus

24  software.  And Virus Bulletin has a glossary, and their

25  glossary defines emulation as "any method of creating a

1    fake environment."  So the '115 and '322 patents

2    themselves, other intrinsic evidence and extrinsic

3    evidence all consistently agree that an emulator is

4    software that simulates a computer system.

5         Next slide, Jerry, 60.  Now, Columbia takes much

6    of their construction for the term "emulator" from this

7    quote of the specification here.  This is a citation to

8    Columbia's brief, and they selectively quote a portion of

9    the specification saying that STEM, which is a technique

10   in the '115 and '322 patents, "permits the selective

11   execution of certain parts or all of a program."  And to

12   arrive at their actual construction they just put

13   "software" with "hardware" in front and then add

14   "execution and monitoring" to this statement here.

15        But let's turn to the next slide and see what

16   this portion of the specification states in general.  What

17   we see is the embodiment being discussed here, Selective

18   Transactional EMulation, or STEM.  STEM "permits the

19   selective execution of certain parts, or all, of a

20   program."  But what Columbia omitted from that quotation

21   from their brief is "inside an instruction-level emulator

22   using the Valgrind emulator."  In other words, this

23   portion of the specification here isn't trying to define

24   emulator at all.  Rather, it is describing a use, a

25   purpose for which an emulator is used.  But just because

1    an emulator is used for a particular purpose doesn't mean

2    that everything that performs that particular purpose is

3    an emulator.  That's a basic error in logic.

4         In this embodiment here upon which Columbia

5    relies so heavily, the Selective Transactional EMulation

6    embodiment, we know what the emulator in this embodiment

7    does, too.  So this '289 provisional application was the

8    application to which the '115 and '322 patents claim

9    priority.  And it was also incorporated by reference into

10   the '115 and '322 patents.  And as you see, the heading at

11   the top of the quote here, it is discussing Selective

12   Transactional EMulation or STEM.  And what does it say

13   about the emulator used by STEM?  The highlighted portion

14   here says, "the emulator snapshots the program state and

15   executes all instructions on the virtual processor."  So

16   again, even the embodiment that Columbia is relying on

17   recites an emulator as software that creates a virtual

18   system.

19        Now, Columbia counsel mentioned a few

20   embodiments in the specification that they described as

21   emulators, and we just have some dispute with a few of

22   those so I wanted to point that out.  I don't have slides

23   for these, so I apologize.  But if you want, you can turn

24   to slide -- okay, go ahead.  They reference an

25   instrumented version described at Column 13, Lines 3

1    through 13 of an application.  That portion of the

2    specification does not describe that instrumented

3    application as an emulator.  They reference a debugger at

4    Column 14, Lines 10 through 15.  Similarly, the

5    specification does not describe the debugger as an

6    emulator.  Rather, they only say it may be invoked in a

7    manner similar to an emulator.  But that's not the same

8    thing.  All it means is that it is using processor

9    capabilities that are built in there for debugging to

10   begin the emulation process.

11           Lastly, Columbia referenced an emulator that is

12   compiled into the program itself.  And they say that

13   that's not a fake program.  But that emulator that's

14   compiled into the code, that's still entirely consistent

15   with Symantec's proposed construction because that

16   emulator also creates a simulated computer system to allow

17   for the execution of the program into which it is compiled

18   in a virtual environment as well.

19           Thank you, Your Honor.

20           THE COURT:  Thank you.  Brief rebuttal?

21           MR. SNYDER:  I'll be brief, Your Honor.  This

22   claim term really comes down to what sources of

23   information you are going to use to arrive at the

24   construction.  Columbia's approach is to look at the

25   specification, carefully read the common features of the

1    embodiments, and derive a construction that's faithful to

2    the specification and actually describes what the patentee

3    was talking about.  Symantec's approach is to use

4    extrinsic evidence, a few random pieces of prior art

5    patents, a few random external treatises, and say that

6    these definitions should be imported into the claims when

7    the specification only mentions "simulate" twice and only

8    in the context of the error virtualization optional

9    feature.

10            Could I have Columbia's slides, please?  I just

11   want to briefly run through some of the definitions that

12   Symantec talked about.  They cited Patent Number

13   6,952,776, and this patent says "a program emulation step

14   that executes the current object in a virtual

15   environment."  This definition, so-called definition,

16   doesn't mention emulator, and doesn't mention simulator.

