IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |
|---|---|
| THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, | |
| *Plaintiff,* | Civil Action No. 3:13-cv-00808-MHL |
| v. | REDACTED |
| NORTONLIFELOCK INC., | |
| *Defendant.* | |

**COLUMBIA UNIVERSITY'S MEMORANDUM OF LAW IN OPPOSITION TO NORTONLIFELOCK INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF UNDISPUTED AND ADDITIONAL FACTS THAT DEFEAT
        NORTON'S MOTION FOR SUMMARY JUDGMENT UNDER E.D. VA. LOC.
        R. 56(B)...............................................................................................................3

        A.      Norton's Communications and Representations to Columbia That Underlie
                Columbia's State Law Claims. .................................................................4

        B.      The Prosecution Histories of the '115 and '322 Patents On Which Columbia's
                Patent Infringement Claims Are Based.......................................................9

III.    NORTON IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON
        COLUMBIA'S STATE LAW CLAIMS ..............................................................11

        A.      Columbia's Fraudulent Concealment and Unjust Enrichment Claims Do Not
                Depend on the Confidentiality of the NICECAP Proposals. ..................11

                1.      Violation of Norton's Duties Under the NDA Is a Disputed Issue
                        of Fact. .....................................................................................11

                2.      Norton Had a Duty to Disclose Its Filing of the Relevant Patent
                        Applications. .............................................................................14

        B.      Columbia's Conversion Claim is Not Preempted. ..................................21

IV.     PROSECUTION HISTORY ESTOPPEL DOES NOT BAR COLUMBIA FROM
        ASSERTING THE DOCTRINE OF EQUIVALENTS IN ADDITION TO
        LITERAL PATENT INFRINGEMENT...............................................................23

        A.      Columbia Did Not Surrender Equivalents to the "Application Community"
                Claim Element, Much Less the Specific Equivalent Asserted Here.......24

        B.      Columbia Did Not Surrender Equivalents to the "Combined Model"
                Limitations in the '322 Patent...............................................................27

        C.      Columbia Did Not Surrender Equivalents Through *Inter Partes* Review.............29

V.      CONCLUSION...................................................................................................30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AHA Sales, Inc.* v. *Creative Bath Prod., Inc.*,
   867 N.Y.S.2d 169 (N.Y. App. Div. 2008) ................................................................17

*Ajinomoto Co.* v. *Int'l Trade Comm'n*,
   932 F.3d 1342 (Fed. Cir. 2019) ...............................................................................24

*Albion All. Mezzanine Fund, L.P.* v. *State St. Bank and Tr. Co.*,
   797 N.Y.S.2d 699 (N.Y. Sup. Ct. 2003) .................................................................14

*Amusement Indus., Inc.* v. *Buchanan Ingersoll & Rooney, P.C.*,
   2013 WL 628533 (S.D.N.Y. Feb. 15, 2013) ............................................................17

*Bank of Montreal* v. *Signet Bank*,
   193 F.3d 818 (4th Cir. 1999) ........................................................................14, 18, 19

*Banque Arabe et Int'l D'Investissement* v. *Md. Nat. Bank*,
   57 F.3d 146 (2d Cir. 1995) .................................................................................14, 18

*Brass* v. *Am. Film Techs., Inc.*,
   987 F.2d 142 (2d Cir. 1993) .....................................................................................18

*Deering Precision Instruments, L.L.C.* v. *Vector Distrib. Sys., Inc.*,
   347 F.3d 1314 (Fed. Cir. 2003) ................................................................................29

*Diaz Vicente* v. *Obenauer*,
   736 F. Supp. 679 (E.D. Va. 1990) ...........................................................................16

*Don* v. *Singer*,
   939 N.Y.S.2d 363 (N.Y. App. Div. 2012) ...............................................................12

*Eli Lilly & Co.* v. *Hospira, Inc.*,
   933 F.3d 1320 (Fed. Cir. 2019) ................................................................................24

*Elmhurst Dairy, Inc.* v. *Bartlett Dairy, Inc.*,
   949 N.Y.S.2d 115 (N.Y. App. Div. 2012) ...............................................................13

*Festo Corp.* v. *Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002) .......................................................................................3, 23, 24

*Festo Corp.* v. *Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   344 F.3d 1359 (Fed. Cir. 2003) ..........................................................................23, 24

*Fox Paine & Co., LLC* v. *Hous. Cas. Co.*,
   60 N.Y.S.3d 294 (N.Y. App. Div. 2017) .................................................................16

*Funai Elec. Co.* v. *Daewoo Elecs. Corp.*,
   616 F.3d 1357 (Fed. Cir. 2010)...........................................................................27, 29, 30

*Intervet Inc.* v. *Merial Ltd.*,
   617 F.3d 1282 (Fed. Cir. 2010).................................................................................26

*Lehman Bros. Com. Corp.* v. *Minmetals Int'l Non-Ferrous Metals Trading Co.*,
   179 F. Supp. 2d 118 (S.D.N.Y. 2000).......................................................................16

*Morgan Guar. Trust Co. of N.Y* v. *Republic of Palau*,
   693 F. Supp. 1479 (S.D.N.Y. 1988)..........................................................................19

*Myers* v. *Lee*,
   2010 WL 2757115 (E.D. Va. July 12, 2010).............................................................16

*Not Dead Yet Mfg. Inc.* v. *Pride Sols., LLC*,
   265 F. Supp. 3d 811 (N.D. Ill. 2017) ........................................................................30

*Penato* v. *George*,
   383 N.Y.S.2d 900 (N.Y. App. Div. 1976) .................................................................17

*In re Platinum-Beechwood Litig.*,
   377 F. Supp. 3d 414 (S.D.N.Y. 2019)........................................................................16

*Ranbaxy Pharms. Inc.* v. *Apotex, Inc.*,
   350 F.3d 1325 (Fed. Cir. 2003)..................................................................................29

*Regents of Univ. of Cal.* v. *Dakocytomation Cal., Inc.*,
   517 F.3d 1364 (Fed. Cir. 2008)..................................................................................25

*Spandex House, Inc.* v. *Travelers Prop. Cas. Co. of Am.*,
   2015 WL 509678 (S.D.N.Y. Feb. 6, 2015).................................................................13

*St. John's Univ., N.Y.* v. *Bolton*,
   757 F. Supp. 2d 144 (E.D.N.Y. 2010) ........................................................................17

*Stone Castle Fin., Inc.* v. *Friedman, Billings, Ramsey & Co.*,
   191 F. Supp. 2d 652 (E.D. Va. 2002) .........................................................................16

*Transamerica Occidental Life Ins. Co.* v. *Sanders*,
   1996 WL 378310 (4th Cir. Jul. 8, 1996).....................................................................12

*Univ. of Colo. Found. Inc.* v. *Am. Cyanamid Co.*,
   196 F.3d 1366 (Fed. Cir. 1999)...................................................................................14

**Statutes**

35 U.S.C. § 112(d) .........................................................................................................27

-iv-

35 U.S.C. § 122(b)(2)(A)(iii) ................................................................................................7, 20

**Other Authorities**

Fed. R. Civ. Pro. 8(b)(6) ........................................................................................................12

Plaintiff, The Trustees of Columbia University in the City of New York ("Columbia"), submits this memorandum in opposition to Defendant NortonLifeLock Inc.'s ("Norton") Motion for Partial Summary Judgment ("Motion").  (Dkt. 312.)  Norton has not met its burden on summary judgment, and its Motion should be denied in its entirety.

