IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |
|---|---|
| THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>*Plaintiff*,<br><br>v.<br><br>NORTONLIFELOCK INC.,<br><br>*Defendant*. | Civil Action No. 3:13-cv-00808-MHL<br>REDACTED |

**COLUMBIA'S MEMORANDUM IN OPPOSITION TO NORTON'S MOTION TO
STRIKE PORTIONS OF THE REPORTS AND TO EXCLUDE TESTIMONY
OF DR. ERIC COLE AND DR. RYAN SULLIVAN**

# TABLE OF CONTENTS

*Page*

**I.  DR. COLE AND DR. SULLIVAN PROPERLY APPORTIONED DAMAGES TO THE SPECIFIC PATENTED TECHNOLOGY AT ISSUE IN THIS CASE** ........................................................................................................1

    A.  Background ............................................................................................4

        1.  The Accused Products and Columbia's Patented Technology ..............................................................................4

        2.  Dr. Cole's Experience and Expertise ........................................6

        3.  Dr. Cole's Apportionment Methodology and Opinion ..............7

        4.  Dr. Sullivan's Reasonable Royalty Opinion ............................11

    B.  Columbia's Damages Experts Properly Considered the Value Contributed to SONAR/BASH by Non-Patented, "Conventional" Elements .........................12

    C.  Dr. Cole's Apportionment Methodology Is Reliable ............................17

    D.  Columbia's Damages Experts Properly Apportioned Value to the Patented Technology at Issue, To a Level More Granular Than the SSPPU ......................20

**II.  DR. SULLIVAN'S DAMAGES OPINION DOES NOT INCLUDE DAMAGES FOR "INFRINGEMENT ABROAD"** ....................................................25

    A.  Background ............................................................................................27

    B.  Substantial Evidence Supports the Conclusion That Each Sale of an Accused Product to a Foreign Customer Reflects a Domestic Act of Infringement .....................................................30

    C.  Dr. Sullivan Properly Included Foreign Revenue in His Reasonable Royalty Calculation Even if Each Foreign Sale Is Not Itself an Act of Infringement ........34

**III.  DR. SULLIVAN'S DAMAGES OPINION REGARDING NORTON'S FRAUD, CONVERSION, AND UNJUST ENRICHMENT IS RELIABLE AND RELEVANT** ....................................................36

    A.  Columbia Seeks Compensatory Damages and Disgorgement Under State Law, and Dr. Sullivan's Use of ▆▆▆▆▆▆▆▆ as a Benchmark for the Value of the Stolen Property Is Appropriate ....................................................38

B.       Norton's █████████████████ ........................................44

**CONCLUSION** ............................................................................45

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Abraxis Bioscience, Inc.* v. *Navinta LLC*,
625 F.3d 1359 (Fed. Cir. 2010)......................................................................38

*Alice Corp. Pty. Ltd.* v. *CLS Bank Intern.*,
573 U.S. 208 (2014).....................................................................................13

*Applied Med. Res. Corp.* v. *U.S. Surgical Corp.*,
435 F.3d 1356 (Fed. Cir. 2006).......................................................................37

*AstraZeneca AB* v. *Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015).......................................................................13

*Baeur & Cie* v. *O'Donnell*,
229 U.S. 1 (1913).........................................................................................30

*Biomedical Enters., Inc.* v. *Solana Surgical, LLC*,
2016 WL 4198304 (W.D. Tex. Apr. 26, 2016)................................................19, 20

*Carnegie Mellon Univ.* v. *Marvell Tech. Grp.*,
807 F.3d 1283 (Fed. Cir. 2015)....................................................................26, 33

*Commonwealth Sci. & Indus. Res. Org. (CSIRO)* v. *Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015).......................................................................20

*Corning Optical Commc'ns Wireless Ltd.* v. *Solid, Inc.*,
2015 WL 5655192 (N.D. Cal. Sept. 24, 2015) ................................................19, 20

*Desalle* v. *TitleMax of Va., Inc.*,
2014 WL 12771139 (E.D. Va. Dec. 23, 2014) .....................................................38

*Dynetix Design Sols., Inc.* v. *Synopsys, Inc.*,
2013 WL 4537838 (N.D. Cal. Aug. 22, 2013) .....................................................26

*Ericsson, Inc.* v. *D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014).................................................................21, 24, 40

*Exmark Mfg. Co.* v. *Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018).........................................................15, 16, 20, 21

*Finjan, Inc.* v. *Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010)....................................................................31, 33

-iv-

*FlowRider Surf, Ltd.* v. *Pac. Surf Designs, Inc.*,
2016 WL 6522808 (S.D. Cal. Nov. 3, 2016) ........................................................32

*GPNE* v. *Apple*,
2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ......................................................22

*Grubb & Ellis Co.* v. *Potomac Med. Bldg., LLC*,
2009 WL 3175999 (E.D. Va. Sept. 30, 2009) .......................................................38

*Halo Elecs., Inc.* v. *Pulse Elecs., Inc.*,
769 F.3d 1371 (Fed. Cir. 2014) ....................................................................26, 31

*Intellectual Ventures II LLC* v. *Sprint Spectrum, L.P.*,
2019 WL 1877309 (E.D. Tex. Apr. 26, 2019) .....................................................40

*Interactive Pictures Corp.* v. *Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001) ..........................................................................19

*Lee* v. *Zom Clarendon, L.P.*,
689 F. Supp. 2d 814 (E.D. Va. 2010) ..................................................................30

*M2M Sols. LLC* v. *Motorola Sols., Inc.*,
2016 WL 70814 (D. Del. Jan. 6, 2016) ......................................................26, 31, 39

*Microsoft Corp.* v. *AT&T Corp.*,
550 U.S. 437 (2007) ...................................................................................32, 33

*Murray* v. *Hadid*,
385 S.E.2d 898 (Va. 1989) ...........................................................................38, 43

*Oasis Research, LLC* v. *Carbonite, Inc.*,
2013 WL 12146744 (E.D. Tex. Feb. 20, 2013) ....................................................44

*Plastronics Socket Partners, Ltd.* v. *Dong Weon Hwang*,
2019 WL 4392525 (E.D. Tex. June 11, 2019) .....................................................35

*Power Integrations, Inc.* v. *Fairchild Semiconductor Int'l, Inc.*,
2018 WL 4804685 (D. Del. Oct. 4, 2018) ...........................................................35

*Quick Serve Concepts, LLC* v. *Cedar Fair, L.P.*,
83 Va. Cir. 59 (2011) .......................................................................................38

*SIMO Holdings Inc.* v. *Hong Kong uCloudlink Network Tech. Ltd.*,
396 F. Supp. 3d 323 (S.D.N.Y. 2019) .................................................................35

*Sonos, Inc.* v. *D&M Holdings, Inc.*,
2017 WL 5633204 (D. Del. Nov. 21, 2017) ........................................................26

*Suffolk Techs. LLC* v. *AOL Inc.*,
   910 F. Supp. 2d 850 (E.D. Va. 2012) ...............................................................38, 39

*Summit 6, LLC* v. *Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015)..............................................................................19

*Texas Advanced Optoelectronic Sols., Inc.* v. *Intersil Corp.*,
   2015 WL 602284 (E.D. Tex. Feb. 11, 2015) ..........................................................26

*TiVo, Inc.* v. *EchoStar Commc'ns Corp.*,
   516 F.3d 1290 (Fed. Cir. 2008)...............................................................................16

*VirnetX Inc.* v. *Apple Inc.*,
   792 F. App'x 796 (Fed. Cir. 2019) .........................................................................31

*VirnetX, Inc.* v. *Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014)..........................................................................21, 22

*VS Techs., LLC.* v. *Twitter, Inc.*,
   2011 WL 4744572 (E.D. Va. Oct. 5, 2011).............................................................18

*Westberry* v. *Gislaved Gummy AG*,
   178 F.3d 257 (4th Cir. 1995) ..............................................................................39, 41

*WesternGeco LLC* v. *ION Geophysical Corp.*,
   138 S. Ct. 2129 (2018)...............................................................................25, 34, 35

*YETI Coolers, LLC* v. *RTIC Coolers, LLC*,
   2017 WL 429210 (W.D. Tex. Jan. 28, 2017) ..........................................................26

*Ziptronix, Inc.* v. *Omnivision Techs., Inc.*,
   71 F. Supp. 3d 1090 (N.D. Cal. 2014) .............................................................26, 32

## STATUTES AND FEDERAL RULES

35 U.S.C. § 271(a) ...............................................................25, 30, 31, 33, 35

35 U.S.C. § 271(f)................................................................32, 33, 34, 35

35 U.S.C. § 281 .............................................................................................38

35 U.S.C. § 284 ..................................................................................... *passim*

Fed. R. Evid. 408 ...............................................................................37, 44, 45

Fed. R. Civ. P. 56.............................................................................................26

Plaintiff The Trustees of Columbia University in the City of New York ("Columbia") submits this memorandum in opposition to Defendant NortonLifeLock Inc.'s ("Norton") Motion to Strike Portions of the Reports and Exclude Testimony of Dr. Eric Cole and Dr. Ryan Sullivan (Dkt. 374).

