**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF
NEW YORK,**

       **Plaintiff,**

    **v.**                                **Civil Action No. 3:13cv808**

**NORTONLIFELOCK, INC.,**

       **Defendant.**

## MEMORANDUM ORDER

This matter comes before the Court on the issue of the missing witness instruction. The parties have engaged in multiple rounds of briefing on this issue, (ECF Nos. 1096–97, 1102–03, 1123–24, 1126–27, 1143–44, 1147–48), and have also presented in-court arguments speaking to it, (*see, e.g.*, Apr. 7 Trial Tr. 44:7-12, 72:12-17). For the reasons that follow, the Court will provide a missing witness instruction to the jury, but it will not admit the emails between Dr. Dacier and Norton's counsel at Latham & Watkins LLP as evidence.

### I.  Factual Background and Procedural History

1.    **Factual Background**

Dr. Marc Dacier was an employee of Norton at the time of its filing of the '643 Patent at the center of Columbia's Fraudulent Concealment and Inventorship Claims. Dr. Dacier served as the senior director of Norton Research and supervisor of Darren Shou, the Norton employee listed as the first named inventor of the '643 Patent. During that timeframe, Dr. Dacier also collaborated with Dr. Keromytis on a government grant proposal regarding decoy technology.

Norton's '643 Patent—issued on April 4, 2011 and entitled "INTEGRATING DECOYS AND DATA LOSS PREVENTION"[1]—began as a provisional patent application that Norton filed on April 2, 2010.  (ECF No. 803-42.)  Norton attorneys asked and were affirmatively told as late as March 24, 2010, just before the filing of the provisional patent, that both Dr. Keromytis and Dr. Stolfo (the "professors") considered themselves inventors or co-inventors of the '643 Patent's technology.  (ECF No. 889, at 2.)  Dr. Dacier was involved in contemporaneous communications with the professors during this period in 2010 regarding the decoy technology grant proposal and the filing of the provisional patent.  (ECF No. 478, at 2–3.)  In his emails regarding the provisional patent, Dr. Dacier told the professors that the link with DLP technology may not be worth a patent, but thought that he "told [Norton] to make sure with [the professors] that [Norton] had the inventorship right since the last thing [he] wanted was to start [the] possible collaboration [with the professors] on the wrong foot."  (ECF No. 889, at 2; ECF No. 801-25.)

While earlier documents included the Professors as inventors, the provisional patent application that Norton filed listed only Dr. Dacier and Mr. Shou as inventors.  (ECF 801, Ex. KK.)  The professors were not told that they were not listed as inventors.

---

[1] The description of the invention in the provisional patent application included the following:

> A [proposed] method and apparatus for creating, distributing and tracking decoy documents for data loss prevention . . . .
> We propose a novel integrated architecture for the creation, distribution and tracking of decoys that will identify malicious activity where other technical means have not or cannot detect them.  [that will] specifically focus on two thrusts: (a) the investigation and development of realistic, self-consistent communications (e.g., email threads and IM conversations)that will present attractive targets to stealthy adversaries , and  (b) the integration of a decoy architecture within an enterprise network and in particular with existing Data Loss Prevention (DLP) technologies.

(ECF No. 803-38.)

For a second year in a row, days before the 2011 filing of the final '643 patent application, Norton attorneys asked the professors if they considered themselves to be inventors. The professors again said yes. As with the provisional patent application, the professors were not told that they had been omitted as inventors or co-inventors in the final patent application. (ECF No. 803-38; ECF No. 803-42; *see* Patent Number 8,549,643.)

