```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                   RICHMOND DIVISION


 3    _____
                                        )
 4    THE TRUSTEES OF COLUMBIA          )
      UNIVERSITY IN THE CITY OF         )
 5    NEW YORK                          )
                                        )
 6    v.                                )   Civil Action No.:
                                        )   3:13 CV 00808
 7    NORTONLIFELOCK INC.               )
      f/k/a SYMANTEC CORPORATION        )
 8    _____)
                                            April 19, 2022
 9
                          DAY 6
10            EXPEDITED OVERNIGHT TRANSCRIPT

11          COMPLETE TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE M. HANNAH LAUCK
12           UNITED STATES DISTRICT COURT JUDGE

13    APPEARANCES:

14    John Erbach, Esquire
      Dana D. McDaniel, Esquire
15    SPOTTS FAIN
      411 E. Franklin Street
16    Suite 600
      Richmond, Virginia 23218
17


18    Garrard Beeney, Esquire
      Dustin Guzior, Esquire
19    Alexander N. Gross, Esquire
      Jessica R. Ecker, Esquire
20    Sullivan & Cromwell
      125 Broad Street
21    New York, New York 10004

22              Counsel on behalf of the Plaintiff

23

24              KRISTA L. HARDING, RMR
                OFFICIAL COURT REPORTER
25           UNITED STATES DISTRICT COURT
```

```
 1    APPEARANCES (CONTINUED):

 2    Dabney J. Carr, IV, Esquire
      TROUTMAN PEPPER HAMILTON SANDERS LLP
 3    1001 Haxall Point, Suite 1500
      Richmond, Virginia 23219
 4
      Michael A. Morin, Esquire
 5    LATHAM & WATKINS LLP
      555 Eleventh Street N.W.
 6    Suite 1000
      Washington, DC 20004
 7
      Douglas E. Lumish, Esquire
 8    LATHAM & WATKINS LLP
      140 Scott Drive
 9    Menlo Park, California 94025

10              Counsel on behalf of the Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1406

```
 1            (The proceeding commenced at 8:19 a.m.)
 2            THE CLERK:  Day 6.  Case Number 3:13 CV 808.
 3   Trustees of Columbia University in the City of New York v.
 4   NortonLifeLock Inc.
 5            Columbia is represented by Garrard Beeney,
 6   Dustin Guzior, Alex Gross, Jessica Ecker, John Erbach and
 7   Dana McDaniel.
 8            Norton is represented by Douglas Lumish, Michael
 9   Morin and Dabney Carr.
10            Are counsel ready to proceed?
11            MR. BEENEY:  Plaintiff is ready.
12            Good morning.  Thank you.
13            MR. LUMISH:  Norton is ready.
14            THE COURT:  Good morning.
15            MR. LUMISH:  Good morning.
16            THE COURT:  I'm sorry to call you in early, but
17   it's important because I have to admit error.
18            Last might it was raised whether or not
19   Dr. Jaeger should be able to testify to the upper end of
20   his technical evaluation.  And I had the opportunity last
21   night to reread my Daubert opinion, not my motions in
22   limine.
23            In my Daubert opinion, I found that Dr. Jaeger
24   used these three apportionment percentages, which counsel
25   for Norton referred to, and then reached an ultimate
```

1    apportionment percentage, which is essentially zero, which

2    I have excluded, and for very good reason.

3           In addressing, though, this 60 percent and the

4    14 percent figure, aside from what it is that I addressed

5    in my motions *in limine* one and three, I, in *Daubert*,

6    reached a different conclusion and specifically rejected

7    Columbia's attempt to exclude Dr. Jaeger's rebuttal

8    apportionment analysis.  And this is at ECF Number 739 at

9    11.

10          I noted certain pieces of Dr. Jaeger's report,

11   in particular, suffice is sufficiently a technical

12   analysis.  And I gave a couple of examples where I thought

13   that was appropriate in my *Daubert* opinion.  And I did

14   that both with respect to the 60 percent and the

15   14 percent figure.

16          So to the extent that Norton wishes to elicit

17   testimony to the first two blocks, as we've been talking

18   about at the intermediate percentages, it may do so.  But

19   it has to do so from a technical perspective, and that's

20   where, you know, the details are -- the devil is left to

21   the details.

22          But it is the case that Norton cannot offer any

23   ultimate apportionment percentage.  And Dr. Jaeger has to,

24   obviously, remain within his opinion that he's already

25   given, and cannot expand on it.  And can only reach his

1 testimony through what is a technical evaluation, not any

2 kind of economic or other marketing, or any other kind of

3 evaluation.

4          So I apologize for thinking only about the

5 motions *in limine*.  I probably should give myself time to

6 think before I rule in any event.  But now I'm getting it

7 right, and I apologize for the inconvenience to all of

8 you, all right?

9          MR. MORIN:  We appreciate the clarification,

10 Your Honor, and we will, of course, abide by that.

11          THE COURT:  All right.  Fine.

12          MR. GUZIOR:  Your Honor, may I address this just

13 very, very briefly?

14          THE COURT:  Of course.

15          Go ahead and approach the podium.

16          MR. GUZIOR:  Thank you, Your Honor.

17          I think what Your Honor said this morning – and

18 thank you, Your Honor, – is consistent with what we had

19 understood yesterday.  We think Dr. Jaeger can talk about

20 the 14 percent number for SONAR that he bases on block

21 count data from the time of the hypothetical negotiation

22 where he uses 2013 block count data.

23          Where we're a little bit confused is the malware

24 detection number, the 60 percent, and I think 70 percent

25 that he assigns, because there is no technical aspect to

1 that opinion that's been disclosed.  It's 100 percent

2 based on his statements about sales and marketing

3 material, and then Carey Nachenberg's testimony where he

4 said I think 70 and 60.  And there isn't any disclosed

5 aspect to that opinion that would be a technical

6 apportionment.

7         And so, you know, we thought this was an issue

8 that would be resolved when Norton submits its Q and A

9 because we're very curious about how that first step will

10 be converted into a technical apportionment opinion,

11 consistent with Your Honor's *Daubert* order, ECF 739, and

12 the ruling on our motion *in limine*, number three,

13 Columbia's motion *in limine*, number three.

14         So although we understand Dr. Jaeger can talk

15 about the 13 to 14 percent for SONAR, but we're not sure

16 there's much more he can do than talk about that.

17         THE COURT:  Well, in Footnote 8, I made a

18 finding that I couldn't accept the argument that

19 Dr. Jaeger just parrots Mr. Nachenberg.  And I indicated

20 that the cases that Columbia presented were factually

21 distinct.  And essentially, I said that I left that to

22 cross-examination.  And so I don't know what you're

23 presentencing that is different than that.

24         MR. GUZIOR:  And, Your Honor, I appreciate the

25 footnote.  And you did say you can't find that he's just

1 parroting fact witness testimony, like in the cases we

2 cited.   What I'm talking about is slightly different,

3 which if you look at Dr. Jaeger's report, and this is just

4 possibly one to three paragraphs, he doesn't have any

5 technical analysis that goes into the 60 and 70 percent.

6 He says I looked at sales and marketing material, and I

7 think what Mr. Nachenberg said is right.

8        And so, you know, consistent with the idea that

9 Dr. Jaeger should be talking about technology, having

10 admitted that never in his life has he done anything that

11 would call for any kind of economic analysis, we're just

12 not sure where that's going to come from unless it's an

13 opinion that hasn't previously been disclosed.

14        THE COURT:  All right.  Well, I will say that

15 the report with respect to the 60 percent figure is pretty

16 light, and so I'll hear from counsel how that relates to

17 something technical.

18        MR. GUZIOR:  Thank you, Your Honor.

19        MR. MORIN:  Your Honor, we thought, like you had

20 indicated, you already addressed this head on in the

21 *Daubert* motion.  This is the same argument from the

22 *Daubert* motion.

23        I'll make two other points:  One is if they want

24 to cross-examine and say the opinion is thin on that, he

25 will point -- and he talks about the marketing materials,

1   you're going to see testimony from Dr. Cole today where

2   he's going to point to a bunch of marketing materials, and

3   he will end up pointing to Mr. Nachenberg also.

4              Number two is Mr. Cole -- Dr. Cole's original

5   report in 2014 used those same numbers, so I think it's

6   fair game also to say it's supported by their own experts'

7   original numbers.  The opinions mirror each other.  There

8   is not a lot of depth there in the analysis.  But it just

9   all sounds like cross-examination.

10             Mr. Guzior is an excellent cross-examiner.  I'm

11  sure he's going to say the sum total of your basis for

12  this is X and Y, and he'll cross-examine on that point.

13             THE COURT:  All right.

14             Well, you are going to submit questions in

15  advance.  I will say I can't -- this is not the strength

16  of either expert's testimony, and I'm going to allow

17  cross-examination to the extent it's reasonably presented.

18             I have made clear that one difference is there

19  is an economic expert and there is not an economic expert.

20  And that's a pretty significant difference.  And

21  Mr. Jaeger is the latter.

22             MR. MORIN:  Correct.

23             THE COURT:  So there is more leeway given to an

24  economic expert, right?  And it's not the case that

25  necessarily a technical expert has the economic expertise

1   to disagree with somebody who's presenting economic

2   testimony, so I'll just take all of that into account.

3            But I will look at your -- at your submissions

4   carefully because it is -- we try to resolve these things

5   at the *Daubert* stage to the extent we can.

6            And I am going to say I do appreciate strong

7   advocacy, I really do, but I think you have heard me say,

8   Mr. Morin, and also, you, Mr. Lumish, I'm a little

9   concerned about how you have presented some of your

10  questions to the witnesses.  Cross-examination is fair,

11  but it is not fair if you misrepresent what a witness has

12  said.

13           So I'm going to tell you, I think I should have

14  shored you up, but I think in your first examination of

15  Mr. Herskowitz you said that he had testified about a

16  particular part of an exhibit that was not the one that he

17  testified to.  And you went down a whole row of questions.

18           And, you know, Columbia can object to that, and

19  maybe my memory was wrong, but I can tell you I have

20  noticed from you-all a predilection to say last year --

21  yesterday you said this happened in 2013, and then you

22  said this.

23           And what the witness testified to was that it

24  happened in 2015.

25           And maybe it's just an error, but I'm just

1 putting you on notice it has been very consistent in my

2 mind, and that's why I've started correcting what I think

3 are not accurate factual predicates.

4          And so I really -- I do appreciate strong

5 advocacy, but it doesn't have to rest on presenting facts

6 not in evidence.

7          MR. MORIN:  We would never intentionally do so,

8 Your Honor.  If we made a mistake, then we will -- and I

9 will be extra vigilant.  And in the next couple of

10 witnesses, I'll be careful.

11          THE COURT:  I am just going to say you both made

12 it, and more than one day, in my -- my reading of the

13 record.

14          So I'm saying this now -- Mr. Lumish, you look

15 confused.  I can give you examples if you want me to.

16          But it just has to stop, especially with

17 experts.  Do not present things as a predicate of a

18 question that are inaccurate.  Just be really careful

19 about that.

20          MR. MORIN:  I'll be extra careful.  And I have

21 the next witnesses, and the last two on cross I'll try to

22 be extra careful on that knowing that --

23          THE COURT:  You know, it's creative and it's a

24 strong cross, but if it's not based on what's really

25 before the jury, it's unduly prejudicial, all right?

1           MR. MORIN:  Thank you, Your Honor.

2           One other question.  It may be -- as I warned

3    you last time, it may be fairly late by the time we get

4    the Jaeger stuff together, so don't wait up for us, but

5    we'll send it before we go to sleep so that you wake up to

6    it in the morning.

7           For Q and A, meaning writing out the questions

8    and the answers, I tend to in my examinations when I write

9    them -- I teach trial advocacy at UVA, and we teach not

10   writing out the questions.  I put the bullet points with

11   the answers.  I want to follow Your Honor's orders, but if

12   the bullet points just state his testimony without

13   question and answer, question and answer, will that be

14   acceptable to Your Honor, or would you like us to put it

15   the question and the answer?  And we'll do either, of

16   course, Your Honor.

17          THE COURT:  So based on what I just said, I want

18   the question and --

19          MR. MORIN:  You've got it.  You've got it.

20   Okay.  We'll do it, of course.

21          THE COURT:  It's unusual, but I'm doing it in

22   this case.

23          MR. MORIN:  So we'll submit *in camera*, and you

24   will have it by the time you wake up.

25          THE COURT:  Perfect.

1              MR. MORIN:  Thank you.

2              THE COURT:  So we can take a recess.

3                      (Recess taken.)

4              THE COURT:  Are we ready to proceed?

5              MR. GROSS:  Just one thing, if I may, Your

6    Honor?

7              THE COURT:  Why don't you go ahead, if you're

8    going to speak, approach the podium.

9              MR. GROSS:  Thank you, Your Honor.

10             THE COURT:  Of course.

11             MR. GROSS:  Just cognizant of Your Honor's

12   comments on the transcript for the Dacier video, Columbia

13   has prepared errata for two of the three videos.  There

14   were no errors we could see, at least in the third video.

15             I just wanted to know if Your Honor would like

16   us to hand this up now or after the video?

17             THE COURT:  That would be great if you hand it

18   up now.  As you can tell, I'm a detailed gal.

19             MR. GROSS:  And what we have done is we've

20   separately listed out the errata to the testimony that

21   Columbia has designated, and separately to the testimony

22   that Norton has designated.  And I'll hand my colleagues a

23   copy of this right now.

24             MR. LUMISH:  That's what I was going to ask for,

25   Your Honor.  I haven't seen a copy.  We may have as a

1416

```
 1  team.
 2             THE COURT:  All right.
 3             MR. GROSS:  Thank you, Your Honor.
 4             THE COURT:  Thank you very much.
 5             MR. MORIN:  We, of course, have no objections,
 6  Your Honor.
 7             THE COURT:  Okay.  Thank you for putting that on
 8  the record.
 9             You can bring them in.
10             (The jury is present in the courtroom.)
11             THE COURT:  Good morning, everybody.
12             JURORS:  Good morning.
13             THE COURT:  All right.  I think we're ready for
14  some video testimony, as we told you yesterday.  So I will
15  allow the parties to introduce that to you.
16             MR. GROSS:  Thank you, Your Honor.
17             Columbia calls as its next witness, Shane
18  Pereira, by videotape deposition.  Mr. Pereira testified
19  as a 30(b)(6) witness on behalf of Norton on the following
20  topics:
21             The testing of SONAR/BASH by Norton, the use,
22  function, operation, structure, specifications, training
23  data and training process of SONAR/BASH, and the use of
24  machine learning with SONAR/BASH.
25             THE COURT:  All right.
```

```
 1              So I'm going to instruct you, as I have before,
 2   that this video includes testimony that is offered both by
 3   Columbia and by Norton, okay?
 4              JURORS:  Yes.
 5              THE COURT:  You can play the video, please.
 6         (Videotaped deposition of Mr. Shane Pereira.)
 7              THE COURT:  Is that the conclusion of the video
 8   testimony?
 9              MR. GROSS:  Yes, it is, Your Honor.
10              THE COURT:  Does either side have any objection
11   to how it was presented?
12              MR. LUMISH:  No objection, Your Honor.
13              THE COURT:  No objection from Columbia either?
14              MR. GROSS:  No objection, Your Honor.
15              THE COURT:  All right.
16              MR. GROSS:  Columbia calls its next witness,
17   Barry Laffoon, by videotaped deposition.
18              Mr. Laffoon was deposed twice in this case.
19   Once in 2014 and once in 2019, and two videos will be
20   played sequentially.
21              THE COURT:  All right.
22              I'm going to ask, sir, next time you introduce
23   it, please come up to the podium.  It's a little bit
24   harder to hear you from counsel table because you're away
25   from the microphone.
```

1          MR. GROSS:  Apologies, Your Honor.

2          THE COURT:  Thank you.

3          Again, I'm going to tell you-all that this video

4  includes testimony offered both by Columbia and by Norton.

5       (Videotaped deposition of Mr. Barry Laffoon.)

6          THE COURT:  Is that the conclusion of the video

7  testimony from Mr. Laffoon?

8          MR. GROSS:  Yes, it is, Your Honor.

9          THE COURT:  Is there any objection to the way it

10  was presented?

11          MR. LUMISH:  No objection, Your Honor.

12          THE COURT:  Any objection at all?

13          MR. LUMISH:  None, Your Honor.

14          MR. GROSS:  And none from Columbia, Your Honor.

15          If we may proceed, Columbia calls its next

16  witness, Carey Nachenberg, by videotaped deposition.

17          THE COURT:  All right.

18       (Videotaped deposition of Mr. Carey Nachenberg.)

19          THE COURT:  Is that the conclusion of

20  Mr. Nachenberg's testimony?

21          MR. GROSS:  Yes, it is.

22          THE COURT:  Any objection to the testimony?

23          MR. LUMISH:  No objection, Your Honor.

24          MR. GROSS:  None from Columbia.

25          THE COURT:  All right.

```
 1              How do we proceed next?

 2              MR. GUZIOR:  Your Honor, Columbia's next witness

 3   is Dr. Cole.  We may need three or four minutes to get the

 4   binders, but we're prepared to proceed.

 5              THE COURT:  All right.  Why don't we take our

 6   first break now, and we'll come back at 10:20, all right?

 7              I'll remind you, please, don't talk about

 8   anything about the case to others or among yourselves.

 9         (Jury no longer present in the courtroom.)

10              THE COURT:  All right.  We'll take a recess and

11   we'll return at 10:20.

12              With experts, I think, a few shorter breaks are

13   better; although, I do feel for our jury.  So we'll make

14   sure they're doing fine through our CSO with the breaks.

15              So we will see you at 10:20.

16                       (Recess taken.)

17              (The trial resumes on the next page.)

