1669

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                  RICHMOND DIVISION

 3   _____
                                     )
 4   THE TRUSTEES OF COLUMBIA        )
     UNIVERSITY IN THE CITY OF       )
 5   NEW YORK                        )
                                     )
 6   v.                              )   Civil Action No.:
                                     )   3:13 CV 00808
 7   NORTONLIFELOCK INC.             )
     f/k/a SYMANTEC CORPORATION      )
 8   _____)
                                         April 21, 2022
 9
                        DAY 8
10            EXPEDITED OVERNIGHT TRANSCRIPT

11          COMPLETE TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE M. HANNAH LAUCK
12           UNITED STATES DISTRICT COURT JUDGE

13   APPEARANCES:

14   John Erbach, Esquire
     Dana D. McDaniel, Esquire
15   SPOTTS FAIN
     411 E. Franklin Street
16   Suite 600
     Richmond, Virginia 23218
17

18   Garrard Beeney, Esquire
     Dustin Guzior, Esquire
19   Alexander N. Gross, Esquire
     Jessica R. Ecker, Esquire
20   Sullivan & Cromwell
     125 Broad Street
21   New York, New York 10004

22            Counsel on behalf of the Plaintiff

23

24            KRISTA L. HARDING, RMR
              OFFICIAL COURT REPORTER
25          UNITED STATES DISTRICT COURT
```

1  APPEARANCES (CONTINUED):

2  Dabney J. Carr, IV, Esquire
   TROUTMAN PEPPER HAMILTON SANDERS LLP
3  1001 Haxall Point, Suite 1500
   Richmond, Virginia 23219

4
   Michael A. Morin, Esquire
5  Benjamin J. Behrendt, Esquire
   LATHAM & WATKINS LLP
6  555 Eleventh Street N.W.
   Suite 1000
7  Washington, DC 20004

8  Douglas E. Lumish, Esquire
   LATHAM & WATKINS LLP
9  140 Scott Drive
   Menlo Park, California 94025

10
            Counsel on behalf of the Defendant
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (The proceeding commenced at 9:02 a.m.)
 2              THE CLERK:  Day eight.  Case Number 3:13 CV 808.
 3   Trustees of Columbia University in the City of New York v.
 4   NortonLifeLock Inc.
 5              Columbia is represented by Garrard Beeney,
 6   Dustin Guzior, Alex Gross, Jessica Ecker, John Erbach and
 7   Dana McDaniel.
 8              Norton is represented by Douglas Lumish, Michael
 9   Morin, Benjamin Behrendt and Dabney Carr.
10              Are counsel ready to proceed?
11              MR. BEENEY:  Plaintiff is ready.  Thank you.
12              MR. LUMISH:  Norton is ready, Your Honor.
13              THE COURT:  All right.
14              Do you-all want to place anything on the record
15   about my opinion?
16              MR. MORIN:  May I approach, Your Honor?
17              THE COURT:  Okay.
18              MR. MORIN:  I'm not going to reargue anything,
19   Your Honor.  Just we have to state for the record we
20   disagree, and we would object to the reading of the
21   curative instruction and the relief that Your Honor has
22   ordered.  But I say that for the record, Your Honor.
23              THE COURT:  Okay.  All right.
24              MR. BEENEY:  Two things, briefly, if I may, Your
25   Honor.
```

```
 1              First of all, mindful that the jury may not
 2   necessarily be deeply steeped in examinations and
 3   cross-examinations and redirect examinations, I would like
 4   to ask Your Honor -- I don't think that we, that is
 5   Columbia, should bear the risk of there being any
 6   confusion here, so I wonder if reading from Page 9 of Your
 7   Honor's opinion, 1155, whether the Court would consider
 8   making three additions.
 9              And that is in the first sentence that reads,
10   "To the extent that the cross-examination" and instead
11   make it to the extent that "Norton's" cross-examination.
12              On Line 4 there's a reference "to Dr. Cole near
13   the end of the testimony and those written on
14   demonstratives by counsel," add the word "Norton's" before
15   counsel.
16              And then, finally, in the last line, "does not
17   pertain to testimony by Dr. Cole during," add the words
18   "Columbia's direct and redirect examination."
19              So those would be our three suggestions just to
20   avoid any chance that the jury is confused by the use of
21   cross, and counsel, and redirect, and those concepts.
22              THE COURT:  All right.
23              I'm going to confirm that you are suggesting
24   that the first line read to the extent that Norton's
25   "cross-examination of Dr. Cole on Tuesday suggested," and
```

 1  then toward the end of that sentence, "the testimony and

 2  those written on demonstratives by" Norton's counsel?

 3          MR. BEENEY:  Yes, Your Honor.

 4          THE COURT:  "The evidence and testimony

 5  discussed," did you not want to repeat Norton's there?

 6          MR. BEENEY:  No.  I think that's fine to leave

 7  that one out.

 8          THE COURT:  And then the last sentence, "This

 9  instruction does not pertain to testimony by Dr. Cole

10  during" Columbia's "direct or re-direct examination."

11          MR. BEENEY:  If Your Honor, please, yes.

12          THE COURT:  Understanding that Norton,

13  obviously, objects to that.  I don't see that that's -- I

14  think it helps the jury understood.

15          MR. MORIN:  Just for the clarity of the record,

16  while Norton objects to the curative instruction, and

17  maintains that objection, we have no objection if the

18  curative instruction is being given over our objection to

19  the changes that are proposed by counsel.

20          And beyond that, the only thing, just to make

21  sure we have a clean record, we may submit later on just

22  for the record a copy of the demonstratives that Dr. Cole

23  used on direct just so they're in the record, if that's

24  okay with Your Honor?

25          THE COURT:  All right.  Sure.  Of course.

1674

```
 1                    MR. MORIN:  Thank you, Your Honor.

 2               THE COURT:  Yes.

 3                    MR. BEENEY:  And, Your Honor, if I may, just one

 4    other brief issue?

 5                    Mr. McDaniel reminded me last night that on

 6    April 7 we had argument on Mr. Hosfield and what he could

 7    say and what he couldn't say.  And on Pages 117 through

 8    124 of the transcript, I made some comments, counsel for

 9    Norton made some comments, and the Court made some

10    comments.  And I think the fair reading of that was that

11    Norton would not be putting numbers in the record for

12    damages.

13                    And again, Mr. Lumish stated, "I just want to be

14    able to say to the jury we didn't infringe so we don't owe

15    them anything.  We didn't fraudulently conceal anything"

16    --

17               THE COURT:  Now you're talking too fast.  And if

18    you can say -- because I'm not looking at what you're

19    looking at, what are you looking at?

20                    MR. BEENEY:  I'm sorry, Your Honor.  It's

21    Page 124 of the April 7 transcript at 10 through --

22               THE COURT:  Of what transcript?

23               MR. BEENEY:  April 7.

24               THE COURT:  Okay.

25                    MR. BEENEY:  I'm sorry.
```

```
 1              "I just want to be able to say to the jury we
 2   didn't infringe so we don't owe them anything.  We didn't
 3   fraudulently conceal anything, so we don't owe them
 4   anything.
 5              I think we should be allowed to say that there's
 6   no liability and no damages at all in the case.  And
 7   that's, I think, what we're trying to protect here."
 8              And I agree that's perfectly appropriate.  But I
 9   just want to make sure going forward that we have the
10   understanding that we're not going to do what we did the
11   day before yesterday, which is throw out numbers which I
12   think clearly cross the line of what the Court said, what
13   I understood and what counsel actually represented both to
14   Columbia and the Court during this hearing on April 7.
15              THE COURT:  All right.
16              MR. MORIN:  Your Honor, we respectfully
17   disagree, for the record.  It was always our
18   understanding, and we never would have said that we have
19   to accept their numbers, that we could challenge them.  My
20   understanding is that we couldn't do that during
21   cross-examination.
22              But I'm just stating that for the record.
23              THE COURT:  All right.  Well, I'm going to order
24   going forward because of how the testimony unveiled on
25   Tuesday, and because of my ruling and because earlier
```

1  commentary that if it is that you plan to roll out actual

2  numbers, that you give notice to Columbia, but in advance.

3        MR. MORIN:  Your Honor, if on cross-examination

4  I want to challenge the other side's numbers and say that

5  the number would actually be lower if you applied this

6  approach, I'm not allowed to say that?

7        MR. BEENEY:  I think, Your Honor, it was

8  clearly -- you know, just to some -- just for some

9  context, we were arguing both of the question of

10 Dr. Dossier, and then we moved into the question of

11 Dr. Hosfield.  And I presented an argument, and Ms. Tull

12 responded by basically saying that Norton agreed with the

13 argument that Mr. Hosfield would not be providing a

14 number.

15       And then we went on to have a discussion about

16 whether there could be a quantification.  And the clear

17 import of 118 to 124 of the April 7 transcript was that

18 there will not be a number.  We spoke in some detail about

19 quantification.

20       I'm just trying to find the best quote.

21       THE COURT:  Well, how about this:  For now

22 you're not doing cross-examination on Dr. Cole anymore,

23 and then we're having some deposition, is that correct?

24       MR. BEENEY:  We're actually, because of

25 scheduling issues for Dr. Sullivan, going to move directly

1677

1    into Dr. Sullivan and then do the depositions afterwards.

2              THE COURT:  Well, I will want to look at that

3    transcript, and I want to allow you-all to respond to it,

4    so I guess we can take at least a break after the redirect

5    and allow folks to approach it.

6              MR. MORIN:  May I approach, Your Honor?

7              MR. BEENEY:  I'm sorry.

8              If I could say one other thing?

9              I suppose it is legitimate that if Dr. Sullivan

10   will adopt a concept that counsel is proposing that it's

11   legitimate to then go through the mathematical exercise.

12   But without the witness adopting the predicate, doing the

13   math in front of the jury is just not evidence of anything

14   except for the fact of the principles of math.

15             So I don't think it's appropriate, even without

16   these representations, to propose a theory to a witness

17   that the witness rejects, and then say without there being

18   any predicate in the record, because we know Mr. Hosfield

19   is not going to tie it up, that therefore let's do the

20   math without anything other than it being counsel's theory

21   as to how the damages should be calculated.

22             So, again, if Dr. Sullivan adopts the predicate

23   for the number, I think that's probably fair.  But I don't

24   think without there being any predicate other than

25   counsel's suggestions as to how the reasonable royalty

 1   damages should be done, to ask a witness to do the math or

 2   for counsel to tell the jury what the result of the math

 3   is.

 4            THE COURT:  Okay.

 5            MR. MORIN:  May I approach, Your Honor?

 6            THE COURT:  Sure.

 7            MR. MORIN:  Very briefly, Your Honor.

 8            I believe that that discussion was all about

 9   Dr. Hosfield, and you had thrown out on *Daubert* part of

10   his opinion, which goes to the opinions that he had

11   offered.

12            I believe, for the sake of the record, that the

13   cross-examination is appropriate, but I have the following

14   proposal to try to help Your Honor deal with the

15   situation.

16            Why don't we proceed forward.  It's not going to

17   affect Dr. Sullivan's direct examination.  And I propose

18   we get through that.  It will probably be a convenient

19   time, hopefully, for a break, and we'll excuse

20   Dr. Sullivan so he won't hear my next cross-examination

21   and I can give Your Honor exactly where I intend to go

22   without him in the room.  We can -- I can get my calls

23   from you there.

24            I think I will be able to explain what I intend

25   to do very -- hopefully effectually, and you can tell me

1   in a very short time what I can and can't do, and it will

2   almost serve as an offer of proof so that no one is

3   surprised about what's happening.

4           So, again, his direct goes, he's excused, and

5   before I begin my cross, and so that he won't hear my

6   cross, I basically preview anything having to do with

7   numbers to Your Honor.

8           THE COURT:  All right.  Well, I'm going to tell

9   you that what Mr. Beeney just said is my ruling.

10          You cannot do what you did on Tuesday, which is

11   to say, okay, I know you don't take my numbers, but if my

12   numbers did apply, here's the math.

13          And the witness continually says I'm not taking

14   your predicate.  I'm not taking your predicate.

15          And you keep saying you relied on this.  You

16   relied on this.

17          And the witness says, no, no, no.

18          Those are only your numbers when that occurs,

19   and it is entirely inappropriate.  Really, if you get to

20   one and the witness doesn't adopt it, much less going on

21   to others, necessarily, if you are trying to do what you

22   did, which is give an alternate apportionment theory,

23   which I maybe would or would not say that, but that's what

24   that graph is.  And if the witness rejects it, you cannot

25   say, okay, I understand you disagree, and move on.  You

1  have to stop asking that question.

2           And I am going to tell you do not switch up what

3  the witness says.  If the witness says I don't rely on

4  it -- I understand that in cross-examination you may ask

5  that once or twice, but you may not continue to do it for

6  10 or 15 minutes.  You just -- you have to do what the

7  witness responds to, and if there's an objection you have

8  to apply -- you have to comply.

9           And I'm happy to hear objections early on so it

10 doesn't continue.

11          MR. MORIN:  Your Honor, we had a day to -- to

12 reflect.  Your Honor, I understand that.  I understand

13 your ruling on that, so what I am going to propose that we

14 do is I'm not going to have him calculate an alternative

15 number like we did on Dr. Cole on --

16          THE COURT:  You can't.

17          MR. MORIN:  That's what I'm saying.  I

18 understand Your Honor's ruling, is what I'm saying.

19          THE COURT:  Okay.

20          MR. MORIN:  And what I'm asking is that I think

21 is an appropriate approach, and I would be surprised if

22 any friends disagree, that before we go with Dr. Sullivan

23 we take 10 minutes to avoid any misunderstandings, and I

24 preview my cross-examination effectively because he'll be

25 out of the room and not know what's -- you know, he won't

1  be previewing it, but you and opposing counsel will, and

2  then you can call the -- tell me what I can do and I will

3  stay within there.

4           I suspect my cross will now be quite short.  And

5  I suspect that it will also serve, and save us time later,

6  as an offer of proof, basically, on the record.

7           THE COURT:  I have no problem with that.  I just

8  wanted to be clear that what Mr. Beeney was placing on the

9  record I think is exactly what I just ruled.  And so as

10  you're preparing your cross, I would want you to be sure

11  that I understand his statement to be correct.

12           MR. MORIN:  I understand.  And so that's why I'm

13  going to preview it, and the wrath will be on me,

14  obviously, if I haven't done a good enough job.  I will

15  preview his cross to you and opposing counsel, and we'll

16  get there.

17           THE COURT:  Well, it won't be wrath.  It will

18  just be excluded.

19           MR. MORIN:  Okay.  I understand.

20           And, Your Honor, we have lodged our objections

21  on the record.  I don't think it's productive to have

22  further argument about them, but we disagree for the

23  record on the decision.

24           I do want to say one point of reflection.  While

25  I disagree with that decision, on reflection I should have

1  asked the Court's permission.  I was only -- the ring tone

2  was a default example.  I was trying to relate something

3  to the jury.  But I'm saying with candor and with

4  humbleness on this point, I should have asked your

5  permission and not brought out the phone, so I apologize

6  for that.

7           THE COURT:  Well, I'm pretty sure that you know

8  the Eastern District.  There is no way that permission

9  would have been granted, and I'm pretty sure you know

10 that.  So that's fine.  We're done with that.  Phones are

11 gone, and we're fine.

12          MR. MORIN:  Right.  And that's the -- I've

13 lodged objections to other things.  I wanted to make sure

14 you knew, Your Honor, that, I wanted to say it on the

15 record, I should have asked permission and guidance which

16 I understand would have denied on that.  I've brought an

17 old-fashioned calculator to the extent we do any math

18 today.

19          THE COURT:  You're not doing it with witnesses.

20          MR. MORIN:  Okay.  Thank you, Your Honor.

21          THE COURT:  All right.

22          So I plan just to instruct the jury before

23 Dr. Cole is placed back on the stand.  That's the process.

24 And when we begin, I will tell them that Dr. Cole is

25 coming in for redirect.

1        I know you object to the substance, but I want

2   to know if there is an objection to the procedure?

3        MR. BEENEY:  Thank you, Your Honor.  That's

4   good.  That's fine with us.  Thank you.

5        MR. LUMISH:  And with Norton, Your Honor.

6        THE COURT:  Right.  Just to procedure.  I

7   understand that.

8        All right.  Let's bring them in.

9        (Jury is present in the courtroom.)

10       THE COURT:  All right.  Good morning.

11       JURORS:  Good morning.

12       THE COURT:  We missed you yesterday.  We were

13  doing hard work, and did not want to keep you at bay any

14  longer than we needed to.  But I hope you understand that

15  that's part of the process going forward smoothly.

16       We're going to have Dr. Cole come to testify on

17  redirect, which means that Columbia's counsel will be

18  asking him questions.  But first I want to issue an

19  instruction that I would like you-all to listen to, all

20  right?

21       To the extent that Norton's cross-examination of

22  Dr. Cole on Tuesday suggested that any kind of

23  apportionment number had been identified during

24  cross-examination, including the number suggested to

25  Dr. Cole near the end of the testimony, and those written

1  on demonstratives by Norton's counsel, they are stricken.

2              And I instruct you to disregard them in their

3  entirety.

4              The evidence and testimony discussed during

5  cross-examination included reliance on inadmissible and

6  inapplicable evidence that cannot be used to assess

7  apportionment and damages.

8              Any notes taken about that evidence shall be

9  disregarded as well.

10             This instruction does not pertain to the

11 testimony that Dr. Cole gave during Columbia's direct

12 examination, and the redirect examination that will occur

13 today.

14             Is anybody confused by that?  Just raise your

15 hand if you are.

16             All right.  I don't see any hands.

17             We'll go forward with redirect.

18             MR. GUZIOR:  May I approach, Your Honor?

19             THE COURT:  Please do.

20                    **REDIRECT EXAMINATION**

21 BY MR. GUZIOR:

22 Q    Good morning, Dr. Cole.

23 A    Good morning.

24 Q    Let's start with Slide 85 from your direct

25 presentation that you gave the other day.

1              Norton's lawyer asked you several questions

2 about your 2014 expert report and your 2019 expert report.

3 Do you remember that?

4 A    Yes, I do.

5 Q    With reference to the slide, I want to start with

6 your 35 percent number that is shown in the blue box.  Do

7 you see that?

8 A    Yes, I do.

9 Q    Can you remind the jury what that 35 percent number

10 represents?

11 A    That 35 percent is Columbia's patents, the value that

12 that adds to the SONAR component of Norton's products.

13 Q    And I want to take a look at your 2014 expert report,

14 please.  And, Dr. Cole, what you see on the screen, is

15 this the cover of your 2014 expert report?

16 A    Yes, it is.

17 Q    Let's take a look at the top of Page 87 of your 2014

18 report.  Do you see the table at the top of the page?

19 A    Yes, I do.

20 Q    Do you see the column with the header '115 family?

21 A    Yes, I do.

22 Q    Does that refer to the '115 and '322 patents at issue

23 in this trial?

24 A    Yes, it does.

25 Q    Now, what percentage of the value of SONAR/BASH did

1  you assign to the '115 and '322 patents in 2014?

2  A    Thirty-five percent.

3  Q    Did you increase that percentage even one decimal

4  point in your 2019 report?

5  A    No, I did not.  It's still 35 percent.

6  Q    Let's go back to Slide 85 from your presentation.  I

7  now want to look at the 24 percent number in the purple

8  box.  Can you remind us what that 24 percent number

9  represents?

10  A    That's the percent value that SONAR adds to malware

11  detection within Norton's products.

12  Q    Got it.

13       Now let's keep that 24 percent number in mind.

14  And I want to go back to your 2014 report at Page 57.  And

15  do you see the table in the middle of the page?

16  A    Yes, I do.

17  Q    Does this table show the percentage value that you

18  assign to SONAR/BASH as part of malware detection

19  functionality?

20  A    Yes, it does.

21  Q    What percentage did you assign to SONAR/BASH in 2014?

22  A    The overall share was 30 percent, but the specific

23  amount for SONAR/BASH was 24 percent.

24  Q    Did you increase that percentage even one decimal

25  point in your 2019 report?

1   A    No, I did not.  It's still 24 percent.

2   Q    In fact, when you take into account all of the

3   accused product sales, did your average percentage

4   decrease in 2019?

5   A    Yes, it did.

6   Q    Why?

7   A    Because there was more product sales, there was more

8   contribution.  So normally what you would do is as sales

9   value, and you have additional data and information shows

10  the increased demand, you would normally increase the

11  percent.  But in this case, I kept the percentage the

12  same.

13  Q    Let's go back to Slide 85.  To summarize, Dr. Cole,

14  as between your 2014 report and 2019 report, did you

15  increase either the 35 percent number or the 24 percent

16  number?

17  A    No, I did not.

18  Q    If Norton's counsel was trying to suggest to the jury

19  that those apportionment percentages changed, would that

20  be true?

21  A    No, it would not.

22  Q    Now I want to talk about your first apportionment

23  percentages in red on Slide 85.  Did those numbers change

24  between your 2014 and 2019 reports?

25  A    Yes, it did.

1   Q     Between 2014 and 2019, was a lot of new evidence

2   produced in this case?

3   A     Yes, there was.

4   Q     Were there several new depositions?

5   A     Yes, there were.

6   Q     Were there several new documents produced?

7   A     Yes, there were.

8   Q     Were there several new data productions?

9   A     Yes, there were.

10  Q     Did you review that new evidence before you wrote

11  your 2019 report?

12  A     Yes, I did.

13  Q     And did you take all of that evidence into account

14  when you estimated your 2019 percentages for malware

15  detection functionality?

16  A     Yes, I did.

17  Q     The other day you tried to explain to Norton's lawyer

18  that the assignment you were given by lawyers in 2014 was

19  different from the assignment you were given in 2019.

20  Have you served as an expert witness in a litigation

21  before this one?

22  A     Yes, I have many times.

23  Q     In your experience, is it common for the lawyers to

24  give instructions and assumptions that an expert witness

25  is required to follow?

1  A      Yes, it's very common that I'm given a specific scope

2  and a specific task that I'm asked to perform.

3  Q      Were you given instructions and assumptions to follow

4  in 2014 for your apportionment opinions in this case?

5  A      Yes, I was.

6  Q      Also in 2019?

7  A      That is also correct.

8  Q      Were those instructions the same?

9  A      No, they were not.

10  Q      What was the main difference?

11  A      The main difference was in 2014, the tasks and

12  instructions I was given was to use 70 percent as the

13  upper limit for a consumer, and 60 percent for the upper

14  limit for enterprise.

15          In 2019, I was asked to not apply any limits and

16  take a complete view using the product and price

17  differential analysis and come up with numbers for malware

18  detection.

19  Q      Norton's lawyer spent more than an hour on Tuesday

20  talking about Mr. Nachenberg's 70 percent number for

21  malware detection functionality.  But even if one were to

22  focus on that issue, Dr. Cole, is there a big difference

23  between the effective or applied average of your first

24  apportionment number in 2019 and Mr. Nachenberg's 70

25  percent number?

1    A    No.  The applied average in 2019 is 74 percent, and

2    that's within 4 percent of Mr. Nachenberg's number.

3    Q    Now to summarize, Dr. Cole, with reference to

4    Slide 85, as between your 2014 and 2019 reports, was there

5    any difference in your 35 percent number in blue?

6    A    No, there was not.

7    Q    Your 24 percent number in purple?

8    A    No, there was not.

9    Q    And was there a substantial difference in your

10   malware detection numbers in red?

11   A    There were some changes in those numbers.  I wouldn't

12   necessarily say they were substantial.

13   Q    If Norton's lawyer was trying to suggest that I asked

14   you to increase these numbers so that Columbia's damages

15   would be larger, would there be any truth to that

16   suggestion?

17   A    There would be no truth to that suggestion.  And I

18   would not have followed such an instruction because my

19   reputation in these cases is very important.

20   Q    Now I want to focus on your 24 percent number in

21   purple momentarily, and I now want to show you a document

22   that we looked at on Tuesday, PX511, on Slide 40 of your

23   presentation.  Was this an ordinary course email sent

24   outside the context of this litigation?

25   A    I apologize.  I'm not sure of the question.

1    Q     Let me do a better job, Dr. Cole.

2          What is PX511?

3    A     This is an email from Adam Bromwich that was sent in

4    2014 talking about the block counts, and how SONAR and

5    insight contribute to the overall product.

6    Q     Now, we've talked about the 90 percent number that

7    Mr. Bromwich mentions for insight and SONAR on Tuesday.

8    Can you remind the jury what that 90 percent number means?

9    A     That 90 percent is referring to the advanced real

10   world unknown threats that are happening and occur on the

11   system.   What Mr. Bromwich is referring to is you have all

12   of these attacks, but a large amount of it is what we call

13   in the security profession, noise on the wire, which are

14   just basic simple attacks.

15         These are attacks that freeware, and almost all

16   commoditized products, would catch.   So what really

17   matters to the customers, and what Mr. Bromwich is

18   highlighting, is the really critical advanced polymorphic

19   threats, that 90 percent of those are caught by insight

20   and SONAR.

21   Q     Now, Mr. Bromwich's email showed that Norton believed

22   SONAR was even more valuable than your 24 percent number?

23   A     Yes, he did.   Because if you are using this number

24   from Adam Bromwich, then you would assign 45 percent to

25   insight and 45 percent to SONAR.

1    Q      I see.

2           Now, Dr. Cole, I have just three points I want

3    to touch on briefly.

4           MR. GUZIOR:  And if it's possible, could we

5    switch over to the ELMO, please.

6           THE CLERK:  I think you're going to have to push

7    the power button in the top corner.

8           MR. GUZIOR:  That would help.  Thank you.

9           THE CLERK:  Give it just a minute.

10          THE COURT:  Are you marking that for

11   demonstrative purposes?

12          MR. GUZIOR:  In a moment I will, Your Honor.

13          THE COURT:  All right.

14   BY MR. GUZIOR:

15   Q      Dr. Cole, do you recall this demonstrative that

16   Norton's counsel showed to you on Tuesday?

17   A      Yes, I do.

18   Q      Now, do you remember on Tuesday that we talked about

19   something called freeware?

20   A      Yes, I do.

21   Q      Can you remind us what freeware is?

22   A      Freeware is software that is free.  And what happens

23   in many industries, including cybersecurity, is when you

24   have features that become commoditized, like signature or

25   firewall, you start seeing free products come out on the

 1   market that provide those base commoditized services that

 2   consumers can use at no cost.

 3   Q    And in the 2008 to 2010 period, was freeware driving

 4   down the price of antivirus software?

 5   A    Yes, it was.

 6   Q    Now I want to draw a line on this chart, Dr. Cole,

 7   and then ask you if you agree with it.

 8          Well, let me first ask you this, Dr. Cole:  I

 9   notice something strange about this chart.  In grade

10   school do you remember you would sometimes draw a chart,

11   and if you went down the Y axis, the last number would be

12   zero, right?

13   A    That is correct.

14   Q    Now, Norton's counsel's chart goes down only to 30,

15   right?

16   A    That is correct.

17   Q    Now I want to draw a line on this chart and ask you

18   some questions about it.  Now, Dr. Cole, do you see that

19   I've added zero to the Y axis of this chart?

20   A    Yes, I do.

21   Q    And do you see that I've added a downward trending

22   red line moving to zero?

23   A    Yes, I do.

24   Q    In light of freeware, if Norton had not introduced

25   new technology at the end of 2009, would the price of

1  Norton's products have been driven down to zero?

2  A    Yes, they would have, in my professional opinion.

3  Q    And was that confirmed by the deposition testimony of

4  Norton's, Mr. Wall, that we looked at on Tuesday?

5  A    Yes, it was.

6  Q    I see.

7              Now, Dr. Cole, --

8              MR. GUZIOR:  And, Your Honor, I'm going to mark

9  this for identification only as a demonstrative as PX1000.

10             THE COURT:  It will be marked as a

11 demonstrative, PX1000.  The top of it was "Accused

12 Functionality Added"?

13             MR. GUZIOR:  That's correct, Your Honor.

14             THE COURT:  All right.

15             (Columbia's Demonstrative Exhibit PX1000 is

16             marked.)

17 BY MR. GUZIOR:

18 Q    Next, Dr. Cole, I'm going to show you another

19 demonstrative that Norton's counsel used on Tuesday.  Do

20 you remember this graphic that was showed to you on

21 Tuesday?

22 A    Yes, I do.

23 Q    First, do you believe that it is fair and accurate to

24 depict the malware protection box in blue as being the

25 same size as free support 24/7, for example?

