**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>*Plaintiff*<br><br>v.<br><br>NORTONLIFELOCK INC.,<br><br>*Defendant* | Civil Action No. 3:13-cv-00808-MHL |

## DEFENDANT NORTONLIFELOCK INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A NEW TRIAL

# TABLE OF CONTENTS

**Page**

I.      Introduction ...................................................................................................................1

II.     Legal Standard .............................................................................................................1

III.    Argument ......................................................................................................................2

    A.      The Court Should Grant A New Trial On Damages.............................................2

        1.      The Court's Daubert and Limine Rulings Were Prejudicial Error .............3

        2.      The Court's Mid-Trial Ruling Further Excluding Norton's Damages Experts Was Prejudicial Error....................................................12

        3.      The Court's Rulings Restricting Norton's Cross-Examination and Closing Argument Were Prejudicial Error ...............................................13

        4.      The Jury Instruction Regarding Foreign Sales Was Prejudicial Error .........................................................................................................23

    B.      A New Trial Is Also Warranted On Liability Because Of The Court's Missing Witness and Curative Instructions ........................................................24

    C.      If The Court Denies Norton's Rule 50(b) Motion, Norton Alternatively Requests A New Trial On Each Issue ..................................................................26

IV.     Conclusion ..................................................................................................................27

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Allred v. Maersk Line, Ltd.*,
   35 F.3d 139 (4th Cir. 1994) ....................................................................................2

*Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*,
   490 F. Supp. 3d 593 (E.D.N.Y. 2020) ...................................................................14

*Amgen Inc. v. Hospira, Inc.*,
   No. CV 15-839-RGA, 2017 WL 3927600 (D. Del. Sept. 7, 2017), *recons. granted, judgment
   vacated in part on other grounds*, No. CV 15-839-RGA, 2017 WL 10088325 (D. Del. Sept.
   20, 2017), and *aff'd*, 944 F.3d 1327 (Fed. Cir. 2019) ..............................................6

*Austin v. Knowlton*,
   234 A.D.2d 918, 651 N.Y.S.2d 795 (1996) ...........................................................25

*Bank of Montreal v. Signet Bank*,
   193 F.3d 818 (4th Cir. 1999) ...............................................................................3, 8

*Banks v. Harris*,
   238 Va. 81, 380 S.E.2d 634 (1989)........................................................................25

*BASF Corp. v. Aristo, Inc.*,
   No. 2:07 CV 222 PPS, 2012 WL 2529213 (N.D. Ind. June 29, 2012)....................6

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Organisation*,
   28 F.4th 1247 (Fed. Cir. 2022) ...............................................................................2

*Bayer Healthcare LLC v. Baxalta Inc.*,
   989 F.3d 964 (Fed. Cir. 2021)................................................................................17

*Bryant v. Aiken Reg'l Med. Ctrs. Inc.*,
   333 F.3d 536 (4th Cir. 2003) ..................................................................................1

*Buckley v. Mukasey*,
   538 F.3d 306 (4th Cir. 2008) ..................................................................................3

*CardiAQ Valve Techs., Inc. v. Neovasc Inc.*,
   708 F. App'x 654 (Fed. Cir. 2017) ..........................................................................6

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
   No. CIV.A. 09-290, 2012 WL 5416440 (W.D. Pa. Nov. 2, 2012) .........................12

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...............................................................................................18

ii

*Davis O'Leary VI, Ltd. v. Peterson Contractors, Inc.*,
    No. 1:15-cv-0518, 2019 WL 8895244 (N.D. Ga. Feb. 25, 2019)...........................................26

*Dennis v. Columbia Colleton Med. Ctr., Inc.*,
    290 F.3d 639 (4th Cir. 2002) .................................................................................................1

*Douglas v. Owens*,
    50 F.3d 1226 (3d Cir. 1995)...................................................................................................13

*E. Tenn. Nat. Gas Co. v. Thomas*,
    298 F. App'x 261 (4th Cir. 2008) ..........................................................................................27

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*,
    927 F.3d 1292 (Fed. Cir. 2019)..............................................................................................10

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014)..............................................................................................10

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018)..............................................................................................12

*Fromson v. W. Litho Plate & Supply Co.*,
    853 F.2d 1568 (Fed Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer
    Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004)....................................5

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970).........................................................................................3

*Gill v. Rollins Protective Servs. Co.*,
    836 F.2d 194 (4th Cir. 1987) .................................................................................................27

*Harbor Ins. Co. v. Schnabel Found. Co.*,
    946 F.2d 930 (D.C. Cir. 1991) ...............................................................................................13

*Harris v. State*,
    458 Md. 370, 182 A.3d 821 (2018) ........................................................................................25

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).........................................................8

*Info-Hold, Inc. v. Muzak LLC*,
    783 F.3d 1365 (Fed. Cir. 2015)..............................................................................................18

*Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*,
    No. CV 2:07CV589, 2009 WL 10689350 (E.D. Va. June 23, 2009), *aff'd*, 374 F. App'x 955
    (Fed. Cir. 2010).....................................................................................................................19

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .......................................................................5, 6, 7

*Macsherry v. Sparrows Point, LLC*,
  973 F.3d 212 (4th Cir. 2020) ..............................................................................2, 8

*Markovich v. Bell Helicopter Textron, Inc.*,
  805 F. Supp. 1231 (E.D. Pa.), *aff'd*, 977 F.2d 568 (3d Cir. 1992).........................25

*Microsoft Corp. v. AT&T Corp.*,
  550 U.S. 437 (2007).........................................................................................23, 24

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*,
  288 F. Supp. 3d 872 (E.D. Wis. 2017).....................................................................14

*Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*,
  174 F.3d 801 (6th Cir. 1999), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d
  650 (6th Cir. 2009).................................................................................................26

*Persinger v. Norfolk & W. Ry. Co.*,
  920 F.2d 1185 (4th Cir. 1990) ...................................................................................2

*PSN Ill., LLC v. Abbott Lab'ys.*,
  No. 09 C 5879, 2012 WL 5381278 (N.D. Ill. Oct. 31, 2012) ....................................6

*Riverwood Int'l Corp. v. R.A. Jones & Co.*,
  324 F.3d 1346 (Fed. Cir. 2003)..................................................................................1

*RSA Protective Techs, LLC v. Delta Sci. Corp.*,
  No. LACV1906024JAKPLAX, 2021 WL 4978462 (C.D. Cal. Oct. 20, 2021) ...............18, 22

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*,
  289 U.S. 689 (1933).....................................................................................................5

*State v. Houser*,
  196 Wash. App. 486, 386 P.3d 1113 (2016)............................................................25

*Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*,
  172 F.3d 44 (4th Cir. 1999) .......................................................................................18

*United States v. Lefsih*,
  867 F.3d 459 (4th Cir. 2017) .....................................................................................17

*United States v. Saenz*,
  134 F.3d 697 (5th Cir. 1998) .....................................................................................26

*United States v. Sepulveda*,
  15 F.3d 1161 (1st Cir. 1993).......................................................................................2

*Wickersham v. Ford Motor Co.*,
   997 F.3d 526 (4th Cir. 2021) ................................................................................2, 3, 23, 24