17   Instead, they point to virtual environment.  But they

18   never really explain why virtual environment or virtual

19   processor, which is the term that's actually in the

20   specification, maps to their claim.

21            Here is another piece of evidence they cite in

22   their brief and was just up on a slide a few minutes ago.

23   It is by the late Peter Szor.  He was a Symantec antivirus

24   researcher and worked at McAfee as well.  He had a book,

25   The Art of Computer Virus Research and Defense.  They cite

1    a section from this saying an emulation of "virtual

2    machine is implemented to simulate the CPU and memory

3    management systems to mimic the code execution.  Thus,

4    malicious code is simulated in the virtual machine of the

5    scanner."

6            The problem with this is that the sentence

7    immediately after Symantec's quoted sentences is some

8    early methods of code emulation used debugger interfaces

9    to trace the code using the processor.  However, such a

10   solution is not safe enough because the virus code can

11   jump out of the emulated environment during analysis.  We

12   talked earlier about the debugger embodiment that's in

13   Column 14 of the '115 specification.  It is talking about

14   using the same debugger interface that Symantec's own

15   extrinsic evidence is saying doesn't count as genuine code

16   emulation.  They are talking about a different type of

17   code emulation.  So there is a conflict here.  It is

18   between the type of emulator that the specification sets

19   up, which has specific roles in the context of the

20   patents, and some abstract emulator that maybe works with

21   Symantec systems.  Who knows?  It is trying to import

22   extra limitations from the extrinsic evidence.  So there

23   are some problems with the extrinsic evidence they are

24   citing.

25           Mr. Hamstra said there is a problem with

1    Columbia's construction which is that we are only

2    describing what an emulator does and we are not defining

3    what an emulator is.  Their construction has the same

4    problem.  It says that it simulates a computer system.

5    That's a function, just like monitoring, and just like

6    selective execution is.  Really, the choice is, do you

7    describe how the emulator is actually being used in the

8    specification and in the claims and its relevant features

9    even if the specification doesn't have an explicit

10   definition of emulator, which it doesn't, or do you use

11   extrinsic evidence?  And PHILLIPS v. AWH says you have to

12   go with the specification.  Thank you, Your Honor.

13            THE COURT:  All right.  Next term?

14            MR. SHEASBY:  Good afternoon, Your Honor.  Your

15   Honor, the next term we need to discuss is "anomalous" as

16   used in the '115 patent.  If Your Honor remembers earlier

17   today I pointed out that "anomaly" and "anomalous" is both

18   a term that appears in the '084 patent as well as in the

19   '115 patent.  We spoke about Symantec's use of the phrase

20   "model of typical, attack-free" and insertion of that into

21   the definition of "anomalous" is so that could then be

22   imported as a limitation into the '115 patent.

23            Now, one of the things that counsel said earlier

24   today, and I think is interesting, he said we have to put

25   in the reference to "model of typical, attack-free" into

1    the definition of anomaly because otherwise no one will

2    know how you test for whether there is an anomaly.  What

3    test do you use.  Well, that doesn't make any sense.

4    Because in the '084 patent, the specification or the

5    claims are clear that you know there is a deviation from

6    normal by comparing it to a model of normal behavior.  So

7    clearly in the '084 patent, that language is not necessary

8    for the purpose that Symantec represents to Your Honor.

9              And it is not really necessary for the '115

10   claims, either.  And the reason for that is that the '115

11   claims actually go into excruciating detail, excruciating

12   detail about the model that they want to have constructed.

13   I'm on Slide 39.  They say, "The model you should use is a

14   model of function calls for the at least a portion of the

15   program, wherein the model is a combined model created

16   from at least two models created at different times."  So

17   this is one of the claims in the family, and you will see

18   the great, great detail that they use to describe the

19   model you are supposed to use to detect the anomaly.  And

20   of course, they don't say, "typical, attack-free," they

21   don't say, "a model that excludes any supplemental

22   abnormal information."  They don't say, "Blind yourself to

23   the common standard techniques that have been used for

24   years," which is to use supplemental abnormal data.  They

25   say nothing of the sort.