## I.   INTRODUCTION

Norton's Motion directed to Columbia's state law fraudulent concealment, unjust enrichment, and conversion claims should be denied because it is based on a mischaracterization of both the law and Columbia's claims.   Norton first asserts that Columbia's fraudulent concealment and unjust enrichment claims fail because certain disclosures made by Columbia to Norton—the draft proposals to the National Intelligence Community Enterprise Cyber Assurance Program ("NICECAP")—were "publicly available" at the time Norton filed the patent applications on which Columbia's claims are based.

As an initial matter, Norton has failed to show that the draft NICECAP proposals were publicly available—a material fact disputed by Columbia.  The provisional patent application in which the draft proposals were included was never published, and there is nothing in the record to show that it was made available in the manner that Norton claims.  Moreover, even if this was not a materially disputed fact, Norton's theft of Columbia's technology encompassed other confidential disclosures, including oral and written disclosures that provided more information about the technology than was included in the NICECAP proposals.  Norton does not argue at summary judgment that this additional information was publicly available.

In addition, Norton is wrong that Columbia's fraudulent concealment and unjust enrichment claims stand or fall on whether the NICECAP proposals were publicly available.  As the Court recognized in denying Norton's motion to dismiss (Dkt. 67 at 17–20), Columbia's state law claims are based on independent tortious conduct by Norton that violated, among other things,

its duty to disclose to Columbia the filing of certain patent applications.  The record is replete with evidence that Norton had such a duty based on the relationship it formed with Columbia, which included both confidentiality and fiduciary obligations.  The nature of that relationship is a question of fact that cannot be resolved on summary judgment.  In addition, Norton chose to contact and then mislead Professors Stolfo and Keromytis regarding Norton's filing of the relevant patent applications.  In doing so, Norton protected its own interests while leading Columbia to believe that it did not need to take steps to protect its own interests.  This is an independently sufficient basis to sustain Columbia's fraudulent concealment claim.  Having solicited Columbia in business dealings, Norton had a legal duty not to mislead Columbia to secure a benefit for itself.

Norton also contends that Columbia's conversion claim is preempted because the claim is based "on the inventorship of the '643 patent."  (Dkt. 314 "Norton Mem." at 2.)  But that misstates Columbia's claim.  Norton's conversion of Columbia's property caused damage to Columbia beyond the mere fact that Norton omitted Columbia's professors as inventors of the patent, and correction of inventorship will not compensate Columbia for that harm, which was collateral to the filing of the relevant patent applications.  In other words, Columbia's conversion claim is not solely based on Norton filing a patent application using Columbia's property, but rather is far broader and not preempted merely because part of the damage to Columbia arose from filing a patent application that improperly omitted Columbia professors as inventors.  Columbia's claim is viable regardless of the inventor of U.S. Patent No. 8,549,643 (the "'643 Patent")—*i.e.*, the issue in Columbia's separate federal claim to correct inventorship.

On the patent infringement side of the case, the Court should deny Norton's motion for partial summary judgment regarding the doctrine of equivalents because the prosecution histories of U.S. Patent Nos. 8,074,115 ("'115 Patent") and 8,601,322 ("'322 Patent") (collectively, the

"Asserted Patents") do not give rise to prosecution history estoppel. Norton implicitly asserts that if a claim-narrowing limitation is added during patent prosecution, the patentee is entirely prohibited from applying the doctrine of equivalents to the added limitation. (Norton Mem. at 22–24.) That is not the law. The Supreme Court in *Festo Corp.* v. *Shoketsu Kinzoku Kogyo Kabushiki Co.* made clear that the presumption of estoppel does not create a "complete bar" on equivalence arguments. 535 U.S. 722, 737–38 (2002). Rather, there is no bar if "the narrowing amendments did not surrender the particular equivalents at issue." *Id.* at 741. If the narrowing amendments did not do so (as is the case here), the patentee remains free to assert such equivalents to the amended claim language. Here, Columbia made amendments to its patent claims—which happens during the prosecution of most patents—but those amendments do not create estoppel because they "bear no more than a tangential relation to the equivalent[s] in question." *Id.* at 740.

## II.    STATEMENT OF UNDISPUTED AND ADDITIONAL FACTS THAT DEFEAT NORTON'S MOTION FOR SUMMARY JUDGMENT UNDER E.D. VA. LOC. R. 56(B)

Columbia does not dispute Norton's Rule 56 Statement of Undisputed Material Facts, except for the following facts. *First*, Columbia disputes that all obligations under the November 2004 Mutual Non-Disclosure Agreement expired after five years because that limitation only applied to Section 2(a) of that agreement. *See infra* § II(A). *Second*, Columbia disputes that U.S. Provisional Patent Application 60/809,898 ("'898 Application") became publicly available with the publication of International Publication No. WO 2007/143011 because Norton has provided no evidence that that publication was publicly available prior to April 2010. *Third*, Columbia disputes that the '898 Application became publicly available with the publication of U.S. Patent Application 2009/0241191 ("'191 Application") because Norton has provided no evidence that the '898 Application was in fact publicly available prior to April 2010. *See infra* § III(A)(1). The rest of this section sets forth the record evidence that establishes these genuine issues of material fact

and discusses additional facts germane to the summary judgment analysis that Norton ignores.

**A.   Norton's Communications and Representations to Columbia That Underlie Columbia's State Law Claims.**

In November 2004, Columbia and Norton (then known as Symantec) entered into a Mutual Non-Disclosure Agreement ("NDA"), prepared by Norton, for the purpose of "facilitating discussions between the parties regarding a possible collaboration." (Ex. A at COL00149692; *see also* Dkt. 20 ¶ 31 ("Answer").)   The NDA prohibited either party from "disclos[ing] any Confidential Information to third parties for five (5) years." (Ex. A at COL00149692.) Separately, the NDA required the parties to use confidential information "only for the purpose for which it was disclosed" and prohibited the "use or exploit[ation of] such information for their own benefit or the benefit of a third party without the prior written consent of the Disclosing Party." (*Id*.; Answer ¶ 31.) This second, separate restriction did not expire even after the first provision expired. (Ex. A at COL00149692.) The parties also understood that, in addition to whatever obligations flowed from the NDA, their collaboration constituted a confidential good-faith working relationship pursuant to which they would communicate in confidence about the prospect of submitting joint grant proposals to government agencies. (*See, e.g.*, Ex. B ("Stolfo Tr.") at 89:2–4, 354:22–355:15, 392:20–23, 395:12–15; *see also* Answer ¶ 2.)[1]

On May 3, 2006, Brian Witten (then Norton Director of Government Research) asked Professors Stolfo and Keromytis to collaborate with Norton on a joint grant proposal to NICECAP. (Ex. C at COL00094682–83.) Although they agreed to "work together" on the proposal, (*id.* at COL00094682), in fact the "collaboration" was one-sided, as the two NICECAP draft proposals

---

[1] Norton has never fully answered Columbia's state law claims.  Instead, Norton stated that it would "timely" provide an answer if its motion to dismiss were denied. (Answer ¶¶ 119–32, 134–38, 140–44.)  Six years later, Norton still has not answered the state law claims and the motion for partial summary judgment may be denied for that reason alone.