Norton has condensed into one motion several independent issues related to two different experts, Dr. Cole and Dr. Sullivan.  Each issue requires consideration of different background facts, legal standards, and arguments, so this opposition is divided into three sections: (i) the reasons Norton's motion regarding apportionment of damages should be denied; (ii) the reasons Norton's improper request for summary judgment regarding foreign sales stemming from U.S.-based patent infringement should be denied; and (iii) the reasons Norton's *Daubert* motion regarding the calculation of damages for Columbia's state law claims—based on the incorrect legal standard for patent infringement damages—should be denied.

## I.   DR. COLE AND DR. SULLIVAN PROPERLY APPORTIONED DAMAGES TO THE SPECIFIC PATENTED TECHNOLOGY AT ISSUE IN THIS CASE[1]

██████████████████████████████████████████████████████████

██████████████████████████ (Ex. 1 ("Cole R.") ¶¶ 31-33, 47-52, 156-64, 206-10, 255-60; Ex. 2 at -298; Ex. 3 at 59:25–60:10 ████████████████████████████

███████████████████████████.)  Columbia's patented technology contributes significantly to that core function, enabling a feature—present in all of Norton's products—called SONAR/BASH, which can monitor and stop malware even as it deploys a method of attack never

---

[1]     Norton's *Daubert* motion is styled as a request to strike and exclude apportionment opinions of Columbia's economics expert, Dr. Sullivan.  As described below, the main apportionment analysis was performed by Dr. Cole—an expert with more than thirty years of experience in the cybersecurity industry—and Dr. Sullivan relied on Dr. Cole's apportionment analysis after Dr. Sullivan satisfied himself that Dr. Cole's apportionment was reasonable from an economist's perspective.  Accordingly, despite the styling of Norton's motion, Columbia focuses on Dr. Cole's apportionment analysis.

seen before.  (Ex. 4 at 1-2; *infra* § I(A)(1).) ███████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ (Cole R. ¶¶ 144-47; Ex. 5 at -085; Ex. 6 at -363.) ████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ (Ex. 7 at -497

(██████████████████████████████████████████████████████████████████████████

██████████████████████████); Ex. 8 at 4 (describing SONAR as "more than an incremental advance—it

is a qualitatively different way" of detecting new malware).)

Columbia's patented inventions—as set forth in the claims that remain at issue—

are essential to the operation of SONAR/BASH. ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ (*See* Ex. 9 (Jaeger R.) ¶ 446

(██████████████████████████████████████████████████████████████████████████

██████████████████████████), ¶ 596; Ex. 10 (Jaeger Tr.) at 249:23–250:11 ████████████

████████████████████████████████████████████████████████████); *see also* Ex. 11 at

104:7-105:3 ██████████████████████████████████████████████████████████████████

██████████████████████████████).) ██████████████████████████████████████████

██████████████████████████████████████████ (Ex. 12 (Bailey Rebuttal) ¶¶ 169-73; Ex. 13 ████████

████████████████████████████████████████████████████████████████████████████),

¶ 86 ████████████████████████████████████████████████████████████████████████

██████████).)  Accordingly, this is not a case in which a multi-component device like Apple's iPhone

has been accused of infringement based on a minor feature ancillary to the purpose of the product (*e.g.*, a "slide to unlock" feature).  Rather, Columbia's patented technology is necessary to the operation of SONAR/BASH, which contributes to the main function of Norton's products.



(Cole R. ¶ 200 ( ).)   Norton incorrectly suggests that Dr. Cole (i) ignored the value of non-patented or "conventional" elements that contribute value to SONAR/BASH; (ii) did not consider that certain patent claims were invalidated during IPR; and (iii) "plucked out of thin air" an opinion that Columbia's patents account for " " of the value of Norton's products.

(Cole R. ¶¶ 203, 271, 297, 317; Cole Reply ¶¶ 84-91; Ex. 14 ("Cole Tr.") at 50:1-14.)

In the end, Dr. Cole's and Dr. Sullivan's analyses resulted in an effective royalty rate of of product revenue (*i.e.*, less than for every dollar Norton earned using Columbia's technology).  This effective royalty—obviously very different from the " " rate Norton attempts to pass off as the opinion of Columbia's experts—renders untenable Norton's contention that Columbia seeks more than the incremental value of its patents.  At trial, Norton

can repeat its refrain that Columbia's patents are worthless, but that is an argument for the jury, and the contrary opinions of Columbia's experts—after a detailed review of the documentary evidence and deposition transcripts—are more than reliable under the *Daubert* standard.

### A. Background

1.  Background: The Accused Products and Columbia's Patented Technology

To understand Dr. Cole's apportionment opinions, and the reasons Norton's motion should be denied, it is helpful to understand how Norton's products work, including the functionality contributed by Columbia's inventions. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ (Cole R. ¶ 274; Ex. 15 at -788.) ████████████████

████████████████████████████ (Ex. 16 at -522.)

████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ (Ex. 10 (Jaeger Tr.) at 214:14-17.)

████████████████████████████████████████████████████

████████████████████████████████████████████ (Ex. 5 at -085.)  SONAR/BASH infringes Columbia's patents.

████████████████████████████████████████████

████████████████████████████████████████████████████

████████ (Ex. 17 at -537, -541), ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ (Cole R. ¶¶ 44, 140; Ex. 3



at 180:6–182:22; Ex. 18 at -965, -984);

(Ex. 19 at -205).

(Ex. 20 at -613.)  Norton

highlighted that within seven months of SONAR's launch it had prevented 4.2 million infections,

"[m]ost of [which] were never-before-seen malware and infection scenarios."  (Ex. 4 at 1.)

(Ex. 5 at -085-87; *see also* Ex. 21 at -070.)

(Ex. 22 at 3; *see also* Ex. 23 at -851; Ex. 24

at 283:12-22.)

(Ex. 11 at 153:16-21; Cole R. ¶ 332; Ex. 25 at 125:8-

25;  Ex.  26  at  137:19-22;  Ex.  27  at  287:9-14.)

SONAR/BASH's  ability                                        is  directly

attributable to infringement of the specific Columbia patent claims that remain at issue—those that

implement combined models created using different computers and random selection of comparison models.  In Norton's own words: "One of the key techniques we use is 'ensembling,' which is a fancy way of saying 'use many models and combine them in a good way.'"  (Ex. 28 at 3.) ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ (Ex. 29 (Bailey R.) ¶¶ 280, 293-94; Cole Reply ¶¶ 86-89, 91; Ex. 30 (Bailey Tr.) at 194:10-13.)

2.    Background: Dr. Cole's Experience and Expertise

Mindful of the Federal Circuit's requirement that an accused product's value usually must be apportioned to the value of the asserted patented technology, Columbia retained Dr. Eric Cole to provide an opinion regarding the incremental value Columbia's remaining patent claims contribute to Norton's products.  Dr. Cole is eminently qualified to perform such an analysis, and the methodology he applied here is comparable to standard industry practice (*i.e.*, the methodology Dr. Cole regularly applies when he helps price products and value product features and patented technology in the cybersecurity industry).

Over thirty years, Dr. Cole has acquired experience and expertise in the cybersecurity industry (Ex. 31), including serving from 2001 to 2005 as Chief Technology Officer at The SYTEX Group, Inc., a company providing information technology services to the Department of Defense and other federal agencies  (*Id.* at 2).  Lockheed Martin acquired SYTEX in 2005, and Dr. Cole worked for Lockheed as Chief Scientist and Senior Fellow until 2009.  (*Id.*)  Dr. Cole then served as Senior Vice President and Chief Technical Officer ("CTO") of the Americas for McAfee, a computer security software company that was and is one of Norton's main competitors.  (*Id.* at 1-2.)  Two years later, Dr. Cole transitioned to his consulting business, which

provides computer security consulting services to Fortune 500 companies, financial institutions, and the federal government.  (*Id.* at 1.)



(Cole Tr. 22:22–24:4; Cole R. ¶ 202.)

(Cole Tr. 23:17-24.)

(*Id.* at 109:7–110:17;  Cole R. ¶ 247.)

(Cole Tr. 150:6–151:6; Cole R. ¶ 210.)