Dr. Dacier traveled from France to Belgium to voluntarily appear for a non-party deposition in August 2014.[2] (ECF No. 768, at 20.) He stated, "we really wanted to have the Columbia people on board as coinventors" and that "[the professors] should be coinventors because [the technology] is really just a result of our joint brainstorming." (Dacier Dep. Trial Designations Tr. 82:8-82:16; Dacier Dep. Trial Designations Tr. 121:21-122:9.) At trial, Professor Stolfo testified that this assertion "gave him confidence that [the application] was going to happen properly" and Professor Keromytis testified he understood Dr. Dacier to be saying "at the very least, Sal and [himself] would be co-inventors in any patent application filed by Symantec." (Apr. 13 Trial Tr. 669:25–670:3; Apr. 14 Trial Tr. 816:9-10.) Professor Stolfo also testified on direct examination that Dr. Dacier "expressed regret for what happened" when he ran into Dr. Dacier at a professional conference around May of 2017. (Apr. 13 Trial Tr. 617:16-818:8.)

Professor Keromytis and Dr. Dacier each separately have characterized their relationship with each other as "friends" and they have kept in touch over the years. (Apr. 14 Trial Tr. 830:3-4; Dacier Dep. Trial Designations Tr. 164:21-165:13.) At trial, Professor Keromytis recounted one such conversation he had with Dr. Dacier in 2017. He recalled:

> I mentioned that this patent dispute had been still ongoing to which [Dr. Dacier] expressed surprise . . . he hadn't heard anything in a few years about the matter.

---

[2] Counsel for Norton represented Dr. Dacier at his deposition but had no further contact with Dr. Dacier between 2014 and 2020.

> And then he told me he was very sorry . . . about everything that had happened, including that Symantec had filed for a patent without Sal and me on them as co-inventors because this was our work and that he had tried to make it not happen, but he didn't prevail on that.

(Apr. 14 Trial Tr. 830:6-16.)  Professor Keromytis also testified to a conversation with Dr. Dacier in January of 2019:

> I had my deposition for the case, which was therefore fresh in my memory, and there were a lot of questions about Marc and Marc's involvement. So I reached out to Marc and asked him if this case ever actually went to trial, given how long it had been going on, whether he'd be willing to come talk, testify, and say his recollection, his knowledge of the relevant facts.

(Apr. 14 Trial Tr. 831:17-24.)  Dr. Keromytis testified that he informed Columbia's counsel that he thought Dr. Dacier would "be willing to testify" and eventually connected Sullivan & Cromwell and Dr. Dacier.  (Apr. 14 Trial Tr. 832:2-8.)

Columbia's counsel then had two phone conversations with Dr. Dacier, on November 14, 2019 and February 11, 2020,[3] in which Dr. Dacier "again expressed willingness to testify at trial, but . . . expressed nervousness that Norton would threaten him with contractual 'trouble' if he provided testimony."  (ECF No. 803, at 22.)  Dr. Dacier had emailed Norton in November 2019 to say Columbia had contacted him.  He said he was "not asking for Symantec to represent [him]" but wanted to confirm that "Symantec d[id] not consider that the lawyer, paid by Symantec, that was present at [his] deposition [wa]s still representing [him], since [he] left the company" and that he was "not bound by any kind of contract or obligation with Symantec that would prevent [him] from responding positively to [Columbia's] request to attend the trial." (ECF No. 478-6, at 2.)  Norton did not respond to this email or Dr. Dacier's follow up email sent a few days later asking for acknowledgement.  (ECF No. 478-6, at 1–2.)

---

[3] Counsel for Columbia explained in communications with Quinn Emanuel that on both phone calls Dr. Dacier stated that he was not and did not wish to be represented by counsel. (ECF No. 478-5, at 5.)

After Columbia listed Dr. Dacier as a witness in 2020, Norton's counsel contacted Dr. Dacier for the first time since 2014. Dr. Dacier replied and copied Columbia's counsel "to avoid any possible . . . interference" from Norton with his plans to testify. (ECF No. 547-11, at 1.) When Columbia's counsel wrote to Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel" or "Quinn") with counsel's "concerns" that Quinn Emanuel might be "trying to encourage [Dr. Dacier] not to come to trial to testify" and to set up a meet and confer, a Quinn Emanuel attorney responded that counsel for Columbia appeared to violate Virginia's Code of Professional Conduct's prohibition on *ex parte* communications with persons represented by counsel when he exchanged emails with Dr. Dacier. (ECF No. 547-12, at 6–7.) On May 6, 2020, Norton filed a Motion for Sanctions against Columbia's counsel, Sullivan & Cromwell LLP, for violation of Virginia Code of Professional Conduct Rule 4.2 by engaging in *ex parte* communications with Dr. Dacier despite his representation by Quinn Emanuel. (ECF No. 477.)