18

19

20

21

22

23

24

25
```

1              (The trial resumed at 10:21 a.m.)

2              (The jury is not present.)

3              THE COURT:  Are we ready to proceed?

4              MR. GUZIOR:  Columbia is ready, Your Honor.

5              MR. MORIN:  Norton is ready, Your Honor.

6              THE COURT:  Okay.  Let's bring the jury in.

7              (The jury entered the courtroom.)

8              THE COURT:  All right.

9              MR. GUZIOR:  Columbia calls Dr. Eric Cole.

10                           **ERIC COLE,**

11  called by the plaintiff, first being duly sworn, testified

12                         as follows:

13             MR. GUZIOR:  Your Honor, I have two copies of

14  Dr. Cole's slide presentation and a copy of his exhibits,

15  which is a copy of what chambers received last night.  Can

16  I hand those to your courtroom deputy?

17             THE COURT:  Yes, please.

18             MR. GUZIOR:  And for the record, Your Honor,

19  I've also given copies to opposing counsel and to the

20  witness, Dr. Cole.

21             May I proceed, Your Honor?

22             THE COURT:  Please.

23                   **DIRECT EXAMINATION**

24  BY MR. GUZIOR:

25  Q    Dr. Cole, good morning.

1   A    Good morning.

2   Q    Let's start with an introduction.  Please introduce

3   yourself to our jury.

4   A    Good morning, Your Honor, members of the jury.  My

5   name is Eric Cole.  I'm a resident of the state of

6   Virginia, and I'm a cybersecurity professional.

7   Q    Can you please spell your name for our terrific court

8   reporter, sir?

9   A    Eric, E-R-I-C, Cole, C-O-L-E.

10  Q    Before we get into the details, I want to ask you a

11  few questions about your background.  Did you prepare a

12  slide presentation to help the jury understand your

13  testimony today?

14  A    Yes, I did.

15  Q    And, Dr. Cole, let me show you the first slide in

16  your presentation.  Does this summarize your employment

17  history, sir?

18  A    Yes, at a high level, it does.

19  Q    Where did you begin your career after college?

20  A    After college, I began my career at the CIA, the

21  Central Intelligence Agency, where I worked at the office

22  of security, testing various products.

23         I then moved into a role for five years where I

24  was a professional hacker, responsible for finding

25  vulnerabilities, exposures, and breaking into various

1    computer systems.

2    Q    Did you say a professional hacker?

3    A    Yes, I did.

4    Q    Why would the CIA want to pay someone to do that?

5    A    For two reasons.  One, the only way to really know

6    the security of your own systems is by trying to break in,

7    by finding the vulnerabilities and exposures before an

8    external adversary does.  So I was responsible for

9    whenever we were rolling out new servers or systems at the

10   agency, I would essentially play the role of a hacker and

11   try to break in and find those exposures.

12          And then the second reason, which is fairly

13   obvious if you watch the news lately, is sometimes we do

14   need to perform some types of offensive operations and

15   need those skill sets.

16   Q    What did you do after leaving the CIA?

17   A    After the CIA, you'll notice on the slide there's

18   some gaps in years, and that's because during the dot-com

19   era, I worked for many different start-ups in which I

20   played different roles of chief security officer, chief

21   information officer, chief technology officer helping

22   organizations role out and implement effective

23   cybersecurity strategies.

24   Q    What brought you to Lockheed Martin in 2005?

25   A    In 2000, I started a company called TSGI, which

1 stands for The Sytex Group inc., and this was a government

2 contracting organization where I was responsible for the

3 research team, for licensing and acquiring different

4 technology that we needed for our contracts.  And in 2005,

5 we were acquired by Lockheed Martin, and the CEO at the

6 time in 2005 -- there was a lot of things going on in

7 cybersecurity.  There were a lot of changes with the

8 threats.  So I was asked to stay on as a special advisor

9 to the executives to focus in on cybersecurity incidents

10 across all of Lockheed.

11 Q    At Lockheed, did you work on any notable

12 cybersecurity incidents?

13 A    Yes, I did, two in particular.

14         One you might have heard about, the Joint Strike

15 Fighter in the mid 2000s was hacked and compromised by a

16 foreign adversary.  Within two hours, I was on an airplane

17 to Texas and spent almost two and a half months down there

18 doing incident response, identifying what the extent of

19 compromise was and what we needed to do to fix and

20 remediate.

21         Also with FBI Sentinel, when that program

22 started having some security issues and challenges, I was

23 brought in to evaluate what the solutions and gaps were,

24 look at whether we should build a technology in house or

25 license or buy third-party technology and then help to put

Eric Cole - Direct                    1424

1    the security strategy back on track.

2    Q     Now, what brought you to McAfee in 2009?

3    A     In 2009 -- I'm foreshadowing a little bit of my

4    presentation, but you'll hear in a little bit, in 2009 it

5    was a very significant time for cybersecurity vendors like

6    McAfee.  They were struggling in the marketplace.

7            So John McAfee and Dave Dewalt, the two founders

8    of McAfee asked if I would come on board to redesign,

9    rebuild, and reprioritize their entire product line to be

10   more competitive within the landscape.

11   Q     And did McAfee compete with the defendant, Norton?

12   A     Yes.  At the time, we called them Symantec, but my

13   understanding in this case, Norton and Symantec are

14   synonymous.  But yes, they were one of our prime

15   competitors during that time period.

16   Q     In what product areas?

17   A     The main product area was endpoint security, or what

18   we call antivirus or malware detection.  And this was both

19   on the consumer side and on the enterprise side.

20   Q     Why did you leave after only two years?

21   A     When I was brought on, I was given a four-year

22   contract where the goal was to reposition McAfee's

23   products, make them one of the leaders and get them

24   acquired.

25            I actually accomplished that with a team.

1  Within two years, we were acquired by Intel.  So once I

2  accomplished what I was brought on to do, I then moved on

3  to start my own company, Secure Anchor Consulting.

4  Q    What type of work do you do at your own company,

5  Secure Anchor?

6  A    At a broad level, Secure Anchor is a cybersecurity

7  consulting company.  So we're brought in to help companies

8  build out security road maps, security health checks,

9  security assessments.

10          I also go in and give briefings to executives.

11 Tomorrow night I fly to Canada to give a keynote for an

12 executive board of manufacturers and also just help

13 organizations understand the challenges and implement

14 effective solutions.

15 Q    And are there any private clients you have at Secure

16 Anchor that you're able to disclose?

17 A    Yes.  One of the areas we don't talk about that much

18 is Cyber Bodyguard where we're actually brought in by high

19 profile net worth individuals.  A lot of our clients,

20 professional athletes, actors, high net worth individuals.

21 Normally, we can't reveal any of our clients, but since

22 I've worked with them for 15 years, I actually got special

23 permission to be able to say that I do the private

24 cybersecurity for the Gates family, for Bill and Melinda.

25 Q    I see.  Now, Dr. Cole, you seem to have a very active

1  social media presence with your company, Secure Anchor,

2  with videos and podcasts.  Why do you do those things?

3  A    There's two reasons.  One is I'm a Virginia start-up

4  company.  I currently have eight employees.  So we

5  continually want to make people aware of our services.

6  Sometimes some of our clients call us the best kept secret

7  in cybersecurity.  So I hire different firms to help us

8  produce content.  I do a podcast show, Life of a CISO,

9  which stands for Chief Information Security Officer, and

10 we just try to be really visible in the space.

11           And second reason is during my career, a lot of

12 people have helped me and I'm a big fan of giving back.

13 So I spend a lot of time trying to produce video and

14 content to encourage high school and college students to

15 get into cybersecurity and pursue a career in cyber.

16 Q    Let me show you the next slide in your presentation.

17 Does this summarize your education and qualifications,

18 Dr. Cole?

19 A    Yes, it does.

20 Q    What degrees do you hold?

21 A    I hold a bachelor's and master's in computer science,

22 with a minor in business, from New York Institute of

23 Technology, and I have my doctorate from Pace University

24 in which my dissertation was on cybersecurity.

25 Q    Now, what did you do on the Cybersecurity Commission

Eric Cole – Direct

1427

1    for the 44th president of the United States?

2    A    There were two main responsibilities.  One was to

3    work as a part of a team to build out a strategy for

4    making sure that the United States can be properly

5    protected from cyber attacks and from a very high level,

6    to make sure the president and executive office was aware

7    of some of the threats and exposures.

8            The second area was when there were specific

9    problems or issues, I was often brought in to brief the

10   president and provide advice.

11   Q    What is a CISSP certification?

12   A    That's, of course, an acronym.  There will be plenty

13   of those today, but I'll do my best to spell them out.  It

14   stands for Certified Information System Security

15   Professional.  It's one of the primary and top

16   certifications in cybersecurity.  I earned my CISSP in the

17   mid-'90s, and I continue to earn CPEs, continuing

18   professional education credits, and maintain my CISSP in

19   good standing today.

20   Q    Have you published any books in the area of

21   cybersecurity?

22   A    Yes, I have.

23   Q    Let me show you your next slide.  Does this show the

24   books that you've authored in cybersecurity?

25   A    Yes, it does.

1  Q     At a high level, what are the topics of these books,

2  Dr. Cole?

3  A     So on the right-hand side, the main topics when I

4  first started writing in the late '90s, early 2000, were

5  really technical topics to help people understand and get

6  into the field of cybersecurity.  Network Security Bible,

7  1st and 2nd edition, has become one of the core textbooks

8  at high schools and colleges.

9            Then in recent years, I started putting more

10 focus on helping to raise awareness with nontechnical

11 folks, parents, doctors, teachers.  Lawyers are often

12 targeted by cyber attacks.  So I wrote books like Online

13 Danger, and my most recent book, Cyber Crisis, was a Wall

14 Street Journal number 1 best seller.

15 Q     During your work in cybersecurity over the past

16 30 years, have you participated in licensing negotiations

17 for cybersecurity patents?

18 A     Yes, I have.

19 Q     About how many?

20 A     Over 15 times with Lockheed Martin, McAfee and with

21 some of our recent clients.

22 Q     What was the nature of the work that you did to

23 support the patent licensing negotiations?

24 A     So at both Lockheed Martin and McAfee, one of the

25 exercises you do in technology companies is when you have

1  a problem or a challenge, you do a buy or build exercise

2  where you'll essentially say is it more cost effective and

3  timely for us to build this technology in-house or does it

4  make sense for us to buy it.

5          In the buy capacity, I was responsible for

6  looking at what other technologies existed, what other

7  patents were out there, and then was directly involved in

8  negotiating licenses for those patents so we could augment

9  our offerings.

10 Q    Now, you said buy or build.  If a company buys, are

11 they developing that technology with their own sweat and

12 in-house R&D?

13 A    No, they are not.

14 Q    I see.  Remind us, Dr. Cole, for how many years have

15 you worked in cybersecurity in one capacity or another?

16 A    It's currently going on 31 years as a cybersecurity

17 professional.

18          MR. GUZIOR:  Your Honor, Columbia offers

19 Dr. Cole as an expert in the cybersecurity industry.

20          THE COURT:  Any objection?

21          MR. MORIN:  No objection, Your Honor.

22          THE COURT:  All right.  You're deemed an expert

23 in cybersecurity.

24 BY MR. GUZIOR:

25 Q    Thank you for that, Dr. Cole.  Let's now get to work.

1  A    Okay.

2  Q    And talk about the assignment that you had for this

3  trial.  Let me show you the next slide.  Does this

4  illustrate your assignment for this trial?

5  A    Yes, it does.

6  Q    What is shown on the left-hand side?

7  A    On the left-hand side is one of the patents and one

8  of the claims of the patents, but what's important is

9  what's in bold.  What's in bold is the combined model

10 invention, which is the core invention that's across all

11 four of the patent claims that are asserted in this case.

12 Q    What is shown in the middle?

13 A    In the middle is BASH.

14 Q    And what is BASH, Dr. Cole?

15 A    BASH is part of a technology called SONAR.  So

16 SONAR/BASH, and BASH is the infringing technology in this

17 case that incorporates machine learning with combined

18 models to be able to catch advanced unknown threats.

19 Q    What is shown on the right-hand side of this slide?

20 A    On the right-hand side is a sample of some of

21 Norton's products that they sell.

22 Q    What type of products does Norton sell?

23 A    Norton sells endpoint security products, sometimes

24 referred to as antivirus.  This is software that you

25 install on a computer system to protect that computer from

1  various types of malware.

2  Q    What does the first arrow "value" represent on this

3  slide?

4  A    That first arrow represents the first step in my

5  apportionment assignment, which was to look at the patents

6  and determine the value that they contribute to BASH.

7  Q    What is the second arrow representing?

8  A    That would be the second step of my assignment, which

9  was then look at BASH and determine the value that it

10 provides to Norton's products.

11 Q    Yesterday and last week the jury heard from

12 Dr. Bailey, who testified about infringement.  Did you

13 perform a separate infringement analysis?

14 A    No, I did not.

15 Q    For your assignment, the value that Columbia's

16 patented invention contributes to the accused products,

17 does the law require you to make an assumption regarding

18 infringement?

19 A    Yes, it does.

20 Q    What assumption?

21 A    The assumption, when you perform apportionment, is

22 that the patents infringe.  So I went into this assignment

23 with the assumption that the patents in this case infringe

24 the products.

25 Q    Dr. Cole, you said that the patents infringe.  Did

Eric Cole – Direct                    1432

1  you mean to say that the products infringe?

2  A    I apologize.  Yes, sir.  The products infringe the

3  patents.  Thank you.

4  Q    And that was a starting assumption of your valuation

5  analysis?

6  A    That is correct.

7  Q    Let me direct you to the next slide, which shows the

8  cover pages of the '115 and '322 patents.  On what date

9  did Columbia file the provisional patent application for

10 these two patents?

11 A    The provisional patent application was filed

12 October 2005.

13 Q    When did these patents issue, Dr. Cole?

14 A    The '115 issued December 2011 and the '322 issued

15 December 2013.

16 Q    For your apportionment analysis, did the issue and

17 state of the patents have any particular significance?

18 A    Yes, they did.

19 Q    What was it?

20 A    Those two dates would indicate the date of the

21 hypothetical negotiation that would occur in this case.

22 Q    What do you mean by hypothetical negotiation?

23 A    So in doing the apportionment to determine the

24 patent's value to the products, you have to go in and look

25 at the dates of 2011 and '13 and say if on those dates,

1  the two parties sat down and in good faith negotiated a

2  proper licensing and they assume that the patents infringe

3  based on the information available during 2011 and 2013,

4  what would the two parties agree to.

5  Q    Is the hypothetical negotiation something that you

6  came up with?

7  A    No, I did not.

8  Q    What is it?

9  A    It's something that is common in patent law; when

10 you're going in and doing apportionment for damages and

11 patent cases you use this concept of a hypothetical

12 negotiation where you go back in time to the dates -- in

13 this case, 2011 and '13 -- you look at what information

14 was available, and based on that information, determine

15 the reasonable value the patents contribute to the

16 products.

17 Q    Now, the provisional patent application was October

18 of 2005.  Can you tell the jury approximately when the

19 Norton first released the infringing SONAR/BASH feature?

20 A    The infringing SONAR/BASH feature was first released

21 in 2009 in the consumer product and was later released in

22 2011 in the enterprise product.

23 Q    Apart from establishing the dates of the hypothetical

24 negotiation, did these dates help you establish a timeline

25 for your valuation analysis?

Eric Cole – Direct                          1434

1  A    Yes, they did because the first important date, the

2  filing of the provisional, that helped me understand when

3  the inventors came up with this idea.  So because the

4  provisional was filed in 2005, that means prior to 2005,

5  they came up with this invention.  Then in 2011 and 2013

6  would be when the hypothetical negotiation occurs based on

7  all the changes that happened within the cybersecurity

8  space.

9  Q    Now, I want to talk through the timeline, Dr. Cole.

10 I'm going to show you an excerpt from Exhibit PX-325 at

11 11.  First, Dr. Cole, what is this exhibit?

12 A    This is an internal Norton presentation talking about

13 the technology and the threats that came out in 2008.

14 Q    What does this chart in Norton's document illustrate?

15 A    This is showing the trend or what we like to call the

16 challenges that started happening in 2000.  So if we look

17 at the left, in 2000 to 2004-2005, the amount of threats

18 were fairly linear.  They were manageable, and a lot of

19 the traditional defenses that companies like Norton and

20 others built were effective at dealing with that threat.

21      But around 2005, 2006, things started changing.

22 We started seeing an exponential increase in the number of

23 threats.  We also saw a huge shift from known threats to

24 unknown threats, and that started putting a huge burden on

25 endpoint security vendors.

1  Q     The title says, "The Onslaught of Unknown Threats

2  Continues to Strain Traditional Defenses."  What does that

3  mean to you?

4  A     So in the late '90s, early 2000 when we started

5  having viruses and malware, companies like Norton and

6  McAfee built methods for dealing with it that were called

7  traditional defenses.  They basically focused on known

8  threats and catching known problems.  And they worked very

9  well for 2001, '2 and '3, but as this threat landscape

10  changed, as we saw this exponential increase in 2006 and

11  we saw all these unknown threats, all of a sudden these

12  traditional defenses weren't working.  They weren't

13  effective, and what was happening is customers were

14  getting infected with a large amount of malware.

15  Q     This chart stops in 2008.  Did the problem stop in

16  2008?

17  A     No, it did not.  I experienced it firsthand at

18  McAfee.  It continued in an exponential fashion where the

19  threats just kept coming and coming and coming.

20  Q     Let me show you an excerpt from Exhibit PX-316 at 8.

21  First, what is this document, Dr. Cole?

22  A     This is another internal Symantec document from

23  September 2010.

24  Q     What does the chart on this slide show?

25  A     So this chart is a little more expansive and detailed

1   than the previous chart.  You'll notice the other chart

2   went from 2002 to 2008.  This goes from 2000 to 2010.  But

3   the important part are the numbers that are added.  When

4   we're looking at early 2000, we're seeing 5 different

5   viruses a day.  Your traditional defenses can handle that

6   very, very well.  But as with we move to '7, '8 and '9

7   where we go to 1500 and greater than 15,000, all of a

8   sudden our traditional defenses are not working, and what

9   happened is you had companies like Norton that, in early

10  2000, was doing a great job of stopping and protecting

11  their clients and in 2007 and '8 because of this

12  onslaught, all of a sudden their products weren't working,

13  their customers were getting infected, and they were

14  starting to have challenges.

15  Q    Let me show you an excerpt from Exhibit PX-466 at 11.

16  First, Dr. Cole, what is this document?

17  A    This is another document from the STAR team.  STAR is

18  another acronym that stands for Symantec Technology And

19  Response.  And it's the team within Norton that's

20  responsible for developing the anti-malware detection

21  methods, and this is from 2013.

22  Q    Is this slide describing some of the problem that you

23  just explained to the jury?

24  A    Yes.  This slide does a great job of summarizing the

25  challenge.  So 2000 to 2004-'5, we had, on the left-hand

1    side, what's called a mass distribution model.  What that

2    meant is malware authors would write one piece of malware

3    and they would send it out to hundreds of thousands of

4    computers to try to infect them.  So if you knew about

5    that one threat, you could detect and stop all those other

6    computers from getting infected because they use the same

7    piece of malware over and over again.

8            But 2006, '7, '8, what happened was not only did

9    we see an exponential increase from 5 to 15,000, but we

10   switched to what we call this micro distribution model

11   where now a malware authors would write a unique piece of

12   malware for every single infection.  So now every time

13   they infected a computer, it was a brand-new piece of

14   malware, it was an unknown threat, and the traditional

15   defenses just did not do a good job dealing with that

16   micro distribution model.

17   Q    A moment ago, Dr. Cole, we saw a 2008 Norton document

18   stating that the onslaught of unknown threats was

19   straining traditional defenses.  In the 2005 to 2009

20   period, what were the most common traditional defenses

21   against malware?

22   A    There were three main types of traditional defenses.

23   One is what we call IPS, which is Intrusion Prevention

24   System, or a firewall.  The second one was signature

25   detection, and the third one was basic behavioral rules.

1   Q    Dr. Cole, does slide 10 provide the graphics that you

2   had created to represent the traditional defenses?

3   A    Yes, it does.

4   Q    Did you prepare animations to show the jury how these

5   traditional defenses operated?

6   A    Yes, I did.

7   Q    Let me show you the first animation, Dr. Cole.  And

8   when I play this, can you explain to the jury what it's

9   showing?

10  A    Absolutely.

11         So with antivirus signatures, the way it works

12  is on the bottom you have a database of known signatures.

13  So once you know about a threat, you create a signature

14  for it and you put it in your database.  Then when a new

15  piece of malware comes out or a new file, what you do is

16  you take that file and you check it against your database.

17  You say does this match signature 1, does this match

18  signature 2.  And in this case, it matches signature 4,

19  and therefore, we know that this is the virus and we're

20  able to block it on the system.

21  Q    Now, let me continue this animation, and please

22  explain to the jury what it shows.

23  A    So we still have our database in the bottom, but now

24  we have a new piece of malware, and as it goes through, it

25  doesn't match any of the signatures.  And because it

1  doesn't match any of the signatures, the way antivirus

2  works is if it doesn't match a signature, we assume it's

3  good and we allow it to run and operate on the system.

4  Q    And is this the reason that antivirus signatures as a

5  traditional defense couldn't keep up with the explosion in

6  new malware?

7  A    That's exactly the reason.  Because antivirus is only

8  as good as the database.  It's only as good as the known

9  threats.  If you know about a threat, antivirus works

10  well.  If you don't know about a threat, it doesn't.

11           So if you remember that first chart where you

12  had 5 new pieces of viruses a day in 2002, we could easily

13  keep up with those signatures.  But in 2008 when you had

14  15,000, antivirus couldn't keep up with those threats and

15  therefore, led to a high amount of infections.

16  Q    Now let's move to IPS firewall.  First, what does IPS

17  mean?

18  A    IPS stands for Intrusion Prevention System.

19  Q    Now, I'm going to play your animation on slide 13,

20  and please explain to the jury what it shows?

21  A    So in the bottom left is the Internet, and in the

22  upper right is a computer, and those boxes are packets or

23  information coming from the Internet into the computer.

24  And the firewall sits like a checkpoint where it looks at

25  each packet, it looks at the address, and it has a list of

1  bad addresses.  If the address of the packet matches a bad

2  address, it blocks it.  If it doesn't match a bad address,

3  then it allows it through.

4  Q    Now, Dr. Cole, how does the firewall know when an

5  address is bad?

6  A    Because we've already detected a known site that is

7  bad and we give that list to the firewall.  So the

8  firewall is provided a list of known bad addresses.  So

9  it's able to catch addresses that we're aware of and we

10 know about.

11 Q    Now, Dr. Cole, why did the -- in your animation, why

12 did the firewall miss the last IP address here that

13 ultimately infects the computer?

14 A    Because it was an unknown address.  It wasn't on the

15 list.  We didn't know about it.  This was a new site

16 that's now malicious, and it illustrates one of the

17 weaknesses of IPS firewall is that it cannot catch unknown

18 threats.

19 Q    Let's talk about the last traditional defense, a

20 simple behavior rule.  Are these graphics on slide 14

21 graphics that you prepared to show how a simple behavior

22 rule works?

23 A    Yes, they are.

24 Q    Can you explain to the jury what this shows?

25 A    So in the top line, we have a piece of malware.  We

Eric Cole – Direct                    1441

1  look at the behavioral pattern of that malware that we

2  know about, and we create a predefined behavioral rule.

3  So we've determined that behavior A, followed by behavior

4  B, followed by behavior C is bad.  So attack 1 comes in.

5  It's a known threat, and its behavior matches the behavior

6  of the predefined rule.  A, followed by B, followed by C.

7  So we flag it as an attack.

8            The problem with simple behavior rules is

9  attack 2, which is an unknown threat.  This is a brand-new

10 threat that has behavior A, followed by B, followed by Q.

11 Because that behavioral string doesn't match our

12 predefined string, it's not known by the software and

13 therefore, it's allowed to execute and infects the system.

14 Q    Now, were all of these traditional defenses strained

15 by the onslaught of unknown malware because they depended

16 on having seen and knowing the malware?

17 A    Yes, that is the exact reason.  All these traditional

18 defenses are based on the premise of the macro

19 distribution model, that we know about a piece of malware

20 before it infects a large number of people and therefore,

21 we can catch it.

22           When that model changed to the micro

23 distribution where now we see all these unknown threats,

24 all of a sudden these traditional defenses do not work

25 well because they do not catch unknown threats that we

1  have not seen before.

2  Q    Dr. Cole, were these shortcomings in traditional

3  defenses having an impact on Norton's business?

4  A    Yes, they were.

5  Q    Let me show you an excerpt from Exhibit PX-315 at 12.

6  First, what is this document?

7  A    This is an internal Norton document from 2009 talking

8  about the problems and challenges with the new types of

9  malware.

10  Q    Now, on this slide, if we look at the second sub

11  bullet under, "We're letting Malware through," it says,

12  "Only 85 percent efficacy (Symantec Internal Testing)

13  15 percent is getting through," with two exclamation

14  points.  At the time of this, October 2009, were you a

15  chief technology officer at Norton's main competitor,

16  McAfee?

17  A    Yes, I was.  I was chief technology officer of the

18  Americas at McAfee.

19  Q    Now, in the computer security business, could a

20  company with an 85 percent efficacy have stayed in

21  business for long?

22  A    In my professional experience, no, they couldn't.

23        When I was at McAfee and you're in antivirus

24  companies, you are obsessed with efficacy.  Efficacy is

25  the accuracy.  That's how accurate the software is.

Eric Cole – Direct                1443

1          Now, I know 85 percent, if you're in school

2    taking a hard class like physics, might seem like a good

3    grade, but in cybersecurity, you want to be as close to

4    100 percent as possible and 85 percent efficacy is a

5    terrible number because it means a large number of your

6    customers are getting infected with malware.

7    Q    Now, I want to show you a page from this same

8    document, PX-315 at 7.  This slide states, "Our promise is

9    to give customers confidence."  And this slide shows

10   Symantec's logo.  Do you see that?

11   A    Yes, I do.

12   Q    In PX-315 at 8, we see Symantec's logo again.  Does

13   this slide relate to the slide that we just looked at?

14   A    Yeah.  So you have the first slide in the

15   presentation talking about Norton's job is to give