1   A     No, I do not.

2   Q     If you were talking about an airplane flight to go on

3   vacation, would it make sense to depict the value of the

4   airplane as being equal to the value of the free hand

5   sanitizer?

6   A     No, it would not.

7   Q     Is that effectively what Norton's counsel was trying

8   to depict in this chart on the screen?

9   A     Yes, they were.

10   Q     In your opinion, Dr. Cole, should the malware

11   protection box be significantly larger than the box for

12   these other features?

13   A     Yes, it should.

14   Q     Now to be clear, Dr. Cole, did you in fact assign

15   value, some value, to these other features in the yellow

16   boxes?

17   A     Yes, I did.  I did account for those features, and

18   assign some value and the reason why the malware

19   protection is at 90 percent.

20   Q     Did you believe that malware protection was

21   significantly more valuable than those other features?

22   A     Yes, I do.

23   Q     Now let's return back to Slide 85 from your Tuesday

24   presentation, please.  Does this slide show your final

25   apportionment percentages on the right-hand side of the

1  slide?

2  A     Yes, it does.

3  Q     Is that 6.3 percent for the enterprise products, and

4  5 to 8 percent for the consumer products?

5  A     That is correct.

6  Q     To be crystal-clear, for the enterprise product, is

7  Columbia seeking any royalty for 93.6 percent of the

8  product?

9  A     No, they are not.

10 Q     For Norton consumer, is Columbia seeking any royalty

11 for 92 to 95 percent of the product?

12 A     No, they are not.

13 Q     In your professional opinion, Dr. Cole, are

14 Columbia's apportionment percentages that you've provided,

15 modest and entirely reasonable?

16 A     Yes, they are.

17 Q     Thank you for your time, Dr. Cole.

18 A     Thank you.

19           THE COURT:  May this witness be excused?

20           MR. GUZIOR:  Yes, Your Honor, for Columbia.

21           MR. MORIN:  Yes, Your Honor, for Norton.

22           THE COURT:  All right.

23           Dr. Cole, thank you so much for your time.  You

24 are excused, and we appreciate your testimony.

25           DR. COLE:  Thank you, Your Honor.

1          Thank you, jury.

2          THE COURT:  You're welcome.

3                    **WITNESS STOOD ASIDE**

4          THE COURT:  All right.  Are you prepared to call

5   the next witness?

6          MR. BEENEY:  Yes, Your Honor.  The last witness

7   that Columbia will be calling to the stand is

8   Dr. Ryan Sullivan, who'll be testifying about a reasonable

9   royalty and damages with respect to fraudulent

10  concealment.

11         THE COURT:  All right.  Thank you.

12         THE CLERK:  You do solemnly swear that the

13  testimony you are about to give in this case, before this

14  Court, shall be the truth, the whole truth and nothing but

15  the truth, so help you God?

16         DR. SULLIVAN:  I do.

17         THE CLERK:  Thank you.

18         THE COURT:  So, Dr. Sullivan, I'm going to

19  welcome you.  And I'm probably going to give you a

20  precursor of my biggest job during this entire trial,

21  which is to remind people to speak slowly and into the

22  microphone because certainly it helps our court reporter

23  get it correctly, and we definitely want the jury to hear

24  what you're saying, okay?

25         DR. SULLIVAN:  Very good.  I will do my very

 1  best.

 2          THE COURT:  Okay.  Thank you.

 3          MR. BEENEY:  If I may, Your Honor?

 4          THE COURT:  Please.

 5          MR. BEENEY:  Thank you.

 6          Whereupon, **Dr. Ryan M. Sullivan**, having been

 7  duly sworn in, testifies as follows:

 8                    **DIRECT EXAMINATION**

 9  BY MR. BEENEY:

10  Q    Good morning, Dr. Sullivan.

11  A    Good morning.

12  Q    Would you please tell us your full name and where do

13  you work?

14  A    Ryan Michael Sullivan.  R-Y-A-N, M-I-C-H-A-E-L,

15  S-U-L-L-I-V-A-N.

16          I work at a company known as Intensity.  I work

17  as an economist, and I serve as president of Intensity.

18  Q    And, Dr. Sullivan, why are you here today?

19  A    I am here to explain and describe the work I did in

20  calculating damages for Columbia due to the infringement

21  of the '115 patent, the '322 patent, as well as to address

22  the allegations of fraudulent concealment, and the damages

23  incurred by Columbia as a result.

24  Q    And just so we're clear, Dr. Sullivan, were you asked

25  to provide or achieve any specific result?

1   A     No.  I was asked for my independent expert opinion.

2   Q     And did you prepare a set of slides to help you

3   present your testimony to the jury today?

4   A     Yes, I did.

5   Q     And we can just pull that up.  And, Dr. Sullivan, do

6   you recognize this?

7   A     Yes, I do.  This is the cover page of the

8   demonstratives that I prepared.

9   Q     And let's turn to the first substantive page, the

10  next page on the slides, and just tell us a little bit

11  about your background, Dr. Sullivan, please.

12          THE COURT:  I'll going to interrupt you,

13  Mr. Beeney.  Did we get a copy of this report?

14          MR. BEENEY:  The Court should have had them on

15  Tuesday, at the latest.

16          THE COURT:  All right.

17          MR. BEENEY:  I'm sorry.

18          THE COURT:  No, that's okay.  We skipped a day

19  and we're out of whack.

20          MR. BEENEY:  I don't even remember what today

21  is, Your Honor.

22          THE COURT:  Thank you.

23          All right.  Now we're ready.  My apologies.

24          MR. BEENEY:  I'm sorry.  That was certainly our

25  fault.

1          THE COURT:  I'm sure it's in our chambers.

2          MR. BEENEY:  But Your Honor does have the

3  exhibits?

4          THE COURT:  I do.  I have those.  And both sides

5  have been very good about getting me what I need.  It

6  doesn't mean that I keep up with it, unfortunately.

7          MR. BEENEY:  One versus many.

8  BY MR. BEENEY:

9  Q    So, Dr. Sullivan, back to your slide deck.  Just tell

10  us a little bit about your background, if you will.

11  A    I have been providing professional economic services

12  since 1992.  So it has been just over 30 years now.  I

13  began my career and my academics at U.C. San Diego –

14  that's University of California in San Diego – performing

15  mathematical economic research.  And since that time, have

16  worked with different economics and data science

17  companies.

18  Q    And why did you choose University of California, San

19  Diego, to do your work?

20  A    U.C. San Diego is world renowned for its research and

21  its faculty in mathematical economists.  It gave me an

22  opportunity to work with some of the top mathematical

23  economists in the world, including the two economists that

24  I have worked with directly that earned the Nobel Prize in

25  economic research.

1  Q    Dr. Sullivan, as an economist just give us a couple

2  of examples of the kind of work that you do.

3  A    I do a wide variety of different types of projects.

4  There are three that I have found to be very interesting

5  for me.

6        One was working with the National Basketball

7  Association, the NBA, and the NBA player's association.

8  So back in 2016, there was a negotiation over the

9  collective bargaining agreement between the NBA on the one

10 hand, and the player's association on the other, in terms

11 of the contract, the compensation, and the like.  I worked

12 with the player's association as the lead economist

13 negotiating that collective bargaining agreement between

14 those two entities.

15       A second example, also in professional sports,

16 was working with the Boston Red Sox.  And therein, we

17 developed pricing, and pricing algorithms, for ticket

18 prices at the Boston Red Sox games.  And the notion was to

19 evolve and adjust those prices to be able to get more fans

20 into the stadium.

21       A third example that I really enjoyed involved a

22 movie a while back called Joy.  And this was a movie, some

23 of you may have seen, with Jennifer Lawrence and Bradley

24 Cooper and Robert De Niro.  And it was illustrating the

25 rags to riches story of Joy Mangano who was selling the

1  Miracle Mop on Home Shopping Network.

2          So I was working with Joy, and her company, and

3  HSN, Home Shopping Network, to evolve the sales of her

4  products from Home Shopping Network into brick and mortar.

5  Into Target, into Bed, Bath & Beyond.

6          And what I did was develop with them the

7  business strategy of how to make that transition.  How to

8  do the launch, what products to put where, how to price

9  them, and how to get the greatest value from the publicity

10  that was occurring from the movie that was being launched

11  at the same time.

12  Q    Dr. Sullivan, you're doing your work today with

13  respect to patents and intellectual property, so maybe we

14  can turn to your next slide that you prepared, and tell us

15  a little bit about your work in the intellectual property

16  area?

17  A    I have maintained a focus on intellectual property

18  for many years.  My work has involved patent valuations

19  for licensing and for sales, sales of individual patents

20  as well as portfolios.  I have been involved in many

21  different patent licensing negotiations in some senses

22  similar to the work that I did with the NBA player's

23  association, albeit with technology.

24          And I have also served as an expert in cases

25  such as this in evaluating damages associated with patent

1  infringement.

2  Q    You mentioned here real world patent licensing

3  negotiations.  Is it common for you to sit, as it were,

4  face-to-face across the table from someone and actually

5  negotiate a license?

6  A    It does occur from time to time.  More frequently

7  negotiations occur over phone, email, and zoom.  Yet I

8  have also had a number of occasions to sit at the

9  proverbial negotiating table working with the opposite

10  side to be able to get to a constructive deal that works

11  for all parties.

12  Q    And is your experience in actually negotiating

13  licenses helpful for the task that you are performing in

14  this case today?

15  A    I believe it is.  It provides the context and the

16  understanding of how it is that parties ultimately reach

17  an agreement, and what that agreement is in substance.

18  Q    So in addition to your work with license

19  negotiations, and determining what the value of a patent

20  license would be on both sides, we've had some testimony

21  about work related to product pricing and how that impacts

22  ultimately a reasonable royalty analysis.  Would you just

23  tell us a little bit about your work with respect to

24  product pricing?

25  A    I have done a lot of work with product pricing.  The

1  Home Shopping Network is one example.  The Boston Red Sox

2  another.

3          A third example in that would be work that I did

4  with a company called Wine.com.  And they are an online

5  wine retailer.  And we built the pricing algorithms and

6  the formulas to adjust each and every bottle of wine that

7  is sold each and every day based upon the demand in a

8  given geography, what is occurring in brick and mortar

9  stores around that geography, as well as what is going on

10  with other online wine retailers.

11          And the key issue there is that the demand for

12  each bottle can really vary depending upon what the

13  customer base is for each individual product.

14  Q    And, Dr. Sullivan, we're obviously asking you for

15  your opinion today in litigation.  This is where we are.

16  But how much of your work is related to litigation, and

17  how much of it is related to actual business negotiations,

18  licensing negotiations, and the like?

19  A    Approximately half of my professional work is related

20  to litigation.

21  Q    And if you take that half that's related to

22  litigation, obviously today you are working or providing

23  an opinion that -- for Columbia, how much of the work that

24  you do is for a plaintiff and how much of the work that

25  you do is for a defendant?

1  A   It is split almost perfectly evenly about 50/50

2  between plaintiffs and defendants.

3  Q   And today you're going to be offering your opinion

4  about the reasonable royalty in patents that are related

5  to computer security.  Have you ever addressed the value

6  of patents in computer security before?

7  A   Yes, I have.  I have done so actually on behalf of

8  accused infringers or defendants in patent infringement

9  litigation.

10 Q   And have you been qualified by courts before as an

11 expert on the question of reasonable royalty in economic

12 damages?

13 A   Yes, I have.

14        MR. BEENEY:  Your Honor, at this point, Columbia

15 will offer Dr. Sullivan as an expert in economics, and the

16 calculation of damages and reasonable royalty for patent

17 infringement, and damages for fraudulent concealment.

18        THE COURT:  All right.

19        Is there any objection?

20        MR. MORIN:  No objection, Your Honor.

21        THE COURT:  All right.

22        He will be qualified as an expert in the areas

23 you just identified.

24        MR. BEENEY:  Thank you, Your Honor.

25 BY MR. BEENEY:

1  Q    Dr. Sullivan, let me go on to the next slide that you

2  prepared to explain to the jury what really you were asked

3  to do in this case.

4  A    I had two primary tasks.  The first is to calculate

5  the damages incurred by Columbia as a result of the

6  alleged infringement of the '322 patent and the '115

7  patent by Symantec and Norton.

8              The second task was to calculate the damages

9  incurred by Columbia as a result of the allegations of

10  fraudulent concealment against Symantec and Norton.

11  Q    And to perform the tasks of calculating the damages,

12  did you look at the evidence in this case?

13  A    Yes, I did.  I reviewed a very large amount of

14  information.

15  Q    And going over to your Slide 5, maybe you can just

16  give us a little bit of high-level description of the

17  materials and the evidence that you considered to provide

18  the jury with your opinion.

19  A    You know, naturally, I reviewed the patents at issue

20  in this case.  There was also a large amount of financial

21  data that has been produced by Symantec and Norton.

22  Reviewed their company documents.

23              I perform my own research into the marketplace

24  for data and information on competitor's products and

25  demand for the products at issue and competing products.

1    I also reviewed witness testimony.  I

2 interviewed witnesses, I reviewed expert reports, amongst

3 other documents.

4 Q    And moving over to your Slide 6, Dr. Sullivan, tell

5 us what you did to actually reach your opinion.

6 A    Well, I reviewed information, I performed research,

7 conducted my analysis, and developed my independent

8 opinions and conclusions.  I set that forth in two reports

9 that were submitted in 2019.

10    These reports included 188 pages of text, nearly

11 900 footnotes supporting the information and opinions that

12 I set forth.  This includes deposition testimony,

13 documents, expert reports.  It included approximately 900

14 pages of analysis, tables and charts.

15    I sat for a deposition, and provided deposition

16 testimony.  And I also updated my calculations earlier

17 this year with additional data that had been produced in

18 this litigation.

19    And the purpose behind all of this is to provide

20 full clarity and transparency over the work that I

21 performed so that the Court and Norton can review and

22 evaluate the work that I performed.

23 Q    So, Dr. Sullivan, let's then move on to the first

24 part of the case.  Were you asked to calculate a

25 reasonable royalty should the jury find that Norton

1  infringes the Columbia patents asserted in this case?

2  A    Yes.

3  Q    And let's move on to your Slide 7, and tell us what

4  you understand a reasonable royalty to be and how that

5  informed your task.

6  A    My understanding, and the statute here states, that

7  damages shall be in no event less than a reasonable

8  royalty for the use made of the invention by the

9  infringer.

10       And there's two primary takeaways here.  The

11  first is that a reasonable royalty is the minimum amount

12  of damages, because damages should be no less than that.

13       And second, that the reasonable royalty should

14  reflect the use made of the invention by the infringer.

15  That means the extent of use, and the amount of use, of

16  that technology in this case by Symantec and Norton.

17  Q    And, Dr. Sullivan, is there a -- kind of a high-level

18  construct or framework that you look at to try to follow

19  what's on Slide 7 here?

20  A    Yes, there is.

21  Q    Let's take a look at your Slide 8, perhaps.

22  A    As you have heard before, the construct or the

23  framework that is being used in this case is known as a

24  hypothetical negotiation.  This is the most common and

25  typical framework for determining a reasonable royalty in

1   patent infringement cases.

2          Here this is a negotiation that would have

3   occurred back in time when the patents issued between

4   Columbia on the one hand as the patent holder, and

5   Symantec as, what's called, the licensee, the company that

6   would be seeking rights to be able to utilize the

7   technology.

8          This negotiation would have occurred in

9   December 2011 for the '115 patent, because that is when

10  the patent issued.  And similarly, it would have occurred

11  in December 2013 for the '322 patent, as that is when that

12  patent issued.

13  Q    And just so we're clear, Dr. Sullivan, you're not

14  going to be explaining to the jury a negotiation that

15  actually occurred between Columbia and Symantec, is that

16  true?

17  A    That's right.  It is hypothetical.  Had the

18  negotiation actually occurred and had the parties actually

19  come to agreement, we likely would not be sitting here

20  today.  Yet that negotiation did not occur, and thus we

21  have to recreate it, if you will, to be able to calculate

22  what the royalty would have been.

23  Q    And do you understand that in infringement cases,

24  like the case that we're in today, that you are required

25  to use your experience, expertise, and the facts of the

1    case to explain how you think that negotiation would have

2    occurred?

3    A    Yes.  That's right.  There are differences between a

4    hypothetical negotiation and a real-world negotiation, yet

5    this hypothetical negotiation is still based upon actual

6    facts, actual data and information.

7    Q    Now we've seen evidence that back in 2005 when

8    Columbia filed a provisional application, PX4, on the

9    patents-in-suit, that Columbia and Norton engaged in some

10   limited negotiation for a license at that time in 2005.

11   Are you permitted to go back to 2005?

12        You gave us the dates of 2011 and 2013 here on

13   the slide, but do you understand whether you are permitted

14   to go back to the provisional application given the fact

15   that we're actually in a litigation now?

16   A    So my understanding is as a legal matter, damages do

17   not start until the patent issues.  So even though in the

18   real world companies often will license a patent

19   application before the patent issues, here, given the

20   framework of a reasonable royalty and a hypothetical

21   negotiation, we are instructed that that begins upon

22   patent issuance.  So here that's 2011 and 2013.

23   Q    And just to make clear to the jury, Dr. Sullivan,

24   that that it is their task to determine whether there is

25   infringement or not, you're not providing an opinion that

1  there is infringement?

2  A    That is correct.  As an economist, it is not my role

3  to evaluate or determine whether there is infringement.

4         Interestingly, at this hypothetical negotiation

5  there is an assumption, a belief, by the parties that the

6  patent is infringed.

7  Q    So just to interrupt you, Dr. Sullivan, let's move on

8  to your Slide 9 and perhaps we can talk about the

9  assumptions that you're required to make.

10        THE COURT:  While you're moving on, we just need

11  to do a quick switch, if you don't mind, with our court

12  reporters.  We're not going to take a recess.  And they do

13  this super fast.

14            (The trial resumes on the next page.)

15

16

17

18

19

20

21

22

23

24

25

Ryan Sullivan - Direct                    1712

1     THE COURT:  That was fast.  Thank you so much.

2  I apologize for the interruption.

3     MR. BEENEY:  Not at all.  I certainly agree with

4  Your Honor's sentiments.  Thank you.  The transcripts have

5  been amazing.

6  BY MR. BEENEY:

7  Q    So, Dr. Sullivan, I think you were about to explain

8  to the jury what you are required to do in approaching

9  your view of what would happen at the hypothetical

10  negotiation.

11  A    Sure.  So two primary assumptions.  One is that the

12  patents are invalid, and second, that the patents are

13  infringed.  And this is a distinction over a real world

14  negotiation where often these items are disputed by the

15  parties.  And so that is one key difference between the

16  hypothetical negotiation and the real world.

17  Q    And here, in this case, we have a direction from the

18  Court about patent validity with respect to the '115 and

19  the '322?

20  A    Correct.  So the validity of those two patents is not

21  at issue in this trial.  Although there is dispute over

22  the infringement, there is not over the validity of those

23  patents.

24        And in addition, what's unique about a

25  hypothetical negotiation is that it's a situation where

Ryan Sullivan - Direct                    1713

1   all of the information is available to both parties.  So

2   rather than a real world negotiation where one party might

3   want to hold back the information that they have, this is

4   much more like playing a card game with all the cards up

5   on the table where both parties can see all of the

6   information that's available that might be relevant.

7   Q    And is it your understanding that that's what you're

8   required to assume in doing your analysis?

9   A    Correct.

10        THE COURT:  Mr. Beeney, I think you may have

11  stepped back a little bit from the microphone.  So I'm

12  going to be sure -- can you all hear everything?

13  BY MR. BEENEY:

14  Q    So ultimately, Dr. Sullivan -- let's move to your

15  slide 10, please.

16        Would you explain to us how you go about at a

17  high level -- and we'll get into more detail so the jury

18  understands, but at a high level, how do you calculate a

19  reasonable royalty?

20  A    The basic formula that applies in this case is shown

21  on this page.  It is the base, or sales base, which is

22  dollars, multiplied by a rate, which is a percentage rate,

23  and that gives the royalty.  By way of simple

24  illustration, if there were $100 worth of sales and if the

25  rate were 5 percent, performing that multiplication would

Ryan Sullivan – Direct                        1714

1   provide a royalty of $5.

2          And what is a common example that is often

3   thought of is a book royalty, an author who owns rights on

4   their book.  That gets sold, and they might earn, say,

5   5 percent of all of the sales, and it's that general idea

6   that is applicable here.

7   Q    So maybe we'll, as they say, cut to the chase and ask

8   Mr. Chase to put up slide 43 and then we'll come back to

9   how you got there, but would you tell the jury what your

10  ultimate opinion is?

11  A    In my view, based upon all of the research and

12  analysis that I have performed, I determined that the

13  appropriate revenue base or sales base is depicted here in

14  the yellow box, and that is $18,511,272,696.  I multiply

15  that by a royalty rate of 1.23 percent, and performing

16  that calculation provides a royalty amount of

17  $227,169,402.  And this, in my view, is the appropriate

18  reasonable royalty for the '322 and '115 patents.

19  Q    So without doing the precise math, if I understand

20  this, when Norton sells $18 and a half billion of products

21  with the accused functionality that is accused to infringe

22  the '115 and the '322, Norton gets to keep, out of that

23  $18 and a half billion, something like $18,250,000,000?

24  A    Roughly speaking, that's correct.

25  Q    And there's been some focus by Norton on the blue box

1  as being a big number, and it certainly is, but in terms

2  of a reasonable royalty, do you believe that you can look

3  at the blue box in isolation from the other two numbers on

4  this slide?

5  A    No.  It is, indeed, a very substantial amount, yet as

6  I'll show you in context and in the relevant information

7  and the extent of the infringement as has been alleged, in

8  my view, this is very reasonable.

9  Q    All right.  So let us now go back and basically tell

10 the jury how you got to that number.  And turning over to

11 your slide 11, can you explain at a high level what this

12 is, please?

13 A    Yeah.  So these are the various tasks that I

14 undertook in calculating the reasonable royalty.  On the

15 left, you'll see a yellow box here for royalty base.

16 That's the sales base that I was referring to earlier.  I

17 evaluated the geographic scope, which looks at where the

18 customers are located in terms of the sales and whether it

19 should be isolated to a particular geography or if it

20 should include the entire world, and I will demonstrate to

21 you that a worldwide scope is appropriate.

22         Secondly, with that in mind, I looked at the

23 sales revenue associated with the products that are

24 accused of infringement.

25         On the right-hand side, in the dark gray box,

Ryan Sullivan – Direct                    1716

1   you'll see royalty rate.  There are three primary items

2   there.  The first is looking at the value of the patents

3   to Norton.  And I will do this on a revenue basis.  I will

4   then apply profit margins to convert that revenue to

5   profit and then I will effectively split that profit so

6   that some of it goes to Columbia as a royalty and some is

7   maintained by Norton and Symantec as part of its

8   profitability.

9          And all of this is informed by the items noted

10  at the top, exclusivity or nonexclusivity, the duration,

11  the time period covered, as well as the structure of the

12  royalty.

13  Q    So, Dr. Sullivan, we'll walk through these eight

14  factors that you looked at, but maybe we can just quickly

15  check off two of them.  Would you tell us what your

16  findings were with respect to exclusivity and duration?

17  A    For exclusivity, I found that the license for the

18  hypothetical negotiation would be nonexclusive.  And this

19  means that I looked at the value of the patented

20  technology to Symantec and Norton, not the additional

21  value from excluding others from utilizing the technology.

22         And with regards to duration, the damages period

23  that I utilized went from the issuance of the patents --

24  so December 2011 and December 2013 -- up through the

25  latest provision of data from Norton, which went through

Ryan Sullivan – Direct

1   February of this year.  So February 2022.

2   Q    And, Dr. Sullivan, do you understand there to be any

3   dispute on these two issues, exclusivity and duration,

4   between Columbia and Norton or do you understand Norton

5   agrees with the testimony just provided?

6   A    I'm not aware of any dispute on those items.

7   Q    So, again, just so we understand just a little bit,

8   Dr. Sullivan, why not just take a percentage of the yellow

9   box, the royalty base?  Why do you go to the black box to

10  come to a reasonable royalty calculation?

11  A    The idea there is that there are additional items,

12  features, functionalities that contribute to the sales of

13  the accused products.  And thus, what I have done is

14  isolated the value contribution of the patented technology

15  separate and apart from other features, functionalities

16  and contributions that are made by Norton and Symantec.

17  Q    And is it fair to say that your calculation of each

18  of the factors in the black box actually ends up reducing

19  the amount of money that Columbia is seeking?

20  A    That is correct.

21  Q    Now, is there, in this negotiation that you are going

22  to talk to the jury about, a set of factors that damage

23  experts and reasonable royalty tasks typically consider to

24  get some insight as to what would have happened in that

25  negotiation?

Ryan Sullivan – Direct                    1718

1    A    Yes.  The *Georgia-Pacific* factors.

2    Q    And can we turn to your slide 12?  I know there's a

3    lot of information on here, but just at a very high level,

4    tell us what the *Georgia-Pacific* factors are.

5    A    These are 15 factors that were set forth by a court

6    approximately 52 years ago, in 1970.  These are factors

7    that can be informative and helpful in determining a

8    reasonable royalty.

9    Q    And let me show you your next slide, slide 13.  Tell

10   us how the *Georgia-Pacific* factors set out by the Court,

11   you know, fit within the hypothetical negotiation

12   framework that you've described for us.

13   A    Factor 15 is the culmination of the *Georgia-Pacific*

14   factors and the result or outcome of a hypothetical

15   negotiation.  You'll see the highlighted piece here states

16   that it's, "The amount that the licensor (such as the

17   patentee)" -- that's the patent holder -- "and a licensee

18   (such as the infringer) would have agreed upon (at the

19   time the infringement began) if both had been reasonably

20   and voluntarily trying to reach an agreement."

21           And this is the basic framework that I have

22   utilized.

23   Q    And, Dr. Sullivan, we'll go back to the factors that

24   you talked about on slide 11, but have you considered all

25   of the *Georgia-Pacific* factors to a degree?

1    A    Yes, I have.

2    Q    And would you explain that to us in your next slide,

3    slide 14?

4    A    So what I have done here is I have noted which

5    factors apply to which task or component of the royalty

6    analysis.  The geographic scope is related to

7    *Georgia-Pacific* factor 3.  Norton sales are related to

8    factors 8, 10, and 11.  The value of the patents to Norton

9    is related to factors 6, 8, 9, 10, 11, 12, 14, and 15.

10   Profit margins are related to factor 8.  Relative

11   contributions are related to factors 5 and 13.

12   Exclusivity is related to factor 3.  Duration, factor 7.

13   Structure, factors 3 and 11.

14           And I'll just note real briefly at the bottom

15   you'll see three other factors -- factors 1, 2, and 4 --

16   which turn out not to be informative in this particular

17   case.  Those relate to other agreements, and there are not

18   other agreements that are informative for the patent

19   infringement side of this case.  And factor 4 relating to

20   particular policies that also are not effective of the

21   royalty.

22   Q    All right.  So let's now start with these factors,

23   Dr. Sullivan.  Let's talk about the first one under the

24   royalty base, geographic scope, and I think you told us

25   that's a question of which Norton customers would be

Ryan Sullivan – Direct

1  covered by the license; is that right?

2  A    Correct.

3  Q    And do you have an understanding whether there is a

4  disagreement there between Norton and Columbia?

5  A    Yes, there is disagreement.

6  Q    And let's let the jury know what the practical impact

7  of that disagreement is.

8  A    For the overall amount of sales, roughly half are

9  made to customers who are located within the United States

10  and the other half are to customers who are located

11  outside of the United States.

12  Q    And what did you conclude that Norton and Columbia

13  would agree to with respect to the coverage of Norton's

14  customers?

15  A    In my view, they would have agreed to a worldwide

16  license that would have included sales to all customers

17  throughout the world.  This would enable Symantec and

18  Norton to be able to provide product sales to customers

19  throughout the world, not just within the United States.

20  Q    And is it fair to say that if the license did not

21  cover customers outside of the United States, then

22  Norton's sales to those customers would remain infringing

23  sales?

24  A    That is my understanding, yes.

25  Q    All right.  Using your slide 15, tell us, again at

1  kind of a high level, of what evidence and facts you

2  considered in this case to reach your opinion that Norton

3  and Columbia would agree to a license to cover customers

4  outside the United States?