*Williams v. Drake*,
   146 F.3d 44 (1st Cir. 1998) .................................................................................................2

*Wonderland NurseryGoods Co. v. Thorley Indus., LLC*,
   No. CIV.A. 12-196, 2014 WL 241751 (W.D. Pa. Jan. 22, 2014).......................................12

## STATUTES

35 U.S.C. § 284 ...................................................................................................................6, 17

## RULES

Fed. R. Civ. P.
   50(b) ................................................................................................................................1, 24
   50(c)(1) ................................................................................................................................1
   59 .........................................................................................................................................1
   59(a)(1)(A) ..........................................................................................................................1
   61 .........................................................................................................................................2

Fed. R. Evid. 611(b) ..............................................................................................................13

## TREATISES

11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2809 (3d ed.
   Apr. 2022 update) ..............................................................................................................25

## OTHER AUTHORITIES

Virginia Model Civil Jury Instruction No. 2.080 & Alerts (Matthew Bender & Co. 2022) .........25

## I.     INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 59, Defendant NortonLifeLock Inc. ("Norton") respectfully submits this motion for a new trial.  First, this Court should grant Norton a new trial on damages because erroneous evidentiary rulings both before and during trial effectively prevented Norton from presenting any damages case or rebutting Columbia's claimed damages, and an erroneous jury instruction on foreign sales further prejudiced Norton.  Second, this Court should grant Norton a new trial on both liability and damages, as the jury's verdict was unduly influenced by missing witness and curative instructions given during trial.  Finally, if this Court denies Norton's Rule 50(b) motion for judgment as a matter of law, this Court should grant Norton a new trial on the issues raised in the Rule 50(b) motion because the jury's verdict was against the clear weight of the evidence.

## II.    LEGAL STANDARD

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).[1]  A new trial is warranted "if '1) the verdict is against the clear weight of the evidence, 2) is based on evidence which is false, or 3) will result in a miscarriage of justice.'"  *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003) (quoting *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 650 (4th Cir. 2002)).[2]  Additionally, errors in the admission or exclusion of evidence warrant a new trial unless the court can say "with fair

---

[1] If this Court grants Norton's Rule 50(b) motion, "it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed" and "must state the grounds for conditionally granting or denying the motion for a new trial."  Fed. R. Civ. P. 50(c)(1).

[2] Regional circuit law governs the standard for granting a new trial.  *See Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1352 (Fed. Cir. 2003).

assurance" that "the judgment was not substantially swayed by the error." *Macsherry v. Sparrows Point, LLC*, 973 F.3d 212, 225 (4th Cir. 2020) (new trial due to error in admission of evidence). Prejudicial errors in the jury instructions are likewise grounds for a new trial. *See, e.g.*, *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 538 (4th Cir. 2021) (improper jury instruction required new trial); *Allred v. Maersk Line, Ltd.*, 35 F.3d 139, 140 (4th Cir. 1994) (same). Even where a single error is by itself insufficient, a new trial is required where "multiple errors synergistically achieve 'the critical mass necessary to cast a shadow upon the integrity of the verdict.'" *Williams v. Drake*, 146 F.3d 44, 49 (1st Cir. 1998) (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993)).

## III.    ARGUMENT

### A.    The Court Should Grant A New Trial On Damages

Erroneous evidentiary rulings necessitate a new trial because Norton was prevented from presenting a damages theory and from meaningfully responding to Columbia's damages theory. Additionally, the foreign sales jury instruction invited the jury to award damages for foreign sales without a sufficient legal basis.

While regional circuit law governs the procedural aspects of evidentiary rulings, where the court rules "as a matter of patent law, that a party is precluded from introducing evidence," Federal Circuit law governs the legal issues, which are non-discretionary. *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Organisation*, 28 F.4th 1247, 1275 (Fed. Cir. 2022). Errors in admitting or excluding evidence warrant a new trial when they "affect [the] party's substantial rights." Fed. R. Civ. P. 61. An evidentiary error is harmless only if the court can say "with fair assurance" that "the judgment was not substantially swayed by the error." *Macsherry*, 973 F.3d at 225 (ordering new trial due to error in admission of evidence); *see also, e.g.*, *Persinger v. Norfolk & W. Ry. Co.*, 920 F.2d 1185, 1189 (4th Cir. 1990) (upholding grant of new trial due to improper

admission of expert's testimony).  The Fourth Circuit has found a new trial warranted where exclusion of evidence "foreclose[d] a coherent and compelling evidentiary account" of a party's case.  *Buckley v. Mukasey*, 538 F.3d 306, 319 (4th Cir. 2008).  And it has also found evidentiary error warranting reversal where the district court excluded evidence pertinent to "[o]ne of [defendant's] chief defenses," leaving plaintiff "able to offer evidence" to support its claims, but leaving defendant with "its hands tied" in responding.  *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 833-34 (4th Cir. 1999).

A number of evidentiary rulings kept Norton from presenting damages evidence or otherwise meaningfully responding to Columbia's damages presentation.  The Court's pre-trial *Daubert* and motion *in limine* ("MIL") rulings prevented Norton from offering evidence related to the appropriate amount of damages—including any apportionment analysis, evidence of the relative importance and use of the patented feature, or discussion of Columbia's past licenses and licensing efforts—all of which was highly probative for purposes of the hypothetical negotiation.  *See Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  Additional trial rulings exacerbated the prejudice by effectively precluding Norton from putting on its own damages experts, meaningfully cross-examining Columbia's damages experts, or arguing reasonable damages inferences in closing.

Additionally, the jury instruction on foreign sales failed to "adequately inform the jury of the controlling legal principles without misleading or confusing the jury," *Wickersham*, 997 F.3d at 535, and resulted in a legally erroneous verdict of $94 million for Norton's sales to non-U.S. customers—more than half the overall damages award.

### 1.   *The Court's* **Daubert** *and* **Limine** *Rulings Were Prejudicial Error*

This Court's pre-trial *Daubert* and MIL rulings effectively precluded Norton from presenting any damages case.  ***First***, the Court precluded Norton from relying on data that post-

dated the hypothetical negotiations and Norton's technical apportionment expert, Dr. Jaeger, from testifying regarding his apportionment percentages on this basis.  *See* Dkt. 903, 904, 905.  **Second**, the Court excluded testimony and evidence regarding Columbia's unsuccessful licensing efforts and past licenses that would have been relevant to the reasonable royalty in a hypothetical negotiation.  Dkt. 911, 891, 900, 740.  **Third**, the Court excluded evidence of prior art and the invalidity of many claims of the patents-in-suit that would have cast light on the relative contribution of Columbia's claimed technology to those claims the PTAB found unpatentable. Dkt. 907, 912.  And, ***fourth***, the Court excluded evidence of Norton's own patent portfolio, which would have demonstrated the significant extent of Norton's own innovative work, suggesting that Columbia's smaller contribution was entitled to a smaller royalty rate.  Dkt. 899.