1           In fact, if you look at the Summary of the

2    Invention, you will see no reference to using 100 percent

3    normal data, you will see no reference to using clean

4    data.  All of the phrases, the buzzwords that Symantec

5    points to in articles, related applications that they say

6    establish when you must use 100 percent clean data, none

7    of those phrases occur in the Summary of the Invention of

8    this patent or in the '084 for that matter, and none of

9    those phrases appear in the claims of either this family

10   or the '085 patent.

11           So I know it is getting late in the day, and if

12   you will allow me to do so, Your Honor, I'm going to skip

13   a couple slides and get to what I think is a really

14   fascinating and interesting point.

15           So one of the things that Symantec says in its

16   reply brief, in the second brief, is it says, "The '115

17   patent relates to the creation of anomaly detectors.  And

18   anomaly detectors by their very nature detect divergence

19   from normal.  When you detect divergence from normal, you

20   basically have to use 100 percent pure data."  That's

21   Symantec's position.  I don't think I'm caricaturing it.

22   I know that's a common argument to the technique.  I think

23   in fairness that's the issue they are asking you to decide

24   in both the '084 patent family and the '115 patent.  You

25   can't detect divergence from normal by using datasets that

1    include both normal and abnormal data.  That's their basic

2    proposition.

3           Well, what's challenging about that is it has no

4    connection to the record before Your Honor.  Let me give

5    you an example.  The patent claims in the '115 patent, the

6    independent claim, I'm on Slide 43 now, says "a method for

7    detecting anomalous program executions using a model of

8    function calls."  What Symantec's position is that once

9    you say "anomalous," once you say "model of normal

10   behavior," you are automatically in a realm in which you

11   can only use 100 percent pure data.  You must blind

12   yourself, take out your eye to this massive set of

13   information that you can use to enrich your datasets.

14          But that can't be right.  Because the dependent

15   claim makes clear that that model of at least a part of a

16   program must, can include, not must, but can include

17   attacks.  This is a very important point.  Because what it

18   reflects is the exact opposite of what Symantec is

19   representing to you as the common, ordinary understanding

20   of anomaly, of detection of divergence from normal.  What

21   Symantec is saying it is impossible to detect divergence

22   from normal using anything other than pure data.

23          And that could not be more incorrect.  It

24   renders the claims, the dependent claims of the patent, an

25   absurdity.  Symantec actually has an interesting

1    argumentative move.  It does this with Claim 7, but I

2    think, I anticipate they will try to do it with Claim 8 as

3    well.  They will say, "Well, Claim 8 is just describing a

4    situation in which you are referring to at least part of a

5    model."  But that's the narrowing limitation from Claim 1.

6    But as you see, that doesn't work because Claim 1 also

7    refers to at least part of a model.  So I did want to flag

8    that argument, because I don't think it holds up when you

9    actually compare Claim 1 to both Claim 7 and Claim 8.

10           This is a differentiation issue.  And the

11   Federal Circuit is quite clear on this.  It is the idea

12   that there could be no cogent way in which anomaly

13   detection, detection of departure from normal, could in

14   its ordinary meaning exclude the use of supplemental

15   abnormal data when the dependent claim specifies that the

16   solution -- the consideration of abnormal data is an

17   option.

18           I don't want to sell a bill of goods to Your

19   Honor.  In other words, there are many types of algorithms

20   that are not sufficiently sophisticated to consider

21   anything other than purely normal data.  That's absolutely

22   the case.  In many ways it is a much less sophisticated

23   algorithm.  It makes it easier to experiment with and is

24   an algorithm that the inventors actually used in many,

25   many situations.  But to say there are only algorithms in

1    which you can use only 100 percent normal data is really

2    missing the point because none of these claims are limited

3    to a particular algorithm.  In fact, if you read the

4    specifications, they make that clear.  The inventors are

5    unabashed.  "We used a very simple algorithm.  You can use

6    more complex ones."

7            Just one final point:  Symantec once again

8    focuses on a provisional application and represents to

9    Your Honor that in these provisional applications, the

10   models of normal behavior, the only way to do it is to use

11   purely normal data.  But we know that's not correct.  Part

12   of the provisional application they did not include makes

13   clear you can create a model of normal data using mixed

14   data.

15           At that point, Your Honor, I think I'm done with

16   that section and I'll save time for a very brief rebuttal.

17           THE COURT:  All right.

18           MR. HAMSTRA:  Go to Slide 66.  Looking at Claim

19   1 of the '115 patent in the context of the anomalous

20   limitation, the claim first recites "comparing a function

21   call made in the emulator to a model of function calls."