were created by Keromytis and Stolfo and then disclosed to Norton.  (*See* Ex. D at COL00094706–09; Ex. E at COL00215750–59.)  █████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

In February 2010, Marc Dacier (Director of Norton Research Labs Europe) approached Stolfo and Keromytis to ask them to collaborate on a proposal to the Defense Advanced Research Projects Agency's ("DARPA") Cyber Genome Program.  (Ex. H at COL00120404–05; Ex. I at COL00215401; Keromytis Tr. at 202:21–204:14.)  On March 2, 2010, Darren Shou (a Director in Norton's Research Labs) indicated that the collaboration would be a continuation of the previous work that Stolfo and Keromytis had disclosed to Norton.  (Ex. H at COL00120413–14.)  ████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

The IDF prepared by Shou states that the invention arose from "*confidential* discussions with Columbia University faculty (2) in preparation for a Government confidential submission for funding." (Ex. K at COL00159625 (emphasis added).) █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Norton then began to pursue patent protection for the invention described in the IDF. On March 24, 2010, outside counsel for Norton e-mailed Stolfo and Keromytis to inform them that Norton was preparing a patent application based on the DARPA proposal and ask whether they were the inventors. (Ex. K at COL00159621.) To deflect any concerns these non-lawyers might have when he contacted them directly rather than through Columbia's counsel, Larson described himself as a "non-evil lawyer" (with a smiley face), and noted that Norton "realize[d] [that it] did not invent the decoy creation technique" described in the IDF. (*Id.*) █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ That same day, Shou also e-mailed Stolfo and Keromytis to tell them that Norton was "look[ing] into the possibility of patenting the idea" described in the IDF and that he had "added [their] names (along with Marc and myself) to the list of co-inventors." (Ex. Q at COL00215733.) However, this last statement was false—the IDF listed only Dacier as an inventor. (*See* Ex. K at COL00159623.)

Instead of continuing the discussion of who owned the ideas in the IDF, on April 2, 2010, Norton simply filed a provisional patent application based on Columbia's ideas with the United States Patent and Trademark Office. That provisional application, contrary to Shou's representations to Stolfo and Keromytis, listed only Dacier and Shou as inventors. (Ex. R at

COL00152027.) Three days later, Larson informed Columbia that Norton "is filing a provisional patent application this week on the IDF," even though Norton had already filed the application. (Ex. S at COL00120721.) Not only did Larson fail to send Columbia a copy of the filed provisional application, he also failed to mention that Norton had omitted Stolfo and Keromytis from the application's list of inventors, having already created the impression that if Norton filed an application it would include Stolfo and Keromytis. (*Id.*) Under applicable law, Norton knew a provisional application would not be available to Columbia.[2] (*See* Norton Mem. at 12 (citing 35 U.S.C. § 122(b)(2)(A)(iii)).)

Unaware that Norton had filed a provisional patent application without crediting Stolfo and Keromytis, Columbia continued to work with and send confidential materials to Norton, which it would not have done if it had known of Norton's misconduct. █████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[2] In a subsequent e-mail, Dacier told Stolfo and Keromytis that Norton had "twisted [his] arm very hard to accept the idea of producing a patent" and that he had hoped the Patent Filer Committee would reject the IDF, because "the last thing [he] wanted was to start [their] potential collaboration on the wrong foot." (Ex. Q at COL00215738–39.) After receiving this e-mail, Stolfo and Keromytis agreed to continue with the DARPA proposal. (*See id.*)

[3] ████████████████████████████████████

Following this exchange, Norton did not disclose anything further to Columbia regarding the non-provisional application, but continued to create the impression that Norton would work with Columbia if Norton chose to move forward with the application. (*See, e.g.*, Ex. W ("Kimes Tr.") at 126:13–127:15; Answer ¶ 43.) Kimes did not actually investigate Columbia's claims that the ideas in the IDF and applications belonged to Columbia and that Columbia had developed the relevant technology. (Kimes Tr. 119:11–120:3, 124:23–125:3, 126:8–12.) Instead, Kimes "discussed [the e-mails from Columbia] with [Norton], and [Norton] decided that the best course of action would be simply to *change the application such that . . . we no longer would need to correspond with them anymore*." (*Id.* at 129:6–13 (emphasis added); *see also id.* at 129:17–19.)

Without notice to Columbia, Norton proceeded to file its non-provisional patent application on April 4, 2011, changing the application to identify only Dacier and Shou as inventors. (Ex. Y at SYMCOL00264365.) When it filed this application, Norton made a specific request—that the Patent Office *not* follow the ordinary course of publishing the application before issuance of the patent and instead keep the application confidential until the patent issued. This request ensured that Norton's misappropriation of Columbia's property would be concealed. (*Id.* at SYMCOL00264356; Answer ¶ 45.) Columbia was not aware, and had no way to determine, that Norton had filed a patent application covering the technology disclosed by Stolfo and Keromytis without acknowledging that the ideas belonged to Columbia. Norton did not submit any work by Stolfo or Keromytis or patent applications filed by Columbia to the PTO during prosecution of the application, despite the requirement that it submit prior art of which it was aware. (Answer ¶ 46.)

Columbia continued to work with Norton, and only learned of Norton's tortious conduct when the '643 Patent issued on October 1, 2013. (*See* Ex. Z at SYMCOL00264585.) Of course, if Columbia had known what Norton did, Columbia: (i) would have ceased working with Norton

and pursued other partnerships; (ii) would have taken steps to prevent misuse of its documents and other confidential communications; and (iii) would have taken steps to intervene in Norton's prosecution of the '643 Patent.  At a minimum, Columbia would have demanded that Norton compensate Columbia for the use of technology ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

B.     **The Prosecution Histories of the '115 and '322 Patents On Which Columbia's Patent Infringement Claims Are Based.**

The prosecution of the Asserted Patents involved typical exchanges between Columbia and the patent examiner at the U.S. Patent & Trademark Office, which were similar in nature to the exchanges that occur during the prosecution of most patents.  U.S. Patent Application No. 12/091,150, which matured into the '115 Patent, was filed on June 15, 2009.  (Ex. AA at COL00146177.)[4]  On August 23, 2010, the Patent Office issued an office action rejecting the claims on multiple grounds, including "as being anticipated by Vu (U.S. Patent number 7496898)." (*Id.* at COL00146180.)  Columbia responded to the office action on February 23, 2011, arguing that Vu does not anticipate or render obvious the proposed claims, because "nothing in Vu shows or suggests the feature of 'executing at least a part of the program in an emulator.'"  (*Id.* at COL00146172.)  Columbia also amended independent claims 1 and 11 to include the limitation "upon identifying the anomalous function call, notifying an application community that includes a plurality of computers of the anomalous function call." (*Id.* at COL00146164–65, 72.)  Columbia noted that Vu did disclose notification to an application community, which provided an additional

_____

[4] Because Norton's excerpts of the '115 and '322 patent prosecution histories (Norton Exs. 14 and 15) lack the cover pages and signature pages of numerous filings, Columbia hereby submits a separate excerpted version of the Asserted Patents' prosecution histories.  (*See* Ex. AA ('115 patent prosecution history); Ex. BB ('322 patent prosecution history).)

way to distinguish Vu. (*Id.* at COL00146172.) Important to the present dispute, Columbia did not make any argument concerning the manner in which notification to the application community would occur under the patent claims, as amended, and Columbia did not need to make such arguments because Vu did not include or address notification of an application community *in any respect*. On March 17, 2011, the Patent Office issued a Notice of Allowance on the claims as amended (*id.* at COL00146153–57), and the '115 Patent issued on December 6, 2011 (*id.* at COL00146085).[5]