Importantly, around the time of the hypothetical negotiation that would have occurred between Columbia and Norton in this case, in the 2011 to 2013 time period, Dr. Cole engaged in valuation of patented technology and product features for McAfee, one of Norton's main competitors.  Dr. Cole thus has unique experience and expertise to help the jury understand market demands that existed at the time of the hypothetical negotiation, the value of the patented inventions in Norton's products, and the import of Norton's internal business documents.

3.     Background: Dr. Cole's Apportionment Methodology and Opinion

Norton argues that Dr. Cole's methodology is unreliable because he purportedly "failed" to take into account value contributed to SONAR/BASH by non-patented or "conventional" elements and because he "plucked out of thin air" an opinion that ▮ of the value of SONAR/BASH should be attributed to Columbia's patents.  Norton is wrong.  To provide an apportionment opinion, Dr. Cole performed a three-step, evidence-driven analysis to determine the incremental value that Columbia's remaining patent claims add to Norton's products.

Dr. Cole's methodology unquestionably is reliable—indeed, Norton's own expert, Dr. Jaeger, adopted Dr. Cole's methodology for his own purported apportionment analysis, and took no issue with the reliability of it.  Each step of Dr. Cole's analysis is described in summary below.



(Cole R. ¶¶ 203-61.)

(*Id.*)

(Cole R. ¶ 206 & n.422 (citing Ex. 3 at 60:14-17)), and (ii)

(Cole R. ¶ 209 & n.429 (quoting Ex. 32 at -309), ¶ 210).

. (Cole R. ¶¶ 221, 229, 234, 239, 243, 255.)

(Cole R. ¶¶ 262-313.)

(*see, e.g.*, Cole R. ¶¶ 283-286 & n.555 (citing Ex. 15 at -788)),



(Cole R. ¶ 286 & n.570 (citing Ex. 21 at -072))).

(Cole Tr. 22:22–24:4.)

(Cole R. ¶¶ 210, 273.)

(*Id.* ¶¶ 271, 297.)

*Third*, Dr. Cole apportioned the value of SONAR to the specific Columbia patented technology at issue.

(Cole R. ¶¶ 314-338.)

(*See* Cole Tr. 49:7–51:25; Cole R. ¶¶ 317, 321-22.)



(Cole Reply ¶¶ 85-86),

(Cole

R. ¶ 336 & n.690).

---

2

(Cole R. ¶ 179 & n.368 (quoting Ex. 33 at 56) (emphasis added); *id.* ¶¶ 180-83.)

(Cole R. ¶ 107-09 & nn.114, 117 (citing Ex. 34 at 13; Ex. 24 at 138:4-13 (

).)

(Ex. 29 ¶ 208 n.409; *see id.* ¶¶ 280, 293-94; Ex. 30 at 194:10-13.)



(*See* Ex. 10 (Jaeger Tr.) at 249:23–250:11; Ex. 9 (Jaeger R.) ¶¶ 446, 596.)

4.   <u>Background: Dr. Sullivan's Reasonable Royalty Opinion</u>[3]

(*See* Ex. 35 ("Sullivan Tr.") at 35:17–36:3.)

(*See* Ex. 36 ("Sullivan R.") ¶¶ 179-93.)  These additional steps informed the calculation of incremental profits between Columbia and Norton to arrive at a reasonable royalty.

The detailed analyses performed by Dr. Cole and Dr. Sullivan ultimately led to an effective royalty rate of            —*i.e.*, Columbia would receive less than            for every dollar Norton earned based on products that incorporate Columbia's patented technology.

---

[3]      Norton does not challenge Dr. Sullivan's methodology for determining a reasonable royalty, so Columbia only briefly summarizes Dr. Sullivan's analysis and conclusion.

**B.     Columbia's Damages Experts Properly Considered the Value Contributed to SONAR/BASH by Non-Patented, "Conventional" Elements**

Norton broadly argues that Dr. Cole failed to determine only the incremental value of the asserted patent claims, and more specifically argues that Dr. Cole did "not account for the conventional elements" that contribute value to SONAR/BASH, and "did not consider distinctions between invalidated claims . . . and those claims that remain."  (Dkt. 375 ("Mot.") at 5, 7.)  Norton is wrong.  Dr. Cole considered the value that non-patented or "conventional" elements contribute to SONAR/BASH—assigning the majority of the value to those elements—but still determined that the incremental value added by Columbia's remaining patent claims is substantial.  The reasons Norton's arguments should be rejected are stated in more detail below.



(*See, e.g.*, Cole Tr. 9:22-24, 22:1-3; Cole R. ¶ 336; Cole Reply ¶¶ 84-100.)

(Cole Reply ¶ 84.)

(Cole Tr. 9:22-24),

(*id.* at 26:20-23; *see also id.* at 22:1-3, 31:13-14).  Norton's motion repeatedly quotes irrelevant testimony regarding the reason Dr. Cole did not need to perform an "independent claim by claim breakdown," while failing to even acknowledge directly relevant testimony that refutes Norton's assertion.

*Second*, Norton's argument that Dr. Cole failed to account for non-patented or "conventional" elements that support the functioning of SONAR/BASH (Mot. at 5), is equally

-12-

puzzling. 

(Cole R. ¶ 317; Ex. 37 (2014 Cole R.) ¶¶ 191, 200; Cole Tr. 49:7–50:14.)

(Cole Tr. 50:7–51:7.)  Those elements, standing alone, are not covered by Columbia's patents, which claim an ordered combination of elements comprising a novel system that detects malware with, *e.g.*, implementation of combined models created using different computers.

Dr. Cole is correct to value the remaining patent claims as a whole—an inventive and ordered combination of elements—and Norton's myopic focus on individual elements overlooks the repeated warning of the Federal Circuit that claims must not be evaluated element-by-element:  "In practice, all inventions are for improvements; all involve the use of earlier knowledge; all stand upon accumulated stor[i]es of the past.  Yet it has long been recognized that a patent that combines old elements may give the entire value to the combination if the combination itself constitutes a completely new and marketable article."  *AstraZeneca AB* v. *Apotex Corp.*, 782 F.3d 1324, 1338-39 (Fed. Cir. 2015) (citations omitted); *see Alice Corp. Pty. Ltd*. v. *CLS Bank Intern.*, 573 U.S. 208, 217-18 & n.3 (2014) ("[P]atent claims must be considered as a whole").  Dr. Cole properly assigned value to non-patented "old elements" that contribute value to SONAR/BASH, but then looked at the separate, incremental value contributed by Columbia's patent claims, which provide a combination of elements that "itself constitutes a completely new and marketable article."  As described above, Dr. Cole's analysis was informed by Norton's

-13-

internal documents and sales and marketing materials ███████████████████████
████████████████████████████████████████████████ (*Supra* § (I)(A)(3).)

   *Third*, Norton argues it is logically impossible that Dr. Cole considered the
incremental value of Columbia's remaining patent claims because Dr. Cole attributed ████ of the
value of SONAR/BASH to Columbia's patented inventions both in 2014 and 2019.  (Mot. at 8-9.)
Norton's argument depends on a deeply flawed logic chain:  (i) in 2014, Dr. Cole determined that
████ of the value of SONAR should be attributed to Columbia's patented inventions and ████
should be attributed to non-patented or "conventional" elements; (ii) between 2014 and 2019,
certain patent claims were invalidated; (iii) ████████████████████████████████████
████████████████████████; and (iv) in 2019, Dr. Cole still determined that ████ of
the value of SONAR should be attributed to Columbia's patented inventions.  Thus (according to
Norton) Dr. Cole could not have properly considered the invalidation of certain claims in his
apportionments because ██████████████████████████████████.  In essence,
Norton argues that the invalidated claims, after IPR, constitute additional non-patented or
"conventional" elements, which add independent value to SONAR/BASH ████████████████
██████████████████████████████████

   The problem with Norton's argument is simple:  It is ███████████████████
██████████████████████████████████████████████████████████████████████
(*supra* § I(A)(3)), ████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████



(*See supra* § I.)

Norton relies heavily on the Federal Circuit's decision in *Exmark Mfg. Co.* v. *Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332 (Fed. Cir. 2018).  (Mot. at 6-7.) *Exmark*, however, only illustrates the error in Norton's argument.  In *Exmark*, the asserted patent claim included all of the elements of a "conventional" lawnmower, and added an improved lawnmower blade.  *Id.* at 1347-48.  In that case, the Federal Circuit criticized the expert for concluding broadly that the patent owner was entitled to a royalty equal to 5% of the price of the *entire lawnmower*, when the conventional lawnmower recited in the claims was an obvious non-infringing alternative.  *Id.* at 1348-50.  The outcome of *Exmark* would have been very different if,



4 ████████████████████████████████████████████████████ (Ex. 9 (Jaeger R.) at 633.) ████████ (*Id.* at 622.)