2. **Procedural History**

Norton's sanctions motion initiated a surfeit of motions, briefs, and arguments on this unusual issue – many at the Court's instruction. For instance, on May 8, 2020, Norton filed a Motion *in Limine* that again sought to exclude comments and arguments regarding Dr. Dacier's absence from trial if he "decide[d] not to attend" and any evidence or information obtained from *ex parte* communications between Columbia's counsel and Dr. Dacier. (ECF No. 493; ECF No. 494, at 15–19.) These motions involved numerous rounds of briefing. (*See, e.g.*, ECF Nos. 516, 547, 566, 580–81, 602, 664.) On September 29, 2021, the Court denied the Motion *in Limine* and, in the same Memorandum Order, denied the Motion for Sanctions. (ECF No. 663, at 3–5.) That Memorandum Order specifically left open the question of whether Quinn Emanuel represented Dr. Dacier in October 2019. (ECF No. 663, at 5.)

5

On February 25, 2022, the parties filed a notice identifying several Pretrial Order issues the parties disputed. (ECF No. 744.) In this filing, Columbia made its first request that the Court provide a missing witness instruction regarding (or grant Columbia permission to comment about) Dr. Marc Dacier's absence from trial. (ECF No. 744-1, at 17.) Norton objected to the inclusion of the issue in the filing and argued the request for a missing witness instruction should be denied. (ECF No. 744-1, at 17–18.)

### A.     The Second Motion *in Limine* Pertaining to Dr. Dacier and the Motion for Reconsideration

On February 28, 2022, Norton filed a new Motion *in Limine* that again sought to exclude comments and arguments regarding Dr. Dacier's absence from trial, and to exclude any missing witness instruction. (ECF No. 767.) Columbia opposed Norton's Motion *in Limine*, presenting counterarguments to Norton's claims that Dr. Dacier was not available. (ECF No. 803, at 24–25.)

The Court issued a Memorandum Opinion on March 15, 2022, denying Norton's Motion *in Limine* with respect to Dr. Dacier and granting Columbia's request to allow out-of-court statements under the residual hearsay exception and for a missing witness instruction. (ECF No. 889.) The Court concluded that Dr. Dacier had been available to Norton and was unavailable to Columbia given Norton's actions, that Dr. Dacier's testimony would be material, and that Dr. Dacier's testimony would not be cumulative. (ECF No. 889, at 14–17.) The Court also found that a conflict existed between Quinn Emanuel's representation of Dr. Dacier and Norton at least between 2017 and 2020. (ECF No. 889, at 13.) Norton filed a Motion to Reconsider its Motions *in Limine* Nos. 5 and 6 and for an Immediate Stay of the Proceedings. (ECF No. 928.) The Court denied this Motion on the same day. (ECF No. 945.) Latham & Watkins ("Latham") entered an appearance on behalf of Norton on March 27, 2022. (ECF Nos.

6

971-978.)  Quinn Emanuel filed a motion to withdraw its representation of Dr. Dacier.
(ECF No. 987.)

> **B.**    **The Final Pretrial Conference, the April 5–7, 2022 Emails, and Related Pretrial Briefing**

**The Final Pretrial Conference**

On April 7, 2022, the Court heard argument regarding a possible missing witness
instruction regarding Dr. Dacier at the Final Pretrial Conference in this matter.  (ECF No. 1100.)
Norton's new counsel, Latham, contended that the Court should revisit its decision to give a
missing witness instruction.  Latham directed the Court to a "caution" underneath Virginia's
model missing witness instruction that "in all caps . . . says, 'This instruction shall rarely be
given.'"  (Apr. 7 Trial Tr. 44:7-12.)  Latham also specifically argued that Norton should not be
sanctioned with a jury instruction for Quinn Emanuel's actions, meaning that sanctions against
Quinn Emanuel would be more appropriate.