16   customers confidence, and then the next slide in the

17   presentation says, "But too many customers have lost that

18   confidence."  And Norton, in their own presentation, put

19   an X through confidence in their logo.

20   Q    Does this document confirm your view that

21   shortcomings in traditional detection methods were

22   impacting Norton's business?

23   A    Yes, it did because it shows that customers are

24   losing confidence.  And this time period, October 2009,

25   when I was at McAfee, and I was seeing this firsthand,

1    where we were getting a lot of Norton customers that were

2    calling us up and wanted to switch to McAfee because they

3    were getting frustrated with the infection rate and they

4    were getting frustrated with the confidence they had in

5    the product.

6    Q    Let me show you an excerpt from Exhibit 325, a

7    document that we looked at earlier, and this is at page 4.

8    Can you explain to the jury what this chart shows?

9    A    Yeah.  So this chart is showing unit sales worldwide,

10   and if you look at the chart, the worldwide unit sales are

11   trending down over time for their core products.

12   Q    Let me show you another excerpt from PX-325 at

13   page 5.  What does this chart show about competition

14   between your former company, McAfee, and at the time,

15   Symantec?

16   A    It's showing that during this time period, McAfee's

17   consumer segment grew 20 percent while Symantec grew only

18   2 percent.

19   Q    Now, around the time of this document in late 2008,

20   were malware detection companies also encountering

21   problems because of something called freeware?

22   A    Yes.  That was another issue.  So a malware detection

23   company is struggling with this onslaught of new unknown

24   threats, and at the same time, we're getting this

25   competitive pressure coming in from freeware products.

1   Q      I want to show you another page of PX-325 at 14.

2   What does this page of PX-325 show, Dr. Cole?

3   A      It's showing the proliferation of freeware.  Now, at

4   the risk of stating the obvious, freeware is software

5   that's free.  So it's software that's freely available

6   that you don't have to pay for.  And what this is showing

7   is that at the end of 2008, 4 of the 5 top products for

8   detecting malware were freeware.

9   Q      And at the time, did freeware typically provide the

10  traditional defenses that we discussed earlier?

11  A      Yes, they did.  What normally happens in software and

12  in cybersecurity is as you have mechanisms for detecting

13  malware becomes what we call commoditized, or common, they

14  often get put in freeware products.  So we started seeing

15  freeware products that did signature, intrusion prevention

16  firewall, and basic behavioral rules to catch that basic

17  level of known threats.

18  Q      Did freeware put pressure on companies like McAfee

19  and Symantec to acquire and sell new technologies?

20  A      Yes, it did put considerable pressure on it because

21  imagine if you now have a product that's free and you're

22  charging for product but it has similar functionality, why

23  would somebody pay for your product if they can get the

24  same feature set for free?  So it put a lot of pressure

25  that we had to go in and put additional value and benefit

1446

1    or new technology to justify the cost of commercial

2    products versus free products.

3    Q    Let me direct your attention to some deposition

4    testimony from Dermot Wall, who will appear by video later

5    today.  First, Dr. Cole, who is Mr. Wall?

6    A    He's a senior director of product management and was

7    also one of the corporate designees to be able to speak on

8    this topic.

9    Q    Mr. Wall's testimony, does it confirm your view that

10   freeware placed pressure on Symantec?

11   A    Yes, it does.  In the first Q and A when he's asked

12   if it put competitive pressure, he said correct.

13         But then Mr. Wall really summarizes it very

14   well, when he says we need to provide better protection

15   than a free product.  If Norton's products are doing

16   similar or the same as a free product, why would anyone

17   buy Norton?

18   Q    Let me show you more of Mr. Wall's deposition

19   testimony on slide 22.  Does this testimony also confirm

20   your view, Dr. Cole?

21   A    Yes, it did.

22   Q    How so?

23   A    It's basically asking, saying if the freeware covers

24   the traditional defenses, do you need to go in and add

25   additional value, and Mr. Wall comes back and says, yes,

Eric Cole – Direct                    1447

1  if you can get it for free, why would you pay for it?

2  Q    Now, before we get to the infringing SONAR/BASH

3  feature in 2009, I want to talk about TruScan.  What is

4  TruScan?

5  A    In 2005, Norton was recognizing that they were

6  starting to have challenges in this space, so they decided

7  to acquire a technology called TruScan and put it into

8  their product around 2005.

9  Q    Was TruScan an early attempt at detecting new malware

10 based on behavior?

11 A    Yes, it was.

12 Q    Now, did Norton create that TruScan technology with

13 its own sweat and in-house R&D?

14 A    No, they did not.  They acquired the technology from

15 a company called WholeSecurity.

16 Q    Was TruScan the answer to Norton's problem?

17 A    No, it was not.  In 2005 and '6, it worked okay, but

18 as the proliferation of threats and unknown challenges

19 came in in '7, '8, and '9, TruScan did not adapt very well

20 and was not able to keep up with those evolving threats.

21 Q    Let me show you an excerpt from Exhibit PX-490 at

22 page 1.  First, Dr. Cole, what is PX-490?

23 A    That is an internal e-mail exchange from Gerry Egan,

24 who was a senior director of STAR at Norton.

25 Q    Mr. Egan says, "First, a bit of background.  TruScan

1  is now quite long in the tooth.  It was based on a

2  technology from WholeSecurity, a company that Symantec

3  purchased back in 2005.  At the time, the technology was

4  leading edge but since then, the threat landscape has

5  shifted considerably."  First, Dr. Cole, what do you

6  understand Mr. Egan to mean when he says, "Now quite long

7  in the tooth"?

8  A    What that means in my professional opinion is that

9  it's no longer working.  It's no longer effective.  It's

10 no longer doing the job of catching the unknown threats.

11 Q    I'm not sure you need a Ph.D. in cybersecurity to

12 pick up on that, Dr. Cole.

13          And, Dr. Cole, when Mr. Egan references that the

14 threat landscape has shifted considerably, do you

15 understand that to be a reference to the explosion in new

16 malware that we discussed earlier?

17 A    Yes, I do.

18 Q    I want to continue on this topic and show you an

19 excerpt from Exhibit PX-501 at 1.  First, what is this

20 exhibit, sir?

21 A    This is an e-mail exchange from one of the engineers

22 that worked on the infringing version of SONAR/BASH called

23 Shane Pereira.

24 Q    Can you read the excerpt from Mr. Pereira's e-mail

25 here?

Eric Cole - Direct                    1449

1  A    "A less stronger argument is that TruScan as

2  currently implemented in SEP" -- that's an acronym that

3  calls for Symantec Endpoint Protection, or the enterprise

4  version -- "is lacking (to put it kindly).  I am sure more

5  customers have realized that it detects almost nothing.

6  You probably would want to jettison such a brand name."

7  Q    And did this e-mail inform your opinion about the

8  efficacy of TruScan?

9  A    Yes, it did.  It is basically showing that inside of

10 Norton, they are recognizing that it is no longer working,

11 it is no longer effective, and that they need a new

12 solution.

13 Q    I want to continue on this same exhibit, PX-501, and

14 this is another e-mail from Gerry Egan, and he says, "As a

15 company, we should be distancing yourselves as far as

16 possible from TruScan.  TruScan just doesn't" -- appears

17 to be a typo -- "isn't affect I anymore."  In the last

18 sentence, Mr. Egan states, "It's time to set the sights on

19 our new technology and create a splash when it launches

20 with a total new branded feature."  What technology do you

21 understand Mr. Egan to be referencing here?

22 A    He's referencing the infringing version of

23 SONAR/BASH.

24 Q    I see.  And continuing on this subject matter, I want

25 to go back to PX-490 at 1.  And Mr. Egan says, "Of course,

Eric Cole – Direct                    1450

1  our protection has evolved and with it, a new generation

2  of behavioral protection has been released in the form of

3  BASH."  What do you understand that to be a reference to,

4  Dr. Cole?

5  A    He is referring to the infringing version of

6  SONAR/BASH.

7  Q    And was the infringing SONAR/BASH a lot better than

8  TruScan in terms of detecting unknown threats?

9  A    Yes, it was.

10 Q    Let's now turn to the infringing SONAR/BASH feature.

11 And first, Dr. Cole, remind us, when was the infringing

12 SONAR/BASH feature released by Norton?

13 A    It was released in the consumer products in 2009.

14 Q    And when was it released in SEP, or Symantec Endpoint

15 Protection, for enterprise customers?

16 A    That was 2011.

17 Q    And remind us where that sits in the timeline in

18 terms of when the provisional patent application for the

19 '115 and '322 was filed?

20 A    So in 2005, the professors at Columbia came up with

21 this new idea as we started seeing these emerging, new,

22 unknown threats.  Then 2008 and '9, we had all these

23 emerging threats, unknown threats occurring in Norton's

24 products weren't doing very well.  Then we come out with

25 the infringing version of SONAR/BASH in 2009, and as we'll

1451

1  see, all of a sudden things start changing dramatically

2  for Norton in terms of their ability to catch the malware.

3  Q     How did Norton portray the infringing SONAR/BASH to

4  the public at the time it was introduced in 2009?

5  A     They portrayed it in a very positive light, as a game

6  changer, as one that allowed them to actually catch these

7  real-world threats.

8  Q     I want to show you another exhibit, PX-170 at 1.

9  First, Dr. Cole, what is PX-170?

10 A     This is a blog post that's publicly available on

11 Norton's website.

12 Q     Based on your review of the documents, did Norton use

13 its blog to provide information to customers?

14 A     Yes.  They used it to share information with current

15 customers, prospective customers, and new customers.

16 Q     Now, Norton says, "SONAR is a behavioral security

17 engine that is at the heart of our anti-malware defenses."

18 In your view, Dr. Cole, why did Norton refer to the

19 infringing SONAR/BASH as the heart of its anti-malware

20 defense?

21 A     Because it really played a critical role of being

22 able to detect and deal with these unknown threats, and

23 not only can the infringing version of the SONAR/BASH be

24 able to detect all these unknown threats, but as we'll see

25 throughout my presentation, it also helped all of the

Eric Cole - Direct

1452

1    other detection components within the product.  So that's

2    why it's considered that heart or critical component.

3    Q    Now, sales and marketing is one thing, Dr. Cole, but

4    sometimes companies overhype a new feature.  Is that what

5    happened here?

6              THE COURT:  I'm going to interrupt you.  What is

7    the date of this blog?

8    BY MR. GUZIOR:

9    Q    Dr. Cole, would you provide the date, please?

10             THE WITNESS:  Sure.  It's July 9th, 2009.

11             THE COURT:  Okay.  Sorry to interrupt.

12             MR. GUZIOR:  Apologies, Your Honor.

13   BY MR. GUZIOR:

14   Q    So, Dr. Cole, sometimes a company will overhype a new

15   feature and the feature actually isn't all that great.

16   Was that the case here?

17   A    No, it was not.

18   Q    Why not?

19   A    Because if we looked at other internal documents and

20   communication within Norton, they provided real numbers to

21   show that it was actually working, it was detecting.  And

22   if you remember, before the infringing version of

23   SONAR/BASH, we were at 85 percent efficacy, and you'll now

24   see with the infringing version of SONAR/BASH, we're close

25   to 100 percent efficacy.

Eric Cole - Direct                    1453

1  Q     Now, Dr. Cole, I want to show you an excerpt from

2  Exhibit PX-349 at page 28.  First, what is this exhibit,

3  and what is the date of this exhibit?

4  A     This is an internal presentation talking about the

5  infringing version of SONAR/BASH, and it's from

6  November 2009.

7  Q     And remind us, where does November 2009 sit relative

8  to the first hypothetical negotiation that would have

9  occurred in this case?

10  A     This is right before the first hypothetical

11  negotiation that could have occurred December 2009.

12  Q     Do you mean 2011, Dr. Cole?

13  A     Sorry.  I'm confusing.  Sorry.  2009 is when the

14  version of -- the infringing version of SONAR/BASH came

15  out within the product.  And then 2011 and '13 were the

16  two hypothetical negotiations.  I apologize.  The dates

17  got confused.  So this is a couple of years before the

18  first hypothetical negotiation of 2011.

19  Q     Thank you, Dr. Cole.  No worries.  I know it's a lot

20  to keep in mind.

21        There's a reference on this slide to BASH 6 and

22  SONAR 2.  What do you understand those to be?

23  A     As you roll out software, you have different version

24  numbers.  So you'll have BASH version 2, BASH version 3.

25  BASH version 6 and SONAR 2 are the first releases that

Eric Cole - Direct                    1454

1  have the infringing version of SONAR/BASH.

2  Q    This slide refers to approximately 200K, or 200,000

3  convictions.  What is a conviction?

4  A    A conviction is when you look at a file, you

5  determine that it contains malware, and you block it or

6  stop it from running on your system.

7  Q    Did this document inform your opinion that the

8  infringing SONAR/BASH feature was technically successful?

9  A    Yes, it did.  This document is talking about a

10 four-week period.  And these are great numbers, 200,000

11 convictions, million install count, 39 million submissions

12 received from 3.4 installs.

13        These are real numbers showing that the

14 infringing version of SONAR/BASH is working.

15 Q    And is this a document for customers or an internal

16 Symantec document?

17 A    This is an internal Symantec document.

18 Q    I next want to show you PX-530 at 12.  What is this

19 document exhibit, and what is the date of it, Dr. Cole?

20 A    This is a presentation that vice president of STAR,

21 Philip(sic) Gardner is going in and given within Symantec,

22 and this is from May 2010.

23 Q    And I think -- what was Mr. Gardner's role at the

24 company, Dr. Cole?

25 A    He was vice president of STAR.

1  Q     And how did STAR relate to the SONAR/BASH feature, if

2  at all?

3  A     STAR stood for Symantec Technology and Response.

4  STAR is the division in Norton that was responsible for

5  all of the different components that were within the

6  antivirus product, including the infringing version of

7  SONAR/BASH.

8  Q     Now, I want to look at the numbers on the slide.  Can

9  you explain the numbers that are provided in the first two

10 bullets?

11 A     Sure.  So SONAR 2 is the infringing version of

12 SONAR/BASH, and it has detected and blocked more than

13 2.8 million threats since shipping in September and has

14 blocked a threat on 1 out of every 5 machines on which

15 it's installed.

16 Q     And what is the reference to September -- I think of

17 2009?

18 A     September 2009 is when the infringing version of

19 SONAR/BASH was released in the consumer product.

20 Q     If you look at the third bullet, it says, "True zero,

21 or 0 day protection."  What does that mean, Dr. Cole?

22 A     Zero day, or 0 day, threats are threats that we've

23 never seen before.  These are brand-new threats that are

24 coming on the scene for the first time or are unknown

25 threats.

1          So this is showing that the infringing version

2   of SONAR/BASH, when we had real-world zero-day threats,

3   real attacks we've never seen before, it was able to

4   detect and block those unknown threats.

5   Q    I want to stick with this exhibit, PX-530, and show

6   you page 15.  Did this slide tell you anything about the

7   value of the infringing SONAR/BASH feature?

8   A    Yes, it did.

9   Q    Why?

10  A    So the vice president of STAR, talking to the sales

11  and marketing team, and he is saying, "Get the word out

12  about SONAR 2.  It's a huge competitive advantage Norton

13  products have over competitors."

14         So they clearly recognize that now with the

15  infringing version of SONAR/BASH, they now are catching

16  unknown threats and are doing much better than their

17  competitors are in this space.

18  Q    I want to stick with 530 yet again, but show you

19  slide 13 in PX-530.  Did third party publications take

20  note of the infringing SONAR/BASH feature?

21  A    Yes, they did.

22  Q    How so?

23  A    So PC magazine, back in 2010, was a very popular

24  magazine for consumers, and it periodically ranks or tests

25  different products, and it came out and said, "SONAR 2

Eric Cole - Direct                    1457

1  turns up the heat.  In testing, this really seemed to

2  work, and it turned in record-breaking scores."  So even

3  third parties that are doing testing are recognizing that

4  SONAR 2, the infringing version, is working and very, very

5  effective.

6  Q    Dr. Cole, were you working at Norton's competitor,

7  McAfee, around the time of this document?

8  A    Yes, I was.

9  Q    And would a product review like the one here in PC

10 magazine provide value to a company like Symantec?

11 A    Yes, it would.  When I was at McAfee, if we get

12 testing results or articles like this, we would make

13 copies.  We would send it out to all of our customers.  It

14 would be something that we would promote and be very proud

15 of.

16 Q    Now, I want to show you -- sticking with Mr. Patrick

17 Gardner, I want to show you PX-502 at 2.  First, Dr. Cole,

18 what is this document, and what was its date?

19 A    So this was an internal e-mail from Mr. Gardner, the

20 vice president of STAR, that he was sending and talking

21 about customer meetings, and this was from September 2010.

22 Q    Mr. Gardner says, "We are pretty proud of it.  It has

23 caught a lot of stuff we would have otherwise missed (over

24 15 million attacks just since 1 year ago launching it) and

25 that is only from consumer products."  What do you

1  understand the reference to "only from consumer products"

2  to mean?

3  A    At the time, 2010, the infringing version of

4  SONAR/BASH, which is what he's referring to here, was only

5  in the consumer products.  So these results of 15 million

6  attacks that would have otherwise been missed is only for

7  consumer.  It's not including any of the enterprise

8  products.

9  Q    Now, in the next sentence, Mr. Gardner says, "On top

10 of all that, it also caught all the big press threats

11 since launch without us changing a things.  Real 0 day

12 proactive protection for Aurora, Stuxnet and last week's

13 Imsolk."  Do you see that?

14 A    Yes, I do.

15 Q    In the cybersecurity industry, is it notable that the

16 infringing SONAR/BASH detected those threats?

17 A    Yes, it was.  And it was something that we noticed at

18 McAfee.

19          When I see the word Aurora, I still start

20 shaking a little bit because that was a zero-day threat

21 that came out January 2010.  And I was at McAfee and was

22 up for seven days straight going between the White House,

23 the Pentagon, and customers because our product did not do

24 a good job at detecting it and we had to do a lot of

25 damage control.  And I remember just sitting back with my

1 team, saying, "What is Norton/Symantec doing," because

2 they were able to catch it when almost all the other

3 vendors were struggling when these attacks came out.

4 Q    Now, Dr. Cole, I think you mentioned that Norton

5 introduced the infringing SONAR/BASH in consumer products

6 first.  Did Norton eventually introduce the infringing

7 feature into the enterprise product?

8 A    Yes, they did.  About -- a little less than two years

9 later in 2011.

10 Q    Let me show you an excerpt from PX-362 at 1.  What is

11 this document, Dr. Cole, and what is its date?

12 A    So this is a document for SEP, which is Symantec

13 Endpoint Protection, which is their enterprise product.

14 12.1 is the infringing version that contains SONAR/BASH,

15 and this was from September 2011.

16 Q    Do you assign any significance to the fact that

17 Norton introduced the infringing technology into its

18 enterprise product?

19         MR. MORIN:  Objection, Your Honor.  I've let it

20 go on for a little while, but he keeps calling it -- even

21 the lawyer's questioning -- the infringing product again

22 and again.  The jury will make that decision.  I'd prefer

23 they call it the accused product, if we don't mind.

24         THE COURT:  I think that's fair.

25         MR. GUZIOR:  Your Honor, legally, his analysis

1   requires an assumption of infringement.

2           THE COURT:  I take that back.  It's overruled.

3   It's a presumption of infringement.  That's what he's --

4   for the hypothetical negotiation.

5           MR. MORIN:  An assumption of infringement that

6   he's made, but I think we could call it the --

7           THE COURT:  No.  The law requires an assumption

8   of infringement for the hypothetical negotiation.

9           MR. MORIN:  Understood, Your Honor.

10          THE COURT:  My apologies.

11          MR. GUZIOR:  No apologies, Your Honor.  Thank

12  you.

13  BY MR. GUZIOR:

14  Q   Dr. Cole, just to step back, we're in 2011 with the

15  SONAR/BASH feature introduced into the enterprise product.

16  And my question for you is do you assign any significance

17  to the fact that Norton chose to introduce the infringing

18  technology into its enterprise product eventually?

19  A   Yes, it's significant because when you're rolling out

20  new features at a software vendor, you always want to roll

21  it out for the consumer base first because if the product

22  doesn't work or there's issues or challenges, it has less

23  of an impact than if you roll it out to your enterprise

24  customers and you take down an entire company.

25          So it's very common that you test out a new

Eric Cole – Direct                    1461

1   feature in consumer products first, and in my experience,

2   normally you wait three to five years to verify and

3   validate it before you put it in the enterprise version.

4          So in this case, when Norton decided to roll it

5   out in their enterprise in less than two years, it is

6   significant not only in the confidence they had in the

7   infringing version of SONAR/BASH, but how well it was

8   working and how effective it was.

9          THE COURT:  Now I'm going to amend my ruling.  I

10  think you should say accused products.  He is presuming

11  infringing, and I think it's different in a question of a

12  lawyer.

13         MR. GUZIOR:  I'll obey that rule perfectly,

14  Your Honor.  Thank you.

15         THE COURT:  Okay.  And thank you for the

16  clarification.  All right.

17  BY MR. GUZIOR:

18  Q    Now, Dr. Cole, did the SONAR/BASH feature continue to

19  succeed in 2012?

20  A    Yes, it did.

21  Q    Let me show you an excerpt from Exhibit PX-506 at

22  page 28.  First, Dr. Cole, what is PX-506, and what was

23  its date?

24  A    This was an internal presentation on the different

25  types of engines, including infringing version of

Eric Cole - Direct                          1462

1  SONAR/BASH, from April 2012.

2  Q    Is the date of this document in between the date of

3  the first hypothetical negotiation and the second

4  hypothetical negotiation?

5  A    Yes.  It's right in between the first hypothetical

6  negotiation was December 2011, and the second was December

7  2013.

8  Q    Can you explain the numbers that are shown on this

9  slide?

10  A    Yes.  This is showing a day in the life of SONAR.  So

11  for a 24-hour period, March 19th, 2012, the infringing

12  version of SONAR/BASH detected 106,829 files on 55,841

13  unique machines.

14  Q    And I want to stay with this topic but show you

15  Exhibit PX-486 at page 38.  What is this document, and

16  what was its date?

17  A    This is another internal document on the infringing

18  version of SONAR/BASH from October 2012.

19  Q    Can you explain the different percentages the jury

20  sees on this slide?

21  A    Yeah.  So Norton took all of the malware that the

22  infringing version of SONAR/BASH detected in which Norton

23  got 100 percent, Norton got 100 percent efficacy, and then

24  they compared it to their competitors.  Their closest

25  competitor only detected 24 percent, Kaspersky.  Microsoft

Eric Cole – Direct                    1463

1   only detected 16 percent, and all of their other

2   competitors were single digits in terms of what they

3   caught.

4              So to compare this with prior to 2009 where we

5   were losing market share to McAfee and had low efficacy,

6   with the finishing version of SONAR/BASH, things changed

7   and now they had a huge competitive advantage.

8   Q    I now want to talk a little bit about why the

9   SONAR/BASH feature was successful.  Are there any

10  characteristics of SONAR/BASH that made it unique?

11  A    Yes.  First is if we look at where it sits in the

12  product and how it works and operates, it's the last line

13  of defense.  So it's going to run after every one of the

14  other components have a chance.  So it's going to catch

15  things that the other engines weren't able to catch.

16             And if we're looking at what it's catching, the

17  second reason, it's catching the 1 percent of malware

18  that's most critical.  These are the advanced zero-day

19  unknown threats that would have a huge impact on

20  customers.  And then the third reason is SONAR/BASH makes

21  undetected threats known.  It makes the unknown known.  So

22  once SONAR/BASH detects an unknown threat, Norton uses

23  that information to then make the other detection

24  components better and smarter.  So infringing version of

25  SONAR/BASH is contributing to the other product engines.

Eric Cole - Direct                          1464

1   Q     Can we take those one at a time?

2   A     Yes.

3   Q     I want to unpack it a little bit.  And let's start

4   with the last line of defense.  Did you prepare an

5   animation to illustrate the concept of a last line of

6   defense in an antivirus product?

7   A     Yes, I did.

8   Q     Let me show that to you.  I'm going to play the

9   animation, and can you explain to the jury what it shows,

10  Dr. Cole?

11  A     Yeah.  So in Norton's products, there's four main

12  components that go in and look for malware.  The first one

13  is network.  The second one is antivirus.  The third one

14  is insider reputation, and the last one is behavioral

15  SONAR.

16        So what happens here is you have a fire that

17  comes in, and network says it looks good.  Antivirus says

18  this looks good.  Reputation says it looks good.  So all

19  three of the previous layers missed it, and then

20  behavioral SONAR, with its machine learning and combined

21  models, is able to catch it and block an attack.

22  Q     So I thought we were discussing why you viewed SONAR

23  as valuable.  If SONAR is last, doesn't that mean it's the

24  worst?

25  A     No, it doesn't.  What you often do is take your

Eric Cole - Direct                    1465

1    components that have some complexity -- behavior SONAR,

2    with all the machine learning and all the combined models,

3    have some complexity.  So you would typically put your

4    most important component last, and then give the other

5    engines, like network and antivirus that catches the known

6    threats, that catch the easy stuff, let those go first,

7    get rid of the simple, easy things.  So now the only

8    things that's left for your most critical defense are the

9    hard critical attacks.

10   Q    Have you seen evidence that Norton also considered

11   SONAR to be uniquely valuable as a last line of defense?

12   A    Yes, I did.

13   Q    Let me show you Exhibit PX-350 at 2.  First,

14   Dr. Cole, what is this document, and what was its date?

15   A    So this is an internal presentation within Norton on

16   BASH 6, which is the infringing version of SONAR/BASH, and

17   it's from 2009.

18   Q    Who is Sourabh Satish?

19   A    She is one of the engineers that works on SONAR/BASH

20   in Norton.

21   Q    And does this document speak to the issue that you

22   just explained with your animation?

23   A    Yes, it does.  On the third bullet, we've highlighted

24   it.  It says, "Last (and very important) line of defense."

25   Q    What do you understand the first sub bullet to mean?

1  A    It's referring to the very advanced threats that we

2  started seeing during that time period.

3          So when it says, "exotic threats," it's talking

4  about threats that are using morphing techniques, like

5  encryption, or polymorphism or obfuscation, to try to go

6  in and hide and disguise what's going on.  And these

7  advanced techniques were able to get around most of the

8  other products, but it wasn't able to get around the

9  infringing version of SONAR/BASH.  It was able to catch

10 these exotic, zero-day threats.

11 Q    Now, we've talked about SONAR qualitatively.  I now

12 want to talk about quantity, and I think what you said was

13 the 1 percent that SONAR catches.  How does SONAR's role

14 as the last line of defense impact the number of malicious

15 programs that it detects?

16         THE COURT:  So, Mr. Guzior, I want to be sure

17 that we get all of this in, and normally we take breaks at

18 an hour and a half, but I think we should take a break

19 now.  It's been a full hour and you're switching from

20 qualitative to quantitative.  And so we'll let the jury

21 take a little rest and then we'll come back.  So this will

22 be another 20-minute break.  Okay?

23         MR. GUZIOR:  Thank you very much, Your Honor.

24         THE COURT:  Yes.

25         (The jury exited the courtroom.)

Eric Cole - Direct                    1467