5  A    At a high level, there are three primary items.  The

6  first is that the accused products were created in and

7  distributed from the United States.  The second is that

8  licensing and activation of those products occurs from the

9  United States, and there are substantial activities that

10 constitute the infringement as alleged that occurred

11 within the United States.

12 Q    So, Dr. Sullivan, using your slide 16, does the fact

13 that your opinion that Norton and Columbia would want to

14 cover customers outside the United States mean that this

15 license would have anything other than patents issued by

16 the United States?

17 A    No.  This is still very specific to United States

18 patents.  However, it is the activities and the way the

19 business is constructed at Symantec and Norton such that

20 it is the infringing activity, as I have assumed it,

21 within the United States that enables the global sales.

22         Here, this graphic is intended to reflect that

23 there are infringing activities, or activities that are

24 accused of infringement, that occur within the U.S., and

25 in particular, within California and Arizona, that enable

Ryan Sullivan – Direct                    1722

1    sales to customers throughout the world.

2    Q    All right.  And then in looking at some of the

3    evidence that you reviewed for the three factors you just

4    told us about, did you see evidence that the Norton

5    accused products were actually created and distributed in

6    the United States even though they went to customers

7    outside the United States?

8    A    Yes.

9    Q    And using your slide 17, could you explain some of

10   that evidence to us, please?

11   A    So let's start off taking a look at the graphic on

12   the right-hand side here, and there are activities that

13   are occurring within the United States, including

14   developing, designing and preparing the software.

15            That software then gets delivered both within

16   the U.S. and throughout the entire world to customers, and

17   predominantly that occurs through delivery companies that

18   are referred to as CDNs.  It's the content delivery

19   network.  You may have heard these referred to in the past

20   from companies like Verizon, Microsoft Azure -- that's

21   A-Z-U-R-E -- and Akamai, A-K-A-M-A-I.

22   Q    And, Dr. Sullivan, did you rely on some testimony

23   that you've cited here on slide 17 from Norton's global

24   director of new products introduction, Ms. Brennan, at

25   page 42, lines 5 to 7 of her deposition?

1  A    Yes.  Linda Brennan is an employee of Symantec/Norton

2  that was designated as a corporate representative on

3  topics such as this.  And she explained that what she

4  referred to as a single point of truth for all customers

5  globally is Culver City.  Culver City is a city that's in

6  the Los Angeles area of California.

7           And what this means is that the software

8  created -- the final software is created in Culver City,

9  and it is from there then delivered to customers

10 throughout the world.

11 Q    And I think, Dr. Sullivan, you provided us with -- I

12 think it's two more slides of testimony from Norton

13 witnesses that you relied on to conclude that the products

14 that customers outside the United States bought were

15 actually created in the United States, designed,

16 developed, mastered by Norton in the United States; is

17 that correct?

18 A    Yes.  So briefly, at the top left, more testimony

19 from Ms. Brennan indicating that the design and

20 development of the masters occurred in Culver City, in the

21 United States.

22           On the bottom left, Dermot Wall, who's a senior

23 director of product management, similarly testified that

24 the Norton product line was designed and developed in

25 United States in Culver City.

Ryan Sullivan – Direct                    1724

1        On the top right, Jokul Tian, who's a

2   development director of the STAR team, indicated that the

3   SONAR content and the trees, the decision trees for SONAR,

4   were created and developed within the United States.

5        And at the bottom right, Pedro Reyes, senior

6   manager of development at Symantec, who was in charge of

7   the STAR team handling the build of the BASH component,

8   indicated that that occurred in the United States, with

9   that team being in the U.S.

10       MR. BEENEY:  And just for the record, slide 18

11  refers to Ms. Brennan's testimony at 106:4 to 7 and 92:21

12  to 22.

13       Mr. Tian's testimony at 89:19 to 24.

14       Mr. Reyes' testimony at 46:22 to 47:3.

15       And Mr. Walls' testimony at 49:25 to 50:4.

16  BY MR. BEENEY:

17  Q    And, Dr. Sullivan, did you see any further evidence

18  that Norton created in the United States the software that

19  it is accused of infringing that it sold to customers

20  outside the United States?

21  A    Yes, I did.

22  Q    And so let's move to slide 19, please, and would you

23  explain to us what this is?

24  A    So three different pieces of testimony here that I

25  viewed to be relevant.  On the left-hand side, Ms. Linda

Ryan Sullivan – Direct                    1725

1    Brennan explaining that the master version is maintained

2    and deployed out of Culver City.

3          On the right, Carey Nachenberg, who was a fellow

4    at Symantec, indicated that for Symantec Endpoint

5    Protection, that the golden disc, or the final piece of

6    software, was developed and distributed from the

7    United States, in particular, from Culver City.

8          And again, bottom right, testimony from Pedro

9    Reyes indicating that what is a master version, that that

10   is what is eventually sold to customers.

11   Q    And, Dr. Sullivan, why was this testimony to your

12   opinion that a license would cover customers outside the

13   United States?

14   A    This demonstrates that it is the product that was

15   created within the United States that is then being sold

16   and delivered to customers both within the United States

17   as well as worldwide, that it is that very product.

18         And if you were to think of it as something

19   physical -- I was talking about basketball earlier.  If it

20   was a basketball and it was created here in the

21   United States and then shipped abroad, that would still,

22   as a matter of economics, be considered part of that

23   royalty base for calculating a royalty.

24         MR. BEENEY:  And forgive the interruption, but

25   just for the record slide 19 refers to Mr. Nachenberg at

1  146:22 to 147:4.  Mr. Reyes at 35:19 to 21.  And

2  Ms. Brennan 37:18 to 21, 39:8 to 10, and 106:15 to 19.

3  BY MR. BEENEY:

4  Q    Dr. Sullivan, was the way that Norton -- I think you

5  mentioned to us content delivery networks, but was the way

6  that Norton distributes the products to customers outside

7  the United States, did that impact your opinion on the

8  scope of the license to cover customers outside the

9  United States?

10 A    Yes, it did.

11 Q    And let's look at your slide 20 to explain that,

12 please.

13 A    There really are three paths of delivery or

14 distribution of the product.

15        The first is through a CDN, as I mentioned, a

16 content delivery network.  And the second is a physical

17 disc that might be sold.  It comes from a box, and it's a

18 physical product delivery, and the third is OEM, original

19 equipment manufacturer, and this is where the product is

20 preinstalled, for example, on a computer and then that

21 computer is purchased by a customer.

22        And what Ms. Brennan testified to is explaining

23 that for each of these three paths, that what's being

24 delivered to customers is the product that was created and

25 stored in Culver City, California.

Ryan Sullivan – Direct

1  MR. BEENEY:  And again, for the record, slide 20

2  refers to Ms. Brennan at 42:13 to 17, 42:8 to 12, and

3  42:18 to 21.

4  BY MR. BEENEY:

5  Q    Dr. Sullivan, of the three methods you list here,

6  what did the evidence tell you is the most common way that

7  Norton distributes its products?

8  A    Through CDNs.

9  Q    And let's turn to slide 21, and can you explain that

10  to us, please?

11  A    Sure.  So a CDN, a content delivery network, I think

12  of it as an electronic FedEx or UPS.  They take a product

13  that is here in the United States.  It is placed on a

14  server in the United States and then set up on servers

15  both throughout the U.S. as well as worldwide, and that's

16  to help optimize the delivery of that software and make it

17  most efficient for consumers who are downloading that

18  software.

19         And here again, referring to Ms. Brennan and her

20  testimony demonstrates that the CDN is delivering the

21  software as it was created in Culver City, and the CDN

22  does not make any changes to that software, and in fact,

23  Symantec and Norton take steps to ensure that there are no

24  changes to that software so that it stays as that -- as

25  intended so that the customer does receive precisely what

1   it is that was created by Symantec and Norton.

2   Q    And so far, Dr. Sullivan, you have shown us your

3   reliance on Norton's own executives and Norton's own

4   documents created at the time.  Is that accurate?

5   A    Yes.

6            MR. BEENEY:  And again, for the record,

7   apologize for the interruption, slide 21 is Ms. Brennan,

8   52:9 to 20.

9   BY MR. BEENEY:

10  Q    Let's turn to the next -- well, let me ask you

11  another question, Dr. Sullivan.  I'm sorry.

12           When you talk about a content delivery network,

13  should we consider that as being similar to a sales

14  distributor?

15  A    Actually, I would not think of it that way.  It

16  really is much more similar to a delivery -- electronic

17  delivery such as UPS or FedEx.  It is not a sales

18  distributor because the CDN is not making the sales.  They

19  are not coordinating with the customer making that sale or

20  the transaction.  They are simply delivering the product

21  just as if you were to order from Amazon and get that

22  product through UPS or FedEx.

23  Q    So to go into a little bit more understanding of how

24  Norton distributes its products to customers outside the

25  United States, would you tell us what's on your slide 22

Ryan Sullivan – Direct                    1729

1   with respect to content delivery networks and why you

2   believe those suggest that a license would have to cover

3   customers outside the United States?

4   A    The software begins in Culver City and then is

5   uploaded to a content delivery server.  Those initial

6   servers are referred to as jump off servers, and so where

7   those servers are located is within the United States.

8            And as indicated by the testimony of David Kane,

9   who's a technical director at Symantec/Norton, as well as

10  the deposition testimony of Pedro Reyes, they both

11  indicate that the jump off servers for the content

12  delivery network providers such Akamai, Verizon and Azure

13  were all located within the United States.

14           MR. BEENEY:  And slide 22 refers to Mr. Reyes at

15  50:7 to 15.  And Mr. Kane, 93:1 to 8.

16  BY MR. BEENEY:

17  Q    So from an economic point of view, Dr. Sullivan, is

18  it appropriate to conclude that when a product is made in

19  the United States and has all of the connections to the

20  United States that you referenced to then conclude that

21  Norton and Columbia would reach a license to cover those

22  sales from the United States?

23  A    Yes.  That is, in my view, the reasonable and

24  appropriate economic conclusion.

25  Q    Now, you told us earlier that most of Norton's sales

Ryan Sullivan – Direct                    1730

1  were done through these content delivery networks.  Have
2  you relied on a Norton document to confirm that?
3  A    Yes, I have.
4  Q    And let's show you your slide 23, please, and tell us
5  what this shows.
6  A    This is indicating, over time, how Norton 360 was
7  delivered, what that channel was.  And you'll see that
8  over three-fourths, over 75 percent of sales were online
9  sales, which would have been delivered through a content
10 delivery network.  And in particular, I'm looking at the
11 far right of this slide because that is in 2011, which is
12 most similar to the timing of the hypothetical
13 negotiation, there's approximately 5 percent of sales that
14 are made through OEMs, the original equipment
15 manufacturers.  And those are provided to those OEMs both
16 electronically and through disc.
17        The retail sales, which are only about 10 or
18 15 percent of sales, are those physical discs that I was
19 referring to earlier.  And then there's a small sliver of
20 sales that are made through ISPs, which are Internet
21 Service Providers, and those two are electronic sales.
22        THE COURT:  Can you please remind the jury what
23 OEM sales are?
24        THE WITNESS:  Original equipment manufacturer.
25 So you can think of that as perhaps a Dell computer or HP,

Ryan Sullivan – Direct                    1731

1  and when you buy a laptop or a desktop computer, sometimes

2  those computers will come with the Symantec or Norton

3  software preinstalled on it.

4          THE COURT:  Thank you.

5          MR. BEENEY:  And slide 33 refers to PX-324,

6  which is dated May 19th, 2011.

7  BY MR. BEENEY:

8  Q    So, Dr. Sullivan, we've been focusing on new product

9  sales, but I also want to ask you about how Norton

10  distributes its updates, called LiveUpdates, to existing

11  customers.  First of all, what is a LiveUpdate?

12  A    LiveUpdates really include two types of updates.

13  There are updates to the software itself, new versions and

14  revisions to that software.  And secondly, the updates to

15  some of the information that's utilized by that software,

16  antivirus, signature databases, decision trees and the

17  like.

18  Q    And does evidence of how Norton distributes these

19  updates impact your opinion about whether Columbia and

20  Norton would agree to a license to cover customers outside

21  the United States?

22  A    Yes.  It further informs and supports my view that a

23  worldwide license is appropriate here.

24  Q    And would you turn to slide 24, please, and tell us

25  what the -- again, Ms. Brennan is becoming a star -- what

Ryan Sullivan – Direct                    1732

1  Ms. Brennan's testimony told you?

2  A    So here is additional testimony from Ms. Brennan

3  indicating that the LiveUpdates that I just explained come

4  from Culver City, California, and those are delivered

5  through content delivery networks originating from Culver

6  City.

7            MR. BEENEY:  And, again, slide 24 is Ms. Brennan

8  at 16:20 to 17:6.

9  BY MR. BEENEY:

10 Q    Moving on to a related factor to the scope of the

11 license but yet another issue of connection to the

12 United States, when a Norton customer downloads or

13 installs a copy of the Norton accused product accused of

14 infringement, does the customer have to agree to a license

15 to use what the customer has bought?

16 A    Yes, they do.

17 Q    And where does Norton host the system to agree to

18 that license?

19 A    That system, both for licensing as well as what is

20 referred to as activation occurs within the United States.

21 So the servers that handle licensing that provides the

22 authorization and activation are all within the

23 United States.

24 Q    So just to talk about activation a little bit more

25 for a second, is it fair that when a customer outside the

1  United States downloads the product, they can't use it

2  unless they have agreed to the license and Norton then

3  activates the product?

4  A    That is correct.

5  Q    All right.  Let's take a look at slide 25, and tell

6  us what that has told you about activation and licensing.

7  A    This is deposition testimony from Dermot Wall, and he

8  is indicating, on the left-hand side, that the licensing

9  servers are based in the United States, Virginia and

10 Arizona, and that secondly, on the right-hand side, that

11 the activation and the infrastructure for that on the

12 server side is also in the United States, in Arizona and

13 Virginia.

14 Q    And, again, you're relying entirely on what Norton

15 has told us?

16 A    Yes.

17 Q    And would you expect Norton to disagree with their

18 executives' sworn testimony?

19 A    I sure would not expect that.

20        MR. BEENEY:  Slide 25 cites Mr. Wall at 15:14 to

21 21, and 16:11 to 16.

22 BY MR. BEENEY:

23 Q    So, Dr. Sullivan, we've heard about something called

24 BASH model submissions where customers send information

25 back to Norton.  Where do the customers from around the

1  world send these BASH submission models back to Norton?

2  A    Within the United States.  So that is part of the

3  GIN, or global intelligence network, that Symantec and

4  Norton have utilized where they take information from all

5  the customer endpoint computers throughout the world, and

6  those submissions come back to the United States and the

7  servers here.

8  Q    So let's talk about what I think is the last factor

9  that I'm going to ask you about, Dr. Sullivan, about the

10 scope of the license.  Is it relevant to your

11 determination where Norton brings its business customers

12 to do its sales pitch?

13 A    I do believe that is informative.

14 Q    And why is that?

15 A    Where the sales occur, in terms of where the sales

16 pitch, the sales tool actually is, I'll show you, being

17 within the United States within their executive briefing

18 center, is where Norton and Symantec have brought their

19 customers to help cause them to make purchases of their

20 products.

21 Q    Again, let's turn to slide 26, and tell us what

22 Norton told you about this issue.

23 A    So here on the right-hand side, you'll see deposition

24 testimony from Fauzia Khan, who's a senior executive

25 briefing manager, explaining that roughly 90 percent of

Ryan Sullivan - Direct                    1735

1  Symantec's enterprise customers, the corporate customers,

2  are brought to the EBC, which is the Executive Briefing

3  Center, where they are effectively being sold on the

4  product.  And this comes in multiple forms, trying to keep

5  customers from going to a different supplier, trying to

6  maintain those customers and explain to them the benefits

7  and features of the products.

8  Q    And slide 26 is --

9         MR. BEENEY:  I'm sorry.  Just go back, if you

10 would, so I can read it for the record is Khan 162:11 to

11 16, 164:7 to 11, and 164:13 to 17.

12 BY MR. BEENEY:

13 Q    So, Dr. Sullivan, I think we can wrap up this factor

14 of the geographic scope of the license.  We've talked

15 through a lot.  So let's take a look at slide 27, and

16 basically, tell the jury what your takeaway is from all

17 the Norton evidence that you reviewed.

18 A    In my view as a matter of economics, it is very clear

19 that the royalty base would include sales to customers

20 throughout the world, not just the United States.  The

21 design and development of the products occurs here in the

22 United States.  The masters are created here in the

23 United States.  New products are distributed through

24 content delivery networks that originate from the

25 United States.  LiveUpdates are distributed from the U.S.

1   Licensing and activation occurs within the United States,

2   and the executive briefing center for sales to enterprise

3   customers is located within the United States.

4           MR. BEENEY:  All right.  So let's move on to

5   another factor.

6           THE COURT:  I think this is a good breaking

7   point if you're moving on to something new.  So we'll take

8   our first break of the day.  It's -- we'll come back at

9   11:10.  That's a 30-minute break.

10          And I'll give you the same admonition, you

11  haven't heard all the evidence yet so keep an open mind,

12  and don't speak to each other or look anything up.

13          Please, everybody remain seated while the jury

14  leaves the courtroom.

15          (The jury exited the courtroom.)

16          THE COURT:  All right.  We're prepared to take

17  the break?

18          MR. BEENEY:  We are, Your Honor.

19          THE COURT:  All right.  So, Dr. Sullivan, I'll

20  tell you now, and I'll have to tell you again in front of

21  the jury, you remain under oath, and we'll see you all

22  again at 11:10.

23          MR. BEENEY:  Thank you.

24          THE COURT:  Thank you, all.

25          (Recess taken from 10:43 a.m. until 11:10 a.m.)

Ryan Sullivan – Direct                    1737

1    THE COURT:  All right.  Are you ready to

2  proceed?

3    MR. BEENEY:  Yes, Your Honor.  Thank you.

4    THE COURT:  Okay.  Let's bring the jury in,

5  please.

6    (The jury entered the courtroom.)

7    THE COURT:  Are you all ready to go?

8    Dr. Sullivan, you're still under oath, and we'll

9  continue with direct.

10    MR. BEENEY:  Thank you, Your Honor.

11  BY MR. BEENEY:

12  Q    Welcome back Dr. Sullivan.

13  A    Thank you.

14    MR. BEENEY:  So can we put up slide 11, please?

15  BY MR. BEENEY:

16  Q    So, Dr. Sullivan, just to orient us, I think these

17  were the things that you told the jury that you did to

18  come to your opinion and we've talked about exclusivity,

19  duration and now geographic scope.  So let's finish up the

20  yellow box and talk about Norton sales.  How did you go

21  about determining the amount of Norton sales?

22  A    I utilized the financial data that was supplied and

23  produced by Symantec and Norton for the accused products

24  and I tabulated those sales data across time.

25    MR. BEENEY:  May we have Dr. Sullivan's slide

Ryan Sullivan – Direct                           1738

1  28, please?

2  BY MR. BEENEY:

3  Q    Dr. Sullivan, tell us what slide 28 shows us.

4  A    This provides a depiction of the sales for the period

5  from December 2011 -- more specifically from December 6th,

6  2011, through February 2022.

7            As I noted earlier, the total amount of sales is

8  $18,511,272,696.  These sales occurred across time.  What

9  I'm showing here is the accumulation of those sales by

10 year.  So these are not at annual sales but rather how

11 they accumulated.  And you can see by the end in 2022,

12 based upon the vertical axis, it is roughly $18 and a half

13 billion, such that the darker gray boxes at the top of

14 each column, those are the annual sales that get

15 accumulated that then become part of the royalty base

16 across time.

17 Q    And, Dr. Sullivan, do you understand whether Norton

18 is disputing that it made $18 and a half billion of sales

19 of accused products?

20 A    I am not aware of any dispute in that regard.

21 Q    Would you turn to the binder in front of you,

22 Dr. Sullivan, that contains sales data that's produced by

23 Norton.

24            And, folks, if you forgive me for doing this,

25 but for the record, I want to ask you what PX-531 to 535,

Ryan Sullivan – Direct                    1739

1   566 to 570, 575 to 579, 617 to 621, 627 and 843 to 853,

2   what are those exhibits?

3   A    These are a collection of all of the sales data that

4   I relied upon in calculating the reasonable royalties.

5   Q    Thank you.

6           So now going back to slide 28.

7           THE COURT:  I'm sorry.  You were looking in

8   Dr. Sullivan's binder.

9           MR. BEENEY:  Yes, Your Honor, in that sales

10  binder.  I hope I correctly listed all the exhibits so

11  that we have them in evidence to the extent anybody wants

12  to use them.

13          THE COURT:  Okay.

14          MR. BEENEY:  Thank you.

15  BY MR. BEENEY:

16  Q    So, Dr. Sullivan, going back to slide 28, is all of

17  the $18 and a half billion of value that Norton received

18  from selling accused products attributable to Columbia's

19  patented technology?

20  A    No, it is not.  A portion of it is, but not all of

21  it.

22  Q    And do you understand that Columbia is asking for a

23  share of that that is attributable to the value of the

24  patented technology?

25  A    That is correct.

1   Q     All right.  So if we go back to slide 11, we now have

2   talked about duration, exclusivity.  We have the royalty

3   base, I think?

4   A     Yes, we do.

5   Q     And so now let's talk about the factor at the top

6   right, structure.  What is structure, Dr. Sullivan?

7   A     Structure refers to whether the royalty would be a

8   running royalty, such as a percentage of sales that occurs

9   across time, or it could also be considered as a lump sum

10  royalty, which would be a single payment that is made at

11  the time of the hypothetical negotiation, say, in

12  December 2011.

13        The key distinction is to recognize that

14  regardless of whether that structure should be a running

15  royalty or a lump sum, that it should reflect the extent

16  of use of the technology and the value contribution of

17  that technology across time.

18        Said another way, the structure should not be

19  determining the amount of the royalty.  It's just a matter

20  of timing of the payment.  In my view, the most likely

21  outcome of the hypothetical negotiation is a running

22  royalty, which would be payable across time as the sales

23  occur.  And that allows the reasonable royalty to

24  correspond to the amount of the use of the technology, and

25  thus, would be economically fair and reasonable to the

Ryan Sullivan – Direct

1741

1  parties.

2  Q    And, Dr. Sullivan, did you rely on evidence that

3  actually at a point in time, Norton offered a running

4  royalty structure for a license to the Application

5  Community's intellectual royalty?

6  A    Yes.

7            MR. BEENEY:  May we look at slide 29, please?

8  BY MR. BEENEY:

9  Q    And tell us what that is.

10  A    That is an e-mail chain that I believe has been

11  presented previously from Brian Witten at Symantec in

12  November 2005.  So this occurred shortly after the filing

13  of the patent application that underlies the '115 and '322

14  patents.

15            Here, you will see that there is reference to a

16  royalty rate being negotiable between half percent and

17  .25 percent, which would be a running royalty.  So this

18  does consider that there would be a running royalty.

19            There's a particular focus on half a percent.

20  As it indicates that Brian Witten here states, "I note

21  that half percent of a billion dollars annually is

22  $5 million per year."

23            But there are some key differences between the

24  offer that is made here and the hypothetical negotiation.

25  Q    And what are those, Dr. Sullivan?

Ryan Sullivan - Direct          1742

1  A     Well, there's a few of them.  First off, this is

2  occurring in 2005 with a patent application, nonissued

3  patent, and as I'll show you later, issued patents, all

4  else equal, have higher values than a patent application.

5          Secondly, at the point in time of this offer,

6  there was not a commercialization of the patented

7  technology in terms of being implemented into Symantec's

8  products.  Importantly, this is just an offer that is

9  being made, and the fact that we all are here today

10 evaluating a reasonable royalty demonstrates that this

11 amount was not acceptable to Columbia.

12          And one other item I should clarify is that this

13 amount was for a nonexclusive license, and that is made

14 clear at the beginning of this document.  So it's a

15 follow-on e-mail to this chain demonstrating that the half

16 percent to quarter percent is reflective of a nonexclusive

17 license, not an exclusive license.

18 Q     Thank you.

19          MR. BEENEY:  And slide 29 refers to PX-83.

20 BY MR. BEENEY:

21 Q     Did you see other evidence from Norton, Dr. Sullivan,

22 that led you to conclude that Norton would be seeking a

23 license in the form of a running royalty?

24 A     Yes.  Deposition testimony from Ms. Mutu in

25 particular.

1  Q     Let's just take a quick look at that, if we can, on

2  slide 30, and tell us what slide 30 shows, please.

3  A     Corina Mutu is the director of revenue accounting for

4  Symantec/Norton.  She indicated and testified that the

5  license agreements that she was aware of for which

6  Symantec pays royalties were structured as a revenue

7  share, and that is reflective of a percentage running

8  royalty.

9          MR. BEENEY:  And slide 30 cites Ms. Mutu at

10  45:10 to 45:18.

11          THE COURT:  I'm sorry.  Mr. Beeney, that's

12  really hard to hear because you're turning away to look at

13  the small print.

14          MR. BEENEY:  Oh, I'm sorry.

15          THE COURT:  And I just want to be sure we

16  capture everything.

17          MR. BEENEY:  Sorry.  So slide 30 refers to

18  Ms. Mutu at 45:10 to 45:18.

19  BY MR. BEENEY:

20  Q     So, Dr. Sullivan, you know, that deals with the

21  structure that Norton would agree to.  Did you also see

22  evidence of the structure that Columbia would agree to?

23  A     Yes, I did.

24  Q     And what was that?

25  A     Two items.  One, I had an interview with Mr. Orin

Ryan Sullivan – Direct                    1744

1  Herskowitz of Columbia University, and also reviewed

2  deposition testimony indicating that Columbia would prefer

3  and, in Mr. Herskowitz's view, would demand and require a

4  running royalty for the technology at issue here.

5  Q    And, Dr. Sullivan, just so that we're clear, would

6  you in every case opine or give us an opinion that a

7  running royalty was the appropriate structure or is that

8  based on the evidence in this case?

9  A    That is based on the evidence in this case.  Facts

10  and information and situations vary from negotiation to

11  negotiation, yet the underlying principle that regardless

12  of the structure that the royalty needs to account for the

13  extent of use really is important.

14  Q    And so based on your opinion about what Norton and

15  Columbia said about a running royalty structure, does that

16  inform the way you've expressed a reasonable royalty in

17  terms of sales and rate equaling reasonable royalty?

18  A    Yes.  It provides the foundation for that formulation

19  of the reasonable royalty.  But, again, what's important

20  is the outcome of that hypothetical negotiation in terms

21  of the amount such that it should reflect that extent of

22  use by Symantec and Norton of the technology.

23  Q    And does that structure reflect the concept that if

24  Norton made no sales of accused products, it would pay

25  Columbia nothing, but that if Norton made huge sales of

1   Columbia -- excuse me -- of accused products, it would pay

2   a more substantial sum?

3   A    Correct.  As the sales and use of the accused

4   functionality and the products incorporating that

5   functionality increases, then the royalty should increase.

6   Q    So let's go back to slide 11 and kind of check off

7   the boxes of what you've done.  I think we've taken care

8   of everything but what's in the black box; is that right,

9   Dr. Sullivan?

10  A    Correct.  So we now have to determine the royalty

11  rate.

12  Q    All right.  So did you look at evidence that led you

13  to reach an opinion of the value of the patents to Norton?

14  A    Yes, I did.

15  Q    And let's go to slide 31 if we could, please.  Could

16  you explain this chart to the jury, please, Dr. Sullivan?

17  A    Yes.  There are five factors that I utilize to

18  determine what that royalty rate is, three of which you

19  have effectively already seen before.  Those are

20  apportionments that go from the product as a whole down to

21  malware detection, from malware to SONAR, from SONAR to

22  the patented invention.  That is effectively the revenue

23  that is attributable to the patented invention.

24          I then apply a profit margin to convert that

25  revenue into profit, and then I calculate Columbia's

Ryan Sullivan – Direct                      1746

1  contribution to that profit.  And when multiplying all of

2  those factors together, that yields or provides the

3  royalty rate.

4  Q    And did you do the calculation of how much of -- you

5  know, for example, a dollar of Norton's sales were

6  attributed to malware because the product does other

7  things and how much of the malware was attributed to SONAR

8  because there were other malware detection in the product

9  and then how much of SONAR is attributable to the patented

10 invention?  Did you do those first three calculations?