In light of the *Daubert* and MIL rulings, the Court ruled that Norton could not present any ultimate conclusions regarding damages, including opinions or evidence about the correct amount of damages (or even that Columbia's numbers were "significantly overstate[d]," Tr. 1395:22-25, 1397:9-25.).  *See* Dkt. 1086.  These rulings decimated Norton's damages case, forcing Norton to face the jury with both hands behind its back when responding to Columbia's damages assertions.[3]

**Post-Hypothetical Negotiation Data And Apportionment.**  The Court broadly excluded Norton's damages evidence because it post-dated the 2011 and 2013 hypothetical negotiations and could not be justified under the "book of wisdom" doctrine.                    REDACTED

---

[3] Norton also briefed these issues in its oppositions to Columbia's *Daubert* motions and MILs and maintains the additional arguments and points set forth therein.  *See* Dkt. 420 (Opp. re Jaeger Mot. to Exclude); Dkt. 425 (Opp. re Hosfield Mot. to Exclude);  Dkt. 787 (Opp. to Col. MILs 1-4); Dkt. 793 (Opp. to Col. MILs 5-12).  Norton confirmed at trial that the Court's rulings on those motions were final and would be strictly enforced at trial, Tr. 1865:20-1866:9, and Norton also set forth the evidence it would have offered but for the Court's rulings in its offer of proof.  *See* Dkt. 1187 (offer of proof); Dkt. 1187-1 through Dkt. 1187-27 (sealed exhibits); Dkt. 1175-1 through Dkt. 1186-4 (additional exhibits).

REDACTED

In doing so, the Court expanded its earlier *Daubert* ruling, ruling that Dr. Jaeger could not provide *any* rebuttal opinion with respect to apportionment based on the excluded data. *Id.* at 3. The Court acknowledged that the full impact of these rulings by entering an Order preventing Norton from presenting *any* ultimate conclusions regarding damages. *See* Dkt. 1086.

These rulings were in error. As Norton explained in its opposition to Columbia's motions in limine, *see* Dkt. 787, under the "book of wisdom" doctrine, the Federal Circuit has long allowed evidence post-dating the hypothetical negotiation. *See Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933) (explaining that, to make "the best appraisal" possible, "[e]xperience is . . . available to correct uncertain prophecy" relating to a patent's value). Indeed, the Federal Circuit not only permits, but "often requires a court to look to events and facts that occurred []after [the hypothetical negotiation] and that could not have been known to or predicted by the hypothesized negotiators." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009) (quoting *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed Cir. 1988),

*overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004)).  Courts have accordingly admitted a range of information and facts known only years after the date of the hypothetical negotiation, including specifically valuations of the allegedly infringing product, *CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, 708 F. App'x 654, 665-66 (Fed. Cir. 2017), and data on "how often the [allegedly infringing software feature] has in fact been used," *Lucent*, 580 F.3d at 1333.

Such information is permissibly considered to ensure the patentee receives "adequate" compensation, as required by 35 U.S.C. § 284.  For that reason, this Court's conclusion that the book of wisdom doctrine applies only if the evidence *increases* the royalty rate, Dkt. 903 at 4, is legal error—it is equally important to avoid *over*-compensating a patentee, and defendants are thus permitted to present post-hypothetical-negotiation evidence to *reduce* the amount of a reasonable royalty.[4]  In the context of malware detection technology, that rule makes particular sense because there is no reason to believe the parties to the hypothetical negotiation would have assumed that the accused technology would remain equally important to the product in perpetuity as it was at the time of the hypothetical negotiation, given the rapid advances in related technology.  REDACTED

---

[4] *See, e.g.*, *Amgen Inc. v. Hospira, Inc.*, No. CV 15-839-RGA, 2017 WL 3927600, at *3-4 (D. Del. Sept. 7, 2017) (denying motion to exclude defendant's expert based on "book of wisdom" doctrine), *recons. granted, judgment vacated in part on other grounds*, No. CV 15-839-RGA, 2017 WL 10088325 (D. Del. Sept. 20, 2017), and *aff'd*, 944 F.3d 1327 (Fed. Cir. 2019); *PSN Ill., LLC v. Abbott Lab'ys.*, No. 09 C 5879, 2012 WL 5381278, at *2 (N.D. Ill. Oct. 31, 2012) (allowing evidence that defendant "abandoned its drug program" post-hypothetical negotiation because evidence was relevant and not unduly prejudicial); *BASF Corp. v. Aristo, Inc.*, No. 2:07 CV 222 PPS, 2012 WL 2529213, at *3-4 (N.D. Ind. June 29, 2012) (allowing defendant's expert to testify that patent was less valuable because defendant was not "successful in breaking into [new] market" even though it expected to do so at the time of the hypothetical negotiation).

REDACTED

In addition, evidence reflecting the actual use of the allegedly infringing feature is independently relevant under *Georgia-Pacific* factor 11, which looks to "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." *Lucent*, 580 F.3d at 1333 (citation omitted) (rejecting argument that "how often the date-picker tool has in fact been used" was "irrelevant" because it "postdate[d] the time of the hypothetical negotiation").  It was therefore error to preclude post-negotiation evidence bearing on the extent to which Norton actually used the allegedly infringing technology.

Norton's proposed evidence and testimony is relevant to both the hypothetical negotiation analysis and *Georgia-Pacific* factor 11.  For example, Norton sought to introduce evidence regarding its minimal use of the alleged claimed invention—                REDACTED

                                Columbia itself relied heavily on data that post-dated the hypothetical negotiations                REDACTED

*See* Dkt. 787 at 7-8 (            REDACTED                ).  The Court's orders thus resulted in a prejudicial asymmetry by preventing Norton from responding to Columbia's evidence dating after the hypothetical negotiation.

And, although the Court granted Columbia's MIL 3 because it found that Dr. Jaeger's apportionment relied on data from 2019, Dkt. 905 at 3,                REDACTED

The jury should have been allowed to consider these facts as part of the evidence it considered in determining a "reasonable" royalty. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010) ("Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury."), *aff'd*, 564 U.S. 91 (2011).

The evidence and testimony detailed in Norton's offer of proof, *see* Dkt. 1187, was essential to Norton's damages case and to proving Columbia's failure to have properly apportioned damages.  Its exclusion undoubtedly affected the jury's damages verdict by preventing Norton from responding to Columbia's damages case.  *Macsherry*, 973 F.3d at 225 (error not harmless if there is no "fair assurance" that the jury's damages verdict "was not substantially swayed by the error").  The prejudice was exacerbated by the fact that Columbia *was* permitted to rely on data post-dating the hypothetical negotiations, while Norton was *not*.  *See Bank of Montreal*, 193 F.3d at 833-34 (holding that a new trial was required where the court excluded evidence that was pertinent to "[o]ne of [defendant's] chief defenses," leaving plaintiff "able to offer evidence," while defendant "had its hands tied" in responding).  The Court's erroneous evidentiary rulings thus warrant a new trial.

**Internal Valuations, Licenses, and Attempts to License.**  The Court also granted several of Columbia's MILs related to Columbia's valuations of its patents and prior licensing efforts, further restricting Norton's damages evidence.  Specifically, the Court granted (1) Columbia's MIL 6, excluding testimony and evidence related to how Columbia valued its own patents, Dkt. 911; (2) Columbia's MIL 7, excluding testimony and evidence related to Columbia's failed attempts to license the claimed technology, Dkt. 891; and (3) Columbia's MIL 8, excluding testimony and evidence regarding Columbia's other licenses,                    REDACTED

                                              ; *see also* Dkt. 741 at 15-23 (discussing licenses).