22   Then it recites "identifying the function call as

23   anomalous based on that comparison."  So what we are doing

24   here is we are measuring the anomalousness of the function

25   call based on a comparison to this model.  Symantec's

1    proposed construction requiring that the anomalous

2    function call be measured against the model of typical,

3    attack-free computer system usages is consistent with both

4    the intrinsic evidence and the extrinsic evidence.  Much

5    of this is a rehash of what we discussed in the '084

6    patent and '306 patent, so I'll be brief here.

7              Starting with the provisional application, we

8    see that anomaly detection is a known technique in the

9    art.  Anomaly detection algorithms build models of normal

10   behavior and use those models to detect behavior that

11   deviates from normal.  The next question is, what is a

12   model of normal behavior.  The intrinsic evidence confirms

13   that a model of normal behavior is a model of typical,

14   attack-free behavior.

15             The '115 and '322 patents themselves at Column 3

16   Lines 50 to 52 describe building the model from normal

17   data.  The embodiments discussed in the '115 and '322

18   patents are entirely silent about using any abnormal or

19   attack data for modeling purposes.

20             Slide 68.  The '289 application likewise

21   confirms, consistent with the plain and ordinary meaning

22   of the term "anomalous," that the training is done using

23   attack-free records.  And interestingly, the documents

24   cited by Columbia at Slide 46 indicating that there is

25   some non-normal data included in the model actually

1    contradicts that statement.  Because the document Columbia

2    cited actually describes all that information as normal

3    data.  "The normal data can include good data, potentially

4    harmful data, and noise."  So again, it is consistent with

5    Symantec's proposed construction.

6              Now, Columbia makes much of claim

7    differentiation.  The Federal Circuit has cautioned

8    against an oversimplistic application of this principle,

9    though.  One Federal Circuit case in particular said that

10   the doctrine of claim differentiation cannot broaden

11   claims beyond their correct scope determined in light of

12   the specification and the prosecution history, and any

13   relevant extrinsic evidence.  That's MULTIFORM DESICCANTS

14   v. MEDZAM, 133 F.3d 1473.  That caution should be taken to

15   heart here, particularly where the disclosed embodiments

16   don't describe a model that actually includes attack data.

17   Here, the correct scope is Symantec's proposed

18   construction, "a deviation from a model of attack-free

19   typical computer system usage."  Thank you.

20             MR. SHEASBY:  Just a brief rebuttal and then one

21   final term.  So at lunch, I was looking over Symantec's

22   slides.  And this slide that they showed, which is Slide

23   68, was actually a new argument that I hadn't seen before.

24   This is one of the pieces of the provisional application

25   for the '115 application.  And you see how they are

1    referring to something called a "one class SVM system."

2    It is a type of algorithm.  They are saying in that

3    algorithm they use attack-free records.  What's

4    interesting, of course, is the phrase "attack-free"

5    doesn't appear in the claims of either the '115 or the

6    '084 patent.

7         Let's have the next slide now.  So the portion,

8    what they are citing here is actually an appendix to the

9    provisional application.  And the appendix is a portion of

10   the appendix which, actually, let me skip that slide, the

11   portion of the appendix they cite to is Appendix B.  They

12   are citing to Appendix B to have a discussion of RAD,

13   which is a type of software algorithm.  And if you go to

14   that portion -- if you actually read the article that they

15   cite to, in context what the article says is that the

16   OCSVM system and the PAD system are different.  We have

17   shown that the PAD system is more reliable.

18        Let me take this in pieces.  So the article that

19   they are relying on in this slide is Appendix B to the

20   provisional application.  The provisional application

21   says, "Look at Appendix B because it is going to have an

22   interesting discussion of PAD/RAD," which is a different

23   type of algorithm.  When you go and you look at the actual

24   article, it says, "PAD is fabulous, OCSVM," the portion

25   they are referring to which uses only attack-free data,

1   "is not very good."

2         Why is this interesting?  Well, the reason why

3   it is interesting is because -- let me stop here for a

4   moment.  I think there are very limited instances in which

5   inventor testimony is helpful during claim construction.