Regarding the '322 Patent, the U.S. patent application (No. 13/301,741) that matured into the '322 Patent was filed on November 21, 2011. (Ex. BB at COL00146411.) On September 7, 2012, the Patent Office issued an office action rejecting the application on multiple grounds, but noted that "[c]laims 44, 45, 54, & 55 . . . would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims." (*Id.* at COL00146419.) In accordance with the examiner's statement, Columbia amended claims 44 and 54 to be in independent form, including all limitations of the original base claims. (*Id.* at COL00146350, 52, 58.) Columbia also cancelled claims 45 and 55, and incorporated those dependent claims' requirement of "wherein the model is a combined model created from at least two models created at different times" into independent claims 43 and 53. (*Id.* at COL00146350, 52, 57.) Important to the present dispute, Columbia did not introduce any new limitation to avoid prior art or even make arguments to distinguish prior art; rather, Columbia simply converted the dependent claims into equivalent independent claims without any substantive modifications. As amended, claims 43, 44, 53, and 54 were issued as claims 1, 2, 10 and 11 of the '322 Patent. (*Id.* at COL00146303; *see also* '322 Patent.)

_____

[5] Amended claims 1 and 11 issued as claims 1 and 11 of the '115 Patent, respectively.

Subsequently, as a result of *inter partes* review of the '115 Patent, independent claims 1, 11, 21, 22, 32, and 42 of that patent were cancelled, leaving claims 2, 9, 10, 12, 19, 20, 23, 30, 31, 33, 40 and 41 as valid and patentable. (Norton Ex. 16.) Notwithstanding Norton's repeated suggestions to the contrary, Columbia is asserting in this case only the patent claims that were left valid and patentable and the cancelled claims have no relevance to the issues left to be tried.

## III.   NORTON IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON COLUMBIA'S STATE LAW CLAIMS

### A.   Columbia's Fraudulent Concealment and Unjust Enrichment Claims Do Not Depend on the Confidentiality of the NICECAP Proposals.

Norton incorrectly asserts that Columbia's fraudulent concealment and unjust enrichment claims can only avoid preemption if Columbia proves that the NICECAP proposals were "confidential under the NDA between Norton and Columbia." (Norton Mem. at 7.) Norton's motion is premised on fundamental mischaracterizations of those claims and the underlying law.

### 1.   Violation of Norton's Duties Under the NDA Is a Disputed Issue of Fact.

As an initial matter, Norton has not shown that the NICECAP proposals were publicly available by 2010 when Norton took the material steps to further its tortious scheme. ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ Norton offers no evidence to show that the '898 Application was in fact maintained in the IFW system during the relevant period, a fact which Columbia disputes. Norton asserts in a conclusory fashion that "[t]he '898 Application was (and still is) available"

(Norton Mem. at 12), but provides no evidence that the '898 Application was publicly available prior to April 2010, much less that anyone obtained the document from the public record, (*see id.* at 10–14).[6]  Thus, there is no evidence to support the argument of Norton's lawyers that the NICECAP proposals were publicly available and Norton is not entitled to summary judgment based on this disputed assumption.

In addition, Norton has already *admitted* that Columbia was, and remains, the owner of the technology disclosed in the NICECAP proposals, regardless of its self-serving "public disclosure" argument manufactured in hindsight.  In its First Amended Complaint, Columbia alleged that "Columbia is, and at all pertinent times was, the owner of materials and technology, and the disclosures merged therein, relating to Columbia's decoy technology reflected in, among other things, the 2006 draft grant proposal that Keromytis prepared and delivered to [Norton]."  (Dkt. 12 ¶ 140.)  Norton never responded to this allegation (s*ee* Answer ¶ 140), and it is thus deemed admitted.  *Transamerica Occidental Life Ins. Co*. v. *Sanders*, 1996 WL 378310, at *1 (4th Cir. Jul. 8, 1996); *see also* Fed. R. Civ. Pro. 8(b)(6).  Norton cannot now contest a fact that it has admitted.

Given the paucity of evidence cited by Norton, and its admission regarding the ownership of the NICECAP proposals, Norton has not satisfied its burden of showing that it is entitled to summary judgment.  *See Don* v. *Singer*, 939 N.Y.S.2d 363, 364 (N.Y. App. Div. 2012) (affirming denial of summary judgment where "[i]ssues of fact exist on the question of whether the material that plaintiffs provided [to defendant] was confidential").

Moreover, Norton does not escape Columbia's claims merely by contending that the '898 application was public and that Norton *therefore* had no duty to disclose Norton's misuse of Columbia's property or was not unjustly enriched by claiming Columbia's property as its own.

---

[6] The '898 Application was never published, unlike those in the cases on which Norton relies.

-12-

Norton claims that all of its obligations under the NDA expired in 2009 (*see* Norton Mem. at 14), but that is plainly false. While section 2(a) of the NDA prohibits the receiving party from "disclos[ing] any Confidential Information to third parties for five (5) years," section 2(b) separately and independently prohibits the receiving party from "us[ing] or exploit[ing]" such disclosures "for their own benefit . . . without the prior written consent of the Disclosing Party" *and is not limited in time*. (Ex. A at COL00149692.) In short, at the time it filed its patent applications covering Columbia's property in 2010 and 2011, regardless of whether it could *disclose* Columbia's confidential information to others, Norton remained under an obligation not to *use* confidential information disclosed by Columbia for Norton's own benefit, especially considering that such use was also to the detriment of Columbia.

Norton's use of the information also violated the implied duty of good faith and fair dealing based upon Norton's contractual relationship with Columbia. The duty of good faith and fair dealing "is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Spandex House, Inc.* v. *Travelers Prop. Cas. Co. of Am.*, 2015 WL 509678, at *2 (S.D.N.Y. Feb. 6, 2015); *see also Elmhurst Dairy, Inc.* v. *Bartlett Dairy, Inc.*, 949 N.Y.S.2d 115, 118 (N.Y. App. Div. 2012) (duty of good faith and fair dealing is "[i]mplicit in every contract").[7] Columbia had a justified expectation that Norton would not deny Columbia the benefit of its bargain and use the disclosures and understanding of cutting edge technologies it solicited from Columbia for Norton's own, sole benefit without Columbia's permission, regardless of whether Norton claims that it was entitled to violate one of many contractual obligations because it had expired.

---

[7] The NDA states that it is governed by New York law. (Ex. A at COL00149694.)

Thus, even if Norton had established today—and it has not—that the '898 Application (including the NICECAP proposals) was publicly available by September 2009, Norton has not shown either that it was aware of this fact by April 2, 2010 when it exploited those proposals, or that other independent legal obligations supporting the fraudulent concealment and unjust enrichment claims were not violated.

> 2.   Norton Had a Duty to Disclose Its Filing of the Relevant Patent Applications.