5 ████████████████████████████████ (*See* Cole R. ¶ 336 & n.690; Cole Reply ¶¶ 85-86.) Although, in contrast to combined models, Dr. Jaeger disputes this issue, that is an issue of fact to be resolved at trial, and Dr. Bailey's opinion provides a solid foundation for Dr. Cole's opinions.

as here, ███████████████████████████████████████████████████████

███████████████████████████████████████████████ Here, there is no

error in Dr. Cole's analysis because it is undisputed that the invalidated patent claims do not—by

analogy to *Exmark*—describe a non-infringing alternative lawnmower. ███████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Norton also relies heavily on the fact that in the 2014 report, Dr. Cole did not

provide an "individual claim-by-claim breakdown," and separately discuss the claims that were

invalidated during IPR and the claims that remain at issue (*i.e.*, there is no specific discussion in

the 2014 report of combined models created using different computers). (Mot. at 8-10.) ████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████ (*See* Cole Tr. 32:1-2.) ████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████[6]   Accordingly, there was no reason to provide numerous different

damages opinions, claim-by-claim, because all claims were assumed valid and infringed.[7]  In any

---

[6] ████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

[7]   Columbia's counsel and experts are unaware of any case in which a damages expert
presented at trial numerous separated damages, claim-by-claim, in the manner Norton suggests.
The analysis occurs at the level of the asserted patent.  Even in cases where a jury has returned a
verdict of infringement of several patent claims, and on appeal, the Federal Circuit found non-
infringement of several (but not all) claims, as a matter of law, the remand expressly did not require
reconsideration of damages.  *TiVo, Inc.* v. *EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1312 (Fed.

event, Norton's critique of Dr. Cole's 2014 report is, at best, fodder for cross-examination, not a basis to exclude Dr. Cole's well-reasoned opinions and testimony.

### C.    Dr. Cole's Apportionment Methodology Is Reliable

Attempting to cast its disagreement with Dr. Cole's opinion as a legal deficiency, Norton challenges the reliability of Dr. Cole's methodology, arguing that Dr. Cole provided insufficient explanation and factual support.  (Mot. at 11-12.)  Norton is wrong.

Dr. Cole's three-step apportionment methodology is fully explained, well-reasoned, and supported by a very substantial amount of evidence.  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  (*Supra* § I(A)(3) (citing Cole R. ¶¶ 203-338).)  The apportioned percentages Dr. Cole assigned at each step are based on a combination of (i) review and analysis of the specific documentary evidence and testimony in this case, and (ii) decades of experience in the cybersecurity industry which included employing this methodology.  (*Supra* § I(A)(2)-(3).)

Regarding documentary evidence and testimony, as described in detail above (*supra* § I(A)(3)), Dr. Cole reviewed Norton's internal business documents and sales and marketing materials—and related deposition testimony—to inform his conclusion at each step.

████████████████████████████████████████████████████

████████████████████████████████████  (*see* Cole R. ¶ 206 (quoting Ex. 3 at 60:14-17

---

Cir. 2008) ("Because the damages calculation at trial was not predicated on the infringement of particular claims, and because we have upheld the jury's verdict that all of the accused devices infringe the software claims, we affirm the damages award entered by the district court.").  If Norton's "theory of damages" were correct, the Federal Circuit would require re-trial of damages in any case where certain infringed claims that support the damages award are found not to be infringed or invalid.  That does not occur in reality.



)), ¶¶ 207-09);

(*see id.* ¶ 285

(citing Ex. 6 at -363), ¶¶ 286-93);

(*id.* ¶¶ 108-10, 179-83, 323-28; *see also supra* § I(A)(1))).

Moreover, in contrast to Norton's apportionment expert, Dr. Jaeger, (*see* Dkt. 381 ("Jaeger Mot.") at 9-14), Dr. Cole's experience and expertise in the cybersecurity industry will assist the jury to understand the commercial significance of Norton's internal business documents, sales and marketing materials, and different product features, to determine the amount of a reasonable royalty. *See VS Techs., LLC.* v. *Twitter, Inc.*, 2011 WL 4744572, at *6 (E.D. Va. Oct. 5, 2011) (expert could rely on professional experience to offer reasonable royalty opinion where it was based on "over forty (40) years of experience in the area of the licensing of patents," and that experience was "applied to the facts" of the case).



(Ex. 9 (Jaeger R.) ¶¶ 525-623; Ex. 10 (Jaeger Tr.) at 212:6-15.)

[8] (Ex. 10 at 211:17-24, 212:16–

---

[8]    Columbia has filed a motion to exclude Dr. Jaeger's apportionment opinion, which is based entirely on Dr. Jaeger's lack of qualifications to perform the analysis, not the methodology of the analysis, which Dr. Jaeger "borrowed" from Dr. Cole without critique or modification. (*See* Dkt. 381.)

213:21.)  If Norton were able to identify an apportionment methodology more reliable than the one used by Dr. Cole, Norton and its expert presumably would have identified and applied it.

Regarding the legal standard, the Federal Circuit has made clear that "estimating a reasonable royalty is not an exact science."  *Summit 6, LLC* v. *Samsung Elecs. Co*., 802 F.3d 1283, 1296 (Fed. Cir. 2015).  Rather, "where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder."  *Id.* at 1296; *see also Interactive Pictures Corp.* v. *Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) ("Although 'a trier of fact must have some factual basis for a determination of a reasonable royalty,' consideration of a hypothetical negotiation 'necessarily involves an element of approximation and uncertainty.'"); *Biomedical Enters., Inc.* v. *Solana Surgical, LLC*, 2016 WL 4198304, at *6 (W.D. Tex. Apr. 26, 2016) (admitting expert's reasonable royalty opinion where apportionment methodology was based on, *inter alia*, review of defendants' marketing materials and information about the infringing features from the plaintiff's technical expert); *Corning Optical Commc'ns Wireless Ltd.* v. *Solid, Inc*., 2015 WL 5655192, at *5 (N.D. Cal. Sept. 24, 2015) (holding expert's damages opinions "reliable enough to be presented to the jury" where based on a thorough review of the evidence "in light of her unchallenged background in finance, marketing and accounting to determine that consumers demand the patented products").

Measured against this standard, Dr. Cole's apportionment methodology is exemplary.  Contrary to Norton's argument, Dr. Cole's apportionment percentages were not "plucked out of thin air"; rather, Dr. Cole performed a detailed analysis based on his experience and the particular evidence of this case.  Dr. Cole's methodology and opinion bear all the hallmarks of reliable expert testimony for a patent damages analysis, which need not be an "exact science."

*See Biomedical Enterprises*, 2016 WL 4198304, at *6 (approving apportionment methodology based on, *inter alia*, review of marketing materials and information about the infringing features from the plaintiff's technical expert); *Corning*, 2015 WL 5655192, at *5.

### D. Columbia's Damages Experts Properly Apportioned Value to the Patented Technology at Issue, To a Level More Granular Than the SSPPU

Norton argues that Norton AntiVirus—the entry-level and most basic consumer product to incorporate SONAR/BASH—constitutes something called the "smallest salable patent practicing unit" ("SSPPU"). ██████████████████████████████████████████ ██████████████████████████████████████ (Mot. at 19-20; Ex. 38 (Hosfield R.) at 23-24, Ex. 4A.) ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████ (Mot. at 20; Ex. 38 (Hosfield R.) at 70.) In the end, Norton essentially argues that Columbia's experts must pretend that each sale of a higher-priced Norton consumer product—for the purposes of calculating damages—was a sale of the lower-priced Norton AntiVirus. There are multiple problems with Norton's suggested approach.

As an initial matter, there is no legal mandate that damages experts utilize the SSPPU in a reasonable royalty calculation or risk exclusion of their opinions and testimony. In a patent damages analysis, "the essential requirement for reliability under *Daubert* . . . is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Commonwealth Sci. & Indus. Res. Org. (CSIRO)* v. *Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (quotation omitted). Apportionment of value to the patented invention "can be addressed in a variety of ways." *Exmark*, 879 F.3d at 1348.

In the context of multi-component devices, the Federal Circuit has explained that one apportionment tool is identification of the SSPPU. *Ericsson, Inc.* v. *D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). For example, if the defendant sells a smartphone with a microprocessor, and the patented technology pertains to the microprocessor only, the SSPPU arguably would be the microprocessor, which is sold on its own. Utilization of the SSPPU has been emphasized in cases where a patent owner improperly seeks damages based on the entirety of a multi-component device, when the asserted patent invention pertains only to a segregable, ancillary feature. *See VirnetX, Inc.* v. *Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014) (finding error when expert used the value of the entire smartphone "without attempting to apportion the value attributable to the [accused features]," based on patented technology pertaining to network security). As the Federal Circuit has observed, in those cases, identification of the SSPPU may "avoid misleading the jury by placing *undue emphasis on the value of the entire product*." *Ericsson*, 773 F.3d at 1226 (emphasis added).