Columbia responded that the issue had already been decided and that Norton's arguments
seemed to be a second motion for reconsideration.  Columbia also argued the instruction should
be given despite the model instruction warning because "this is an exceptional case."  (Apr. 7
Trial Tr. 72:12-17.)  The Court commented on the exceptionality of the case, noting that it had
never before seen such handling of a witness by a party.

At the end of the Final Pretrial Conference, the Court ordered the parties to file
statements of support for an appropriate remedy given the Court's finding that Quinn Emanuel
rendered Dr. Dacier unavailable.  (ECF No. 1083.)

**The Emails**

The next day, on April 8, 2022, Columbia filed a Notice of Norton's Communications
with Dr. Dacier on April 5–7, 2022.  (ECF No. 1084.)  Columbia had become aware of the

communications—a series of emails—after court on the night of April 7, 2022, when Norton's counsel forwarded emails between one of its attorneys and Dr. Dacier that reflected his then-current inability to testify at trial. (ECF No. 1084-2, at 7.) Columbia said it felt compelled to provide the Court with the emails because Norton failed to disclose them while counsel argued issues regarding Dr. Dacier the day prior. (ECF No. 1084.)

The emails began on April 5, 2022, two days before the April 7, 2022 Final Pretrial Conference and Dacier argument about the propriety of a missing witness instruction. Two days before argument, a Latham attorney introduced himself to Dr. Dacier and expressed his desire to have Dr. Dacier testify at trial. (ECF No. 1084-1.) In response, Dr. Dacier admitted he was "a bit surprised by this sudden rush after years of inaction" and conversations with Quinn Emanuel "in which they repeatedly told [Dr. Dacier] that there was no need for [him] to do anything [and] that they did not want [him] to do anything." (ECF No. 1084-1, at 3.) Dr. Dacier further explained that although he was "more than willing to help," "such an extremely short notice . . . ma[de] it impossible for [him] to come" and that had he been "warned months ago, when [counsel], most probably, had been given the trial dates," he could have "frozen some days to make [himself] available." (ECF No. 1084-1, at 2–3.)

The emails continued until at least the morning of April 7, 2022, the day of the Final Pretrial Conference. (ECF No. 1084-1, at 1.) Dr. Dacier confirmed that he considered his testimony to be, "in [his] opinion, harmful for Norton's case" and that he could "see now why the Quinn team has done what they have done over the years, while pretending to 'represent' [him]." (ECF No. 1084-1, at 2.)

Upon receipt of Latham's emails with Dr. Dacier, counsel for Columbia replied that he was "astounded by the record of misconduct." (ECF No. 1084-2, at 4.) By email, he asked why

8

counsel for Norton had not mentioned these communications to the Court during the hearing earlier in the day.  (ECF No. 1084-2, at 4.)  Counsel for Norton responded that "the accusations of misconduct [were] baseless" and asserted that Latham informed both Columbia and the Court of efforts to secure Dr. Dacier's appearance in Norton's objection to the missing witness instruction.  (ECF No. 1084-2, at 3–4.)  Counsel for Columbia replied that Columbia "obviously would be delighted if Dr. Dacier appeared at trial, and [Columbia] take[s] no issue with Latham trying to make that happen" but that the email chain contradicted many of Norton's representations to the Court, including during the April 7, 2022 hearing.  (ECF No. 1084-2, at 1.)

Norton filed a response to Columbia's Notice that highlighted its giving Columbia the emails proactively and identifying plans to address the communications in the upcoming submissions ordered by the Court.  (ECF No. 1085, at 1.)