```
 1              THE COURT:  All right.  Sir, I'm going to remind
 2   you, as I must, that you remain under oath during the
 3   break and not to talk to anybody about your testimony.
 4              And we'll take a 20-minute recess.  So that puts
 5   us really at noon, I think.
 6              MR. MORIN:  Your Honor, one point of
 7   clarification, we've agreed with our friends, subject to
 8   Your Honor's permission, that during direct, that he could
 9   talk, if he'd like to, to his attorneys.  I just figured I
10   would put that on the record.
11              THE COURT:  No, you're right.  And I thought of
12   it just as I said it.  So I'm very glad it's on the
13   record.  You may speak to your own attorneys, and we'll
14   come back right at noon.  Okay?
15              MR. GUZIOR:  Thank you, Your Honor.
16              (Recess taken at 11:36 a.m.)
17              (The trial resumes on the next page.)
18
19
20
21
22
23
24
25
```

1468

1    THE COURT:  All right.  We can begin again.

2    Dr. Cole, I'm going to say in front of the

3    jury that you remain under oath, because I have to say

4    it in front of them.

5    I want to confirm, I think I misstated what

6    he was offered as an expert in.  He's offered as an

7    expert in --

8    MR. GUZIOR:  Cybersecurity industry, Your

9    Honor.

10   THE COURT:  Cybersecurity industry.  Because

11   I think in your *Daubert*, you said cyber and technical

12   computer security.

13   MR. GUZIOR:  I think we shortened it to

14   cybersecurity industry.

15   THE COURT:  Okay.  So I'll make a finding

16   that you are qualified in the cybersecurity industry.

17   I think all I said was computer or something.

18   MR. GUZIOR:  We probably caused the

19   confusion.

20   THE COURT:  No, no, you said it right.

21   MR. GUZIOR:  May I approach?

22   THE COURT:  Please do.

23   The other thing I'm going to say is I want to

24   keep it at about one for the break.  I know it's only

25   an hour.  You can go over a little bit, but the jurors

1  have to eat.  Then we'll have a full one-hour break.

2  So just let me know when you're coming close.  It may

3  not be perfectly timed, but I think with the expert

4  testimony, it's good to take more frequent breaks, but

5  they still, they need that hour, I think.

6          MR. GUZIOR:  I'm going to try to finish in an

7  hour.

8          THE COURT:  Oh.

9          MR. GUZIOR:  So, Your Honor, let me see how

10  that goes in keeping that promise, but I was hoping to

11  finish in an hour, and then if Your Honor wanted to

12  take the lunch break.

13          THE COURT:  Oh, okay.  That would work out

14  pretty well.

15          We can bring the jury in.

16          (The jury entered the courtroom.)

17          THE COURT:  All right.  Welcome back.  I

18  think we're going to be doing smaller chunks with

19  expert testimony.  I hope that works for you.

20          So, Dr. Cole, you're still under oath, and we

21  will continue with direct examination.

22  BY MR. GUZIOR:

23  Q   Dr. Cole, before the break we were talking about

24  the characteristics of SONAR/BASH that you had

25  identified as being unique.  And we had talked about

1  the last line of defense, and I now want to move on to

2  the second characteristic that you identified that

3  SONAR/BASH catches the most important 1 percent of

4  malicious programs.  Is that okay?

5  A   Yes, it is.

6  Q   So far this morning, we've been talking about

7  SONAR/BASH mostly from a qualitative perspective, and

8  I want to spend a moment talking about quantity.

9      How does SONAR/BASH's role as the last line of

10 defense impact the number of malicious programs that

11 it detects?

12 A   Because it goes last, it's going to catch a

13 smaller number than the layers that go before it, but

14 this is where we get into the quantity versus quality

15 where it might be a lower number, but the importance

16 of that 1 percent is very, very critical because it's

17 the difference between blocking an attack or a

18 guaranteed infection.

19 Q   During your work on this case, have you seen data

20 that Norton provided showing the number of blocks by

21 the malware detection feature?

22 A   Yes, I have.

23 Q   Let me show you Slide 39, Dr. Cole.  Is this a

24 summary of the malware detection data that you

25 reviewed in PX511 and PX523?

ERIC COLE – DIRECT                1471

1  A    Yes, it is.

2  Q    Can you explain these numbers to the jury, please?

3  A    Yes.  Just so we're aligned, network is referring

4  to intrusion prevention system or firewall.  That's

5  the IPS layer.  AVE is antivirus engine.  Insight is

6  reputation, and then BASH is the SONAR/BASH we've been

7  talking about.

8      So network and antivirus engine, they're really

9  good at catching known threats.  And there is a lot of

10 what we call in cybersecurity noise on the wire, which

11 is basic simple attacks.  And that's what network and

12 AV are really good at catching, and that's why those

13 numbers are higher at the 41 and 52 percent because

14 they're catching a lot of that noise.  And then when

15 it comes down to BASH, it's catching that 1 percent of

16 critical attacks that all the other layers are

17 missing.

18          THE COURT:  Can I just confirm, are you

19 saying "noise on the wire"?

20          THE WITNESS:  Yes, I am.

21          THE COURT:  Okay.  Thank you.

22 BY MR. GUZIOR:

23 Q   Dr. Cole, earlier today we talked about freeware.

24 Do you remember that?

25 A   Yes, I do.

1  Q   And is freeware also going to catch a lot of these

2  noise-on-the-wire, easy-to-detect malicious programs?

3  A   Yes, they are.  Essentially, freeware would cover

4  the first two categories.  So network and antivirus

5  engine is essentially what your freeware is going to

6  focus on.

7  Q   Doesn't this show that antivirus and firewall are

8  the most important features?

9  A   No, they don't, because this is where we get into

10 the quantity versus quality.  Network and antivirus,

11 their numbers are higher, but they're catching simple,

12 easy attacks that every product, including freeware,

13 would catch.  It's that 1 percent that SONAR catches

14 that other products would miss that differentiates it

15 from the other layers.

16 Q   If the data here focused only on the difficult

17 unknown attacks, would the percentage of detections

18 for Insight and BASH be higher?

19 A   Yes, they would be much, much higher.

20 Q   Why?

21 A   Because if we go in and remove the basic simple

22 attacks that most of the products catch and freeware

23 catches, you're essentially removing almost all of

24 what network and AV is catching.  So if we take that

25 out, and we're only focusing on the zero-day unknown

1   threats, then around 90 percent of those threats are

2   going to be caught by Insight and SONAR/BASH.

3   Q    When looking at block count percentages, like the

4   one on the screen, using all malware, easy to detect,

5   and difficult to detect, is there a rule of thumb that

6   you would recommend about the size of the percentage

7   and the value of the technology?

8   A    What would happen is because the lower the number,

9   the more valuable that layer is, because it's catching

10  things that other layers miss, so I would actually say

11  even though BASH is one of the lowest numbers, that

12  means it's one of the most valuable pieces because

13  it's able to detect the malware that the other layers

14  are not able to catch.

15  Q    Based on your review of the evidence, did Norton

16  share that view?

17  A    Yes, they did.

18  Q    Let me show you an excerpt from Exhibit PX511 at

19  2.  First, what is PX511 and what does it state?

20  A    This is an email exchange with Adam Bromwich who

21  is a vice president of STAR.  And it's from

22  March 2014.

23  Q    How does this email from Mr. Bromwich relate to

24  the block count data that we just reviewed?

25  A    So what he's saying is there's another important

ERIC COLE - DIRECT                1474

1    stat we need to look at, which is what we've been

2    discussing.  He says, If you're looking at the real

3    world, newly-crafted polymorphic threats, the advanced

4    threats, 90 percent of our detection capability is due

5    to Insight and SONAR.

6    Q    Now, remind us, Dr. Cole.  If we were to look at

7    all malicious programs, ones that are easy to find and

8    ones that are hard to find, would the vast majority of

9    them be the easy to find variety?

10   A    Yes, they would.

11   Q    And in that scenario, would the percentage of

12   blocks by SONAR appear small?

13   A    Yes, they would.

14   Q    Now, in Mr. Bromwich's email here, Dr. Cole, what

15   do you understand Mr. Bromwich to be saying about

16   Norton's own view of the value of the Insight and

17   SONAR feature accused of infringement?

18   A    He's essentially saying that Insight and SONAR are

19   the critical parts of the system.  If we look at that

20   second paragraph, he says the most popular threats are

21   handled by antivirus and intrusion prevention system,

22   but the 90 percent is what matters to the user

23   experience, and that 90 percent is caught by Insight

24   and SONAR.

25   Q    Now, to be fair, Dr. Cole, you understand that the

1   Insight feature is not accused of infringement, right?

2   A    That is correct.

3   Q    And when was the Insight feature launched?

4   A    The Insight feature was launched at the same time

5   of the infringing version of SONAR/BASH.  So that

6   would be 2009 in consumer and 2011 in enterprise.

7   Q    And do you believe that the Insight feature also

8   is valuable?

9   A    Yes, I do.

10  Q    Now, I want to go back to the quantitative aspect

11  of this and the idea of easy to find and hard to find

12  malicious programs.

13       If we were to look at all of the malicious

14  programs, easy to find and hard to find, and customers

15  wanted to stop all of them, does a feature like SONAR

16  still play an important role in sales and marketing?

17  A    Yes, it does, because it's able to catch those

18  advanced attacks that the other layers are not able to

19  catch.

20  Q    Let me show you an excerpt from Exhibit PX607 at

21  1.  First, Dr. Cole, what is a competitive battle

22  card?

23  A    Competitive battle cards are what organizations do

24  to go in and look at their product, the competitor's

25  product, and then they create this battle card of what

1    do we need to do to be able to win in the market

2    against our competitors.

3    Q    I want to take a look at the how-to-win excerpt on

4    this slide.  Can you explain to the jury what the

5    percentages here represent?

6    A    So the percentages here are showing how effective

7    are the efficacy of the products.  So it's showing

8    that Norton's products have 100 percent detection of

9    advanced malware, and one of their competitors only

10   has 999.6 and 99.7 efficacy in detecting those same

11   attacks.

12   Q    Why would Norton want to promote that it did only

13   0.3 percent better than a competitor?

14   A    In cybersecurity products like malware, it's all

15   about those decimals.  Every product is going to score

16   in the high nineties, but the difference between first

17   and last is sometimes only .3 or .4 percent.  And I

18   know that might seem like a small number, but if

19   you're looking at 15,000 different threats occurring

20   on a daily basis, and your product allows .3 percent

21   of those through, that's still a high number of

22   infections, that's still a high number of frustrated

23   customers, and that's still a failure to protect your

24   customers' computers.

25   Q    Is the 0.3 percent the unknown and difficult to

ERIC COLE - DIRECT                1477

1   detect malware?

2   A    Yes, it is.

3   Q    I want to talk about the last characteristic that

4   you mentioned.

5           THE COURT:  Are you moving on from this?

6           MR. GUZIOR:  Pardon?

7           THE COURT:  You said, "What is a competitive

8   battle card?"  Is this a competitive battle card?  Is

9   that why that question was asked?

10          MR. GUZIOR:  I will establish the foundation,

11  Your Honor.

12          THE COURT:  I also think the date should go

13  on.

14  BY MR. GUZIOR:

15  Q    Dr. Cole, is PX607 a competitive battle card?

16  A    Yes, it is, and it's from September 2016.

17  Q    Thank you, Dr. Cole.

18      On the last characteristic that you mentioned that

19  SONAR contributes to and improves other malware

20  detection features, can you explain how that happens?

21  A    Yes.  So your traditional defenses like your

22  firewall, instruction prevention system, and your

23  antivirus engine, those are based on known threats.

24  You have to know about a threat in order for it to

25  catch it.  Where SONAR/BASH comes in with the

ERIC COLE – DIRECT                    1478

1   1 percent is it can catch the unknown threats.  It can

2   catch those advanced unknown threats, but something

3   interesting happens.  When SONAR/BASH catches an

4   unknown threat, it then becomes known.

5        Now the Norton engineers know about it.  They can

6   take that knowledge from the SONAR detection of that

7   known threat, and they can now write signatures, they

8   can write firewall rules, and they can now improve the

9   other defense layers that go before the infringing

10  version of SONAR/BASH.

11  Q   Did you prepare an animation to illustrate what

12  you just explained?

13  A   Yes, I did.

14  Q   Let me show that to you.  And can you explain to

15  the jury what this shows?

16  A   So on the right-hand side, you have all the

17  computers that are running Norton software with the

18  infringing version of SONAR/BASH.  They go in and

19  catch unknown threats.  They feed it to Norton's

20  back-end, and then that unknown threat becomes known,

21  and they use it to write new virus signatures for the

22  antivirus engine.

23  Q   If SONAR makes a single detection of an unknown

24  malicious program, can that translate into millions of

25  detections of that same program in the future using a

ERIC COLE - DIRECT          1479

1    signature?

2    A    Yes, it could.  And the important thing to point

3    out is, in those block count numbers, if the

4    infringing version of SONAR/BASH catches that threat

5    once, it gets counted as one block.  If it then

6    creates a signature that goes in the AV and AV catches

7    100,000, AV gets all the credit, the hundred thousand

8    in the block count, even though it came from a

9    signature detected by SONAR/BASH.

10   Q    Thank you for these explanations, Dr. Cole.

11        Before we turn to the apportionment percentages

12   that you provided in this case, I first want to ask

13   you to briefly summarize why we made the jury sit

14   through all of this.  Why did this historical context

15   and how did this historical context factor into your

16   thinking about the value of the product feature that

17   you were asked to assume was infringing?

18   A    So if we look at a brief history, starting in the

19   late '90s, malicious folks started writing malware

20   that started infecting computer systems.  Companies

21   like Norton Symantec started creating anti-malware

22   products in late '90s, early 2000, that would block

23   those threats using traditional defense measures like

24   simple behavioral rules, firewalls, and antivirus

25   engine.

1    Those worked very well in 2002 and 2003.  2004

2  things started changing.  We started seeing more

3  threats coming on the scene.  And the professors at

4  Columbia University recognized this changing dynamic

5  landscape and come up with an invention that they

6  created in 2005 using combined models to be able to

7  detect these advanced unknown threats.

8    Then, as we moved through 2005-2006, Norton

9  started struggling, and they tried to solve this

10 problem by acquiring a technology called TruScan that

11 worked initially, but as we moved through 2007, 2008,

12 it just became too much for the traditional defensive

13 measure.  It became too much for TruScan.

14    In the 2008 time period, Norton was struggling in

15 the marketplace.  They were losing customer

16 confidence.  Their efficacy was low.  So they went in

17 and rolled out the infringing version of SONAR/BASH in

18 2009 and everything started changing.

19    Their efficacy numbers went up to almost 100.

20 They went from last to first.  It was detecting

21 unknown threats.  They were differentiating in the

22 marketplace in 2010.

23    2011, they go in and release this infringing

24 version of SONAR/BASH in the enterprise version.

25 2011, at the end, is the first date of the

ERIC COLE - DIRECT                1481

1   hypothetical negotiation where SONAR/BASH essentially

2   is a game changer.

3        Then as we go through 2012 and '13, it continues

4   to be a big differentiator in the market which leads

5   us to the second date of the hypothetical negotiation

6   at the end of 2013.

7   Q    Thank you for summarizing that, Dr. Cole.

8        Now, when we turn to your apportionment

9   percentages, I want to start with a reminder.  What is

10  apportionment -- not a word we use every day -- in the

11  context of a patent reasonable royalty?

12  A    At a high level, it's looking at the patents and

13  determining the value that it contributes to the

14  products.

15  Q    Now, before we start down this path, are you aware

16  that this case between Columbia and Norton started in

17  2013?

18  A    Yes, I am.

19  Q    When were you first engaged to provide an

20  apportionment opinion in this case?

21  A    In 2014.

22  Q    In 2014, did you provide apportionment opinions

23  based on the evidence that was available to you at the

24  time and the instructions that the lawyers provided in

25  2014?

ERIC COLE – DIRECT                1482

1   A    Yes, I did.

2   Q    In 2019, half a decade later, did I ask you to

3   take a fresh look with additional evidence?

4   A    Yes, you did.

5   Q    Did I ask you to provide your own opinions without

6   some of the constraints that you were asked to follow

7   in 2014?

8   A    Yes, you did.

9   Q    Do the apportionment percentages that you are

10  presenting at trial today reflect, in your judgment,

11  accurate valuations based on all of the evidence

12  available?

13  A    Yes, they do.

14  Q    Have you estimated the value of computer security

15  product features previously as part of your

16  professional experience?

17  A    Yes, I have.

18  Q    Not to repeat too much, but at what companies did

19  you do that?

20  A    At Lockheed Martin, I was responsible for the

21  cybersecurity portfolio.  So I was responsible for

22  both taking our patents and licensing them out and

23  also looking for gaps in our products and negotiating

24  license with other companies for us to license those

25  products.

1483

1    At McAfee, since we were a cybersecurity company,

2    that was one of my key roles where I was constantly

3    doing the buy, first build.  And in many cases, if

4    there's good technology or good patents, it actually

5    makes more sense to license that technology.  You can

6    get there quicker than building it in-house.

7        And then also at Secure Anchor, I'm often brought

8    in by venture capitalists and private equity to look

9    at technology and patents that they want to invest in

10   and determine the value.

11   Q   When you assign value percentages to different

12   product features like the ones in this case, is that a

13   mathematically perfect calculation?

14   A   No, it is not.  It is not a math problem.  It's a

15   qualitative estimate.

16   Q   Is a mathematically-precise calculation even

17   possible?

18   A   No, it is not.

19   Q   Why not?

20   A   Because there isn't math involved here.  You have

21   to look at the products, you have to look at all of

22   the documentation, you have to look at the testimony

23   of evidence, and you have to rely on expert opinion to

24   determine what the estimated value of given features

25   are.

ERIC COLE - DIRECT                1484

1    Q    When it comes to computer security products, do

2    you often have a quality versus quantity issue like

3    the block count data we discussed earlier?

4    A    Yes, you do.

5    Q    And is that one of the reasons that you have to

6    look at qualitative factors and professional judgment

7    when you estimate value percentages?

8    A    Yes, it is, because as we talked about the block

9    count data, sometimes data can be misleading.

10   Q    Let's now turn to the opinions that you provided,

11   the percentages that you provided to reflect the value

12   that Columbia's combined model invention contributed

13   to Norton's products.  Did you prepare an animation to

14   illustrate the apportionment steps that you took?

15   A    Yes, I did.

16   Q    Just give me one moment, Dr. Cole, to get this up.

17   Thank you for your patience.

18          MR. GUZIOR:  Mr. Chase, can you take us to

19   Slide 44, please.

20   Q    Now, Dr. Cole, what was the starting point, this

21   big yellow box, for your apportionment analysis for

22   the reasonable royalty?

23   A    The starting point was to take a Norton product,

24   and that's 100 percent of the accused product price.

25   Q    And moving forward in your animation, what is the

ERIC COLE - DIRECT                    1485

1   first apportionment percentage that you estimated?

2   A   The first step is to look at malware detection and

3   determine the percent value that it provides to the

4   overall product.

5   Q   Why do you have a range of 60 to 95 percent rather

6   than a single number?

7   A   Because on the consumer side with Norton, there's

8   approximately 14 different products that all have

9   different features and, therefore, have different

10  percent allocation.

11  Q   We'll talk about that in a moment.

12      Looking at the second apportionment step, what was

13  that?

14  A   The second step was to look at SONAR and determine

15  the percent value it provides to malware detection.

16  Q   And the final apportionment step, what was that?

17  A   Was to look at the patented technology and

18  determine the percent value it provides to SONAR.

19  Q   Now, was 35 percent your end number, that the

20  combined model inventions contribute 35 percent of the

21  value to Norton's products?

22  A   No, it was not.

23  Q   How would you get to the final number in your

24  opinion?

25  A   To get to the final number, you'd have to multiply

1  the value in the green box by the value in the purple

2  box by the value in the red box.

3  Q    Sounds like a math problem.  But, Dr. Cole, in

4  terms of the size of the number, does that

5  multiplication make the number bigger or smaller?

6  A    It makes it smaller.

7  Q    And to get to the end, approximately what range of

8  percentages did you ultimately conclude represented

9  the value of Columbia's combined model invention to

10 the accused products?

11 A    We have a slide at the end with the exact value,

12 but it's going to be between 4 to 6 percent.

13 Q    Thank you, Dr. Cole.

14      Let's start with step one.  The value of malware

15 detection functionality in Norton's products, do all

16 of the accused products detect malware?

17 A    Yes, they do.

18 Q    Is that their predominant function?

19 A    Yes, that's the reason why somebody would buy a

20 Norton product, is to protect your computer from

21 viruses and malware.

22 Q    In performing your valuation at this first step,

23 did you use any particular consumer product as your

24 baseline?

25 A    Yes, I used Norton AntiVirus as the baseline

ERIC COLE – DIRECT                1487

1    product.

2    Q    Why?

3    A    Because during the time of the hypothetical

4    negotiations, 2011 and 2013, Norton AntiVirus was the

5    base product available during that time period.

6    Q    Now, looking here at your Slide 48, what factors

7    did you consider to apportion the value of Norton

8    AntiVirus as a whole to malware detection

9    functionality?

10   A    So I start off with 100 percent, and then I look

11   at what other features are in the product that don't

12   do malware detection.  And in this case, there were

13   two categories; supplemental features, like password

14   manager or browser protection, and other minor

15   features like customer support and power saver

16   settings.

17   Q    And is Columbia University seeking a royalty for

18   features that don't do malware detection?

19   A    No, it is not.

20   Q    To start this discussion, I want to show you an

21   excerpt from PX196, Dr. Cole, what is PX196 and what

22   was the date of the document?

23   A    This is what we call a product spec or

24   specification sheet that's available on their website

25   telling people about their product, and it's from

ERIC COLE – DIRECT                 1488

1    January 2013.

2    Q    What did this document tell you about the basic

3    functionality of the Norton Antivirus product?

4    A    If we look at the main sentence, it says, "Basic

5    antivirus protection that stops viruses and spyware,

6    so you can safely go online and share."  In its

7    high-level description, it's talking about antivirus

8    protection.  It's not talking about any of the other

9    supplemental features.

10   Q    Now, sticking with this topic, I also want to show

11   you PX323 at page 7.  What is this exhibit and what

12   was its date?

13   A    So this is an internal presentation from Norton

14   showing customer survey data, and it's from June 2009.

15   Q    Was the Norton 360 product sold at the time of the

16   hypothetical negotiations?

17   A    Yes, it was.

18   Q    Now, Dr. Cole, can you explain what's shown in the

19   bar chart on this slide?

20   A    Yes.  So on the bar chart, it's a little hard to

21   see, but at the bottom are various components of the

22   product, and they take customer surveys asking them

23   what is most important to them.  And first and

24   foremost, what's important to consumers is to protect

25   their computer from viruses, firewalls, hackers,

1    spyware.  Other features, like the password managers

2    and the supplemental features I mentioned are less

3    critical to consumers.

4    Q    And, Dr. Cole, let me show you some more

5    deposition testimony from Mr. Wall.  Was Mr. Wall

6    designated to speak for Norton on the very issue we're

7    discussing?

8    A    Yes, he was.

9    Q    Did Mr. Wall's testimony support your opinion that

10   malware detection is the predominant functionality of

11   Norton's products?

12   A    Yes, it was.  If you'll look at his answer, the

13   major reason why they purchased Norton Security was

14   protection from malicious threats.

15   Q    Who is "they"?

16   A    They are Norton's customers.  So the reason why

17   consumers or customers purchase Norton product was so

18   the consumer could have their computer protected from

19   malicious threats.

20   Q    Going back to Norton AntiVirus, what percentage of

21   the total product value did you assign to malware

22   detection functionality?

23   A    So starting with the hundred percent, I determined

24   the supplemental features provided 5 percent; the

25   other minor features, 5 percent.  That's a total of

ERIC COLE - DIRECT                    1490

1   10 percent.  So when you minus that from 100,

2   90 percent is allocated to malware detection.

3   Q    Why did you pick 5 percent as a representative

4   figure for supplemental features and other minor

5   features?

6   A    I want to emphasize this is a qualitative

7   estimate.  One could state that because the primary

8   reason why somebody is buying Norton AntiVirus is for

9   malware detection, that the supplemental features and

10  minor features would get zero, and you would provide

11  100 percent to malware detection.

12       I wanted to go in and fairly account for those

13  features.  So I determined it would be between zero to

14  5 percent.  And to recognize those features, assigned

15  5 percent for the supplemental and 5 percent for the

16  other minor features.

17  Q    Do all of the other consumer products have

18  identical features compared to Norton AntiVirus?

19  A    No, they do not.

20  Q    How did you go about using Norton AntiVirus as

21  your baseline for the other products?

22  A    So I used Norton AntiVirus as what we call a

23  yardstick or a measuring stick.  So I would take

24  Norton AntiVirus, and I would compare it to the other

25  products, and I would say, "Does this product that I'm

1   comparing to Norton AntiVirus have more features or

2   less features?" and based on that answer, would adjust

3   the percent.

4   Q   Now, again, was that a mathematically-precise

5   calculation or judgment?

6   A   It was not a mathematical calculation.  It was a

7   qualitative estimate.

8   Q   Let me show you the next slide.

9       Now, I understand that your base line was Norton

10  AntiVirus, but what did the other two tables for

11  Norton Internet Security and Norton 360 represent?

12  A   These are the three products that were being sold

13  by Norton during the time of the hypothetical

14  negotiation.

15  Q   What does it mean "Users:  1" under Norton

16  AntiVirus and "Users:  3" under the other two

17  products?

18  A   That's what we call entitlement or the number of

19  licenses that you're purchasing with that product.  So

20  when you purchase Norton AntiVirus, you're able to

21  install it on one computer.  When you purchase Norton

22  Internet Security, you're able to install it on three

23  computers.

24  Q   So could we think about Norton Internet Security

25  as three sales of the accused software?

1   A    Yes, you could.   That's a great way to think about

2   it.

3   Q    Is that significant from a commercial perspective?

4   A    Yes, it is.

5   Q    Why?

6   A    Because if I have three computers at home, and I

7   want to protect it with Norton AntiVirus, I would have

8   to purchase three copies of that software.   But if I

9   purchase one copy of Norton Internet Security, it

10  allows me to install it on all three computers.

11  Q    Among all the consumer products, is the greatest

12  number of user licenses three?

13  A    No, it is not.   Some of them have five user

14  licenses, and some of the products have 10 user

15  licenses.

16  Q    Now, how did you go about valuing the additional

17  add-on features like spam blocking or parental

18  controls in Norton Internet Security?

19  A    So I started off with Norton AntiVirus as my

20  baseline, my yardstick.   I then compared it to Norton

21  Internet Security.   When I compared it to Norton

22  Internet Security, I realized it had similar features,

23  but Norton Internet Security also had a firewall and

24  other features like spam blocking.

25       So I took the 90 percent from my baseline ruler, I

1  deducted 5 percent for the firewall, 5 percent for the

2  other minor features to arrive at 80 percent for

3  malware detection for Norton Internet Security.

4  Q   In your opinion, Dr. Cole, is assigning 20 percent

5  of the value of Norton Internet Security to

6  supplemental features conservative?

7  A   Yes, it is.

8  Q   Why?

9  A   Because as we have seen so far, the reason why

10  people purchase Norton's products is for malware

11  detection.  That's the primary reason, not the

12  supplemental features.  So one could provide

13  100 percent of the value to malware detection, but I

14  wanted to make sure that in doing my qualitative

15  estimate, I accounted for those other features and

16  provided a percent value to them.

17  Q   And is Columbia seeking a reasonable royalty for

18  those other features that you conservatively excluded?

19  A   No, they are not.

20  Q   Let's return to the deposition testimony of Dermot

21  Wall.  And Mr. Wall says, "The vast majority of the

22  public would think of Norton as a protection, a

23  consumer protection product.  In that if you ask a

24  customer which Norton product they have, they will

25  normally just say I have Norton and not know

1    previously whether they had Norton AntiVirus, Norton

2    Internet Security or Norton 360 or Norton Security

3    Standard, Deluxe, or Premium.  They say I have

4    Norton."

5         Does Mr. Wall's testimony support your view that

6    add-on features could fairly be assigned no value?

7    A    Yes, they could, because what Mr. Wall is saying

8    is customers really don't pay attention to those

9    add-on features.  When you ask a customer, they don't

10   say, Oh, I have this add-on feature or that.  They

11   say, I have Norton to protect my computer from

12   malware.

13        So what's really important to the consumer is the

14   protection from malware, not the supplemental

15   features.

16   Q    Now, the product feature comparison that we looked

17   at for Norton Internet Security and Norton 360, did

18   you do that for all of the Norton consumer products

19   accused of infringement in this case?

20   A    Yes, I did.  I did it for all 14 products.

21   Q    Now, I'm worried we would hear boos from the jury.

22   We're not going to go through each and every one of

23   those, but did you prepare a slide to summarize your

24   conclusions for each of the consumer products?

25   A    Yes, I did.

ERIC COLE - DIRECT                    1495

1   Q   Let me show that to you.  Does this table provide

2   your conclusions on the value of each consumer product

3   that should be attributed to malware detection

4   functionality?

5   A   Yes, I did.  Just to help the jury, software

6   companies like Norton over the years change their

7   product line.  So if you look at the left, 2010 to

8   2014, you have three products.  Then in 2015, there

9   were two.  2016 to 2019, there were five.  So this is

10  just showing the evolution of their products and the

11  value that I assigned to malware detection using the

12  product differential method that I mentioned.

13  Q   Now, Dr. Cole, I want to use as an example 2019

14  Norton 360 with LifeLock.  And your conclusion was

15  that 60 percent of that product's value should be

16  attributed to malware detection.  Do I understand that

17  correctly?

18  A   That is correct.

19  Q   Now, is Columbia asking for a reasonable royalty

20  on the other 40 percent?

21  A   No, they are not.

22  Q   Dr. Cole, I have just two questions for you.  I

23  thought you said that Norton AntiVirus, 90 percent,

24  was your baseline.  Why do you have Norton AntiVirus

25  Basic between 2016 and 2019 at 95 percent?

ERIC COLE - DIRECT                    1496

1    A    In 2010, it was the baseline.  That was the base

2    product that was available.  I used it as a yardstick,

3    and when I used it as that yardstick, I would compare

4    it to a product and say, Does the product I'm

5    comparing it to have more features or less features?

6    In the case of Norton AntiVirus Basic, when I compared

7    my yardstick Norton AntiVirus, I determined that

8    Norton AntiVirus Basic had less features, and

9    therefore I assigned five additional percent to

10   malware detection.

11   Q    Now, you said a few times that assigning

12   apportionment percentages was not a mathematically

13   precise exercise.  Was there anything that you did to

14   check your estimations with a more numeric exercise?

15   A    Yes, there was.

16   Q    What was that?

17   A    There's something called price differential

18   analysis that you could go in and use as a spot check

19   or validation of the analysis you do in product

20   feature analysis.

21   Q    And, Dr. Cole, did you do that sort of price

22   differential analysis for each of the accused consumer

23   products?

24   A    Yes, I did.

25   Q    And did you prepare a slide to summarize the price

ERIC COLE - DIRECT                    1497

1    differential analysis methodology?

2    A    Yes, I did.

3    Q    Let me show that to you.  Now, what was the first

4    step in your price differential analysis?

5    A    The first step was to take my baseline ruler,

6    Norton AntiVirus, and determine the apportioned price

7    or the price that would be allocated to malware

8    detection.

9    Q    And what was the second step, 2a, in your

10   comparison of that baseline to a different product?

11   A    So here I'm comparing it to NIS, which is Norton

12   Internet Security, and in 2a, I'm just looking for the

13   difference in price between Norton Internet Security

14   and Norton AntiVirus.

15   Q    And what was the third step in 2b?

16   A    In 2b, what I had to account for is in the

17   cybersecurity software industry, when you're adding

18   supplemental features to a base product, you perform a

19   markup of that product because you know that people

20   are going to buy the premium product.  So in my

21   experience, we use a 2.5 markup for those additional

22   features.

23   Q    And is that consistent with how you would approach

24   supplemental features, or how did you approach

25   supplemental features during your time at McAfee?

ERIC COLE - DIRECT                    1498

1  A    Yes, it is.

2  Q    Now, what was the next step in your price

3  differential analysis, 2c?

4  A    It was to calculate the Norton Internet Security

5  apportioned price.  Essentially, determine what the

6  price would be without the markup.

7  Q    And then what was the last calculation that you

8  did dividing 44.99 by 61.99?

9  A    This was to determine the percent that would be

10  allocated to malware detection in Norton Internet

11  Security.

12  Q    What does the 72.6 percent figure represent?

13  A    That would represent for Norton Internet Security

14  the percent that malware detection contributes to the

15  overall product.

16  Q    Did you do this type of calculation for each of

17  the accused consumer products?

18  A    Yes, I did.

19  Q    Did you prepare a table to summarize the results?

20  A    Yes, I did.

21  Q    Let me show that to you.  Did the price

22  differential analysis that you did give you comfort

23  that the qualitative estimations you provided based on

24  product feature comparisons were reasonable?

25  A    Yes, it did.  Just to help Your Honor and the

1   jury, on this chart, Method 1 is referring to the

2   product feature analysis that we showed first, and

3   Method 2 is the price differential analysis that we've

4   just shown.

5   Q   Now, the Method 2 number seems to be lower than

6   the Method 1 number in a number of cases.  Why is

7   that?

8   A   That is to be expected.  One of the areas with

9   price differential analysis you have to be aware of is

10   it doesn't take into account multiuser licenses.  So

11   whether a product has one, three or 10, price

12   differential analysis is not going to take that into

13   account, while the product feature will.  So it is

14   naturally expected that your price differential

15   analysis numbers are going to be a little lower

16   because of that.

17   Q   Now, Dr. Cole, I want to sort of understand the

18   end result of all of these numbers, but before I do

19   that, I want to show you some testimony from Carey

20   Nachenberg.  Remind us, who is Mr. Nachenberg?

21   A   He was a Symantec fellow, which is the highest

22   technical position within Norton.

23   Q   What did Mr. Nachenberg testify to regarding the

24   value of malware detection to Norton's consumer

25   products?

ERIC COLE - DIRECT                    1500

1    A    He testified that 70 percent of the product would

2    be assigned to malware detection.

3    Q    And is that the percentage that Norton's own

4    expert has used in this case?

5    A    Yes, it is.

6    Q    Now, I want to show you a summary chart here on

7    Slide 59.  Dr. Cole, what does the red line on the

8    chart represent?

9    A    The red line on the chart represents the

10   70 percent of Norton's expert Mr. Nachenberg.

11   Q    What does the dark blue line represent?

12   A    That represents the average of my numbers that

13   were applied in this case which would be 74 percent.

14   Q    Does your effective average differ significantly

15   from Mr. Nachenberg's 70 percent?

16   A    No, it does not.  It's within 4 percent.

17   Q    Now, we've been talking about consumer products,

18   but did you also estimate a percentage for the value

19   of malware detection functionality in Norton's

20   enterprise product for large companies?

21   A    Yes, I did.

22   Q    Is the predominant function of that product, SEP,

23   the same as the predominant function of the Norton

24   consumer products?

25   A    Yes, it is with that primary function being

ERIC COLE - DIRECT                1501

1    malware detection.

2    Q    Let me show you some testimony from Archana Rajan.

3    Who is Ms. Rajan?

4    A    She worked on the Enterprise product.  She was a

5    director, but also she was a corporate representative

6    to talk on this topic.

7    Q    Well, did Ms. Rajan's testimony confirm your view

8    that malware detection is the primary function of SEP?

9    A    Yes, she does.  She emphasizes that we, meaning

10   Norton, are in the security business, that the primary

11   responsibility is to ensure our customers are

12   protected.

13   Q    Let me show you Slide 61, Dr. Cole.  What does the

14   table in the center, Symantec Endpoint Protection,

15   malware protection 75 percent, what does that

16   represent?

17   A    That represents the percent that malware detection

18   contributes to the Enterprise product.

19   Q    How did you go about determining that percentage?

20   A    First, I went in and did a product feature

21   analysis just like I did with the consumer products to

22   arrive at the 75 percent.  As you've seen before, I

23   also like to do validation.

24        So then I used a consumer product as a baseline

25   where you have 90 percent on one end and 60 percent on

1   the other and felt that the Enterprise version had

2   more features than Antivirus Basic, but it didn't have

3   all the features of consumer protection and LifeLock

4   that the 60 percent did, and therefore determined that

5   putting it in the middle, 15 percent lower, 15 percent

6   higher, than the two endpoints was appropriate to

7   validate the 75 percent.

8   Q    Now, again, Dr. Cole, to be honest, is this math

9   or is this a qualitative estimate?

10  A    This is a qualitative estimate.  This is not math.

11  Q    Now, when we started the discussion of your

12  apportionment percentages, I asked you about the work

13  that you did for this case in 2014.  Do you remember

14  that?

15  A    Yes, I do.

16  Q    In 2014, were you also asked to provide an opinion

17  about the value of malware detection to Norton's

18  products?

19  A    Yes, I was.

20  Q    Was that analysis focused on any particular

21  testimony?

22  A    Yes, it was.  It was focused on the testimony of

23  Carey Nachenberg's 70 percent.

24  Q    Were you given any guidance in 2014 with respect

25  to that testimony?

1  A    Yes.  The guidance or assignment was to treat the

2  Carey Nachenberg number as the upper limit and then

3  perform my analysis down from that upper limit.

4  Q    In 2014, when you took a fresh look at this

5  assignment, did you come up with your own valuations

6  absent that constraint?

7  A    Yes, I did.

8  Q    With regard to the consumer products, how do your

9  numbers today differ from your 2014 numbers?

10 A    So the numbers today are 60 to 95 percent.  And in

11 2014 with that constraint, it was 53 to 70 percent.

12 Q    And do the percentages that you provided today

13 represent, in your professional judgment, accurate

14 estimations of the value that malware detection

15 functionality contributes to the accused products?

16 A    Yes, it does.

17 Q    Now, Dr. Cole, I want to move on to your second

18 apportionment step, but just to reorient ourselves,

19 remind us.  What is the second apportionment step that

20 you took?

21 A    The second apportionment step is to look at SONAR

22 and determine the value that it provides to malware

23 detection.

24 Q    Remind us, how many malware detection features did

25 Norton's products have at the time of the hypothetical

ERIC COLE - DIRECT                    1504

1   negotiation?

2   A    There were four different types of detection.

3   Q    Let me show you Slide 63.  Dr. Cole, what was your

4   starting point for estimating the value of SONAR, the

5   feature accused of infringement, among the four

6   malware detection features?

7   A    So as a starting point, there were four features.

8   So I penciled in 25 percent for each of those features

9   as a base starting point.

10  Q    And did you believe ultimately that it was

11  appropriate to weight value in favor of or against

12  SONAR?

13  A    Based on looking at everything in this case, I

14  felt it appropriate to weight value in favor of SONAR.

15  Q    On that topic, I want to show you Exhibit PX132 at

16  page seven.  What is PX132 and what does it state?

17  A    This is a paper that Norton puts together on their

18  product feature that they give to potential customers

19  and customers, and the date is 2012.

20  Q    Norton said that SONAR is more than an incremental

21  advance.  It is a qualitatively different way of

22  classifying and blocking or isolating malicious code.

23  Did the concept expressed here inform your valuation

24  of the SONAR feature?

25  A    Yes.  Norton is clearly calling out SONAR as a

 1   differentiator, that it was a huge improvement in

 2   their products, and also looking at a lot of the other

 3   documents we've already discussed, shows that SONAR is

 4   able to catch those advanced threats that other layers

 5   cannot.

 6   Q   On this topic, I next want to show you Exhibit

 7   PX506 at 26.  First, what is this exhibit and what

 8   does it state?

 9   A   This is another internal presentation from the

10   STAR team, which is Symantec technology in response,

11   the team responsible for all the detection methods in

12   the antivirus product, and it's from April 2012.

13   Q   And did the last line of defense concept that we

14   touched upon earlier inform your opinion that value

15   should be weighted in favor of SONAR among the malware

16   detection features?

17   A   Yes, it did, because there's two key components of

18   this slide.  First is download Insight, IPS, that's

19   Intrusion Presentation System, and AV, which is

20   Antivirus Signatures, took a shot and missed.

21       So it's saying that all of the three previous

22   layers missed this malware and SONAR was able to catch

23   it.

24       And the second important part is without SONAR,

25   they would have had a guaranteed infection.  So SONAR

1  was the difference between blocking and protecting a

2  customer and having an infection.

3  Q    Now, Dr. Cole, did you prepare a slide to

4  summarize the value percentages that you assigned to

5  each of the malware detection features?

6  A    Yes, I did.

7  Q    Let me show that to you.  Why did your valuation

8  weight against network, including IPS firewall?

9  A    So based on the evidence that we looked at, it was

10 determined that SONAR was a critical part and

11 30 percent.  That meant that I needed to take

12 5 percent from one of the other layers.  Looking at

13 the other three layers, antivirus has a lot of

14 advances and new engines that they're putting in.

15 Reputation and Insight was a key part of the product,

16 and Firewall to Network was more commoditized and

17 therefore determined it was appropriate to lower that

18 to 20 percent.

19 Q    Now, I understand that you adjusted your valuation

20 percentages post 2016.  Is that right?

21 A    That is correct.

22 Q    Let me show you this next slide.  Does this slide

23 summarize the changes to your valuation percentages

24 for the period after 2016?

25 A    Yes.  There were two main changes.  One is there

ERIC COLE - DIRECT                1507

1    was a back-end feature in SONAR that was removed.  And

2    there were two new features; sandboxing and memory

3    Exploit Prevention that were added that was assigned

4    10 percent.  So the other numbers had to be adjusted

5    to account for that.

6    Q    And what was the ultimate percentage that you

7    assigned to SONAR for the post 2016  period?

8    A    23 percent.

9    Q    And in your opinion, is that percentage

10   conservative?

11   A    Yes, it is.

12   Q    Let me direct your attention back to an exhibit we

13   looked at earlier, PX511 at 2, a March 2014 email from

14   Adam Bromwich.  With reference to the 90 percent

15   figure, does Mr. Bromwich's email confirm your view

16   that the 23 percent assigned to SONAR is conservative?

17   A    Yes, it does, because if you're focused on the

18   advanced newly-crafted threats that Mr. Bromwich is

19   calling out, then one could justify that Insight would

20   get 45 percent, SONAR would get 45 percent, and AV and

21   Firewall would each get 5 percent.

22   Q    Now, Dr. Cole, just to put this into context, for

23   the 19 percent that's assigned to Network and the

24   19 percent that's assigned to Antivirus and the 29

25   percent that's assigned to Reputation Insight, is

ERIC COLE - DIRECT                 1508

1   Columbia seeking a reasonable royalty on those

2   features?

3   A    No, they are not.

4   Q    I want to move to your final apportionment step,

5   Dr. Cole.  And to reorient ourselves, I want to go

6   back to our roadmap.  Remind us, what is the last

7   apportionment step that you had to take under patent

8   damages law?

9   A    The last step was to look at the patented

10  technology and determine the value that it contributed

11  to SONAR.

12  Q    We should probably pause here to talk about

13  vocabulary for a moment.  The jury's heard a lot about

14  SONAR and SONAR/BASH.  Are there subcomponents to

15  SONAR?

16  A    Yes.  SONAR has two main components; BASH and BPE.

17               THE COURT:  Can you make sure you're saying

18  B, as in bug; P as in peanut; and E as in enterprise?

19               THE WITNESS:  That is correct.

20  BY MR. GUZIOR:

21  Q    Now, Dr. Cole, which of the subcomponents in SONAR

22  is accused of infringing Columbia's patent claims?

23  A    That is only BASH.

24  Q    Why did you depict BASH as a brain?

25  A    Essentially, because it is the brain.  If you look

ERIC COLE - DIRECT                    1509

1  at how SONAR works, BASH, which stands for behavioral

2  analysis and system heuristics, that's where the

3  machine-learning and combined models takes place.

4  That's what does the heavy lifting of catching the

5  unknown threats and catching the real zero-day

6  threats.  So because it's doing the work of catching

7  those unknown threats is why I depicted it as a brain.

8  Q    Between BASH and BPE, which subcomponent is more

9  valuable in your opinion?

10 A    It would be BASH because BASH is detecting the

11 unknown threats.  BPE, they are behavioral policy

12 enforcement.  These are just policies that catch known

13 threats.  The BPEs are not doing the heavy lifting of

14 catching the unknown threats.  That is all done by

15 BASH.

16 Q    I want to explore that concept a bit more and show

17 you an excerpt from PX350, a document that we looked

18 at earlier, at page 8.  This is from February of 2009.

19 This excerpt says, "BPE, behavioral policy

20 enforcement, policies to block well known and well

21 understood malicious behaviors."  Can you explain what

22 that means?

23 A    Yes.  There are cases where there are some known

24 activity that is bad.  For example, if any of you use

25 Adobe PDF, the ability for it to write or execute code

1   on your computer is very, very dangerous.  That's

2   well-known bad behavior.  So that's an example where

3   Norton went in and wrote a BPE to cover that.  But

4   these BPEs are simple rules that are catching the

5   well-known threats not catching the unknown threats

6   like BASH.

7   Q    And is BPE similar to that behavior rule ABC but

8   then you had ABQ that you showed in a graphic earlier?

9   A    Yes, that's a great comparison of how BPEs work.

10  Q    Let me show you your next slide, Dr. Cole.  Is

11  this a chart that you prepared?

12  A    Yes, it is.

13  Q    What does it show?

14  A    It shows that 85 percent of SONAR was BASH and

15  15 percent of the allocation of SONAR was BPE.

16  Q    Again, is this a mathematically-precise

17  calculation?

18  A    No, it is not.

19  Q    What is it?

20  A    It's a qualitative estimate looking at all of the

21  documents, the expert testimony, understanding the

22  role that BASH plays versus the role that BPE plays.

23  The qualitative estimate is BASH is significantly more

24  important to SONAR and provided 85 percent.

25  Q    Was this the last step in your analysis?

1   A    No, it was not.  One more to go.

2   Q    Let's talk about that now, Dr. Cole.  What is

3   shown on the left-hand side of this slide?

4   A    On the left-hand side is one of the patents with

5   one of the claims, but if you look at what's in bold

6   wherein the model is a combined model created from at

7   least two models created using different computers,

8   that's the core invention that's part of all four of

9   the claims that are asserted in this case.

10  Q    Were there any particular factors that informed

11  your opinion about the value that Columbia's combined

12  model invention contributed to SONAR/BASH?

13  A    Yes, there were three specific ones.  First, the

14  combined models is key to the functioning of BASH, and

15  there is no other non-infringing alternatives.

16       Second is the combined models with BASH is a huge

17  improvement over TruScan and how it worked.

18       And the third is the combined models in BASH with

19  something that Norton used in its sales and marketing

20  material.

21  Q    Let's briefly touch on each of those.  So, first,

22  you mentioned non-infringing alternatives.  I want to

23  show you an animation on Slide 74.  Do you recognize

24  this or something like this from Dr. Bailey's

25  infringement presentation?

ERIC COLE - DIRECT                 1512

1   A    Yes, I do.

2   Q    What do the green and red cubes represent?

3   A    Those represent models that are created on

4   individual computers where green is a model of a good

5   program and red is a model of a malicious program.

6   Q    Now, moving forward in the animation, what is this

7   showing?

8   A    This is showing that those individual models from

9   each of the computers is sent to the Norton computers

10  in what we call GIN, the Global Intelligence Network.

11  GIN creates the combined models and then pushes them

12  back out to the individual computers.

13  Q    Now, you said a moment ago that one of the factors

14  you took into consideration in your valuation was

15  there are no non-infringing alternatives.  What is a

16  non-infringing alternative?

17  A    A non-infringing alternative is an alternate way

18  of accomplishing similar functionality without

19  infringing the patents.

20  Q    Did Norton or its experts identify a

21  non-infringing alternative version of BASH?

22  A    No, they did not.

23  Q    Did Dr. Bailey identify one?

24  A    No, he did not.

25  Q    What is the practical significance of that?

ERIC COLE - DIRECT                    1513

1    A    The practical significant is if you want to have

2    the value and benefit of the combined models, you have

3    to use Columbia's patents.

4    Q    Now, I think the second factor you mentioned,

5    Dr. Cole, was that the combined model invention

6    improved TruScan into something like SONAR/BASH; is

7    that right?

8    A    I would be careful because it didn't improve

9    TruScan.  It was an improvement over TruScan.  The

10   infringing version of SONAR/BASH was a completely

11   different technology than TruScan.  So TruScan was

12   their first attempt at trying to solve this problem.

13   It didn't work.  And SONAR/BASH, using the combined

14   models, was a huge improvement that did work.

15   Q    Thank you for correcting me on that, Dr. Cole.

16        On that topic, I want to show you an excerpt from

17   Exhibit PX482 at 64 from April of 2012.  First, what

18   is this document?

19   A    This is a planning document for STAR which is the

20   Symantec technology in response, the group responsible

21   for all the detection methods.  And as you stated,

22   it's from April of 2012.

23   Q    Remind us, at the time of the hypothetical

24   negotiations, was TruScan an effective product

25   feature?

ERIC COLE - DIRECT                    1514

1    A    No, it was not.

2    Q    With reference to Symantec's internal document

3    PX482, can you explain the difference between TruScan

4    and SONAR/BASH that is noted?

5    A    Yes.  It's important to note for the jury, this is

6    one of many differences, but the difference here is

7    TruScan was based on a hand-weighted scoring engine,

8    and because it was hand-weighted, there's a manual

9    component, it wasn't able to have a high number of

10   attributes and wasn't effective at catching the

11   advanced malware.

12        SONAR 4.0, which was one of the infringing

13   versions of SONAR, it had machine-learning with

14   combined models and was able to track significant

15   amounts of attributes and was highly effective at

16   catching zero-day attacks.

17   Q    Now, Dr. Cole, the third factor you mentioned --

18             THE COURT:  Now, I'm going to interrupt you,

19   Mr. Guzior.  We're coming close to where things should

20   end.  How much more do you have?

21             MR. GUZIOR:  I probably have five to 10

22   minutes, but if you want to take a lunch break, I'm

23   happy to continue after.

24             THE COURT:  Can you guys do five to 10

25   minutes?