11 A    I investigated and researched that issue, yet I also

12 talked with and interviewed Dr. Eric Cole and ultimately

13 decided to rely upon his quantification, the numbers that

14 he calculated for each of those items.

15 Q    And in your field as an economist, is it appropriate

16 for you to use calculations done by someone who's spent

17 their life in the industry itself, determining values of

18 different components of malware products?

19 A    Yes, in my view, that is entirely reasonable.

20 Dr. Cole is clearly an expert in these areas.

21 Q    All right.  So let's then move on to slide 32, which

22 I think is something that you've modified from Dr. Cole.

23 And would you tell us what this is, please?

24 A    Yes.  So I borrowed the graphic of the rectangles

25 from Dr. Cole, the yellow reflecting the accused products

1  in terms of the sales price or the overall sales revenue.

2  That would be the money that comes into Symantec and

3  Norton.  The red box reflects the apportionment to malware

4  detection.  Dr. Cole determined that on a product by

5  product basis, and it ranges from 60 percent to

6  95 percent.

7          You'll see on the right-hand side of this slide

8  that I have those boxes that I was showing you earlier.

9  And the top box has 73.6 percent.  So when I look at the

10 data for the sales of the products and that product mix,

11 you know, different product sales across time, the overall

12 weighted average is 73.6 percent.

13         Similarly, looking at the purple box, that's the

14 apportionment within malware to SONAR, which is 23 to

15 25 percent.  The overall weighted average is 23.6 percent,

16 and for the patented invention, the green box is an

17 apportionment of 35 percent.

18         And I'd like you to keep in mind that this green

19 box is reflective or represents the revenue that is

20 attributable to the patented invention separate and apart

21 from all other features and functionalities.  And so the

22 royalty rate that I'm going to calculate from there is

23 going to take a piece of that revenue that's attributable

24 to the patented invention.

25 Q    And, again, you're doing this because Columbia is

1  asking for a share of the value it contributed but not a

2  share of things in the Norton products it did not

3  contribute to?

4  A    That's right.

5           THE COURT:  I'm going to interrupt you and

6  confirm, the 73 percent, where did that come from?

7           THE WITNESS:  You may recall that Dr. Cole

8  referenced 74 percent as the overall average.  Me, being

9  more precise on it, refer to it as 73.6.  It is the

10 weighted average for apportionment for malware detection

11 that ranges from a low of 60 percent to a high of

12 95 percent depending upon the product.  And given that

13 there's different amounts of sales of the different

14 products, the overall weighted average amount is

15 73.6 percent.

16          THE COURT:  All right.  Thank you.

17 BY MR. BEENEY:

18 Q    So, Dr. Sullivan, I want to talk to you about some of

19 the evidence that you saw that led you to conclude that

20 these numbers were reasonable; that is, the value of

21 malware to the product and the value of SONAR to the

22 malware and the value of the patents to SONAR.  But I

23 think the jury has seen this evidence before, and so

24 rather than take the jury's time, I'd like to walk through

25 it a little bit quickly, if that's all right, rather than

1 repeat testimony the jury has already seen.

2        But let's move to slide 33, and if you could

3 tell us briefly how this informed your opinion that these

4 allocation of value numbers were reasonable?

5 A    As an economist doing my work in this case, I

6 reviewed a great deal of information, did my own

7 independent research.  This is just a small collection of

8 information that I utilized in my research.

9        You'll see PX-325 indicating Norton's sales and

10 Symantec sales were declining at around the time of the

11 hypothetical negotiation, that they were losing market

12 share because the competition's sales were growing faster

13 than their sales were growing, and also -- and that was in

14 PX-325 also.

15        And then in PX-315, that customers were losing

16 confidence in the Symantec products, and thus, Norton

17 needed to improve its products in order to stay

18 competitive and to be able to increase its sales.

19 Q    And slide 34, Dr. Sullivan, what did that tell you?

20 A    As Dr. Cole mentioned, there was intensifying

21 competition from freeware that was providing much of the

22 functionality that the Norton products were providing.

23        And in PX-541, it indicated that there was

24 fierce competition and that Symantec needed to develop a

25 defensible competitive advantage through innovation.

Ryan Sullivan – Direct                    1750

1      And these issues were noted also by the

2  deposition testimony of Mr. Wall, who acknowledges,

3  naturally, that one has to have a product that is superior

4  to a free product in order to continue to make those

5  sales.

6           MR. BEENEY:  And slide 34 refers to Mr. Wall's

7  deposition at 180:10 to 20.

8  BY MR. BEENEY:

9  Q    Did you see other Norton documents, having recognized

10 that their products needed something, that they thought

11 that the accused component of SONAR/BASH had significant

12 value to Norton's products?

13 A    Yes.

14 Q    Let's look at slide 35, and tell us what that told

15 you, Dr. Sullivan.

16 A    Here again, I have just a small collection of the

17 documents that I relied upon in this regard.

18           PX-530 indicated that the portion of SONAR that

19 is accused of infringement was a huge advantage and turned

20 in record breaking scores, PX-170 indicating that SONAR

21 was at the heart of the anti-malware defenses, and PX-506

22 demonstrating numerically some of the counts of the

23 machines that were being protected based upon the

24 detections made per day.

25 Q    And then what did PX-170 tell you, Dr. Sullivan?

1   A     It just indicated that at the heart of the

2   anti-malware defenses is SONAR.

3   Q     And, again, you are relying on evidence from Norton

4   business records at the time they created them, not what

5   they are saying here in the courtroom?

6   A     That is based upon the documentation at the time that

7   Symantec created in the ordinary course of business.

8   Q     And, again, moving on to the same kind of evidence

9   that you relied on, let's just take a look at slide 36.

10  Tell us what that showed you, Dr. Sullivan.

11  A     This is demonstrating that detecting that last

12  1 percent is really important.  Here, at PX-350 referring

13  to that last line of defense as being very important for

14  behavioral detection.

15          And PX-506 I find to be very compelling from the

16  perspective of from an economist, that a SONAR detection

17  equals that they blocked an otherwise guaranteed

18  infection.  And clearly for customers who are getting

19  infected in spite of having the security software is a bad

20  outcome for Symantec and Norton.

21          And this is demonstrated also by the deposition

22  testimony of Archana Rajan, indicating that it's even just

23  a matter of decimals being able to have that

24  differentiation.

25          MR. BEENEY:  And that's deposition at 282:24 to

1   283:22.

2   BY MR. BEENEY:

3   Q    Dr. Sullivan, given Norton's own expressed need for

4   something new, given its own expression that customers had

5   lost confidence in its product, given the competition from

6   free substitutes that consumers could buy, are you

7   surprised that it took Norton a couple of years to raise

8   prices after incorporating the accused technology?

9   A    No, not at all.  As a matter of economics, prices

10  reflect what is occurring in the marketplace.  They don't

11  change immediately, yet given the intensifying competition

12  as, in part, reflected by the testimony here of Ms. Rajan

13  indicating the need to be able to differentiate relative

14  to, for example, freeware, and in the absence of the

15  innovations and the changes, we would expect the prices to

16  start to decline over time because of that intensifying

17  competition.

18         But rather, what occurred is the prices stayed

19  even, and then over time, they became able to raise their

20  prices.  And that is anticipated and expected in terms of

21  economics.

22         MR. BEENEY:  So let's go back to slide 11, if we

23  could, please, Mr. Chase.

24  BY MR. BEENEY:

25  Q    So I think -- is it right, Dr. Sullivan, that really

1   what we have left before we come to your royalty rate is

2   profit margins and relative contributions and we've done

3   everything else?

4   A     Correct.

5   Q     And we look at profit margins.  I think you told us

6   to make sure that Columbia does not get a share of

7   Norton's costs but only its profits?

8   A     Correct.

9   Q     So let's go, please, then to slide 37, and it looks

10  like a big green box.  What is that, Mr. Sullivan?

11  A     So what I did is I took that green box from the prior

12  slide, I blew it up here.  This is representing

13  illustratively the revenue attributable to the patented

14  invention.  So if you turn your head, you can see on the

15  side this is reflecting that patented invention.

16         And what I have done is determined what are the

17  costs that were caused by this additional revenue.  And

18  here, it is important to recognize that this is only a

19  slice or a portion of revenue, and thus, we would not

20  expect that this portion of revenue is causing all costs

21  to increase.  For example, there's not additional research

22  and development required because the patented technology

23  is providing that R&D.  There's not a requirement that

24  general and administrative expenses, such as the executive

25  salaries, would increase, but rather, we need to look at

Ryan Sullivan - Direct                    1754

1   what are the costs that are caused by this additional or

2   incremental revenue.

3   Q    So let's talk about how you go about determining

4   profits from this portion of the revenue of the Norton

5   accused product.  And maybe you can explain that to us

6   from slide 38, please?

7   A    This is a little messy graphically, but what I did is

8   on the bottom you'll see the white boxes here.  There's

9   implementation at .3 percent.  What that means is that the

10  cost to actually implement this technology was .3 percent

11  of that incremental revenue.  It's actually $3.6 million

12  to make that implementation.

13          And as Mr. Nachenberg testified, technologies

14  that are low cost to implement but deliver high value are

15  highly valuable because they're profitable.  So I deducted

16  that cost.

17          I also deducted what is known as the cost of

18  goods sold.  So this is the actual cost of being able to

19  have that product developed and sold.  And sales and

20  marketing costs as well.  And cost of goods sold ranges

21  from 5 percent to 13 percent, depending upon the product.

22  Sales and marketing ranges from 22 percent to 34 percent,

23  depending upon the product.  Such that all told, that

24  weighted average, which reflects the product mix, is

25  33.3 percent.  It just happens to be that it is one third

1  of that overall revenue.

2         That means here now we have a blue box, which is

3  smaller than the green, and that means that two-thirds, or

4  66.7 percent, of that revenue is profit.  Such that the

5  blue box here is representing the additional profit that

6  Symantec and Norton actually received as a result of the

7  patented technology.

8  Q    And, Dr. Sullivan, whose records did you rely on to

9  do these calculations?

10 A    This is all based upon Symantec and Norton's

11 financial information that is specific to the accused

12 products.

13 Q    And by doing the calculations on slide 38, is that --

14 does that assure us that your royalty rate does not give

15 Columbia a portion of implementation costs, costs of goods

16 sold, and sales and marketing costs?

17 A    Correct.  Those are deducted, or subtracted.

18 Q    In terms of the costs, Dr. Sullivan, you said that

19 you used a method called incremental costs, and I think

20 you explained to use costs tied to the profits that were

21 achieved.  Would you use that measure in every case or

22 again, was that just tied to the facts of this case?

23 A    Well, the notion or the concept of incremental really

24 applies very broadly, but determining which costs are

25 incremental depends upon what the increment is.

1          So if the increment is relatively narrow, then

2    it can be the case that not too many costs change and so

3    there's not much in the way of incremental costs.  If the

4    increment is an entire product line or a business unit,

5    then it may be that more of those costs should be

6    deducted.

7          And so the notion of incremental costs really is

8    broad, but determining which costs are incremental --

9    again, that means which costs are caused by this -- what

10   was the green box, that portion of additional revenue

11   that's attributable to the patented invention -- that's

12   specific to that particular increment.

13   Q    And so is your next step now to determine how

14   Columbia and Norton would share the profit caused by

15   Norton's implementation of the Columbia technology?

16   A    Correct.

17   Q    So tell us about how you do that on the next slide,

18   please.  Slide 39, I believe.

19   A    So I have now taken this blue box, and I convert that

20   into a circle to try to convey that this is similar to

21   there being a profit pie that is being split between the

22   two parties based upon the relative contributions.

23          Columbia, on the one hand, is providing the

24   invention, the patented technology.  Whereas on the other

25   hand, Norton and Symantec are supplying the

Ryan Sullivan – Direct                    1757

1  commercialization.  They're getting that product into the

2  hands of customers to where they are using them.  So it

3  really does take both contributions to be able to realize

4  that overall amount of profit.

5            I utilize the financial data from Symantec and

6  Norton to determine those relative contributions.  On the

7  one hand, I utilize research and development expenditures

8  to reflect the patented invention contribution, and I use

9  sales and marketing expenditures to reflect

10  commercialization.

11           Now, I want to be clear that these are not

12  deductions.  I already accounted for the costs.  This is

13  looking at Symantec's and Norton's business, how they

14  operate their business in terms of how much R&D they

15  utilize relative to sales and marketing in order to

16  realize profits.

17           And so this is a reasonable estimation based

18  upon the actual financial data of Symantec and Norton to

19  create and determine what the split of this pie would be.

20  Q   So in your opinion, Dr. Sullivan, once you get to the

21  pure profit created in the Norton product just from the

22  Columbia patents, you would give 70 percent of that profit

23  to Norton because of its sales and marketing and

24  30 percent of that profit to Columbia because of its

25  research and development?

1  A    Yes.  And even more precise, it's 30.2 percent to

2  Columbia and 69.8 percent to Norton.

3  Q    The difference between an economist and a lawyer.

4         So let's go back to slide 11 and I think we're

5  done with everything in terms of your tasks, Dr. Sullivan,

6  except relative contributions?

7  A    So that provided us with those relative

8  contributions, and now we can put it all together to

9  figure out or calculate the royalty rate.

10 Q    So let's turn to slide 41, please.  And,

11 Dr. Sullivan, explain what's on slide 41, please.

12 A    This is the math, the calculation that provides that

13 the royalty rate is 1.23 percent.  I took the 73.6 percent

14 for malware detection, multiplied by 23.6 percent for the

15 apportionment to SONAR, multiplied by 35 percent for

16 apportionment to the patented invention, multiplied by

17 66.7 percent to convert that apportioned revenue into

18 profit, multiplied by 30.2 percent to reflect Columbia's

19 contribution, and the multiplication of those five factors

20 provides the royalty rate of 1.23 percent.

21 Q    And, Dr. Sullivan, is it your expert opinion that a

22 reasonable royalty rate that would give Columbia only a

23 share for the value that its patents created in the Norton

24 product as a result of the '115 and '322 patents

25 1.23 percent?

Ryan Sullivan – Direct                    1759

1  A    Yes.  In my view, this is reasonable and appropriate

2  as the outcome of the hypothetical negotiation, that the

3  parties would agree to the 1.23 percent.

4          I'm not suggesting that the parties would agree

5  to each of these individual five factors.  Those are the

6  factors that we utilize to determine a reasonable outcome

7  of the hypothetical negotiation.  The parties may think of

8  things a little bit differently.

9          If you think about a traditional license

10 agreement, what it reflects is a percentage royalty

11 overall, not that there's agreement at every step of the

12 apportionment.  These steps are what enable us to get to

13 the answer or that outcome.

14 Q    And, Dr. Sullivan, have you taken Norton's $18 and a

15 half billion of sales of accused products and shown us how

16 you get to your reasonable royalty number at each of these

17 stages?

18 A    Yes, I have.

19          MR. BEENEY:  And can we turn to the slide 42,

20 please?

21 BY MR. BEENEY:

22 Q    And would you explain to us what this shows,

23 Dr. Sullivan?

24 A    Yes.  In my view, this is informative, granted I like

25 math.  But the first row here, the yellow row, is the

Ryan Sullivan – Direct

1  accused product revenue of approximately $18.5 billion.

2  The next row, the red malware detection, as I indicated,

3  the average factor there is 73.6 percent.  Applying

4  73.6 percent to 18 and a half billion provides

5  $13,625,526,217.

6          Within that, I apply the apportionment to SONAR

7  of 23.6 percent in purple.  And when I apply the

8  23.6 percent to the 13.6 billion, that yields

9  $3,217,825,280.  And that amount is approximately

10 17.4 percent of the overall revenue.

11         Next step, for the patented invention, I apply

12 35 percent apportionment.  That provides then revenue

13 attributable to the patented invention of $1,126,238,848.

14 And that reflects an overall revenue share of 6.1 percent.

15         I then apply the profit margin of 66.7 percent,

16 and that indicates that Norton's profit that they actually

17 realize that's attributable to the patented invention is

18 $751,254,925, which is 4.1 percent of overall accused

19 product revenue.

20         And to calculate the royalty, then Columbia's

21 contribution of 30.2 percent is applied to that profit,

22 and that provides an amount of $227,169,402, which is the

23 royalty rate of 1.23 percent of overall accused product

24 revenue.

25 Q    So, Dr. Sullivan, we may get to this, but I think

Ryan Sullivan – Direct                    1761

1   with slide 42, perhaps it bears noting.  Do I correctly

2   understand this, that should the jury find infringement

3   and award Columbia 1.23 percent, or the 227,169,402, that

4   nevertheless, even after Norton's payment to Columbia,

5   Norton would still retain, as a result of the value

6   contributed by the '115 and the '322 patents, more than

7   $751 million in pure profit?

8   A    Close.  So Norton actually did realize $751 million

9   worth of profit attributable to this patented technology.

10  If they make a payment overall of $227 million to

11  Columbia, that leaves Norton with $524 million of profit.

12          So even after paying the 227 million, they are

13  still better off by having used the technology and made

14  the payment to roughly over $500 million.

15  Q    So to determine the profit that Norton would still

16  keep after the payment Columbia is seeking in this case,

17  you'd take the 751 and subtract the 227 payment to

18  Columbia?

19  A    That's right.

20  Q    Okay.  Let's turn to slide 43.  And again, I think we

21  took a quick look at this before we started down the

22  journey of how you get here, but again, just quickly tell

23  the jury what this is, please.

24  A    So this is the calculation of reasonable royalties of

25  sales to customers worldwide such that $18.5 billion

Ryan Sullivan – Direct                    1762

1   multiplied by the royalty rate of 1.23 percent yields the

2   reasonable royalty of $227 million.  And this applies for

3   both the '322 patent and the '115 patent collectively,

4   together.

5   Q    And so we can unpack this, Dr. Sullivan, did I then

6   ask you to unpack it by patent?

7   A    Yes.

8   Q    So let's take a look at the next slide.

9   A    In the --

10  Q    I'm sorry.  Tell us what that is.

11  A    In the event that only the '322 patent is found to be

12  infringed, then there's a difference in time period

13  because the '322 patent does not issue until

14  December 2013.  Thus, the sales base is smaller, and it is

15  $14,192,309,441.  The royalty rate is slightly different.

16  It is 1.21 percent.  And that difference is because

17  there's a bit of a difference in the product mix, given

18  the difference in time period.  Applying the 1.21 percent

19  then provides, or yields, a reasonable royalty for the

20  '322 patent only of $171,938,941.

21  Q    And, Dr. Sullivan, did I ask you to do a further

22  breakdown just so that we can see how you actually build

23  up to your opinion?

24  A    Yes.

25  Q    And let's take a look at slide 45, please, and tell

Ryan Sullivan – Direct

1  us what this is, please.

2  A    As I noted earlier, sales to customers located in the

3  United States is roughly half of the total worldwide

4  sales.  So I've performed a royalty calculation for sales

5  to customers in the United States only, and that's shown

6  here on this slide.

7           For the '322 and '115 patents, the sales base is

8  $9,110,477,753.  The royalty rate is 1.18 percent.  Again,

9  that's slightly different due to the different product

10  mix.  That provides a royalty amount of $107,535,615.

11          For the '322 patent only, which is a shorter

12  period of time, the sales base for customers located in

13  the United States only is $7,013,287,674, with an

14  applicable royalty rate of 1.17 percent, and that yields a

15  royalty amount of $81,807,500.

16  Q    Thank you for doing that.

17          And let's move to slide 47, and what does this

18  show us, Dr. Sullivan?

19  A    This, again, is reflecting why, in my view, the

20  reasonable -- the royalty that I've calculated is, indeed,

21  reasonable.  Again, here, the blue pie is profit in total

22  that is attributable to the patented technology separate

23  and apart from other features and functionalities.

24          The royalty of $227 million still provides a

25  profit to Norton and Symantec of $524 million.  So when

Ryan Sullivan – Direct                    1764

1  they are sitting at the hypothetical negotiation in

2  determining whether to enter into this agreement, it would

3  be economically appropriate and Symantec would be

4  incentivized to do so because of the additional profit

5  that utilizing the technology would provide while also

6  still providing a reasonable payment to Columbia for the

7  rights to use that technology.

8  Q     And, Dr. Sullivan, does the Norton profit of

9  $524 million reflect its profit for the accused product as

10 a whole?

11 A     No.  Not even close.  This is for the profit that is

12 specifically attributable to the patented invention.

13 Q     And let's go back to slide 46, and tell us what this

14 shows, please.

15 A     This is just a graphical depiction indicating that of

16 the total revenue for the accused products reflected here

17 in yellow, that the royalty rate, and thus, the royalty,

18 is a relatively small sliver of those overall revenues at

19 1.23 percent.

20 Q     And, Dr. Sullivan, is this circle in the little pie

21 sliver, you know, in scale?

22 A     Yes.

23 Q     All right.  So to conclude on the infringement

24 portion of the case, if the jury finds that Norton

25 infringes the '115 and the '322 patents, is it your

Ryan Sullivan – Direct                    1765

1  professional and expert opinion that at the hypothetical

2  negotiation Columbia and Norton would agree to a royalty

3  rate of 1.23 percent to be applied to Norton's $18 and a

4  half billion in sales of accused products, resulting in a

5  payment from Norton to Columbia for the use of the

6  Columbia patents over the last 11 years of $272.2 million?

7  A    227 million.

8  Q    Thank you.

9         All right.  Let's move on to the second part of

10 the case, Dr. Sullivan, and I promise you it will be

11 briefer.  I think there was less for you to do here.

12 Columbia's claim for fraudulent concealment for the steps

13 that Norton took to patent the '643 decoy invention and

14 under the claim that that technology actually belonged to

15 Columbia.

16        In order to determine the damages for this

17 claim, did you develop a high level understanding of what

18 Columbia alleges?

19 A    Yes.

20 Q    And tell us what you understand.

21        MR. BEENEY:  Perhaps we can look at slide 48,

22 please.

23 A    Well, at a high level, my understanding is that there

24 was fraudulent concealment that was conducted under the

25 allegations by Symantec, and that related to the

1  application, and that became the '643 patent, that

2  technology involving decoy technology used with DLP

3  products, data loss prevention.

4          And what actually occurred -- I have actual here

5  in red on this particular slide -- is that Columbia, in

6  the actual world, what actually happened is that they did

7  not have any ownership of the '643 patent, and in this

8  actual world, Norton and Symantec had sole or only

9  ownership of the '643 patent.  And in the absence of the

10 fraudulent concealment, as alleged as a matter of

11 economics, this would be different.

12 BY MR. BEENEY:

13 Q    And going over to slide 49, explain to us how it

14 would be different if the alleged fraudulent concealment

15 had not occurred.

16 A    I've labeled this in blue with the term "but for."

17 And this is a term that economists use to explain what

18 would have occurred but for the conduct, but for the

19 issue.  And in this case, it is but for the fraudulent

20 concealment.

21         And in the absence of that fraudulent

22 concealment, then as a matter of economics, Columbia would

23 have had either sole or joint ownership of this patent

24 while Norton would have either no ownership or joint

25 ownership with Columbia of the '643 patent.

Ryan Sullivan – Direct                    1767

1  Q    And the '643, as things stand right now, is owned by

2  Norton.  Is your analysis position of putting Columbia

3  back in the position it would have been in but for

4  Norton's conduct dependent on Norton's use of the '643 or

5  infringement or the hypothetical negotiation that we

6  talked about in the infringement part of the case?

7  A    No.  No.  And no.  This is reflecting ownership.  In

8  this -- for calculating damages for this part of the case,

9  it is not considered a hypothetical negotiation.  There is

10 not an assumption of infringement or use by Norton or

11 Symantec.  Rather, a fundamental nature of a patent is the

12 right to exclude, the right to exclude others from using

13 technology.

14        And by having ownership over the '643 patent,

15 this provided Norton and Symantec with an ability to

16 exclude, if they so chose, others from using the

17 technology.  It also allows them to use it too, but allows

18 them to exclude others, yet in the but for world where

19 there would not have been the fraudulent concealment and

20 where Norton would not have had sole ownership of the

21 technology in the patented technology, then they would not

22 have been able to exclude others from using that

23 technology.

24        So then the question becomes what is a

25 reasonable amount that Norton, and at the time Symantec,

1   would pay to Columbia to be able to have those sole

2   rights.  So if we're looking at the bottom row of this

3   table, it's the difference between having no rights or

4   joint ownership versus having sole ownership that would

5   enable them to exclude others from using this technology.

6   Q    And does your slide 50 basically show us what you

7   just explained?

8            MR. BEENEY:  If we can move to slide 50, please.

9   A    Yes.  So the -- the measure of damages, the amount of

10  damages is the lost value of ownership, and it's the

11  amount that Norton, Symantec at the time, would have paid

12  Columbia back in April 2011 for sole ownership of the '643

13  patent.

14  BY MR. BEENEY:

15  Q    And as with your analysis of infringement, did you

16  rely at least in part on Norton's own business records to

17  make this determination?

18  A    Yes, I did.

19  Q    So did you come to learn in your review of Norton's

20  business records why Norton went to the steps that it did

21  to obtain the '643 patent?

22  A    Yes.

23            MR. BEENEY:  Can we turn to the next slide,

24  please?

25  BY MR. BEENEY:

Ryan Sullivan – Direct                    1769

1  Q     And tell us what this is, Dr. Sullivan.

2  A     This is an e-mail from Marc Dacier of Symantec dated

3  March 31st, 2011, which is just a few days before they

4  filed the application that gives rise to the '643 patent.

5          In here, he indicates that -- and I have this

6  highlighted that, "It is a defensive patent to protect our

7  DLP technology from competitors who would like to

8  integrate the same concept into theirs."

9          And what this is reflecting is, as I noted, a

10 fundamental nature of a patent is the right to exclude and

11 to exclude others.  And this demonstrates that Symantec

12 was wanting to protect their data loss prevention product

13 and the sales and profits associated with that product

14 from competitive pressures from others who could otherwise

15 be able to implement this concept, technology concept into

16 their products.

17          MR. BEENEY:  And slide 51 refers to PX-461.

18 BY MR. BEENEY:

19 Q     So, Dr. Sullivan, with your understanding from

20 Dr. Dacier as to why --

21          THE COURT:  Can everybody hear?  Yeah, everybody

22 can hear?  No?  Not really?

23          So I do think, Mr. Beeney, you're going to have

24 to step closer to the microphone.

25          MR. BEENEY:  Sorry.

1       THE COURT:   That's okay.

2   BY MR. BEENEY:

3   Q    So, Dr. Sullivan, with your understanding of why

4   Norton's Dr. Dacier -- as Dr. Dacier explained why Norton

5   wanted the '643 patent, how do you go about putting a

6   dollar value on what Columbia lost as a result of at least

7   its claim that Norton took what really belonged to

8   Columbia?

9   A    I used what is called the income approach whereby I

10  utilize a reference that I will show you of value for this

11  type of technology as applied to the data loss prevention

12  product across time to be able to determine what would be

13  a reasonable amount that Symantec and Norton would have

14  paid in 2011.

15  Q    And did you have something to look at that you think

16  as an economist was reasonable to rely on to answer the

17  question of if Norton wanted to use this technology

18  defensively to protect its own products, what it would

19  have paid Columbia instead of taking the technology from

20  Columbia?

21  A    Yes.

22  Q    Let's take a look at slide 52, please, and what is

23  this?

24  A    This is reflecting an agreement that was a patent

25  license that was entered into in 2011 -- so around the

Ryan Sullivan - Direct                    1771

1  same time period -- between Columbia and a company known

2  as Allure.  The technology underlying this agreement was

3  similar in nature involving decoy technology, as I

4  reviewed it and as explained to me in my interviews with

5  Dr. Cole.

6        And it provides exclusive rights to the

7  technology and thus, the right to exclude others.  And

8  that is exactly the type of right that Norton and Symantec

9  would have had and did have that they did not pay for.

10        MR. BEENEY:  And slide 52 refers to PX-62.

11  BY MR. BEENEY:

12  Q    Dr. Sullivan, was there a particular part of the

13  Allure license agreement, PX-62, that you relied on?

14  A    Yes.  The royalty rates that are specified in that

15  agreement.

16  Q    And let's look at that on slide 53, please.  Tell us

17  what this says to you, Dr. Sullivan.

18  A    There are two rates, royalty rates that are specified

19  in this agreement.  There is a lower rate of 2.5 percent

20  for a patent application.  That means for the period of

21  time for -- while the technology is licensed is just a

22  patent application, the royalty rate that applies is

23  2.5 percent.  Then, after the patent issues, it becomes

24  4 percent.