As Norton explained in its opposition to these MILs, Dkt. 793 at 6-18, each of these sources of evidence was relevant to the *Georgia-Pacific* factors and the hypothetical negotiation analysis.

REDACTED

This testimony would have been probative of Columbia's expectations about what it was willing to accept for a license to its patents (*Georgia-Pacific* factor 15).  The Court excluded this evidence because Columbia's internal analyses did not assume infringement, *see* Dkt. 911 at 2, but it is not necessary for every piece of evidence to account for infringement and this evidence showed Columbia's assessment of the *relative* value of the '115 patent compared to the rest of its patent portfolio, something that could reasonably bear on the royalty analysis.  *See* Dkt. 793 at 7, 11-2.

Furthermore,                              REDACTED

Such evidence would have shown no market demand for the claimed

9

technology at the time of the hypothetical negotiation, which would have impacted the amount Norton would have paid to license the technology and the amount that Columbia would have accepted to grant a license (*Georgia-Pacific* factor 15).  The Court found the offers could not be relevant because they did not "assume[] validity and infringement."  Dkt. 891 at 4.  As Norton explained even past comparable licenses would be excluded because in the real world, parties to a license do not assume infringement.  Such a rule would undercut traditional methods of determining a reasonable royalty, and would render the first two *Georgia-Pacific* factors (which address past licenses entered into by the licensor and licensee) pointless.  And the Court's other bases for finding the evidence irrelevant go, at most, to the *weight* to be afforded the offers to license, not a basis to exclude that evidence entirely.  *See* Dkt. 891 at 4-5.

Finally, evidence regarding Columbia's other licensing agreements would have illustrated how Columbia valued its own technology,                               REDACTED

The Court erred in deeming the licenses so distinct as to be inadmissible, *see* Dkt. 900, because "the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227-28 (Fed. Cir. 2014).  As Norton previously detailed, the licenses were sufficiently comparable for the jury to consider them.  *See* Dkt. 793 at 16-18; Dkt 425 at 11-19; *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1299 (Fed. Cir. 2019) (use of prior licenses does not require "identity of circumstances" (citation omitted)).

These rulings severely prejudiced Norton's damages case by preventing it from presenting evidence probative to what Columbia would have accepted in the hypothetical negotiation with Norton and what a reasonable royalty would be.  *See* Dkt. 1187 at 8-10.  The Court relied on its

*Daubert* and MIL rulings at trial as a basis to narrow Norton's cross-examination of Columbia's witnesses with respect to Columbia's past licensing, *see* Tr. 436:14-446:20, further preventing Norton from responding to Columbia's damages arguments through cross-examination.

**Prior Art and Invalidity of Claims.**  The Court also granted Columbia's MILs 5 and 9, excluding Dr. Jaeger and Mr. Hosfield from providing opinions related to the prior art and claims the PTAB had cancelled or found invalid to rebut Columbia's expert Dr. Cole's apportionment opinions.  Dkt. 907; Dkt. 912.  Although the Court acknowledged that a party may "introduce evidence of prior art to calculate damages under the *Georgia-Pacific* factors," it found that Norton's witnesses had not expressly tied their references to the prior art to the *Georgia-Pacific* factors.  Dkt. 907 at 2.  At trial, Dr. Jaeger and Mr. Hosfield were prepared to rebut Dr. Cole's claims regarding how Columbia's patents contribute to malware detection by showing that any contributions from Columbia's patents are, at best, minimal in light of the prior art including the invalidated independent claims on which several of the asserted claims depend.  *See* Dkt. 793 at 1-5, 19-21.  This testimony would have been particularly relevant to damages because Dr. Cole testified to an apportionment analysis that did not account for the contributions of the Columbia patents over prior art.  *See, e.g.*, Tr. 1515:8-1517:23.

**Norton's Patent Portfolio.**  Finally, the Court granted Columbia's MIL 10, excluding testimony and evidence related to Norton's own patent portfolio.  Dkt. 899.  The Court erred in concluding that evidence had "virtually no probative weight," *id.* at 5, because evidence of Norton's patent portfolio would have been probative to show the extent to which Norton innovates through research and development, thereby rebutting the implication that Norton's own technological contributions were lesser or insignificant.  That evidence was relevant for damages

11

purposes, including for the hypothetical-negotiation analysis and for purposes of apportionment.[5] The Court likewise erred in concluding that the probative value of the evidence was outweighed by potential jury confusion because a limiting instruction could have prevented any risk of confusion. *See, e.g., Wonderland*, 2014 WL 241751, at *2 (holding that any risk of prejudice or confusion from evidence of defendant's patent portfolio could be mitigated with limiting instruction); *see also* Dkt. 793 at 23 (proposing limiting instruction).

In sum, the Court's pre-trial evidentiary rulings seriously undercut Norton's ability to present damages evidence or any affirmative damages case and warrant a new trial on damages.

## 2.    *The Court's Mid-Trial Ruling Further Excluding Norton's Damages Experts Was Prejudicial Error*

As discussed above, and as the parties acknowledged at the pre-trial conference, the Court's pre-trial rulings precluded Norton from presenting any ultimate conclusion as to damages through its experts. *See* Dkt. 1100, Final Pre-trial Conference Tr. 107:2-117:15; *id.* at 118:9-25. The Court also ruled that Norton could not present any ultimate damages figure. *See* Dkt. 1086.

The Court's ruling on Columbia's MIL 3, regarding Dr. Jaeger's apportionment testimony, ordered Norton to submit written questions and answers if it wanted to try to present "rebuttal testimony as to apportionment" from Dr. Jaeger. *See* Dkt. 905 at 3. Notwithstanding the unusualness and asymmetry of that order, Norton indicated its intent to submit questions and answers consistent with that order. Tr. 1387:18-1388:2; Tr. 1392:6-1393:3. In response, the Court

---

[5] *See Wonderland NurseryGoods Co. v. Thorley Indus., LLC*, No. CIV.A. 12-196, 2014 WL 241751, at *2 (W.D. Pa. Jan. 22, 2014) (holding that evidence regarding defendant's patents was "relevant in the calculation of an appropriate reasonable royalty"); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. CIV.A. 09-290, 2012 WL 5416440, at *2 (W.D. Pa. Nov. 2, 2012) (same); *see also Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("[O]ur law recognizes that a reasonable royalty award 'must be based on the incremental value that the patented invention adds to the end product.'" (citation omitted)).

reiterated its pre-trial rulings, stating that Dr. Jaeger could not testify to any ultimate apportionment percentage, or to apportionment numbers at the third level. *See* Tr. 1391:2-3 1394:9l; Tr. 1406:23-1408:3. And it further instructed Norton that Dr. Jaeger could not respond to Columbia's expert's testimony by stating the number was "significantly too high," because such statements imply a percentage. Tr. 1397:9-25.