6   I think it is extremely rare.  But I think one instance in

7   which it is relevant is when the actual experiments they

8   do are put into issue.  And what Symantec has been doing

9   today is they have been saying, "Well, they have used

10  algorithms to run their experiments that use 100 percent

11  pure data, and so I want to import those into the claim

12  and we are going to point to articles in which they were

13  using these algorithms which could only support the use of

14  100 percent clear data."

15        And one of the things that happened earlier this

16  month is they actually took the deposition of Inventor

17  Hoenig.  Inventor Hoenig actually works at Google now.  He

18  is completely independent.  What I mean by that is, we

19  don't interact with him, we didn't prepare him for his

20  deposition.  He actually just came in and spoke cold at

21  his deposition.  And one of the things he spoke about at

22  his deposition was, there are different types of

23  algorithms that the inventors were using.  One of those

24  algorithms that they were using is an algorithm called

25  PAD.  Why is that important?  Because PAD is the algorithm

1    that's referenced in the '115 application, and it is the

2    algorithm that's referenced in the '084 application as

3    potential candidates for use.  Here is what he says about

4    the PAD algorithm.  He says:  "In the PAD algorithm, we

5    could build a model of normal behavior using mixed normal

6    and abnormal data."  I'm on Slide 6 of the supplemental

7    slides.  There wasn't a requirement to use 100 percent

8    pure data.

9            So they had algorithms available to them, PAD,

10   for example, that didn't require 100 percent pure data.

11   He said, "I want to be open with you."  These are

12   unfortunately not in your slides, Your Honor, but I'll get

13   you copies and I apologize for that, but it is an

14   exhibit -- none of this is new evidence.  I want to be

15   clear.  These are all lodged.  These are excerpts from the

16   deposition of Inventor Hoenig in Exhibit Z.  What he says

17   is, "I want to be clear, we had the PAD algorithm, which

18   was -- allowed us to use normal data supplemented with

19   abnormal data.  We had other algorithms which didn't allow

20   us to use supplemental data.  We had to use 100 percent

21   pure data.  They were weaker algorithms, less complex.

22   PHAD was one of them."

23           So PAD allowed the use of supplemental abnormal

24   data.  PHAD, P-H-A-D, did not allow the supplemental use

25   of abnormal data.  Why is this so important?  Well, the

1    reason why it is so important is because if you look at

2    both the '115 patent and the '084 patent, '115 patent,

3    Column 4, Lines 9 through 10, '084, Column 18, Lines 5

4    through 9, they both make clear that you can use PAD as an

5    optional way of -- optional algorithm for doing your

6    anomaly detection.  Why is that so important?  Because PAD

7    is one of the algorithms that allows you to use both

8    normal and abnormal data.

9            So we spent a lot of time today talking about

10   this issue.  And what makes it sort of frustrating,

11   excruciating, is because there is actually a scientific

12   answer behind this.  In other words, you may ask yourself,

13   "Well, Mr. Sheasby, if they were using -- doing

14   experiments with algorithms that only used 100 percent

15   pure data, why shouldn't I import that in the claim as a

16   negative limitation?"  Putting aside the Federal Circuit

17   says no.  In other words, it seems like the inventors are

18   trying to get away with something.  But they are not

19   trying to get away with anything.  They used very simple

20   algorithms because it allowed them to do efficient,

21   targeted experiments.  But they also published and made

22   clear that more robust algorithms, PAD, for example, could

23   allow this mixed data.

24           And so that's why we keep coming back to the

25   question of where Symantec is saying "The ordinary meaning

1    of normal excludes the use of any supplemental abnormal

2    data."  It is really reflecting a state of a fact that

3    doesn't connect to the science.  And I think that's why in

4    this very narrow situation, looking at what Mr. Hoenig

5    said, completely unprompted, completely independently, is

6    actually pretty relevant.

7             So with that, I have no more on "anomaly" and I

8    will move on to the final term, Your Honor.

9             So the final term is "application community."

10   And as is often the case, it is the last term in -- it is

11   the last term in the brief and it was the last term today.

12   And so sometimes when you are last, you get short shrift.

13   Just ask people whose last name is Z in elementary school;

14   they had to wait until the end to get called.  But there

15   actually is something deep here and it is not going to

16   take long but I don't want to lose it.

17            These definitions are really passing in the

18   night, so it seems.  But the big dispute, I think, is

19   actually not that great.  Let me tell you what I mean.  In

20   the application, in the specification, there are really

21   two different roles that "application community" plays.