Norton's motion is premised on its contention that Columbia's claims depend on whether the NICECAP proposals were confidential.  (*See* Norton Mem. at 7.)  As the Court recognized in deciding Norton's motion to dismiss, however, Columbia's fraudulent concealment claims "spring from [Norton's] alleged duty to inform [Columbia] of the patent application," and are not based merely on the confidentiality of any disclosure made by Columbia.  (Dkt 67 at 18 (discussing *Univ. of Colo. Found. Inc.* v. *Am. Cyanamid Co.*, 196 F.3d 1366, 1371–72 (Fed. Cir. 1999)).)  Likewise, Columbia's unjust enrichment claim is premised on Norton's "alleged wrongful use of [Columbia's] research," not on confidentiality.  (*Id.*)

To establish fraudulent concealment under either New York or Virginia law,[8] in addition to the elements of fraud "a plaintiff must also prove that the defendant had a duty to disclose the material information."  *Banque Arabe et Int'l D'Investissement* v. *Md. Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995); *see also Albion All. Mezzanine Fund, L.P.* v. *State St. Bank and Tr. Co.*, 797 N.Y.S.2d 699, 704 (N.Y. Sup. Ct. 2003) (New York law); *Bank of Montreal* v. *Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999) (Virginia law).  As discussed below (and as Norton largely agrees,

---

[8] Norton assumes that Columbia's state law claims are governed by New York law, although the Court did not decide this issue in deciding Norton's motion to dismiss.  For purposes of this response, Columbia will show that its claims should not be resolved on summary judgement regardless of whether New York or Virginia law governs.

Norton Mem. at 7–8), a duty to disclose arises where the parties are (i) in a fiduciary or other relationship signifying a heightened level of trust; (ii) where one party makes a partial or ambiguous statement that requires further disclosure to avoid misleading the other; or (iii) where one party possesses superior knowledge, not readily available to the other, and knows the other is acting on the basis of mistaken knowledge. Each of these considerations is present here.

Regardless of whether the NICECAP proposals were confidential under the express terms of the NDA, Columbia's fraudulent concealment and unjust enrichment claims are based on Norton's failure to meet its independent obligation to disclose its filing and prosecution of a patent application directed to technology that Columbia disclosed to Norton, in addition to Norton's independent obligation not to intentionally mislead Columbia to Norton's benefit and Columbia's detriment. The nature of the parties' relationship, and thus the nature of Norton's duty to disclose, involves disputed questions of material fact. Columbia's fraudulent concealment and unjust enrichment, therefore, cannot be resolved on summary judgment.

a.

a.     <u>The Parties Had a Special Relationship That Created a Duty to Disclose and to Refrain from Using Columbia's Disclosures</u>

The NDA between Columbia and Norton was entered into to "facilitat[e] discussions between the parties regarding" potential collaborations (Ex. A at COL00149692), and the parties understood that, in addition to whatever obligations flowed from Section 2(a) of the NDA, their work together constituted a confidential relationship pursuant to which they would communicate in confidence about the prospect of submitting joint grant proposals to government agencies. (*See* Stolfo Tr. at 89:2–4, 355:12–15, 392:20–23, 395:12–15.)

██████████████████████████████████████████████████

████████████████████████████████

In short, the record shows that Columbia and Norton both understood that they had entered into a "confidential relationship . . . that prohibited [Norton] from using confidential disclosure for its sole benefit." (Dkt. 67 at 19.) As the Court noted in denying Norton's motion to dismiss, Norton's breach of that relationship for its own benefit constitutes "tortious conduct" that creates a "right of recovery" for fraudulent concealment and "allows Columbia to disgorge [Norton] of any benefit that accrued to it as a result of its wrongful conduct" for unjust enrichment. (*Id.*) Nothing has changed to even suggest that the Court's 2014 conclusion should be revised.

In addition to the confidential relationship between Columbia and Norton, the record is replete with evidence that a fiduciary relationship should be implied between the parties. Whether the relationship between parties is a fiduciary one is a question of fact that should not be resolved on summary judgment. *See, e.g.*, *Fox Paine & Co., LLC* v. *Hous. Cas. Co.*, 60 N.Y.S.3d 294, 297 (N.Y. App. Div. 2017) ("[T]he actual relationship between the parties determines the existence of a fiduciary duty."); *Lehman Bros. Com. Corp.* v. *Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 151 (S.D.N.Y. 2000) ("At base, the existence of a fiduciary relationship is a factual question."); *Myers* v. *Lee*, 2010 WL 2757115, at *7 (E.D. Va. July 12, 2010) (Under Virginia law, "whether a fiduciary relationship exists is a question of fact."); *see also Diaz Vicente* v. *Obenauer*, 736 F. Supp. 679, 695 (E.D. Va. 1990).

In "determining whether a fiduciary duty exists, the focus is on whether one person has reposed trust or confidence in another and whether the second person accepts the trust and confidence and thereby gains a resulting superiority or influence over the first." *In re Platinum-Beechwood Litig.*, 377 F. Supp. 3d 414, 420 (S.D.N.Y. 2019); *see Stone Castle Fin., Inc.* v.

*Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 661 (E.D. Va. 2002) (same).  For example, a fiduciary relationship may be implied based on prior business dealings where one party induces the other to continue the relationship.  *AHA Sales, Inc.* v. *Creative Bath Prod., Inc.*, 867 N.Y.S.2d 169, 181 (N.Y. App. Div. 2008); *Penato* v. *George*, 383 N.Y.S.2d 900, 904–05 (N.Y. App. Div. 1976) (finding allegations of fiduciary relationship sufficient based on prior dealings that resembled a joint venture).  A fiduciary relationship may also be implied from conduct by a defendant to induce trust by the plaintiff.  *See, e.g.*, *Amusement Indus., Inc.* v. *Buchanan Ingersoll & Rooney, P.C.*, 2013 WL 628533, at *9–10 (S.D.N.Y. Feb. 15, 2013).  Courts have also found a fiduciary relationship where parties participated in a relationship that required candor and loyalty.[9]

Here, a fiduciary relationship should be implied because, as the evidence at trial will show, it was Norton that repeatedly approached and induced Columbia to collaborate with Norton and to disclose confidential information to Norton.  In response to Norton's solicitation, Columbia put trust in Norton and (i) shared valuable confidential information and (ii) did not take steps to protect its own interests based on the understanding that Norton had undertook to act in the interests of both parties by repeatedly acknowledging that Norton and Columbia were working together for the obvious benefit of both, not just Norton.  *See AHA Sales, Inc.*, 867 N.Y.S.2d at 181.

In early May 2006, Norton asked Professors Stolfo and Keromytis to collaborate on a joint grant proposal for NICECAP.  (Ex. C at COL00094682.)  Likewise, in February 2010, Norton again approached Stolfo to inquire whether Columbia would like to work together on a proposal for the DARPA program.  (Ex. H at COL00120404–05.)  ██████████████████████████

---

[9] In *St. John's University, New York* v. *Bolton*, 757 F. Supp. 2d 144, 174–76 (E.D.N.Y. 2010), for example, the court found constructive fraud where defendant faculty failed to disclose the value of their work to a university and instead patented it themselves.  The court held that the defendants' agreement to disclose research they believed patentable created fiduciary duties of loyalty and candor whose violation stated a claim for fraudulent concealment.  *See id.* at 167–68, 176.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Norton also took other measures to induce Columbia to trust Norton with respect to Norton's patent filings.  On March 24, 2010, Delos Larson e-mailed Stolfo and Keromytis to tell them that Norton wished to file a patent application based on the DARPA proposal.  (Ex. K at COL00159621.)  To garner Columbia's trust, Larson described himself as a "non-evil lawyer" at Norton, and emphasized that Norton "realize[d] we did not invent the decoy creation technique." (*Id.*) ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