More recent Federal Circuit cases, however, make clear that the SSPPU is one possible tool, and not a mandatory part of a patent damages analysis. Rather, the key question is whether damages have been appropriately apportioned to the patented technology. *See Exmark*, 879 F.3d at 1348 (allowing use of the full product as the royalty base "[s]o long as [plaintiff] adequately and reliably apportions between the improved and conventional features of the accused mower"); *CSIRO*, 809 F.3d at 1303 ("The rule [defendant] advances—which would require all damages models to begin with the smallest salable patent-practicing unit—is untenable."); *see also Ericsson*, 773 F.3d at 1226-27.

As described in detail above (*supra* § I(A)(3)), Columbia's experts in this case went significantly beyond Federal Circuit requirements, apportioning value with granularity down to a

functionality not separately sold, *i.e.*, a level below the SSPPU. 

(Ex. 39 ("Sullivan Reply") Attach. N-11a.)  This is a far cry from other situations that might cause

juror confusion if a royalty is based, without apportionment, on billions of revenue stemming from

the sale of an entire product.

(*Id.*

¶¶ 59-65.)  Although Norton's motion could be denied based on the foregoing alone, there are

several independent, additional reasons Norton's SSPPU argument should fail.

> *First*, even if Columbia's experts were required to utilize an SSPPU (and they are

not), Norton AntiVirus is not the SSPPU.  An SSPPU must tie product revenue "to an individual

component of a multi-component product," *VirnetX*, 767 F.3d at 1326, the classic example being

a processor within a smartphone, *GPNE* v. *Apple*, 2014 WL 1494247, at *13 (N.D. Cal. Apr. 16,

2014).  But, Norton AntiVirus is not in any respect a "component" of the other Norton products.[9]

10

---

[9]     Before the Broadcom divestment in November 2019, Norton sold only one business
enterprise product, Symantec Endpoint Protection ("SEP"), which also infringes.  Although
Norton argues that Norton AntiVirus must be treated as an SSPPU "component," Norton curiously
does not claim that also is true for SEP.  In other words, if Norton AntiVirus truly could be thought
of as an SSPPU "component," there would be no reason to treat SEP and the Norton consumer
products differently.  In the context of SEP, Norton embraces the idea that apportionment must be
considered based on the unique set of product features (presumably because it works in Norton's
favor), but Norton cannot have it both ways.

10

(Mot. at 19 (citing Cole Tr. 99:6-18; Cole R. ¶¶ 193-97, 266; Sullivan
Tr. 95:15-19).)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ (Cole Reply ¶ 41; Ex. 38 (Hosfield R.) Ex. 4A Schedule 3 at n.1.)

*Second*, Norton's SSPPU argument rests on a significant factual oversight. ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ (Cole R. ¶¶ 214, 217, 222, 230, 232-33, 241; Cole Reply ¶ 40.) ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ (Cole R. ¶ 232; *id.* ¶ 217 ████████████████

████████████████████████████████████████████████████

██████████████████ ").) ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Furthermore, Norton's SSPPU argument is mistaken even with respect to products

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

████████████████████████████████████████████████████

████████████████████ (*See, e.g.*, Cole R. ¶¶ 193-94, 266; Sullivan Tr. 95:15-19.)

███████████████████████████████████████████████████████

██████████ (Mot. at 20; Ex. 38 (Hosfield R.) at 69-70; Cole R. ¶ 248 & n.492.) ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████ (Cole R. ¶ 248 & n.492; Cole Reply ¶¶ 37-38.) █████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

(Cole Reply ¶ 38.) ██████████████████████████████████████

███████████████████████████████████████████████████████

*See Ericsson*, 773 F.3d at 1226 (providing that the "reasonable royalty award must be based on the incremental value that the patented invention adds to the end product").

█████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████ (Sullivan Reply ¶¶ 64-65; *see also* Cole R. ¶ 248; Cole Reply ¶ 39 (███████

███████████████████████████████████████████████████████

████████████████████████████████████ ).)

      In sum, there is no reason—based on law, logic, or fact—to impose an SSPPU requirement on the damages analysis in this case. █████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████   (Cole R. ¶¶ 211-43.)  Norton may attempt to pitch its criticisms to the jury, but they do not provide a basis to exclude any portion of Dr. Cole's and Dr. Sullivan's opinions.

## II.   DR. SULLIVAN'S DAMAGES OPINION DOES NOT INCLUDE DAMAGES FOR "INFRINGEMENT ABROAD"

Norton contends that Dr. Sullivan's damages opinion improperly includes compensation for acts of patent infringement that occur outside the United States.  This is a profound mischaracterization of Dr. Sullivan's opinions.  For two independently sufficient reasons, Dr. Sullivan properly included within his reasonable royalty calculation revenue that Norton received from foreign customers based on infringement in the United States. *First*, substantial evidence supports the conclusion that each of Norton's foreign customers received a software product that Norton *made* in the United States as part of a *sale* substantially within the United States, and thus each foreign sale itself is an act of domestic infringement under 35 U.S.C. § 271(a).

*Second*, Norton cites only pre-2018 case law, failing to bring to the Court's attention the Supreme Court's 2018 decision in *WesternGeco LLC* v. *ION Geophysical Corp.*, 138 S. Ct. 2129 (2018), which establishes that Columbia is entitled to claim a reasonable royalty, pursuant to 35 U.S.C. § 284, based on *foreign* revenue that is the result of *domestic* acts of infringement, even if each individual sale were not itself an act of domestic infringement.  Under *WesternGeco* and recent cases applying it, Dr. Sullivan correctly included foreign revenue in his reasonable royalty calculation.

Preliminarily, Norton's motion should be denied for a simple reason:  Norton has improperly submitted a summary judgment motion in the guise of a *Daubert* motion.  It is not appropriate to raise under *Daubert* hotly contested issues of fact and substantive law—whether Norton's revenue from non-U.S. customers stems from U.S. infringement or should otherwise be

included in damages pursuant to § 284.  *See, e.g.*, *YETI Coolers, LLC* v. *RTIC Coolers, LLC*, 2017 WL 429210, at \*2 (W.D. Tex. Jan. 28, 2017) (*Daubert* motions are inappropriate for determining the legal standard); *Dynetix Design Sols., Inc.* v. *Synopsys, Inc.*, 2013 WL 4537838, at \*5 (N.D. Cal. Aug. 22, 2013) (parties "cannot 'convert a *Daubert* motion into an ersatz motion for summary judgment' where the legal standards are 'not so well-defined' or can reasonably be argued"); *Sonos, Inc.* v. *D&M Holdings, Inc.*, 2017 WL 5633204, at \*2 (D. Del. Nov. 21, 2017) (denying motion *in limine* "seeking a dispositive ruling on a substantive [damages] issue").

The fact that this issue should have been raised at summary judgment is established by the cases Norton cites in its motion.  All of those cases arose in the context of summary judgment of non-infringement or a post-verdict motion for judgment as a matter of law.  *M2M Sols. LLC* v. *Motorola Sols., Inc.*, 2016 WL 70814, at \*26 (D. Del. Jan. 6, 2016) (summary judgment relating to non-infringement and damages); *Halo Elecs., Inc.* v. *Pulse Elecs., Inc.*, 769 F.3d 1371, 1374 (Fed. Cir. 2014) (appealing summary judgment relating to infringement and damages), *rev'd on other grounds*, 136 S. Ct. 1923 (2016); *Ziptronix, Inc.* v. *Omnivision Techs., Inc.*, 71 F. Supp. 3d 1090, 1092 (N.D. Cal. 2014) (summary judgment relating to infringement); *Texas Advanced Optoelectronic Sols., Inc.* v. *Intersil Corp.*, 2015 WL 602284, at \*2 (E.D. Tex. Feb. 11, 2015) (enforcing summary judgment ruling in evidentiary ruling); *Carnegie Mellon Univ.* v. *Marvell Tech. Grp.*, 807 F.3d 1283, 1288 (Fed. Cir. 2015) (appeal of post-judgment motions).

Under the Rule 56 summary judgment standard (the proper vehicle for Norton's argument), Norton is required to demonstrate that there is no genuine issue of material fact regarding infringement associated with sales to non-U.S. customers.  Norton makes no such showing, and attempts to use *Daubert* as an end-run around the Rule 56 standard, presumably because Norton appreciates it could not meet the appropriate standard.  The record here is replete

with evidence that Norton's sales to non-U.S. customers stem from domestic acts of infringement, as described below.  A *Daubert* motion simply is not the right vehicle for Norton's arguments, and the Court should deny the motion for this reason alone.  If the Court decides to engage with the merits of Norton's motion, it should be denied for the additional reasons set forth below.