The Court held an emergency status conference that day—April 8, 2022—to discuss the emergence of these emails, (ECF No. 1092; ECF No. 1101), during which it informed the parties that the information in the emails was "troubling."  (Apr. 8 Trial Tr. 5:8-12.)  The Court expressed concern that the emails existed days before the argument to which they pertained, but they were not mentioned or alluded to.  (Apr. 8 Trial Tr. 8:6-9.)  The Court also ordered the parties to file proposed missing witness instructions by the end of that day.  (ECF No. 1101; ECF No. 1091.)  Columbia and Norton timely complied with this order.  (ECF Nos. 1096–97.)

In addition, later that day, Columbia, Latham, and Quinn Emanuel filed their Responses to the Court's Request for Appropriate Sanctions.  (ECF Nos. 1088, 1089, and 1102.)  Notably, Latham argued that no missing witness instruction should be issued, but if the Court did issue the instruction, no other remedies should be imposed.  (ECF No. 1088-1, at 1.)  Quinn Emanuel argued no sanction was appropriate.  (ECF No. 1089-1.)  And in Columbia's filing, Columbia re-

presented its arguments from the hearing, Columbia also requested permission to use Dr.
Dacier's April 2022 emails with Norton's counsel as exhibits at trial.  (ECF No. 1102, at 3, 7.)

On April 8, 2022, Quinn Emanuel also filed a motion to withdraw from its representation
of Norton.  (ECF No. 1093.)  The Court denied this motion.  (ECF No. 1094.)

On April 10, 2022, the Court requested by email that the parties provide relevant
testimony and evidence at issue for Mr. Shou and Dr. Dacier in determining appropriate
sanctions.  The parties provided those excerpts from Mr. Shou and Dr. Dacier's depositions
*ex parte* that day and later filed the submissions under seal on April 13, 2022.  (ECF
Nos. 1118, 1120.)

## C.    Orders and Filings Made During Trial

On April 12, 2022, the Court ordered the parties to provide briefing on which parties'
missing witness instruction should be given to the jury, whether the jury should hear evidence to
explain Dr. Dacier's absence, and if so, what evidence would be presented.  (ECF No. 1116).
On April 14, 2022, the parties filed their responses to the Court's April 12, 2022 Order.  (ECF
Nos. 1123–24.)

While maintaining its objection, Norton argued that, if the instruction were given, the
Court should adopt its revised proposed missing witness instruction:

> Unexplained Failure to Produce Important Witnesses: Because Norton
> failed to call Dr. Dacier as a live witness at trial, you may, but are not
> required to, infer that Dr. Dacier's testimony would have been
> unfavorable to Norton.  (ECF No. 1123 at 1.)

Columbia responded Norton's proposed instruction "downplay[ed] its own misconduct."  (ECF
No. 1127, at 2.)

In contrast, Columbia argued the Court should adopt its revised proposed missing witness instruction:

> Earlier you heard the videotaped deposition testimony of Dr. Marc Dacier. Dr. Dacier did not appear at trial. If a party fails to call a person as a witness who has knowledge about the facts and is reasonably available to the party, and who is not reasonably available to the other party, then you may infer that the testimony of that person is unfavorable to the party who could have called the witness and did not do so. (ECF No. 1124, at 2.)

Norton responded that Columbia's revised instruction remained "confusing and needlessly complicated" and that arguments surrounding hearsay exceptions did not address the procedural concerns Norton had raised about introducing evidence. (ECF No. 1126, at 1–4.)

Columbia elaborated as to the admission of the April 2022 emails authored by Dacier, that its revised instruction would "only address Columbia's prejudice if Columbia is able to introduce the Dacier Emails as an exhibit (and make appropriate argument regarding the same)." (ECF No. 1124, at 2.) Columbia cited Rule 804(b)(6) of the Federal Rules of Evidence as the basis of this argument, stating the Dacier Emails met the standard for admitting hearsay when a defendant intends to render a declarant unavailable as a witness laid out in *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012). (ECF No. 1124, at 3.) Columbia also argued that discussion of the Dacier Emails is "central to ***this trial***," rather than a trial within a trial as Norton suggested. (ECF No. 1127, at 4 (emphasis in original).)