```
 1              THE JURY:  (Nodding heads.)

 2              MR. GUZIOR:  I saw some head shakes no.

 3              THE COURT:  All right.  Okay.  Just a little

 4   more to go.

 5              No offense, Dr. Cole.

 6              THE WITNESS:  Okay.

 7   BY MR. GUZIOR:

 8   Q   Now, the third factor you mentioned, Dr. Cole, is

 9   that the combined models invention gave Norton certain

10   abilities to promote their product in sales and

11   marketing materials.  Did I get that one right?

12   A   Yes, you did.

13   Q   What does that have to do with Columbia's combined

14   model invention?

15   A   As a software inventor, if you have a feature

16   that's very important that you want to use to

17   differentiate, you'll want to tell your customers or

18   future customers about it and put it in sales and

19   marketing.  And that's what happened in this case

20   where Norton was telling potential and future

21   customers about the value of the combined models

22   within SONAR/BASH.

23   Q   And I want to show you on this issue an excerpt

24   from Exhibit PX192.  And, first, Dr. Cole, what is

25   PX192 and what is its date?
```

1   A    This is a page from Norton's website that's

2   publicly available for customers, potential customers

3   to look at.  And it's from early 2012.

4   Q    What does this have to do with Columbia's combined

5   model invention?

6   A    This is Columbia's combined model invention.  So

7   you have Norton Community Watch Program.  Those are

8   the individual computers that are running SONAR/BASH

9   that are creating the individual models that we saw on

10  a previous slide.

11       Then when it talks about largest database of

12  behavioral profiles on nearly 200 million

13  applications, that's taking those individual models,

14  bringing them into the global intelligence network and

15  creating the combined models.

16  Q    Now, on this same topic, Dr. Cole, I want to move

17  forward and show you Exhibit PX132 at page 8.  What is

18  this document and what was its date?

19  A    This is another public document that Norton puts

20  out on its application behavior malware protection

21  ,and this is from 2012.

22  Q    What does the first bullet on this slide mean?

23  A    "More than 50 million active participants."  These

24  are the individual computers that are running Norton's

25  products with the infringing version of SONAR/BASH

1   that are creating the models that are being sent up to

2   the global intelligence network.

3   Q   Now, I want to turn back to your valuation

4   percentages, Dr. Cole.  Did you take each of the three

5   factors we just discussed into account when you

6   estimated the value that Columbia's combined model

7   invention contributed to SONAR/BASH?

8   A   Yes, I did.

9   Q   Let me show you your next slide.  Is this a chart

10  that you prepared?

11  A   Yes, it is.

12  Q   Can you explain the percentages to the jury?

13  A   So if you remember earlier, I assigned 85 percent

14  to BASH and 15 percent to BPEs.  Of that 85 percent,

15  50 percent was assigned to non-infringing features

16  such as API hooking and machine-learning, and

17  35 percent was assigned to Columbia's patents.

18  Q   Now, once again, Dr. Cole, was this a

19  mathematically-precise calculation or an estimation

20  that you had to make based on qualitative

21  considerations?

22  A   It was a qualitative estimate.  This was not a

23  mathematical calculation.

24  Q   Okay.  Now, not to stand between people and lunch,

25  Dr. Cole, I'm going to move forward a couple slides.

ERIC COLE - DIRECT                 1518

1    Did we just cover your last apportionment step?

2    A    Yes, we did.

3    Q    And once again, Dr. Cole, was 35 percent a number

4    that you chose to represent the value of Columbia's

5    inventions as part of Norton's overall products,

6    35 percent?

7    A    No, it was not.

8    Q    And, again, did you prepare a table to summarize

9    that percentage that you ultimately calculated?

10   A    Yes, I did.

11   Q    Let me show that to you.  Dr. Cole, can you

12   explain to the jury the summary that's shown on this

13   slide?

14   A    Yes.  So, essentially, you have to multiply those

15   three numbers.  You take the malware percent, multiply

16   it by the SONAR percent, multiply it by the Columbia

17   percent, and for consumer products, you add 5 to

18   8 percent of the contribution of Columbia's patents to

19   Norton's products.  And for Endpoint Protection, it's

20   6.3 percent.

21   Q    Now, Dr. Cole, using Endpoint Protection as an

22   example, is Columbia asking the jury to award it a

23   royalty based on the other 93.7 percent of the

24   product?

25   A    No, it is not.

1  Q    So Columbia is asking for a reasonable royalty

2  just on this 6.3 percent slice; is that right?

3  A    That is correct.

4  Q    Now, at the beginning of the case, the jury heard

5  about the reasonable royalty, the amount of money

6  Columbia was requesting as a royalty for the alleged

7  infringement.  Are the 5 to 8 percent numbers that the

8  jury sees here the reasonable royalty?

9  A    No, it is not.

10 Q    Why not?

11 A    I perform the apportionment, but then these

12 numbers get passed to my colleague, Dr. Sullivan,

13 who's an economist, and he performs calculations to

14 arrive at the reasonable royalty.

15 Q    And does that make these numbers bigger or

16 smaller?

17 A    It makes these numbers smaller.

18 Q    Thanks.

19      Dr. Cole, focusing on all of the evidence that we

20 talked through and marched through today around the

21 time of the hypothetical negotiation, do you believe

22 that these are conservative numbers?

23 A    Yes, I do.

24 Q    Why?

25 A    Because if you looked at all the evidence, the

1   infringing version of SONAR/BASH was a game changer

2   for Norton.   Prior to 2009, customers were losing

3   confidence.   They were losing market shares to

4   competitors like McAfee.   Their efficacy numbers were

5   low.

6      They then release the version with the -- they

7   then released their product with the version of

8   SONAR/BASH that infringes and everything changed.

9   They started leading the pack.   They started

10  differentiating from their customers, and their

11  efficacy numbers were near 100 percent.

12          MR. GUZIOR:   Thank you, Dr. Cole.   I have no

13  further questions, Your Honor.

14          THE COURT:   All right.   So we will take our

15  lunch break now.   We'll come back at 2:20.   We will

16  have an hour break.   And I hope you all enjoy your

17  lunch.   And we'll see you, I suppose, with

18  cross-examination, if there is any, of Dr. Cole.

19          All right.   Thank you.

20          (The jury exited the courtroom.)

21          THE COURT:   All right.   Is there anything

22  else we need to cover before lunch?

23          MR. MORIN:   Yes, Your Honor, if I may

24  approach.

25          THE COURT:   Okay.

1    MR. MORIN:  I echo Mr. Guzior's sentiments

2    about not delaying your lunch, but if we could get

3    Slide 41 on the screen, please, from our friends.

4        Your Honor, as you're well aware, you made a

5    ruling on motion in limine, No. 1, that prohibited us

6    from using block count data from 2015 to '19 to show

7    that in fact the attributes of the patented technology

8    were not as valuable, and we had not yet made the

9    product perform well at that time.

10       Your Honor kept it out.  That is docket

11   No. 903.  Your Honor kept it out, finding that it was

12   not admissible under the book of wisdom.  So I was

13   therefore surprised to see that our friends put up

14   Slide 41, not only put it up, but expanded the portion

15   that talked about June 2015 to June 2016 and

16   100 percent protection and 100 percent protection in

17   the reference set in 99.6 percent, suggesting to the

18   jury certainly that the patented technology

19   contributed to that high performance.

20       At this point in time, we think they've

21   clearly opened the door to cross-examination of the

22   block count data from the 2014 to '19 timeframe to

23   challenge the suggestion that this high performance

24   that they've not only put on the exhibit but expanded

25   and blown up for the jury had anything to do with the

1    patented technology.

2          So we think that door has been opened.   I

3    wouldn't have bothered the Court before lunch, but I

4    know you want me to not wait until after lunch.   And,

5    of course, I was going to approach you with permission

6    before just launching into the cross-examination.

7          THE COURT:  No.   This is the appropriate

8    time.

9          MR. GUZIOR:  Your Honor, may I respond?

10          THE COURT:  Of course.

11          MR. GUZIOR:  There's a mixing of apples and

12    oranges.   What the Court excluded was Dr. Jaeger using

13    the shifting of the data that showed a shifting of

14    credits for blocks from BASH to BPE.

15          Dr. Cole didn't say one word about that.   We

16    were very conscious of Your Honor's ruling on the

17    motion in limine, and the broad count split between

18    BASH and BPE did not come up at all.

19          Similarly, Your Honor, we did not touch block

20    count data as between the four malware detection

21    features that postdated the hypothetical negotiation.

22    We used the 2012, 2013, early 2014 data only just to

23    show to the jury that BASH was detecting 1 percent,

24    but to make the point that 1 percent means it's the

25    most valuable product feature.

ERIC COLE - DIRECT          1523

1    What we're showing here from PX607 is all

2    broad principle.  I could have used a 2012 document

3    for this.  I could have used Archana Rajan's testimony

4    for this.  There's nothing special about 2016.  And I

5    would be happy to, if this was an issue, to have it

6    struck from the record, and we could replace it with

7    2012 information that would show the exact same thing.

8    This has nothing to do with the issue that Mr. Morin

9    now wants to get into, which is to open up the 2014 to

10   2019 BASH BPE split.

11        This slide simply has nothing to do with

12   that.  This is a broad principle that competitors were

13   fighting at the sub 1 percent level, and I could have

14   used 2012 or any other date for it.  This is pure

15   coincidence.

16        THE COURT:  All right.

17        MR. MORIN:  May I respond, Your Honor?

18        THE COURT:  Of course.

19        MR. MORIN:  Your Honor, the idea that he

20   could have used another document when it was obviously

21   a very well planned out direct examination, what Mr.

22   Guzior didn't do is, for example, only blow up the

23   value and say 100 percent is what mattered.  He showed

24   to the jury and had it in front of the jury blown up

25   the idea that 2015 to 2016 was 100 percent.

ERIC COLE - DIRECT                1524

1    We certainly should be able to challenge and

2  say that that high level of protection had very little

3  to do with the patented technology once he

4  affirmatively introduces that to the jury, Your Honor.

5  So we think he's opened the door.

6         THE COURT:  All right.  This time I'm going

7  to read through my motions ruling.  We'll come back at

8  quarter of, and I'll make a ruling whether there will

9  be cross-examination or not.

10        MR. GUZIOR:  Thank you, Your Honor.

11        MR. MORIN:  Thank you, Your Honor.

12        THE COURT:  Thank you very much.  We'll see

13 you at quarter of two.

14        MR. MORIN:  Quarter til, Your Honor?

15        THE COURT:  Quarter after.  I said 2:20.  So

16 I will see you at 2:05.  Those are just qualitative

17 estimates of time.  2:05.

18        MR. MORIN:  2:05.  Thank you, Your Honor.

19        (Recess taken at 1:30 p.m.)

20        (The trial resumes on the next page.)

21

22

23

24

25

1525

1    (The trial reconvened at 2:13 p.m.)

2    (The jury is not present.)

3    THE COURT:  All right.  I do have some

4 questions, and, Mr. Guzior, I want you to answer why you

5 think you haven't opened the door.

6    So if you look at slide 67, you're talking about

7 the post 2016 value of SONAR, and then in slide 27, you're

8 talking about the value of SONAR versus BPE.  And I did

9 rule that Dr. Jaeger was relying on unreliable figures,

10 which he was, and importantly, he was relying on 2015 and

11 2016 that were entirely interpolations.  He didn't try to

12 pretend that was any kind of actual calculation.

13    But I also ruled that Norton didn't provide any

14 evidence among the types of information they would have

15 anticipated looking for when negotiating, and I actually

16 said nothing in the record indicates the parties would

17 have anticipated this.  So I'm going to hear from you.

18 That's from Document 903 at pages 4 and 5.

19    MR. GUZIOR:  May I approach, Your Honor?

20    THE COURT:  Of course.

21    MR. GUZIOR:  When it comes to the accused

22 products that Norton sold, the federal circuit requires

23 that Columbia seek a royalty on no more than what the

24 patented technology contributes to any given accused

25 product.

1        What we have in this case is a little bit
2   unusual because of the duration of the litigation.  So the
3   problem -- and the reason Your Honor saw post 2016 numbers
4   that nobody has ever disputed is because new versions of
5   Norton's software were released from 2011 through the
6   present.  New products have even been released between
7   2019 and the present.  And we would get reversed at the
8   federal circuit if we didn't take into account the new
9   product features.
10       So, for example, on the slide 67 that Your Honor
11  referenced showing post 2016 value of SONAR, Dr. Cole
12  notes at the bottom of the slide that there were two new
13  features released, a sandboxing feature and a memory
14  exploit prevention feature, and those had not previously
15  been in the product.
16       Now, that's not a hypothetical negotiation
17  issue.  That's an issue of if we're going to seek damages
18  on that product, we're legally required to take into
19  account that the total sales price includes the value from
20  those new features.
21       That's different from talking about the value of
22  the infringing feature that has not changed.  And
23  Your Honor will hear testimony over the coming days, in
24  the cross-examination of Norton's witnesses, that the
25  source code for the infringing feature has not been

1   touched since 2013.  And that's really where we have a

2   problem with the book of wisdom and the issue that

3   Your Honor ruled upon in response to our motion in limine,

4   and that's that what Dr. Jaeger does is he doesn't look at

5   what the parties would have known about that technology at

6   the time of the hypothetical negotiation.  He looks at the

7   way that Norton chose to credit one component of SONAR

8   versus another.  It's just a choice about which feature

9   gets the count after the hypothetical negotiation, 2015 to

10  2019.

11          And as Your Honor pointed out, half of those

12  data points for individual years are not even data.  We

13  don't know what the number is, which is strange because as

14  we put in our briefs, Norton's 30(b)(6) witness, Jokul

15  Tian, testified that they produced block count data every

16  day, but Norton did not provide that block count data for

17  any of the years, and Dr. Jaeger is relying on a guess.

18          So when it comes to the block count data for

19  BASH versus BPE and this counting of function call in a

20  decision tree exercise that Dr. Jaeger did, that's

21  something entirely different from what Dr. Cole was

22  talking about, which is the fact that we accused different

23  products with new features of infringing and there were

24  products with new features released after the date of the

25  hypothetical negotiation that infringed the patents

1   because of the same SONAR/BASH technology.

2           And so I don't think, Your Honor, that we opened

3   the door by acknowledging that we can't claim a royalty on

4   memory exploit prevention or on the sandboxing feature

5   that was introduced in 2016.  That's something we have to

6   do.  We would be reversed on that if we didn't do it, but

7   that doesn't mean that we've opened the door to Norton

8   coming in and saying, well, now we can use this

9   information, half of which is just speculation.  We have

10  no idea what it is.  It's for a product feature that

11  hasn't changed since the date of the hypothetical

12  negotiation, SONAR/BASH, to try to create the impression

13  that the feature is less valuable than it was.  And I

14  think all of the evidence Dr. Cole reviewed this morning

15  shows how valuable that product feature was at the time.

16          THE COURT:  Well, let me ask you this.  Weren't

17  they trying to show -- and I think they would concede that

18  maybe it would not have been anticipated, but aren't they

19  trying to show that BPE started doing more than BASH,

20  detecting more?

21          MR. GUZIOR:  That's what -- well, that's what

22  they're trying to use the data to show, Your Honor, but

23  there's no indication that anyone would have contemplated

24  that at the time.  And Dr. Jaeger's testimony, Your Honor,

25  was that he didn't even know if the BPE system could

1  develop as it did in the absence of SONAR/BASH.  It's not

2  a new product feature that was introduced at a later date.

3  It's a product feature that depended on the performance of

4  the infringing functionality.

5          And we think, Your Honor, what the parties would

6  have talked about at the hypothetical negotiation is what

7  do we know about BASH and BPE.  Those are both features

8  that existed at the time of the hypothetical negotiation.

9  BPE is not a new feature that came in at a later date,

10  like sandboxing or memory exploit prevention.  It existed.

11  And what the parties would have done at the hypothetical

12  negotiation is say what do we know about BASH and BPE now?

13          And there's zero evidence in the record to

14  support the idea that the hypothetical negotiators would

15  have foreseen that BASH would have performed so well that

16  they could convert some of its predictions into BPE rules.

17          And that's a foundation question.  They could

18  have developed the case differently.  I don't think they

19  could have supported it, but they could have put in an

20  expert opinion from an economist saying, I believe that

21  the parties could have anticipated that.  But there's no

22  such evidence in the record.

23          THE COURT:  So you're saying that even though,

24  likely, they couldn't have anticipated sandboxing and

25  memory exploit prevention, that can be taken into account

1    because it's -- are all the things that Dr. Cole is using

2    with respect to the different technologies of the

3    different products, are they all new?

4              MR. GUZIOR:  Yes.  So that's -- that's the

5    distinction, Your Honor.  The memory exploit prevention

6    feature and the sandboxing feature were introduced in

7    2016.

8              And just the same as if you were to sell a

9    blender, let's just say as a random example, and then

10   three years later you add to that blender a new component

11   that allows you to slice cucumbers, just -- I'm coming up

12   with this on the spot.  You wouldn't be able to say, in a

13   patent infringement case, that you don't have to take into

14   account that the feature to slice cucumbers was introduced

15   at a later date.  You have to apportion.  But that's a

16   question of a new feature that was introduced, a new

17   product, if you will.  And it's not a question about

18   technology that existed at the time of the hypothetical

19   negotiation where unforeseen statistics -- half statistics

20   and some of it speculation -- could not have been foreseen

21   as to that technology that existed at the time.

22             And so we're not really saying that the

23   sandboxing and the memory exploit prevention would have

24   been foreseen at the time of the hypothetical negotiation.

25   It wouldn't have been.  But because of the way that this

1  litigation has played out over so many years, we simply

2  have to deal with the fact that the new features in the

3  product came into existence.  And we can't claim a royalty

4  on that.  I hope it makes some sense.

5          THE COURT:  It does.

6          Okay.  I'll hear from Norton.

7          MR. MORIN:  Thank you, Your Honor.  For the

8  record, of course, we disagree with the ruling on the book

9  of wisdom, but that aside, my primary objection -- the

10 motion in limine that you granted, Your Honor, didn't

11 say -- in fairness to my friends, it didn't say you can't

12 refer to anything that happens after the hypothetical

13 negotiation.  They talked -- many slides talked about the

14 subsequent years.

15          I was only looking at -- and I intend to cross

16 him on the general market, then, because he's talking

17 about the functional features.  I think we're only

18 disputing the BPE count specifically and that motion in

19 limine, and my point there was, Your Honor, that when he

20 put up a slide in 2016 and highlighted for the jury that

21 it was nearly 100 percent effective against the viruses,

22 that could give the wrong impression and he chose to do

23 that, that that had something to do with the -- or more

24 than it should have had with the patent and functionality,

25 and we should be able, at that point in time, to rebut

1   that impression that would be left with the judge -- with

2   the jury -- I'm sorry, Your Honor -- having to do with the

3   use of those features.  So that was my bigger point was

4   about the BPE data.

5            I think there's obviously common ground that

6   they can look to the additional features, and we'll cross

7   on the subsequent market as well.

8            We, in fairness, for the record, think that that

9   opened up the book of wisdom also, but we're not here to

10  redebate that.  My smaller point here for today was they

11  showed the jury something that suggested that the product

12  is working great, nearly 100 percent in 2016.  I should

13  then be able to cross and show that it has less to do with

14  the patented technology once they have done that.

15           But I do think there's common ground that when

16  there's new features added, it's fair to bring that into

17  the apportionment analysis.  I'd love to fight with him

18  and say that that opened the door, but I'm mindful that

19  Your Honor wants us to work in good faith towards

20  solutions so I'm not going to make that argument.  I will

21  cross generally on the market.  This has to do with the

22  specific motion in limine that you granted having to do

23  with the block count data, and I just -- I don't think it

24  would be fair for them to leave the impression that the

25  patented functionality is somehow -- has more to do with

1   that than it actually did once they put that on the

2   screen.

3           THE COURT:  So I'm going to ask you, Mr. Morin,

4   how is it that you do that?  How do you cross on that

5   issue discreetly?

6           MR. MORIN:  On the block data?

7           THE COURT:  Uh-huh.  From 2016.

8           MR. MORIN:  I would say, for example -- could we

9   excuse Dr. Cole for a moment?

10          THE COURT:  Absolutely.

11          MR. MORIN:  Thank you.

12          Dr. Cole, I'm sorry.

13          THE COURT:  And Dr. Sullivan too, probably.

14          MR. MORIN:  Thank you.  I was going to give him

15   all my cross questions.

16          (Dr. Sullivan and Dr. Cole exited the

17          courtroom.)

18          MR. MORIN:  It would be along the lines of you

19   pickup a slide indicating that this was very successful,

20   at near 100 percent in 2016, even years after the

21   hypothetical negotiation.  Sir, you've seen some block

22   count data -- and I don't have to use the interpolated

23   data.  I'll just use the actual data, Your Honor.  You've

24   also seen numbers that show that the use of the patented

25   feature, the allegedly patented feature -- he's got me

1  doing that now -- the patented feature was declining over

2  time and as a matter of fact, had less to do with the

3  performance of the product in that and subsequent years.

4           It would be on those lines, Your Honor.

5           THE COURT:  So the lines -- the years that were

6  actual years -- so one problem with these figures is

7  there's none in 2011, right?  There are no figures for the

8  time of that hypothetical negotiation.  And I don't think

9  that Dr. Jaeger gave terrific testimony about the

10 underlying basis for it.  So he did 2012 and 2014 were

11 accurate, and then he says 2017 and '18 were accurate.

12          But first, let me ask you this.  Did Norton give

13 any of this information to Columbia?  They said they

14 didn't get any block count data.

15          MR. MORIN:  I think that would be mistaken,

16 Your Honor.  In Dr. Cole's supplement to his reply, he

17 repeats the same -- may I use the ELMO, please?

18          THE COURT:  Sure.

19          MR. MORIN:  Thank you.

20          THE CLERK:  It takes just a second for it.

21          MR. MORIN:  Thank you.  Hopefully, it will

22 autofocus.

23          THE COURT:  Yes, I know he uses the same chart,

24 but did he have the same underlying data for the chart?

25          MR. MORIN:  Yeah.  My point, Your Honor, is he's

1  footnoted below where those particular years came from,

2  and you see Symantec production numbers 2017, an exhibit

3  number for 2018.  So he does indicate production numbers

4  for sourcing that.

5          THE COURT:  Well, you certainly can't use the

6  interpolated years.

7          MR. MORIN:  Yes, Your Honor.

8          THE COURT:  Let me see what it says.

9          MR. MORIN:  Would you like it back on the ELMO

10  or you've got it handy?

11          THE COURT:  I have it.  Thank you.

12          MR. MORIN:  Thank you, Your Honor.

13          THE COURT:  All right.  I'll hear any response.

14          MR. MORIN:  Thank you, Your Honor.

15          MR. GUZIOR:  Your Honor, on the point about

16  receiving the data, the issue is that we repeatedly asked

17  for the data that's relevant.  We wanted 2009, 2010, 2011

18  and 2013, with 2011 being the year of the first

19  hypothetical negotiation and 2013 being the year of the

20  second, and we didn't get it.  They produced what they

21  wanted to produce, and we complained.

22          And then even going forward from 2013, they

23  produced only some years.  And we don't know what happened

24  in the middle.  It could have been that BASH was

25  100 percent.  But Dr. Jaeger, as he admitted at his

1   deposition, didn't know and just guessed that it went

2   down.

3          And so the point on production, I agree with

4   Norton's counsel that we received for the years that they

5   wanted to show.  The problem is what about the rest of the

6   picture, and in particular, the data for the years of the

7   hypothetical negotiation?  That's not produced.

8          Dr. Jaeger doesn't have it.  We don't have it,

9   and it's strange because Norton's 30(b)(6) witness said

10  they make this data every day.  So we don't know where

11  that is.  That's point one.

12         Point two, Your Honor, is on predictability of

13  trial presentation.  You know, we had the motion in limine

14  ruling on this issue, and if we had known that this was

15  going to come up, we would have covered it in Dr. Cole's

16  direct examination.  We would have explained the evolution

17  of BPE.  We would have explained that BPE functions only

18  because of BASH.  We would have explained that the way

19  that BPE changed was because of how successful BASH was,

20  and I was very careful not to open the door.  We didn't

21  show any of the block count data for BASH versus BPE, the

22  subject of Your Honor's ruling on our motion in limine

23  number 3 even though that block count data is quite

24  favorable for us in the one relevant year they gave us,

25  which is 2012.

1        And we said we're not going to risk it, we're

2   not going to put it up and open the door on this.  And I

3   do think Norton's counsel is latching on to something that

4   is quite far out there as a basis for opening the door

5   where the simple point that we were making with the

6   document, the competitive battle card document -- the

7   99.6, 99.7, 100 -- is the competition between Norton and

8   other antivirus companies happens at the sub 1 percent

9   level.  That was true in 2011.  It was true in 2013, and

10  it's true today.

11       And I do think, a little bit, Norton's counsel

12  is latching on to a hyper technicality looking for, oh,

13  there was one document in here from 2016, and I would just

14  plead with Your Honor that we didn't open the door.  We

15  would have handled this presentation differently if we

16  thought that the ruling on the motion in limine was going

17  to change.

18       THE COURT:  Well, let me ask you that.  Is the

19  cure that you just do redirect with Dr. Cole?

20       MR. GUZIOR:  I don't think so, Your Honor,

21  because the cross-examination on this, this is something

22  that we would have wanted to cover first in order to

23  appropriately explain the issue to the jury.

24       Additionally, we do think that it's inadmissible

25  evidence that's highly prejudicial.  In the middle of this

1  litigation, they chose to -- in the partial data that they

2  gave us, many years missing -- to shift what they would

3  credit with a block count from BASH to BPE.  It's long

4  after the hypothetical negotiation.  I think Your Honor's

5  ruling that it's not relevant is right.

6           THE COURT:  So what's your evidence to that,

7  that they shift it?

8           MR. GUZIOR:  Because there's a change that

9  happens only in the middle of the litigation, and in the

10 years where the change happens, they haven't produced any

11 data.  As I said, we don't know what it looks like.  It

12 could be 100 percent BASH.  It could be -- it could be

13 10 percent BASH, but they had the data and they didn't

14 give it to us.

15          And we do think it's highly prejudicial,

16 Your Honor, if on cross they get into the fact that in

17 2019 there was an 8 percent block count for BASH, I do

18 think that will be prejudicial to Columbia's case when the

19 evidence is inadmissible.

20          THE COURT:  All right.

21          MR. GUZIOR:  Thank you, Your Honor.

22          MR. MORIN:  Briefly, Your Honor.  Very, very

23 briefly, Your Honor.  First of all, we've been very

24 cognizant of bringing things to Your Honor's attention

25 first.  That slide 41, they chose not to just blow up that

1  we want to get near 100 percent.  They chose to blow up

2  for the jury 2016 data of near 100 percent and

3  99.6 percent.  They chose to blow that up.

4          Your Honor, when we exchanged demonstratives

5  last night, they took advantage -- not unfairly -- of a

6  rule in the pretrial order that says you don't have to

7  exchange demonstratives that are only the exhibits that

8  are blown up.  If I had gotten this last night, I could

9  have raised it with them.  They chose not to give it to me

10  last night.  They chose to hand it to me in the middle of

11  this morning.  So I had no prior notice that they were

12  going to blow up that section of the document and display

13  it to the jury.  So I raised it as soon as I possibly

14  could, which was before the lunch, so Your Honor could

15  think about it and address it.

16          I will tell you that they talk about the years

17  that are produced.  I know I should know.  I'm responsible

18  for knowing why certain years were produced, but I will

19  note the 2012 data is aligned with a large number of their

20  slides that relied on 2012 information.  So it's right in

21  the sweet spot, and I will not imply or infer anything

22  about the data other than the specific years that were

23  actually produced.  And that's all I have on it,

24  Your Honor.

25          THE COURT:  All right.  Okay.  Well, this,

1  again, I think, raises the issue where we have new

2  counsel, new counsel who's doing the job they are hired to

3  do, former counsel unable to inform them about what

4  happened, and they're not pretending to say that they know

5  what happened.

6          I do know that my record shows that they -- for

7  whatever reason, Symantec did not produce any real data

8  for really the most relevant years, especially those 2015,

9  2016 when this drop started happening.  I don't --

10 according to Norton, I don't have any reason not to take

11 Mr. Guzior at his word that Norton has this information

12 and they -- they do it regularly.  I think he said -- let

13 me look.

14         MR. GUZIOR:  Your Honor, it's in the testimony

15 of Jokul Tian, and we can provide a copy to Your Honor.

16         THE COURT:  And how frequently did he say or she

17 say -- I didn't hear you.

18         MR. GUZIOR:  He said daily.

19         THE COURT:  Daily.  All right.  Well, I

20 certainly -- that is in the record, and I'll take

21 Mr. Guzior's representation of that, and I don't hear that

22 Norton is challenging that representation.

23         MR. MORIN:  I'm not in a position to do so,

24 Your Honor.

25         THE COURT:  All right.  So Norton apparently

1  counts this information daily and did not produce, for

2  some pretty important years, including the year that this

3  slide speaks to.  I am -- you guys, I just -- just

4  exchange the demonstratives.  I guess you're playing

5  chicken with each other.  You're not going to be the first

6  to do it and then not have the other side not do it, and I

7  guess it's litigation, but it's not a particularly good

8  use of judicial resources.

9      I do think there is -- when you look at what

10  Dr. Jaeger said, his testimony is confusing at best, and

11  it doesn't lay a particularly good foundation, if any

12  foundation at all.  He says he didn't do a quantitative

13  assessment, which is okay.

14      He says, "Then a number of attributes in

15  SONAR/BASH" -- this is at page 238 of his deposition --

16  "SONAR/BASH appear to be associated with not function

17  calls but something else.  Probably data, I would

18  envision.  And so a program, when you assess a program,

19  the program has a control flow graph and a data flow

20  graph, and so one potentially could replace the attributes

21  associated with function calls with those associated --

22  well, not associated with function calls but rather with

23  the data that's being processed by the program."

24      And the question is, "And that's your

25  qualitative assessment?  You've not actually tested

1  whether the theory would impact performance

2  quantitatively?"

3        And he says, "I have not quantitatively assessed

4  that, but there's a large number of these attributes that

5  appear to be related to data.  Those could be counted."

6        Now, I'm going to tell you, I think this says

7  almost nothing comprehensible.  I think it would be

8  prejudicial and confusing to place his data information or

9  basis on the record.

10        And it is the case that he talks about SONAR and

11  BPE, and he indicates that there is some independent data,

12  not independent data for the years at issue here, just

13  interpolations.  And to make the record clear, he says,

14  "The independent data are 2012, '14, '17, and '18."  And

15  that includes nothing between 2009, 2010 or 2011 or 2013,

16  which is -- '11 and '13 are the years of the hypothetical

17  negotiation.

18        And I don't think that cross-examining -- using

19  any of these kinds of numbers is fair, whether or not 2017

20  or '18 are accurate.  The underlying change, the fulcrum

21  as to why they started going so low or how they started

22  going so low is not established by Dr. Jaeger, and he says

23  he didn't ask Symantec for the information in the

24  interpolated years, and he says he probably -- it's

25  possible he would have used it if he had asked for it, the

1    actual data.

2           And then he says that "between 2012 and the

3    present, Symantec has introduced new BPE signatures at

4    least some of which are generated from BASH submissions,

5    correct?"

6           And he says, "That's my understanding, yes."

7           "Did you do any quantitative analysis or

8    modeling to determine whether the block share attributed

9    to BPE would have increased from 2012 to the present in

10   the absence of BASH?"

11          "No, I did not do a quantitative assessment of

12   that question."

13          So I certainly think it is the case that

14   Dr. Jaeger established that BPE was informed, at least, or

15   trained, at least, by -- by BASH, and it's creating

16   information in the manner I think that Dr. Cole has just

17   testified to.

18          But with respect to the numbers in 2017 and

19   2018, I don't think that they have opened up the door to

20   those specific numbers.  First, 2015 and '16 are

21   interpolations.  They go from 55.3 percent to

22   37.2 percent, and then suddenly, the actual number in 2017

23   is 10 percent.  And then in 2018, it's 8 percent.  And I

24   am not certainly indicating that these lawyers have

25   participated in the lack of production of necessary

1  information to Columbia, but it is the case that if they

2  had that information, they could -- they could speak to

3  what the numbers were in 2017 and 2018.  And absent Norton

4  having produced that information, I think it's too

5  prejudicial and confusing to the jury, which is nothing

6  this set of lawyers did.  But they are pleading ignorance

7  and they are stuck with the record as it developed here.

8          I think it is fair to ask some questions about

9  whether -- how block count data may or may not have been

10 used and some interaction between BASH and BPE, but it

11 can't be much because the information that I have in front

12 of me from Dr. Jaeger is -- is nothing.  He uses bad data,

13 and he says, I didn't try to get good data and I didn't

14 try to get good information.

15         And I think both parties are acknowledging that

16 BASH informs BPE to some degree, and the question would be

17 how much.  And I think you can cross-examine with respect

18 to how much BPE and BASH interact and including in 2016.

19 But I will say that I'm not sure they opened the door

20 entirely to the book of wisdom, but I'll let you talk

21 about -- or ask about this specific slide and the

22 interaction of BPE and BASH, but no numbers and no

23 foundational assumption in the cross that suggests any

24 kind of significant number because I think all of these,

25 based on what Dr. Jaeger testified to, are totally

1  unreliable.  I found in my motion or in my *Daubert*, I

2  can't remember which one, that they are unreliable.  So

3  you can't use these numbers to cross.  They're unreliable.

4  So you can't use any of them, the ones that are actual

5  data and the ones that are not because the implication of

6  the group is based on unreliable data and it's completely

7  prejudicial to Columbia that they don't have the years or

8  the actual data to prepare their expert with or to do any

9  kind of redirect.  So that is my ruling.

10            MR. MORIN:  Understood, Your Honor.

11            THE COURT:  All right.

12            MR. MORIN:  Sorry for taking the time.

13            THE COURT:  No.  That's fine.  We have to make a

14  record.

15            Is that clear to everybody?

16            MR. GUZIOR:  Yes.  Thank you, Your Honor.

17            THE COURT:  All right.

18            MR. MORIN:  May I approach and get set up while

19  we call the jury in?

20            THE COURT:  Of course.

21            MR. MORIN:  Thank you.

22            THE COURT:  You don't need me to leave the bench

23  to do that, do you?

24            MR. MORIN:  No.  No.

25            MR. GUZIOR:  We'll get Dr. Cole back in.

1546

 1          THE COURT:  Okay.  Can we ask him not to come in

 2   for just one second, while you're setting up?

 3          MR. MORIN:  Your Honor, may I put these at the

 4   witness box?  I don't want to overstep my boundaries.

 5          THE COURT:  Actually, can you do that, please,

 6   Ms. Deskins?

 7          MR. MORIN:  Thank you.  And we have two copies

 8   for the Court.  We'll do that as well.  Thank you.  That's

 9   for the witness.  Ms. Tull has the other two.

10          THE COURT:  All right.

11          So the last thing I want to say is that with

12   respect to the book of wisdom, I think that the use for

13   cross-examination here would be somewhat contrary to the

14   fact that it is a backward looking doctrine, but that's

15   only part of the basis of my ruling.

16          MR. MORIN:  I understand, Your Honor.

17          THE COURT:  Okay.  I just want that on the

18   record.  Now we're ready.

19          (The jury entered the courtroom.)

20          THE COURT:  Good afternoon.  It's good to see

21   you all.  We took a little extra time.  Unfortunately, we

22   didn't give you more food because of that, but we're

23   taking care -- I swear all information that we're dealing

24   with is helping the presentation.  Everybody is working

25   very hard, both sides.  And so we are not trying to waste

1   your time.  Some things are just unpredictable in trial.

2   Okay?

3           All right.  So we're ready for cross; is that

4   correct?

5           MR. MORIN:  Yes, Your Honor.  May I proceed?

6           THE COURT:  Yes.  I just want to remind

7   Dr. Cole, as I'm sure he knows, that you continue to be

8   under oath.

9           THE WITNESS:  Yes, Your Honor.

10          MR. MORIN:  Thank you, Your Honor.

11          And good afternoon, ladies and gentlemen of the

12  jury.

13                      **CROSS-EXAMINATION**

14  BY MR. MORIN:

15  Q    Good afternoon, Dr. Cole.

16  A    Good afternoon.

17  Q    My name is Mike Morin.  We met briefly in the

18  hallway.  You understand I'm the lawyer for Norton in this

19  case?

20  A    Yes.  That's my understanding.

21  Q    And I heard you live in Northern Virginia in your

22  direct.  I live not far from you, I think.  Maybe we'll

23  have coffee when this whole thing is over.

24  A    Hopefully we'll be on speaking terms.

25  Q    Okay.  I hope so too.  My goal here is not to get in

Eric Cole - Cross

1548

1 an argument with you.  I just want to see if we can agree

2 on some foundational things as we go through your

3 testimony.  Okay?

4 A    Sounds great.  Thank you.

5 Q    Okay.  And the first thing I wanted to get agreement

6 on, I interrupted you at one point in time when you were

7 giving your answers, and do you remember I objected on the

8 issue of whether we were going to call it an infringing

9 function, right?  Do you remember that?

10 A    Yes, I do.

11 Q    Okay.  And just so we're all clear here, you haven't

12 offered any opinions on whether or not the patents in this

13 case are infringed, correct?

14 A    That is correct.  I've offered no infringement

15 opinion.

16 Q    All right.  You've merely, for the sake of your

17 testimony here, assumed that the patents are infringed,

18 right?

19 A    That is correct.  For apportionment, I make the

20 assumption that the patents infringe.

21 Q    And I just want to tell you, that's a fair thing to

22 do because your analysis, you're asked to assume that the

23 patents are infringed, but that's not actually your

24 opinion that they're infringed.  You're agnostic on that,

25 right?

1  A    Correct.  I did not form an opinion on infringement.

2  I'm just making that assumption.

3  Q    So every time during your testimony that you said the

4  infringing products or the infringing functionalities,

5  that's shorthand.  But would it be fair to say what you're