25        So the royalty rate, then, at that point in time

1   that applies from that point forward is 4 percent.  And

2   this reflects the basic point that oftentimes the value

3   and thus, the royalty rate associated with an issued

4   patent is higher than just a patent application.

5           And I referred to this point a while back on the

6   other part of the case when I was referring to the 2005

7   offer made by Symantec for the Applications Community

8   technology at that point in time.

9   Q    And, Dr. Sullivan, how did you use the rates in

10  PX-62, the Allure license agreement, to determine what

11  Norton should pay Columbia for using Columbia's ideas if

12  the jury agrees with Columbia's claim that Norton obtained

13  the rights to the '643 by concealing facts from Columbia?

14  A    As noted, Symantec viewed this as a defensive patent

15  and defensive technology to protect their data loss

16  prevention product.  So I applied these rates to the sales

17  revenue that was projected for the data loss -- DLP, data

18  loss prevention, product across time from 2011 up through

19  when the patent would expire.

20  Q    So take a look at slide 54, and would you explain to

21  us what you did here to determine the revenue to which you

22  would apply the Allure license royalty rates?

23  A    At a high level, this revenue would occur across a

24  20-year period, from the patent filing up through

25  expiration of the patent in April of 2031.

Ryan Sullivan – Direct                    1773

1    Because it occurs across time, I discount it

2  using the weighted average cost of capital for Symantec,

3  which is considered a discount rate, to discount those

4  revenues across time to what's known as present value.

5  And the notion is that a dollar received one year from now

6  is worth less than a dollar received today.  A dollar

7  received ten years from now is worth even less than a

8  dollar received a year from now, which is less than a

9  dollar received today.

10    We're all experiencing inflation right now so

11  that is part of the issue that this reflects, but there's

12  also the fact that when we look out into the future,

13  there's more and more uncertainty the further out we look

14  in terms of what those revenues are going to be and what

15  that level of revenues will be because the world changes,

16  markets change.

17    And so the discount rate is used and accepted

18  from the financial markets to reduce mathematically what

19  the overall revenue is to present value.  And when I do

20  that -- and these boxes are to scale -- that the present

21  value of the revenue is $572,717,514.

22  Q   And so the value you used to apply the Allure rates

23  is actually less than -- is the word nominal value of the

24  sales?

25  A    Yes.

1   Q     Let's go to slide 55, please.

2               THE COURT:  Wait a minute.  Can I confirm on 54,

3   present value of revenue of what?

4               THE WITNESS:  This is the present value of the

5   revenue of Symantec's DLP product, the data loss

6   prevention product, for a 20−year period from 2011 through

7   2031.

8               I'll make it a little bit more precise in the

9   text table.

10              THE COURT:  All right.

11  BY MR. BEENEY:

12  Q     So tell us what slide 55 shows us, Dr. Sullivan.

13  A     I'm going to do this in two steps.  So I take that

14  overall amount and I break it into two time periods.  As

15  you'll recall, we have a 2.5 percent rate that applies

16  while it's a patent application.

17              So this occurs from the filing of the

18  application on April 4th, 2011, up until when the patent

19  issued or just prior to.  The patent issued October 1 of

20  2013.  So it's an application up until the day before,

21  September 30th, 2013.

22              During that time, the present value of revenue

23  is $45,951,983, to which I apply the patent application

24  royalty rate of 2.5 percent, and that yields a payment for

25  that time period of $1,148,800.

1  Q     And did you also do a calculation for the period in
2  which Allure had a license to an actual patent and not
3  just the application?
4  A     Correct.  So it is the period of time for which the
5  '643 patent is an issued patent.
6  Q     So let's look at slide 56, please.
7  A     So for the period where the '643 patent is an issued
8  patent, which occurs from October 1, 2013, up through
9  expiration on April 4th of 2031, the present value of
10 those revenues is $526,765,531.
11        And given that I am utilizing the
12 Columbia-Allure agreement as the reference for the royalty
13 rates here, then it is an applicable rate of 4 percent
14 because it's an issued patent, and that yields a payment
15 amount for that period of $21,070,621.
16 Q     And so, Dr. Sullivan, as an economist, given what
17 Norton told you about why it wanted the '643 patent and
18 how it was using the '643 patent, explain to us why, from
19 an economics point of view, it was appropriate to use
20 those two Allure royalty rates.
21 A     Because Symantec, and thus Norton, viewed this to be
22 a defensive patent to protect the revenues associated with
23 their data loss prevention product so that they could have
24 the opportunity to prevent competitors from implementing a
25 similar concept into their products.

1  Q    All right.  And so you've calculated what Norton

2  would have paid for the '643 while it was an application

3  and separately what they would have paid for the '643 when

4  it was an issued patent.  And what do you do next?

5  A    I add the two together.

6         MR. BEENEY:  So let's turn to the next slide.

7  Thank you.

8  BY MR. BEENEY:

9  Q    And tell us what this is, Dr. Sullivan.

10  A    So I added the $1.1 million payment to the

11  $21 million payment so that in total, it would be a

12  payment that would have been made by Symantec to Columbia

13  in 2011 of $22,219,421.

14         And as you can see, I've also shown here that

15  the present value of revenue for those two time periods

16  adds up to the $572.7 million figure that I provided a few

17  moments ago with the different rectangles.

18  Q    So, Dr. Sullivan, based on the evidence that you've

19  seen in this case, is it your professional and expert

20  opinion that the amount to make Columbia whole as a result

21  of the alleged Norton conduct would be $22,219,421?

22  A    Yes.

23  Q    And this is separate and apart from the infringement

24  damage analysis of a reasonable royalty?

25  A    Correct.  The two are separate.

1  Q     So just to conclude, Dr. Sullivan, are you confident

2  that the opinions that you have expressed to the jury this

3  morning in this case are consistent with and in accord

4  with well established and accepted economic concepts and

5  your experiences in actual license negotiations?

6  A     Absolutely.

7           MR. BEENEY:  Thank you, Dr. Sullivan.

8           Thank you, Your Honor.

9           THE COURT:  All right.  It's probably a good

10  time, I would think, to break for lunch before cross.

11           And so, ladies and gentlemen of the jury, we

12  will see you at 1:20, and we will begin with the

13  cross-examination of Dr. Sullivan.

14           Please remain seated while the jury leaves the

15  courtroom.

16           (The jury exited the courtroom.)

17           THE COURT:  All right.  So, Dr. Sullivan, you

18  will remain under oath when you return.  And we have some

19  matters to take up that would be outside of your presence,

20  Dr. Sullivan, so can we take a -- how long of a break do

21  you want before we do that?

22           MR. BEENEY:  I leave it to Your Honor.

23           MR. MORIN:  I'd leave it to Your Honor also.

24           What I've proposed to our friends to make things

25  as easy as possible is I'm going to share with him what

1  I'm going to share with you at the beginning of the lunch

2  break, with the understanding that unlike our normal

3  process, the witness and his crew will be sequestered so

4  that we can make sure where we have areas of disagreement.

5        I don't think we're going to need terribly long,

6  given your prior rulings, to address this before we bring

7  the jury in.  In some of them, I may be making my record

8  to make sure that we have a clear record.  I will present

9  them as briefly as I can reasonably do so.  But we will

10  try to work out what we can, or at least confirm we have

11  disagreement, so that it can be an efficient process when

12  we conclude lunch.

13        THE COURT:  So do you want me to come back at

14  1:00?  That gives you 20 minutes.

15        MR. MORIN:  That would be fine with us,

16  Your Honor.

17        THE COURT:  I mean 20 minutes to argue.  That

18  gives you 40 minutes to be together.  I can come back at

19  1:05.

20        MR. MORIN:  Your Honor, I believe, but, you

21  know, we'll have to see, I believe 1:05 would give us

22  sufficient time.  Of course, that may depend, but I

23  believe it will give us sufficient time.

24        THE COURT:  All right.

25        MR. BEENEY:  I guess my only question is -- I'm

Ryan Sullivan - Direct                    1779

1   not sure if I understood counsel correctly, but it seems

2   to me that the record can be made outside the presence of

3   the jury.

4              THE COURT:  Oh, yeah.

5              MR. BEENEY:  Okay.

6              THE COURT:  I think we're all presuming that.

7   That's why we're talking before the jury returns --

8              MR. BEENEY:  Okay.

9              THE COURT:  -- at 1:20.

10             MR. BEENEY:  I just wanted to make sure we were

11  all on the same page.

12             THE COURT:  And if we need extra time, I don't

13  think the jury will mind too much.  I want to get this

14  right.  So I'm sure we'll all aim.  I'll see you at 1:05,

15  but feel free to communicate --

16             MR. BEENEY:  Your Honor, if we need less or more

17  time, we'll communicate with chambers, if that makes

18  sense.

19             THE COURT:  It makes great sense.

20             MR. BEENEY:  Okay.

21             THE COURT:  All right.  Okay.

22             MR. MORIN:  Thank you, Your Honor.

23             (Recess taken at 12:22 p.m.)

24             (The trial continues on the next page.)

25

1    (The trial resumes at 1:15 p.m.  The jury is
2  not present.)
3    THE COURT:  All right.  I understand you all
4  have discussed something, and I'm here to hear the
5  upshot.
6    MR. MORIN:  May I approach, Your Honor?
7    THE COURT:  Please do.
8    MR. MORIN:  I have spoken with opposing
9  counsel about anything that approaches a lower number,
10 as Your Honor had indicated in her ruling this
11 morning, the Court's ruling this morning.  I have a
12 few to put on the record and get rulings on, Your
13 Honor, just for the sake of the record, if that's
14 okay, Your Honor.
15   THE COURT:  All right.
16   MR. MORIN:  The first thing is Dr. Sullivan
17 submitted a 2014 report as well.  He relied on
18 Dr. Cole's 53 to 70 percent range.  I was going to
19 have him divide two numbers in his report to come up
20 with the weighted average of 57 percent.  And then I
21 was going to inquire that that is, of course, lower by
22 a quarter, by 25 percent, than his 74 percent number
23 now.  That's the first issue.
24   THE COURT:  Okay.  You're going to have to
25 say that slower because apparently you have to say it

1   slower.

2          MR. MORIN:  Okay.  Your Honor, Dr. Sullivan

3   had a 2014 report.

4          THE COURT:  Right.

5          MR. MORIN:  In that report, he adopted

6   Dr. Cole's level one analysis.  That level one

7   analysis was 53 to 70 percent.  The weighted average

8   of that is 57 percent because of the distribution of

9   products.  We could show that by taking his 2014

10  report and having him divide two numbers.  So we were

11  proposing to do that.

12         THE COURT:  Divide which two numbers?

13         MR. MORIN:  It would be dividing the

14  apportioned amount at that level one by the overall

15  sales, and that yields 57 percent.  And I was going to

16  have him do that number and point out that compared to

17  his new weighted number of 74 percent, it is

18  25 percent lower.

19         THE COURT:  All right.  I'm sorry.  I'm going

20  to ask you one more question.  You're arguing the

21  apportioned amount, what's the top number?

22         MR. MORIN:  Your Honor, it's the percentage

23  of the product that Dr. Cole and Dr. Sullivan contend

24  is the value of malware detection relative to the

25  overall product.

1   And if you're confused, Your Honor, may I for

2   one more moment?

3   THE COURT:  Sure.

4   MR. MORIN:  The range is 53 to 70 percent.

5   You heard today Dr. Sullivan testify that the weighted

6   average for his new number is 74 percent.  Do you

7   remember that 73.6 percent?

8   THE COURT:  Uh-huh.

9   MR. MORIN:  The reason the weighted average

10  isn't in the middle is because a lot more of one type

11  of product is sold than the other.  So he did a

12  weighted average for today that he presented to the

13  jury.  I was merely going to present the weighted

14  average of his 2014 numbers and compare the two.

15  THE COURT:  Okay.  It would help me to sort

16  of look at some of the documents that you're referring

17  to, but go ahead.  It's a bad sign that I can't follow

18  you, and I've read all this.

19  MR. MORIN:  Of course, there are appendices.

20  I have a demonstrative I could share with the Court if

21  you'd like to see.

22  THE COURT:  That would probably help me.

23  You've shown it to counsel, right?

24  MR. MORIN:  I wasn't going to use the

25  demonstrative.  It's more to show you what the math

1   is.  I was going to use his reports in light of what

2   you said about demonstratives, but on attachment F-1,

3   he says, Here's the apportioned amount in 2014.

4           And underneath is the --

5           THE COURT:  Apportioned amount of?

6           MR. MORIN:  Malware as related to the overall

7   product.

8           THE COURT:  Okay.

9           MR. MORIN:  And below the line, the

10  denominator is overall revenue in 2014.

11          THE COURT:  Okay.

12          MR. MORIN:  And the percentage and the

13  weighted average ends up being 57 percent.  I was

14  going to show him that math and confirm that that is a

15  quarter lower than his 74 percent.

16          THE COURT:  Okay.  All right.

17          MR. MORIN:  We have the appendices if you'd

18  like to see it.

19          THE COURT:  No.  I'm sure that this comes

20  from you.

21          MR. MORIN:  Thank you.

22          THE COURT:  I didn't mean to cut you off.

23          MR. MORIN:  Of course.

24          THE COURT:  All right, Mr. Beeney.

25          MR. BEENEY:  Your Honor, just for the record,

1    with respect to Mr. Morin's preamble, we do not object

2    to anything that leads to a lower number.  So that's

3    point No. 1.

4         Point No. 2, 3, and 4 is that there are

5    really three objections to this one category.  And

6    I'll state the first principle, Your Honor, because I

7    think it applies to all of these, which is the

8    principle that I tried to articulate this morning,

9    which is counsel cannot be the person providing the

10   expert theory that makes a mathematical exercise

11   relevant.

12        In the context of this case, they have

13   nothing to tie up that it is appropriate to reach any

14   legitimate conclusion as an evidentiary matter to

15   combining and doing a mathematical exercise of

16   numbers.

17        Now, in the context of this particular issue,

18   there are two other objections.  One goes back to

19   Dr. Cole with his apples and oranges issue, which is,

20   again, exactly what I think, as I understand it,

21   counsel is proposing to use a calculation that was

22   made when Dr. Cole was asked to give an opinion

23   between 0 and 70 in that first step of the allocation

24   process to the exercise when both Dr. Cole and

25   Dr. Sullivan are being asked "what's your opinion"

1  without boundaries to it.

2        So it is mixing a number that came from a

3  different exercise to suggest to the jury that this

4  was an opinion similar to what's the right number.  It

5  was not.  It was an opinion based on an exercise of

6  what is the right number between 0 and 70.

7        And that was Dr. Cole's pitch about apples

8  and oranges.  You can't take -- if a client comes to

9  me and says, "What's the right number between 0 and

10  70?" you can't suggest that 70 is the right number

11  when the client comes to me and says, "What's the

12  right number between 0 and 100?" and I go slightly

13  above 70.  You can't use one for one exercise and one

14  for the other.

15        And then the third objection, Your Honor, and

16  I can articulate these hopefully better if I'm not

17  being articulate, but the other is that counsel has

18  the math wrong, which is another reason for not doing

19  these kinds of exercises.  I think the difference is

20  17 percent, not 24 percent.

21        But, primarily, what we object to is asking

22  this witness, who would not agree to -- or may not

23  agree to the principle that when you combine these

24  numbers, any economic expert would do that, and then

25  asking him to do the math.  That just makes no sense.

1   It's not evidence.  It's prejudicial, et cetera, et

2   cetera.

3           And then the second thing is the thing that

4   Dr. Cole was trying to explain to the jury, which I

5   think Your Honor really has already excluded, which is

6   this idea of saying to an expert, Let's take your

7   70 percent, and thereby it seems to me, and without

8   casting aspersions, I'm suggesting to the jury that

9   that's your number when you're doing the exercise that

10  you're doing now, which is what's the number between 0

11  and 100 when that 70 came from the request to do an

12  exercise between 0 and 70.  And so I hope that's

13  clear, Your Honor.

14          THE COURT:  Yes.

15          MR. BEENEY:  Thank you.

16          MR. MORIN:  If may briefly respond, Your

17  Honor.

18          THE COURT:  Uh-huh.

19          MR. MORIN:  To start with the last point on

20  the math, it's 17 percent lower of 74 percent which is

21  nearly a quarter.  Of course, by similar example, if

22  you started at 50 percent and went to 25 percent,

23  you'd be half less.  It's just that math.  So I was

24  representing math accurately, Your Honor, just for the

25  record.

 1          On the point of the other -- that he was

 2   asked to do one assignment one time and one assignment

 3   the other, I think we established during the

 4   cross-examination, and I'd invite counsel to show me

 5   where I'm wrong, that nowhere in the 2014 report does

 6   it say, "I was constrained.  I was asked to do this."

 7   Rather he says, "Here's how I came up with my number,"

 8   and used Nachenberg as a floor and explained why.

 9          That's for the record.  I don't want to

10   belabor the point, but I need to make the record clear

11   that none of that is reflected in the report, and I

12   think that's fair cross-examination.

13          To get to this immediate issue, Dr. Sullivan

14   explained to this jury that if you did a weighted

15   average of his 2019 numbers, it would be 74 percent.

16   I would be only asking him and making two points, that

17   if you did a weighted average of your 2014 report, you

18   would end up with 57 percent, which is -- I can phrase

19   it however Your Honor would like -- is 17 points lower

20   or nearly 25 percent lower.  So that's the only point

21   I was looking to make, Your Honor.

22          MR. BEENEY:  I would only be repeating

23   myself, Your Honor, but I think the one thing I would

24   add is I do believe -- sorry.  Thank you.

25          I don't want to take the Court's time in

1788

 1   repeating what I just said, but I will add the

 2   following, which is, I do think Dr. Cole did say that

 3   the nature of his assignment was repeated in the

 4   report.  I can't -- I don't -- I think if I'm

 5   recalling his testimony, it was "I did not say counsel

 6   told me to pick a number no higher than 70 because of

 7   Mr. Nachenberg's testimony," but I believe Dr. Cole's

 8   testimony was, "It's in the report that I was

 9   constrained to that 70 number."  So that's the only

10   thing I'd add, Your Honor.

11        THE COURT:  Do we know if Dr. Sullivan says

12   it one way or the other?

13        MR. BEENEY:  Dr. Sullivan, by taking

14   Dr. Cole's, imports it.

15        THE COURT:  Right.

16        Okay.  So I'm going to have to disallow the

17   calculation largely for the reasons I did in the

18   opinion I issued today.  It is the case that we heard

19   testimony all day yesterday saying that this is not a

20   fair comparison, the 70 percent in 2014 versus the

21   whatever you think is the appropriate percent of 100

22   in 2019.  And I agree that that is not an apples to

23   apples comparison.

24        And I think it is fair to ask, Were you given

25   different tasks? because he probably was.  But then to

1  try to compare an actual number from one place to

2  another, I think it is unduly confusing, and it hits

3  the wrong -- just let me rule before you stand up.

4  Are you going on to the next one?

5           MR. MORIN:  I was trying to be efficient,

6  Your Honor.  I'll stay right here.

7           THE COURT:  Okay.  I thought you were coming

8  to argue against me.

9           MR. MORIN:  No, Your Honor.

10          THE COURT:  Okay.  Not that I'm defensive.

11          Okay.  So, largely for the reasons that I

12  said earlier, I don't think it's a fair comparison,

13  and especially when you start talking about

14  70 percent of 24 percent.  It is just way too

15  confusing when you're talking about two different sets

16  of data.  So it will be excluded.  My apologies.  You

17  can approach.

18          MR. MORIN:  May I approach now, Your Honor?

19          Thank you, Your Honor.

20          THE COURT:  Uh-huh.

21          MR. MORIN:  The next one may not even need a

22  response.  I'm putting some things on the record.  I

23  was next going to ask, we are going to get into the

24  idea, Your Honor, of price discrimination

25  qualitatively, meaning charging more in the higher

1   priced products.  So I will ask some questions about

2   that.  But I was also planning to point out that if

3   you used his number for Norton AntiVirus, which is the

4   lower-priced product, across the board, that the

5   overall damages would drop in the neighborhood of

6   $35 million.

7           And I could take Your Honor's ruling if -- of

8   course, he could respond.  But in view of -- let me

9   phrase it differently.  In view of Your Honor's

10  decision and your guidance tonight, am I correct that

11  you would prohibit such testimony?

12          THE COURT:  Well, I don't understand what the

13  basis for 800 doing that would be.

14          MR. MORIN:  Sure.  So let me explain it, Your

15  Honor.

16          We saw yesterday, or Tuesday, that there's a

17  40-dollar product that he attributes 90 percent of the

18  value to.  I can't believe I'm bringing this up again.

19  But he adds $36 of value to that product.  And we had

20  testimony from him -- not objected to, I think

21  everyone's okay with.  But for the 80-dollar product,

22  because he uses the 70 percent, he attributes $56 to

23  that same functionality.

24          I'm going to talk about that a little bit,

25  Your Honor.  But I take it that you would not allow me

1  to then say, if we applied $36 across all of the

2  products, that it would drop the damages amount by

3  $35 million.

4       THE COURT:  I don't understand how you think

5  that that's a valuable comparison.  So I think I'm

6  saying no, but you have to tell me why you think it's

7  a valuable comparison.

8       MR. MORIN:  It's a valuable comparison, Your

9  Honor, because we have -- let's take two examples,

10  Your Honor, a 40-dollar baseline product and an

11  80-dollar 360 product.  The 40-dollar baseline product

12  he's attributing $36 to.  The 80-dollar product he's

13  attributing $56 to.  I'm going to cross-examine

14  Dr. Sullivan on that qualitatively, but I would like

15  to wrap it up with the point that if the jury were to

16  ascribe $36 across all of the products, then that

17  would drop the damages total of his by $35 million.

18       THE COURT:  So I'm pretty sure that that

19  presumes that the only product that is infringed is

20  the Norton AntiVirus.

21       MR. MORIN:  It presumes, Your Honor --

22  without saying the number, let's say there are four

23  components in Norton AntiVirus and one of them is

24  infringing.  Let's -- when you go to the bigger

25  product, there are eight components, and it's still

1    only one of the eight.  The argument I would be making

2    is they should receive -- I would make this argument

3    anyway that they should receive the same value level,

4    cross-examine him on that point.  And the next point I

5    was going to make is, if 800 give them all the same

6    value, that $36, his overall number would drop by

7    $35 million.

8            THE COURT:  I'm not seeing how 800 give them

9    the same value.  I may be just running 800 in circles,

10   but in what possible world would they have the same

11   value?  Because -- go ahead.

12           MR. MORIN:  Please.  I didn't mean to

13   interrupt.

14           THE COURT:  No, go ahead.

15           MR. MORIN:  Dr. Sullivan, I was going to

16   cross-examine him, and I am probably qualitatively,

17   about testimony he gave, for example, in the *Techcet*

18   *vs. Adobe* case which was also in this court, in

19   Alexandria.

20           Your Honor may be familiar with Adobe

21   Acrobat.  There is, for example, a product that's

22   called Acrobat Standard and one that's called Acrobat

23   Pro.  And in that case, one sold for 12.99 and one

24   sold for 14.99.  And he testified there that the

25   additional price does not and cannot be attributed to

1  the patented feature because it's in both products.

2  And if 800 applied the same analysis here, you could

3  make no part of that extra $40 and say that that was

4  due to the accused feature, which would mean in all

5  the products, it's worth $36, which drops his overall

6  number by $35 million.  That was the point I was going

7  to make.

8           THE COURT:  All right.  I'll hear from the

9  other side.

10          MR. MORIN:  Thank you.

11          MR. BEENEY:  Your Honor, I think there are

12  basically two things wrong with this.  In the context,

13  what's being argued, Your Honor, is Federal Circuit

14  smallest saleable patent practicing unit law.  And

15  what I believe is being suggested is is that

16  Dr. Sullivan be used to do a calculation of applying a

17  royalty across all Norton products regardless of what

18  their sales price was under the theory that the lowest

19  priced Norton product is the smallest saleable patent

20  practicing unit.

21          So two things wrong with that at least.  One

22  is that SONAR/BASH is what's accused of infringement,

23  and there is no smallest saleable patent practicing

24  unit in this case.  I think perhaps more

25  significantly, in docket 737, on February 24, Your

1   Honor already rejected the argument, and if you'll

2   forgive me, completely consistent with Federal Circuit

3   law, that you need not do that.

4        And then finally, you know, I apologize for

5   repeating myself, but certainly the cross-examination

6   is fine until 800 get to that calculation.  There is

7   no witness who's going to say that it is appropriate

8   to use the lowest priced Norton product across the

9   entire product line.  And, in fact, Dr. Cole and

10  Dr. Sullivan will say exactly the opposite based on

11  their reports.  And so it is inappropriate for counsel

12  to then do the calculation, thereby providing

13  counsel's theory about how you would do a reasonable

14  royalty calculation using the lowest priced product

15  across the entire product line.

16        These witnesses say that's not appropriate.

17  And so it's not appropriate for counsel to ask them

18  what the math is for a theory that is only counsel's.

19        THE COURT:  Did you want to respond?

20        MR. MORIN:  May I approach, Your Honor?

21        THE COURT:  Uh-huh.

22        MR. MORIN:  Just so the record is clear, in

23  terms of the testimony that I will elicit,

24  Dr. Sullivan will agree that the SONAR/BASH component,

25  which is, of course, the issue here, is the same in

1   all the products.  So that when we're looking at the

2   valuation, it is the same accused functionality.

3          I believe in Your Honor's order, you said

4   also that -- the order that Mr. Beeney is referring

5   to -- that you're not required to look at the smallest

6   saleable unit.  I wasn't aware, and I don't think Your

7   Honor said it's improper to even look at the smallest

8   saleable unit.  But that's all I'll say.

9          THE COURT:  It would be improper for 800 to

10  look at it when no other expert adopts it.  So the

11  part of the argument that has weight is that if no

12  expert is saying anything about that particular

13  theory, you cannot introduce math based on that

14  theory.  And so it is totally improper because there

15  is no factual predicate, and it's inadmissible for 800

16  to introduce it.  If 800 had somebody else who might,

17  maybe.

18          And whether or not -- I mean, I'd have to

19  look.  Of course, in some possible world, you can

20  always use that type of royalty analysis.  I'd be a

21  little surprised -- I have to look at my own ruling --

22  if I said you can never do it because, of course, you

23  can.  I honestly can't remember if I said you can't do

24  it in this case, because there is evidence in this

25  case about whether or not the accused products can

1  work without SONAR/BASH, right?  So it's not really a

2  saleable unit, right?  It's part of the bigger part.

3         And so I don't think that that analogy works

4  perfectly.  Even though it is the same throughout all

5  of them, I don't have anything on the record that

6  suggests that you can take SONAR/BASH -- it's somewhat

7  disputed -- take SONAR/BASH out and still use Norton's

8  products in the same way.

9         So I don't know how you would get that theory

10 in.  I suppose you're allowed to try to get

11 Dr. Sullivan to adopt it.  And if he does, then he

12 opens the door.  And if he doesn't, then you have to

13 stop.

14         MR. MORIN:  Understood, Your Honor.  I was

15 cutting to the chase at the beginning because I think

16 not asking him the math appears consistent with Your

17 Honor's ruling of this morning.

18         THE COURT:  Right.

19         MR. MORIN:  So I was just putting it on the

20 record, which is --

21         THE COURT:  Right.  I'm engaging 800 so you

22 have a full record.

23         MR. MORIN:  Thank you, Your Honor.  So I'm

24 not permitted to do the math?

25         THE COURT:  Correct.

 1        MR. MORIN:  Thank you.

 2        MR. BEENEY:  I'm sorry.  Your Honor, just to

 3   clarify, I don't believe Your Honor's *Daubert* ruling

 4   said 800 may not do that.  I think Your Honor's

 5   *Daubert* ruling analyzed that law and said we were not

 6   required to do that.  So I just wanted to make sure

 7   that I didn't misrepresent --

 8        THE COURT:  Right.  That's what I presumed I

 9   said, because, of course, you can do it in some

10   worlds, but the challenge was whether or not he was --

11   it was an improper opinion because he had not.  And

12   the answer was:  That is not improper.  So you can't

13   introduce the theory if he does not adopt it.

14        MR. MORIN:  Understood, Your Honor.  And he

15   hasn't adopted it.  So I'm not going to do the math.

16   And in fairness to Mr. Beeney, I don't think he

17   suggested otherwise either.