These rulings were severely prejudicial, for they effectively prevented Norton from presenting any meaningful damages testimony at all. *See* Tr. 1867:2-6. Columbia took full advantage of that fact, emphasizing in closing that Norton "didn't have an expert come tell you what a reasonable royalty is." Tr. 2691:1-5; *see also id.* at 2691:8-10 ("[I]f Norton really had anything to say about what a reasonable royalty was, wouldn't they have brought you somebody?"). The Court's mid-trial rulings regarding Norton's damages experts are further reason to grant a new trial on damages.

### 3.    *The Court's Rulings Restricting Norton's Cross-Examination and Closing Argument Were Prejudicial Error*

Given the Court's pre-trial exclusion of Norton's damages experts and evidence, Norton could respond to Columbia's damages case only through cross-examination and by urging the jury to draw reasonable inferences during closing argument. The Court's rulings also cut off this avenue of attack.

It is well-established that counsel has broad latitude on cross-examination and in closing argument. Counsel may cross-examine on any matter within the scope of "the subject matter of the direct examination" or "affecting the witness's credibility." Fed. R. Evid. 611(b). And a new trial may be required when a district court "unduly limit[s] the scope of cross-examination." *Douglas v. Owens*, 50 F.3d 1226, 1232 (3d Cir. 1995); *see also Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 935 (D.C. Cir. 1991) (district court abused discretion by "cut[ting] off cross-

examination of [defendant's] principal expert witness" and explaining that district courts must be "cautious in limiting cross-examination"). In closing argument, counsel is similarly "afforded wide latitude to suggest inferences to be drawn from the evidence." *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 897 (E.D. Wis. 2017); *see also, e.g.*, *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 629 (E.D.N.Y. 2020) (counsel may suggest that the evidence supported a particular royalty rate); Jacob Stein, *Closing Arguments* § 1:14 (2021-2022 ed.) ("Generally speaking, the courts allow counsel to explore the full realm of logic, eloquence and advocacy in closing argument, affording counsel the greatest latitude in the making of argument, and in replying to an opponent's arguments.").

**Cross-Examination of Dr. Cole Regarding Nachenberg Figures.** With respect to Dr. Cole, Norton's counsel sought to compare the apportionment figures regarding the value of malware presented in Dr. Cole's 2014 report with those he presented in his 2019 report and at trial. *See* Tr. 1583:25-1654:12. As reflected in Dr. Cole's reports, his apportionment numbers for 2014 attributed between 53-70% of the value of Norton AntiVirus to malware, whereas his 2019 numbers attributed 60-95% of the value to malware—a substantial increase (the 2014 weighted average was 57% versus the 2019 average of 74%, and thus 23% lower in relative terms). *See* Tr. 1604:1-7; Tr. 1604:21-23; *see also* Dkt. 1164-1 (2014 Cole Report); Dkt. 1164-2 (2019 Cole Report). Dr. Cole agreed those numbers accurately reflected what was in his report, *id.*, and that he had performed the "same general steps" in both reports. Tr. 1584:17-18. But he claimed he was "given different scope and direction" for the two reports. *See* Tr. 1584:17-18; Tr. 1605:14-15. Specifically, Dr. Cole claimed that for the 2014 report, he was told by Columbia's prior lawyers to use the deposition testimony of Mr. Nachenberg, a Norton employee, to provide an "upper limit" of 70% in doing his apportionment, but Dr. Cole admitted that the report does not

say anywhere that the attorneys "directed [him] to use Mr. Nachenberg's testimony as the upper limit." Tr. 1585:25-1586:5. To the contrary, the report states, "I *generally agree with* the assessment of Symantec's witness [Mr. Nachenberg] who estimated that malware detection contributes approximately 70 percent of the value of Symantec's consumer products . . . and approximately 60 percent of the value of Symantec's enterprise products . . ." Tr. 1587:18-25 (emphasis added); *see also* Tr. 1592:18-22 (quoting portions of 2014 report citing Mr. Nachenberg in stating that "substantial evidence . . . supports the allocation of up to 70 percent of the value of the consumer products to malware detection"). Dr. Cole also admitted that he "relied on [Mr. Nachenberg's] deposition and cited it in both of [his] reports," Tr. 1595:11-14, although he later walked that testimony back, stating that he did not "rely on it" in the 2019 report, but rather used it "as a spot check" or "validation point," Tr. 1645:5-7. In the midst of Norton's cross-examination, the Court admonished Norton's counsel against stating that Dr. Cole had "relied on" the 70% figure, Tr. 1646:208, notwithstanding that he unequivocally testified earlier to that effect (a fact supported by his report).

During Dr. Cole's cross-examination, Norton's counsel prepared a demonstrative reflecting his different apportionment figures from 2014 and 2019, including the percentage of Norton's malware detection that Dr. Cole concluded was attributable to SONAR/BASH, which was 24%. *See* Tr. 1637:6-25; *see also* Dkt. 1152-1, 1152-2 (demonstratives). Norton directed Dr. Cole to Mr. Nachenberg's deposition testimony, immediately following the 70% figure, in which Mr. Nachenberg states that 4% of the value was contributed by BASH machine-learning. Tr. 1644:18-25. Norton's counsel thus added the 4% figure to the demonstrative, as a reflection of Mr. Nachenberg's testimony and an alternate potential figure Dr. Cole could have used for purposes of the royalty calculation. Tr. 1645:11-14. Although Dr. Cole contended that the

demonstrative was "misleading," he agreed that it did accurately reflect the numbers being discussed. Tr. 1645:15-17. Norton then added 35% as the apportionment percentage of the patented technology relative to SONAR, for both the 2014 and 2019 reports. Tr. 1649:15-17. Dr. Cole again agreed those numbers accurately reflected the contents of the reports. *Id.* Finally, Norton's counsel mathematically calculated, based on the 2014 numbers and Mr. Nachenberg's 4% figure, how the damages amount would change from the $227 million Columbia was claiming to less than $30 million dollars. Tr. 1653:23-1654:3. Dr. Cole acknowledged that the "math seems okay," Tr. 1652:14, though he (unsurprisingly) did not agree with the conclusions Norton was suggesting based on those numbers, *see* Tr. 1654:4-6.

After Norton had finished its cross-examination of Dr. Cole and the jury had been dismissed, Columbia told the Court it would be seeking an instruction telling the jury to disregard the demonstrative, because the 4% number reflected in the demonstrative was presented by Mr. Nachenberg as a "guess" and was not supported by "expert testimony." Tr. 1657:16-1658:7.

Following briefing on the subject, *see* Dkt. 1149, 1150, the Court issued an Order not only striking the demonstrative (Dkt. 1155), as Columbia had requested, but going much further—striking the related cross-examination and issuing a "curative" instruction to the jury, that stated:

> To the extent that Norton's cross-examination of Dr. Cole on Tuesday suggested that any kind of apportionment number had been identified during cross-examination, including the number suggested to Dr. Cole near the end of the testimony and those written on demonstratives by counsel, they are stricken. And I instruct you to disregard them in their entirety. The evidence and testimony discussed during cross-examination included reliance on inadmissible and inapplicable evidence that cannot be used to assess apportionment and damages.