22   Think of "application community" as distributed computers.

23   They can be at different locations across the country,

24   they can be in the same room together, but they are

25   running independently.  It is a way of using something

1    called parallel computing to unlock the power.  You give a

2    piece of a big problem to lots of different workers, and

3    together they solve it.

4           And there is another concept of "application

5    community" used in which the members of the community all

6    share a same model.  And so both these strategies are

7    available and spoken about in the patent.  So the patent

8    speaks about "members of the community sharing a common

9    model."  So they all run the same model, the model used to

10   test divergence from normal.  But they talk about a

11   different, equally important embodiment in which the

12   members of the community don't share a same model.  They

13   all contribute to the creation of a model by doing

14   distributed pieces of analysis.  And the problem with

15   Symantec's construction is that ignores Option 2.  That's

16   really the crux of the dispute.

17          And you can actually see this as clear as day in

18   the specification.  The '115 patent at 6:33 to 36.  This

19   is a very important passage in my mind.  What the passage

20   says is that "In some embodiments, the members of the

21   application community share models with each other."

22   That's Option 1.  There is a model that they share, or

23   more than one model that they share.  But they share

24   something in common.  The alternative, and/or, they

25   "update each other's models."  Interesting.  They are not

1    sharing a common model.  They are both contributing

2    information.  They are contributing information that other

3    members of the community can use to update their own

4    specific model.  And this actually, what's interesting is,

5    even though Option 2 -- Option 1, Option 2 are both real

6    and meaningful and important.  It is Option 2, the option

7    that Symantec's definition ignores, that gets the most

8    amount of attention in the specification.  It is complex,

9    and that's the reason.  And sometimes in those situations,

10   you lose the forest for the trees.  But they are very,

11   very focused on this Option 2.  "Some particular randomly

12   chosen function or functions and its associated data" are

13   divvied out to the different members of the community so

14   they can work on parts of problems, analyze portions of

15   code, determine weaknesses and danger, and then use that

16   information and share it with other members of their

17   community who can create their own models.  Option 2.  You

18   see that at Column 16, Lines 55 through 58 as well.  "Each

19   portion or slice" is divvied out to each member of the

20   workstation.

21          And so Symantec has this argument where they

22   say, "This construction that Columbia is proposing is

23   fantastically broad and it allows for these absurd," what

24   they characterize as "absurd outcomes."  Actually, I think

25   that's a caricature.  I don't think that's what's going on

1   here.  In our mind the construction we proposed allows for

2   two different options when you read it in light of the

3   claim.  Members of the application community either run

4   the same model of application or a portion thereof, or

5   they run an application that allows them to share

6   information that is used to build a model.  That's what we

7   believe is the implication of our construction.  We don't

8   think it is broad, we don't think it is narrow.  We think

9   what it does is, it shows fidelity to the two options that

10  are consistently described in the specification.  Thank

11  you very much, Your Honor.

12          THE COURT:  All right.  Symantec?

13          MR. HAMSTRA:  Slide 72.  Your Honor, going back

14  to basically some of the same content Mr. Sheasby just

15  left off at, in Columbia's responsive brief, they said

16  this here.  They believe Columbia's construction requires

17  that the "members of the application" include "those who

18  run the same modeled application or a portion thereof."

19  And that sounds a lot like Symantec's proposed

20  construction of "application community."  Assuming that

21  the modeled application refers to the programs in the

22  claims for which there is a model, I don't think we

23  disagree with that at all.

24          The problem comes from this second statement

25  here, that an "application community" also includes those

1     who "run an application that allows them to share

2     information that is used to build a model."

3              So the first problem with that statement is that

4     it does not appear supported by Columbia's actual

5     construction.  Go to Slide 70.  So Columbia's proposed

6     construction is on the right here.  It is "members of a

7     community running the same program or a selected portion

8     of a program."  There is nothing about that construction

9     that would encompass any application that allows sharing

10    of information to build a model.  Slide 72 again.  And

11    there are other problems with this statement.  For

12    instance, Columbia's statement here just recites a model.

13    What is that model of?  Is that a model of the modeled

14    program recited in the claims?  We don't know.  It doesn't

15    say.

16             And Columbia referenced the fact that the

17    specification also describes the sharing of models among

18    application community members.  But there is a simple

19    reason for that.  The application community members share

20    models because they each have a model of that same

21    program, and therefore share pieces of that model.