In light of the evidence of a relationship of trust (solicited by Norton), Norton had a duty to not use Columbia's property solely for Norton's own benefit, and to refrain from making misleading statements to Columbia regarding its intentions with respect to Columbia's property.

        b.     <u>Norton's Misleading Conduct and Statements Created a Duty to Disclose and to Refrain from Using Columbia's Disclosures</u>

Under the laws of both New York and Virginia, a duty to disclose also arises where "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Banque Arabe*, 57 F.3d at 155 (New York law); s*ee also Bank of Montreal*, 193 F.3d at 829.  Such a duty may also arise where "a party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth." *Brass* v. *Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *see also Morgan Guar. Trust Co. of N.Y* v. *Republic of Palau*, 693 F. Supp. 1479, 1497

(S.D.N.Y. 1988); *Bank of Montreal*, 193 F.3d at 829.  Here, Norton had a duty to disclose at least the nature and circumstances of its patent application filings that led to the '643 Patent, because of its superior knowledge of the circumstances; its partial, false and misleading statements regarding those filings; and the steps it took to prevent Columbia from discovering the truth.

As noted above, on March 24, 2010, Larson e-mailed Stolfo and Keromytis to inform them that Norton was preparing a patent application based on their DARPA proposal and to ask whether Stolfo and Keromytis were the inventors of the technology.  (Ex. K at COL00159621 (attaching the IDF).)  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  ████████████████████  Shou also e-mailed Stolfo and Keromytis on the same day to tell them that he had "added [their] names (along with Marc and myself) to the list of co-inventors."  (Ex. Q at COL00215733.)  Larson's statement was misleading, however, and Shou's statement was simply false; Shou listed only Dacier and Shou as the inventors.  (*See* Ex. K at COL00159623.)

Instead of responding to Stolfo's or Keromytis' assertions that they had invented the technology, Norton simply filed a secret provisional patent application on April 2, 2010, which omitted them as inventors.  (Ex. R at COL00152027.)  Subsequently, Larson informed Columbia that Norton "is filing a provisional patent application this week on the IDF," even though Norton had already filed the application.  (Ex. S at COL00120721.)  Not only did Larson fail to send Columbia a copy of the filed application, he also failed to mention that Norton had omitted Stolfo and Keromytis from the application's list of inventors.  (*Id.*)  Norton knew that the provisional application would not be available for review by Columbia.  *See* 35 U.S.C. § 122(b)(2)(A)(iii). Columbia thus had no way to determine that Stolfo and Keromytis were not named as inventors.[10]

---

[10] Whether as a matter of federal law Stolfo and Keromytis were inventors of the inventions Norton

Norton then compounded its misconduct by deceiving Columbia as to the filing of a non-provisional application. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ This

new draft, however, unlike the provisional application Norton had filed, included Stolfo and

Keromytis as inventors.  (Ex. U at COL00150445.) ████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████ After receiving

Stolfo's e-mail rejecting any notion that Norton had a role in or ownership of the invention, Norton

did not disclose to Columbia any further information regarding its non-provisional patent

application. (*See, e.g.*, Kimes Tr. at 126:13–127:16.)  Instead, in a "consensus" decision, Norton

simply omitted Stolfo and Keromytis from the application and secretly submitted it to the Patent

Office. (*Id.* at 129:6–13, 129:17–19; Ex. Y at SYMCOL00264356.)  Specifically, Norton

requested that the Patent Office *not* publish the application until the patent issued so that Columbia

could not become aware of it. (Ex. Y at SYMCOL00264356.)  As a result, Columbia continued

to work with Norton, and only learned that Norton had filed the non-provisional application in a

form materially different from what Norton had shown Columbia when the '643 Patent issued on

October 1, 2013. (*See* Ex. Z at SYMCOL00264585; Ex. DD at COL00082290.)

In sum, the record evidence establishes that throughout the process of filing and

prosecuting the applications that led to the '643 Patent, including the initial IDF, Norton repeatedly

---

sought to patent, Norton had a duty to disclose relevant facts about what it was doing with
Columbia's property, not lie about what Norton did with the property, and not solely profit from
it. As shown *infra*, none of the state law claims depend on whether the patent that issued properly
listed the correct inventors as a matter of federal law.

made partial, misleading, or downright false statements to Columbia regarding Norton's use of Columbia's property. Norton had superior—indeed sole—knowledge regarding the contents of its applications and the ownership of the inventions Norton disclosed to the Patent Office. Further, as Norton took steps to ensure that the applications would not become public until a patent issued, Columbia had no way to independently determine whether Norton misappropriated Columbia's property or whether Columbia had to take steps to protect its property. In these circumstances, the record shows Norton had a duty to fully disclose its actions to Columbia, and Columbia's fraudulent concealment and unjust enrichment claims cannot be resolved on summary judgment.

**B.    Columbia's Conversion Claim is Not Preempted.**

Norton also asserts, wrongly, that Columbia's conversion claim is preempted.

*First*, Norton claims that the Court should grant partial summary judgment if "any of the 2006 NICECAP drafts or proposals were not confidential when Norton filed the applications that matured into the '643 Patent . . . because any state law conversion claim based on the use of non-confidential material to obtain a patent is preempted" by federal patent law. (Norton Mem. at 21.) However, as shown *supra*, Norton has failed to establish from the record that (i) the NICECAP proposals disclosed to Norton pursuant to the NDA were publicly available by 2010 or (ii) any of the state law claims depend wholly on the application as opposed to other confidential exchanges.

Indeed, Columbia's conversion claim is not based solely on the confidentiality of the NICECAP proposals, but also on the additional confidential disclosures made by Columbia to Norton, both in writing and orally, to explain Columbia's invention. █████████

-21-



*Second*, Norton acknowledges that Columbia's conversion claim is not preempted if "the 2006 NICECAP grant proposal drafts were employed by Norton for other beneficial uses not related to obtaining a patent." (Norton Mem. at 20 (emphasis omitted) (quoting Dkt. 67 at 22).) The record is clear that Norton *has* used the technology disclosed by Columbia for purposes beyond obtaining a patent.

Simply put, Norton's tortious conduct extends beyond obtaining a patent, and the damage caused by that conduct extends beyond harm that can be remedied through correction of inventorship.[11] Norton's misconduct collateral to seeking the '643 Patent: (i) caused Columbia not to protect its own interests (through, *e.g.*, a demand for compensation before filing the application; *ex ante* legal

---

[11]

-22-

action to prevent misuse); (ii) caused Columbia to forego seeking other lucrative business relationships and instead continue to work with Norton; and (iii) caused damage to one of Columbia's existing licensees.  Accordingly, Norton has not shown that Columbia's conversion claim is preempted by federal patent law as it is not dependent on determining inventorship as a matter of federal law, nor is the damage caused by conversion remedied by correcting inventorship.

## IV.    PROSECUTION HISTORY ESTOPPEL DOES NOT BAR COLUMBIA FROM ASSERTING THE DOCTRINE OF EQUIVALENTS IN ADDITION TO LITERAL PATENT INFRINGEMENT

Although Columbia made amendments to the Accused Patents during prosecution (which is common during the course of any patent prosecution), Columbia disputes that those amendments create prosecution history estoppel that would prevent the jury from considering whether Norton's products infringe the Asserted Patents under the doctrine of equivalents.  The purpose of prosecution history estoppel is to prevent a patentee from narrowing her claims to distinguish prior art (and thereby achieving patentability) and then later recapturing what was given up to obtain the patent by asserting infringement under the doctrine of equivalents.  Estoppel does not apply here because the equivalents Columbia asserts do not recapture ground that was given up during prosecution.  Indeed, the amendments Columbia made during prosecution do not bear any substantive relationship to the asserted equivalents.