### A.     Background

Norton's worldwide sales have a significant nexus to the United States because



(Ex. 40 at 54:18-22; Ex. 25 at 13:14-17, 89:22-24.)

(Ex. 40 at 33:4–34:14; Ex. 41 at -637-68.)

(Ex. 42 at 16:14–17:6, 92:17-25, 106:4-19; Ex. 40 at 55:18-25.)

(Ex. 40 at 13:5-22, 18:24–19:6, 20:19-23, 21:24–22:7, 25:16-25, 30:21-23, 35:5-21.)[11]

---

[11]  This activity is irrelevant to infringement.

(Ex. 40 at 27:16–28:13, 35:5-14.)



(Ex. 40 at 20:14–21:1, 36:15-19, 46:12-15; Ex. 42 at 38:1-12, 61:17-18, 67:25–68:11, 90:11-16, 91:10-12.)

(Ex. 42 at 34:1-8, 42:1-21.)

(Ex. 42 at 106:15-19; *see also* Ex. 40 at 55:18-22.)

(Ex. 40 at 47:22–48:7, 50:7-21, 51:10-16; Ex. 42 at 16:14–17:6.)

(Ex. 42 at 42:13-17, 50:20–51:1, 51:17-24, 52:4-8, 59:14-24, 54:11–55:19; Ex. 43.)

(Ex. 42 at 51:13-18, 52:9-20.)

(Ex. 42 at 46:25–47:14, 54:5-10, 57:1-18, 83:1-5; Ex. 40 at 51:14-16.

(Ex. 42 at 50:7-19, 57:21-23, 58:13–59:2.)



(Ex. 42 at 24:4-14, 25:5-9, 25:13-18; Ex. 44 at 7.)

(Ex. 42 at 33:22–34:8, 42:8-25, 43:17–44:1, 76:1-20; Ex. 45 at 146:4–147:4.)

(Ex. 42 at 59:14-24.)

(Ex. 42 at 85:18–86:7.)

(Ex. 3 at 14:7–17:19.)

(Ex. 3 at 14:7–17:19.)

(Ex. 42 at 16:2-6; Ex. 40 at 52:1-12.)

(Ex. 42 at 13:14-20, 16:7-19, 92:17-24; Ex. 40 at 52:18–53:1.)

(Ex. 29 ¶¶ 120, 157, 235; Ex. 46 at 93:12-16; Ex. 26 at 223:6-15, 224:20–225:3.)



(Ex. 42 at 13:15-25; Ex. 40 at 41:10–42:18; Ex. 25 at 128:3–129:7.)

(Ex. 47 at 22:17-20, 162:11-24.)

[12] (Sullivan R. ¶ 147; Ex. 47 at 162:11-24, 163:7-13, 164:7–166:4, 166:17-20.)  In summary, even if certain Norton customers reside in foreign countries, the evidence overwhelmingly demonstrates that each sale itself results from domestic infringing activity (

**B.    Substantial Evidence Supports the Conclusion That Each Sale of an Accused Product to a Foreign Customer Reflects a Domestic Act of Infringement**

Title 35 of the United States Code, Section 271(a), provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention within the United States . . . infringes the patent."   Section 271(a) can "scarcely be made plainer . . . [it] embraces the construction of the thing invented." *Baeur & Cie* v. *O'Donnell*, 229 U.S. 1, 10 (1913).  Regarding software, the Federal Circuit has long held that software infringes a patent claim if it is *configured*

---

12

(Ex. 48.)  *See Lee* v. *Zom Clarendon, L.P.*, 689 F. Supp. 2d 814, 816 (E.D. Va. 2010) ("[A] deposition is not a take home exam.  The errata sheet 'clarifications' . . . are akin to a student who takes her in-class examination home, but submits new answers only after realizing a month later that the import of her original answers could possibly result in a failing grade.").

to satisfy the elements of a patent claim. *Finjan, Inc.* v. *Secure Computing Corp.*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010) (establishing that infringement by software only requires that the software be "capable of operating" as claimed); *VirnetX Inc.* v. *Apple Inc.*, 792 F. App'x 796, 808 (Fed. Cir. 2019) (noting that infringement by software does not require the software to be active or enabled as long as infringing code is included).

Many of the patent claims asserted in this case are "computer-readable medium" or "CRM" claims, which cover software and "recite[] capability and not actual operation," such that they are infringed by software as it sits on a server, not as operated by a user. *Finjan*, 626 F.3d at 1204-05. █████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

(Ex. 29 ¶ 243; Ex. 12 ¶¶ 97, 167; Ex. 30 at 187:16-23.) ████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████ (*Supra* § II(A).)  As such, every sale of the infringing products, whether foreign or domestic, itself reflects an act of infringement under § 271(a) because it stems from a copy of infringing software that was *made* in the United States. ████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

The cases on which Norton relies are easily distinguished—each case found no infringement under § 271(a) because the products were created, delivered, and used entirely in foreign jurisdictions. *M2M Solutions LLC*, 2016 WL 70814, at *19-20 (manufactured abroad and shipped outside of the United States); *Halo Elecs.*, 769 F.3d at 1381-82 (manufactured abroad and

sold outside of the United States); *Ziptronix*, 71 F. Supp. 3d at 1096-97 (manufactured, delivered, and sold outside of the United States); *Intersil*, 2015 WL 13469929 at *7 (manufactured, packaged, and sold outside of the United States); *FlowRider Surf, Ltd.* v. *Pac. Surf Designs, Inc.*, 2016 WL 6522808, at *5 (S.D. Cal. Nov. 3, 2016) (not "made, imported, sold, used, manufactured, nor offered for sale in the United States"). Those cases are inapposite here, where the connection to the United States is significantly greater— ███████████████████████████████████ █████████████████████████████  At a minimum, there is a genuine issue of material fact, and a jury should decide whether infringement occurred in the United States.

Norton also heavily relies on the Supreme Court's decision in *Microsoft* v. *AT&T* for the purported principle that "domestic possession of master software and the foreign distribution of copies" never gives rise to U.S. patent infringement. (Mot. at 15); *Microsoft Corp.* v. *AT&T Corp.*, 550 U.S. 437 (2007). Norton is mistaken. In *Microsoft*, the Supreme Court interpreted the phrase "such components" under 35 U.S.C. § 271(f), which applies to exports from the United States of *components* that do not themselves infringe a U.S. patent. *See Microsoft*, 550 U.S. at 444-45. Microsoft's Windows operating system, as it sat in the United States, did not infringe AT&T's patents—a fact that the Supreme Court found outcome determinative—and AT&T's patents were not even infringed when the foreign recipient made copies of Windows abroad. *Id.* at 446-47. Instead, AT&T's patents were infringed only when a foreign individual installed Windows on a foreign computer abroad. *Id.* at 442 ("It bears emphasis [] that uninstalled Windows software does not infringe AT&T's patent any more than a computer standing alone does; instead, the patent is infringed only when a computer is loaded with Windows and is thereby rendered capable of performing as the patented speech processor.").

-32-

*Microsoft* is inapposite because the patent claims, statutory provision, and facts are entirely different from those presented here.   Norton's software products—including the SONAR/BASH feature—infringed Columbia's patents ████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.   *Finjan,* 626 F.3d at 1204. Columbia is not accusing purely foreign activity of infringement—nor is Columbia applying § 271(f)—rather, Columbia has put forward very substantial evidence that Norton's products infringe in the United States as they are distributed to customers globally.

Additionally, substantial record evidence supports a conclusion that each sale of a Norton product to a foreign customer was a _sale_ in the United States, within the scope of § 271(a). *Carnegie Mellon,* cited by Norton, is instructive.  *Carnegie Mellon Univ.* v. *Marvell Tech. Grp., Ltd.*, 807 F.3d 1283 (Fed. Cir. 2015).  In that case, several of the defendant's accused products were manufactured, shipped, delivered, and used entirely abroad.  *Id.* at 1305.  The Federal Circuit nevertheless found there was sufficient evidence for a jury to find that those products were "sold" from the United States.  *Id.* at 1306.  The Federal Circuit noted evidence of a "substantial level of sales activity in the United States," including the fact the defendant was headquartered in California, and the evidence demonstrated that product design, testing, and evaluation occurred in California.  *Id.* at 1309-10.  With these facts, the Federal Circuit concluded that it was a fact question for the jury whether the foreign activities infringed under 271(a), as long as the jury was instructed that, as to the foreign sales, they had to find a "domestic location" of the sale.  *Id.* ███ ███████████████████████████████████████████████████████████████

-33-

████████████████████████████████████████████████████████

████████████████████████████████████████  13

In sum, substantial record evidence supports a conclusion that each sale of a Norton product to a non-U.S. customer itself reflects a domestic act of infringement. At a minimum, there is a genuine issue of material fact, which cannot be resolved through a *Daubert* motion.