Norton stated that its proposed instruction would render the issue of "whether Norton has an explanation for Dr. Dacier's absence" moot, meaning that the jury should not hear evidence on the issue, including the contested emails. (ECF No. 1123 at 2–4.) Norton also argued that "the three-prong test for FRE 804(b)(6) has not been met" because Norton "did not engage in anything remotely approaching the extreme 'wrongdoing' contemplated by the Rule or the

11

caselaw interpreting it," such as "where the defendant has silenced a witness through the use of threats, violence or murder." (ECF No. 1126, at 4.)

The Court then sought additional insight to the test set forth in *United States v. Dinkins*, which addresses (which the filings did not) how, if at all, the record supports, or precludes, application of the forfeiture of wrongdoing test seemingly applicable to these factual and procedural predicates. *United States v. Dinkins*, 691 F.3d at 383 ("Before applying the forfeiture-by-wrongdoing exception, a trial court must find, by a preponderance of the evidence, that "(1) the defendant engaged or acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness.") (ECF No. 1130.)

Norton asserted that the "degree of 'wrongdoing' necessary to justify use of the forfeiture-by-wrongdoing exception must be so 'abhorrent' that it 'strikes at the heart of the system of justice itself.'" Norton said that its conduct clearly does not rise to this level. (ECF No. 1139, at 2.) Norton characterized the conduct as "at worst . . . an 'example of non-wrongdoing that might cause a witness to decline to testify' that 'do[es] not trigger Rule 804(b)(6).'" (ECF No. 1139, at 4.) In contrast, Columbia argued Norton's conduct did in fact satisfy "wrongdoing" under Rule 804(b)(6). (ECF No. 1144.) Columbia stated that "a party's wrongdoing 'need not consist of a criminal act'" and that "[c]ourts have found that repeated efforts to dissuade a witness from testifying are sufficient to establish wrongdoing under the *Dinkins* test." (ECF No. 1144, at 1.)

Norton, preserving its objection, offered that, if the emails were to be admitted, the Court "should simply read them to the jury, to avoid any unnecessary argument or emphasis." (ECF No. 1147.) Columbia stated that it expected Norton's witness Mr. Shou to testify to his

12

relationship with Dr. Dacier in a way allowing Columbia to impeach his testimony on cross examination with the Dacier emails.  (ECF No. 1148, at 3.)  Of course, if Columbia were to attempt to impeach Mr. Shou, it would have to first establish all the foundational requirements of Rule 613(b).

## II.  The Court Will Provide a Missing Witness Instruction to the Jury

Having considered all briefing, argument, and testimony before it, the Court confirms its earlier finding that it will issue a missing witness instruction as part of the "Evidence" instruction in this case.  A proposed instruction including it has been sent to the parties.

In doing so, the Court recognizes that the missing witness instruction is unusual.  But this is an uncommon factual and procedural scenario that merits its inclusion in the jury instructions here.  Norton's repeated emphasis that Virginia's model missing witness instruction includes commentary that the instruction should rarely be given has been heard.  However, the Court has repeatedly found that numerous remarkably atypical events have occurred in this case.

It is true that the missing witness instruction cases discuss factually distinct circumstances. There is no doubt that this case does not involve a plaintiff who made himself unavailable, or a witness rendered unavailable through threats or murder.  But it is also true that the lengthy and abnormal procedural and factual unfolding as to whether Dr. Dacier would be a live witness at trial, and how Norton – through counsel – caused Dr. Dacier's practical unavailability, is utterly distinct from anything this Court has seen.  The Court sees no other remedy beyond one delaying this case even longer.  A delay might procure Dr. Dacier's presence, but it would require navigating the complicated process of obtaining testimony of a witness in Saudi Arabia under the necessary international treaty or convention allowing one to do so.  Such a delay would be untenably and unpredictably long.