6  saying is the product that I've been asked to assume is

7  infringed but I don't know if it is.  Is that fair?

8  A    I did not form any opinion on infringement.  So that

9  would be fair.

10 Q    Okay.  Good.  I'm going to call it, if it's okay with

11 you, the accused functionality.  Would that be all right?

12 A    Yes, it would.

13 Q    Okay.  And you did multiple reports in this case.  We

14 heard a little bit about that on your direct examination,

15 right?

16 A    That is correct.

17 Q    And you did a set of reports or one report in 2014

18 and then some additional reports in 2019, right?

19 A    That is correct.

20 Q    Okay.  And just so you know what's in front of you,

21 my colleague has left you some binders.  You have whatever

22 you had on direct examination, but we've left you three

23 things to refer to.  The first is your report because I

24 want you to be able to refer to your reports whenever you

25 need to.  Okay, sir?

Eric Cole - Cross                          1550

1   A     Okay.  Thank you.

2   Q     The second thing we've left you is your deposition

3   transcript.  There may be a time that we want to talk to

4   you about what you said in your deposition.  Okay?

5   A     Yes, I see that.

6   Q     And then there's just a few demonstrative exhibits,

7   which are -- I'll remind the jury are not evidence.  They

8   may be slides or graphs that we use to illustrate the

9   testimony.  Fair enough?

10  A     Yes, I see that also.

11  Q     Okay.  And in those reports, you set forth the

12  opinions that you're offering in the case.  Is that fair?

13  A     That is fair.

14  Q     And you set forth the bases for those opinions in

15  your reports, right?

16  A     That is correct.

17  Q     And those reports are fairly extensive, fair to say?

18  You spent a long time on them?

19  A     Yes, I did.

20  Q     And would you agree that your conclusions are only as

21  strong as the evidence and assumptions that they are based

22  on?  Is that fair?

23  A     It would be based on the materials considered, the

24  deposition transcripts, and my expertise in the industry.

25  Q     Okay.  And one thing you said -- if we could look at

1  your 2019 report.  If you'd like to turn to it, or you

2  could just look at it on the screen, if that's okay.  Are

3  your eyes pretty good?

4  A    They are pretty good.

5  Q    My wife's an ophthalmologist in Northern Virginia.

6  So if you need eye help, we can help you out.

7  A    Okay.  Thank you.

8  Q    Okay.  And one thing that you said -- and if we could

9  pull up your 2019 report, and if we could go to

10  paragraph 80, one thing you said -- in the first sentence

11  you said, "Indeed, the approaches outlined above have been

12  widely adopted in modern security systems."  Do you see

13  that?

14  A    I do.

15  Q    And those prior paragraphs you were talking about the

16  patented technology, this is a section on the patented

17  technology.  Do you remember that?

18  A    Could we pull that up quick just so I could

19  spot-check?

20  Q    Absolutely.

21         MR. MORIN:  Let's go to the prior page, if we

22  could, Mr. Schmoller.

23  BY MR. GUZIOR:

24  Q    And let's turn to the top of that page.  Do you see

25  the heading for this section is, "Columbia's patented

1  technology has been a key driver of demand for Symantec's

2  products"?  Do you see that?

3  A     I do see that.

4  Q     And then I'll represent to you -- and we can look at

5  it if you'd like -- that the following several paragraphs

6  are about the patented technology?

7              THE COURT:  Wait a minute.  Where is that that

8  you just showed him?

9              MR. MORIN:  Your Honor, it's in the 2019 report.

10             THE COURT:  Right.

11             MR. MORIN:  At page 23.

12             THE COURT:  So you're going back to 23 from

13 page 39?

14             MR. MORIN:  I didn't think it was page 39,

15 Your Honor.  It was on page --

16             THE COURT:  Didn't you say paragraph 80?  Am I

17 in the wrong report?  Oh, I'm in the reply.

18             MR. MORIN:  Yes.  I'm sorry, Your Honor.

19             THE COURT:  No.  No.  No.  This is why I ask the

20 questions.  I want to make sure.

21             MR. MORIN:  I think it's pages 23 and 24, for

22 the record, Your Honor.

23             THE COURT:  I'm sorry.

24             MR. MORIN:  No worries, Your Honor.

25             THE COURT:  All right.  All right.  Now I'm with

1   you.  Apologies.

2              MR. MORIN:  Of course, Your Honor.

3   BY MR. MORIN:

4   Q    Paragraphs 74 through 79 talk about the patented

5   technology.  Do you see that?

6   A    Yes, I do.

7   Q    And then we'll go back to paragraph 80, and you say,

8   "Indeed, the approaches outlined above have been widely

9   adopted in modern security systems."  You say that.  Do

10  you see that?

11  A    I do see that.

12  Q    So you're saying the patented technology has been

13  widely adopted?

14  A    Generally, that's what it looks like it's referring

15  to.

16  Q    Right.  And that assertion isn't true, is it, sir?

17  A    I believe it is.  I'd have to go back and check the

18  specific paragraphs, but I believe it's true.

19  Q    Well, let's talk about that for a second.  There are

20  many different companies who sell malware software, right?

21  A    That is correct.

22  Q    And you're an expert in this area, very impressive

23  credentials.  I will represent that to you.  You know the

24  market well, right?

25  A    That is correct.

Eric Cole - Cross                    1554

1  Q    And you realize that Norton only has 15 to 20 percent

2  market share typically, right?

3  A    It depends which years you're talking about, but

4  generally, that seems to be correct.

5  Q    All right.  And you have no idea whether any other

6  competitors have ever used the patented technology.  True?

7  A    That is correct.

8  Q    And you actually -- we started with this at the

9  beginning.  We don't know whether Norton uses the patented

10 technology, right?

11 A    Correct.  I did not opine on infringement.

12 Q    So you say here that the patented technology has been

13 widely adopted.  What we know, as far as we know, between

14 zero percent and at most, 20 percent of the market uses

15 it, right?

16 A    I think to be clear, I think it's saying the

17 approaches, which is talking about some of the general

18 approaches in cybersecurity.  I don't think it's referring

19 directly to the patents.

20 Q    In that case, let's turn --

21       THE COURT:  Wait.  Wait.  Wait.  You just said

22 zero percent to 20 percent?

23       MR. MORIN:  Correct.

24       THE COURT:  Didn't he say that -- so you're

25 saying that because Norton is the only one that uses it,

1  perhaps?

2          MR. MORIN:  Correct.

3          THE COURT:  All right.

4          MR. MORIN:  Yeah, because he doesn't know,

5  Your Honor, whether Norton use it.  So it's between zero

6  and 20 percent of the market.

7          THE COURT:  Got it.

8  BY MR. MORIN:

9  Q    All right.  So you were just making a point that

10 maybe you weren't referring to just the patented

11 technology here?

12 A    Correct.  This is just an introductory section that

13 I'm just talking about technology in general.

14 Q    Okay.  So let's look at your deposition transcript,

15 sir, at page 82, lines 1 through 13, and let's just see if

16 we can refresh your recollection on this.

17         MR. MORIN:  If we could pull that up.

18         THE COURT:  Are you entering this into evidence

19 or you're showing it to him?

20         MR. MORIN:  So I'm going to impeach him with it,

21 Your Honor.

22         THE COURT:  Okay.

23         MR. MORIN:  Maybe we're in the wrong spot.  I

24 need page 82, lines 1 through 13.

25 BY MR. MORIN:

1  Q    And you were asked the following question, sir, and

2  gave the following answers.  "But based on your experience

3  and general understanding of the field, you do offer the

4  opinion that approaches of the '115 and '322 patents have

5  been widely adopted in modern security systems, correct?"

6              MR. GUZIOR:  Objection.

7              THE COURT:  Yes.

8              MR. GUZIOR:  He's not impeaching the witness.

9  There's nothing that's been said that's inconsistent.

10             THE COURT:  Take it down.  What's inconsistent?

11             MR. MORIN:  That he was referring to the

12  patented technology when he said that it was not widely

13  adopted -- when he was saying it was widely, Your Honor.

14             THE COURT:  I'm going to overrule the objection.

15             MR. MORIN:  If we could put it back up, please.

16  BY MR. MORIN:

17  Q    And you were offering the opinion of the approaches

18  of the '115 and '322 patents have been widely adopted in

19  modern security systems, and there's an objection.  And

20  your answer is, "Yes."

21             Do you see that?

22  A    Yes.  But to be clear, it's asking about approaches

23  of the '115 and '322.  It's not asking for an opinion on

24  infringement or specific use of each claim.

25  Q    Okay.  So we can agree, can we not, sir, that the

1   technology claimed in the '115 and '322 patent have not,

2   in fact, been widely adopted.  Fair?

3   A    That was not a task I was asked to perform.  To me,

4   the general approaches that are in the '115 and '322, I

5   have seen some of those general approaches.

6   Q    Okay.  That's fine.  We're talking the same language.

7   The general approaches may have been used, but your

8   apportionment needs to talk about the particular claims of

9   the patent, right?

10  A    The apportionment is focused on the patented

11  technology and its value to the products.

12  Q    And specifically the claims of the patent, right?

13  A    Depending on which year or which report, the answer

14  could be different.

15  Q    When you apportioned down to the number you got to,

16  were you talking about the patented technology generally

17  or were you apportioning to the claims of the patent?

18  A    I was referring to the components that focus on the

19  combined model claims in the patents.

20  Q    The claims of the patents, right?

21  A    The combined model claims.

22  Q    Right.  And we can agree that there's no evidence

23  that the claims of the patent have been widely used.  Is

24  that fair?

25  A    That would be correct.

1    Q    Okay.  Then in your most recent report, your 2019

2    report, there's a large section of the report that relates

3    to demand for the patented technology.  Do you remember

4    that?

5    A    Generally the section.  I don't remember the specific

6    paragraphs.

7    Q    Okay.

8              MR. MORIN:  So if we could pull that up on the

9    screen, Mr. Schmoller.

10   BY MR. MORIN:

11   Q    It's actually 55 pages of your report.

12             MR. MORIN:  Maybe we'll go to the table of

13   contents just to make sure we're on the same page.  And if

14   we could blow that up.

15   BY MR. MORIN:

16   Q    Do you see -- you start at page 23, and do you see

17   that section is entitled Section 3, "Columbia's patented

18   technology has been a key driver of demand for Symantec's

19   products."  Do you see that?

20   A    I do see that.

21   Q    And then the first subsection under there, you divide

22   that into three periods of time in your report, right,

23   sir?

24   A    If I could look at the next page to refresh, I

25   believe that is correct.

1   Q    Let's start with this one, and we'll count them as we

2   go.  Is that fair, sir?

3   A    Yes, it is.

4   Q    Okay.  Okay.  Section 3.1 deals with the first period

5   of time before 2009.  Do you see that?

6   A    Yes, I do.

7   Q    And you talk about the period of demand between 2009

8   and -- between -- before 2009 up to 2009.  Fair?

9   A    Correct.

10  Q    Okay.  And if we go to the next page, we go to

11  Section 3.2, your second period of time that you talk

12  about is what you called the products differentiator time,

13  and that's between 2009 and 2015, correct?

14  A    That is what's listed in the table of consents.

15  Q    Right.  And what you mean by a product differentiator

16  is it's something in Norton's product that allows it to

17  differentiate itself from other products?

18  A    That is generally correct, at a high level.

19  Q    Okay.  And then the third period of time is

20  Section 3.3, and that's when you say it's part of the core

21  elements, the core features of the products, and that's

22  from 2016 to '19.  Do you see that?

23  A    Yes, I do.

24  Q    So you break your demand analysis into three periods

25  of time, kind of pre-2009, 2009 to '15, and then 2016

Eric Cole - Cross

1   onward, correct?

2   A    That is correct.

3   Q    Right.  And that's about 55 pages of your report,

4   give or take?

5   A    I did not calculate or remember that number.

6   Q    That's fine.  That's fine.  It's a long report, but

7   I'll represent to you it's about 55 pages.  Okay?

8   A    Okay.

9            THE COURT:  The part starts at 23 and ends at

10  55.

11           MR. MORIN:  No, Your Honor, I don't mean to

12  correct you.  The last section starts at page 55.  Of

13  course, that section goes on until page 79.

14           THE COURT:  Got it.

15           MR. MORIN:  Thank you, Your Honor.

16  BY MR. MORIN:

17  Q    Is that -- what we see now, it's about 50 pages?

18  A    Give or take a few pages, that seems to be correct.

19  Q    Okay.  So I'd like to go back and focus you on that

20  first period of time, if we could, the period of time

21  before 2009, right?

22  A    Okay.

23  Q    And that's the period of time in which you say that

24  Norton's products without SONAR/BASH were inadequate to

25  satisfy consumer demand.  Fair?

Eric Cole - Cross                    1561

1   A    Without the infringing version of SONAR/BASH.

2   Q    Right.  You say without it, couldn't satisfy consumer

3   demand, right?

4   A    Generally, that's one of the opinions.

5   Q    Okay.  Now, you showed the jury earlier an Exhibit

6   PX-325.

7            MR. MORIN:  And I'd like to go ahead and call up

8   the slide that you showed.  What slide was that,

9   Mr. Schmoller?  If we could put it up, that would be fine.

10           Okay.  Actually, let's use the exhibit that they

11  had.

12           A moment's indulgence, Your Honor.  May I?

13           THE COURT:  Of course.

14           MR. MORIN:  Thank you.

15           THE COURT:  You can take that one down if that's

16  not the one you're using.

17           MR. MORIN:  Sure.  It's going to be the same

18  document, Your Honor, but in his slide, if that's okay.

19           THE COURT:  Sure.

20           MR. MORIN:  If we could put up slide 19.

21  BY MR. MORIN:

22  Q    I'd like to show you a slide you showed to the jury.

23  And what you talked about here, sir -- and now we're

24  talking about, to reorient ourselves, your period one

25  before 2009.  Okay?  Are you with me?

Eric Cole - Cross                    1562

1   A     Yes, I am.

2   Q     Okay.  And you showed the jury this slide -- you

3   didn't show the jury this slide.  Your counsel displayed

4   the slide, correct?

5   A     During my direct, correct.

6   Q     Right.  And at the beginning of your direct, you

7   testified that these are your slides, that you had created

8   them.  It's fine if it's with the assistance of someone,

9   but you created them, right?

10  A     That is correct.

11  Q     Okay.  And if I say by accident, just so we're all

12  clear, you put up a slide, we understand your counsel put

13  it up, but these are your slides.  You take ownership,

14  right?

15  A     That is correct.

16  Q     Okay.  And in this slide, you thing you focused on

17  was in the middle, and you talked about how McAfee's

18  consumer segment grew 20 percent year over year versus

19  Symantec at 2 percent, right?

20  A     Yes, that's what the slide says.

21  Q     Right.  What you didn't talk about -- you weren't

22  asked, to be fair -- were the actual numbers, right?

23  A     That is correct.

24  Q     So let's talk about the actual numbers about the

25  period of time that you say they couldn't satisfy demand.

Eric Cole - Cross

1  And these are in millions.  So you see that in 2005,

2  Symantec sold $1.4 billion worth of product.  Then it went

3  up to 1.55, 1.7 and then 1.836.  Do you see that?

4  A    Yes, I do.

5  Q    All right.  So between -- in the period of time that

6  you said Symantec's falling behind, between 2005 and 2008

7  without the accused functionality, sales had gone up by

8  more than $400 million.  Is that true?

9  A    Yes, but that's expected because you do raise your

10  price each year.  So if you're losing market segment,

11  which the slide clearly shows they are losing market

12  segment and they're not growing as fast, you would still

13  expect to see some increase in revenue from the increase

14  of the price each year.

15  Q    My question, sir, was simply have the sales in the

16  period of time where you said they weren't able to meet

17  demand gone up by more than $400 million?  Is that a true

18  statement?

19  A    That does appear to be true.

20  Q    Right.  Whereas I know in percentages it's different.

21  But it's more than the amount that everyone else combined

22  has gone up in absolute dollars?

23  A    But it's going to be proportional based on percent

24  increase.

25  Q    Sir, my question is only that the sales volume, in

Eric Cole - Cross

1  terms of dollars, for Symantec, without the accused

2  product, had gone up more than the entire rest of the

3  market combined.  True?

4  A    That would be true because they have a larger market

5  share, but the percent is still smaller.

6  Q    And what you don't know, sir, is whether the addition

7  of the accused functionality improved Norton's revenue

8  after that.  You don't know one way or another, correct?

9  A    Not revenue specifically, but I do have documents to

10 show that it was a key game changer within Norton.

11 Q    I understand that you've shown some documents here

12 that say SONAR/BASH was good, a game changer, whatever you

13 want to talk about.

14         My question, sir, is you don't know whether

15 adding that functionality actually translated into

16 additional sales?  You don't know one way or another.

17 True?

18 A    That was not something I was asked to directly opine

19 on.

20 Q    So the answer is you don't know?

21 A    That is correct.

22 Q    Okay.  And one of the main reasons you said that

23 Norton needed the Columbia technology was because

24 competitors had stepped up their games.  Fair?

25 A    I believe I said something similar to that.

1    Q    Now, by 2006 -- you know this because you worked at

2    McAfee -- McAfee had a product that protected against

3    zero-day exploits, right?

4    A    It did.  Just to be accurate for the record, you said

5    2006?

6    Q    Correct.

7    A    And that was not the years I was at McAfee.

8    Q    Oh, I understand you came later, but you know from

9    opining in your report and from your history that by 2006,

10   they had software that prevented zero-day malware,

11   correct?

12   A    They had software that had that claim.  The working

13   and efficacy is always a little different than what the

14   products claim.

15   Q    Right.  And there's no reason for you to think that

16   McAfee used the technology at issue here, right?

17   A    That was not something I was asked to opine on, and I

18   wasn't focused on infringement in this case at all.

19   Q    Right.  So the answer is you don't have any idea

20   whether they used the patented technology, right?

21   A    Yeah.  That was not something I was asked to opine

22   on.

23   Q    So you don't know?

24   A    Correct.

25   Q    Okay.  And you know that -- you showed the '115

Eric Cole - Cross                    1566

1   patent.  You know that that application published in May

2   of 2007 so the whole world could see it.  You're aware of

3   that?

4   A    I believe that date is correct.  I'm trying to go

5   from memory, but that sounds to be about right.

6   Q    We don't have to go from memory.  I want to make sure

7   that we are all on the same page.

8              MR. MORIN:  So why don't we put it up on the

9   screen, if we could, Mr. Schmoller.

10  BY MR. MORIN:

11  Q    And we'll see that the publication of the patent was

12  in May of 2007.  Do you see that there?

13  A    Yes, I do.  Thank you for sharing that.

14  Q    Of course.  And anytime you want to see anything, you

15  tell me, okay, and we'll pause and we'll find it for you.

16  Okay?

17  A    Okay.  Thank you.

18  Q    Sure.

19              And so what we know is that the first patent in

20  suit didn't publish, you talked about this -- didn't issue

21  until December of 2011.  Fair?

22  A    That is correct.

23  Q    So the information in the patent had published, the

24  whole world knew about the technology in 2007.  We saw

25  that, right?

1  A     Yes, we did.

2  Q     And the first patent didn't issue until December of

3  2011, right?

4  A     That is correct.

5  Q     And that's a four-and-a-half-year period, about

6  right?

7  A     Yes.

8  Q     All right.  So for those four and a half years, the

9  technology was known to everybody and they could have --

10 the whole world could have used it for free.  Do you

11 understand that?

12 A     That's not my general understanding of when a patent

13 issues, that you have the right to use it for free.  It's

14 putting the public on notice that you filed a patent for

15 that technology.  So I wouldn't agree with that statement.

16 Q     My point is a little different.

17 A     Okay.

18 Q     From 2007, everyone knew about the technology, or at

19 least had access to it from the publication, right?

20 A     It was public at that point.

21 Q     And the patent at issue didn't issue until 2011,

22 right?

23 A     That is correct.

24 Q     And until a patent issued, you -- you talked about

25 patents in your direct a little bit.  Until a patent

Eric Cole - Cross                    1568

1  issues, everyone has the right to do it.  You can't assert

2  a patent that hasn't issued.  You're aware of that?

3  A    I am aware of that.  I would disagree with everyone

4  has a right to use it, but you can't assert it until it

5  issues.

6  Q    Right.  And so for those four and a half years, the

7  patent couldn't have been asserted against anybody.  Do

8  you understand that?

9  A    Once again, you're getting into the legal side,

10 which -- but that's my general understanding.  But like I

11 said, when it comes to the law of patents, which is what

12 you're asking me, I'm going to defer to the attorneys for

13 that.

14 Q    That's very fair.  So let's just phrase it

15 differently, then.  The technology was known and out there

16 as of 2007.  We agreed on that?

17 A    Yes, we did.

18 Q    And the first patent that could be enforced that

19 we're aware of in this case didn't issue until December of

20 2011, right?

21 A    That is also my understanding.

22 Q    And so there's a four-and-a-half-year period that

23 people could use it without being sued for patent

24 infringement, right?

25          MR. GUZIOR:  Your Honor, it's just a

1  misstatement of the law.

2          THE COURT:  You can continue.  Continue with

3  your objection.

4          MR. GUZIOR:  So, Your Honor, I object on the

5  basis that he's asking this witness about the law and

6  misstating the law in the premise of the question.  You

7  can go back with back damages six years after the patent

8  issues.

9          THE COURT:  All right.  So it is a misstatement

10 of the law.  You said without being sued.

11         MR. MORIN:  Correct.

12         THE COURT:  So I guess that is okay.  But the

13 problem is you're asking a legal question of a witness who

14 doesn't know that once it's issued, you can go back six

15 years.

16         MR. MORIN:  But you -- I won't argue the law

17 here.  We can take that up outside and not waste the

18 jury's time with it.  I can move along and make my point.

19         THE COURT:  All right.

20         MR. MORIN:  Okay.

21 BY MR. MORIN:

22 Q    My only point is as far as you're aware, nobody else

23 used the claim technology prior to the patent issuing in

24 2011.  True, as far as you're aware?

25 A    I was not asked to research that so I am not aware of

1  anyone because that was not a task I was asked to do.

2  Q    Right.  And you were, during some of that period of

3  time, at McAfee, during some of that period of time,

4  right?

5  A    Yes.

6  Q    Were you using Columbia's patented technology while

7  you were there?

8  A    Not that I'm aware of.

9  Q    Right.  And you were at Lockheed Martin for part of

10 that time, right?

11 A    Prior to McAfee, yes.

12 Q    Right.  And were you using Columbia's technology

13 there?

14 A    Not that I am aware of.

15 Q    Right.  And was IBM or Intel or Kaspersky or

16 Trend Micro using that technology prior to the issuance of

17 the patent?

18 A    I do not know that answer.

19 Q    Okay.  Do you know if anyone even approached Columbia

20 to say, hey, could we use the technology prior to -- in

21 your first period of time, prior to 2009?

22 A    You're asking me about information from Columbia.  I

23 don't know who did or didn't approach Columbia so I'm not

24 sure.

25 Q    Well, you have 50 pages on demand for the patented

Eric Cole - Cross                    1571

1  technology.  We agreed on that.  Fair, sir?

2  A     Yes.

3  Q     And Columbia hired you.  You had access to talk to

4  whoever you wanted.  Fair?

5  A     Within the scope of my assessment of what I was

6  brought on to do.

7  Q     One of which was demand for the technology?

8  A     Was apportionment, in which understanding the demand

9  was a key component of that.

10 Q     And when you're trying to figure out whether there

11 was demand for the patented technology, you have no idea

12 whether any single company on the planet went to Columbia

13 demanding or asking for the patented technology.  True?

14 A     I do not know that answer.

15 Q     Okay.  Let's go to the second period of time, sir,

16 which is your differentiation years.  Do you remember

17 that?  We talked about that.

18 A     Yes, the second section.

19 Q     That's between 2009 and '15, right?

20 A     I believe that's correct, yes.

21 Q     Would you -- do you need to be refreshed or do you

22 remember well enough?  Either is fine.

23 A     I do remember.  That's fine.

24 Q     Okay.  And your point there was that Columbia's

25 technology from 2009 to '15 was a product differentiator,

1   right?

2   A     That's correct.

3   Q     And that's a feature that one product offers but

4   competing products lack, right?

5   A     That is correct.

6   Q     Okay.  And you've spoken with Columbia's damages

7   expert in this case.  You referred to him.  Dr. Sullivan

8   in the back of the room?

9   A     I've had some brief discussions with him with

10  attorneys.

11  Q     Right.  And you also said -- I thought it was

12  interesting in your direct, you said that you had worked

13  on at least 15 licensing agreements, right?

14  A     That is correct.

15        MR. MORIN:  And, jury, I apologize I keep

16  turning my back to you.  I don't mean to be rude.

17  BY MR. MORIN:

18  Q     When you said that you had -- let me reorient myself.

19  I realized I was looking at you and not including them.

20        You had done at least 15 licensing projects,

21  right?

22  A     That is correct.

23  Q     Okay.  And you also discussed the hypothetical

24  negotiation in your direct examination, right?

25  A     Yes, I did.

Eric Cole - Cross                        1573

1  Q      So you're familiar with what that is, right?

2  A      Yes, I am, and I believe I explained it in the

3  direct.

4  Q      Okay.  Now, you understand that in this case the

5  hypothetical negotiation contemplates that the parties

6  would have negotiated what's called a nonexclusive

7  license.  You're aware of that?

8  A      That is my general understanding.

9  Q      All right.  And a nonexclusive license means that

10  Columbia could, after the license to Norton in our

11  hypothetical world, go out and license the same technology

12  to the competitors.  You're aware of that?

13  A      Once again, you're asking for legal terms.  I'm

14  giving you my technical understanding, but I just want to

15  be clear for the record that I'm not a lawyer and can't

16  opine on legal terms.

17  Q      I understand that.  You introduced in direct that you

18  had done at least 15 licensing agreements, right?

19  A      Yes, I have.

20  Q      And you're aware generally that a nonexclusive

21  license means, like it sounds like, the patent holder can

22  license to other people as well.  You're aware of that?

23  A      Once again, not speaking on the law.  But my general

24  understanding, working in the field, that is my

25  understanding.

Eric Cole - Cross                    1574

1  Q    All right.  Whereas an exclusive license might mean I

2  license it to you and you're the only licensee.  That's

3  what makes it exclusive.  Do you understand that,

4  generally?

5  A    Yes, and I've negotiated both types of licenses.  So

6  yes.

7  Q    Okay.  Good.  So the nonexclusive license means that

8  Columbia could license the patents afterwards to other

9  companies.  You understand that?

10 A    That is my understanding of the term, yes.

11 Q    Okay.  And Columbia could then, therefore, license

12 these patents after the nonexclusive license to McAfee and

13 to IBM and to Intel and anyone else it wanted.  Do you

14 understand that?

15 A    That's generally what the term nonexclusive means.

16 Q    All right.  And Mr. Herskowitz talked about this last

17 week.  Did you hear or see his testimony?

18 A    No, I did not.

19 Q    So let me show a little to you and see if we can

20 agree on the same understanding.

21          MR. MORIN:  If we could look at the trial

22 transcript, day 2, at page 455, please.

23 BY MR. MORIN:

24 Q    If you need water at any time or anything, please.

25 A    Okay.  Thank you.  I'm working on this, but I

Eric Cole – Cross                    1575

1  appreciate it.

2  Q    Okay.  And this was Mr. Herskowitz's testimony to the

3  jury.  I asked him, "Because a nonexclusive license allows

4  you to give a license to lots of different companies,

5  right?"

6            And his answer was, "Yes."

7            So that's consistent with what we saw, right?

8            THE COURT:  He doesn't know what we saw.

9            MR. MORIN:  Oh, let me rephrase the question.

10 BY MR. MORIN:

11 Q    That's consistent with your understanding?

12 A    Yes.

13 Q    All right.  And if we can pull up one more bit.  I

14 want to see if this is consistent with your understanding.

15 And I asked Mr. Herskowitz, that someone can't rely on a

16 nonexclusive license as a part of differentiation from the

17 competitors because you can license it to them as well.

18 Do you see that?

19 A    I do.

20 Q    And you generally agree with that?

21 A    Once again, just being careful as it's taking context

22 out of the whole transcript, but that one statement

23 generally is aligned with my understanding, without seeing

24 the rest of the transcript.

25 Q    So just so we're on the same page, period two we

1  decided was our differentiation years.  That's what we

2  decided it was called?

3  A    I believe so.

4  Q    And during the differentiation years, the license or

5  the damages that we're talking about in this case wouldn't

6  have allowed Norton to differentiate itself from its

7  competitors at all.  True?

8  A    If it was the nonexclusive.

9  Q    Okay.  And we'll talk to Dr. Sullivan about that

10 tomorrow.  That's not your area, right?

11 A    Sorry.  Which area?

12 Q    Whether it's exclusive or nonexclusive, you'd defer

13 to Dr. Sullivan, right?

14 A    That is not something I opined on.  I'm very careful

15 not to point to other experts.  So I will just state

16 that's not something I was asked to opine on.

17 Q    Okay.  Now let's go to the third period of time in

18 your report for the demand years.  Okay?

19 A    Okay.

20 Q    And that's from 2016 on, and you call those the core

21 feature years, right?

22 A    I believe so, yes.

23 Q    All right.  And then by then, by the time we get to

24 2016, instead of being a product differentiator, you've

25 offered the opinion that this behavioral protection became

Eric Cole - Cross

1   a feature that customers expected, right?

2   A    I think I might have used the word core feature.

3   Q    Right.  And that core feature, you call it core in

4   that it's no longer a differentiator, it's a feature that

5   customers expect, correct?

6   A    Right.  Typically, when you release a new feature,

7   it's a differentiator.  Some differentiators actually work

8   and become core features.  Other differentiators don't

9   necessarily work and go away and don't get embedded into

10  the product.

11  Q    All right.  Fair enough.  Let's look at your report

12  and just see if we're on the same page here.  If we look

13  at your 2019 report, paragraph 152, please, sir.  And then

14  if we look at the beginning of that paragraph?

15           MR. MORIN:  Your Honor, I'll wait for you.

16  Whenever you're ready.

17           THE COURT:  I'll get there.  I think I'm there.

18           MR. MORIN:  Of course.

19           We can do the whole sentence.  I want to make

20  sure we have context, Mr. Schmoller.

21           Are you there, Your Honor?

22           THE COURT:  I am.

23           MR. MORIN:  Thank you, Your Honor.

24  BY MR. MORIN:

25  Q    And what you said here about the core years is that,

Eric Cole – Cross

1  "Rather than continuing to serve as a product

2  differentiator, behavioral protection became a feature

3  that certain customers expected and which Symantec

4  recognized was an important feature to maintain in its

5  products to avoid being placed at a competitive

6  disadvantage."  Have I read that correctly?  Please, take

7  your time.

8  A    Yes, you did.  I was just sort of anchoring with the

9  table of contents to give the context, but yes.

10  Q    And, sir, you take whatever time you need.  If you

11  need to look at anything else, you always just let me

12  know.  Okay?

13  A    I appreciate that.  Thank you.

14  Q    Okay.  So the point here is that in our core years,

15  rather than our differentiation years, it had become kind

16  of an expected feature because all of the major companies

17  had it.  Fair?

18  A    I wouldn't say that.  To me, a core feature is where

19  it could still go in and be a key component of

20  differentiating from the competition, but now instead of

21  being something new or unique, it's embedded into the core

22  product.

23  Q    Right.  We're past what you call the differentiation

24  years.  We're in the core years, right?  Fair?

25  A    The core features and the key drivers of demand.

Eric Cole - Cross

1  Q    Right.  And if we -- and that's because most

2  competitors had realtime behavioral detection by this

3  period of time.  True?

4  A    Some competitors had similar features during this

5  time period.

6  Q    So is it fair to say, like you said in your report,

7  that most had by that period?

8  A    I believe that would be correct.

9  Q    Okay.  And zero-day protection had also become a core

10 feature, right?

11 A    That is also correct, yes.

12 Q    All right.  So let's take a look at your report,

13 please.  If we go to your 2019 report to page 66.

14         MR. MORIN:  And if Your Honor would let me know

15 when the Court's there.

16         Page 66, please.

17 BY MR. MORIN:

18 Q    And let's put up the chart that you include.  This is

19 your report.  I want to make sure we all know where things

20 are coming from.  This is your report, sir?

21 A    Yes, it is.

22         MR. MORIN:  Okay.  And let's blow up across the

23 top what we're looking at, which is the different

24 companies.

25 BY MR. MORIN:

1  Q     And do you see -- so that we line them up, I want to
2  make sure we're really clear on what we're doing here.  So
3  that we can see the companies next to Realtime Behavior
4  Monitoring, I've taken the top legend, and I've also blown
5  up the line that says Realtime Behavior Monitoring.  Do
6  you see that?

7  A     Yes.  And just for the record, I want to be clear
8  that we're talking the 2016 to '19 period, and the main
9  focus of my apportionment was the 2011 and '13 of the
10 hypothetical negotiations.

11 Q     Totally understand that, sir.  We're going to come
12 back to that, but this is your report, right?

13 A     Yes.  I just wanted to -- this is for context, but
14 the primary focus was on the dates of the hypothetical
15 negotiation.

16 Q     We're going to spend a lot of time there, but, sir,
17 50 pages of your report talks about demand, and this is
18 from your report about one of those three periods.  True?

19 A     That is correct.

20 Q     Okay.  And the point here during the core years was
21 that -- and you included to -- you decided to include this
22 choice, right, that was your choice?

23 A     Yes, it's my report.

24 Q     Right.  And across the top, we use Norton Security
25 with Backup, Norton Security, and then Kaspersky,

1  Trend Micro, McAfee, Webroot and AVG and BitDefender.  Do

2  you see those across the top?

3  A    Yes, I do.

4  Q    And all of those companies had -- and you include

5  this in your report, had realtime behavioral monitoring,

6  right?

7  A    Yes.  In general, yes.

8  Q    And as far as you're aware, other than possibly

9  Norton, none of these used the Columbia technology, as far

10  as you're aware, correct?

11  A    That was not something I was asked to opine on.  So I

12  would just leave it as I'm not sure.

13  Q    You don't know one way or another?

14  A    Yeah, that was not something I was asked to opine on.

15  Q    And you were aware of no evidence that any of these

16  other companies use this functionality that you say is in

17  such high demand?  You're aware of no evidence, right?

18  A    It was not something I researched to see who else

19  utilized the patents.

20  Q    All right.  Let's step forward to your apportionment

21  analysis if that's okay, sir.

22  A    Yes.

23  Q    And I think we saw on the -- during your direct

24  examination, very thorough direct examination, you did

25  kind of -- is it fair to say three levels of

Eric Cole - Cross                    1582

1   apportionment?  Is that fair?

2   A    Yes, it is.

3   Q    All right.  And so we're all on the same page,

4   level 1, you have a product and you're asking yourself

5   what percentage of the value of the overall product is

6   attributable to malware overall, correct?

7   A    I think it would be the opposite, which is malware

8   detection, what is the value of malware detection added to

9   the overall product, what percent of the overall product

10  is contributed to malware detection.

11  Q    You said it.  That's what I was getting at.  So we

12  have a product.  What percentage of the value of that

13  product do you attribute to malware versus other things?

14  A    Correct.

15  Q    Okay.  And then level 2, what we do is we go and we

16  say now we're at malware, but we all agree that the

17  patents don't cover all malware.  What you do next is say

18  how much of that is the accused functionality, which I'll

19  shorthand as SONAR.  Fair?

20  A    That is correct.

21  Q    And to make sure I understand your analysis

22  correctly, the third level that we do then is we say now

23  we're at SONAR.  What percentage of the value of SONAR is

24  the patented features.  Fair?

25  A    That is step three.

Eric Cole - Cross                    1583

1  Q     Okay.

2              MR. MORIN:  Moment's indulgence, Your Honor.

3              THE COURT:  Of course.

4              MR. MORIN:  If we could switch to the ELMO,

5  please.  Thank you.

6  BY MR. MORIN:

7  Q    Now, my -- my handwriting is terrible.  My mom would

8  be literally very upset, but here we go.  I want to track

9  what we're doing.  Level 1, we'll call it malware.  Fair

10  to refer to it that way?  That will get you shorthand.

11              MR. MORIN:  I'm not on the screen.

12              THE CLERK:  Hang on.  It should have autofocus.

13              MR. MORIN:  Yep.  There we go.

14  BY MR. MORIN:

15  Q    Level 1, malware.  Level 2 is SONAR, and level 3 is

16  patented technology.  Fair?  Reasonable shorthand.

17  A    I tend to be more visual so I would refer back to my

18  slide with the boxes, but from looking at that, I believe

19  that represents what's on that graphic in my direct.

20              MR. MORIN:  Okay.  So we can take that down for

21  a minute.

22  BY MR. MORIN:

23  Q    We're going to track as we go.  Is that fair?

24  A    Yes, that's fine.

25  Q    All right.  So let's start with the first step, which

Eric Cole - Cross                    1584

1   is determining the value of the malware protection to

2   Norton's products, and you mentioned on direct examination

3   that you did two sets of reports, one in 2014 and the

4   second in 2019, right?

5   A    That is correct.

6   Q    I'm glad you mentioned it earlier.  The hypothetical

7   negotiations in this case took place either in 2011 or

8   2013, correct?

9   A    That is correct.

10  Q    So we're all on the same page, your 2014 report came

11  after when the hypothetical negotiation would have been?

12  A    That is correct.

13  Q    Okay.  And you did the same apportionment, meaning

14  the step, the level of apportionment, from the products to

15  the component that was malware value back in 2014 as well.

16  True?

17  A    I did the same general steps, but I was given

18  different scope and direction in '14 than I was in '19.

19  Q    By the lawyers?

20  A    That is correct.

21  Q    Okay.  So Columbia had one set of lawyers, you're

22  saying, that gave you one set of instructions?

23  A    In 2014.

24  Q    Right.  And then Columbia replaced the lawyers and

25  then the lawyers gave you a different set of instructions?

Eric Cole - Cross                    1585

1   A    Or a different assignment in 2019, that is correct.

2   Q    But the overall step of taking the product and

3   bringing it down and apportioning the malware value, you

4   did that in 2014 as well.  True?

5   A    That is true.

6   Q    Right.  And you signed -- let's look at the front

7   page of that 2014 report.

8            MR. MORIN:  If we could put it on the screen.

9   BY MR. MORIN:

10  Q    You signed -- it wasn't the lawyers who signed that

11  report.  You signed the report.  Fair?

12  A    Yes, I did.

13  Q    Right.  And you take ownership for that report,

14  representing your opinions, right?

15  A    Yes.  And it's clearly in the report the scope and

16  task that I was asked to do.  So based on the limited task

17  in '14, I do stand behind that opinion.

18  Q    Well, one of the tasks you were asked to do was

19  apportion the value of the accused functionality as part

20  of the overall product, right?

21  A    But the task had a caveat that said I needed to use

22  Carey Nachenberg's number as the upper limit.  So that was

23  the task that I started with, Carey Nachenberg's number as

24  the upper limit to do my apportionment.

25  Q    Does that report say anywhere the lawyers directed me

Eric Cole - Cross                    1586

1   to use Mr. Nachenberg's testimony as the upper limit?

2   A    I do not believe that report has a legal section,

3   which normally they do that covers the various legal

4   assumptions.  But under apportionment, it does say that

5   I'm using 70 percent as the upper limit.

6   Q    Oh, we're on the same page there.  We'll look at

7   that.  But what it doesn't say is the lawyers or anyone