18        THE COURT:  No, I don't think he did, nor did

19   800 say otherwise.

20        MR. MORIN:  What's that?

21        THE COURT:  Nor did you say otherwise.

22   Neither of you were scoring points.

23        MR. MORIN:  Okay.  I think we're on the same

24   page there.

25        The next one is one that I think also falls

```
 1    under Your Honor's ruling this morning likely, but I
 2    just wanted to put it on the record and maybe confirm
 3    that I would not be allowed to do this in view of Your
 4    Honor's ruling this morning.
 5            At the level five, Your Honor, Dr. Sullivan
 6    takes Norton's -- you saw this -- R&D expenses and
 7    divides them into the sum total of Norton's R&D plus
 8    sales and marketing expenses.  That was the 30 percent
 9    we saw this morning.
10            THE COURT:  Uh-huh.
11            MR. MORIN:  I was going to, if permitted, go
12    to the specific functionality of SONAR/BASH.
13    Dr. Sullivan says there was 600,000 a year for six
14    years in R&D expenses for SONAR/BASH.  That's in his
15    report.  I was going to take the overall sales and
16    marketing for the product group of $511 million, use
17    his apportionment and Dr. Cole's that SONAR/BASH
18    machine-learning is worth 6.1 percent, and that would
19    yield $23 million for the record.  And I was going to
20    do the math and show that that yields a relative
21    contribution of 1.8 percent.
22            I will acknowledge to the Court that we have
23    no expert who did that math or offered that, and I
24    just wanted to confirm with Your Honor that the way I
25    read your ruling I will not be allowed to do that.
```

 1        THE COURT:  800 cannot do that to the extent
 2   that 800 can't get Dr. Sullivan to adopt it.
 3        MR. MORIN:  For the record, rather than waste
 4   the jury's time, I think it's quite certain he won't
 5   adopt the 1.8 percent rather than 30.  So with Your
 6   Honor's blessing, I'd rather not waste the jury's time
 7   on that if that's okay with Your Honor.
 8        THE COURT:  That is totally your call, and
 9   you've preserved your issue.
10        MR. MORIN:  Thank you.
11        One other one that I think may be quick.
12   During Dr. Herskowitz's cross-examination, Your Honor
13   ruled before a break that they had opened the door,
14   and I could ask questions about the $723,000 total
15   that all the cyber patents from Columbia have yielded.
16   And 800 said no.  And we did a little bit.  And then
17   800 said that they had opened the door at that time.
18        And Your Honor will recall that I didn't
19   follow up with that question, and we said we'll carry
20   it over to Dr. Sullivan and address it at that time.
21   We said that won't go on for a while.
22        I'm renewing my request.  I think my point
23   was counsel had opened the door with the 600 million.
24   I know it's been a long time.  We're talking about the
25   600 million in licensing revenue, for example, that

1  Columbia had given to the university.  800 ruled last

2  Tuesday that it had opened the door for

3  Dr. Herskowitz's cross-examination on that point.  And

4  I didn't ask the question.  I didn't follow up.  And

5  we said we'd talk about it before Dr. Sullivan.

6       Our position would be it was counsel who

7  opened the door, so it would be fair to ask of this

8  witness.  But I'm just making that request for the

9  record because Your Honor had said that they had

10  opened the door, and our point was we thought it was

11  counsel who had opened the door.

12       THE COURT:  Right.  Okay.  I'll hear a

13  response to that.

14       MR. BEENEY:  In candor, Your Honor, I don't

15  remember whether Your Honor said that Norton could

16  talk about the relative number of, you know,

17  proportion of cyber licensing as opposes to a specific

18  number based on adding licenses that Your Honor

19  excluded because they were noncomparable.  But I don't

20  think that it's appropriate to take licenses that are

21  noncomparable and add them up and say that's the

22  totality of the cyber licensing.  It just creates,

23  again, kind of a -- to use Dr. Cole's words -- a

24  mismatch.

25       Nothing Dr. Sullivan said about, you know,

1   Columbia's revenue would allow this to be appropriate

2   cross examination.  This is not their witness.  This

3   is not within the scope of his direct testimony.  It

4   really has nothing to do with what he had to say, and

5   it's kind of throwing something into Dr. Sullivan's

6   cross-examination that had nothing to do with his

7   examination on direct.  So for that reason we just

8   don't think it would be appropriate here.

9           THE COURT:  All right.  Did you want to

10  respond?

11          MR. MORIN:  I don't need to respond, Your

12  Honor.

13          THE COURT:  All right.  Okay.  Well, with

14  respect to that, I did make a finding that

15  Mr. Herskowitz's testimony did open the door with

16  respect to some of the cross-examination of him.  And

17  I can't make the finding that that opened it up for

18  the entire case.

19          There was no cross-examination of him in that

20  instance.  And Dr. Sullivan just doesn't have anything

21  to say that I think would -- that speaks to that

22  particular issue in a way that opens the door today.

23  So I'm going to exclude that line of questioning.  And

24  obviously 800 preserve that also.

25          MR. MORIN:  Thank you, Your Honor.  May I

1 approach for the last one?

2          THE COURT:  Yes.

3          MR. MORIN:  May we put something on the

4 screen, Your Honor?

5          THE COURT:  Sure.

6          MR. MORIN:  If we could put up Slide No. 26

7 from the testimony of Dr. Sullivan from his slides.

8          During direct examination, Dr. Sullivan was

9 asked about some of Dr. Khan's deposition testimony

10 where 90 percent of Symantec's enterprise customers

11 visit this executive briefing center.

12          THE COURT:  Uh-huh.

13          MR. MORIN:  And, Your Honor, there was an

14 errata sheet that Ms. Khan filed timely with her

15 deposition, if we could put it up, please.  And she

16 explained -- and Dr. Sullivan acknowledged that this

17 existed in his reply report.  So I was a little

18 surprised he didn't talk about it.  She clarified her

19 testimony that she didn't mean 90 percent of the

20 world's enterprise customers visited the executive

21 briefing center, that she said that she -- what's said

22 at the bottom there, "I thought I was being on the

23 first box, asked out of the visitors to the executive

24 briefing center, how many are enterprise customers, to

25 which I would answer 90 percent."

1  So there's an errata that I was going to

2  cross-examine on.  It's part of her testimony in

3  completeness.  And, Your Honor, there's a -- Your

4  Honor has cautioned everybody to be careful in

5  characterizing testimony.  She has an errata sheet

6  here.  And, Your Honor, I think everybody in the room

7  knows that the errata sheet is correct as well.  May I

8  explain, Your Honor?

9  THE COURT:  Sure.

10  MR. MORIN:  There are thousands of enterprise

11  customers in the world; in China and in Australia, a

12  grocery store in Italy, wherever it might be, Turkey,

13  Egypt.  Of course, 90 percent of the people and the

14  companies that use Norton software don't go to

15  California and meet in the briefing center.  So her

16  clarification makes total sense that 90 percent of

17  their visitors are enterprise users or businesses

18  rather than 800 and me who might have software in our

19  individual computers.  So I think it's fair

20  cross-examination to cross with the errata sheet.

21  I understand when we looked at the emails,

22  that there was a perfunctory one-line email that this

23  was sent before we were in the case that said, without

24  explanation, "we object and reserve rights."  But

25  that's the sum total in an email that was said.

1804

```
 1              With the motions in limine and the like that
 2    were filed, if they wanted to try to strike a timely
 3    errata sheet -- that, by the way, it's not really
 4    changing testimony but clarifying it, Your Honor,
 5    because, like I said, it's inconceivable, and I'll
 6    doubt they'll say otherwise, that 90 percent of the
 7    thousands of enterprise customers from all around the
 8    world fly to Culver City to meet with Norton.  So we'd
 9    like to cross-examine with the errata sheet.
10              THE COURT:  All right.  I'll hear argument.
11              MR. BEENEY:  Your Honor, if I may, may I pass
12    up to the Court, just to make it a little easier, the
13    errata sheet -- excuse me.  Columbia's objection to
14    the errata sheet of Ms. Khan's deposition transcript
15    and a copy of Judge Cacheris' opinion in Stradtman,
16    S-T-R-A-D-T-M-A-N, vs. Republic Services?
17              THE COURT:  Do they have all of that?
18              MR. MORIN:  Your Honor, we've never seen the
19    case.
20              MR. BEENEY:  We did this at lunchtime, Your
21    Honor.  I'm sorry.
22              THE COURT:  Listen, I'm going to take a
23    seven, 10-minute break so you all have time to read
24    it.  You can give me the case, at the very least,
25    also, and then you all will be prepared to argue with
```

1    knowledge.

2            MR. BEENEY:  Okay.  Thank you.

3            THE COURT:  So we'll take a 10-minute break.

4            MR. BEENEY:  Your Honor, I don't know if it's

5    useful, would you like me to respond first of all,

6    Your Honor?

7            THE COURT:  Well, why don't we do that?

8    You're right.  I'm sorry.

9            MR. BEENEY:  Thank you.  So, Your Honor, I

10   think my understanding of this, without doing the

11   research because we just learned about this at lunch,

12   is that courts actually are split on the question of

13   whether an errata sheet can be used to make

14   substantive changes in a witness's testimony.  And

15   were it not for the following facts, I might pass on

16   this, but I think it's important not to because I

17   think it's going to create a misleading impression to

18   the jury.

19           On the errata sheet, Your Honor, there are

20   three corrections.  They are all to the testimony

21   that, you know, 90 percent of the business customers

22   visit the site in California.  And, again, it is not

23   illogical because these are the largest customers who

24   come to visit Norton.  So if we're arguing logic, it's

25   not illogical.  But what Ms. Khan, who is a senior

1   executive at Norton, did was to change her testimony

2   three times in which she swore at her deposition that

3   the 90 percent was correct, including, you know, I

4   think the last one, which I think is informative,

5   where she says, Rather than saying I meant the later,

6   I meant the former.

7          So she swore to it three times in her

8   deposition.  Then a month later in an unsworn

9   declaration, she changes the testimony substantively

10  three times, and I think it would be misleading to ask

11  Dr. Sullivan, you know, Why didn't 800 apply this one

12  change to the deposition testimony 800 got given that

13  Ms. Khan testified to it three separate times.

14         Now, just finally, Your Honor, in the

15  *Stradtman* decision that we handed up to Your Honor,

16  which was Judge Cacheris, in 2015, Judge Cacheris

17  cites at least two other Eastern District cases for

18  the proposition that "altering deposition testimony to

19  make substantive changes rather than technical or

20  typographical changes is an impermissible use of an

21  errata sheet."  And I think Judge Cacheris cites the

22  *Touchcom* case from the Eastern District, in 2011,

23  which is on the first page of the opinion, and quotes,

24  "a deposition is not a take-home examination."

25         And I think that's pretty apt here.  This was

1    not an interrogatory.  This was a deposition.  And to

2    suggest to Dr. Sullivan that he relied on testimony

3    that was changed not once, not three times, I think is

4    inappropriate, particularly at least from the 45

5    minutes that we looked at it over lunch, that that

6    does not appear to be the law in this district.

7    Although I do acknowledge that the courts are split on

8    this, I don't know of a case in which a witness did it

9    three times.  But that's the state of play, I think,

10   Your Honor.

11             THE COURT:  All right.

12             MR. MORIN:  Your Honor, may I respond?

13             THE COURT:  Sure.

14             MR. MORIN:  Your Honor, it may be that we

15   don't need a break for the *Stradtman* decision.   I

16   think here Your Honor has advised us and admonished us

17   to make sure we're fair and complete with witness

18   testimony.

19             I see this as a clarification and a pretty

20   straightforward one.  She was asked, What percentage

21   of the enterprise customers visit the EBC?  She said

22   in a different place in her transcript she didn't know

23   one of the times.  The three changes are to change one

24   thing to clarify, but, very reasonably, she was saying

25   90 percent of the people who come to Culver City are

1   business people rather than the customers.

2            And it is beyond comprehension that

3   90 percent of the businesses on the planet and the

4   people using it there are visiting Culver City in this

5   little executive business center around the world.

6   It's misleading testimony if not corrected, Your

7   Honor, and I don't see this -- and it's not a

8   take-home examination with three consistent changes

9   that are consistent with what she had in her record.

10           So irrespective of Judge Cacheris' idea that

11  you shouldn't be able to change "the light is red" to

12  "the light is green," this is a clarification of what

13  she meant consistent with the other testimony, like I

14  said, one time when she said "I don't know," which is

15  part of the errata sheet.  And it's only fair, and I

16  think the Court can take some aspect of logic or

17  common sense that with $9 billion in foreign sales and

18  20 percent of them, or whatever, being enterprise

19  users, that all the businesses in Australia who run

20  Symantec are not visiting the executive research

21  center.  So that would be the point I would make.  I

22  don't think we need a break.

23           THE COURT:  I need a break.  I'm going to

24  read the testimony.  You all have been studying the

25  testimony.  I'm going to be prepared.

1809

1      MR. MORIN:  Of course.

2      THE COURT:  And so I'm going to give myself

3   15 minutes.  And you all may exchange whatever 800

4   wish.

5      MR. MORIN:  Thank you, Your Honor.

6      THE COURT:  I want to look at the testimony.

7   And I'm making sure I have it.  Do I have her

8   testimony?

9      MR. BEENEY:  Yes, Your Honor, I passed up a

10  copy of the deposition to you.

11      THE COURT:  I just got it.  Yes.  All right.

12  Okay.  We'll take a brief recess.

13         (Recess taken.)

14         (The trial resumes on the next page.)

15

16

17

18

19

20

21

22

23

24

25

 1          (The trial resumed at 2:14 p.m.)

 2          (The jury is not present.)

 3      THE COURT:  Okay.  So I have taken our break and

 4  I've taken under consideration the cross-examination

 5  proposed with regard to Ms. Khan's errata sheet.  I'm just

 6  going to make some findings in the first instance.

 7          It is certainly the law of this district that

 8  one cannot make substantive changes to an errata sheet.

 9  It is to correct -- Judge Cacheris says, "The purpose of

10  an errata charge is to correct the alleged inaccuracies in

11  what the deponent said at his or her deposition, not to

12  modify what the deponent said for tactical reasons or to

13  reflect what that person wishes that they had said."  And

14  so that is at the Westlaw cite of -- it looks like *1.

15          And in that case, Judge Cacheris found that a

16  person who gave a series of equivocal answers to a

17  question and then afterward changed it to something that

18  was definitive, that that was a substantive change in

19  testimony, and he disallowed the errata sheet.

20          With respect to the other two cases that are

21  in -- that are cited within *Stradtman*, they're not as

22  relevant.  The *Touchcom* case is reported, 790 F.Supp. 2d

23  435.  In that case, it was just -- frankly, I think it's

24  factually driven.  There the deponent was blind, legally

25  blind and took a deposition and then submitted an errata

1 that said subject to reviewing the relevant documents, and

2 essentially Judge Cacheris goes through a factual analysis

3 about whether or not that was tactical.  And in the end,

4 he found it was largely a tactical decision.

5          The third case is from Judge Ellis, and that is

6 *Lee v. Zom Clarendon, L.P.*  This is also reported,

7 689 F.Supp. 2d 814, and in that case, he doesn't actually

8 talk about how the errata was used.  He makes the finding

9 that even assuming that the deponent had submitted

10 appropriate deposition transcript changes, that the errata

11 sheet makes substantive changes, not technical or

12 typographical changes to the plaintiff's deposition

13 testimony.  He finds that that is not an appropriate use

14 of errata sheets, citing a Maryland case that says a

15 deposition is not a take-home exam, it is for

16 clarifications and cannot be akin to the student who takes

17 the exam home to make sure it's right.

18          So here, we have three instances in which

19 Ms. Khan cites testimony about this 90 percent figure with

20 respect to visitors in the executive business center.

21          Counsel for Norton is correct that the first

22 question on page 36 of the deposition says, "So of

23 enterprise customers who purchase Symantec Endpoint

24 Protection, 90 percent visit the Executive Briefing Center

25 in Mountain View, California?"

1812

1     And she says, "Could you repeat the question?"

2     And the question is repeated, and then she asked

3 for clarification.

4     And the question becomes, "Would you estimate

5 that approximately 90 percent of the customers who

6 purchase Symantec Endpoint Protection visit the Mountain

7 View EBC?"

8     And she says, "I do not know."

9     Noting that that is an enterprise product, I'll

10 add that.

11     The more, I think, pertinent discussion starts

12 on page 164 and goes through 166.  There are questions

13 about whether or not one purpose of the EBC meetings is to

14 sell products and services and that they occur in the

15 United States.

16     She says, "Yes."

17     Then there's a question about the 90 percent of

18 Symantec's enterprise customers who visit EBC, Were you

19 talking about the customer base globally?

20     And she says, "Yes."

21     And the question is, "Is there a different

22 percentage for foreign versus domestic customers who visit

23 the EBC?"

24     And she asked for clarification, and then she

25 says, "You may need to ask one by one, because are you

1  saying that the U.S. number of enterprise customers that

2  come in versus the global enterprise that come in, are you

3  asking are both at 90 percent or are we talking about

4  joint?"

5          And the -- the examiner says, "Correct.  So I'm

6  trying to figure out if we pull apart this joint number,

7  what is the number or the rate of the domestic enterprise

8  customers who come to the EBC, and what's the rate of the

9  foreign customers that come to the EBC?"

10         There's an objection.

11         And the answer is, "Very different numbers."

12         And the question is, "So what is the number for

13 domestic customers?"

14         And the answer is, "I don't know what the

15 domestic is and/or foreign is.  I know as a global

16 organization 90 percent of our global organization

17 enterprise salespeople make a request for a briefing."

18         "And the global enterprise salespeople are the

19 ones who deal with the global customer accounts, correct?"

20 is the next question.

21         And she said, "We do have a subset of sales

22 representatives that deal with global accounts, yes."

23         And then she's asked if those are the largest

24 enterprise accounts, and she says, "Yes."

25         And the question is, "And they're customers who

1   tend to span the globe, which is why they're called

2   global?"

3            And she says, "Yes."

4            And the question is, "And you said 90 percent of

5   those global enterprise customers submit a request?"

6            And the answer is, "90 percent of enterprise

7   that include global make a request to come into the EBC."

8            And then as to the latter, the question is, "And

9   when you say 75 to 95 percent enterprise, do you mean of

10  the briefings that are held at the EBC 75 to 90 percent of

11  them are enterprise customers, or are you saying that

12  75 percent to 90 percent of enterprise customers visit the

13  EBC?"

14           And she says, "The latter," meaning that 75 to

15  90 percent of the enterprise customers come visit the EBC.

16           Now, I'll say that she certainly is asking for

17  clarification when these questions are being asked, but

18  she gets it.  And it is the case that -- she doesn't say

19  that 90 percent of the global customers necessarily come,

20  but she does say that 90 percent request.

21           And I certainly think that that is -- that is

22  the testimony, not that 90 percent of the customers who

23  visit are enterprise customers.  I don't think that that's

24  what this testimony says, and I'm going to make a finding

25  that this errata sheet is substantive.

1          To the extent there's any question -- I don't

2   know -- what slide are we looking at?  What number?

3          MR. MORIN:  Your Honor, slide 26 of

4   Dr. Sullivan's deck.

5          THE COURT:  So I think you can ask Dr. Sullivan

6   whether he knows that she testified that 90 percent of

7   global customers asked to visit the EBC.  I think that's a

8   fair cross-examination based on the testimony, but the

9   errata can't come in.  I think it's a substantive change.

10         MR. MORIN:  Understood, Your Honor.

11         THE COURT:  And let me just say on the record

12  because I don't think I did, none of these cases have

13  been -- they don't have flags on them.  One has a flag for

14  where the judge changed his own opinion.  The Fourth

15  Circuit has not cited them, but they are not bad law in

16  the Fourth Circuit, and they are certainly good law.  Two

17  of them published in the Eastern District of Virginia.  So

18  I'm going to apply the law that they have.

19         MR. MORIN:  Yes, Your Honor.  And maybe we'll

20  submit -- we're going to submit some things just to

21  complete the record.  Maybe we'll submit the errata with

22  just the omnibus documents, say some documents that were

23  discussed in court, if that's okay.

24         THE COURT:  That's fine.  You can make whatever

25  record you want.  That's fair.

1816

1    MR. MORIN:  Thank you, Your Honor.

2    THE COURT:  Okay.

3    Mr. Wigley.

4    All right.  Are we prepared to proceed?

5    MR. MORIN:  We are, Your Honor.

6    MR. BEENEY:  We're bringing in Dr. Sullivan.

7    THE COURT:  Okay.  Sure.

8    MR. MORIN:  Do you want me at the podium,

9    Your Honor?  I don't want to --

10   THE COURT:  Yes.  That way the jury just thinks

11   we've been sitting here the whole time.

12   All right.  Dr. Sullivan, welcome back.

13   THE WITNESS:  Thank you.

14   THE COURT:  We'll bring the jury in, and we'll

15   start with cross-examination.

16   THE WITNESS:  Very good.  Thank you.

17   (The jury entered the courtroom.)

18   THE COURT:  All right.  Welcome back.  I want to

19   make sure everybody is ready to hear the next evidence.

20   Everybody ready?

21   Okay.  So we'll begin with cross-examination,

22   and I need to remind you, Dr. Sullivan, that you're still

23   under oath.

24   THE WITNESS:  Understood.  Thank you.

25   THE COURT:  Thank you.

Ryan Sullivan - Cross                    1817

1          MR. MORIN:  May I proceed, Your Honor?

2          THE COURT:  Please.

3          MR. MORIN:  Good afternoon, ladies and

4    gentlemen.

5                    **CROSS-EXAMINATION**

6    BY MR. MORIN:

7    Q    And good afternoon, Dr. Sullivan.  It's nice to see

8    you.

9    A    Good to see you.

10   Q    Dr. Sullivan, just so we're all on the same page,

11   you're an economics expert, correct?

12   A    That is right.

13   Q    And you, for the purposes of your assignment, assumed

14   that the '115 patent and the '322 patent were infringed,

15   right?

16   A    That is correct.

17   Q    You don't know and don't have an opinion one way or

18   another about whether Norton actually infringes the '115

19   or the '322 patent, correct?

20   A    That's right.

21   Q    And is it fair to say that if there's no finding of

22   patent infringement, then the damages would be zero?

23   A    That would be my understanding --

24   Q    Okay.

25   A    -- as it relates to the patent infringement.

Ryan Sullivan - Cross                    1818

1   Q     Fair enough.  If there's no finding of patent

2   infringement by this jury, then the damages would be zero

3   for patent infringement?

4   A     That's my understanding.

5   Q     Okay.  In your report, you categorize it as five

6   different families of products that are accused of

7   infringement in this case.  Is that fair?

8   A     Yes.

9   Q     And just so we're on the same page, there's Norton

10  AntiVirus, Norton Internet Security, Norton Security,

11  Norton 360, and Symantec Endpoint Protection?

12  A     Correct.

13  Q     And each has different features and different price

14  points?

15  A     Yes, generally.

16  Q     Okay.  The malware detection aspects of each of those

17  five different families of products is the same, though,

18  to your understanding, correct?

19  A     The apportionment is distinct, yet the malware

20  functionality, as I understand it, is generally similar.

21  Q     Yes.  We heard a difference is in apportionment.  But

22  if we were to look at the technology in the product, it's

23  your understanding that the malware technology is the same

24  across those five different families of patents?

25  A     Products.

Ryan Sullivan - Cross                    1819

1  Q     Products.

2  A     My understanding, there's some variation across time

3  especially between enterprise and consumers, Symantec

4  Endpoint, or SEP, versus the Norton line, yet I'm not

5  addressing those distinctions from a technological

6  standpoint.

7  Q     From an economics standpoint, how you're testifying,

8  you treated the patented functionality as equivalent

9  across all the different products?

10 A     The patented invention, the green rectangle, in

11 effect, what's encompassed in there I have treated

12 similarly.  Different magnitudes but similar technology.

13 Q     You treat them to be -- the technology to be

14 equivalent across all the different product lines.  Fair?

15 A     The technology from the patented invention, yes.

16 Q     The same across all the families?

17 A     In terms of a functional perspective, yes.

18 Q     Okay.  And you understand, and because you relied on

19 it, that Dr. Cole gave different dollar values to malware

20 detection in different products that use the same accused

21 technology?

22 A     He did a price comparison, as well as a product

23 comparison.  So it wasn't all dollar values, but there are

24 distinctions on that apportionment.

25 Q     Right.  For an $80 Norton 360 product, you applied

1   70 percent to malware, which would give you $56, correct?

2   A    That arithmetic is correct, and I believe that is

3   correct.

4   Q    All right.  Whereas for a 40-dollar Norton AntiVirus

5   product, he did a 90 percent apportionment, and you would

6   have $36 for what you say technologically is the same,

7   correct?

8   A    That's right.  There is one nuance, which is that

9   those are prices, not necessarily revenue, and there can

10  be a bit of a distinction.  So to the extent that there

11  are any variations in pricing across customers, I have

12  captured that in the revenue data.

13  Q    Right.  But if we were to assume, for example, that a

14  Norton AntiVirus product sold at its list price of $40 and

15  a Norton 360 product sold at its list price of $80, he

16  would give $56 of value to malware for the higher priced

17  product and $36 of value to malware for the lower priced

18  product, correct?

19  A    If those are, indeed, the selling prices, yes.

20  Q    Right.  And that sounds about right on the selling

21  prices, right?

22  A    Those are -- there are distinctions on the selling

23  prices in terms of what Symantec and Norton actually

24  receives.  Occasionally there's discounts or coupons or

25  things of that nature.

Ryan Sullivan - Cross                    1821

1  Q     All right.  But is that the ballpark, about 20 bucks

2  more?

3  A     The 36 versus 56, yes.

4  Q     All right.  And you've opined in software patent

5  cases in the past?

6  A     I have.

7  Q     Including in this court in the Eastern District of

8  Virginia?

9  A     Yes.

10 Q     And one of those cases was the *Tecsec v. Adobe* case?

11 A     That's right.

12 Q     And in that case, there were two versions of Adobe at

13 issue.  Do you recall that?

14 A     I do not.

15 Q     All right.  There was -- and we have some testimony

16 if we need to refresh your recollection, but let's see if

17 we can do that by discussing it.  There was Adobe Acrobat

18 Standard that sold at one price and Acrobat Pro, which you

19 may use, that sells at a different price point.  Do you

20 recall that?

21 A     I do recall the different products, and I recall that

22 as a consumer but not from that case in particular.

23 Q     Do you recall, in that case, testifying that because

24 the same accused functionality was in both products, the

25 difference in price, quote, is not and cannot be because

1   of the accused technology?

2   A     I would believe that would be correct.

3   Q     Okay.  And you used the numbers that you got from

4   Dr. Cole in your first three layers of your apportionment,

5   correct?

6   A     His quantification of those numbers as supported and

7   evaluated from my analysis as well.

8   Q     But he's the one who quantified those, gave you those

9   numbers?

10  A     He did quantify those, and I used the numbers as he

11  quantified them.

12  Q     Correct.  And the first numbers, then, that you

13  quantified started at level 4 in the apportionment

14  analysis?

15  A     Fair enough.

16  Q     Okay.  And you used what's called incremental

17  profitability.  Is that true?

18  A     That's right.

19  Q     And maybe we could put your slide 38 on the screen,

20  and this is a slide you showed during your direct

21  examination?

22  A     It was displayed during my direct exam, yes.

23  Q     All right.  And your point here was the incremental

24  profitability was 66.7 percent and what you've subtracted

25  are three things, correct?

1   A     Yes.

2   Q     For implementation, you used the 3.6 million, or so,

3   that you opined that Norton spent on developing the

4   machine learning aspect of SONAR/BASH?

5   A     It is what I determined from the economic evidence,

6   which is 3.6 million.

7   Q     And for cost of goods sold -- COGS it's sometimes

8   referred to as?

9   A     That's right.

10  Q     And that is the cost of selling the goods, as I think

11  you explained it?

12  A     It's the cost of the goods that are sold.  It's not

13  the cost of the selling itself.

14  Q     Right.  The materials, the inputs to actually making

15  and selling the product?

16  A     Making.

17  Q     Okay.  And then sales and marketing would be selling

18  the product?

19  A     That's right.

20  Q     Okay.  And what's not in here is what you'd have for,

21  let's say, operating profitability or net profitability.