Tr. 1683:21-1684:7. The Court had two rationales for its ruling: (1) that Dr. Cole had *not* "relied" on the 70% and 60% numbers from Mr. Nachenberg, and thus did not agree with the premise of Norton's questioning, Dkt. 1155 at 4, and (2) that the 4% figure from Mr. Nachenberg's deposition

testimony was too speculative because Mr. Nachenberg had described it as a "guess," and because Dr. Cole testified that Norton's counsel's numbers had no basis, Dkt. 1155 at 4.

Respectfully, neither rationale is supported.  *First*, the Court's decision rested on its assessment of Dr. Cole's credibility.  The Court improperly credited Dr. Cole's testimony that his apportionment analysis "was based on a wide range of record evidence," and that he had not relied on Mr. Nachenberg's 70% and 60% numbers, Dkt. 1155 at 4, even though *the jury* could well have disbelieved Dr. Cole's claims that he did not rely on Mr. Nachenberg's figures and that his opinions were the result of Columbia's counsel having given him two different targets for his two reports. In fact, Dr. Cole testified earlier in the cross-examination that he *had* relied on the Nachenberg deposition in "both of [his] reports," Tr. 1595:11-14, and it is undisputed that the "70 percent was cited in his report."  Tr. 1646:2-8, 1646:16; *see also* Tr. 1595:11-4 (Dr. Cole agreeing that Nachenberg is cited in both reports).  Similarly, on the 4% number, the Court emphasized Dr. Cole's testimony refuting the premise of Norton's questions, and in fact cited Dr. Cole's testimony as a basis for concluding that the 4% number was not relevant.  *See* Dkt. 1155 at 5.  The Court thus based its conclusion that Norton's cross-examination and demonstrative were improper on its own view of the credibility of the witness, which is "within the purview of the jury."  *See, e.g.*, *United States v. Lefsih*, 867 F.3d 459, 466 (4th Cir. 2017).

*Second*, the Court's conclusion that Norton could not mention the 4% number in cross-examination because reasonable royalty opinions must be offered by an expert witness,  Dkt. 1155 at 5, contradicts both the plain text of 35 U.S.C. § 284 and Federal Circuit precedent.  Section 284 provides only that a court "*may* receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances," and the Federal Circuit repeatedly has held that a "party need not present expert testimony on damages."  *Bayer*

*Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 985 (Fed. Cir. 2021); *see also, e.g.*, *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir. 2015) (district court erred in failing to consider record evidence relevant to a reasonable royalty after excluding plaintiff's damages expert).  In fact, "even without expert testimony, Defendant may still present a claim for damages to the factfinder based on the admitted, relevant evidence, including testimony by lay witnesses" and "may respond to" Plaintiff's evidence regarding a reasonable royalty "with exhibits, lay witness testimony and by cross-examining Plaintiff's expert," just as Norton sought to do here.  *RSA Protective Techs, LLC v. Delta Sci. Corp.*, No. LACV1906024JAKPLAX, 2021 WL 4978462, at *6 (C.D. Cal. Oct. 20, 2021).

*Third*, the Court's conclusion that the 4% number was "[i]nadmissible and unreliable" (Dkt. 1155 at 5) runs counter to the fact it had *already admitted it into evidence* during Columbia's case in chief (as a counter-designation by Norton), without objection from Columbia.  Tr. 1418:14-25 (entering video of Nachenberg deposition into evidence without objection).  And Columbia itself had relied on Mr. Nachenberg's immediately preceding testimony referring to the 70% figure, which was equally speculative, in its own direct examination of Dr. Cole—including dedicating an entire slide to the testimony.  *See* Tr. 1499:19-1500:16.  Dr. Cole's expert report likewise cited Mr. Nachenberg's 60% figure, even though Mr. Nachenberg himself referred to that figure as "entirely speculation" and a "guess."  *See* Dkt. 1164-2 at ¶¶ 47, 257 (2019 Cole Report); Dkt. 1164-7 at Tr. 234:3-234:4 (Nachenberg Dep. Tr.).  Given those circumstances, Norton should have been permitted to cross-examine Dr. Cole about Mr. Nachenberg's testimony that directly followed the very testimony that Dr. Cole recited in his direct examination.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) (emphasizing importance of "[v]igorous cross-examination" of experts); *Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*, 172 F.3d 44 (4th

Cir. 1999) (table) (emphasizing importance of affording party opportunity to question expert witness about "his methodology" and "the factual basis for his opinions"); *see also Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*, No. CV 2:07CV589, 2009 WL 10689350, at *5 (E.D. Va. June 23, 2009) (rejecting challenge to cross-examination that used patent's file history where objecting party had listed history on its own "will use" list of exhibits)*, aff'd*, 374 F. App'x 955 (Fed. Cir. 2010).

These rulings were highly prejudicial to Norton.  In addition to simply striking the demonstrative at issue, which was itself prejudicial, the Court struck the related portion of Norton's cross-examination of Columbia's key apportionment expert, undermining one of Norton's sole remaining ways to respond to Columbia's damages case.  The "curative" instruction was severely prejudicial, because it suggested to the jury that Norton was using improper evidence, when in fact Norton was referring to evidence that was *already admitted* without objection, as well as evidence cited in Dr. Cole's own reports.  Together, those rulings prevented Norton from responding to Columbia's damages presentation, and undermined Norton before the jury.

**Cross-Examination of Dr. Cole Regarding Product Features.**  During the cross-examination of Dr. Cole, Norton sought to question Dr. Cole about his apportionment figures by reference to a demonstrative depicting a host of features included in Norton 360 and Norton AntiVirus products. *See* Dkt. 1149-3 (demonstrative).  The demonstrative included a legend indicating that Dr. Cole had assigned features in the blue boxes 70% of value (and only one box, Malware Protection, was blue), while the many features in the yellow boxes were assigned 30% of value. *Id.* at 7.  And the brackets at the top of the diagram extended to show that it was referring to the entire Norton 360 product, rather than just Norton AntiVirus. *Id.*  But because the legend was placed near the center of the page under the area pertaining to Norton AntiVirus products, Dr.

Cole was apparently confused by the diagram, even though Norton's counsel correctly stated that the percentages pertained to Norton 360 overall. *See* Tr. 1626:15-20. Norton's counsel addressed the placement issue Dr. Cole had flagged, and twice clarified that the percentages pertained to Norton 360. Tr. 1626:21-1627:7. But the Court told the jury that the demonstrative was "wrong." Tr. 1628:16. In response, Norton adjusted the demonstrative in front of the jury and again clarified verbally that the percentages pertained to Norton 360. Tr. 1629:3-14.

The Court nevertheless struck the demonstrative, finding it "misleading" because in its view, the demonstrative "suggested that all of Norton's additional features in *every* product, including premium products, were contained in the Norton AntiVirus." Dkt. 1155 at 7. This was not the concern Dr. Cole raised on cross-examination, where he merely remarked that the placement of the legend suggested that the 70% and 30% figures applied only to the Norton AntiVirus line, rather than Norton 360. *See* Tr. 1626:15-20.[6] The Court thus struck the demonstrative on a mistaken premise, and the Court's interjections and remedy were unduly prejudicial to Norton. This is especially so because counsel made clear the demonstrative was something "[Norton's] team put together," Tr. 1625:6-7, and then "correct[ed] the document . . . in front of the jury," Dkt. 1155 at 7, eliminating any possible confusion.