22             Flip to Slide 74.  So there is a citation in the

23    provisional application here, and again, "application

24    communities are...instances of the same application

25    that...monitor their execution," i.e., the execution of

1    those independent instances, "for flaws and attacks."  So
2    they are all looking at that same program that they are
3    running and modeling.
4            I just want to respond to one point on
5    "anomalous."  Columbia has spent a lot of time talking
6    about various methods for detection of malicious software
7    that use some attack data for modeling.  But what we
8    haven't seen today a single time is a single quotation
9    describing "a model of normal computer system usage" as a
10   model that includes attack data.  That's just something we
11   haven't seen before.  I have nothing further, Your Honor.
12           THE COURT:  All right.  Rebuttal?
13           MR. SHEASBY:  Your Honor, just one point of
14   rebuttal, which is, I don't believe that last statement
15   was accurate.  We, of course, did show you the portion of
16   provisional application as just one example that they
17   omitted from their brief that describes a model of normal
18   data that uses mixed data.  With that, I don't think we
19   need to say anything else.
20           THE COURT:  All right.
21           MR. NELSON:  Your Honor, can I address
22   something?  Mr. Sheasby has said about five times now that
23   we omitted something from the brief.  The provisional
24   application that he is talking about, we submitted that in
25   the Declaration, the first time around.  It was 300 pages

1  long.  And there was already a number of things in front

2  of Your Honor, right?  And what we did is said

3  specifically the parts, the citations that we have in

4  there, that's what we are providing to Your Honor.  That

5  was like the first 50 pages.  The last 250 pages didn't

6  get cited.  They came back then and said, "We want to put

7  the rest of it in."  We said, "Fine."  We didn't oppose

8  that.  So I'm a little bit -- there has been several times

9  where there has been this implication that we were trying

10 to keep something from Your Honor.  Absolutely no possible

11 way.  That's not what we were trying to do.  I will never

12 do that.  I will represent that to you as an Officer of

13 the Court.  I just want to make sure the record is clear

14 so Your Honor doesn't walk away from here thinking just

15 because Columbia kept saying it, that the Symantec guys

16 are trying to keep information away from Your Honor.

17 That's not the way it is.  All right.

18             THE COURT:  All right.

19             MR. SHEASBY:  And Your Honor, I actually agree

20 with that.

21             THE COURT:  Is there anything else anybody wants

22 to say?  You all have grand argument?

23             MR. NELSON:  There was only one point that I

24 wanted to make a little bit clear on what Mr. Hamstra said

25 at the end there.  The inventor testimony was an example,

1    you saw it at the end.  I don't need to put it back up on

2    the screen.  Where the inventor said, "Well, we had these

3    models where we included normal data and abnormal data,"

4    right?  These algorithms.  "We had things where we

5    included things in addition to normal data."  During my

6    portion of the argument, I showed you that.  There were a

7    number of those things that were discussed.  But those are

8    different algorithms.  That's the point.  Different

9    algorithms from the ones that are claimed for various

10   parts in the '084 patent where it says "a model of normal

11   computer usage."  That's what they chose to claim.  What

12   Mr. Hamstra was saying, the point being made, any of that

13   inventor testimony you saw, the stuff from the

14   provisionals, all these other models there was a

15   distinction made with normal and abnormal data.  The one

16   that we have claimed here and the one that was referenced

17   was a model of normal computer system usage, which is one

18   that uses attack-free data.  So that was the point that

19   was being made.  I just wanted to address that because I

20   think Columbia had a little issue with Mr. Hamstra's

21   point.  So thank you.

22              THE COURT:  All right.  Okay.  I'll take the

23   matter under advisement.  It will take me a little while

24   to turn my mind from what I was into and to this, but I

25   will do that shortly and try to get these terms construed

1    so that we can march on.  Thank you all very much.  I

2    appreciate it.

3              (Proceedings adjourned at 4:04 p.m.)

4                   CERTIFICATE OF REPORTER

5        I, Jeffrey B. Kull, Official Reporter, certify that

6    the foregoing is a correct transcript from the record of

7    proceedings in the above-entitled matter.

8

9

10   _____/s/_____

11   Jeffrey B. Kull,
     Official Federal Reporter
12

13   _____/s/_____

14   Date

15

16

17

18

19

20

21

22

23

24

25