Under prosecution history estoppel, a "patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the *territory between the original claim and the amended claim*." *Festo*, 535 U.S. at 740 (emphasis added) (citation omitted).  Prosecution history estoppel's "reach," in the context of the doctrine of equivalents, "requires an examination of the subject matter surrendered by the narrowing amendment." *Id.* at 737.  Courts should consider whether the amendment was "directly relevant" to the asserted equivalent, *Festo Corp.* v. *Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003) ("*Festo II*"),

based "solely upon the public record of the patent's prosecution." *Eli Lilly & Co.* v. *Hospira, Inc.*, 933 F.3d 1320, 1331 (Fed. Cir. 2019) (quoting *Festo II*, 344 F.3d at 1369). Ultimately, when "the way in which the alleged equivalent departs from what the claim limitation literally requires is tangential to the discernible objective reason for the narrowing amendment . . . there is no surrender of the equivalent by that amendment." *Ajinomoto Co.* v. *Int'l Trade Comm'n*, 932 F.3d 1342, 1354 (Fed. Cir. 2019) (collecting cases on tangential relation exception). As the Supreme Court stated: "There is no reason why a narrowing amendment should be deemed to relinquish equivalents . . . beyond a fair interpretation of what was surrendered." *Festo*, 535 U.S. at 738.

A.    **Columbia Did Not Surrender Equivalents to the "Application Community" Claim Element, Much Less the Specific Equivalent Asserted Here.**

Columbia's amendment to the '115 Patent—adding the "application community" notification limitation—does not estop Columbia from asserting equivalents because the amendment did not relate to the accused equivalent in Norton's products or to the manner in which notification to the application community would be achieved in any respect.

Columbia expects

-24-

Norton will make this "direct" notification argument at trial, and Columbia will argue that even if "direct" notification is assumed to be required—contrary to the claim language—Norton still infringes under the doctrine of equivalents because the process that Norton follows meets the legal requirements to assert infringement under an equivalents theory—*i.e.*, the accused products perform (i) substantially the same function as direct notification, (ii) in substantially the same way as disclosed in the patent, (iii) to achieve substantially the same result (*i.e.*, community members benefit from anomalous function call data collected from the group).  This is a fact issue for the jury, and prosecution history estoppel does not foreclose Columbia from making this argument.

Turning to the prosecution history, claims 1 and 11 of the '115 Patent were amended during prosecution to include the "application community" notification limitation.  Although the new limitation was not required to distinguish the Vu prior art reference, Columbia noted that Vu did not disclose an application community or notification to such community.  (Norton Ex. 14 at COL00146172 (Vu disclosed displaying "an error message" to a computer user, but this has nothing to do with notifying a community of computer system users of an anomalous event).)  In other words, the application community limitation was an *entirely new and additional* limitation, and the amendment did not concern the way in which notification is achieved.  Importantly, the "application community" notification limitation was never itself at issue in prosecution, and never modified.  Because the scope of the "application community" notification limitation was not at issue—much less the "direct" nature of the notification—the prosecution history cannot be read to estop Columbia from asserting the equivalents at issue here.

Two Federal Circuit cases illustrate the point.  *First*, in *Regents of Univ. of Cal.* v. *Dakocytomation Cal., Inc.*, the patentee added the limitation "*blocking* nucleic acids" to distinguish prior art based on the "blocking" method.  517 F.3d 1364, 1378 (Fed. Cir. 2008)

(emphasis added). The "nucleic acids" portion of the limitation was never narrowed during prosecution. *Id.* In the patent infringement case, the patentee asserted that a "peptide nucleic acid" was equivalent to a "nucleic acid." The defendant argued the patentee was barred from asserting equivalents simply because the "blocking nucleic acids" limitation was added during prosecution. The Federal Circuit agreed with the patentee that the "amendment did not surrender the equivalent in question" because (i) "in narrowing the claim to overcome the prior art rejections, the focus . . . centered on the method of blocking—not on the particular type of nucleic acid that could be used for blocking," and (ii) "the 'nucleic acid' limitation . . . was not at issue in the office action rejecting the claims." *Id.* Similarly here, the "application community" notification limitation on which Norton relies to create prosecution estoppel was not itself at issue during prosecution. Although Columbia might not be able to assert equivalents when a hypothetical accused product does not provide *any* kind of notification to a community, there is no justification for blocking Columbia from asserting that Norton's *method* of notification is an equivalent when the method of notification was not at issue during prosecution.

*Second*, in *Intervet Inc.* v. *Merial Ltd.*, the patentee originally used claim language that would cover two type of viruses—porcine circovirus type I and type II ("PCV-1" and "PCV-2"). 617 F.3d 1282, 1291–92 (Fed. Cir. 2010). The invention as to PCV-1 was found to be in the prior art, so patentee amended the claim to specifically identify PCV-2. In the patent infringement case, the patentee asserted that a virus very similar to natural PCV-2 was an equivalent to the limitation. Defendant asserted that patentee was estopped from asserting equivalents because the PCV-2 limitation was added by amendment during prosecution. The Federal Circuit agreed with the patentee that estoppel did not apply because "[t]he rationale for the amendment was to narrow the claimed universe . . . down to [] PCV-2, and bore only a tangential relation to the question of which

DNA sequences are and are not properly characterized as PCV-2." *Id.* at 1292. Similarly here, the "application community" notification limitation was added merely to narrow the claims at issue down to ones where some form of notification is provided. However, this provides no basis to estop Columbia from asserting equivalent means of accomplishing notification to a community.

> **B.    Columbia Did Not Surrender Equivalents to the "Combined Model" Limitations in the '322 Patent.**

Substantially the same reasoning applies to the "combined model" limitations in the '322 Patent.[12] Notably, the "combined model" limitations of the '322 Patent were *not* added as narrowing amendments during prosecution, nor were they altered in substance in any way during prosecution. The "combined model" limitations, exactly as they appear in the issued patent, were originally filed as dependent claims 44, 45, 54, and 55. (*See* Norton Ex. 15 at COL00146459–60.) During prosecution, however, the examiner requested that they be "rewritten in independent form." (Norton Ex. 15 at COL00146419.) Columbia revised the dependent claims into independent form, but did not alter their substance.[13] (*Id.* at COL00146350–52, 57–58.) These claims, as amended, were allowed and issued as claims 1, 2, 10, and 11 of the '322 Patent.

While amendments of dependent claims into independent claims may create a presumption of estoppel as a technical matter, that is significantly different from when a new limitation is added or a limitation is modified in a substantive way. For example, in *Funai Elec. Co.* v. *Daewoo Elecs.*

---

[12] The "combined model" limitations in the '322 Patent are "wherein the model is a combined model created from at least two models created using *different computers*" in asserted claims 2, 11, and 27; and "wherein the model is a combined model created from at least two models created at *different times*," incorporated in asserted claims 8, 17, and 25.