### C. Dr. Sullivan Properly Included Foreign Revenue in His Reasonable Royalty Calculation Even if Each Foreign Sale Is Not Itself an Act of Infringement

Title 35 of the United States Code, Section 284, allows recovery of "damages adequate to compensate for [patent] infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." The Supreme Court held in a 2018 decision (ignored by Norton) that a patent owner's recovery under § 284 can include damages based on *foreign* sales, as long as the activity is related to a *domestic* act of infringement. *WesternGeco LLC* v. *ION Geophysical Corp.*, 138 S. Ct. 2129, 2138-39 (2018). Although U.S. statutes, including § 284, generally "apply only within the territorial jurisdiction of the United States," *id.* at 2136, the "statutory focus" of § 284 is acts of patent infringement, and thus there is no violation of extraterritoriality principles if § 284 is applied to calculate damages based on foreign commercial activity, as long as the underlying act of infringement is domestic, *id.* at 2137.

Although *WesternGeco* arose in the context of infringement under § 271(f)(2), the holding of the case pertains to § 284 generally, and there is no reason the holding would not extend to other forms of U.S. patent infringement. Indeed, following *WesternGeco*, Chief Judge Stark of

---

13 ████████████████████████████████████████████████████████

████  (Sullivan R. Attach. I-1 (█████████████████

████ .)  This tends to support the conclusion that Norton is aware of the very significant nexus between its global sales and the United States.

the U.S. District Court for the District of Delaware—one of the most experienced patent jurists in the country—held that there is "no persuasive reason to conclude that the interpretation of § 284 should differ here from what was available in *WesternGeco* . . . . Section 271(a) 'vindicates domestic interests' no less than Section 271(f)."   *Power Integrations, Inc*. v. *Fairchild Semiconductor Int'l, Inc*., 2018 WL 4804685, at *1 (D. Del. Oct. 4, 2018); *see Plastronics Socket Partners, Ltd.* v. *Dong Weon Hwang*, 2019 WL 4392525, at *4-5 (E.D. Tex. June 11, 2019) ("The focus of § 271(a), as in § 271(f)(2), is on domestic conduct."); *SIMO Holdings Inc.* v. *Hong Kong uCloudlink Network Tech. Ltd.*, 396 F. Supp. 3d 323, 350-51 (S.D.N.Y. 2019) (noting that foreign damages can be recovered "for harms abroad that are proximately caused by domestic acts of infringement").  Limiting *WesternGeco* to infringement claims under § 271(f)(2) would lead to "strange results," including the "presumption against extraterritoriality appl[ying] to inarguably domestic forms of infringement . . . but not to forms of infringement that are more tenuously connected to this country, such as exportation."  *SIMO*, 396 F. Supp. 3d at 351.

Even if (contrary to the facts here) each of Norton's foreign sales did not itself reflect a domestic act of infringement, it is entirely proper for Dr. Sullivan to include foreign revenue within his reasonable royalty calculation because Norton's foreign sales, at a minimum, have a very substantial connection to U.S. acts of infringement. ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████ (Ex. 42 at 112:10-17; *see also id.* 42:8-21, 92:25–93:6, 106:15-19; Ex. 40 at 47:22–48:7, 50:7–51:16, 59:20–60:3; Ex. 45 at 146:4–147:4.)  These acts are clearly the but-for and proximate cause of all sales of Norton's products worldwide.

Finally, given the current legal landscape following *WesternGeco*, and the compelling facts presented in this case, the Court should exercise discretion to let the issue of damages for foreign revenue go to the jury as a matter of judicial economy.  The addition of foreign sales to Dr. Sullivan's reasonable royalty calculation will not increase the length or complexity of the trial, nor will it have any conceivable prejudicial effect on the jury—it is simply a matter of the amount of revenue included in Dr. Sullivan's analysis.  Moreover, if the jury verdict separates damages for foreign and domestic sales, it will be easy to eliminate the portion of any award associated with foreign sales in the event that the Federal Circuit or the Supreme Court finds that collecting damages for foreign sales is not legally permissible.

In contrast, if the Court does not allow this issue to be presented to the jury, and the Federal Circuit or Supreme Court were to decide that foreign sales can be included in the damages—and thus the issue should have gone to the jury—Norton will likely insist on another trial that focuses on damages for foreign sales.  In these circumstances, the Court should exercise discretion to allow the issue to be presented at trial.

## III.   DR. SULLIVAN'S DAMAGES OPINION REGARDING NORTON'S FRAUD, CONVERSION, AND UNJUST ENRICHMENT IS RELIABLE AND RELEVANT

As explained in Columbia's Opposition to Norton's Motion for Partial Summary Judgment (Dkt. 321 at 11-21), Norton is liable to Columbia for acts of fraud and conversion, and related unjustified enrichment.  Columbia seeks compensatory damages and disgorgement, and Columbia's damages expert, Dr. Sullivan, was the only expert on either side to provide an opinion regarding the amount Columbia should recover.  Norton seeks to exclude Dr. Sullivan's opinion on essentially three grounds, none of which has merit.

*First*, applying Federal Circuit law regarding a reasonable royalty pursuant to § 284, Norton contends that Dr. Sullivan's damages calculation improperly used a license

agreement that was insufficiently comparable to a hypothetical negotiation between Columbia and Norton. The problem with Norton's argument is plain: Columbia does not claim that Norton infringes U.S. Patent No. 8,549,643 (the "'643 Patent"), and Columbia thus has not sought a reasonable royalty. The very particular Federal Circuit precedent, applying § 284, is inapposite because it provides a framework focused on a *willing* licensor and *willing* licensee, grounded in policy considerations related to U.S. patent law. *See Applied Med. Res. Corp.* v. *U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006). Here, Dr. Sullivan was not calculating a reasonable royalty, and he properly utilized Columbia's license agreement with ███ as a benchmark for the *value* of the property Columbia lost, which is the correct standard under state law.

   *Second*, Norton argues that Dr. Sullivan's damages opinions "lack any factual support," and thus are unreliable. Norton is wrong. The record contains (i) substantial evidence of the value of the property at issue, and (ii) substantial evidence that Norton would have compensated Columbia for the property, at the time of the misappropriation in 2011, assuming for the sake of argument that Norton's willingness to compensate Columbia is relevant.

   *Third*, Norton argues that Dr. Sullivan's opinions should be excluded because (in Norton's view) Dr. Sullivan assigned insufficient weight to Norton's ███



(Dkt. 384 ("Hosfield Mot.") at 23), the fact that Dr. Sullivan disagrees with Norton regarding ███████ ███████ does not provide a basis for exclusion of Dr. Sullivan's opinions and testimony.

**A.**     **Columbia Seeks Compensatory Damages and Disgorgement Under State Law, and Dr. Sullivan's Use of ███████████ as a Benchmark for the Value of the Stolen Property Is Appropriate**

As an initial matter, Columbia does not—and cannot—contend that Norton infringes the '643 Patent, which Columbia does not own. 35 U.S.C. § 281 ("A *patentee* shall have remedy by civil action for infringement of his patent") (emphasis added); *Abraxis Bioscience, Inc.* v. *Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010); *Suffolk Techs. LLC* v. *AOL Inc.*, 910 F. Supp. 2d 850, 854-55 (E.D. Va. 2012). In this case, Columbia seeks damages arising from state law fraud, conversion, and unjust enrichment claims. The damages arising from these claims is a question of Virginia state law, not Federal Circuit law regarding a reasonable royalty pursuant to § 284.[14] As relevant here: (i) the remedy for conversion generally is the fair market value of converted property at the time and place of the conversion;[15] (ii) the remedy for fraud is a make-whole amount that will "restore the defrauded party to the position [s]he held prior to the fraud,"[16] which can include "prospective profits;"[17] and (iii) the measure of damages in unjust enrichment actions is the value of the benefit which accrued to the Defendant.[18]

---

[14]     Norton's motion does not make any argument that depends on whether Virginia or New York state law applies to Columbia's claims. Columbia does not attempt to address a detailed choice-of-law analysis in the limited space available. In any event, the damages calculation under Virginia and New York law for conversion, unjust enrichment, and fraud are the same, which vitiates any choice of law concerns.

[15]     *Desalle* v. *TitleMax of Va., Inc.*, 2014 WL 12771139, at *2 (E.D. Va. Dec. 23, 2014) ("The measure of damages in a conversion action is the market value of the property at the time of conversion") (citing *Straley* v. *Fisher*, 10 S.E.2d 271, 277 (Va. 1940)).