As stated in the Court's opinion denying Norton's Motions *in Limine* regarding Dr. Dacier (ECF No. 889), the missing witness instruction has long been established as a "statement of the settled rule that the unexplained failure of a party to call an available material witness gives rise to an inference, sometimes called a presumption, that the testimony of such absent witness would be adverse to such party." *Scott v. Watsontown Trucking Co.*, 920 F. Supp. 2d 644, 653 (E.D. Va. 2013), *aff'd* 533 F. App'x 259 (4th Cir. 2013) (citations omitted). When a party fails to call an "available material witness," an inference can arise that the missing witness's testimony would have been adverse to the party that failed to call them. *Id.* (citations omitted). "The essential elements of the rule . . . are availability and materiality." *Id.* (citations omitted). Of course, the complaining party must also establish that the testimony is relevant and non-cumulative. *Id.* (citation omitted).

The Court confirms its Motion *In Limine* decision and the basis for concluding that Dr. Dacier had been available to Norton, was unavailable to Columbia given Norton's actions through its lawyers, and that Dr. Dacier's testimony would be material and non-cumulative. (ECF No. 889, at 14–17.)

### III.  The Text of the Court's Missing Witness Instruction

As previously noted, the parties submitted proposed missing witness instructions at the Court's direction. (*See* ECF Nos. 1096–97, 1123–24.) Although both parties included the substance of their proposed missing witness instructions, they provided almost no insight as to what the law requires when crafting jury instructions, much less a missing witness instruction. (*See* ECF Nos. 1096–97, ECF No. 1123, at 2–5, ECF No. 1124, at 2–3.) Upon review of the parties' arguments, their proposed instructions, and the transcript of the trial in this matter, the Court has chosen to issue the following missing witness instruction:

14

> Dr. Marc Dacier's deposition testimony was presented to you by Columbia as part of its case in chief. You have heard testimony that, after the date his deposition was given, Dr. Dacier made certain statements to Dr. Stolfo and Dr. Keromytis about Norton's conduct in identifying inventors on the application for the '643 Patent. Because Norton did not call Dr. Dacier in its case to address what he allegedly told Dr. Stolfo and Dr. Keromytis, you may, but are not required to, infer that his testimony on that topic would have been unfavorable to Norton.

The Court will use this instruction for several reasons. First, this instruction draws upon Virginia's model missing witness instruction,[4] *see* Virginia Model Jury Instructions - Civil Instruction No. 2.080 (2022), and the parties' proposed instructions, (*see* ECF No. 1097, at 2; ECF No. 1123, at 2). It also relieves the jury of additional responsibilities such as "weigh[ing] evidence or decid[ing] whether Norton had an excuse not to call Dr. Dacier," (ECF No. 1123, at 2). This missing witness instruction is simple and easy to understand. *See Cooper v. Paychex, Inc.*, 960 F. Supp. 966, 971 (E.D. Va. 1997), *aff'd*, 163 F.3d 598 (4th Cir. 1998) (citation omitted). It conveys to the jury the identity of the missing witness and the party against whom the jury may draw the inference based on the record established, and without inappropriate commentary on the facts or evidence by the Court.

## IV. The Court Will Not Admit the Emails Between Dr. Dacier and Counsel from Latham & Watkins LLP Pursuant to Federal Rule of Evidence 804(b)(6)

Finally, the Court will address the April 2022 emails to and from Dr. Dacier. Federal Rule of Evidence 804(b)(6) provides that "[a] statement offered against a party that wrongfully

---

[4] Although this District has not crafted its own set of pattern jury instructions, the United States Court of Appeals for the Fourth Circuit has recognized that, when crafting jury instructions, parties may use pattern instructions provided by the state court systems. *See, e.g., In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair System Products Liability Litigation*, 810 F.3d 913, 929–30 (4th Cir. 2016) (mentioning that "[t]he district court charged the jury using Georgia's pattern jury instructions for strict liability tort cases" and indicating that doing so is acceptable (citation omitted)). Indeed, the *Scott* court relied on the Virginia Model Jury Instruction when giving its missing witness instruction. 920 F. Supp. 2d at 651.

caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result" is not excluded by the rule against hearsay, Fed. R. Evid. 804(b)(6), codifying a "well-established common law exception to the hearsay rule." *Dinkins*, 691 F.3d at 383 (citing *Davis v. Washington,* 547 U.S. 813, 833 (2006)). Rule 804(b)(6) is designed to "prevent 'abhorrent behavior which strikes at the heart of the system of justice itself.'" *Id.* (quoting Fed. R. Evid. 804(b)(6) Advisory Committee Note).

To admit evidence pursuant to Rule 804(b)(6), "a trial court must [first] find, by a preponderance of the evidence, that" the party seeking admission of the evidence has satisfied three elements: "(1) [that a party] engaged or acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness." *Id.* (quoting *United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005)); *see also id.* (stating that "federal courts have broadly construed the elements of" Rule 804(b)(6) (citing *Gray*, 405 F.3d at 241-42); *United States v. Tsoa*, No. 1:13cr137, 2013 WL 6145664, at *6 (E.D. Va. Nov. 20, 2013) (Mentioning that "the proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception.")

Considering this requirement, the arguments and evidence here do not enable a finding that Columbia has, by a preponderance of the evidence, proven each of the three elements discussed in *United States v. Dinkins*. The Court will not admit into evidence the emails between Dr. Dacier and Norton's counsel at Latham, especially when it already will give a missing witness instruction to the jury.

Specifically, while Columbia has presented some evidence that might support a finding that each of the three *Dinkins* elements have been satisfied, the preponderance of the evidence does not show that Columbia has proven each of the elements so as to warrant admission of these

16

emails in addition to the missing witness instruction.[5]  Clearly, for instance, Dr. Dacier's

statement in an email that "Norton "repeatedly told [him] that there was no need for [him] to do

anything [and] that they did not want [him] to do anything," (ECF No. 1124-1, at 5), suggests

that Norton "engaged or acquiesced in wrongdoing . . . intended to render [Dr. Dacier]

unavailable as a witness and . . . did, in fact, render [him] unavailable as a witness,'" *Dinkins*,

691 F.3d at 383 (quoting *Gray*, 405 F.3d at 241).  But Dr. Dacier resides in Saudi Arabia

(beyond the subpoena power of this Court) and Norton's Latham counsel *did* attempt to secure

Dr. Dacier's attendance at trial.  Simply put, while Columbia has proffered some evidence to

enable the Court to consider admitting the emails pursuant to Rule 804(b)(6), it has not proffered

enough evidence to place these emails before a jury on top of issuing a missing witness

instruction. *See id.* (quoting *Gray,* 405 F.3d at 241); *Tsoa*, 2013 WL 6145664, at *6 (mentioning

that "the proponent of hearsay evidence bears the burden of establishing the applicability of a

hearsay exception").  Accordingly, the Court will not admit the emails between Dr. Dacier and

Latham into evidence.

---

[5] The Court already has recognized that the factual predicate for a missing witness instruction differs from those of other cases. That applies with similar force to this Rule 804(b)(6) analysis. While Norton's wrongdoing "need not consist of a criminal act," Fed. R. Evid. 804 Advisory Committee Notes (citing *United States* v. *Mastrangelo*, 693 F.2d 784, 789 (2d Cir. 1982), these circumstances do not rise to the level of seriousness necessary to enable admission of evidence pursuant to Rule 804(b)(6) here.

17

## V. Conclusion

For the foregoing reasons, the Court will provide a missing witness instruction to the jury

but will not admit into evidence the emails between Dr. Dacier and Norton's counsel at Latham.

Date:
Richmond, Virginia

_____/s/_____
M. Hannah Lauck
United States District Judge

18