8   has instructed me to use 70 percent as the upper limit.

9   It doesn't say that.  True?

10  A    Like I said, I don't believe there's a legal section

11  that would normally cover that, but I'm telling you today

12  what the tasking was.

13  Q    Right.  But that's not what the report says, right?

14  A    Like I said, I believe the report does say that I

15  used 70 percent as the upper limit.

16  Q    Oh, we can agree on that.  We'll look at that in a

17  moment.

18          But in that -- in that report, you relied on the

19  deposition testimony of Mr. -- I think it's Nachenberg,

20  Mr. Nachenberg, correct?

21  A    Yeah.  I apologize if I mispronounced his name, but I

22  believe we're referring to the same person.

23  Q    I get the names wrong all the time.  I was just

24  speaking common parlance.

25  A    Okay.

Eric Cole - Cross

1    Q    I may have it wrong too.  I haven't met the man.

2         But let's -- and he estimated that the

3    protection feature of -- in the Norton product was

4    70 percent of the value of the product and 60 percent for

5    the enterprise product, right?

6    A    70 percent for consumer and 60 percent for

7    enterprise.

8    Q    Now, let's look at paragraph 36, if we could, of the

9    report, and we're in your 2014 report.

10        MR. MORIN:  And I'd like to blow it up, please.

11   BY MR. MORIN:

12   Q    And this is, again, a report you signed your name to,

13   sir?

14   A    Yes, it is.

15   Q    Okay.  And let's look at what it says at the last

16   half of that sentence -- and I think this is important.

17   It doesn't say, I have been instructed.  It says the

18   following, sir:  "Accordingly, I generally agree with the

19   assessment of Symantec's witness who estimated that

20   malware detection contributes approximately 70 percent of

21   the value of Symantec's consumer products (the Norton line

22   of products) and approximately 60 percent of the value of

23   Symantec's enterprise products (Symantec Endpoint

24   Protection and Symantec Mail Security)."

25        So in that report, you say that you agree,

1   correct?

2   A    Generally agree, but there are segments where I talk

3   about the 70 percent upper limit and I am telling you what

4   the assignment is, but yes, those words do say I generally

5   agree.

6   Q    Right.  So we're going to get to that section.  I

7   know you keep mentioning it.  We're going to get there,

8   sir.  I promise we'll give you a chance to be heard.

9            But when we start on this section of the report,

10  you don't say, I've been instructed to adopt

11  Mr. Nachenberg.  You say, I agree with Mr. Nachenberg,

12  correct?

13  A    I generally agree.  And like I said with today, my

14  average was 74.  His was 70.  So we're still within

15  4 percent.

16  Q    We're going to get there also.  Now, Mr. Nachenberg

17  mentioned, as you said on direct, that Mr. Nachenberg is a

18  fellow at Norton.  You mentioned that, right?

19  A    A senior fellow, I believe.

20  Q    Right.  That's the highest position -- engineering

21  position you can have at the company, right?

22  A    Typically, a company as a senior fellow is the

23  highest technical position.

24  Q    Have you been a senior fellow anywhere?

25  A    Yes, I have.

1  Q     Where was that?

2  A     Lockheed Martin.

3  Q     Right.  That's a really prestigious position, right?

4  A     At Lockheed, it was.

5  Q     And the same at Norton for Mr. Nachenberg, right?

6  A     That's my general understanding.

7  Q     And you mentioned Norton's STAR division in your

8  direct a couple of times, right?

9  A     Yes.

10 Q     And that stands for Security Technology And Response,

11 right?

12 A     That's one where some of the documents call it

13 Symantec Technology And Research, and some of the

14 documents call it Security Technology And Research.  So

15 I'm not sure which S is correct.

16 Q     That's an organization that you've talked about as

17 being an important organization in your direct

18 examination.  Fair?

19 A     My understanding is STAR is the division that's

20 responsible for those four detection components within the

21 antivirus product.

22 Q     And Mr. Nachenberg, you're aware, was the chief

23 architect of all of STAR.  You're aware of that?

24 A     I believe he did have that title at one point, yes.

25 Q     And I think maybe we can reach agreement that

1  Mr. Nachenberg knows his stuff and is pretty impressive.

2  Fair?

3  A    I've never met the individual, but from what I've

4  seen in the documents and based on his titles, he does

5  appear to be a very knowledgeable person.

6  Q    Right.  And you mentioned Dr. Bailey's testimony

7  during your direct exam.  Do you remember that?

8  A    Yes, I did.

9         MR. MORIN:  And maybe we could put up

10 Dr. Bailey's slide 60, please.

11 BY MR. MORIN:

12 Q    And here we see Mr. Nachenberg there.  He's a

13 Symantec fellow.  That was from Dr. Bailey's slides,

14 right?

15        THE COURT:  Does he know that?

16        MR. MORIN:  He talked about Dr. Bailey's

17 testimony on direct.  I can represent it instead,

18 Your Honor.

19        THE COURT:  Yeah, he doesn't know Dr. Bailey's

20 slides.

21        MR. MORIN:  Be happy to.

22 BY MR. MORIN:

23 Q    I will represent to you that this was one of

24 Dr. Bailey's slides.  You see that Mr. Nachenberg is on

25 there?

1   A    I did.  He seems to have disappeared, but I did see

2   that.

3   Q    All right.  And just so we're on the same page --

4           MR. MORIN:  If we could put up slide 82.

5   BY MR. MORIN:

6   Q    And we see that Dr. Bailey cited to Mr. Nachenberg

7   down there in this slide.  Do you see that?

8   A    Sorry.  Where is this slide coming from?

9   Q    I'll represent to you it's from Dr. Bailey.

10  A    Oh, Dr. Bailey's direct?

11  Q    Right.

12  A    Okay.

13  Q    And you'll see if we go to slide 157, he cites to

14  Mr. Nachenberg.  Do you see that?

15  A    Is the question just for me --

16  Q    Do you see that?

17  A    I do see that he sourced Nachenberg.  I can't opine

18  on what is or is not in Bailey's presentation.

19  Q    Absolutely not.

20  A    Okay.

21  Q    If we go to slide 136, do you just see that he cited

22  to Mr. Nachenberg?

23  A    Once again, I see that on the slide.  I do not know

24  these slides specifically.

25  Q    And on slide 176, finally, do you see that Dr. Bailey

1   again relied on Mr. Nachenberg?

2   A    I do see "Source Nachenberg" on the slide.

3   Q    Now, here's the part that you were trying to get to.

4   In 2014, you used Mr. Nachenberg's number as your ceiling

5   as to what the highest amount of value would be.  That's

6   the point you were making?

7   A    Yes, it was.

8   Q    Okay.  Let's look at your report on that subject.

9         MR. MORIN:  If we could pull up paragraph 121,

10  please, and put it on the screen.

11  BY MR. MORIN:

12  Q    And, again, this is your 2014 report.  Do you

13  understand that?

14        MR. MORIN:  Go to paragraph 121, please.

15  BY MR. MORIN:

16  Q    Are you there, sir?

17  A    Yes, I am.

18  Q    All right.  And paragraph 121 in your report says,

19  "First, substantial evidence from Symantec's documents and

20  witnesses supports the allocation of up to 70 percent of

21  the value of the consumer products to malware detection."

22  Do you see that?

23  A    Yes, I do.

24  Q    And then if we go to the bullet points you used to

25  support that, the first bullet point talks about Symantec

1  designating Carey Nachenberg.  Do you see that?

2  A    I do see that.

3  Q    And the next report in your reports talks about

4  Mr. Nachenberg elaborating on a presentation.  Do you see

5  that?

6  A    I do see those words.

7  Q    And the third point talks about Mr. Nachenberg

8  confirming that no functionality is more important than

9  malicious intrusion functionality.  Do you see that?

10  A    I see that.

11  Q    So just so we're clear, your report doesn't say the

12  lawyers have asked me to treat it as a ceiling.  It

13  doesn't say the lawyers told me to allocate up to

14  70 percent.  Your report says, "Substantial evidence

15  supports the allocation of up to 70 percent."  That's what

16  the report says, correct?

17  A    The report says, "From Symantec's documents and

18  witnesses."

19         As I mentioned, there's not a legal section in

20  the report, but I'm the author of the report, so I'm

21  telling you what direction I was given in writing that

22  report.

23  Q    Okay.  So just so we're on the same page, you're

24  telling all of us years later that you adjusted the

25  numbers up because of what the lawyers said, but can we

Eric Cole - Cross                    1594

1   agree there's no indication of that in the report?  Can we

2   agree on that?

3   A    I do believe I indicate 70 percent is the upper

4   value, but there is not a legal section in the report

5   where I talk about the legal assumptions and what the

6   lawyers told me to do.

7   Q    And I just -- I won't belabor the point.  We'll move

8   along.  Can we agree that anyone reading this report, when

9   you say -- and this is you talking, right?  This is your

10  signature?

11  A    Yes, it is.

12  Q    You say, "Substantial evidence from the documents and

13  the witnesses supports the allocation of up to 70 percent

14  of the value."  That it doesn't say, or remotely suggest,

15  you were asked by the lawyers to treat it as a cap.  It

16  suggests and it says that it's your opinion.  Fair?

17  A    Just for the record, I believe you did leave out the

18  word "Symantec documents and witnesses," just so it's

19  correct.

20        But this section says up to 70 percent, but I

21  will agree that that section does not say what was the

22  task I was given from the attorneys.

23  Q    All right.  And so we're clear on the record, you

24  signed the report, and this is the opinion that you gave

25  at the time.  True?

1   A     Based on the assignment I was asked to do, yes.

2   Q     Okay.  Now, that means if 70 percent of the value was

3   due to malware detection, it meant that 30 percent was for

4   features other than malware protection.  Fair?

5   A     That would be the general basis.

6   Q     All right.  And by the way, what Mr. Nachenberg did

7   not say, that 70 percent of the value was due to malware

8   detection, did he?

9   A     I would have to look back at his deposition.  I think

10  it was a little more general.

11  Q     Right.  So let's take a look at that.  You relied on

12  his deposition and cited it in both of your reports.

13  Fair?

14  A     Correct.

15  Q     All right.  So let's take a look at his deposition

16  testimony.

17  A     Would I be able to get an additional bottle of water?

18  Q     Of course.  Of course, sir.

19              MR. MORIN:  May I approach, Your Honor?

20              THE COURT:  No.  My CSO will do it.

21              MR. MORIN:  Okay.

22              THE COURT:  Thank you.

23              MR. MORIN:  Of course.  We can take five, if

24  Your Honor would like.  It's up to Your Honor.

25              THE COURT:  Are you doing okay?  Dr. Cole,

1  you're doing okay?

2           THE WITNESS:  Yes, I'm doing good.  Thank you,

3  Your Honor.

4           THE COURT:  All right.

5  BY MR. MORIN:

6  Q    Okay.  I needed a break also so thank you.

7           Okay.  Now, let's look at the testimony that

8  actually you put on the screen -- your lawyers put on the

9  screen, which was your slides.  Okay?

10           MR. MORIN:  May I have a moment, Your Honor?

11           THE COURT:  Yes, you may.  And actually, let's

12  just take -- we've been an hour.  So we'll come back at

13  4:10.

14           MR. MORIN:  Sorry, guys.

15           (The jury exited the courtroom.)

16           THE COURT:  How much longer do you think you

17  have?

18           MR. MORIN:  Forty-five minutes.

19           THE COURT:  Okay.

20           MR. MORIN:  Thank you, Your Honor.  I'm sorry

21  for the interruption.  I had a little frog in my throat.

22           THE COURT:  No.  That's okay.  It happens.  I

23  have my own Life Savers up here.

24           All right.  So we'll take a recess until 4:10.

25           I'll remind you now and again, Dr. Cole, that

Eric Cole – Cross

1  you're still under oath.

2           THE WITNESS:  Yes, Your Honor.

3           THE COURT:  And we'll see you back in just a few

4  minutes.

5           MR. MORIN:  Thank you.

6           (Recess taken at 3:49 p.m.)

7           (The trial continues on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ERIC COLE – CROSS                    1598

1              (The trial resumed at 4:11 p.m.)

2         THE COURT:  Is there anything we need to

3    cover before we bring in the jury?

4         MR. MORIN:  No, Your Honor, other than me

5    apologizing for calling for a break when my voice went

6    out.

7         THE COURT:  No, that's fine.  The jury was

8    ready.

9         MR. MORIN:  Okay.

10        THE COURT:  So we can bring them in.

11   Ms. Deskins.

12        MR. MORIN:  Dr. Cole, have you got your

13   water?

14        THE WITNESS:  Yes.

15             (The jury entered the courtroom.)

16        THE COURT:  All right.  Are we all ready to

17   go?

18        A JUROR:  Yes.

19        THE COURT:  Okay.  Dr. Cole, you're still

20   under oath.

21        THE WITNESS:  Yes.  Thank you, Your Honor.

22        THE COURT:  Thank you.

23        MR. MORIN:  May I proceed, Your Honor?

24        THE COURT:  Yes, please.

25        MR. MORIN:  Thank you, Your Honor.

ERIC COLE – CROSS                    1599

1    BY MR. MORIN:

2    Q    When we left off and when I had a frog in my

3    throat, we started talking about Mr. Nachenberg's

4    testimony about the 70 percent, right?  Is that about

5    where we left off?

6    A    That's my understanding, yes.

7    Q    Okay.  And I was just turning to where you had

8    displayed on the screen -- where your counsel had

9    displayed on the screen some of his testimony, and I'd

10   like to go to your Slide 58, sir.  And we'll put it on

11   the screen for you.  And this is a slide that you

12   talked about on direct examination; is that correct?

13   A    Yes, it is.

14   Q    And it actually doesn't say malware detection.  It

15   says what percentages of the value that consumers get

16   from their products from you is attributed to

17   protection, and then you bolded the 70 percent.  Do

18   you see that?

19   A    Yes, I do.

20   Q    And you are aware, sir, that that wasn't just

21   malware protection he was talking about, sir?

22   A    My understanding is when he was talking about the

23   protection, that it was the malware protection

24   component.

25   Q    All right.  Let's go back to Mr. Nachenberg's

1  deposition transcript at page 210, lines 16 through

2  25.  And you see that --

3          MR. MORIN:  Maybe we can go up to line 16.

4  That's right, 16 to 25.

5  BY MR. MORIN:

6  Q   And he was asked, "And you see that the first

7  category is virus protection.  Do you see that, sir?"

8       His answer is, "Yes."

9       "Second category is firewall protection.  Do you

10 see that, sir?"

11      His answer is, "Yes."

12      "Third category is spyware protection.  Do you see

13 that, sir?"

14      And his answer is, "Yes."

15      "And the fourth one is phishing protection."

16      And I cut that off.

17          MR. MORIN:  We should probably continue and

18 give him the answer, in fairness.  Thank you,

19 Mr. Schmoller.

20 BY MR. MORIN:

21 Q   And he says -- the answer is, "Yes."

22      Do you see all that, sir?

23 A   I do see that Q and A, that one segment from his

24 transcript.

25 Q   Okay.

1    MR. MORIN:  And let's go to page 211, lines 1

2  through 17, please -- or I guess we should take 3

3  through 17.

4  BY MR. MORIN:

5  Q   And then he was asked a question, "And all these

6  four categories involve what we would classically

7  describe as security, correct, sir?"

8       And he says, "Yes."

9       And he was asked a question by Columbia's counsel,

10 "There are ways of protecting against malicious

11 programs entering the computer system, correct, sir?"

12      And his answer is, "That is incorrect."

13      And the question is, "Why is that incorrect?"

14      And he says, "Virus protection and spyware

15 protection are, in part, focused on blocking malicious

16 software.  Firewall protection and phishing protection

17 are focused on the network and, you know, web scanning

18 respectively so they're not focused on malware, you

19 know, files," so on.

20      Do you see that, sir?

21 A   I do see that, and I think he's differentiating of

22 how the blocking was happening, whether it's coming in

23 over the network or a file on the computer system, but

24 both of those seem to imply that they're still

25 stopping malware either at a network or a file level.

1  Q    Well, Mr. Nachenberg's testimony that both you and

2  Dr. Bailey have relied on, he says those aren't

3  focused on malware, correct?

4  A    He said "malware, you know, files."  So he's

5  referring to files on the computer instead of malware

6  coming in network packets.

7  Q    And he actually says at the beginning of that

8  answer, "Virus protection and spyware protection" --

9  two of the four -- "are, in part, focused on blocking

10  malicious software."  Then he says, "Firewall

11  protection and phishing protection are focused on the

12  network and, you know, web scanning respectfully."

13  That's his testimony, right?

14  A    I believe what he's differentiating is if you

15  remember my animations where we talked about IPS or a

16  firewall where we had the guardhouse with the packets

17  coming in from the Internet, that's the network

18  traffic he's referring to.  And when you have files on

19  a computer with the antivirus signature, he was

20  referring to that.  But both of those are stopping

21  malware at different levels.  He's just

22  differentiating between network blocking and file

23  blocking.

24  Q    Okay.  And you used his 70 percent number in that

25  first report.  We talked about that, right?

1  A    As the upper limit, correct.

2  Q    And then your range ended up being 53 to

3  70 percent, right?

4  A    For the consumer products, right.

5  Q    And for the enterprise product, it was 60 percent.

6  So the overall range was 53 to 70 percent?

7  A    Sorry.  Are you mixing the two?  I am not sure of

8  the question.

9  Q    We can do it separately.  The consumer product was

10  53 to 70, right?

11  A    That is correct because we used 70 as the upper

12  limit.

13  Q    Right.  And the enterprise product was 60 percent,

14  right?

15  A    Yes.  Mr. Nachenberg, if I can pronounce it

16  correctly, Nachenberg said 60 percent for enterprise,

17  and because there was only a single product, based on

18  my direction for the 2014 report, 60 percent was that

19  value.

20  Q    They told you what to allocate for the 2014

21  report?

22  A    No, they didn't.  The scope was -- in 2014, was

23  use Mr. Nachenberg's numbers as the upper limit and

24  allocate down.  That was the assignment I was asked to

25  do in '14.

1   Q    Sure.  And just because the 60 percent is between

2   53 and 70, we can agree your numbers in 2014 were

3   between 53 and 70 percent, all of them, correct?

4   A    For both products, now I understand, yes.

5              MR. MORIN:  Can we go to the ELMO, please?

6   BY MR. MORIN:

7   Q    53 to 70 percent.  Okay.

8   A    Just for accuracy, could we put 2014 so -- because

9   the numbers are different in 2019.

10  Q    Of course.

11             MR. MORIN:  Actually, I've messed up.  Can I

12  get a new piece of paper?  A moment's indulgence, Your

13  Honor.

14  BY MR. MORIN:

15  Q    I should have looked at my notes.  I think you are

16  exactly right.  Apologize for making you wait.

17       Okay.  And you raise a good point.  We'll wait and

18  put 2014 down.  Let's do 2019, if we can.  While we

19  have this up, can we agree that your numbers for 2019

20  were all between 60 and 95 percent?  Is that fair?

21  A    Yes.  It was 60 to 95 percent for consumer, and

22  enterprise was 75.  So it would also be within that

23  range.

24  Q    All right.  So that would be current position, 60

25  to 95 percent.  That's your testimony now, correct?

 1          THE COURT:  I am going to ask you not to ask

 2   questions when you're away from the microphone,

 3   please.

 4   BY MR. MORIN:

 5   Q    That accurately represents your current opinion,

 6   correct?

 7   A    With my assignment in 2019 to look at the new

 8   evidence and not have any constraints and just do a

 9   full analysis of the allocation, that would be

10   correct.

11   Q    The first set of lawyers, you were at 53 to 70.

12   With the second set of lawyers, you were from 60 to

13   95, true?

14   A    With the caveat, for the record, I was given two

15   different assignments.  So the assignments were

16   different.  And also, the evidence was slightly

17   different between '14 and '19.  So there are two

18   variables that would cause the change.

19   Q    Okay.  So your 2014 report had 70 percent of the

20   value of the Norton AntiVirus product as malware,

21   correct?

22   A    So can you repeat the question?

23   Q    Your 2014 report allocated 70 percent --

24          MR. MORIN:  We can take that down, please.

25   BY MR. MORIN:

ERIC COLE - CROSS                    1606

1    Q    -- allocated 70 percent of the value of the basic

2    Norton AntiVirus product to malware, correct?

3    A    In 2014, I was asked to use Mr. Nachenberg's

4    number, 70 percent for consumer as the upper limit.

5    So I started at 70, not 100.

6    Q    Okay.  But you applied, in your apportionment,

7    70 percent to the Norton AntiVirus product in 2014,

8    fair?

9    A    That is correct.

10   Q    Okay.  Then we get to 2019 and the new lawyers,

11   and the number all of a sudden was 90 percent, right?

12   That's what your new number is for Norton AntiVirus?

13   A    With the different assignments of 2014, I started

14   at 70 percent.  And in 2019, there was no constraints

15   so I was asked to start at 100 percent.

16   Q    Okay.  But just so we are all following along,

17   2014 report, 70 percent of the value of Norton

18   AntiVirus was malware.  2019 report concludes

19   90 percent, true?

20   A    Once again, for the record, two different

21   assignments and tasks.  2014, I started at 70, and

22   2019, I started at 100.

23   Q    Okay.  How about I spot you the following so we

24   are all on the same page?  We know that you're going

25   to tell us they were different assignments.  Let's

1    just talk about the numbers for a minute.  I will tell

2    you, we all understand that's your testimony.

3         Can we just get to the point that in 2014 the

4    number is 70 percent, in 2019, the number is

5    90 percent?  True?

6    A    The numbers are different because the assignment

7    was different in those two cases.

8    Q    Right.  And when you go from 70 percent to

9    90 percent, you are saying that the value of all of

10   the other components is cut in a third; it goes from

11   30 percent to 10 percent.  The math is right?

12   A    That would be correct, the allocation, because

13   we're starting at a different point and remembering

14   that the primary feature of why somebody is buying

15   these products is malware detection.

16   Q    Okay.  And we talked about -- earlier we agreed

17   that in 2014 you treated Mr. Nachenberg's numbers as a

18   ceiling, right?

19   A    That is correct.

20   Q    And then 2019 comes along and you treated them as

21   a floor, correct?

22   A    That's not correct because my numbers were 60 to

23   95 percent.  So if I treated Mr. Nachenberg's numbers

24   as a floor, then my range would have stopped at 70.

25   Q    All right.  You treated Mr. Nachenberg's numbers

ERIC COLE – CROSS                1608

1   of 70 percent as a floor as it relates to the Norton

2   AntiVirus product, true?

3   A    I'm not understanding the question.

4   Q    Let's put up your report, then.

5           MR. MORIN:  If we could go to the 2019 report

6   to paragraph 47.  And if we could throw that on the

7   screen, please.  And we're going to pages -- we're

8   going to paragraph 47, please.  Paragraph 47 of the

9   2019 report, Mr. Schmoller.

10          THE COURT:  What paragraph are you saying?

11  I'm sorry.

12          MR. MORIN:  47 of the 2019 report.  We're

13  getting it up, Your Honor.

14     If we could bring up the beginning of the next

15  page to make sure we're complete for the jury and for

16  the witness.

17  BY MR. MORIN:

18  Q    Let's read what you said in 2019 about

19  Mr. Nachenberg.  You said, "Symantec's own witness

20  estimated that malware protection contributed

21  approximately 70 percent of the value of Symantec's

22  customer products (the Norton line of products) and

23  approximately 60 percent of the value of Symantec's

24  enterprise products."  And then -- do you see that

25  part?  It's on your screen as well, sir.

ERIC COLE - CROSS                1609

1    A    Yes, I do.

2    Q    Okay.  So before, in your 2014 report, you said it

3    was the ceiling.  And then you say, "Figures that

4    having been admitted by Symantec's witness, I consider

5    it appropriate to treat as a floor in assessing the

6    value of Symantec's products attributable to malware

7    detection," right?

8    A    But it says, "As discussed below."  So it's used

9    more as, like we did in that summary graph, as sort of

10   a sanity check of those numbers.

11   Q    I understand, but am I reading this correctly that

12   because Symantec's witness, which is -- Mr. Nachenberg

13   testified to that, you say, "Having been admitted by

14   Symantec's witness, I consider it appropriate to treat

15   as a floor in assessing the value of Symantec's

16   products."  Do you see that?

17   A    That is there.  But if you read the rest of the

18   report, it puts that in context of what I was

19   referring to.

20   Q    I understand, but I just want to make sure that we

21   can agree together.  In 2014, you were asked to do a

22   report, and you signed it, and you used Nachenberg's

23   number, and you said it was a ceiling, and now in the

24   2019 report -- you used the same testimony -- you say

25   it's a floor, correct?

1    A    That's what that sentence says, but as I said, if

2    you read the whole report, it puts it in context.

3    Q    I'm pretty sure we don't want to read the whole

4    report, but that's what that sentence says at least,

5    right?

6    A    The one sentence out of context does say that.

7    Q    Okay.  And it's interesting you say that.  You say

8    it's a floor because it was admitted by Symantec's

9    witness.  Do you see that?

10   A    I do see that.

11   Q    So you decided that it's a floor, it says here in

12   the sentence, because it was Symantec's witness who

13   said it.  That's what you say here?

14   A    That's what that sentence says.

15   Q    And he was a Symantec employee when you wrote your

16   2014 report.  That hadn't changed, right?

17   A    Once again, the assignment was different between

18   the two years, and I think that's a very critical

19   difference in the numbers.

20   Q    Just to be clear, when you treated it earlier as a

21   ceiling, when you wrote that report, he was a Symantec

22   employee, right?

23   A    That is correct.

24   Q    And when you wrote this one, he was the same,

25   still a Symantec employee, right?

1    A    That is correct, but the assignments were

2    different between the two reports.

3    Q    I understand.  But in this report, you say it's a

4    floor because it was Symantec's witness.  That's what

5    you say right there.  We just agreed on that?

6    A    Yes, that's what it says.

7    Q    Do you understand that Mr. Nachenberg testified

8    under oath in his deposition?

9    A    That is my understanding, yes.

10   Q    Do you know the man?

11   A    No, I do not.

12   Q    All right.  Do you understand that the Court has

13   instructed the jury that they are the sole judges of a

14   witness's credibility?  It's not your decision, it's

15   the jury's.  Are you aware of that?

16   A    I haven't seen the specific jury instructions, but

17   having done this before, that's my general

18   understanding.

19   Q    The jury saw Mr. Nachenberg's testimony earlier

20   today and they can decide to credit it or not.  Do you

21   understand that?

22   A    Once again, you're asking me for legal --

23              THE COURT:  You know, you really are.

24   Just -- he doesn't know what I instructed the jury.

25   He wasn't there.

1     MR. MORIN:  I could put it up, Your Honor, if

2  you'd like.

3          THE COURT:  Go ahead and put it up.

4          MR. MORIN:  Okay.  If we could call out

5  page 43, lines 17 through 20.

6  BY MR. MORIN:

7  Q   And it says here, "Now, judging a witness's

8  credibility, you are the sole judges of each witness's

9  credibility.  In deciding the facts, you may have to

10  decide which testimony to believe and which testimony

11  not to believe."  You understand that's the jury's

12  role, correct?

13  A   Sorry.  I don't know what this document is.  You

14  just -- I didn't see a title page or anything related

15  to it.  So I'm not sure what this is you're showing

16  me.

17  Q   Okay.  I will represent to you and then move on,

18  but that was the instructions that the Court gave to

19  the jury at the beginning of this case.

20  A   If you attest to that.  Like I said, you're

21  throwing up page 43 out of context.

22  Q   Okay.  Now, we talked about the fact that by going

23  from 70 percent to 90 percent, you changed the

24  allocation for the other components of Norton

25  AntiVirus from 30 percent to 10 percent.  The math

1   works, right?

2   A    I believe that is correct, yes.

3   Q    Okay.  So let's go to a demonstrative and look at

4   some of the features that are in a Norton AntiVirus.

5            MR. MORIN:  If we could put that on the

6   screen.

7   BY MR. MORIN:

8   Q    So here's Norton AntiVirus.  And you talked about

9   malware detection.

10           MR. MORIN:  Let's see that.

11  BY MR. MORIN:

12  Q    Now, malware detection I have in blue, and let me

13  make sure I have this straight.  If we go to the next

14  clip, we have -- you gave 90 percent of the value of

15  the product to malware protection and 10 percent to

16  the collection of Norton community watch, the product

17  downloads and installations, the free support, like if

18  you call or you email, all the stuff Norton has to do,

19  the live threat monitoring, the antiphishing, the

20  identity safe, the network mapping and monitoring,

21  Norton Pulse, insight and optimized file copy,

22  built-in intelligence, Norton Management, Norton Power

23  Eraser, and Norton Bootable Recovery Tool.  I just

24  want to make sure we're clear.  You gave 90 percent to

25  malware protection and 10 percent to all the rest

ERIC COLE — CROSS                    1614

1    combined, true?

2    A    I gave 10 percent to all the other features.   I

3    don't know if all of these features are actually

4    Norton AntiVirus, but I did give 10 percent to the

5    other non-malware.   But I believe a few of these might

6    not actually be a Norton AntiVirus.

7            THE COURT:   Let me just ask a question.   What

8    are we looking at again here?

9            MR. MORIN:   It's a demonstrative exhibit,

10   Your Honor.

11           Jury, I should tell you, this is not

12   evidence.   This is based on other documents, but this

13   document --

14           THE COURT:   You know what.   I'll instruct

15   them on jury --

16           MR. MORIN:   Oh, I thought we were supposed to

17   instruct, Your Honor, and tell them.

18           THE COURT:   You've told them that.

19           I think you all know demonstrative exhibits

20   are not evidence.   So they are created by each party

21   to demonstrate something.

22           MR. MORIN:   Thank you, Your Honor.   I didn't

23   mean to step in your role.   I think in the pretrial

24   order it asked us to do that, and I had neglected to

25   do that, Your Honor.

1          THE COURT:  All right.  That is fine.

2   BY MR. MORIN:

3   Q    All right.  So let's talk more about the basic

4   Norton AntiVirus product.  It sold for about $40; is

5   that correct?

6          MR. MORIN:  We can pull that down.

7   BY MR. MORIN:

8   Q    Is that about right?

9   A    I have to check the price.  I think it was a

10  range.  I don't have every price memorized.

11  Q    You're actually right.  It goes up by 10 bucks.

12  Let's look at your report at page 110, 2019 report.

13  And let's look at NAV -- NAV is Norton AntiVirus,

14  correct?

15  A    That is correct.

16  Q    And we see that in 2010, '11 and '12, it is $40.

17  33.99.  Do you see that?

18  A    Yes, I do.

19  Q    And by the way, we may get a little confused

20  sometimes.  The accused functionality was added in

21  2009, right?

22  A    Into consumer, yes.

23  Q    At the consumer level, right.  On Norton

24  AntiVirus, it was added in 2009, correct?

25  A    NAV, or Norton AntiVirus, is a consumer product.

ERIC COLE - CROSS          1616

1    So it was added in 2009.

2    Q    All right.  Sometimes it will say year 2010.  You

3    understand it's a little like cars.  At the end of

4    2009, it may be the 2010 version?

5    A    So I apologize.  I don't follow the question.

6    Q    You start here with your 2010, but that's actually

7    the version of Norton AntiVirus that was released in

8    2009.  Do you understand that, in late 2009?

9    A    Yes, that's my understanding.  Thank you for

10   clarifying.

11   Q    I was just making the point so we don't get too

12   confused that if you buy a -- if this year you might

13   be able to buy a 2023 Chevy in summer or fall of 2022.

14   That's the point here.

15   A    That's my general understanding.

16   Q    Okay.  And -- but Norton AntiVirus had been sold

17   for many years before the accused functionality was

18   added, right?

19   A    I believe so.  Why I was pausing is I know they

20   changed product names so I am trying to figure out

21   when they changed the product names, but Norton did

22   have solutions prior to adding in the infringing

23   technology.

24   Q    So if you turn in your binder to what's been

25   marked for identification purposes as DX-EB, we have a

ERIC COLE - CROSS                   1617

1   screenshot just to look at a price point from the

2   Wayback Machine.  You relied, by the way, in your

3   report sometimes on the Wayback Machine, right?

4   A   Yes, I did.  And for the jury, the Wayback Machine

5   is basically a recording mechanism of the internet so

6   you can go back to 2010 or 2009 and search on names,

7   and it will show you what the content of websites were

8   during that time period.

9   Q   That was going to be my next question.  Thank you,

10  sir.

11      And if we look at what the price point was in

12  2007, we'll see that it was 39.99.  Do you see that?

13  Or 2008, I should say.  Do you see it's 39.99?

14  A   Yeah, it looks like this was captured in 2007, but

15  it is talking about Norton Internet Security 2008,

16  which is what I meant by the name changes.

17  Q   Right.  So it's our car example.  It was captured

18  in 2007, but the model is 2008, but what's important

19  is you see that the price in 2007 was 39.99.  Do you

20  see that?

21  A   I do see that.

22  Q   All right.  Let's go to what's been marked for

23  identification purposes as DX-EC.  And if we look at

24  the price of that product on October 5, 2008, we'll

25  see that the price, if you just confirm that I'm

1  reading this correctly -- no, wrong product.  We'll

2  talk about that one -- was 39.99.  Do you see that?

3  A    Yes, I do.

4  Q    All right.  Let's go back to your report, then, at

5  page 111 and look at what it costs in the years 2010,

6  '11, and '12.  And in 2010, '11, and '12, the price

7  was 39.99, right?

8  A    That is correct.

9  Q    And then it goes up 10 bucks in 2013 and '14,

10 right?

11 A    That is also correct.

12 Q    Okay.  So let's put this on a graph what we've

13 just seen.  This is a demonstrative, just a graph of

14 what we've seen.  If we could put that on the screen.

15      So what we know is the Norton AntiVirus product

16 was $40 for years before the accused functionality was

17 added.  And then this what you call game changer

18 functionality was added, and the price of the product

19 didn't increase by a dollar for a few more years,

20 right?

21 A    That is correct.

22 Q    Okay.  And then it finally goes up 10 bucks in

23 2012, but that was a different year.  It's two years

24 from when the accused functionality was added,

25 correct?

1   A    That's correct.  And that would be typical of what

2   I would expect to see because if you have a product

3   that you're selling, but it's not working very well

4   and customers are getting frustrated and then you add

5   new technology to solve that, you're typically not

6   going to raise the price.  You want to the keep the

7   price the same to win back the customer confidence, to

8   win back the customer's opinion that your product

9   works, and then over time you would eventually raise

10  the price.  So this is exactly what I would expect

11  with adding new technology.

12  Q    My only question, sir, and then we'll explore

13  that, my question was:  When they added the -- this

14  technology, they didn't increase the price by a penny

15  was my only question, correct?

16  A    That's correct.  And like I said, that's what I

17  would expect.

18  Q    Okay.  And you said they needed to win back the

19  customers, but we saw earlier that the sales had gone

20  up by $400 million in the years leading to this.  We

21  saw that, correct?

22  A    The revenue increased but not necessarily sales.

23  We saw data that showed that the sales were down

24  considerably.

25  Q    Revenue increased by $400 million.  They add the

ERIC COLE — CROSS                 1620

1    accused functionality, and they don't increase the

2    price by a penny.  Is that a fair statement?

3    A    For the reason I just explained, yes.

4    Q    Okay.  Now, at the 90 percent apportionment

5    rate -- we can take that down -- for a 40-dollar

6    Norton AntiVirus product, the amount that you

7    attribute to malware detection is $36 and everything

8    else is $4, right?

9    A    That sounds about right.  I don't have a

10   calculator.  And don't tell my kids that I'm not doing

11   math on the fly.  But those numbers sound about right,

12   but I didn't calculate that.

13   Q    10 percent of $40 is $4.

14   A    Fair enough.  If we look at it that way, yes.

15   Q    So $36 for the malware, 4 bucks for everything

16   else, fair?

17   A    Yes, it is.  And now you really can't tell my kids

18   I didn't get that math correct.

19   Q    I won't tell a soul.  Okay.

20        But Norton AntiVirus, for years, was Norton's most

21   basic product for years, right?

22   A    Yes, it was.

23   Q    And they also had more expensive products with

24   more features, right?

25   A    Yes, they did.

1    Q    And you talked about those in your report and, in

2    fact, on direct, right?

3    A    On direct, we showed, I believe, three products

4    from 2010 to '14, but we didn't show all the products,

5    but it is in my report.

6    Q    And one of the products was Norton 360, right?

7    A    Yes, that was one of the products.

8    Q    So why don't we look in your binder to what's been

9    marked for identification purposes as DX-EC.  And this

10   is an October 5, 2008, screenshot to look at the

11   pricing.  And if we look at Norton 360 -- actually,

12   it's Norton Internet Security.  If we look at Norton

13   Internet Security, the middle one -- thank you,

14   Ms. Tull -- we see that in October of 2008, and that's

15   before the accused functionality was added, it was 70

16   bucks, right?

17   A    Just to be clear, you were earlier saying Norton

18   360, but now you switched.  I just want to make sure

19   we're on the right --

20   Q    I did.  I made a mistake, sir.  I apologize.

21   A    So it is Norton Internet Security.

22   Q    That's what I'm referring to, sir.

23   A    Okay.  And that is 69.99.

24   Q    Okay.  So that's before the accused functionality

25   was added.  It was 70 bucks?

1  A    That is correct.

2  Q    All right.  Now, let's go back to your report, and

3  if we can go to your report at page 111.  And let's

4  look at the price of Norton Internet Security when --

5  it's in the middle -- when the accused functionality

6  was added.

7           THE COURT:  Can we confirm which report we're

8  referring to?

9           MR. MORIN:  Of course, Your Honor.  The 2019

10  report.  I will generally call out when I go to 2014,

11  but I should be more precise for the record.  It's the

12  2019 report.

13  BY MR. MORIN:

14  Q    And if we look at the price of Norton Internet

15  Security in 2010, it's now 60 bucks.  Do you see that?

16  A    Yes, I do.

17  Q    Okay.  So what's happened is the product cost $70,

18  and then the accused functionality was added, and it

19  actually dropped by $10 in price, correct?

20  A    That is correct, which, once again, would be

21  expected if a product wasn't working and you were

22  losing customers.  Even with new features, you would

23  drop the price to be able to regain those customers.

24  Q    So they add the accused functionality, the price

25  comes down, fair?  True?

ERIC COLE – CROSS                1623

1    A    That's what happened, yes, and that's logical to

2    how the industry works.

3    Q    Now, we talked about on a 40-dollar product

4    malware detection was worth $36, right?

5    A    That's correct.  That's the main reason why

6    they're purchasing the product.

7    Q    And if you look at Norton 360, it includes the

8    same features but some additional features, and now

9    it's $56 in value because you gave it 70 percent, not

10   $36, correct?

11   A    I didn't follow the question.

12   Q    When you looked at Norton AntiVirus --

13           MR. MORIN:  We're on the wrong part.  It's

14   the 80-dollar part.  Thank you, Mr. Schmoller.

15   BY MR. MORIN:

16   Q    I just want to make sure we're on the same page.

17   Norton 360, you showed us earlier, and I think we can

18   agree, includes all of the components of Norton

19   AntiVirus plus more, right?

20   A    That is correct.

21   Q    Okay.  And you said malware was worth 36 bucks on

22   Norton AntiVirus but for Norton 360, you gave it

23   70 percent of the value, right?

24   A    That is correct.

25   Q    And 70 times $80 is -- all of a sudden the malware

ERIC COLE – CROSS                    1624

1   was worth $56, right?

2   A    That is correct.

3   Q    So the same malware detection went up $20 in

4   value, correct?

5   A    That is correct.

6   Q    Okay.  So the customer is getting the same thing

7   and paying $20 more, right?

8   A    Because, as we said earlier in my direct, when you

9   go in and add in new features, you typically do a

10  markup of 2.5 or higher.  So you need to account for

11  that because the main reason why they're still buying

12  the product is malware detection.  And we even saw

13  Mr. Nachenberg say that customers don't know the

14  difference.  They just know they're buying Norton.

15  Q    I think, sir, my only question was, now you're

16  saying customers are paying $20 more for the exact

17  same functionality, true?

18  A    Because the price increase, so, yes, that's part

19  of the price of doing markups.

20  Q    And just so the record is clear, my question is