22  You haven't used those here, correct?

23  A     Some of it.  So cost of goods sold and sales and

24  marketing are typical deductions to get an operating

25  profit.  As I mentioned, there are two other items that

Ryan Sullivan - Cross                    1824

1  would take you to that level, which is research and

2  development and general and administrative.  And in my

3  view, it would not be appropriate to deduct those.

4  Q    And you alluded to this in direct examination, sir.

5  In other cases, you've used something other than

6  incremental profitability.   True?

7  A    I endeavor to use incremental profitability, and

8  depending upon the increment, sometimes that means that

9  incremental profits are equivalent to operating profits

10 and at other times not.  There are a number of occasions

11 where sales and marketing, for example, are not

12 incremental and sometimes there are.  It just depends upon

13 what that increment is.

14 Q    Sure.  That same Adobe case that we're both familiar

15 with, you used -- in that case, you went to the 10K of

16 Adobe for the year of the hypothetical negotiation and

17 used operating income.  Do you recall that?

18 A    I do not recall the year.  I do recall the remainder

19 of what you said.

20 Q    Okay.  That you went to the -- in whatever year the

21 hypothetical negotiation was, you went to -- let me strike

22 that.  Let me withdraw it.

23         I think you're saying you don't know if you used

24 the hypothetical negotiation year?

25 A    I do not recall the time period.

Ryan Sullivan - Cross                          1825

1  Q     But you recall looking to the 10K or the securities

2  filing and looking at operating income in calculating your

3  hypothetical negotiation, right?

4  A     Looking at operating expenses, yes.

5  Q     All right.  And let's take a look -- and you've

6  provided that in this report.  Let's look to your

7  attachments to your 2019 report at Attachment C1.

8              MR. MORIN:  And if we blow that up a little

9  bit --

10             THE COURT:  Is this in something I have?

11             MR. MORIN:  It may not be if they didn't hand

12 up -- did you hand up all of his attachments to his report

13 in direct?

14             If not, we can get it for Your Honor.

15             Your Honor, just for context, Dr. Sullivan had

16 large attachments to his report.  This is one of them.  I

17 thought they would have been handed up in direct.  It's my

18 apologies.  We'll get it for you.

19             MR. BEENEY:  Which ones do you want?

20             MR. MORIN:  The 2019 opening report.

21             May I approach, Your Honor?

22             THE COURT:  My CSO will do that.

23             MR. MORIN:  Please.  Thank you.

24             THE COURT:  All right.  Now, where am I in this

25 report?

Ryan Sullivan - Cross

1    MR. MORIN:  You are in Attachment C1,
2  Your Honor.
3    THE COURT:  Okay.  Thank you.
4    MR. MORIN:  Of course.
5  BY MR. MORIN:
6  Q    And you'll remind us, the hypothetical negotiation
7  here took place in either 2011 or 2013?
8  A    That's right.
9  Q    And just to reorient ourselves, in your apportionment
10 you used the incremental profitability rate of 67 percent.
11 Do I recall that correctly?
12 A    That's right.
13 Q    Right.
14 A    And that's just over a broader time period, and we'll
15 probably have to make a little distinction here for fiscal
16 year versus calendar, but --
17 Q    Understood.  If we look at the years of the
18 hypothetical negotiation, we see for 2011, the operating
19 margin is 14.2 percent.  Do you see that?
20 A    For fiscal year 2011.
21 Q    And --
22 A    Which is different from calendar year.
23 Q    Of course.  And if we look at the fiscal year of
24 2013, it's 16 percent?
25 A    Correct.

Ryan Sullivan - Cross

1   Q      And if we look at net margin, which is what you have

2   when it's all said and done, it's 9.6 percent in 2011,

3   correct?

4   A      I disagree with the "when all is said and done."

5            However, numerically, the net margin in fiscal

6   2011 was 9.6 percent and 10.9 percent in 2013 fiscal.

7   Q      The net profitability of the overall company in 2011

8   was 9.6 percent?

9   A      The net income is.  I would not call that the overall

10  net profitability.

11  Q      Okay.

12  A      The two are a bit different.

13  Q      All right.  The net income for the company was

14  9.6 percent, correct?

15  A      That's right, $593 million.

16  Q      The net income of the entire company in 2013 was

17  10.9 percent?

18  A      That's right.

19  Q      Okay.  That was on level 4 beforehand that we had

20  discussed profitability.  Can we talk about level 5,

21  Dr. Sullivan?

22  A      Of course.

23  Q      Level 5 is when you talk about the relative

24  contributions of how we're going to split up that profit,

25  if you will?

1    A    Yes.

2    Q    So you have calculated through level 4 the

3    profitability that you assigned to the patented technology

4    in the product.  Is that fair?

5    A    Say that again.  I didn't follow.

6    Q    By the time we're through level 4, you've determined

7    the profitability of the accused feature in the product.

8    Fair?

9    A    It's the profit that is attributable to the patented

10   functionality.

11   Q    Right.  And so now you're trying to decide I have

12   this much profit that you've assigned to the patented

13   technology, how are we going to divide that between the

14   companies.  Is that fair?

15   A    In effect, yes.

16   Q    Okay.  And let's put up the -- first slide 42,

17   please, of your presentation.  And what you call that in

18   your slide 42 is Columbia's contribution, correct?

19   A    Yeah.  So that's the amount that would go to Columbia

20   as a royalty, and the remainder would remain at

21   Symantec/Norton.

22   Q    And just to be fair, these are your words, to make

23   sure we're clear, you've called that Columbia's

24   contribution, right?

25   A    Yes.

Ryan Sullivan - Cross

1829

1   Q     Okay.  And then you show what you did there on

2   slide 39, sir, in relative contributions.

3              MR. MORIN:  If we could go there.

4   BY MR. MORIN:

5   Q     And you have a blue piece of pie called Columbia at

6   30.2 percent; is that correct?

7   A     That's right.

8   Q     And the remainder of the pie in gray you've called

9   Norton at 69.8 percent?

10  A     Correct.

11  Q     And in the blue portion, you're saying invention,

12  research and development.  Is that fair?

13  A     That is the label, yes.

14  Q     And just so the jury is clear, no part of this math

15  or this pie chart was generated using any numbers from

16  Columbia.  True?

17  A     Correct.  This is all from the Symantec and Norton

18  data.

19  Q     So just so we're all on the same page, when you look

20  at what Columbia contributed, you're not using any

21  financial data or any data from Columbia, you're only

22  comparing numbers within Norton.  Is that true?

23  A     For the split of the pie, that is correct.

24  Q     Okay.  And you also don't look at the relative

25  contributions even within Norton reduced to the accused

1   products or even the accused functionality.  Here, you've

2   taken the company as a whole, true?

3   A    Correct.  Just like in the Adobe case that we worked

4   on, which came from the 10K filings with the Securities

5   and Exchange Commission, that is precisely what I used

6   here, and that reflects the business of Symantec and

7   Norton, the way that business is operated.

8   Q    Right.  So -- but I just want to make sure we pause

9   and we're on the same page.  You're using Norton ratios of

10  Norton numbers in determining Columbia's contribution, but

11  you haven't taken any inputs at level 5 from Columbia.

12  True?

13  A    At this point of the analysis, it's already isolated

14  to the patented invention, which reflects Columbia.  This

15  stage utilizes data from Norton and Symantec only and

16  their financial data.

17  Q    All right.  And you have the ratio in terms of the

18  research and development, and you call that invention to

19  commercialization.  Fair?

20  A    The ratio of R&D as compared to the sum or the total

21  of R&D, plus sales and marketing.

22  Q    Now, if we think about what actually happens in the

23  hypothetical negotiation, in the hypothetical negotiation,

24  first of all, we can agree it would be a nonexclusive

25  license?

1  A    That's right.

2  Q    And it's effectively what I've used as an analogy, a

3  fishing license in the sense that all it means is that

4  Columbia, if you have the hypothetical negotiation, is not

5  going to sue Norton for patent infringement.  Fair?

6  A    I would not put it that way.

7  Q    All that they have is the right to practice under the

8  patent.  Is that fair?

9  A    They do have the right to use the patented

10 technology, and I view that as different from what you

11 said a moment ago.

12 Q    If I was unclear, I am trying to make the point that

13 that license agreement in your hypothetical negotiation

14 doesn't come with, let's say, any source code, right?

15 A    No, it does not come with source code.  It does not

16 come with an ability to exclude others from utilizing the

17 technology.  It's the right for Symantec and Norton to use

18 the technology.

19 Q    Right.  And it's actually -- it's only the right for

20 Symantec and Norton to use the technology in terms of this

21 patent of Columbia's.  For example, it doesn't give Norton

22 clearance against other companies' patents, right?

23 A    That's correct.

24 Q    Or even other Columbia patents.  They could be sued

25 on other Columbia patents even if they had your

1  hypothetical license, right?

2  A    To the extent that Symantec and Norton are utilizing

3  or infringing other technology, that would be separate.

4  Q    Right.  So for example, we heard Professors Stolfo

5  and Keromytis have hundreds of patents.  You're aware of

6  that?

7  A    I don't think it was hundreds.  I think it was 103

8  and in the 60s for Professor Keromytis.

9  Q    Fair enough.  163 patents for the two of them, right?

10 A    That is my understanding.

11 Q    And you understand Columbia has other researchers who

12 have other patents, right?

13 A    Correct.

14 Q    So we're all on the same page -- bless you.

15        So we're all on the same page, you understand,

16 sir, that this hypothetical license that you've

17 constructed and say is 227 million, they could enter that

18 deal and the next day Norton would be subject to suit from

19 Columbia on any other patents?

20        MR. BEENEY:  I'm sorry.  Objection, Your Honor.

21 There's no evidence that Columbia has any patents that

22 Norton is infringing other than the two in this case.

23        THE COURT:  I'm going to sustain that.  What's

24 the underlying predicate?

25        MR. MORIN:  Your Honor, I can move on, but the

Ryan Sullivan - Cross                    1833

1   point I was making is it's a license that doesn't give

2   peace of mind for everything.  It's only for two patents.

3          THE COURT:  Right.  But you have no underlying

4   predicate that Columbia has any other licenses under which

5   to sue, and we've heard testimony, for instance, that

6   Columbia has sued twice, and so I think it is an unfair

7   hypothetical.

8          MR. MORIN:  Okay.  I'll move on, Your Honor.

9   BY MR. MORIN:

10  Q    And we can agree that Norton did a whole lot of work

11  in commercializing -- developing first, before they

12  commercialized, developing the patented technology.   True?

13  A    They did some development, and that expense, as I

14  mentioned, is approximately $3.6 million.

15  Q    And you have a bit of a software background, right,

16  Dr. Sullivan?

17  A    In varying degrees, correct.

18  Q    And what Norton had to do was, for example, design

19  the product and then they had to write and debug the

20  source code?  You've written source code before?

21  A    So there's two things there.  Yes, I have written

22  source code.

23  Q    And debugging it can be a pain?

24  A    If I've written it well, it's not, yet if I've made

25  mistakes, it is.

Ryan Sullivan - Cross                    1834

1  Q    All right.  And they had to build the back-end

2  infrastructure and test and validate the product, right?

3  A    I would expect that they would do so.

4  Q    They had to go through regulatory review and privacy

5  review and all the other things?

6  A    That I do not know.

7  Q    But in our hypothetical negotiation, they have to do

8  all of that.  None of that, no code, no know-how was

9  supplied by Columbia.  Fair?

10  A    There is patented technology in the invention that is

11  supplied.  The development in that cost is something that

12  would be borne by Symantec, and that's the $3.6 million

13  that they deducted in getting to -- along with other

14  costs, in getting to the profitability.  So it is

15  accounted for.

16  Q    Okay.  Are you aware that Columbia is asserting two

17  categories of infringement by Norton, one is direct

18  infringement and one is indirect infringement?

19  A    I understand that.

20  Q    And I don't know if you heard Dr. Bailey testify on

21  direct in his examination that the direct infringement was

22  based on testing that's done by Norton and its use of the

23  product to protect its own computers.  You're aware of

24  that?

25  A    I understand that.

Ryan Sullivan – Cross                                 1835

1  Q      But you haven't separately, in your reports or in

2  your opinion, quantified direct versus indirect

3  infringement.  Fair?

4  A      Not separately.  The damages, in my view, would be

5  the same whether it would be direct or indirect

6  infringement.

7  Q      So if all of the use that Norton had ever done with

8  the products was using it on its own products and testing

9  the product, in your view, same damages?

10 A      In this case, the evidence demonstrates that it is

11 those activities that enable the sales and the global

12 sales for Symantec and for Norton.

13 Q      Okay.  You talked a bit about worldwide sales

14 damages, and you opined that Columbia is owed 227 million

15 in patent damages based on worldwide sales.  Do I have

16 that right?

17 A      That is the amount of the reasonable royalty in the

18 event there is a finding of infringement.

19 Q      And of that, more than half is for sales that were

20 made outside the United States.  True?

21 A      Not quite.  It is roughly half.  And it's sales to

22 customers who are located outside the United States.

23 Q      Right.  So if we could put your slide up on the

24 screen.

25            MR. MORIN:  If we could go to slide 44 and we go

Ryan Sullivan - Cross                          1836

1   to the bottom line number.

2   BY MR. MORIN:

3   Q    The worldwide you have is 227 million and change.

4   Fair?

5   A    Yes.

6   Q    And if you go to the next page, USA only, if it's

7   just the U.S. damages based on the U.S. patent, it would

8   be 107 million, correct?

9           MR. BEENEY:  Objection.  Mischaracterizes the

10  testimony.  It's not just U.S. patents.  It's U.S.

11  customers as compared to customers outside the

12  United States.  Both are U.S. customers.  There was an

13  inaccurate predicate in the question.

14          THE COURT:  That's sustained.

15  BY MR. MORIN:

16  Q    Let me ask it differently.  If the only infringing

17  sales are found to be to customers who are located in the

18  United States, then damages would drop by $120 million.

19  Fair?

20  A    There would be two different amounts, and that

21  difference is roughly $120 million.

22  Q    Okay.  And, again, let's restate it with respect to

23  the sales to foreign customers, customers outside the U.S.

24  You don't have any opinion about whether Norton has

25  infringed when making those sales, correct?

1  A     Well, to be clear, I do not have an opinion on

2  whether there is infringement one way or the other, and

3  that does not change whether it's a customer located in

4  the United States or outside of the United States.

5  Q     Right.  You made a few points on global sales, and

6  one of the points that you made --

7            MR. MORIN:  If we could pull up slide 18 that

8  you had.

9  BY MR. MORIN:

10 Q     -- is that the design and development occurs in the

11 United States.  Do you see that?

12 A     Substantive design and development, correct.

13 Q     And you are aware, of course, that the first accused

14 product was released in 2009?

15 A     That is my understanding.

16 Q     And that's two years before the first of these

17 patents issued?

18 A     It is roughly two years.

19 Q     And so we can agree that at least the design and

20 development that led to the first accused product occurred

21 before there was a patent, correct?

22 A     The patent had been applied for at that point in

23 time.  The patent had not issued.

24 Q     So the design and development of that product, the

25 initial product occurred before there was an issued

Ryan Sullivan - Cross                    1838

1  patent, correct?

2  A    The initial design and development would have been

3  prior to that point in time.

4  Q    Okay.

5  A    That does not mean there's not continuing design and

6  development and testing and updates and all of those

7  items.

8  Q    Understood that there might be more things going on

9  later, but when you talk about where the product -- when

10 the product was initially made, that preceded the patents

11 in suit, correct?

12 A    As a matter of chronology, some of that design and

13 development initially would occur before 2011, yet the

14 activities that constitute the infringement as alleged

15 continue throughout time.

16 Q    I am only focused on one thing with this slide that I

17 think we can reach agreement on.   This slide, you told the

18 jury, that all substantive design and development occurs

19 in the USA.   And my question simply is, and I think we'll

20 reach agreement, that at least the design and development

21 that led to the initial release of the accused products

22 occurred at a time where there was no issued patent.

23 True?

24 A    Not quite because of enterprise versus Norton line of

25 consumer products.   But for the Norton line of consumer

Ryan Sullivan - Cross                    1839

1    products that were issued prior to the issuance of the --

2    that were released prior to the issuance of the patent, by

3    definition that occurs prior.

4    Q    Right.  And if we look to your slide 19, sir, it says

5    that master software was created in the U.S., and you talk

6    a little bit about golden discs in the upper right-hand

7    corner -- or you quote some testimony that talks about

8    golden discs, right?

9    A    That's right.

10   Q    And you talked about a basketball that could be

11   shipped abroad during your direct.  With respect to the

12   golden discs, sir, to your knowledge they never leave

13   California.  Fair?

14   A    The golden disc is two different items, one --

15   Q    Bless you.

16   A    One can think of that as a physical disc.  It also

17   is -- that term is used to reflect to the source software

18   that is generated that can be delivered electronically.

19   Q    Okay.

20   A    So it's not always a physical disc.  It can be, but

21   oftentimes it's not.

22   Q    The physical golden discs, to your knowledge, have

23   never left California.  Fair?

24   A    I do not have personal knowledge of that.

25   Q    Okay.

1          MR. MORIN:   One moment, Your Honor.

2    BY MR. MORIN:

3    Q    Let's talk briefly about the '643 patent, if we

4    could?

5    A    Of course.

6    Q    And just like with the patent infringement analysis,

7    the damages analysis, here as well you have no opinion on

8    whether Norton has committed fraudulent concealment,

9    correct?

10   A    That's right.

11   Q    And if the jury were to find that Norton hasn't

12   committed fraudulent concealment, the damages on that part

13   of the case, to your knowledge, would be zero.  Fair?

14   A    That would be my understanding.

15   Q    All right.  And you say that Columbia lost the

16   ability to sell and/or license the '643 patent, right?

17   A    I don't know that I said that earlier today, but that

18   is accurate.

19   Q    And that's what you say in your report.  Fair?

20   A    Yes.

21   Q    And you say that lost value is best represented by

22   what Norton would have paid Columbia in an arm's length

23   transaction for the '643 patent.  Fair?

24   A    Yes.

25   Q    And that hypothetical transaction would have taken

1  place on the filing of the nonprovisional application,

2  April 4th, 2011, correct?

3  A    Yes.

4  Q    And unlike in what we just talked about, just so

5  we're clear, the hypothetical negotiation for patent

6  infringement, in this transaction there would be no

7  assumption of validity or infringement, correct?

8  A    That's right.

9  Q    And at that point in time, I think we can agree that

10  the transaction would have involved a patent application

11  rather than an issued patent at that time, correct?

12  A    At that time, correct.

13  Q    Right.  And because there's no assumption of

14  validity, the parties wouldn't know whether a patent would

15  ever issue from that application.  Fair?

16  A    There would be an expectation, of course.  That's the

17  intention.

18  Q    Okay.  They don't know, though, whether a patent

19  would issue, right?

20  A    Not with certainty.

21  Q    Okay.  And you say that transaction would have

22  yielded over $22 million; is that right?

23  A    That's right.

24  Q    You submitted a report in 2014, correct?

25  A    I did.

Ryan Sullivan - Cross

1  Q      And, again, just so we're clear, our hypothetical

2  transaction would have occurred in 2011, right?

3  A      That's right.

4  Q      And so that report was after when the hypothetical

5  transaction would have occurred?

6  A      Almost by definition, yes.

7  Q      And at that point in time, you opined that Norton

8  owed Columbia 12.9 million for fraudulent concealment.

9  True?

10  A      I do not recall the exact number.

11  Q      If we could direct your attention to your 2014 report

12  at paragraph 172, please.  Tell me when you're there, sir.

13  A      I am there.

14  Q      And your testimony -- or your report, I should say,

15  in 2014 about this 2011 transaction was that it was --

16  would have yielded $12.9 million.  True?

17  A      Roughly speaking, that's right.

18  Q      And we heard a little bit about this yesterday with

19  Dr. Cole.  That was when you were working with a different

20  set of lawyers?

21  A      There were different lawyers, different data,

22  different facts, evidence, information.

23  Q      Sure.  But the -- in 2014, which is three years after

24  when the hypothetical transaction would have occurred,

25  your number was 12.9 million?

1   A      At the time of this report, that is correct.

2   Q      And now you're number is 22 million plus, right?

3   A      Correct.

4   Q      You talked about the Columbia-Allure agreement, and

5   you used -- the math, at least, is you used the royalty

6   rates in that agreement to come up with your damages

7   number, at least in part, correct?

8   A      Correct.

9   Q      All right.  And you applied those rates to what you

10  said would have been the expected sales of Norton's DLP

11  product over the life of the '643 patent.  Fair?

12  A      Roughly, looking at the different time periods of

13  patent application versus patents.  Issued patent, that

14  is.

15  Q      And the 2.5 percent royalty for expected DLP product

16  sales, you used 2.5 from the date of the application until

17  the date that the '643 patent issued.  Fair?

18  A      Correct.

19  Q      And then you used 4 percent from the issuance date

20  until 9 years from now, until 2031?

21  A      Correct.

22  Q      Now, in the Columbia-Allure agreement, those royalty

23  rates applied only to products covered by the claims of a

24  patent or patent application.  Fair?

25  A      That's right.

Ryan Sullivan - Cross                     1844

1  Q     And that's consistent with Mr. Herskowitz's testimony

2  earlier in this trial that you generally only pay

3  royalties under a license agreement if you use the patent.

4  Fair?

5  A     I don't recall exactly what he said, but that is

6  consistent with my understanding.

7  Q     Let's --

8  A     There are different types of license agreements, but

9  that is very typical.

10 Q     All right.  So let's just put it on the screen and

11 see if we can agree that this is not only typical but also

12 applies to the Allure agreement that you're using.

13         MR. MORIN:  If we could put up the trial

14 transcript at page 460, lines 5 through 8.

15 BY MR. MORIN:

16 Q     "But for our purposes here, the important thing to

17 know is that with the patent royalties, you only pay if

18 you use the patent?"

19         Answer, "That's correct."

20         And that's consistent with your general

21 understanding?

22 A     Different agreements have different terms in terms of

23 payment of royalties.  The Allure agreement is what would

24 be considered an infringement-based agreement such that

25 the royalties are payable for the use of the technology.

1  Q    Right.  And if -- under the Allure agreement, if

2  you're not practicing any claims of either the patent

3  applications that are licensed or the patents, you pay

4  nothing in royalties, correct?

5  A    There are other terms of that agreement, including

6  equity, that is supplied on top of that, and that's

7  irrespective of that piece.  And there are other royalties

8  for other pieces.  So it's not a blanket the way you

9  suggest.

10  Q    At least in the way you apply the Allure agreement,

11  the 2.5 and the 4 percent would only apply if you practice

12  the claims.  True?

13  A    No, that's not right.

14  Q    Okay.  Let's look at the -- what you put on the

15  screen for the jury on slide 53, please.

16         MR. MORIN:  And if we could blow up the bottom

17  portion.  This is not my highlighting, just for the

18  record.

19  BY MR. MORIN:

20  Q    It says the 4 percent royalty, you've highlighted,

21  are on net sales of patent products covered by an issued

22  patent, and the royalty of 2.5 percent is for net sales of

23  patent products covered by the then pending patent

24  application.  And maybe we could put a pin in that.

25         Let's look at what "covered by" is defined as.

1   If we could go to tab 7 of your binder.  You have a binder

2   there that we've handed you.  We won't use much.

3              MR. MORIN:  And this is PX-62, for the record.

4   BY MR. MORIN:

5   Q    If we go to the first page and the definition of

6   cover, and it says, "Cover or covered by shall mean

7   infringes in the case of a claim in an issued patent, or

8   would infringe the claim if it existed in an issued

9   patent, in the case of a claim in a pending" --

10             THE COURT:  You know you're reading that really

11  fast.

12             MR. MORIN:  Sorry, Your Honor.

13             THE COURT:  We just have to keep up with you.

14             MR. MORIN:  You got it.

15             THE COURT:  I know what you're doing.

16             MR. MORIN:  Okay.

17  BY MR. MORIN:

18  Q    -- "would infringe the claim if it existed in an

19  issued patent, in the case of a claim in a pending

20  application."  Do you see that?

21  A    Yes, I do.

22  Q    All right.  So the 2.5 and the 4 percent are paid if

23  there's a sale of a product that falls within the claim of

24  either a patent application or an issued patent?

25  A    Allure pays royalties under this agreement to

1    Columbia.  I used this agreement as a reference for

2    determining what is a reasonable rate to be applied to

3    Symantec's and Norton's DLP sales, the data loss

4    prevention.  And as I explained, that is a result of the

5    defensive nature that they were utilizing the patent for,

6    to protect those sales.

7    Q    We will talk about that.  Maybe we're talking past

8    each other.  We can at least agree that under the actual

9    terms of the Allure agreement, these 2.5 and 4 percent

10   royalties were only due if a product practiced the claim

11   of a pending application or issuing patent.  Is that fair?

12   A    That's correct.

13   Q    Okay.  And you don't have any evidence or information

14   that at least as of 2011 anyone intended to practice the

15   technology or practice the claims in the '643 patent

16   application.  Fair?

17   A    I disagree.

18   Q    All right.  You certainly didn't have any evidence or

19   information that Symantec infringed or practiced the

20   claims of the '643 at that time, correct?

21   A    I have not made an opinion or come to a conclusion on

22   infringement or practicing.  However, there is evidence

23   that Symantec was considering and evaluating practicing

24   the particular technology claimed in the '643 patent.

25   Q    Right.  And when you talk about the -- you talked

Ryan Sullivan - Cross                    1848

1  about the '643 patent being used as a defensive patent.

2  Do you recall that?

3  A     Yes.

4              MR. MORIN:  And if we could go to the slide that

5  you put up, which is slide 51.

6  BY MR. MORIN:

7  Q     And this is based on an e-mail from Dr. Dacier to

8  Darren Shou; is that correct?

9  A     That's right.

10  Q     And is it true that in the million plus, I believe,

11  pages of documents produced in the case, this is the only

12  document that you point to in your report or in your

13  examination that anyone at Norton intended to use this as

14  a defensive patent?

15  A     I recall testimony in this regard from Mr. Dacier.

16  Other documents I just don't have committed to memory.

17  Q     All right.  You don't -- you're free to look at your

18  report, but I will represent to you my belief that the

19  only thing you cite to on the value or the use of this as

20  a defensive patent is one line from one e-mail.  Do you

21  have reason to believe otherwise that you cited to

22  anything else?

23  A     That was compound, two different things about value

24  and defensiveness.  The value from being defensive I'll

25  take your representation, but there's other value that I

 1  identify.

 2  Q     Okay.

 3           MR. MORIN:  We can take that down.

 4  BY MR. MORIN:

 5  Q     You discussed that this hypothetical transaction

 6  would have been in April of 2011 when the nonprovisional

 7  patent application was filed?

 8  A     April 2011, that's correct.

 9  Q     And let's again reorient ourselves.  There's no

10  assumption of validity, right?

11  A     That's right.

12  Q     And so we need to put ourselves back in the room with

13  how Columbia and Norton were looking at this technology at

14  the time.  Fair?

15  A     That's right.  That's why the Columbia-Allure

16  agreement is so informative because it too does not

17  reflect an assumption of infringement or validity of those

18  patents.

19  Q     Right.  But separate and aside from that, we should

20  do our best, and the jury should do its best, to try to

21  put ourselves in the room, what did people think of the

22  value of this application, what would they have demanded

23  for it.  Is that fair?

24  A     For the patent application.

25  Q     And we actually know a little something of what we

1  thought about the patent application from the record,

2  don't we?

3  A     There's a number of things.

4  Q     And let's take a look at tab 2 in the binder, DX-AP.

5              THE COURT:  DX?

6              MR. MORIN:  AP.  Apple, paul, Your Honor.

7              THE COURT:  Thanks.

8  BY MR. MORIN:

9  Q     And this is an e-mail when a provisional patent

10  application was being discussed, and Dr. Stolfo e-mails

11  that, "I don't think we should file a patent application.

12  There is prior art well before the discussions between

13  Marc and Angelos.  I have it well documented."  Do you see

14  that?

15  A     I do.

16  Q     All right.  And what they are saying when they're

17  saying there was prior art well before the discussions,

18  they're saying they don't think that this would be a valid

19  patent?

20  A     It's not how I would interpret this.

21  Q     They say they don't think we should file a patent

22  application, right?

23  A     Yes.  And there's good reason.

24  Q     And it says, "There is prior art."  And that's

25  something that comes before the patent, right?