**Cross-Examination of Dr. Sullivan**. As with Dr. Cole, Norton sought to cross-examine Dr. Sullivan based on the substantial differences between the figures he presented in his 2014 report and those he presented at trial. But in light of the Court's rulings with respect to Dr. Cole's cross-examination, Norton first requested permission from the Court to proceed with that line of questioning. *See* Tr. 1780:8-1783:15. Norton's proposed cross-examination would have involved,

---

[6] The Court mistakenly cited Dr. Cole's comments about a different demonstrative in the part of its order addressing the product features demonstrative. Dkt. 1155 at 7 (citing Tr. 1634:13-25).

*inter alia*, basic math in the form of identifying a weighted average, which would reveal that Dr. Sullivan had relied on a "level 1" apportionment figure in his 2014 report that was nearly a quarter (23%) lower than his testimony at trial.  Tr. 1780:16-23; *see generally* Dkt. 1164-8 (2014 Sullivan Report); Dkt. 1164-9 (2019 Sullivan Report).   Columbia objected to that proposed cross-examination arguing, among other things, that the 2014 report involved a different assignment with different parameters than the trial testimony, as Dr. Cole had testified.  Tr. 1786:3-13.  In response, Norton pointed out that the reports themselves do not reflect that fact and that asking about earlier expert reports on the same topic in the same case was "fair cross-examination."  Tr. 1787:1-12.

The Court again agreed with Columbia.  Rather than permit the full scope of cross-examination, the Court credited Dr. Cole's testimony that his reports resulted from different assignments, without allowing the jury to decide that question.  Tr. 1788:25-1789:3.  The Court further curtailed Norton's cross-examination by precluding Norton from using "math" in conjunction with questions about how Columbia's damages claim would be impacted if the patented technology were given the *same* value across all of the accused products, rather than being given a greater value for more expensive products, *see* Tr. 1792:20-1793:7, because, in the Court's view, an expert was first required to adopt that theory, Tr. 1795:9-10.

**Closing Argument.** The Court also substantially restricted Norton's arguments during closing, even though counsel is generally afforded wide latitude to discuss the evidence and propose inferences during closing argument.  *See* Stein, *Closing Arguments* § 1:14 (explaining that counsel are afforded "the greatest latitude in the making of [closing] argument").

In particular, extending its prior ruling during the cross-examination of Dr. Cole, the Court ruled that Norton could not respond to Columbia's damages figures by invoking the 4% number

from Mr. Nachenberg's testimony, because it was "inadmissible and unreliable." Dkt. 1171. The Court acknowledged that Mr. Nachenberg's testimony regarding the 70% figure was also "speculative," but concluded that "Dr. Cole did not rely on the 70% speculative testimony." *Id.* This resolved credibility issues belonging to the jury, and discounted indisputably admitted testimony because an expert had not offered it. *See RSA Protective*, 2021 WL 4978462, at *6 (explaining that, "even without expert testimony, Defendant may still present a claim for damages to the factfinder based on the admitted, relevant evidence, including testimony by lay witnesses").

These rulings also prevented Norton from arguing that no evidence showed that anyone (other than Norton, according to Columbia) used the infringed technology, reasoning that the argument would "place[] an implicit requirement for Plaintiff to look for all technology that might be infringing." Dkt. 1170. This evidence was relevant because (1) evidence of use or non-use (or absence of any evidence of use by Columbia) is highly relevant to the damages inquiry (*see supra* at 8) and (2) as Norton explained, Columbia had opened the door to such argument because its own witnesses testified that the technology was in high demand and widely adopted in the industry. Tr. 2180:8-14; Tr. 2182:6-11; Tr. 2183:23-2184:8.

Finally, the Court ruled that Norton could not discuss any specific valuation in its closing argument, even if based on admitted evidence, including evidence elicited through cross-examination. Dkt. 1170. That ruling reflected the culmination of the Court's exclusion of all of Norton's evidence, which left Norton with no evidence in the record to argue for an alternative damages amount. *Id.* This left Norton with no opportunity to present a damages case of its own, or to meaningfully challenge Columbia's, and Columbia was allowed to argue in closing that Norton's failure to present a damages case meant that Norton had no response to Columbia's damages number.

4.     *The Jury Instruction Regarding Foreign Sales Was Prejudicial Error*

Errors in the jury instruction regarding foreign sales also warrant a new damages trial.  Jury instructions must "adequately inform the jury of the controlling legal principles without misleading or confusing the jury," and where a jury instruction fails to do so, a new trial is warranted if there is "a reasonable probability that the erroneous instruction affected the jury's verdict." *Wickersham*, 997 F.3d at 535 (citation omitted).

Here, over Norton's objection, the Court instructed the jury as follows with respect to foreign sales:

> If you award damages, you must determine whether damages should include sales to customers located outside of the United States.
> Columbia is entitled to damages based on sales to customers located outside of the United States if you find that the infringing product sold to those customers was made in or distributed from the United States, even if the infringing product is delivered to a customer and used by the customer outside of the United States.
> Columbia is also entitled to damages based on sales to customers located outside the United States if the sales substantially occurred in the United States.  A sale can substantially occur in the United States even if delivery is made outside of the United of the United States.  Whether a sale substantially occurs in the United States may depend on the facts including where the legal commitment to buy and sell occurred and where other substantial activities of the sales transactions occurred, such as negotiating and contracting.

Tr. 2841:23-2842:18.  The Court then described the verdict form, which included three separate questions about the jury's basis for awarding damages based on foreign sales.  Tr. 2842:19-2845:1.

As Norton explained, that instruction was incorrect.  *See* Dkt. 1048-1 at 24-25 (setting out Norton's objection to jury instruction); *see also* Tr. 2472:21-24 (reiterating objection).  The instruction failed to inform the jury that one who makes, uses, sells, or offers to sell a claimed invention outside the United States does not infringe.  And, by stating that Columbia is entitled to damages based on foreign sales if the product was "made in or distributed from the United States," it suggested that infringement could be found merely by showing that the software was developed and built within the United States.  But, under *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437

23

(2007), the question is whether the actual allegedly infringing article, e.g., the computer-readable medium or system, is made, used, sold, or offered for sale in the United States, and here, there is no dispute that such foreign sales and infringing articles are "made" outside the United States. *See id.* at 453 (holding that copies of Windows that were generated by third parties outside the United States "were not themselves supplied from the United States"). The jury instruction thus failed to "adequately inform the jury of the controlling legal principles without misleading or confusing the jury." *Wickersham*, 997 F.3d at 535. That error was compounded by the fact that the jury instruction and verdict form "place[d] undue emphasis" on Columbia's claim for foreign sales damages by laying out each basis for awarding foreign sales. Tr. 167:3-11; *id.* at 168:5-6.