[13] A dependent claim refers back to an independent claim and incorporates all of the limitations in the independent claim by reference.  35 U.S.C. § 112(d).  An examiner might object to the independent claim, but find the dependent claim is patentable because of the additional limitations it includes.  When this occurs, the text of the independent claim is formally added to the dependent claim.  However, there is no *substantive* change to the scope of the formerly dependent claim.

*Corp.*, broad independent claims were found to be unpatentable, and as a result, a dependent claim was rewritten in independent form, as was the case here. 616 F.3d 1357, 1369 (Fed. Cir. 2010). The Federal Circuit held that this amendment "did not surrender access to equivalency" with respect to a limitation that was originally only in the dependent claim. *Id.*

Nevertheless, even if estoppel presumptively applies, here too the amendment is not related to the asserted equivalent. Columbia is not attempting through an equivalents argument to recapture what it gave up during prosecution. The "combined model" dependent claims were re-written as independent claims because independent claims 43 and 53—which did not contain the "combined model" limitations at issue here—were subject to a prior art objection. (Ex. BB at COL00146416–17.) The prior art objections for independent claims 43 and 53 did not relate to the "combined model" limitations found in dependent claims 44, 45, 54, and 55. (*See id.*) Neither the examiner nor the patentee addressed the scope or substance of the "combined model" limitations during prosecution in any respect, let alone as a basis to distinguish prior art.

At trial, Columbia will show that Norton literally uses a "combined model" because SONAR/BASH uses a model that is created by combining models generated on different computers and at different times. Norton is not challenging literal infringement at this time. Columbia asserts the doctrine of equivalents because Norton has (inconsistently) taken the position that certain of the things that are combined are not "models" within the meaning of the asserted claims. Thus, Columbia asserts that even if Norton's products do not literally meet the "combined model" limitations, Norton's products infringe under the doctrine of equivalents because Norton's combination approach leads to an aggregate model that reflects the experiences of different computer users and experiences of the users at different times—exactly the nature of the asserted invention. In other words, Columbia asserts that Norton's products, if not literally infringing, use

equivalent models that (i) perform substantially the same function as the combined models of the claims, (ii) in substantially the same way, (iii) to achieve substantially the same result. Again, this is an issue for the jury, and the prosecution history provides no basis to take that away from them.

Similar to the Federal Circuit's decision in *Funai*, Columbia's restatement of dependent claims as independent claims in the '322 Patent "did not surrender access to equivalency" with respect to a limitation that was originally only in the dependent claims, and there were no substantive modifications. 616 F.3d at 1369. As in *Funai*, because the scope of the "combined model" limitations was never at issue during prosecution—when a dependent claim was simply re-written as independent—the scope of estoppel cannot extend to limit Columbia from asserting doctrine of equivalents with respect to the "combined model" limitations. *See id.* at 1369–70 ("insulating material" limitation was 'merely tangential' to the prosecution where "the *nature* of the insulating material . . . was not at issue during prosecution;" rather, the limitation was added without regard to the nature of the material) (emphasis added).

C.    **Columbia Did Not Surrender Equivalents Through *Inter Partes* Review.**

Norton asserts, in a wholly conclusory fashion, that the cancellation of independent claims during *inter partes* review of the '115 Patent gives rise to the *Festo* presumption that estoppel applies to bar equivalence arguments on the remaining dependent claim limitations. (Norton Mem. at 29.) Norton, however, has failed to identify any legal support (and Columbia is not aware of any) for their argument that the cancellation of independent claims through *inter partes* review presumptively gives rise to prosecution history estoppel as to the remaining dependent claims.[14]

---

[14] The cases that Norton cites in purported support of this proposition (*see* Norton Mem. at 29), *Ranbaxy Pharms. Inc.* v. *Apotex, Inc.*, 350 F.3d 1325 (Fed. Cir. 2003) and *Deering Precision Instruments, L.L.C.* v. *Vector Distrib. Sys., Inc.*, 347 F.3d 1314 (Fed. Cir. 2003), both relate to amendments made during the *original prosecution* of the patents, not to IPR proceedings.

Even if such a rule did apply to IPR proceedings, prosecution history estoppel would not apply here for the same reasons discussed above. The limitations in the dependent claims that survived IPR—combined models and random selection—are unrelated to the cancellation of the independent claims, which did not include these elements. *See, e.g.*, *Funai*, 616 F.3d at 1369 (restatement of dependent claims as independent claims "did not surrender access to equivalency" with respect to a limitation that was originally only in the dependent claims). Thus, there is no reason to estop Columbia from asserting equivalents to those limitations.

The only case cited by Norton that even relates to *inter partes* review—*Not Dead Yet Mfg. Inc.* v. *Pride Sols., LLC*, 265 F. Supp. 3d 811 (N.D. Ill. 2017), *reconsideration denied*, 2018 WL 688324 (N.D. Ill. Feb. 2, 2018)—does not support Norton's position. That case addresses specific arguments made by the patentee in an IPR to overcome prior art. The court in *Not Dead Yet* noted that unlike "estoppel []based on a patentee's voluntary *amendment* of a claim," when "estoppel rests on *arguments* the patentee made during prosecution, 'the prosecution history must evince a clear and unmistakable surrender of subject matter.'" *Id.* at 830 (emphasis added) (quoting *Conoco, Inc.* v. *Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006)). The court found that specific statements made by the patentee during *inter partes* review showed such a clear and unmistakable surrender of the alleged equivalents, estopping the patentee from asserting them. Here, Norton fails to point to any arguments made by Columbia during *inter partes* review that would "evince a clear and unmistakable surrender of subject matter" with respect to the combined model and random selection equivalents asserted by Columbia. Norton asserts only the *fact* of claim cancellation during IPR, and there is no reason estoppel would arise because of that fact.

## V.   CONCLUSION

The Court should deny Norton's motion for partial summary judgment.

Dated:  February 6, 2020                          Respectfully submitted,

                                                  */s/ John M. Erbach*
                                                  Dana D. McDaniel (VSB No. 25419)
                                                  John M. Erbach (VSB No. 76695)
                                                  SPOTTS FAIN, P.C.
                                                  411 East Franklin Street, Suite 600
                                                  Richmond, Virginia  23219
                                                  Tel.: (804) 697-2065
                                                  Fax:  (804) 697-2165
                                                  dmcdaniel@spottsfain.com
                                                  jerbach@spottsfain.com

                                                  Garrard R. Beeney (*pro hac vice*)
                                                  Dustin F. Guzior (*pro hac vice*)
                                                  Stephen J. Elliott (*pro hac vice*)
                                                  SULLIVAN & CROMWELL LLP
                                                  125 Broad Street
                                                  New York, New York  10004
                                                  Tel.: (212) 558-4000
                                                  Fax:  (212) 558-3588
                                                  beeneyg@sullcrom.com
                                                  guziord@sullcrom.com
                                                  elliotts@sullcrom.com

                                                  *Counsel for Plaintiff The Trustees of Columbia*
                                                  *University in the City of New York*

-31-

**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that on the 6th day of February, 2020, I electronically

filed the foregoing Opposition to Defendant's Motion for Summary Judgment using the CM/ECF

system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ *John M. Erbach*
Dana D. McDaniel (VSB No. 25419)
John M. Erbach (VSB No. 76695)
SPOTTS FAIN, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia  23219
Tel.:   (804) 697-2065
Fax:   (804) 697-2165
dmcdaniel@spottsfain.com
jerbach@spottsfain.com