[16]     *Murray* v. *Hadid*, 385 S.E.2d 898, 904 (Va. 1989).

[17]     *Grubb & Ellis Co.* v. *Potomac Med. Bldg., LLC*, 2009 WL 3175999, at *15 (E.D. Va. Sept. 30, 2009) (noting that a plaintiff is entitled to damages that restore the "injured party to the position it held prior to the fraud" and "prospective profits upon a showing that he is entitled to those profits as damages").

[18]     *Quick Serve Concepts, LLC* v. *Cedar Fair, L.P.*, 83 Va. Cir. 59, 4-5 (2011).

In its Motion, Norton makes no attempt to address the appropriate remedy standards for state law claims, much less to explain why Dr. Sullivan's opinions are inadmissible under them. Instead, Norton cites three cases—*Suffolk*, *Trell*, and *M2M* (Mot. at 25-26)—each of which concerns the standard for calculation of a reasonable royalty under § 284.  Norton's motion thus is devoid of relevant legal support, and should be denied for that reason alone.  Dr. Sullivan's damages opinions related to state law claims cannot be excluded because they purportedly fail to adhere to a very different legal standard, pursuant to federal patent law.



(Ex. 49 at -521.)

(Mot. at 24);

(*id.* at 23-24);[19]

(*id.* at 26).[20]

---

[19] it goes to weight, not admissibility of Dr. Sullivan's opinion. *Westberry* v. *Gislaved Gummy AG*, 178 F.3d 257, 261 (4th Cir. 1995).

[20]

Although Norton's arguments may be valid (even if ultimately unavailing) in the context of a reasonable royalty analysis, they are misplaced in the context of Columbia's state law claims. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████[21]

With the appropriate measure of damages in mind, Dr. Sullivan's use of the ████ ████ is instructive. ████████████████████

████████████████████████████ (Dkt. 321 at 8), ████████████████████████████████

████████████████████████████████████████

████████████████████ (Sullivan R. ¶ 277; Sullivan



(Sullivan Reply ¶ 119.) ████████████████████

████████████████████████████████████████

(Id.)

[21] ████████████████████████████████████

████████████████████████ (Sullivan R. ¶¶ 264, 265.) ████████████████████████████████

████████ See Ericsson, Inc. v. *D-Link Sys., Inc.*, 773 F.3d 1201, 1227-28 (Fed. Cir. 2014) (recognizing that although "prior licenses . . . are almost never perfectly analogous," expert testimony regarding such licenses is reliable where the expert "account[s] for such distinguishing facts"); *Intellectual Ventures II LLC v. Sprint Spectrum, L.P.*, 2019 WL 1877309, at *3 (E.D. Tex. Apr. 26, 2019) (finding that because the damages expert "account[ed] for both the technological and economic differences between the hypothetical and actual licenses," questions of comparability "go[] to the weight of the evidence, not its admissibility").



Tr. 75:17–76:6

)).

(Sullivan R. ¶ 277.)

(*Id.*; *see also* Sullivan Reply ¶¶ 117-23; Sullivan Tr. 76:7-17.)

(Sullivan R. ¶¶ 257-90; Sullivan Tr. 75:3-16.)  Dr. Sullivan reduced to present value the amount of actual and projected payments, which served as an estimate of the value of the property that Norton misappropriated.

The evidentiary standard is not mathematical perfection; rather the standard is whether a damages expert's opinion is reasonably based on the particular facts of the case, rather than speculation. *See Westberry* v. *Gislaved Gummy AG*, 178 F.3d 257, 261 (4th Cir. 1995) ("[A] court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct.  As with all other admissible evidence, expert testimony is subject to being tested by

'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof.'" (second alteration in original)).  Dr. Sullivan has more than met the standard.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█ ██████████████████████████████████████████████████████

███████████████████████████  Dr. Sullivan's conservative approach, relying on concrete facts of this particular case, confirms the integrity and appropriateness of the opinions.

Finally, Norton appears to argue that Dr. Sullivan cannot perform a valuation of Columbia's property absent evidence that Columbia actually would have sold its property to Norton, and Norton would have paid for it.  (*See* Mot. at 28.)  Although Columbia does not believe this is relevant to the question of damages, the record is replete with evidence that Norton would have compensated Columbia for the property it took.  ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████  (Sullivan R. ¶¶ 263, 273; Sullivan Reply ¶ 115; *see also, e.g.*, Ex. 50 at -316

(██████████████████████████████████████████████████████

████████████████  ); Ex. 51 at -612 ████████████████████████████

██████████████████████████████  ); Ex. 52 at 191:8-24; Ex. 24 300:4-7.)  ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



(Cole R. ¶¶ 349-50; Cole Tr. 133:12–135:7, 138:16–139:6; Sullivan R. ¶ 273; Sullivan Reply ¶ 115; Ex. 53 at -601.)

(*See, e.g.*, Ex. 54 at -708-09; Ex. 55 at -483-85; Ex. 56 at 201:4-16; 215:2-6; Ex. 57 at 127:14–128:10; 131:17–132:8; 132:25–133:11; 184:7-12.)

(*See* Sullivan R. ¶ 272 (quoting Ex. 58 at -612).)

(*See* Sullivan R. ¶ 272-73; Sullivan Reply ¶ 114; Sullivan Tr. 74:21–75:2 (

); *id*. at 76:25–77:2.)

In sum, the foregoing evidence is more than sufficient to support Dr. Sullivan's damages opinions related to the state law claims.  Under state law, Columbia's damages theory must be based on "sufficient facts and circumstances to permit a jury to make a reasonable estimate of [] damages," *Murray* v. *Hadid*, 385 S.E.2d 898, 904 (Va. 1989), but that does not require

absolute certainty and mathematical precision.  From the evidence described above, a jury could reasonably conclude—assisted by Dr. Sullivan—that (i) Norton's actions deprived Columbia of a remunerative sale of the Columbia technology, in an amount of at least ███████, including prejudgment interest; and (ii) that same amount reflects Norton's unjust enrichment (*i.e.*, receiving for free an asset reasonably valued at ███████, including prejudgment interest).

**B.    Norton's ██████████████████████**

Finally, Norton suggests that Dr. Sullivan's opinion is unreliable because he gives insufficient consideration to █████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████. (Hosfield Mot. at 23-27.) More importantly, however, ██████████████████ does not have the dispositive weight Norton seeks to give it.

As an initial matter, Norton fundamentally misunderstands the damages associated with its intentional tortious conduct.  For several years, Norton unlawfully took control of technology that belonged to Columbia. █████████████████████████

████████████████████████████████████████████████

██████████████████████████ *See Oasis Research, LLC* v. *Carbonite, Inc.*, 2013 WL 12146744, at *4 (E.D. Tex. Feb. 20, 2013) (failure to name all correct inventors of a patent "renders a patent invalid"). ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ (Sullivan Tr. 82:20–83:9; 83:13–84:2.) ██

████████████████████████████████████████████████



(*See* Sullivan Reply ¶¶ 124-25.)

Finally, the evidence strongly supports a conclusion that, at the time of misappropriation,

(*See supra* at     .)  Even assuming Norton has not infringed the '643 Patent (an issue reserved for another day),

).  Simply put, a make-whole remedy for fraud and conversion provides compensation to Columbia based on value at the time of the fraud or conversion, and in this case, that means the value of the technology in 2011.

With the issue properly framed, it is entirely reasonable for Dr. Sullivan not to assign weight to

## CONCLUSION

For the foregoing reasons, Norton's Motion to Strike Portions of the Reports and Exclude Testimony of Dr. Cole and Dr. Sullivan should be denied.

Dated:  April 10, 2020

Respectfully submitted,

*/s/ John M. Erbach*

Dana D. McDaniel (VSB No. 25419)
John M. Erbach (VSB No. 76695)
SPOTTS FAIN, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia  23219
Tel.: (804) 697-2065
Fax:  (804) 697-2165
dmcdaniel@spottsfain.com
jerbach@spottsfain.com

Garrard R. Beeney (*pro hac vice*)
Dustin F. Guzior (*pro hac vice*)
Stephen J. Elliott (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel.: (212) 558-4000
Fax: (212) 558-3588
beeneyg@sullcrom.com
guziord@sullcrom.com
elliotts@sullcrom.com

*Counsel for Plaintiff The Trustees of
Columbia University in the City of New
York*

**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that on the 10th day of April, 2020, I will electronically

file the foregoing document using the CM/ECF system, which will then send a notification of such

filing (NEF) to all counsel of record.

*/s/ John M. Erbach*
John M. Erbach (VSB No. 76695)
SPOTTS FAIN, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia  23219
Tel.: (804) 697-2065
Fax:  (804) 697-2165
jerbach@spottsfain.com