21  only that you say they're paying $20 more for the

22  exact same functionality, correct?

23  A    Yes.  And I gave the explanation of why that's the

24  case.

25  Q    Okay.  Now, let's take a look at what comes in

ERIC COLE – CROSS                  1625

1   Norton 360, sir.  And we'll go to a demonstrative

2   showing some of the features.  Now, we already started

3   with Norton AntiVirus.  Do you remember that?

4   A    Yeah.  Just for the record, these are your

5   demonstratives, not mine.

6   Q    Absolutely.  These are my demonstratives that our

7   team put together.  I absolutely agree.  And then

8   let's look at what you get on the demonstrative with

9   Norton Internet Security.  When you upgrade there, you

10  get a number of additional things.  Do you see that?

11  A    Yes.  And, once again, this is -- I have not seen

12  these demonstratives.  So I'm not able to validate

13  whether the features are or are not correct.

14  Q    But you studied apportionment.  Nothing jumps off

15  the page as wrong to you on this, does it?

16  A    Like I said, with Norton AntiVirus, I think a few

17  of those might not be correct, but I know there are

18  add-on features.  But just for the record, I don't

19  have that memorized.  So without verifying and

20  checking, I'm not confirming that this is accurate.

21  Q    Okay.  And you do know that a number of features

22  get added in Norton Internet Security, correct?

23  A    That is correct.

24  Q    And then you get even more features with Norton

25  360.

ERIC COLE - CROSS                1626

1    MR. MORIN:  If we could show that.

2    Q    You're aware that you get more features with

3    Norton 360?

4    A    Yes.  Each one is called premium products because

5    they have additional features.

6    Q    Okay.  And if we look now, when you look at Norton

7    360, you say that malware protection is still

8    70 percent of the value of the overall product; is

9    that correct?

10   MR. MORIN:  Can you show that?

11   BY MR. MORIN:

12   Q    And everything else collectively gets 30 percent,

13   right?

14   A    Well, I'm confused.  What are we --

15   Q    Your new number that you say for Norton 360 is

16   that the malware is 70 percent of the value and

17   everything else collectively is 30 percent, true?

18   A    Yes, but that's not what this slide appears to be

19   showing.  It still looks like it's putting it under

20   Norton AntiVirus.

21   Q    What I'm trying to illustrate, and maybe I've made

22   a mistake with the slide, what we're trying to

23   illustrate is here is a lot of features that are in

24   Norton 360.  You have given 70 percent to malware

25   protection and 30 percent to everything else

ERIC COLE – CROSS                    1627

1   collectively, true?

2   A    For Norton 360, not Norton AntiVirus.

3   Q    Correct.  You're giving 70 percent for Norton 360

4   to malware, 30 percent to everything else

5   collectively, true?

6   A    For Norton 360, yes.  Like I said, this slide

7   doesn't seem to state that.

8   Q    Now, one way you justified increasing the number

9   is that you basically say that your experience with

10  McAfee was that you are able to charge basically less

11  price-weary customers, the ones who bought the more

12  expensive product, more money for the same feature,

13  right?

14          THE COURT:  So, I'm just going to put on the

15  record, the 70 percent and 30 percent were not under

16  Norton 360.  Correct?  They were under Norton

17  AntiVirus.

18          MR. MORIN:  No, Your Honor.  The 70 percent

19  -- and I think he can testify to that.  He takes 70

20  percent of the value of Norton 360 and says that's

21  malware.

22  BY MR. MORIN:

23  Q    Correct?

24  A    That's not what the slide shows.  That was my

25  whole point that I think Your Honor is making.

ERIC COLE - CROSS                1628

1    THE COURT:  I'm noting it differently.  So

2    you can correct it.  Can you put the slide back up?

3    MR. MORIN:  Absolutely, Your Honor.

4    THE COURT:  So I see that 30 percent under

5    Norton AntiVirus, not under Norton 360.

6    MR. MORIN:  I could have been clearer on --

7    this is my fault.  I could have moved the 30 percent

8    down.  I am saying the 30 percent in yellow applies to

9    all the yellow boxes on the page, just to be clear.

10   BY MR. MORIN:

11   Q   Do you understand that?  I'm making that

12   correction.

13   A    Right.  But my point is that I think Your Honor is

14   also making is that's under Norton AntiVirus, not

15   under Norton 360, the 70 percent.

16   THE COURT:  It's wrong as it is.  You can put

17   it under Norton 360 and say it includes everything.

18   But the way it reads right now is that it's under

19   Norton AntiVirus only.  That's how it reads.

20   MR. MORIN:  The legend, the 70 and the 30

21   should be on the bottom of the page.  Let me ask it

22   differently so we can all clarify it.

23   THE COURT:  You said it's 30 percent under

24   Norton 360, right?

25   MR. MORIN:  Correct.

1    THE COURT:  70 percent malware.  All of that

2    is under Norton 360.

3    MR. MORIN:  Right.  I have changed the --

4    Mr. Schmoller has adapted on the fly.  Let me try it

5    this way to make sure that we're clear on this.

6    BY MR. MORIN:

7    Q    When you look at all the boxes collectively in

8    Norton 360, you're giving 70 percent of the value to

9    malware protection and 30 percent to everything else,

10   correct?

11   A    That is correct for Norton 360.

12   Q    Okay.

13   MR. MORIN:  Thank you, Your Honor.  The boxes

14   were in the wrong place.  The point was the same.

15   BY MR. MORIN:

16   Q    70 for the blue, 30 for the yellow, fair?

17   A    For Norton 360.

18   Q    Okay.  Now, you justified increasing the number on

19   your direct examination in saying you could charge

20   different customers more money for the same feature in

21   part based on what you did at McAfee, correct?

22   A    Yes.  And what I did at McAfee was standard

23   industry practice to do a markup of features in

24   premium products.

25   Q    And your point was you could get away with

1   charging some customers two to three times more money

2   than other customers for the exact same feature,

3   correct?

4   A   I don't know if I used that exact wording.  As you

5   go to a new product, a premium product, you can go in

6   and do a markup on those features based on the premium

7   product.

8   Q   Right.  So the same feature would cost more money

9   for someone who was less price sensitive and bought

10  the more expensive product.  That's your point, right?

11  A   No.  It's if you have a base product, and then you

12  go to a premium product, those features that you're

13  adding to the premium product, you wouldn't just

14  account for their price.  You would do a markup on

15  that price to account that they are in a premium

16  product.

17  Q   Right.  And you called this in your report price

18  discrimination, right?

19  A   I believe so.

20  Q   Right.  And you say that discriminatory price

21  practices are common in the cybersecurity industry,

22  discriminating the prices, right?

23  A   Can you show me where in the report?

24  Q   Sure.  Let's go to page 248 of the 2019 report.

25  A   Did you say page 248?

ERIC COLE - CROSS                          1631

1    Q    Paragraph 248.

2    A    I was going to say it doesn't have that many

3    pages.

4    Q    Paragraph 248.

5              THE COURT:  We're still in '19?

6              MR. MORIN:  Correct, Your Honor.

7    BY MR. MORIN:

8    Q    And you say you consider the price differential

9    between AntiVirus and Internet Security and then

10   discount the differential by an appropriate factor to

11   compensate for price discrimination.  You call it

12   price discrimination, right?

13   A    Yes.  That's the term that's used in the industry.

14   Q    And you don't point to a single article to support

15   this proposition that there's price discrimination in

16   the computer software industry, do you?

17   A    For that bullet, no, I do not.

18   Q    And you know Norton produced millions of pages of

19   documents in this case.  You're aware of that?

20   A    I know they produced a lot of documents.  I don't

21   know the exact number.

22   Q    Thousand of pages of marketing and financial

23   documents, you're aware of that?

24   A    I have seen a lot of documents.

25   Q    Including documents about Norton's pricing

1   strategies, right?

2   A   My main focus was on -- what I presented in my

3   direct was more the differentiation of SONAR/BASH.   I

4   didn't really get into detail on the pricing

5   documents.

6   Q   You don't cite a single Norton document that

7   supports the proposition that it engages in what's

8   called price discrimination.   You don't cite a single

9   document from the case, do you?

10  A   No, I do not.   It's based on my professional

11  experience.

12  Q   And you read and considered 14 different Norton

13  employee depositions, right?

14  A   I don't know the exact number, but I considered

15  many depositions.

16  Q   And you don't cite to a single line of a single

17  deposition supporting the proposition that Norton

18  engaged in price discrimination, correct?

19  A   That's correct.   It was based on my professional

20  experience.

21  Q   In fact, the only thing that you cited to was your

22  experience at McAfee on this point, correct?

23  A   That is correct.

24  Q   And say that you discriminated at McAfee, so there

25  must be discrimination at Norton, right?

1   A    It was based on McAfee and my experience working

2   across many different software companies.

3   Q    All you cited to was McAfee in your report, fair?

4   A    I believe I mentioned McAfee.  I don't know if

5   it's exclusive to McAfee.

6   Q    Okay.  And you were at McAfee for less than two

7   years, right?

8   A    About two years, yes.

9   Q    Over a decade ago?

10  A    I guess it's been that long, yes.

11  Q    And you were the CTO or chief technology officer

12  of the Americas, right?

13  A    That is correct.

14  Q    And that's a high position with the company,

15  right?

16  A    Yes, it is.

17  Q    And you report up to the chief technology officer

18  worldwide, right?

19  A    I reported both to the CTO and the CEO.

20  Q    And you understand that we don't have access to

21  your emails from McAfee and the documents you had at

22  McAfee, the things you did there.  You understand we

23  can't see that, right?

24  A    That is my understanding.

25  Q    So you understand when you say "I did it at

ERIC COLE — CROSS                    1634

1   McAfee," you're basically saying to the jury, Trust

2   me.  We have no way to test it.  We have no documents.

3   There's no way we can look and evaluate and test

4   against it.  You understand that?

5   A   Yes.  I'm here today as an expert.  So I can offer

6   opinions on my expertise and experience.

7   Q   I have no quibble with that.  I'm saying you cite

8   a lot of documents in your report, but on this one,

9   it's basically, "Trust me.  That's the way we did it

10  at McAfee," fair?

11  A   This one is based on my professional experience,

12  yes.

13  Q   Okay.  All right.  In any event, let's go back to

14  our sheet here for a second.  If we could go to the

15  ELMO.  And I'm going to put an alternative number

16  down.

17      In 2014, your numbers were 53 to 70 percent.  We

18  talked about that.  That was a range that you offered

19  in 2014, correct?

20          THE COURT:  It would be a lot less confusing

21  if you put 2014 above and 2019 above Columbia and

22  alternative.

23          MR. MORIN:  I'd be happy to.

24          THE WITNESS:  Your Honor, you read my mind.

25  I was thinking the same thing.

ERIC COLE – CROSS                    1635

1   BY MR. MORIN:

2   Q   And some of these are going to be different.  So

3   I'm going to put here that this is 2014, fair?

4              THE COURT:  Just put it above.

5              MR. MORIN:  Your Honor, I'm going to do other

6   things in my alternative chart that may not all be

7   2014, Your Honor.

8              THE COURT:  Okay.

9   BY MR. MORIN:

10  Q   So I want to make it clear to everyone so we have

11  a clear report.  Your number in 2019 was 60 to

12  95 percent.  In 2014, it was 53 to 70 percent, fair?

13  A   Just so we don't confuse the jury, can we cross

14  off that source of '14 because that implies it's for

15  the entire line.

16  Q   Sure.  Absolutely.  I will make it clear that

17  that's the source for the alternative.  We have some

18  more work to do, but I'll make it clear that it's the

19  source for the alternative number.  Okay?

20  A   Okay.

21             MR. GUZIOR:  Your Honor, I have an objection.

22             THE COURT:  What's your objection?

23             MR. GUZIOR:  I think the demonstrative is

24  misleading calling this category an alternative.  It

25  doesn't accurately represent Dr. Cole's testimony that

1    they were two different assignments based on two

2    different sets of evidence.

3          You obviously have different documents,

4    different testimony in 2014 versus 2019, and Dr. Cole

5    has never said it was an alternative number.  I think

6    Mr. Morin's going to suggest to the jury that this is

7    the alternative when it's no such thing.

8          MR. MORIN:  Your Honor, it is a demonstrative

9    exhibit.  It's not coming into evidence.  I can make

10   my points on a demonstrative however I --

11         THE COURT:  What is it an alternative of?

12         MR. MORIN:  It is the alternative for level 1

13   that he offered in 2014.  We already went through

14   that.  It is exactly what he offered in 2014, Your

15   Honor.  I will stipulate that this is my

16   demonstrative.  I'm writing these numbers.

17         MR. GUZIOR:  Your Honor, shouldn't a

18   demonstrative demonstrate evidence?  And if there is

19   no testimony that it's an alternative, it's just

20   Mr. Morin writing words.

21         MR. MORIN:  I can write "other."  Would that

22   make it better?

23         THE COURT:  Well, you can write it's the same

24   level, different date.

25         MR. MORIN:  Got it.

ERIC COLE - CROSS                    1637

1    Okay.  We can take that down.

2    BY MR. MORIN:

3    Q   All right.  Now we're on layer 2 of your three

4    layers.  And I promise the other two are going to be

5    much quicker.

6        In step 2, you quantify the percentage of Norton's

7    malware detection that you thought was attributable to

8    SONAR/BASH, right?

9    A   That is correct.

10           MR. MORIN:  Actually, let's have the screen

11   up here for a moment.

12   BY MR. MORIN:

13   Q   Your current testimony was that it's 24 percent,

14   give or take.  There's some 23, some 24, but

15   24 percent is fair, correct?

16   A   It was 30 percent, but then, yes, there was an

17   adjustment that the number I used was 24 percent for

18   SONAR.

19   Q   Okay.  And you talked about four levels of

20   protection in your direct examination, right?

21   A   That is correct.

22   Q   And then you ended up giving this level about

23   24 percent, which is about a quarter of the overall

24   attribution to malware, fair?

25   A   That is correct.

ERIC COLE – CROSS                1638

1   Q    Okay.  And you'd agree with me that not all

2   features are necessarily created equal.  Just because

3   there's four buckets, you can't just say a quarter

4   each.  I think you'd agree on that, right?

5   A    Correct.  And that's where I did the analysis to

6   confirm that.

7   Q    Right.  And we looked at the block data, and that

8   actually is your demonstrative.  Let's take a look at

9   that.

10         MR. MORIN:  If we could switch, please.

11  Thank you.  And if we could put it on the screen,

12  please.

13  BY MR. MORIN:

14  Q    Your demonstrative -- and you talked about this in

15  direct examination, right?

16         THE COURT:  Where is this from?  What slide?

17         MR. MORIN:  This is Slide 39 from Dr. Cole's

18  direct examination.

19         THE COURT:  Okay.

20  BY MR. MORIN:

21  Q    And you looked at this on direct examination and

22  talked us through it, right?

23  A    That is correct.

24  Q    And BASH overall blocked .8 percent of the malware

25  that was blocked, right?

ERIC COLE – CROSS                   1639

1   A    In '13, yes.

2   Q    And for the corporate product, it was 0.1 percent,

3   right?

4   A    Remember, though, that's when it just rolled out

5   in the enterprise version.  So those numbers could be

6   skewed for the year because it came out halfway

7   through the year.

8   Q    Halfway through 2013?  Or was it 2012?

9   A    Apologize.  I'm getting my hypothetical

10  negotiations and my dates confused a little.  I

11  withdraw that.  It was 2011, yes.

12  Q    So it was 0.1 percent of the blocks in the

13  corporate product were made by BASH, right?

14  A    That is correct.

15  Q    And you gave it approximately equal value with the

16  others.  It's 24 percent, some 30, some --

17              THE COURT:  Okay.  I'm sorry.  Now you lost

18  me.  I thought the hypothetical dates were 2011 and

19  2013.

20              MR. MORIN:  Correct.

21              THE COURT:  '11 for consumer, '13 for

22  enterprise.

23              MR. MORIN:  2011 was the first issued patent,

24  Your Honor.  2013, the second issued patent.

25              THE COURT:  All right.  And when did

ERIC COLE – CROSS                    1640

1   enterprise unroll?

2              THE WITNESS:  2011.  And then consumer was

3   2009.

4              THE COURT:  Got it.  Thank you.

5              MR. MORIN:  Thank you, Your Honor.

6              THE COURT:  Sure.

7   BY MR. MORIN:

8   Q    But you gave them all about equal weighting,

9   24 percent, 30.  You ended up giving them close to

10  equal weighting, fair?

11  A    I guess -- and I believe I gave the detailed

12  explanation it's the quantity versus quality.  We saw

13  many slides that showed that Network, Antivirus, and

14  Insight all missed threats.  And if it wasn't for

15  BASH, it would have been a guaranteed infection.

16      So the low number is not a representation because

17  it's catching the advanced threats that everything

18  else is missing.

19  Q    Right.  And you showed the jury a slide that said

20  90 percent of the sophisticated -- or I'm sorry --

21  polymorphic viruses -- you called them newly-created

22  polymorphic viruses, 90 percent were caught by Insight

23  or BASH.  You showed the jury that, right?

24  A    I believe that actually was an email within

25  Norton, not a slide presentation.

ERIC COLE - CROSS          1641

1   Q    And between Insight and BASH, it's about fivefold

2   Insight to BASH, right, if we look at this slide?

3   A    Correct, because the order they go, BASH is the

4   last line of defense.

5   Q    Sure.  And we have data on the enterprise

6   customers, and we know that about 25 percent of

7   enterprise customers, even though the default is for

8   BASH to be on, actively turn it off.  Are you aware of

9   that?

10  A    I know that some do.  I don't recall the exact

11  number.

12  Q    Let's take a look at your report.  Paragraph 287.

13           MR. MORIN:  2019 report, Your Honor.  I'll

14  get better at this.

15  BY MR. MORIN:

16  Q    And it's paragraph 287.  And if we look at the

17  top.

18           MR. MORIN:  And if we can close it.  Let's

19  just look at the table, Mr. Schmoller.

20  BY MR. MORIN:

21  Q    This is from your report, and we see that

22  30 million customers have it installed and enabled,

23  6.5 million have it installed but disabled, and

24  4.4 million have it not installed.  So it would be

25  more than 25 percent of people in the enterprise world

ERIC COLE — CROSS                    1642

1    are not running SONAR/BASH even though it was

2    defaulted on, right?

3    A    That was from the interrogatory response in 2014.

4    Q    Which you cite in your report.

5    A    Yes, I do.

6    Q    So let's just talk about this.

7                MR. MORIN:  I'm in airplane mode, Your Honor.

8    BY MR. MORIN:

9    Q    If I go to my phone and the ringer is set to

10   whatever the ringer is, we could do sounds.  And we

11   have a ring tone, and it's set to that ringer.  That's

12   the default.  It's what we call a default ring, right?

13   A    I don't know what the default ring tone is on an

14   iPhone.  I'm assuming that is.

15   Q    So a quarter of the people not only were neutral

16   about having SONAR/BASH, but they actually went to the

17   trouble to turn it off or disable it.  Do you

18   understand that?

19   A    For enterprise customers, which would be expected

20   because some of them do have some privacy concerns.

21   Q    They switch to a different ring tone.  They

22   switched to something else.  They turned it off,

23   right?

24   A    I'll testify they turned it off.  I'm not

25   following the ring tone example, but enterprise

ERIC COLE – CROSS                    1643

1    customers are sometimes concerned with privacy.  So it

2    would be expected some of them would turn it off.

3    Q    They didn't turn the other three layers off, did

4    they?

5    A    I would have to check on that.

6    Q    Okay.  You certainly haven't opined on how often

7    they turned off the other three layers.  You haven't

8    opined on that, right?

9    A    That's correct.

10    Q    Okay.  Let's go back to Mr. Nachenberg one last

11    time.  And you relied on his testimony about

12    70 percent.  Let's go to your Slide 58 and put it up

13    on the screen.  And you put this in in your direct

14    examination as 70 percent of the product, the value

15    being attributed to malware.  Do you know what the

16    next lines of his testimony were, sir?  Do you

17    remember?

18    A    No, I don't.

19    Q    Let's put them on the screen.  Let's go to

20    Nachenberg, and let's look at the very next lines.

21                MR. MORIN:  Maybe we could pull that up.

22    BY MR. MORIN:

23    Q    We finished at 233, 24 or 12.  Let's go to 234,

24    line 13.

25                THE COURT:  Wait.  This says this is from

ERIC COLE – CROSS          1644

1   233, 16 through 24.

2          MR. MORIN:  This is his last -- his last

3   testimony that we relied was 233, 16 to 24.  I'm

4   sorry.  It continues on on the same subject on the

5   next page, I should clarify.  Let's look at his next

6   testimony on the next page.

7          THE COURT:  So it's the next question.  It's

8   not the same question.

9          MR. MORIN:  Correct.  Absolutely, Your Honor.

10  BY MR. MORIN:

11  Q   You didn't cut off a question.  Let's look at the

12  next question.  And you didn't cite to this in your

13  direct examination, right?

14  A   No, I did not.

15  Q   And you didn't cite to this in your report, did

16  you?

17  A   I do not believe that I did.

18  Q   And he was asked in the same series of questions

19  that you relied on him to say 70 percent was the value

20  of malware.  He was then asked what percentage of the

21  value of protection is contributed by BASH

22  machine-learning?  And you gave the answer of,

23  "4 percent of that 60 or 70 percent," right?

24  A   He says, If I were to guess, 4 percent of the 60

25  to 70.

ERIC COLE - CROSS                1645

1    Q    And he also said earlier on the 70 percent, he

2    said "I don't know."  And he was asked to give his

3    best assessment, and he relied on 70 percent, right?

4    Do you remember that?

5    A    Once again, in the report, I don't rely on it.  I

6    use it as a spot check in 2019, as a validation point.

7    So I don't rely on it.  I just use it as a validation.

8    Q    Okay.  But his very next question and answer goes

9    to level 2, and he says it's 4 percent, right?

10   A    That's what he does say.

11   Q    Okay.  Let's put that on our sheet.  If we could

12   go to -- for the jury's effort, I am writing this.

13   This is my writing, not his.  But we have 4 percent is

14   what Nachenberg testifies to for level 2.  Correct?

15   A    Just for the record, I think this is very

16   misleading on how it's being written, but he did say

17   4 percent that I guess.

18   Q    So Nachenberg is at 4 percent on level 2.  Level 3

19   will be quick, I promise.

20        THE COURT:  Well, let me ask you this:  Is

21   there a timeframe where he says 4 percent?

22        MR. MORIN:  It is equally unbounded as the

23   70 percent that the doctor is relying on in his

24   slides.

25        MR. GUZIOR:  Your Honor, Dr. Cole just

ERIC COLE - CROSS                    1646

1    testified he didn't rely on this.

2              THE COURT:  Right.  I'm going to say, you

3    know, he's corrected you many, many times.  You keep

4    saying you relied on it, and he keeps saying he did

5    not.  So you're putting the word "rely" into his

6    mouth, and I've let you do it for about a half an

7    hour.  And I'm going to ask you to stop doing that,

8    please.

9              MR. MORIN:  I apologize, Your Honor.  I

10   should phrase it better.  It's getting late in the

11   day.

12             THE COURT:  Yes.  You should be phrasing it

13   better now.

14             MR. MORIN:  Okay.

15   BY MR. MORIN:

16   Q    The 70 percent was cited in his report.  We could

17   put it that way.  And we can move on from that.  We

18   can take that down off the screen.

19        All right.  Let's go to level 3, and that's where

20   you calculated the value of the patented technology

21   relative to SONAR.  And you put that, and you say

22   level 3 is 35 percent, correct?

23   A    That is correct.

24   Q    Okay.  If we could go to the ELMO.  Okay.  I've

25   written that on the ELMO.  So we can agree on the

1    following.

2              MR. MORIN:  If we can take that down.  Thank

3    you.

4    Q    That in order to do the level 3 analysis, we need

5    to know what the scope of the claims of the patent

6    are, fair?

7    A    That is correct.

8    Q    Okay.  What they do and do not cover, right?

9    A    That is correct.

10   Q    And let's just reorient ourselves.  Let's put the

11   '115 Patent on the screen.  That's PX188.  We've seen

12   this a little bit.  I won't take too long, but we

13   don't compare what Norton is doing with the cover page

14   or with the -- if we scroll through it -- with the

15   written description, the drawings, and those types of

16   things.  It's important that we compare it to the

17   claims; is that fair?

18   A    I need to know the context of your question.

19   Q    For level 3, when we're determining the value, we

20   don't look at the written description or the drawings.

21   We look at the claims of the patent, fair?

22   A    That is correct.

23   Q    Okay.  And if we look at the claims of the patent,

24   and the claims are kind of like the fence around the

25   property, if you will.  There is a video the jury was

ERIC COLE – CROSS                    1648

1    shown.  But you're familiar with patents.  It's

2    generally like the boundaries, right?

3    A    Correct.

4    Q    Okay.  And there's four claims asserted here in

5    this case, right?

6    A    Yes, there are.

7    Q    And there's one claim asserted on the '115 Patent,

8    right?

9    A    That is correct.

10   Q    Out of the 42 total claims in that patent, right?

11   A    That sounds about right.

12   Q    And there's three claims of the other patent, the

13   '322, out of 27 claims, right?

14   A    I believe that to be correct.

15   Q    All right.  So let's look at Claim 2 of the '115

16   Patent.  And Count 2 is what's called a dependent

17   claim.  Do you understand that?

18   A    Yes, I do.

19   Q    And it includes all of the elements of Claim 1

20   plus some additional elements, right?

21   A    That is my understanding of a dependent claim.

22   Q    And dependent Claim 2 says it further comprises

23   creating a combined model from at least two models

24   created using different computers.  Do you see that?

25   A    Yes, I do.

1  Q    Okay.  And Claim 1 is not being asserted against

2  Norton.  You understand that?

3  A    That is my understanding.

4  Q    All right.  And so there's no allegation that

5  Norton's product infringes Claim 1.  You understand

6  that?

7  A    Once again, I'm not here to offer an infringement

8  opinion.  I would defer to Dr. Bailey for that.

9  Q    Okay.  You agree that you can perform the method

10  of Claim 1 without performing the additional

11  limitation of Claim 2, right?

12  A    Can you repeat that question?

13  Q    I'll move on.

14  A    Okay.

15  Q    In your 2014 report, you also assigned 35 percent

16  as your apportionment on level 3, right?

17  A    That is correct.

18  Q    Now, most of your discussion of level 3 with this

19  jury, please correct me if I'm wrong, you talked

20  about, and I wrote it down, you said that the combined

21  model was the core technology of the four asserted

22  claims.  That's what you kept telling the jury?

23  A    Something similar that, yes.  All of the value of

24  the patents come from the combined models.

25  Q    Right.  And you told -- is this a fair

ERIC COLE - CROSS                    1650

1   characterization, not of your testimony, but is this a

2   fair statement that you believe using the combined

3   models is the core technology of the four asserted

4   patent claims, is that fair?

5   A    I would put it a little differently.  That all of

6   the value of the patents that are added to BASH come

7   from the combined models.

8   Q    Okay.  And you originally, like we said,

9   apportioned 35 percent in your 2014 report on level 3

10  as well, right?

11  A    That is correct.

12  Q    Okay.  And in level 3 -- your 2014 report, if we

13  want to turn to it, is 117 pages long.  Are you aware

14  of that?  You can take a look and verify it.

15            THE COURT:  Which report?

16            MR. MORIN:  2014, Your Honor.

17  A    It appears to be 117 pages.

18  Q    Okay.  If we could go to the ELMO, please.  I'm

19  going to just do this on the sheet.

20       Now, I looked through the report and did a word

21  search and --

22            MR. MORIN:  A moment's indulgence, Your

23  Honor.  I'm almost done.

24  BY MR. MORIN:

25  Q    And in this 117-page report, I was able to find a

ERIC COLE – CROSS                    1651

1    sum total of one sentence that discussed combined

2    models.  Do you agree with that?

3    A    Yes, I would.

4    Q    Okay.  There is no other place in the report that

5    uses the words combined models, combined models on

6    different computers, all the language you just used

7    with the jury in 2014, correct?

8    A    First, I believe the word "combined models,"

9    because I did a similar search prior, I believe it

10   does appear multiple times, more than one, but also

11   the concept.  I might not say combined models, but the

12   description of what a combined model is does appear

13   throughout the 2014 report.

14   Q    I will invite your counsel on redirect to show us

15   any other instances of the words combined models,

16   combining models, combined from different computers.

17   Of course, he'll have the chance to do that.

18       One last thing before we finish, and you've been

19   very patient, and you all have been very patient.  One

20   last thing before we finish.  In your -- first of all,

21   I'm going to go ahead and mark for identification

22   purposes only the handwritten table I was making

23   DX-ED, just for the record.

24       Let me go ahead and put up your chart.  And I want

25   to just do some math.  I understand you may disagree

1   with the premise, but I want to do some math.

2       If we were to multiply, on the business, your 2014

3   report number of 60 percent times Mr. Nachenberg's

4   testimony about 4 percent, and even if we use

5   35 percent here, the number is 0.84 percent.  Do I

6   have that math?  Look okay?  I can do it on a

7   calculator.  But do you take me on that?

8              THE COURT:  Do you know what exhibit this is,

9   what slide it is?

10             MR. MORIN:  Yes, Your Honor.  It's Slide 85,

11  Your Honor.

12             THE COURT:  Okay.  Thank you.

13  A   Once again, I don't have a calculator.  Generally,

14  the math seems okay.  But for the record, I don't

15  agree with those numbers.  You're mixing apples and

16  oranges and just sort of putting random numbers on the

17  screen.

18  Q   I didn't expect that you'd agree.  I'm just making

19  sure the math is right.  If we use your 2014 report

20  number, and then Mr. Nachenberg's 4 percent testimony,

21  we get to 0.84 percent, right?

22  A   I don't have a calculator.  So like I said, it

23  generally looks okay, but --

24  Q   Sorry.  That's my family.  Let's do the math.  .6

25  times .04 times .35 equals --

1    THE COURT:  How about you just put it in, and

2    we don't look at your family, and all that other

3    stuff.

4    MR. MORIN:  Of course, I'll take the

5    calculator off.

6    BY MR. MORIN:

7    Q   I have to do the math.  Sorry.  I get .84 percent.

8    Okay?

9    A   You ran the calculation.  So I did not run it.

10   Q   Okay.  And if we do the other numbers, and we use

11   your 2014 numbers of .53 to --

12   THE COURT:  We can't see where you're

13   writing.

14   MR. MORIN:  Sorry.  .53.  It's 53 percent, I

15   should say.  53 to 70 percent.  That's 2014.  Plus

16   Mr. Nachenberg.  And we'll use 35 percent again.  We

17   get 0.74 percent to 0.98 percent.  You trust me on the

18   math there?

19   A   Generally on the math, but once again, you're just

20   putting random numbers and just doing random

21   calculations.  So to me there's no foundation for what

22   you just put up there.

23   Q   I understand.  But if we then multiply and use

24   your original report numbers, we use Mr. Nachenberg's

25   testimony, we get to these numbers, and that would

1  reduce, even before we get to Dr. Sullivan tomorrow,

2  the damages they're asking for from 227 million to

3  less than $30 million.  Are you aware of that?

4  A   I'm not aware of the numbers on the damage's side,

5  and I don't agree with the assessment for the numbers

6  on the slide.

7           MR. MORIN:  I'm going to go ahead and mark

8  for identification purposes only, this is DX-EE, which

9  is a demonstrative exhibit for the record.  I have

10  taken far longer than I thought I would.  I want to

11  thank you for your time, Dr. Cole, and I tender the

12  witness.

13           Thank you, Your Honor.

14           Thank you for your time.

15           THE WITNESS:  Thank you, sir.

16           THE COURT:  All right.  Will there be

17  redirect?

18           MR. GUZIOR:  Yes, Your Honor, probably 15

19  minutes.

20           THE COURT:  I don't think we go on any more

21  today.  It's 5:30.  We've had a lot of numbers.  And

22  so, ladies and gentlemen of the jury, we're going to

23  do redirect tomorrow morning, nine o'clock.

24           So, again, please don't talk to each other or

25  anybody else or look stuff up.  And we'll see you in

 1    the morning.  And we appreciate your good attention.

 2                  (The jury exited the courtroom at 5:25 p.m.)

 3                  THE COURT:  Is there anything else we need to

 4    cover before we break?

 5                  MR. MORIN:  Ever so briefly, Your Honor.  I'm

 6    sure you're tired of hearing from me.

 7                  On Dr. Jaeger, we will email, as I said, the

 8    Q and A.  There is a possibility, just to give the

 9    Court a heads-up, we're going to look at what's left

10    after the *Dauberts* and the MILs, and we will also

11    email, Your Honor, if we decide to forego him on

12    apportionment.  But we will let you know either way so

13    that you're not waiting and expecting something, Your

14    Honor.

15                  THE COURT:  All right.  Now, Mr. Morin, did

16    you notice when I told you you were giving improper

17    foundational questions, did you notice that you put up

18    a demonstrative that was misleading as it was

19    initially put up?  And you said, "Ah, I'm so sorry.  I

20    just need to put it on a different side."  You have to

21    stop doing that.

22                  MR. MORIN:  Your Honor --

23                  THE COURT:  It is actively misleading.  It

24    was misleading as it was, and I want you to stop that.

25    You must have asked him 10 times that he relied on it,

1    and that's okay in some cross-examination, but you

2    can't keep saying it when he's correcting you 15 or 20

3    times.

4           MR. MORIN:  Your Honor, Your Honor, very

5    respectfully, if I may, Your Honor.  The boxes and the

6    legends were in the wrong spot.  I was not trying to

7    mislead anything.

8           THE COURT:  You had lots of time to prepare

9    it, just like you said the other side did.  And I have

10   told you do not put things in a manner where they can

11   be misleading.  And so now you're saying, "Ah, I'm so

12   sorry."  Don't do it again.  Do you hear me?  Not by

13   accident, not respectfully, not any way.  Do not do it

14   again.  I will instruct the jury that you are doing

15   that too many times, and they should take it into

16   account.  I'm telling you that.

17          MR. MORIN:  I understand, Your Honor.  I will

18   tell you, as an officer of the court, I intended

19   nothing misleading.  The boxes were in the wrong spot.

20   The color coding on the boxes was spot on.  Blue was

21   30 percent, yellow was 70 percent.  It was not --

22          THE COURT:  I will make the factual finding I

23   saw it as misleading.  It was under the Norton

24   AntiVirus.  Colors or not, it was under the block of

25   Norton AntiVirus.  And I will make the factual finding

1     it was misleading.  Whether you intended or not, it

2     was.  And I'm telling you to be more careful.

3              MR. MORIN:  All right.  I will be more

4     careful, Your Honor.  I will tell you only, I hope you

5     accept this, I will tell you only with everything I

6     have, it was not intended as such.  I won't dispute --

7              THE COURT:  I just don't want to hear that

8     from you guys anymore.  I don't want to hear from you

9     all.  Just get it right.

10             MR. MORIN:  Okay.  Thank you, Your Honor.

11             THE COURT:  All right.  Is there something

12    else we need to cover?

13             MR. BEENEY:  I'm sorry.  I'm sorry to keep

14    the Court, but I do want to note, Your Honor, and let

15    counsel know as well, that last chart with the

16    apportionment numbers, we may ask Your Honor to give

17    the jury an instruction tomorrow to disregard it.  It

18    is nothing but math.  There is no expert testimony

19    that the correct apportionment is going to be below

20    1 percent.

21             That 4 percent number that counsel used to

22    create the mathematical equation with a witness who

23    kept on telling him that he wouldn't agree with this

24    and yet he created it anyway comes from Mr. Nachenberg

25    who said it was a guess.  There is no expert testimony

1  that's going to support that.  There is no factual

2  testimony that this is correct.  It is creating an

3  apportionment number that is entirely bogus.  And

4  after doing a little research tonight, Your Honor, I

5  expect that we will ask Your Honor to instruct the

6  jury that they are to disregard those apportionment

7  numbers.

8          MR. MORIN:  Your Honor, that's entirely

9  proper cross-examination.  I made it clear it was my

10  demonstrative.  I let the witness say that he

11  disagreed with it.  I am allowed to cross-examine the

12  witness.  And Your Honor, in your most recent ruling,

13  said I could cross as to the apportionment, and I can

14  go into those things.  Of course, they can argue, and

15  I expect the redirect --

16          THE COURT:  What did I say?  Exactly what did

17  I rule?

18          MR. MORIN:  You ruled that we could

19  cross-examine.  I have the ruling here.  Just a

20  moment, Your Honor.  I don't have the right ruling.

21          THE COURT:  Well, then how about you write a

22  couple paragraphs with citations about why it's

23  proper.  And you all write a couple paragraphs with

24  citations about why it's improper.  And you give that

25  to me.  You can do that tonight.

1    MR. MORIN:  Of course.

2    THE COURT:  I want it tonight.  And then I

3    will review what you all say, and I will rule in the

4    morning.

5    MR. MORIN:  Thank you, Your Honor.

6    MR. BEENEY:  Just to -- I'm sorry.  I can't

7    help myself, but I can't walk out of the courtroom,

8    flag down a car and ask somebody what they guess is

9    the value to a product, and then put it in front of

10   the jury and ask the jury to consider it.  And what

11   was just done is no better than that.

12   MR. MORIN:  I could not disagree more, Your

13   Honor.  They put up in direct examination the prior

14   page where he also said it was a guess, an estimate.

15   They put up exactly the same category of testimony,

16   just on one level and not the other.

17   MR. BEENEY:  With the witness saying he

18   didn't rely on it.

19   MR. MORIN:  Sure.  He didn't rely on it.  I'm

20   allowed to cross-examine him on relying on one page

21   but not relying on the other.  Of course I am, Your

22   Honor.

23   THE COURT:  Submit it on paper.

24   MR. MORIN:  Thank you, Your Honor.

25   (Recess taken at 5:32 p.m.)

1       THE CLERK:  This is Kathy Hancock, Judge Lauck's

2  courtroom deputy.  We are here today, April 19th, to

3  confirm exhibits and demonstratives.  And we have --

4       MS. ROWLAND:  Rebecca Rowland with Columbia.

5       MS. NGUYEN:  Laura Nguyen from Norton.

6       THE CLERK:  We'll start with Eric Cole exhibits,

7  and they are PX-325, PX-316, PX-315, PX-501, PX-170,

8  PX-349, PX-530, PX-504, PX-362, PX-506, PX-486, PX-350,

9  PX-511, PX-607, PX-132, PX-506, PX-482, PX-192, PX-132.

10       And then on cross, we have PX-325, PX-511, and

11  PX-188.

12       And as demonstrative exhibits, we have DX-EC,

13  DX-EB, DX-ED, and DX-EE.

14       MS. ROWLAND:  I have some additional ones from

15  Cole's direct.  PX-466, PX-490, PX-196, PX-323.

16       THE CLERK:  Did you have those as well?

17       MS. NGUYEN:  I have those.

18       THE CLERK:  Okay.

19       MS. ROWLAND:  That's my complete list.

20       THE CLERK:  Okay.  We're good.

21       (The trial adjourned at 5:39 p.m.)

22

23                REPORTER'S CERTIFICATE

24    I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

25  the Commonwealth of Virginia at large, and whose

1    commission expires September 30, 2023, Notary Registration

2    Number 7108255, do hereby certify that the pages contained

3    herein accurately reflect the stenographic notes taken by

4    me, to the best of my ability, in the above-styled action.

5          Given under my hand this 19th day of April 2022.


                         /s/
7    _____
                   Tracy J. Stroh, RPR

8    _____
                         /s/

9              Krista Liscio Harding, RMR

10   _____
                         /s/

11             Diane J. Daffron, RPR, CCR

```
                                                    1662
 1                     I N D E X

 2                    WITNESSES

 3  Examination By:                             Page

 4                  SHANE PEREIRA
    Video                                       1417
 5                  BARRY LAFFOON
    Video                                       1418
 6              CAREY NACHENBERG
    Video                                       1418
 7                  ERIC COLE
    Direct   - MR. GUZIOR                       1420
 8  Cross    - MR. MORIN                        1547

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```