Ryan Sullivan - Cross                    1851

1  A    Yes.

2  Q    Okay.  And then Columbia said it thought it already

3  had patent applications covering the same technology.  Do

4  you recall that?

5       MR. BEENEY:  Object to that.  I don't think

6  there's any evidence of that, Your Honor.

7       THE COURT:  You can show evidence.  So that's

8  sustained to the extent --

9       MR. MORIN:  Of course, Your Honor.

10 BY MR. MORIN:

11 Q    If we could look at the next bit of this.  Mr. Chu,

12 from the Columbia technology office says that he's

13 reviewed his dockets and we have this area pretty solidly

14 covered, and it finishes with the idea that, "I'm of the

15 opinion that there is not much, if anything, left to

16 claim."  Do you see that?

17 A    I do.

18 Q    And Mr. Chu there was saying that they had already

19 covered this technology with prior applications and that

20 there was not much, if anything, left to claim, right?

21 A    No.  And this is where the fraudulent concealment as

22 alleged affects the patenting that proceeded, because the

23 process, as that works, is with the '643 patent being

24 prosecuted, that impacts the inventions of which could be

25 patented by Columbia for their applications.

Ryan Sullivan - Cross                1852

1  Q    Your opinion, just so we're clear, is that the later

2  filed patented applications would constrain what Columbia

3  could do in its earlier filed patent applications.  Is

4  that your testimony?

5  A    No, that's not what I stated.

6  Q    And there are points in these e-mails, and we heard

7  testimony on this last week, was they thought that they

8  already disclosed and put into patent applications these

9  same things.  Fair?

10 A    I wouldn't use the term "same things," but there are

11 similar concepts, and that is the issue.

12 Q    And even as a result of that, with them saying we've

13 got everything covered and there's prior art, your

14 testimony is that they demand $22 million.  Fair?

15            THE COURT:  There's an objection.

16            MR. BEENEY:  Mischaracterizes the document.

17            THE COURT:  Pardon me?

18            MR. BEENEY:  Mischaracterizes the document.

19 What Mr. Chu says is, "I am of the opinion there is not

20 much, if anything, left to claim."

21            THE COURT:  Right.  You can't say everything is

22 covered when he didn't say that.

23            MR. MORIN:  In that case, Your Honor, I'll pass

24 the witness.  I have no further questions.

25 BY MR. MORIN:

1  Q     It was nice to see you, Dr. Sullivan.

2  A     Thank you.

3              MR. BEENEY:  We have nothing, Your Honor.  Thank

4  you.

5              THE COURT:  All right.  May this witness be

6  excused?

7              MR. BEENEY:  For Columbia, yes, Your Honor.

8              MR. MORIN:  Thank you, Dr. Sullivan.

9              THE COURT:  Yes.  All right.  Sir, well, you're

10  excused.  We appreciate your time and your patience, and

11  we wish you well.  Thank you.

12              THE WITNESS:  Thank you.

13              (Witness stood aside.)

14              THE COURT:  Are we prepared to go forward with

15  the next witness?

16              MR. GROSS:  I've learned my lesson to come up to

17  the mic now.

18              THE COURT:  You know what.  It's not catching

19  your voice.  I don't know why.

20              MR. GROSS:  How about now?

21              THE COURT:  A little better.

22              MR. GROSS:  I can hear the echo now.

23              Columbia and Norton call the next witness,

24  Corina Mutu, by videotape deposition.

25              THE COURT:  All right.  And do we have

1    transcripts?

2            MR. GROSS:  I apologize, Your Honor.  I forgot

3    to hand this up.  These are the corrections to -- all four

4    transcripts that will be played.  I gave them to our

5    colleagues the other day, and they had no comments on

6    them.

7            THE COURT:  All right.  Mr. Wigley, do I have

8    the transcripts?

9            MR. GROSS:  I handed them to your courtroom

10   deputy this morning.

11           THE COURT:  Oh.  Never mind.  Yes, I do have the

12   transcript.

13           Okay.  Bless you, whoever just sneezed.  I

14   think.

15           Thank you, sir.

16           (Video deposition of Corina Mutu was played.)

17           THE COURT:  Now, I'm going to ask, can you all

18   hear this?  It's pretty light.  Everybody can hear?  Yes?

19           Okay.  Sorry.  Better safe than sorry.

20           All right.  Does anybody object to how that

21   testimony was presented?

22           MR. LUMISH:  No objections from Norton,

23   Your Honor.

24           THE COURT:  I just want to remind the jury that

25   any video that you see includes testimony that is offered

1   both by Columbia and by Norton.

2            Okay.

3            MR. GROSS:  May I approach to --

4            THE COURT:  Please do.

5            MR. GROSS:  Columbia calls its next witness,

6   Dermot Wall, by videotape deposition, which contains

7   designations from both parties.

8            Mr. Wall testified as a 30(b)(6) witness on

9   behalf of Norton on the following topics:  The identity,

10  location, role or title and reporting chain for

11  individuals involved in the conception, design,

12  development and testing of Norton's software, and the

13  value of SONAR to malware detection in Norton's software.

14           THE COURT:  Okay.  Thank you.  Again, this is

15  offered by both Columbia and Norton.

16           (Video deposition of Dermot Wall was played.)

17           THE COURT:  All right.  Does anybody object to

18  how that testimony was presented?

19           MR. LUMISH:  No objection from Norton,

20  Your Honor.

21           THE COURT:  All right.  Now, I know we have a

22  couple more deposition testimonies, but this would be when

23  we'd take a break.  Is there any objection to that?

24           MR. BEENEY:  No, Your Honor.  Thank you.

25           MR. LUMISH:  No objection.

1856

1        THE COURT:  All right.  I think we'll stretch a

2   little bit.  It's 4:00.  We'll -- we'll come back at 4:20.

3        (The jury exited the courtroom.)

4        MR. LUMISH:  May I ask one question, Your Honor?

5        THE COURT:  Certainly.

6        MR. LUMISH:  May I approach?

7        THE COURT:  Of course.

8        MR. LUMISH:  Our understanding is that after the

9   next round of video, which, by my count, runs somewhere

10  around 45 minutes or 50, that plaintiff is going to rest.

11       Our first witness is ready to come today, but

12  I'm assuming, based on the break, that we don't need him

13  to sit around in a suit for the rest of the afternoon.

14       THE COURT:  No.

15       MR. LUMISH:  Thank you, Your Honor.

16       MR. BEENEY:  I guess I just stood corrected for

17  the record.  We're not going to rest because we're

18  bringing in some of the testimony in our case through

19  Norton's witnesses as well.

20       THE COURT:  Right, which you both established

21  before.

22       MR. BEENEY:  Yes.

23       THE COURT:  That's why there's not going to be a

24  motion, right.  So I think these last videos will be it,

25  and then we will start tomorrow fresh.  All right?

1857

1      And who is the first witness?

2              MR. LUMISH:  David Kane.

3              THE COURT:  Kane.  That's right.  Mr. Kane.

4              All right.  Okay.  So we'll take a recess until

5      4:20.

6              (Recess taken at 3:55 p.m.)

7              (The trial continues on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The trial resumed at 4:20 p.m.)

2    THE COURT:  So we're continuing with

3  deposition testimony; is that correct?

4    MR. GUZIOR:  Yes, Your Honor, that's correct.

5    THE COURT:  All right.  So we'll bring the

6  jury in.

7    (The jury entered the courtroom.)

8    THE COURT:  All right.  Ladies and gentlemen,

9  this is the last round for today.  You're going to

10  hear some more deposition testimony.  And I don't have

11  to tell anybody here that they're still under oath,

12  but I need to tell you that for both of these, that

13  these videos include testimony offered by both

14  parties.  All right?

15    MR. GROSS:  May I approach, Your Honor?

16    THE COURT:  Please do.

17    MR. GROSS:  Norton and Columbia call the next

18  witness, Linda Brennan, by videotape deposition, which

19  includes designations by both parties.

20    Ms. Brennan testified as a 30(b)(6) witness

21  on behalf of Norton on the following topics:

22    The distribution of Norton's software,

23  including the creation and maintenance of electronic

24  master versions, golden disk versions, and/or master

25  disk versions of the Norton software, where Norton

creates, tests, and maintains master versions, and

2 from where such versions are sent to others via file

3 transfer or any other method, and the distribution of

4 any updates to Norton software.

5      In addition, Ms. Brennan testified as a

6 30(b)(6) witness on the topic of Norton's historical

7 and current arrangement with Akamai, Verizon Digital

8 Media Services or any other content delivery network

9 or any replicator for Norton software distributed

10 other than as a digital download, including from where

11 Symantec sends master versions to such parties to the

12 extent it concerns distribution.

13      And the final topic on which Ms. Brennan

14 testified as a 30(b)(6) witness on behalf of Norton

15 was whether and how a non-U.S. customer purchasing or

16 operating Norton software will interact directly or

17 indirectly with Norton customers or other equipment in

18 the United States and how payment from non-U.S.

19 customers flows into Norton to the extent it concerns

20 distribution.

21      THE COURT:  All right.  Are we prepared to go

22 forward?  You can play the video.

23      (A video deposition of Linda Brennan is

24 played at this time.)

25      THE COURT:  Does anybody have any objection

1    about how that testimony went in?

2            MR. LUMISH:  No objection, Your Honor.

3            MR. GROSS:  May I approach?

4            THE COURT:  Yes.  No objection, right?

5            MR. GROSS:  No objection.

6            THE COURT:  All right.  You may approach.

7            MR. GROSS:  Thank you all for your patience.

8            The last witness for today, Columbia calls

9    its next witness, Pedro Reyes, by videotaped

10   deposition, which includes designations from both

11   parties.

12           Mr. Reyes testified as a 30(b)(6) witness on

13   behalf of Norton on the following topic:

14           The manufacturing, mastering, testing, and

15   distribution of Norton's software including:

16           (1)  The creation and maintenance of

17   electronic master versions, golden disk versions,

18   and/or master disk versions of Norton software;

19           (2)  Where Norton creates, tests, and

20   maintains master versions, and from where such

21   versions are sent to others via file transfer or any

22   other method; and

23           (3)  The creation, maintenance, testing, and

24   distribution of any updates to Norton's software.

25           The parties agree that Mr. Reyes' testimony

1   about the build and certification of the accused

2   consumer products also applies to the accused

3   enterprise products.  This includes Mr. Reyes'

4   testimony about interactions with Perforce.

5           And for the record, the page and lines from

6   the deposition transcript to which this agreement

7   applies are page 18, lines 15 through 20; page 28,

8   lines 5 through 13; page 35, lines 5 through 21; page

9   36, lines 15 through 25; page 47, line 7 through 15;

10  page 46, lines 21 through 25; and page 47, line 4

11  through page 48, line 2.

12          THE COURT:  Thank you.

13          (A video of the deposition of Pedro Reyes is

14  played.)

15          THE COURT:  We can't hear that.  Can you all

16  hear that?  No, it's still pretty light.

17          THE CLERK:  I just turned it up all the way.

18          (The videotape deposition of Mr. Reyes is

19  resumed.)

20          THE COURT:  Does that conclude that

21  testimony?

22          MR. GROSS:  Yes, it does, Your Honor.

23          THE COURT:  Any objection to how it came in?

24          MR. LUMISH:  No objection from Norton, Your

25  Honor.

1862

1   　　　　　MR. GROSS:  No objection from Columbia, Your

2   Honor.

3   　　　　　THE COURT:  All right.  Certainly we're near

4   the end of the day.  Is this a good breaking point?

5   It looks as if it is.

6   　　　　　MR. BEENEY:  I think so, Your Honor.

7   　　　　　THE COURT:  Okay.  All right.  We will break

8   for the day.  And we will see you again tomorrow

9   morning.

10  　　　　　Can we tell the jurors to come in at

11  nine o'clock, or do we have morning issues that we

12  should take care of and make sure they don't wait?

13  　　　　　MR. BEENEY:  So depending upon how early Your

14  Honor would like to get started, I think we conferred

15  and thought that the morning issue might take

16  something like 45 minutes.

17  　　　　　So whenever Your Honor would like to get

18  started, plus 45, might be a convenient time for the

19  jury.

20  　　　　　THE COURT:  Okay.  So I'll ask you all to

21  report at 9:30.  We usually get together about an hour

22  before you normally come in.  And so if you could be

23  ready to go at 9:30.

24  　　　　　You guys promise me that we're going to be

25  ready to go at 9:30 if we start at eight?

1   MR. BEENEY:  I think given Your Honor's
2   promise to the jury, we must absolutely get started at
3   9:30, not 9:31.  9:30.
4   MR. LUMISH:  Agreed, Your Honor.
5   THE COURT:  Okay.  Good.
6   We do our best.  They're doing their best.
7   I'm doing my best.  I want you all to know that.  So
8   we will see you tomorrow at 9:30.
9   Again, deliberation hasn't started.  Just
10  absorb it, and you'll get more information.  And once
11  you have that and my instructions on the law, that's
12  when you can start considering things, but not yet,
13  and not yet talking about it.  All right?
14  You all be very safe.
15  Please remain seated while the jury leaves
16  the courtroom.
17  (The jury exited the courtroom at 5:25 p.m.)
18  THE COURT:  All right.  So we're going to
19  have -- did you have something you wanted to say,
20  Mr. Lumish?
21  MR. LUMISH:  I'll wait until you're done.  I
22  did have something I wanted to ask you, though.
23  THE COURT:  Go ahead and ask.
24  MR. LUMISH:  May I approach?
25  THE COURT:  Yes.

1864

1       MR. LUMISH:  Your Honor, our case we expect

2   to go quite quickly.  So we could easily be done with

3   witnesses by lunchtime on Monday.

4       So one question I have for you is whether we

5   should be prepared to close Monday afternoon if that

6   were to happen?

7       THE COURT:  I think I'd like to use the

8   jury's time as best as possible.  So the answer would

9   be yes.

10      MR. LUMISH:  That would be our preference as

11  well.  Thank you.

12      Second would be Mr. Morin and I are still

13  discussing it, but we may choose to split the closing

14  if Your Honor doesn't object to that.  We have spoken

15  with opposing counsel.  They were fine with it.  They

16  didn't object anyway.  But I wanted to make sure that

17  was something Your Honor would be okay with.

18      THE COURT:  Yeah.  We don't normally do that,

19  but that's fine.  I want you all to present the case

20  as best you can.

21      MR. LUMISH:  And then last issue, this is

22  more just a notice to Your Honor which is there was a

23  whole dispute about some tutorial slides from the

24  other side that you may remember in the limines, them

25  seeking to strike a tutorial that they had provided to

1    Your Honor.

2            THE COURT:  Right.

3            MR. LUMISH:  Those, I think, you will see in

4    our slides for Dr. Jaeger, having discussed it with

5    opposing counsel, having read Your Honor's comments

6    and concerns about those slides and wanting to avoid

7    any trouble, we're not going to use those slides.  I

8    just wanted to let you know that.  So when you see

9    them in Dr. Jaeger's material, we're not planning to

10   use them.

11           THE COURT:  All right.  That's actually good

12   to know.  Not that you care, but I think that's an

13   appropriate outcome.

14           MR. LUMISH:  We care very much, Your Honor.

15   So that was all I had.  I think Mr. Morin had a

16   question for you as well on the damage's front.

17           THE COURT:  Sure.

18           MR. MORIN:  May I approach, Your Honor?

19           THE COURT:  Of course.

20           MR. MORIN:  This is only for the purposes of

21   the record.  Limine decisions are technically kind of

22   temporary decisions that can be revisited.  We're

23   looking at streamlining our case, and I just want to

24   get confirmation from the Court that the limine and

25   *Daubert* decisions will be enforced and strictly

1    enforced for the remainder of the trial so that we can

2    make our decisions based upon that, Your Honor.

3         THE COURT:  I can't imagine why they would

4    not be.  I certainly don't have anybody asking me to

5    change them.  I know there are objections, but I have

6    no intention to do anything but enforce them as they

7    stand.

8         MR. MORIN:  Okay.  We just wanted to have

9    that on the record so we could streamline our case.

10        Before the close of our case, I expect we'll

11   make an offer of proof, again, to preserve the record.

12   Would Your Honor prefer that be made writing so as not

13   to take up time reading it in court?  We'd be happy to

14   do that.  It won't be argument.  It's just placing

15   things on the record.  But we wanted to do it how Your

16   Honor would prefer.

17        THE COURT:  Right.  I think having it on the

18   record is fine.  Go ahead unless Columbia objects.

19        MR. BEENEY:  No, Your Honor.

20        THE COURT:  All right.  I think if that

21   streamlines it, it also creates an easier record for

22   you all to access should anybody revisit this after we

23   finish.

24        MR. MORIN:  So we'll do it in writing before

25   the close of the case?

1   THE COURT:  Yes.

2   MR. MORIN:  And one last -- I just wanted to

3   be fair.  Your Honor had asked about witnesses.  In

4   view of the *Daubert* and limine decisions and the other

5   instructions Your Honor has given us, we're not going

6   to call Mr. Hosfield.  So we figured we'd give you and

7   our friends on the other side the heads-up as to that.

8   So that will limit the number of witnesses that we

9   have remaining.

10   THE COURT:  All right.  Okay.  So we're

11   starting with Mr. Kane, correct?

12   MR. MORIN:  Correct, Your Honor.

13   THE COURT:  Do you care about who you're

14   saying is next?  I don't want you to give up your

15   strategy.

16   MR. LUMISH:  Thank you, Your Honor.  I think

17   we've disclosed to them at least Mr. Kane and

18   Dr. Jaeger.

19   THE COURT:  Okay.

20   MR. LUMISH:  So I believe they know at least

21   that.

22   MR. BEENEY:  And one more after that.

23   MR. LUMISH:  And then Dr. Nielson is third,

24   yes.

25   THE COURT:  Okay.  All right.  So that's just

1   helpful to know, but I know that you all -- I don't

2   want you to go beyond what you're required to.  I'm

3   happy to hear things privately if that's better for

4   you.

5         All right.  So we will start at eight

6   tomorrow, and that is the discussion about

7   Dr. Jaeger's -- what Columbia suggests might be claim

8   construction but that you all have agreed on the use

9   of the exhibit.  So that's no longer before me; is

10  that correct?

11        MR. BEENEY:  Correct, Your Honor.  I believe

12  the only issue for the Court are the Jaeger slides.

13        And if Your Honor would prefer, maybe Your

14  Honor wants some time to consider the arguments, but

15  we will commit to getting this done if Your Honor

16  wants to start at 8:30 instead.  We will not keep the

17  Court more than 45 minutes, period, if that's what you

18  would prefer to do, but it's up to you.

19        THE COURT:  I actually might prefer to start

20  at eight just so that if I want -- I'll tell you, the

21  slides are not obviously claim construction when you

22  look at the pictures on them.  And so I might take a

23  moment just to review what it is you're arguing and

24  then come back and rule.  Maybe I'll be able to do it

25  right off the bat.  Then if I do, perhaps folks can

1  get some coffee, and then we'll start at 9:30.

2          MR. MORIN:  Thank you, Your Honor.

3          THE COURT:  Yes.

4          MR. GUZIOR:  Your Honor, just two

5  housekeeping matters.  Would you prefer that I

6  approach?

7          THE COURT:  Please, it's so much easier for

8  my --

9          MR. GUZIOR:  I like to keep it simple for

10 Ms. Daffron.

11         First, on the argument tomorrow morning for

12 claim construction, I put together a binder for myself

13 of Judge Spencer's 2014 claim construction, the

14 submissions he received, including things like

15 Symantec's *Markman* presentation, and I thought it

16 might be helpful, because I thought it was helpful for

17 me, if you'd like to receive it tonight.  I made

18 copies, and we can give you two copies, and we'll give

19 copies to opposing counsel as well.

20         THE COURT:  That would certainly be helpful,

21 I think.

22         MR. GUZIOR:  We'll make sure you get that

23 tonight.

24         THE COURT:  Okay.

25         MR. GUZIOR:  The second question is just

1  logistics.  There hasn't been a huge amount of

2  impeachment in the trial so far.  It's sort of

3  remarkably absent.  So I just wanted to get Your

4  Honor's preference when it's a fact witness on

5  deposition video.

6       Would you prefer that, you know, if the

7  witness is going to be impeached, I first give the

8  witness time to look at the transcript, and Your

9  Honor, and opposing counsel, and then we play the

10  video?  Or if there's impeachment and it's pretty

11  clear, go right to video?

12       THE COURT:  Do you all have any kind of

13  agreement with respect to that?

14       MR. GUZIOR:  We don't, Your Honor.  I was

15  going to defer to the Court's preferred procedure.

16       THE COURT:  I think perhaps giving them an

17  opportunity and then going to video is the appropriate

18  way to go.  Is that your question?

19       MR. GUZIOR:  Yes.  So I'll just reference the

20  deposition transcript page and line, give it a moment

21  for people to stand up, and then hearing nothing will

22  go ahead with the video.

23       THE COURT:  Yes.  Agreed?

24       MR. LUMISH:  That sounds right to us, Your

25  Honor.  We would like an opportunity to make sure it's

1  really impeaching and lodge an objection if it were

2  not.

3         THE COURT:  Absolutely.  All right.  Okay.

4         MR. GUZIOR:  Thank you, Your Honor.

5         THE COURT:  All right.  Thank you.

6         Wow.  Folks need their exercise tonight.

7         MR. BEENEY:  I'm sorry for imposing on the

8  Court.

9         THE COURT:  No, that's fine.

10         MR. BEENEY:  I have a question that, if I may

11  pose, and it is sincerely only intended for

12  informational purposes only.  And that is for our own

13  planning purposes, Your Honor, and given that Norton

14  is starting its case in the morning, I just wondered

15  if the Court had a sense of when we might be hearing

16  on the remaining Dacier issue.

17         THE COURT:  It will not be tomorrow.  I think

18  it will be probably Saturday, just so you know.

19         MR. BEENEY:  That's helpful.  Thank you.

20         THE COURT:  My poor clerks.  I should say

21  Saturday or Sunday.  They're working really hard.  I

22  know you all are, too.  We're all working hard.  So

23  I'm going to say over the weekend, for their sake.

24         All right.  Then is that everything?

25         So now does everybody get to stand up because

1872

1    I do?  Are you ready?

2              (Recess taken at 5:35 p.m.)

3              (The trial resumes on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1873

```
1        THE CLERK:  This is Kathy Hancock in
2   Judge Lauck's chambers.  We are doing the record review
3   for April the 21st, confirming the exhibits that were
4   entered today and the demonstratives that were entered.
5        So we started the day with the redirect of
6   Eric Cole, and I have PX-511 and PX-1000 as demonstrative.
7        And then we start with Dr. Ryan Michael
8   Sullivan.  We used PX-324, PX-531, PX-535, PX-566, PX-83,
9   PX-541, PX-170, PX-530, PX-506, PX-350, PX-461, PX-62,
10  PX-567, PX-568, PX-569, PX-570, PX-617, PX-618, PX-619,
11  PX-620, PX-621, PX-575, PX-576, PX-577, PX-578, PX-579,
12  PX-843, PX-844, PX-845, PX-846, PX-847, PX-848, PX-849,
13  PX-850, PX-851, PX-852, and PX-853.
14       So that was a lot.  Am I on the right track with
15  you?
16       MR. STRETTON:  I just wanted to confirm a few
17  with you, if that's all right.
18       THE CLERK:  Yeah.
19       MR. STRETTON:  So PX-627.
20       THE CLERK:  Okay.  I don't think I said -- did I
21  say 627?  I don't have 627.
22       MR. STRETTON:  I don't think I heard it, but I
23  have that on my list.
24       THE CLERK:  Okay.  We need to confirm that one,
25  then.
```

1874

1    MR. STRETTON:  And these ones you might have

2    said and I didn't quite hear it, but PX-325.

3    THE CLERK:  No.  I have 324.

4    MR. STRETTON:  Okay.  I have 324 as well.  So

5    let me ask, that one was already admitted, but it was

6    referenced today.

7    THE CLERK:  Yeah.  For Mr. Sullivan?

8    MR. STRETTON:  For Mr. Sullivan, yes.

9    THE CLERK:  Yeah.  So let's just put it on there

10   so we have both.

11   MR. STRETTON:  Okay.  PX-315.

12   THE CLERK:  I don't have that one either.

13   Do you have that one?

14   MS. NGUYEN:  I wasn't here even in the room so

15   I'm going to have to double-check everything.

16   THE CLERK:  All right.  We're going to need to

17   double-check that one too because I don't have that one.

18   MR. STRETTON:  PX-541.

19   THE CLERK:  I have that.

20   MR. STRETTON:  Okay.  PX-530.

21   THE CLERK:  I have that.

22   MS. NGUYEN:  I have that too.

23   MR. STRETTON:  And then there's just this range

24   I want to make sure we have.  It's PX-531 through 535.

25   THE CLERK:  I have 531, and I have 535.  I

1  didn't get 532 -- so I just have a dash there.  So we can

2  put those all on there.  532.

3          Okay.  The other ranges are good?

4          MR. STRETTON:  I believe so, but like I said, it

5  would be great if we could also confirm.

6          THE CLERK:  Yeah.  Because like you said, he

7  said blocks.

8          All right.  Mr. Sullivan's cross, I have PX-62,

9  PX-461, DX-AP.

10          MS. NGUYEN:  Uh-huh.

11          THE CLERK:  And then we have Joint Exhibit JTX-7

12  is the video deposition of Corina Mutu.  JTX-8 is the

13  video deposition of Dermot Wall.  JTX-9 is the video

14  deposition of Linda Brennan, and JTX-10 is the video

15  deposition of Pedro Reyes.

16          MS. NGUYEN:  And Norton would like to move its

17  exhibits into evidence from cross.

18          THE CLERK:  From cross?

19          MS. NGUYEN:  Yeah.

20          THE COURT:  Okay.  I can't do that.  So the

21  judge has to do that.

22          MS. NGUYEN:  Oh, I thought the procedure was

23  just to say it, like, here.

24          THE CLERK:  We get it --

25          MS. NGUYEN:  Oh.

1      THE CLERK:  We confirm what we have put on the

2  record, and the parties actually just have -- if DX-AP is

3  not admitted as evidence, then they have to move it in as

4  evidence.

5      MS. NGUYEN:  Okay.

6      THE CLERK:  I mean, I think -- the way I

7  understood it was unless they are objected to, that it was

8  entered.

9      MS. NGUYEN:  Okay.

10      THE CLERK:  So it's probably already entered

11  unless there was some type of an objection about it.

12      MS. NGUYEN:  Okay.  There wasn't that I heard.

13      THE CLERK:  Okay.  Then it's already admitted.

14      MS. NGUYEN:  Okay.  Just checking.  Well --

15  yeah, just checking.

16      THE CLERK:  We're just here to confirm that what

17  we put on the record matches what I have on the record and

18  that we're all in agreement as to what's demonstrative and

19  what's been entered.

20      MS. NGUYEN:  Okay.

21      THE CLERK:  So if DX-AP is not objected to in

22  any way, then it is entered.

23      MS. NGUYEN:  Okay.  All right.  Sounds good.

24      THE CLERK:  Does that sound?

25      MS. NGUYEN:  Yep.

1877

1        MR. STRETTON:  I think it was already brought in

2   with Stolfo as well so --

3        THE CLERK:  Yes.

4        (The trial adjourned at 5:45 p.m.)

5

6                 REPORTER'S CERTIFICATE

7      I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

8   the Commonwealth of Virginia at large, and whose

9   commission expires September 30, 2023, Notary Registration

10  Number 7108255, do hereby certify that the pages contained

11  herein accurately reflect the stenographic notes taken by

12  me, to the best of my ability, in the above-styled action.

13     Given under my hand this 21st day of April 2022.

14                    _____/s/_____

15                    Tracy J. Stroh, RPR

16                    _____/s/_____

17                    Krista Liscio Harding, RMR

18                    _____/s/_____

19                    Diane J. Daffron, RPR, CCR

20

21

22

23

24

25

1878

```
 1                    I N D E X

 2                    WITNESSES

 3  Examination By:                               Page

 4               ERIC COLE
    Redirect    - MR. GUZIOR                      1684
 5               RYAN SULLIVAN
    Direct      - MR. BEENEY                      1698
 6  Cross       - MR. MORIN                       1817
                 CORINA MUTU
 7  Video                                         1854
                 DERMOT WALL
 8  Video                                         1855
                 LINDA BRENNAN
 9  Video                                         1859
                 PEDRO REYES
10  Video                                         1861

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```