The erroneous jury instruction undoubtedly "affected the jury's verdict." *Wickersham*, 997 F.3d at 535 (citation omitted). The jury awarded over $94 million as a royalty for sales to non-U.S. customers, after indicating on the verdict form that it had concluded that the infringing products were made and distributed in the United States. Dkt. 1206 at 4-5.[7] As Norton explained in its Rule 50(b) motion, there was no evidence to support those conclusions. *See* Norton Rule 50(b) Motion at Section III.E. There is thus a "reasonable probability" that the jury was misled by the instruction into concluding that it could award damages for foreign sales based solely on a showing that the software was initially developed in the United States.

### B.    A New Trial Is Also Warranted On Liability Because Of The Court's Missing Witness and Curative Instructions

With the utmost respect to the Court, Norton submits that a new trial is appropriate on both liability and damages because the Court's missing witness and curative instructions were improper and prejudicial, affecting not only the issues they were tied to, but the entirety of the case.

---

[7] The jury concluded that Columbia had not proven that the sales to foreign customers "substantially occurred" in the United States. Dkt. 1206 at 5.

*Markovich v. Bell Helicopter Textron, Inc.*, 805 F. Supp. 1231, 1240 (E.D. Pa.), *aff'd*, 977 F.2d 568 (3d Cir. 1992); *see also* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2809 (3d ed. Apr. 2022 update) (noting this as grounds for a new trial).

Starting with the missing witness instruction, without repeating the objections that Norton has already raised,[8] and recognizing that the Court has already issued several rulings on this issue,[9] Norton maintains that the instruction was prejudicial and erroneous. As Norton pointed out in its prior briefing, the commentary to the Virginia model civil jury instructions cautions against the use of a missing witness instruction precisely because of the instruction's prejudicial effect on the party subject to the instruction. *See generally* Virginia Model Civil Jury Instruction No. 2.080 & Alerts (Matthew Bender & Co. 2022). Appellate courts have often ordered new trials when a missing witness instruction was improperly given. *See, e.g.*, *Harris v. State*, 458 Md. 370, 182 A.3d 821 (2018); *State v. Houser*, 196 Wash. App. 486, 386 P.3d 1113 (2016); *Austin v. Knowlton*, 234 A.D.2d 918, 651 N.Y.S.2d 795 (1996); *Banks v. Harris*, 238 Va. 81, 380 S.E.2d 634 (1989). And the fact that the jury did not find Norton liable for fraud does not change the result that a new trial is warranted here. This instruction tainted the entire case, by suggesting that Norton acted egregiously in connection with Dr. Dacier's failure to appear live at trial (he appeared by deposition, as foreign third-party witnesses normally do). Indeed, Columbia's counsel leveraged that implication in closing argument, making repeated references to other witnesses Norton did not call and suggesting that Norton acted inappropriately even beyond Dr. Dacier. *See* Tr. 2679:19-25 ("Where was Mr. Pereira? Where was Mr. Bromwich? Where was Mr. Laffoon, Mr. Tian, Mr. Mann, Mr. Nachenberg? . . . [W]hy didn't Norton bring them to testify in front of you

---

[8] *See, e.g.*, Dkt. 1048-1, 1085, 1088-1, 1096, 1103, 1123, 1126, 1139.

[9] *See, e.g.*, Dkt. 1083, 1092, 1099, 1116, 1130, 1167.

under oath?  They didn't."); *see also, e.g.*, Tr. 2648:3-6; 2677:13-20; 2687:25-2688:1; 2691:4-5. But for the missing witness instruction and the Court's curative instructions related to it, there is a reasonable probability that the jury's verdict would have been different on multiple issues.

The same is true for the Court's striking much of Dr. Cole's cross-examination and the demonstratives relating thereto and the text of the curative instruction it gave.  *See supra* at 16-22. This not only directly impacted Norton's damages case, it also improperly tainted Norton and its counsel in the eyes of the jury, in ways that spilled over to the remainder of the case.  *See Davis O'Leary VI, Ltd. v. Peterson Contractors, Inc.*, No. 1:15-cv-0518, 2019 WL 8895244, at *1 (N.D. Ga. Feb. 25, 2019) (ordering a new trial where "improper arguments rendered the entire proceeding unfair" and there was "no way to determine the possible impact of the taint upon" different parts of the verdict).

In contrast, there were no comparable instructions directed at Columbia.  This left the jury with the unfair impression that it should be particularly skeptical of Norton's case and counsel. *Cf. United States v. Saenz*, 134 F.3d 697, 706 (5th Cir. 1998) (finding new trial appropriate where judge's conduct "created an appearance that the court was assisting the government in proving its case").  Respectfully, the cumulative weight of these instructions and rulings prejudiced Norton to such a degree that the integrity of the jury's verdict is undermined, warranting a new trial.  *See, e.g.*, *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 808 (6th Cir. 1999), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009).

### C.    If The Court Denies Norton's Rule 50(b) Motion, Norton Alternatively Requests A New Trial On Each Issue

Finally, if the Court denies Norton's Rule 50(b) motion for judgment as a matter of law, Norton moves in the alternative for a new trial on each issue raised in that motion.  A new trial is warranted where "the verdict is against the clear weight of the evidence . . . even though there may

be substantial evidence which would prevent the direction of a verdict." *Gill v. Rollins Protective Servs. Co.*, 836 F.2d 194, 196 (4th Cir. 1987) (citation omitted).  "In deciding whether or not to grant a new trial, a court may properly weigh the strength of the evidence and consider the credibility of witnesses." *E. Tenn. Nat. Gas Co. v. Thomas*, 298 F. App'x 261, 263 (4th Cir. 2008). For all of the reasons set forth in Norton's Rule 50(b) motion, the verdict with respect to each of the issues raised in that motion is against the clear weight of the evidence in this case and warrants a new trial.

## IV.  CONCLUSION

For the foregoing reasons, Norton respectfully requests that the Court grant Norton's motion for a new trial.


June 3, 2022                                    NORTONLIFELOCK INC.


                                               By:  ___/s/_____
                                                          Of Counsel

Dabney J. Carr, IV, VSB #28679
Robert A. Angle, VSB #37691
Laura Anne Kuykendall, VSB #82318
TROUTMAN PEPPER HAMILTON SANDERS LLP
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
la.kuykendall@troutmansanders.com

Douglas E. Lumish (*pro hac vice*)
Srinivas Pathmanaban (*pro hac vice*)
Ryan T. Banks (*pro hac vice*)
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone:  650.463.4600
doug.lumish@lw.com

giri.pathmanaban@lw.com
ryan.banks@lw.com

David Callahan (*pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Ave., Ste. 2800
Chicago, IL 60611
Telephone: 312.876.7700
david.callahan@lw.com

Michael Morin (*pro hac vice*)
Susan Yates Tull (*pro hac vice*)
Richard A. Lowry (*pro hac vice*)
Benjamin J. Behrendt (*pro hac vice*)
Laura Nguyen (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh St., NW, Ste. 1000
Washington, DC 20004
Telephone:  202.637.2200
michael.morin@lw.com
susan.tull@lw.com
richard.lowry@lw.com
benjamin.behrendt@lw.com
laura.nguyen@lw.com

ATTORNEYS FOR DEFENDANT NORTONLIFELOCK INC.