**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>        *Plaintiff*,<br><br>    v.<br><br>NORTONLIFELOCK INC.,<br><br>        *Defendant*. | Civil Action No. 3:13-cv-00808-MHL |

**MEMORANDUM IN SUPPORT OF COLUMBIA'S MOTION FOR**
**ENHANCED DAMAGES UNDER 35 U.S.C. § 284**

# TABLE OF CONTENTS

*Page*

APPLICABLE LAW ................................................................................................. 5

FACTUAL BACKGROUND .................................................................................... 7

    A.    Norton Willfully Infringed Columbia's Patents. ................................. 7

        1.    Norton Told Columbia It Would Pay a Royalty for Use of Its Patent-Pending Invention, But Then Refused............................................ 8

        2.    Norton Refused to Take a License Even After Patent Issuance. .............. 10

        3.    Columbia Told Norton It Was Infringing, and Norton Ignored Columbia............................................. 12

    B.    Norton's Behavior as a Litigant Has Been Egregious. ......................... 14

ARGUMENT ......................................................................................................... 18

    A.    The *Read* Factors Compel Enhanced Damages Under § 284 .............................. 18

        1.    Factor 1: Norton Copied Columbia's Patent-Pending Invention While Misrepresenting to Columbia that It Would Pay a Royalty .......... 18

        2.    Factor 2: Norton Infringed in Bad Faith ................................. 19

        3.    Factor 3: Norton's Litigation Conduct Was Reprehensible..................... 21

        4.    Factor 4: Norton Is a Large Corporation That Received Revenue of More Than $18.5 Billion from the Infringing Products.......................... 23

        5.    Factor 5: This Was Not a Close Case ..................................... 25

        6.    Factor 6: Norton's Misconduct Spanned More Than a Decade................ 26

        7.    Factor 7: Norton Took No Remedial Action ............................. 27

        8.    Factor 8: Norton's Motivation Warrants Deterrence ............................... 27

        9.    Factor 9: Norton Attempted to Conceal Its Willful Infringement During Discovery................................. 28

    B.    Because of Norton's Egregious Conduct Before and During This Litigation, the Court Should Treble the Jury's Damages Award. ................................. 29

CONCLUSION...................................................................................................... 30

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Alfred E. Mann Found. for Sci. Rsch.* v. *Cochlear Corp.*,
    2018 WL 6190604 (C.D. Cal. Nov. 4, 2018) ........................................................ 24, 25, 26-27

*Apple Inc.* v. *Samsung Elecs. Co.*,
    258 F. Supp. 3d 1013 (N.D. Cal. 2017) ................................................................................ 20

*Arctic Cat Inc.* v. *Bombardier Recreational Prods. Inc.*,
    198 F. Supp. 3d 1343 (S.D. Fla. 2016) ................................................................. 19, 20, 29, 30

*Barry* v. *Medtronic, Inc.*,
    250 F. Supp. 3d 107 (E.D. Tex. 2017) ........................................................................ 6-7, 19

*Centripetal Networks, Inc.* v. *Cisco Sys., Inc.*,
    492 F. Supp. 3d 495 (E.D. Va. 2020) .......................................................................... 23-24

*Crane Sec. Techs., Inc.* v. *Rolling Optics AB*,
    337 F. Supp. 3d 48 (D. Mass. 2018) ..................................................................................... 19

*Creative Internet Advert. Corp.* v. *Yahoo! Inc.*,
    689 F. Supp. 2d 858 (E.D. Tex. 2010) ................................................................................. 27

*Cyntec Co., Ltd.* v. *Chilisin Elecs. Corp.*,
    2022 WL 1443232 (N.D. Cal. May 6, 2022) ............................................................ 21, 25, 30

*EagleView Techs., Inc.* v. *Xactware Sols., Inc.*
    522 F. Supp. 3d 40 (D.N.J. 2021) .......................................................................... 23, 27, 29, 30

*Eidos Display, LLC* v. *Chi Mei Innolux Corp.*,
    2018 WL 1156284 (E.D. Tex. Mar. 5, 2018) .......................................................... 21-22, 26

*Georgetown Rail Equip. Co.* v. *Holland L.P.*,
    2016 WL 3346084 (E.D. Tex. June 16, 2016) .............................................................. 18-19

*Georgetown Rail Equip. Co.* v. *Holland L.P.*,
    867 F.3d 1229 (Fed. Cir. 2017) ............................................................................................ 6

*Halo Elecs., Inc.* v. *Pulse Elecs., Inc.*,
    281 F. Supp. 3d 1087 (D. Nev. 2017) .................................................................................. 12

*Halo Elecs., Inc.* v. *Pulse Elecs., Inc.*,
    579 U.S. 93 (2016) .................................................................................................. *passim*

*Idenix Pharms. LLC* v. *Gilead Scis., Inc.*,
  271 F. Supp. 3d 694 (D. Del. 2017)........................................................6

*Imprenta* v. *Karll*,
  20-CV-6177 Dkt. 95 (C.D. Cal. May 13, 2022) .....................................19

*Innovention Toys, LLC* v. *MGA Ent.*,
  2017 WL 3206687 (E.D. La. Mar. 8, 2017) ...........................................30

*Izzo Golf Inc.* v. *King Par Golf Inc.*,
  2019 WL 4023562 (W.D.N.Y. Aug. 27, 2019) ........................... 27-28, 30

*Joyal Prods., Inc.* v. *Johnson Elec. N. Am., Inc.*,
  2009 WL 512156 (D.N.J. Feb. 27, 2009) ...........................................21-22

*Milwaukee Elec. Tool Corp.* v. *Snap-On Inc.*,
  288 F. Supp. 3d 872 (E.D. Wis. 2017)................................. 20, 21-22, 26

*Pavo Sols. LLC* v. *Kingston Tech. Co., Inc.*,
  2021 WL 3116849 (C.D. Cal. Feb. 16, 2021).................................. *passim*

*Polara Eng'g Inc* v. *Campbell Co.*,
  894 F.3d 1339 (Fed. Cir. 2018)............................................................ 5-6

*R–BOC Representatives, Inc.* v. *Minemyer*,
  233 F. Supp. 3d 647 (N.D. Ill. 2017) ................................................20-21

*Read Corp.* v. *Portec, Inc.*,
  970 F.2d 816 (Fed. Cir. 1992)........................................................ *passim*

*Saint-Gobain Autover USA, Inc.* v. *Xinyi Glass N. Am., Inc.*,
  707 F. Supp. 2d 737 (N.D. Ohio 2010)..............................................22-23

*SRI Int'l, Inc.* v. *Cisco Sys., Inc.*,
  14 F.4th 1323 (Fed. Cir. 2021) ...........................................................6, 22

*SRI Int'l, Inc.* v. *Cisco Sys., Inc.*,
  254 F. Supp. 3d 680 (D. Del. 2017)...................................................21-22

*Stryker Corp.* v. *Zimmer, Inc.*,
  2017 WL 4286412 (W.D. Mich. July 12, 2017)......................25-26, 28, 29, 30

*Tinnus Enters., LLC* v. *Telebrands Corp.*,
  369 F. Supp. 3d 704 (E.D. Tex. 2019).................................21-22, 26, 29

*Top Lighting Corp.* v. *Linco, Inc.*,
  2019 WL 13020830 (C.D. Cal. Aug. 26, 2019).......................................21

-iv-

*VirnetX Inc.* v. *Apple Inc.*,
    324 F. Supp. 3d 836 (E.D. Tex. 2017)................................................................21-22, 27-28

*WCM Indus., Inc.* v. *IPS Corp.*,
    721 F. App'x 959 (Fed. Cir. 2018) ............................................................................6

**Statutes**

35 U.S.C. § 284................................................................................................ *passim*

35 U.S.C. § 285................................................................................................ *passim*

U.S. patent law, 35 U.S.C. § 284 ("§ 284"), permits trial courts to award exemplary damages to punish and deter egregious conduct that shows disrespect for intellectual property and the judicial system. If there ever has been a case for enhanced damages—to punish, deter, and warn against extraordinary misconduct—it is this one. Dr. Stolfo's trial testimony captured the spirit of the issue:

> I'm being very polite. Ten years waiting for my day in court to have somebody come and wish to collaborate so that we could do good things together, and then take my inventions, claim it's theirs and put their own name on it, it's outrageous. It's not just once apparently. It was twice. And this is my opportunity to express my outrage by it, and this should not stand. This should not be allowed. This is not their property. This is my livelihood. This is my life. This is what I do, and it's really galling that this happened. (Ex. A (Trial Tr.) 618:14-23.)

Columbia appropriately—even politely—litigated its positions for nearly a decade, while Norton repeatedly exemplified every characteristic that § 284 was enacted to deter. Norton copied Columbia's patented invention and falsely promised to compensate Columbia for use of that invention in products that generated billions of dollars of profits for Norton. Then, Norton refused to pay a modest royalty to Columbia, and faced with litigation, Norton (i) pursued every conceivable litigation defense, regardless of merit and without concern for the resulting waste of judicial and party resources, and (ii) deployed numerous improper litigation tactics—endless re-argument of decided issues, disregard of the Court's orders and admonitions, filing a meritless and callous motion for sanctions, last-minute withdrawal of defenses and arguments, and extraordinary misconduct that prevented a material trial witness from testifying.

At the end of that decade-long litigation, a jury of eight unanimously rejected all of Norton's infringement-related contentions and found that Norton willfully infringed Columbia's asserted patent claims. In light of that history, as detailed below, it is impossible to overstate Columbia's conviction that Norton's countless unjustified choices—in attempts to avoid paying

an extremely modest royalty for groundbreaking technology—can and should be punished and deterred, as Congress envisioned in § 284.  In light of Norton's disregard for patent rights and the appropriate bounds of fair-minded litigation, settled law should lead to trebling of the jury's relatively modest damages award, which is necessary to deter similar misconduct.

Norton's disregard for patent rights started in 2005 when a Norton executive learned of Columbia's "application communities" invention during a confidential workshop hosted by the Defense Advanced Research Projects Agency ("DARPA") of the U.S. Department of Defense.  As the uncontroverted trial evidence showed (*infra* at 8-10), Norton wanted to incorporate Columbia's patent-pending technology into its products that generated a billion dollars annually, and Norton told Columbia that it would pay a reasonable royalty for the invention.  That never happened. Instead, Norton simply copied the Columbia technology, profited enormously on more than $18.5 billion of infringing product sales, but refused to pay Columbia a dime.  As Columbia's Orin Herskowitz testified at trial:  "[Columbia] tried really hard, over many years, to get [Norton] to come to the table and negotiate for a license . . . and they would not engage in any business conversation about the licenses."  (Trial Tr. 399:10-13.)  Even worse, over the same period (2006-2013), Norton collaborated with the Columbia professors on a different technology (called decoys) but wrongly obtained a patent on that technology that named a Norton employee as the sole inventor when—as the jury found by clear and convincing evidence—the Columbia professors were co-inventors.  (Dkt. 1206 at 5-6.)

Norton's theft of Columbia's intellectual property reflected Norton's corporate culture of taking others' technology.  As Norton admitted in 30(b)(6) testimony:  "[Norton's] preference has been to get technology R&D conducted by other companies as opposed to developing it organically in-house[.]"  (Trial Tr. 1854:16; Ex. B (JX-007) (Mutu) 108:8-13.)  Norton also readily

admitted—through 30(b)(6) testimony in both 2014 and 2019—that it never asked its engineers or other employees to take even the most cursory measures to address Columbia's infringement claim.  Rather than taking steps the law encourages, Norton chose to ignore Columbia's rights. (*See infra* at 12-14.)  As Norton itself testified:  "We don't do that at [Norton]," and when asked to clarify, testified further, "[w]ell, the things you said, try to design around patents and things like that" (Trial Tr. 1418:5; Ex. C (JX-005) (Laffoon) 69:12-15).  Norton's treatment of Columbia and its professors was a symptom of a far deeper problem with corporate culture and policies.

Because of Norton's refusal to pay a modest royalty, Columbia filed this lawsuit, and Norton's egregious behavior increased.  As explained in Columbia's Motion for Attorneys' Fees Under 35 U.S.C. § 285 (the "§ 285 Motion"), Norton and its counsel adopted a scorched earth strategy:  From 2018 through the 2022 trial, Norton (i) engaged in "gamesmanship" and "appalling," "███████████████," and "facial[ly] bad faith" conduct (Ex. D (Apr. 7, 2022 Tr.) 55:25-57:5; 88:4-10, 90:8-9; Dkt. 889 at 13-14); (ii) made "████████████" statements to a potential witness and "troubling" misrepresentations to Columbia and the Court (Dkt. 889 at 13; Ex. E (Apr. 8, 2022 Tr.) 5:8-10); (iii) repeatedly filed motions that were "████████" or "inappropriately s[ought] to 'rehash'" decided issues (Dkt. 889 at 13, 19; Dkt. 703 at 11); (iv) engaged in "utterly improper" trial conduct that "misrepresent[ed] the record and . . . misle[d] the jury" (Dkt. 1155 at 7); and (v) attempted to "make a messy record" to obscure the merits (Ex. F (Mar. 17, 2022 Tr.) 10:17-18).

Moreover, since at least 2018, this has not been a close case on the merits.  Norton's invalidity defenses failed at the PTAB—in decisions upholding the validity of Columbia's patent claims asserted at trial—and after Norton's invalidity and claim construction arguments failed at the Federal Circuit, Norton still continued its infringement unabated, refusing to pay a modest

royalty. Instead, Norton returned to the District Court with even more aggressive tactics and exceptionally weak defenses. Columbia prevailed on *every* pre-trial motion regarding patent infringement, and a jury of eight agreed with Columbia on *every* patent infringement issue. (Dkt. 1206 at 2-4.)

At trial, Columbia did not shoot for the moon, but rather sought a modest royalty, and the jury awarded one: $185 million based on infringing product sales of more than $18.5 billion, or 1%. (Dkt. 1206 at 4; Trial Tr. 1738:3-16.) Even if the Court were to grant Columbia's § 285 Motion and award attorneys' fees (*e.g.*, on the order of $35 million for significant work over many years), the total award would be a tiny drop in Norton's bucket, and that amount does not begin to address Norton's misconduct, mistreatment of Columbia, and disrespect for intellectual property and the judicial system.[1] Unless the Court awards significant enhanced damages, Norton's conduct will be the rational, profit-maximizing way to do business—***but it should not be***. A trebling of damages would make clear that a decent corporate citizen should approach patent infringement claims in good faith and litigate based on what the facts and law support, not every conceivable tactic outside litigation counsel can devise treating life as a zero sum game.

The Court also should award enhanced damages to give meaning to the jury's incredibly deliberate verdict. A jury unanimously found—based on evidence of the egregious conduct summarized above and further explained below—that Norton's infringement did not occur in ignorance or good faith, but rather Norton willfully infringed Columbia's patents. (Dkt. 1206 at 4.) The jury rendered that decision aware of the consequences—Norton's counsel told them during

---

[1] Norton is a large corporation with significant resources: From fiscal year 2012 to fiscal year 2020, Norton had average annual revenue of $5.2 billion and average annual EBITDA of $1.2 billion, and even after the divestment of certain businesses to Broadcom, Inc., in fiscal years 2021 and 2022, Norton had annual revenue of $2.6 billion and $2.8 billion, respectively, and EBITDA of $1.0 billion and $1.1 billion, respectively. (Sullivan Decl. ¶¶ 11-12.)

closing argument that willful infringement was "a 'do not press [] button'" because it is "all about the company" and "your statement of who we are" and an "indictment" of Norton.  (Trial Tr. 2786:6-2787:8.)  Having heard all of the evidence—and after unbelievably careful consideration of the facts and instructions—the jury made that "indictment," and clearly decided "who" Norton is, *i.e.*, a company engaged in deliberate misconduct.  To punish, deter, and make an example of that conduct—and to give effect to the jury's unanimous verdict—Columbia respectfully requests that the Court treble the jury's damages award under § 284.

*          *          *

Many of the facts supporting enhanced damages under § 284 overlap with the facts supporting an exceptional case finding under 35 U.S.C. § 285, as set forth in Columbia's § 285 Motion submitted herewith.  This motion for enhanced damages and the § 285 Motion are intended to be read together, and for efficiency, Columbia does not re-recite verbatim all of Norton's litigation misconduct described in detail in the § 285 Motion.  Under applicable law, the Court could award treble damages based solely on the misconduct described in the § 285 Motion, and below, Columbia largely focuses on Norton's additional egregious conduct with respect to Columbia's intellectual property before this litigation began.  Those facts provide additional reasons that the Court should award treble damages, as explained below.

**APPLICABLE LAW**

"Enhanced damages are as old as U.S. patent law," and the animating principle has been the same since the Patent Act of 1836:  deterring deliberate infringement or other bad faith conduct that shows a lack of respect for intellectual property, as distinguished from infringement that occurred "in ignorance or good faith."  *Halo Elecs., Inc.* v. *Pulse Elecs., Inc.*, 579 U.S. 93, 97 (2016).  As construed by the Supreme Court, 35 U.S.C. § 284 achieves that purpose by giving a trial court "discretion to decide whether [a] case is sufficiently egregious to warrant enhancing

-5-

damages and to decide the amount of enhancement that is warranted (up to the statutory limit of treble damages)." *Polara Eng'g Inc* v. *Campbell Co.*, 894 F.3d 1339, 1353 (Fed. Cir. 2018) (discussing *Halo*, 579 U.S. at 100). The trial court should exercise that discretion based on the "particular circumstances of each case." *Halo Elecs., Inc.*, 579 U.S. at 106.

In the 2016 *Halo* decision, the Supreme Court rejected a rigid test for enhanced damages, but post-*Halo*, many courts still have used a nine-factor balancing test—set forth in *Read Corp.* v. *Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992)—as a framework for the analysis. Those nine factors, "although not mandatory, do assist the trial court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages at all, and if so, by how much." *WCM Indus., Inc.* v. *IPS Corp.*, 721 F. App'x 959, 972 (Fed. Cir. 2018).[2]

The *Read* factors consist of: (i) whether the infringer deliberately copied the ideas of another; (ii) whether the infringer investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (iii) the infringer's behavior as a party to the litigation; (iv) the defendant's size and financial condition; (v) the closeness of the case; (vi) the duration of the defendant's misconduct; (vii) remedial action by the defendant; (viii) the defendant's motivation for harm; and (ix) whether the defendant attempted to conceal its misconduct. *Read*, 970 F.2d at 827. Generally, no single factor is dispositive, nor do all or most of the factors have to be present to enhance damages.[3] *See Barry* v. *Medtronic, Inc.*, 250 F. Supp.

---

[2] *See Georgetown Rail Equip. Co.* v. *Holland L.P.*, 867 F.3d 1229, 1244-46 (Fed. Cir. 2017) (affirming enhanced damages award where district court "applied and considered all nine *Read* factors"); *SRI Int'l, Inc.* v. *Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (same).

[3] After *Halo*, facts relevant to enhanced damages must be proven by only a preponderance of the evidence, *Halo Elecs., Inc.*, 579 U.S. at 107, and the court may consider evidence that was not presented to the jury, *see Idenix Pharms. LLC* v. *Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 697 (D. Del. 2017).

3d 107, 112, 119 (E.D. Tex. 2017). Rather, as the Supreme Court stated in *Halo*, the ultimate standard simply is whether the particular facts demonstrate culpability that warrants deterrence. *See Halo Elecs., Inc.*, 579 U.S. at 103-04.

Although the *Read* factors provide an analytic framework, the Supreme Court provided important guidance that a court should take into account: "culpability is generally measured against the knowledge of the actor ***at the time of the challenged conduct***." *Halo Elecs., Inc.*, 579 U.S. at 105 (emphasis added). As the Supreme Court explained, the Federal Circuit's pre-*Halo* test for enhanced damages placed undue emphasis on creation of *ex post* litigation defenses without any evidence that the infringer "act[ed] on the basis of the defense or was even aware of it." *Id*. Thus, "the ability of the infringer to muster a reasonable (even though unsuccessful) defense" in litigation should be given little weight—otherwise, a culpable infringer would "escape any comeuppance under § 284 solely on the strength of [his or her] attorney's ingenuity." *Id*.

## FACTUAL BACKGROUND

### A. Norton Willfully Infringed Columbia's Patents.

The jury was instructed that it could find Norton's infringement to be willful if "Columbia proves by a preponderance of the evidence that Norton knew that its actions constituted infringement of an asserted claim or made itself willfully blind to its infringement of Columbia's asserted claims." (Trial Tr. 2838:23-2839:13.) Going beyond the jury instruction, Norton's counsel argued in closings that the willful infringement question on the verdict form was "a 'do not press [] button'" because it is "all about the company" and "your statement of who we are" and an "indictment" of Norton. (*Id*. 2786:6-2787:8.) Fully aware of the significance of the willfulness finding, the jury made such an "indictment" based on the evidence. The jury found not only that Norton directly and literally infringed each and every asserted claim of the '322 and '115 Patents—and indirectly infringed each and every asserted claim from the '322 Patent—but

-7-

also found that Norton's infringement of each patent was willful.   (Dkt. 1206 at 1-4.)

Overwhelming evidence supported the jury's verdict, as shown below.

           1.      <u>Norton Told Columbia It Would Pay a Royalty for Use of Its Patent-Pending Invention, But Then Refused</u>

The evidence is uncontroverted:  On October 25, 2005, Columbia filed the provisional

patent application for the invention that eventually led to issuance of the Asserted Patents.  (Ex. G

(PX-4); Trial Tr. 361:12-362:4; 562:4-15.)   That year, the Columbia inventors presented their

invention—referred to as the "application communities" technology—at a workshop sponsored by

DARPA, and a Norton representative, Brian Witten, attended.  (Trial Tr. 573:1-574:9.)  Dr. Stolfo

testified that, following the workshop, he and Mr. Witten discussed the "application communities"

invention, and that Mr. Witten's unequivocal reaction was:  "We want to license this from you."

(*Id*. 574:16-25.)  Norton did not call Mr. Witten to testify.

As Dr. Stolfo explained, the Columbia invention was attractive to Norton because it was

directed at "detecting zero day attacks," a feature that had become necessary for Norton's malware

detection products in light of the huge proliferation of new malware in the early 2000s.  (*Id.*

558:10-559:12; 1016:6-18.)  Dr. Stolfo testified that Norton's products at that time, by contrast,

used so-called "signature based" malware detection that was "not very successful at defending

against zero day attacks," such that, without incorporation of an invention like the "application

communities" technology, they "would soon be obsolete and valueless."  (*Id.* 574:21-575:14.)

A November 2005 e-mail chain introduced at trial fully corroborates Dr. Stolfo's testimony

(Ex. H (PX-83).)   Specifically, in PX-83, Norton's Mr. Witten expressed interest in the

"application communities" technology (Trial Tr. 576:13-20), and Dr. Stolfo informed him that the

invention was covered by "IPR" (intellectual property rights)—a clear reference to the provisional

patent application filed just a week earlier (*id.* 578:7-579:2).  Dr. Keromytis likewise testified that

he understood Mr. Witten to be offering, in PX-83, to license the "Application Communities work," which Norton was interested in "because they didn't have the capability like what we had and they were interested in expanding their offering" to incorporate the invention described in the Asserted Patents.  (*Id.* 795:1-796:25.)

As recounted at trial, Norton was planning to integrate Columbia's "application communities" technology into specific Norton products that generated "roughly a billion dollars annually."  (PX-83 at 3.)  In fact, the correspondence quickly progressed to specific licensing terms, whereby Mr. Witten indicated that he had discussed licensing the invention with senior Norton management and was prepared to offer Columbia a running royalty.  (*Id.*; Trial Tr. 579:5-580:21.)  Dr. Stolfo testified that, in subsequent licensing discussions, he advised Mr. Witten that "a quarter of a percent, or half of a percent, was way below market" and that he believed "6 percent would be probably a fair negotiated value."  (Trial Tr. 582:9-14.)  Later in the correspondence, the parties confirmed that "[a]bsolutely all conversations pertaining to licensing and all materials exchanged related to discussion of licensing . . . are absolutely confidential and covered under the terms and conditions of the existing NDA."  (PX-83 at 1.)  Norton did not provide any evidence at trial to contradict these facts.

Additional documentary evidence corroborated Dr. Stolfo and Dr. Keromytis' testimony that Norton wanted to license Columbia's "application communities" technology.  (*See, e.g.*, Trial Tr. 583:1-584:17 (testifying that he reminded Mr. Witten in an April 2006 email chain that the "application communities" technology "[was] owned by Columbia and not licensed to anyone" because Mr. Witten "previously expressed interest in licensing [the 'application communities' technology]" and he "wanted [Mr. Witten] to be alerted to" another aspect of that technology described in the email); Ex. I (PX-776) at 2.)  In those communications, Dr. Stolfo noted that the

information he was sharing was pursuant to the "confidentiality agreement" into which the parties had entered related to the "[Application Communities] proposal to DARPA" (PX-776 at 1), and Dr. Stolfo testified that "the fact that Columbia and [Norton] ha[d] a confidentiality agreement [made him] more comfortable in disclosing [his] invention to [Norton]" (Trial Tr. 584:13-17).

During discovery, Norton notably did not produce any evidence relating to these licensing discussions, and only Columbia produced the e-mail correspondence with Mr. Witten (at his symantec.com e-mail address), which is PX-83. Norton has never been able to explain why it produced no evidence relating to this issue—including internal correspondence regarding the potential license—despite its obvious relevance to the case. In all likelihood, the record is missing substantial additional evidence of willfulness that uniquely is in Norton's possession.[4]

### 2.    Norton Refused to Take a License Even After Patent Issuance

Columbia and Norton's patent licensing discussions extended beyond the November 2005 e-mail correspondence. At trial, Mr. Orin Herskowitz, the Senior Vice President of Intellectual Property and Technology Transfer at Columbia, testified about meetings and correspondence between Columbia and Norton in the 2010-2011 period, the purpose of which was to educate Norton about Columbia-owned technologies that may be of interest to Norton, including the

---

[4] In its 2014 Initial Disclosures, Norton identified Mr. Witten as having information relevant to Columbia's inventorship and state-law claims only. When the case resumed in 2018, Norton updated its disclosures and removed Mr. Witten entirely. Norton's counsel told Columbia's new counsel—unfamiliar with the details of the case at the time—that Mr. Witten was removed because it had been determined that he was included in error in the first place. It now is abundantly clear that the removal of Mr. Witten from Norton's disclosures was improper, and the representations made as to why Mr. Witten was removed were false. During trial, Norton's counsel made the wrong representation that Mr. Witten had been deposed (Dr. Stolfo testified he did not know) when asking Dr. Stolfo if he knew whether Mr. Witten agreed with Dr. Stolfo's recollection of the licensing discussions. (Trial Tr. 636:4-6.) Norton thus suggested to the jury without basis that there was evidence contradicting Dr. Stolfo's testimony, but there is no such evidence.

"application communities" technology that became the Asserted Patents. (Trial Tr. 382:14-383:5.)

For instance:

- In June 2010, Columbia had a meeting with Norton's then-Chief Technology Officer, Mark Bregman, in advance of which Columbia sent Norton a presentation introducing some of the work of Dr. Stolfo and Dr. Keromytis, including "[i]ntrusion detection in computer systems, **anomaly detection**, [and] attacker modeling." (*Id.* 374:16-377:19; 381:6-10; Ex. J (PX-426) at 24 (emphasis added).)

- A so-called "leave-behind" prepared and distributed in connection with the June 2010 meeting included a "technology brief" entitled "Methods, media and systems for detecting an anomalous sequence of function calls" and specifically described an "invention [that] includes a system for **model-based anomaly detection of function calls**"—*i.e.*, the very same invention disclosed in the Asserted Patents. (Trial Tr. 381:12-384:18; Ex. K (PX-836) at 19 (emphasis added).)

- Following the June 2010 meeting, Columbia sent—at Norton's request—additional "backgrounders" regarding each of Dr. Stolfo and Dr. Keromytis' areas of research, including "unsupervised **anomaly detection**" that is "capable of discovering threats that have never been seen before." (Trial Tr. 385:25-388:20; Ex. L (PX-77) at 4 (emphasis added).) A few months later, Mr. Shou requested that Columbia "resend the cloud computing and security packages"—*i.e.*, the "backgrounders" it previously had sent to Norton. (Trial Tr. 391:19-393:14; Ex. M (PX-389) at 1.)

- In January 2011, another meeting between the parties was scheduled, an agenda circulated in advance of which (i) designated time to discuss "[p]otential collaborations & licensing opportunities (requires reviewing IP portfolio)," and (ii) indicated that Dr. Stolfo and Dr. Keromytis personally would attend the meeting. (Trial Tr. 390:20-391:18; Ex. N (PX-37) at 1-2.)

- A document provided to Norton by Columbia at the January 2011 meeting (Ex. O (PX-72)) included an "**anomaly detection**" category that identified a number of invention reports specifically related to the invention that became the Asserted Patents, any recipient of which would have been able to determine to which patents those inventions related. (Trial Tr. 393:15-395:8; PX-72) at 1 (emphasis added).)

Despite all of these discussions and information disclosed to Norton about Columbia's patented technology—and Norton initially offering to pay Columbia a running royalty—Norton ultimately decided to use Columbia's technology without paying a fair share of the profit to Columbia. The trial evidence showed why Norton made that decision: In Norton's own words, its products were unable to keep up with the "onslaught" of new malware (Ex. P (PX-325) at 11;

*see* Ex. Q (PX-315) at 8), and Norton needed new technology that could detect "zero-day" threats (Trial Tr. 1434:9-1437:16; Ex. R (PX-170) at 2).  After the November 2005 licensing discussions fell through, Norton acquired behavioral technology called TruScan, but TruScan, according to Norton, was "long in the tooth" and "detect[ed] almost nothing."  (Ex. S (PX-490) at 1; Ex. T (PX-501) at 1.)  Thus, Norton turned back to Columbia's invention, which allowed Norton to market products with zero-day malware detection that actually worked.  (Ex. U (PX-504) at 2; Ex. V (PX-530) at 12-15.)

In 2009, Norton launched its first Accused Product that included the infringing functionality—SONAR 2.0 or BASH 6.0—and, as Dr. Bailey testified at trial without contradiction, all Accused Products since then have included the same infringing functionality. (Trial Tr. 1020:18-1021:25; 1027:20-25; 1228:23-1229:3; 1261:7-9; *see* Dkt. 705-1 ¶¶ 11-13 (identifying all Accused Products); Trial Tr. 2820:7–2821:15.)  Norton's approach with respect to both TruScan and Columbia's technology reflected Norton's corporate culture.  As the jury heard at trial, Norton's "preference has been to get technology R&D conducted by other companies as opposed to developing it organically in-house."  (Trial Tr. 1854:16; JX-007 (Mutu) 108:8-13.)

3.     <u>Columbia Told Norton It Was Infringing, and Norton Ignored Columbia</u>

The '115 Patent issued on December 6, 2011,[5] and, as Mr. Herskowitz testified at trial, Columbia sent Norton a letter in August 2012 specifically identifying the issued '115 Patent and

---

[5] There is no colorable argument that Norton did not actually know of Columbia's patent-pending invention.  Columbia's patent application published in 2007 (Ex. W (PX-830) at 3), and it was cited on the face of Norton's own patents (U.S. Patent No. 8,429,744 (citing prior publication 2010/0023810); U.S. Patent No. 9,953,158 (same)).  The claims in Columbia's published application are consistent with the Asserted Claims of the '115 and '322 Patents.  This further confirms willfulness, and the Court may consider this evidence.  *See Halo Elecs., Inc.* v. *Pulse Elecs., Inc.*, 281 F. Supp. 3d 1087, 1092 (D. Nev. 2017) (court was not "restrict[ed] . . . to the evidence produced at trial" since "[t]he Supreme Court and Federal Circuit both instructed that [it] consider *all* the circumstances").

advising that Norton required a license.   (Trial Tr. 395:13-396:9; Ex. X (PX-331) at 1-2.)

Mr. Herskowitz testified that, had Norton "wanted to take a look at the ['115] patent" following

receipt of the August 2012 letter, it had the necessary information to do so.   (Trial Tr. 396:10-21.)

On December 3, 2013, the '322 Patent issued, and Columbia informed Norton of the issued patent

in a December 6, 2013 letter.   (*Id.* 397:22-398:16; Ex. Y (PX-22) at 1.)   As Mr. Herskowitz

testified, Columbia sent this letter "[b]ecause [it] had run out of any other way of getting [Norton]

to take a license to the patents." (*Id.* 398:14-16.)   Columbia had no choice but to take a step it

almost never does:  File this lawsuit, alleging infringement of both Asserted Patents.[6]  (Dkt. 12.)

Despite the fact that this lawsuit has been pending for more than a decade, Norton offered

no evidence that, before Columbia was forced to sue, Norton attempted to (i) investigate the scope

of the Asserted Patents and whether it was infringing, or (ii) design around the patents to avoid

infringement.   To the contrary, Norton testified in 2014 that, despite repeated notice, (i) it had

never read the Asserted Patents, (ii) it had "never crossed [its] mind" to "investigate whether [the

Accused Products] are infringing Columbia's patents," (iii) it had never "instruct[ed] anybody on

[the engineering] team to research the Columbia patents," and (iv) it had not instructed anyone to

"prepare design-arounds to the Columbia patents." (Trial Tr. 1418:5; JX-005 (Laffoon) 42:18-21,

46:17-47:1, 104:17-21.)   At a second 30(b)(6) deposition in 2019, Norton confirmed that—five

years later—it still had not "ever looked at the patents in this case" and, when asked whether it had

ever discussed with someone at Norton whether "by changes to its product or processes, [Norton]

could avoid infringement of the patents," Norton's 30(b)(6) witness replied:  "We don't do that at

---

[6] In contrast to Norton's refusal to honor intellectual property rights, Mr. Herskowitz testified that his office had executed over 1,500 consensual licenses with those who use Columbia's technology. (Trial Tr. 351:2-7.)   During this time, Columbia filed infringement litigation only "one or two" times.   (*Id.* 398:17-399:2.)

[Norton]."  (JX-005 (Laffoon) 67:8-10, 69:6-15.)  No evidence shows the slightest effort by Norton to investigate the Asserted Patents or respect the property rights the law creates in such patents.

Even more remarkably, Norton offered ***no defense*** to willfulness at trial.  Norton did not call Mr. Laffoon or Mr. Witten—or any other witness—to testify that Norton was not aware of its infringement of Columbia's patents.  Norton did not even call a witness to testify about when and how Norton purportedly researched and developed the infringing version of the SONAR/BASH product feature.  Norton engineers who testified by deposition likewise offered no evidence even suggesting that Norton had adopted the infringing technology by any process other than copying the technology Columbia had disclosed.  And Shane Pereira—the person responsible for SONAR/BASH when the infringing functionality was implemented (Trial Tr. 1986:14-16; 1990:14-1991:4; Ex. Z (Kane Tr.) 56:4-8)—notably was absent from Norton's case.  Although Norton's counsel represented in openings that he knew "for sure" that PX-83 (*i.e.*, the email in which Norton offered to license Columbia's technology) was not about the Asserted Patents (Trial Tr. 334:15-21), and that the jury was going to hear how Norton launched the infringing SONAR/BASH feature for the low sum of "$3.6 million" (*id*. 332:21-25)—a surprising fact that is far more consistent with copying than in-house R&D—those were empty promises for which Norton adduced no evidence, which is evidence one would expect to see if Norton did anything other than copy Columbia's invention.

### B.    Norton's Behavior as a Litigant Has Been Egregious.

As explained above, after years of effort to get Norton to enter into a reasonable license agreement, Columbia had to file this lawsuit, which is something that Columbia very rarely does (*Id*. 398:17-399:2).  Norton's strategy to delay and obfuscate became clear when the case returned to the District Court in 2018—after Norton lost before the PTAB and lost twice before the Federal Circuit in decisions rejecting Norton's claims that the Asserted Patents were invalid.  Still, Norton

did nothing to respect Columbia's patent rights.  As explained in Columbia's § 285 Motion (at 3-20), the manner in which Norton has litigated this case since 2018 has been exceptional in every respect—ranging from a pattern of wasteful tactics to the making and re-arguing of exceptionally weak positions.  Columbia does not re-recite here all of the reasons that Norton's behavior as a party to this litigation has been unreasonable (*see id.*), but Columbia summarizes three particularly relevant points.

*First*, since 2018, Norton has taken a kitchen-sink approach to this litigation, advancing one weak argument after another, which unnecessarily prolonged this litigation and made it unnecessarily costly.  Columbia has prevailed on every substantive motion relating to infringement since 2018.  For example, (i) all motions relating to Norton's prior art and Section 101 invalidity defense (*see* Dkt. 251 (IPR estoppel); Dkt. 288 (Rule 12(c) § 101 decision); Dkt. 683 (sua sponte § 101 order)); (ii) all motions relating to claim construction (*see* Dkt. 306 ("model of function calls for the at least a portion of the program"); Dkt. 713 ("anomalous")); (iii) all motions relating to non-infringement defenses (*see* Dkt. 686 (prosecution history estoppel)); (iv) all *Daubert* motions regarding infringement (Dkts. 701 (Nielson); 703 (Bailey); 717 (Jaeger); 737 (Cole & Sullivan); 739 (Supp. Jaeger); 741 (Supp. Hosfield)); and (v) all motions *in limine* regarding infringement (*see* Dkts. 889; 891; 898; 899; 900; 902; 903; 904; 905; 906; 907; 911; 912; 913; 915).  Time and again, Norton advanced every argument its counsel could conjure regardless of legal support or strength, and, as demonstrated in Columbia's § 285 Motion, Norton endlessly re-argued points that the Court already had rejected, and did so in thinly-veiled iterations (§ 285 Motion at 7-13).

*Second*, with regard to Columbia's patent infringement claims, Norton had no reasonable defenses after this case returned to the District Court in 2018.  The Court excluded Norton's two main non-infringement defenses—regarding the terms "anomalous" and "application

community"—as attempts to re-argue claim construction arguments that Norton already had lost, and properly so. (§ 285 Motion at 9-10, 16-19.) Then Norton's new trial counsel removed from the case—and did not present at trial—other non-infringement defenses that Norton had advanced for years. (*Id.* at 17-19.). Moreover, the non-infringement defenses that Norton did present at trial were unsupported by evidence. Although Norton conceded that SONAR/BASH satisfied the Court's construction of the term "emulator" (Trial Tr. 2067:9-17), Norton argued that SONAR/BASH did not execute programs "in" an emulator (*id.* 2065:17-2066:18; 2071:12-15). On that issue, the only opinion that Norton's Dr. Jaeger had to offer was an improper claim construction argument that the Court rejected in 2014 and excluded the day of Dr. Jaeger's direct examination. (*Id.* 2045:7-2050:20.) Dr. Jaeger provided no explanation for Norton's non-infringement position, and after the Court sustained objections, Norton's counsel said he would "move on." (*Id.* 2066:6-18.) With respect to the only issue on which Dr. Jaeger made an effort—the question of what constitutes a "model"—Dr. Jaeger admitted that he provided no alternative definition of "model" to the jury (*id.* 2198:16-2199:2), and the testimony he did provide was contradicted by his own 2017 research paper (*id.* 2213:24-2217:23).

To the extent Dr. Jaeger explained Norton's non-infringement positions at all, Dr. Jaeger relied exclusively on demonstratives from Norton's opening statement, rather than independent work. (*Id.* 2074:14-2075:25.) Furthermore, Dr. Jaeger readily admitted that (i) he had spent only a cursory amount of time reviewing source code for the Accused Products, and (ii) his "orientation" for that source code review was provided by Norton's outside litigation counsel (counsel who made no appearance at trial). (*Id.* 2110:21-2112:22.) Dr. Jaeger also had not bothered to speak with any Norton engineer or other employee about Norton's source code or any other topic that was relevant to the issues presented at trial. (*Id.* 2112:23-2114:14.) Indeed,

Dr. Jaeger purported to interpret Norton's 30(b)(6) deposition testimony, despite admitting that he never had talked to the deponent.  (*Id.* 2113:7-25, 2114:10-14, 2136:2-6.)  In short, Norton offered exceedingly weak non-infringement defenses based on conclusory testimony of an expert witness who plainly was not familiar with the material facts of the case.

Norton's trial presentation was particularly weak for yet another reason:  Norton failed to call a single fact witness to testify about how the infringing product feature came to be in Norton's Accused Products.  Instead, Norton called only a Broadcom employee, David Kane, who "did not work on BASH in any meaningful way." (*Id.* 1988:12-1990:8; Kane Tr. 55:4-8; Trial Tr. 2009:17-21; 2015:2-6; 1990:9-13.)   Mr. Kane also provided the jury with entirely misleading and conclusory testimony about what he considered to be a "model" (*id.* 1960:2-8), but then readily admitted that he was unfamiliar with the definition of "model" and had no basis to disagree with Columbia's Dr. Bailey or Norton's 30(b)(6) testimony on the same topic (*id.* 2006:1-2008:14). Tellingly, Norton did not call as a witness either Mr. Pereira—the person most knowledgeable about the infringing product feature (*id.* 1990:14-1991:4; Kane Tr. 56:4-8)—or Mr. Bromwich (Trial Tr. 1984:8-1985:6), a senior engineer who had publicly described Norton's training of behavioral detection models as clearly meeting a contested claim limitation—"us[ing] many models and combin[ing] them in a good way" (Ex. AA (PX-236) at 3; Trial Tr. 2018:11-2023:2). Norton failed to call material witnesses, and its non-infringement case was entirely superficial.

*Third*, with regard to damages for patent infringement, Norton "swung for the fences" and missed with sham theories that sought to ascribe zero value to Columbia's Asserted Patents, despite the fact that Norton described the infringing product feature as the "heart" of its malware detection technology.  (Trial Tr. 1394:1-9; PX-170 at 1.)  The Court excluded many of these theories, and related expert opinions, before trial.  (*See, e.g.*, Dkt. 739 at 17-29; Dkt. 741 at 15-27;

Dkt. 900; Dkt. 905; Dkt. 907; Dkt. 1086 at 1.)  Then, during trial, Norton voluntarily decided (i) not to call their economics expert, Mark Hosfield, at all (Trial Tr. 1867:2-9), and (ii) not to provide any of Dr. Jaeger's apportionment testimony (Ex. BB (Apr. 19, 2022 E-mail from D. Carr to L. Deskins)).  Norton's counsel also engaged in a wholly improper cross-examination of Columbia's Dr. Cole, during which it sought to create a back door to their excluded damages number (*i.e.*, a decimal approaching zero) through purported testimony from Norton's counsel.  (*See* § 285 Motion at 10-13.)  Norton's frivolous damages case caused both Columbia and the Court to expend significant resources, and delayed the jury trial one full day.

Every aspect of Norton's defense since this case returned to the District Court in 2018—from early motions to trial presentation—was exceptionally weak, as explained in more detail in Columbia's § 285 Motion.

**ARGUMENT**

Under the Supreme Court's 2016 *Halo* decision, the determinative question is whether Norton's conduct was sufficiently egregious to warrant punishment and thus deterrence.  Guided by this principle and the facts of this case, Columbia urges the Court to award treble damages to punish, deter, and make an example of Norton's egregious conduct before and during this litigation.  The *Read* factors compel the same conclusion, as shown below.

**A.    The *Read* Factors Compel Enhanced Damages Under § 284**

      1.    <u>Factor 1: Norton Copied Columbia's Patent-Pending Invention</u>
              <u>While Misrepresenting to Columbia that It Would Pay a Royalty</u>

The first *Read* factor strongly favors enhancement because "[Norton] deliberately copied the ideas or designs of [Columbia]."  *Read*, 970 F.2d at 827.  The jury concluded that Norton's infringement of the Asserted Patents was willful based in substantial part on evidence of Norton's copying, as explained above (*supra* at 8-12), which is the type of evidence that courts frequently

-18-

have found sufficient to show copying.  *Georgetown Rail Equip. Co.* v. *Holland L.P.*, 2016 WL 3346084, at *17 (E.D. Tex. June 16, 2016) (use of a "very similar system" following a patentee's disclosure is "strong evidence of copying and favors enhanced damages"), *aff'd*, 867 F.3d 1229 (Fed. Cir. 2017).[7]  Moreover, as explained above, Norton did not offer an alternative theory to copying, *e.g.*, by presenting evidence of its own development of the infringing product feature, which also strongly supports an inference of copying.  *See, e.g.*, *Imprenta* v. *Karll*, 20-CV-6177 Dkt. 95 (C.D. Cal. May 13, 2022) (concluding infringers copied patentee's invention where infringers "ha[d] not produced any evidence of independent development to suggest otherwise").

At trial, Norton emphasized that the Asserted Patents did not issue until 2011 and 2013, but the infringing feature launched in 2009.  That is irrelevant.  The first *Read* factor focuses on the copying of "ideas or designs"—here, Columbia's "application communities" invention disclosed to Norton in 2005 and published in a patent application in 2007 (*see supra* at 8-14).  The fact that Norton's copying occurred before the Asserted Patents issued is irrelevant because the "copying inquiry under *Read* focuses not on whether [the infringer] copied [the patentee's] patent but whether it copied 'the ideas or designs of another,' ***regardless of when [the] patents might have issued***."  *Medtronic*, 250 F. Supp. 3d at 112 (emphasis added).  The first *Read* factor strongly favors enhancement.

2.      Factor 2: Norton Infringed in Bad Faith

---

[7] *See Crane Sec. Techs., Inc.* v. *Rolling Optics AB*, 337 F. Supp. 3d 48, 57 (D. Mass. 2018) ("The Court observes that the similarities of RO's technology to Crane's patented invention, coupled with RO's extensive knowledge of Crane's intellectual property rights and products, support the inference of copying that favors enhancement."), *aff'd*, 784 F. App'x 782 (Fed. Cir. 2019); *Arctic Cat Inc.* v. *Bombardier Recreational Prods. Inc.*, 198 F. Supp. 3d 1343, 1350 (S.D. Fla. 2016) (similar), *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017); *Barry* v. *Medtronic, Inc.*, 250 F. Supp. 3d 107, 112 (E.D. Tex. 2017) ("'Smoking gun' evidence of copying is [] not required . . . .").

The second *Read* factor also strongly supports enhancement.  The record shows that Norton did not perform any investigation of the Asserted Patents—not in 2012, when Columbia sent Norton a letter specifically identifying the '115 Patent, and not in 2013, when Columbia filed this lawsuit.  (*See supra* 12-14.)  Instead, Norton's corporate representative confirmed that Norton did ***not*** investigate the Asserted Patents, which was a matter of corporate policy.   (*See* JX-005 (Laffoon) 69:12-15 ("A. We don't do that at [Norton]. Q. Do what? A. Well, the things you said, try to design around patents and things like that.").)  Courts frequently have concluded that a failure to investigate the asserted patents in good faith, outside of litigation-inspired defenses, weighs in favor of enhanced damages. *Apple Inc.* v. *Samsung Elecs. Co.*, 258 F. Supp. 3d 1013, 1032 (N.D. Cal. 2017).[8]

Although Norton's litigation counsel put forward every possible defense—regardless of the merits—there is zero evidence that Norton sought and relied on advice of counsel at the legally relevant times, *i.e.*, (i) before copying Columbia's ideas, (ii) before launching the infringing product feature, or (iii) when Columbia notified Norton of the need to take a license before this litigation started.  As the Supreme Court explained in *Halo*, "culpability is generally measured against the knowledge of the actor ***at the time of the challenged conduct***," and "the ability of the infringer to muster a reasonable (even though unsuccessful) defense" in litigation has little (if any) relevance.  579 U.S. at 105 (emphasis added).  Accordingly, "[t]he fact that [Norton] may have

---

[8] *See also Milwaukee Elec. Tool Corp.* v. *Snap-On Inc.*, 288 F. Supp. 3d 872, 901 (E.D. Wis. 2017) ("The absence of evidence of an adequate investigation means that [the defendant] likely did not hold a reasonable belief that the patents were invalid"); *Arctic Cat Inc.*, 198 F. Supp. 3d at 1351 ("[I]t is disingenuous at best for [infringer] to claim that it subscribed to the good-faith belief that the patents were invalid where . . . no [] employee even took the time to review the 31 claims in the issued [patent]."); *cf. Pavo Sols. LLC* v. *Kingston Tech. Co., Inc.*, 2021 WL 3116849, at *6-8 (C.D. Cal. Feb. 16, 2021) (second *Read* factor favored enhancement where infringer's investigation into validity—albeit existent—was "cursory and legally deficient" and there was no affirmative corporate "policy for seeking authority to use another party's patents").

developed some colorable invalidity or non-infringement theories during litigation—but years after infringement began—cannot remedy" culpability, *Milwaukee*, 288 F. Supp. 3d at 901, and "do[es] little to demonstrate its good faith belief in invalidity or non-infringement," *Pavo*, 2021 WL 3116849, at *7.[9]  The second *Read* factor tips heavily in favor of enhanced damages.

### 3.    Factor 3: Norton's Litigation Conduct Was Reprehensible

Since this case returned to the District Court in 2018, Norton's misconduct has in many ways been the mainstay.  In Columbia's § 285 Motion, Columbia describes in detail all of Norton's extraordinary litigation misconduct from 2018 through the 2022 trial.  As described in Columbia's § 285 Motion, Norton (i) repeatedly attempted to re-argue settled issues regarding invalidity and IPR; (ii) repeatedly attempted to re-argue claim construction and raised arguments—even at trial—that violated the Court's claim construction orders; (iii) filed meritless motions, including a baseless motion for sanctions directed at an attorney who "was trying to abide by every single rule" (Apr. 7, 2022 Tr. 57:1-7); (iv) failed in several respects to engage in good faith on pre-trial tasks; and (v) violated the Court's admonitions at trial not to misleadingly cross-examine witnesses.  (*See* § 285 Motion at 2-16.)  All of those facts strongly support enhanced damages, and for efficiency, Columbia does not re-recite all of those relevant facts here.

With regard to the law, courts confronted with a ***single*** instance of litigation misconduct have found that the third *Read* factor favors enhancement.  *See Cyntec Co., Ltd.* v. *Chilisin Elecs. Corp.*, 2022 WL 1443232, at *14 (N.D. Cal. May 6, 2022) (third *Read* factor favors enhancement where infringer "attempted, on multiple occasions, to reopen claim construction").[10]  But when—

---

[9] *See R–BOC Representatives, Inc.* v. *Minemyer*, 233 F. Supp. 3d 647, 686-87 (N.D. Ill. 2017) ("[W]e are concerned, not with what defenses or stories were devised, but what the infringer knew or thought.").

[10] *See also Top Lighting Corp.* v. *Linco, Inc.*, 2019 WL 13020830, at *5 (C.D. Cal. Aug. 26, 2019) (same where infringer "fail[ed] to submit required pretrial documents and respond to discovery");

as is the case here—"[a]t nearly every stage of [the] litigation, [the infringer] took untenable positions and created unnecessary and wasteful work for the parties and the Court," courts find that this factor heavily weighs in favor of enhanced damages. *Tinnus Enters., LLC* v. *Telebrands Corp.*, 369 F. Supp. 3d 704, 722 (E.D. Tex. 2019); *see SRI Int'l, Inc.* v. *Cisco Sys., Inc.*, 254 F. Supp. 3d 680, 722-25 (D. Del. 2017), *aff'd in relevant part*, *SRI Int'l, Inc.*, 14 F.4th 1323, 1330-31.

SRI is particularly instructive. Like much of Norton's conduct in this case, the court noted that the infringer "pursued litigation about as aggressively as the court ha[d] seen in its judicial experience," and in doing so "crossed the line in several regards," including by (i) pursuing defenses at trial that were contrary to the court's rulings or the infringer's internal documents; (ii) engaging in frivolous motion practice, including a frivolous sanctions motion (as occurred here); (iii) and severely over-designating deposition testimony while ultimately only "present[ing] 22 lines of testimony from a single transcript at trial." 254 F. Supp. 3d at 721-23. In affirming the district court's enhancement award, the Federal Circuit endorsed the court's heavy reliance on the infringer's litigation misconduct as the basis for enhancing damages, explaining that the infringer had "created a substantial amount of work for both SRI and the court, much of which was needlessly repetitive or irrelevant or frivolous." *SRI Int'l Inc.*, 14 F.4th at 1330-32.

Similarly, in *Tinnus Enters., LLC*, the court found "significant enhancement" appropriate "given [infringer's] continued litigation misconduct," including (i) filing "several non-meritorious

---

*Eidos Display, LLC* v. *Chi Mei Innolux Corp.*, 2018 WL 1156284, at *5 (E.D. Tex. Mar. 5, 2018) (same where infringer "wait[ed] until moments before hearings to resolve disputes"); *VirnetX Inc.* v. *Apple Inc.*, 324 F. Supp. 3d 836, 868 (E.D. Tex. 2017) (same where infringer tried to "inject evidence" of post-grant proceedings "even after receiving adverse rulings from the Court"); *Joyal Prods., Inc.* v. *Johnson Elec. N. Am., Inc.*, 2009 WL 512156, at *6 (D.N.J. Feb. 27, 2009) (same where infringer was "warned by the Court" during cross-examination about "distorting the case" through "the questions [] put to th[e] witness").

motions, thereby expending significant resources of the parties and the Court," (ii) repeatedly rearguing, through its expert, "rejected positions" regarding claim construction, and (iii) soliciting "prohibited testimony" following sustained objections.  369 F. Supp. 3d at 718-21; *see also Saint-Gobain Autover USA, Inc.* v. *Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 752 (N.D. Ohio 2010) (enhancing damages where "record is replete with instances where Defendants pursued a course of conduct that had the effect of unduly burdening the Court with unnecessary matters and prolonging the litigation").  Likewise, in *EagleView Techs., Inc.* v. *Xactware Sols., Inc.*, the court concluded that the infringer's litigation misconduct "significantly favor[ed]" enhancement where the infringer had "litigated this case in a manner that ignored the weaknesses of their own positions, advanced unreasonable arguments, and forced Plaintiffs to spend significant sums rebutting those unreasonable positions and arguments."  522 F. Supp. 3d 40, 69 (D.N.J. 2021).

Consistent with precedent, Norton's litigation misconduct that permeated every aspect of this case tips very heavily in favor of enhanced damages.

4.     Factor 4: Norton Is a Large Corporation That Received Revenue of More Than $18.5 Billion from the Infringing Products

The Fourth *Read* factor—the size and financial condition of the infringer—"is used to ensure that any damages enhancement is not out of proportion with the defendant's size and the scope of its infringing versus non-infringing sales."  *Pavo*, 2021 WL 3116849, at *11 (citations omitted).  The fourth *Read* factor strongly favors enhancement.

Norton is a large for-profit corporation that employs 2,700 people, and, until late 2019— when Norton sold to Broadcom for more than $10 billion its business of selling infringing products to enterprise customers—employed more than 12,000 people.  (Trial Tr. 1980:12-1981:19.)  There is no dispute that Norton received approximately $18.5 billion in revenue for its sales of the Accused Products through February 2022.  (*Id.* 1738:3-16.)  The jury's award of approximately

-23-

$185 million—which does not take into account the jury's willful infringement finding—represents a modest 1% royalty relative to far greater profits that Norton obtained because of Columbia's technology.  (*See id.* 1463:4-7 ("So to compare this with prior to 2009 where we were losing market share to McAfee and had low efficacy, with the finishing version of SONAR/BASH, things changed and now they had a huge competitive advantage.")); *see Centripetal Networks, Inc.* v. *Cisco Sys., Inc.*, 492 F. Supp. 3d 495, 603 (E.D. Va. 2020) (fourth factor favored enhancement where addition of infringing functionality correlated with substantial increase in profit).

Moreover, in 2021, Norton received approximately $2.6 billion in revenue (███████████ ██████████████████████████).  *See* Ex. CC (NortonLifeLock Inc., Annual Report 2021 (Form 10-K) (May 21, 2021)) at 90; Ex. DD (Sullivan Add'l Suppl. Calc'ns) Attach. F-6b; (Sullivan Decl. ¶¶ 11-12).  Similarly, Norton's 2021 letter to investors stated that Norton "finished fiscal year 2021 with strong results, delivering record revenue and non-GAAP profit in Q4," a remarkably high "non-GAAP profit margin of 50%," and "annualized free cash flow in excess of $900 million."  Ex. CC at 2-3.  Thus, an award of treble damages would not remotely be out of proportion to either Norton's size or total sales of infringing products, which make up the substantial majority of Norton's revenue and profit.  "Where, as here, [Norton] is a multi-billion dollar enterprise and the market leader—due in significant part to sales of products found to willfully infringe [Columbia's] patents—enhancement of damages is particularly warranted."  *Alfred E. Mann Found. for Sci. Rsch.* v. *Cochlear Corp.*, 2018 WL 6190604, at *29 (C.D. Cal. Nov. 4, 2018), *aff'd*, 798 F. App'x 643 (Fed. Cir. 2020).

Additionally, Norton's resources are such that the jury's base damages award—sharing with Columbia a penny out of every dollar Norton received from core infringing technology—is highly unlikely to have the intended deterrence effect, and deterrence likely would result here only

if the Court awarded the statutory maximum (*i.e.*, a trebling of the jury's damages award).  *Pavo*, 2021 WL 3116849, at *11 (fourth *Read* factor "additionally accounts for calibration of such an award to allow for the proper deterrence effect").  Thus, the fourth *Read* factor heavily favors enhanced damages, and shows that significant enhancement is necessary for deterrence effect.[11]

     5.     <u>Factor 5: This Was Not a Close Case</u>

The fifth *Read* factor—closeness of the case—also favors enhancement for several reasons, as explained more fully in Columbia's § 285 Motion (at 7-10, 16-20).  Columbia does not re-recite all of those relevant facts here, but briefly summarizes three main points.  *First*, Columbia achieved a complete trial victory with regard to infringement—the jury found in favor of Columbia on each of the nine patent infringement questions on the verdict form.  *See, e.g.*, *Cyntec Co., Ltd*., 2022 WL 1443232, at *15 (fifth *Read* factor favored enhancement where jury rejected infringer's non-infringement arguments, found infringement was willful, and awarded full measure of damages).  As demonstrated above (*supra* at 15-18) and in Columbia's § 285 Motion (at 16-20), the patent infringement defenses that Norton presented at trial were exceedingly weak, and the jury rejected all of them.

*Second*, in addition to prevailing on every patent infringement issue at trial, Columbia also has prevailed on every single substantive motion relating to infringement since 2018 (*supra* at 15). This further shows the strength of Columbia's positions—and the relative weakness of Norton's positions—and tips in favor of enhanced damages.  *See Stryker Corp*. v. *Zimmer, Inc*., 2017 WL 4286412, at *5 (W.D. Mich. July 12, 2017) (favoring enhancement where "[e]very major

---

[11] The financial wherewithal of Columbia, a non-profit educational organization, is irrelevant. "[T]he proper focus is on the size and financial condition of the infringer and not on the ability of a plaintiff to protect its patent."  *Alfred E. Mann Found.*, 2018 WL 6190604, at *29.

decision—from claim construction to post-verdict motions—went against [infringer]"), *aff'd*, 745 F. App'x 167 (Fed. Cir. 2018).

*Third*, the fifth factor "ties in closely with the second factor," *Milwaukee*, 288 F. Supp. 3d at 903, and as explained above (*supra* at 12-14, 19-21), Norton's litigation defenses were not the product of a good faith investigation of Columbia's Asserted Patents, but rather were the product of a scorched earth strategy devised by litigation counsel. Columbia anticipates that Norton's opposition to this motion will focus heavily on its numerous litigation defenses—including some that were successful for different patents—but those defenses are entitled to no weight. *Halo*, 579 U.S. at 105. As to the patent infringement claims on which the jury rendered a verdict—and awarded Columbia damages—this was not a close case, and the fifth factor supports enhancement.

### 6. Factor 6: Norton's Misconduct Spanned More Than a Decade

As shown above (*supra* at 2-3, 8-10), Norton was aware of Columbia's patent-pending invention since November 2005. In 2009, Norton launched the infringing product feature without a license and then rebuffed Columbia's many attempts to enter into a license before Columbia filed its Complaint in 2013. Also as shown above (*supra* at 10-14, 19-21), Norton readily admitted that it never investigated Columbia's Asserted Patents and Norton continued to make billions of dollars from sales of infringing products during this litigation. Norton also never removed or made plans to remove the infringing feature from its products (Trial Tr. 1993:23-1994:2), even after the Federal Circuit rejected Norton's claim construction arguments and affirmed the PTAB's decision that Norton had not shown that the Asserted Patents were invalid. Norton thus ignored not only Columbia's claim to validity, but also judicial endorsement of it.

The duration of Norton's willful infringement—spanning more than a decade—tips in favor of enhanced damages. *See Eidos*, 2018 WL 1156284, at *6 (favoring enhancement where duration was due to infringer "failing to meaningfully investigate the [patent] while continuing to

infringe it for several years"); *Alfred E. Mann Found.*, 2018 WL 6190604, at *30 ("Continuing to sell infringing products after receiving notice of infringement [and] during the course of the litigation . . . supports an enhancement of damages.").

### 7.    Factor 7: Norton Took No Remedial Action

As described above (*supra* at 12-14), Norton never took remedial action, *e.g.*, by ceasing sales of infringing products or attempting to redesign those products.  To the contrary, Norton testified that it has a policy against "design[ing] around patents."  (Trial Tr. 1418:5; JX-005 (Laffoon) 67:8-10, 69:6-15.)  Although Norton may now contend—only after a jury verdict—that it will seek to remove the infringing product feature or redesign it, that is simply not relevant to the enhanced damages analysis.  *See Tinnus Enters., LLC*, 369 F. Supp. 3d at 723-24 (defendant "took no remedial action once they were on notice about infringement" and design-around "was spurred only by the [Court's] recommendation for a preliminary injunction"); *Creative Internet Advert. Corp.* v. *Yahoo! Inc.*, 689 F. Supp. 2d 858, 869 (E.D. Tex. 2010) (defendant "at no time prior to the jury's verdict" attempted to either cease infringement or design around the asserted patent).[12]  Norton made no efforts to remediate over a decade—by ceasing sales of infringing products, redesigning them, or entering into a license—even when Norton's invalidity arguments were rejected on appeal.  This factor tips in favor of enhancement.

### 8.    Factor 8: Norton's Motivation Warrants Deterrence

The eighth *Read* factor is "typically viewed as supporting enhanced damages where the infringer engages in infringing conduct to gain an edge over the patentee in a *competitive market*." *Pavo*, 2021 WL 3116849, at *14 (emphasis added).  Because Columbia is a non-profit educational

---

[12] *EagleView Techs., Inc.*, 522 F. Supp. 3d at 53-54 (favoring enhancement where infringer "seemingly took no efforts to design around the patent, and kept [its] products on the market until the very end").

organization that does not sell commercial products, the eighth *Read* factor does not apply here and should not factor into the overall assessment. *See Izzo Golf Inc.* v. *King Par Golf Inc.*, 2019 WL 4023562, at *8 (W.D.N.Y. Aug. 27, 2019) (eighth *Read* factor "neutral" and trebling damages on the basis of other factors); *VirnetX*, 324 F. Supp. 3d at 869 (eighth *Read* factor neutral).

Although the eighth *Read* factor, as "typically viewed," does not apply here, Columbia believes that the circumstances of Norton's infringement exhibit motivation that warrants deterrence. As Columbia's Mr. Herskowitz explained at trial, it is exceedingly rare that Columbia will commence litigation, which is the only way to enforce intellectual property rights. (Trial Tr. 398:17-399:6.) In the vast majority of cases, Columbia relies on companies acting in good faith and entering into a consensual license. (*Id.* 350:11-351:7.) Here, the evidence at least suggests that Norton took advantage of Columbia by encouraging professors to disclose inventions, stringing them along with the prospect of a royalty-bearing license, but then refusing to pay for use of the disclosed inventions.[13] (*Supra* at 8-12.) The Supreme Court's *Halo* decision encourages flexibility based on the particular facts of each case, and Columbia respectfully submits that Norton's behavior here—endlessly litigating rather than entering into a reasonable license agreement with Columbia as many others have done—exhibits a motivation that warrants deterrence. Thus, the eighth *Read* factor should tip slightly in favor of enhanced damages.

      9.    Factor 9: Norton Attempted to Conceal Its Willful Infringement
            During Discovery

As explained above (*supra* at 10), during discovery, Norton withheld documents and information relevant to its willful infringement by (i) failing to produce any documents regarding

---

[13] The Court also is familiar with the facts relating to Columbia's correction of inventorship and fraudulent concealment claims, which show a pattern of questionable conduct (at best) through which Norton was less than candid with Columbia's professors.

Norton's 2005 interest in licensing Columbia's "application communities" technology,[14] and (ii) removing Mr. Witten from Norton's Rule 26 disclosures in 2018 on the plainly incorrect premise that Mr. Witten had no information relevant to the case.  That type of withholding of discoverable information tips in favor of enhancement.  *Tinnus Enters., LLC*, 369 F. Supp. 3d at 724-25 ("unjustified withholding of relevant information . . . weighs in favor of enhancement" under the ninth *Read* factor); *see EagleView*, 522 F. Supp. 3d at 54-55 ("discovery strategies evinced an effort to withhold relevant, discoverable information" that "later revealed, in part, the scope of Defendants' infringement"); *Stryker*, 2017 WL 4286412, at *6 (same).

### B.      Because of Norton's Egregious Conduct Before and During This Litigation, the Court Should Treble the Jury's Damages Award.

As demonstrated above, overwhelming evidence confirms that Norton had a "degree of dismissiveness of [Columbia's] patent rights and disrespect of the value the law places on protection of intellectual property that was exceptional."  *Arctic Cat Inc.*, 198 F. Supp. at 1354 (citations omitted).  Thus, "[e]nhanced damages are merited to punish this conduct and deter similar behavior, and to promote appropriate regard for patent rights," *id.*, and "the real question is not whether enhancement is warranted, but ***how much*** enhancement is appropriate," *Stryker*, 2017 WL 4286412, at *3 (emphasis added).

Although the *Read* factors provide helpful guidance, they should not be a "rigid, mechanical assessment," and the touchstone of the analysis is "egregious infringement behavior." *Tinnus Enters., LLC*, 369 F. Supp. 3d at 714.  Here, Columbia respectfully submits that (i) what the Court directly observed from Norton's behavior as a litigant in this case, and (ii) what the

---

[14] Indeed, Norton produced zero e-mails on which Mr. Witten appeared on either the "to" or "from" line, which is curious to say the least given Mr. Witten's involvement in circumstances relevant to both willful infringement and Columbia's claims with respect to the '643 Patent.  (Trial Tr. 528:11-19, 573:25-580:25.)

evidence showed about Norton's disrespect for intellectual property rights, compels the maximum allowed enhancement, *i.e.*, trebling of the jury's damages. Trebling is particularly justified because Columbia sought, and the jury ultimately awarded, a modest reasonable royalty that does not reflect Norton's egregious conduct in this case, and that would have no deterrence effect in light of Norton's significant financial resources.

That conclusion is consistent with the application of the *Read* factors should the Court decide to follow that nine-factor analysis. When all or many of the applicable *Read* factors favor enhancement, courts have frequently awarded treble damages. *See Arctic Cat Inc.*, 198 F. Supp. at 1354 (trebling notwithstanding that factor 3 "cuts the other way"); *Cyntec*, 2022 WL 1443232, at *14-15 (trebling where only six factors favor enhancement); *Izzo Golf*, 2019 WL 4023562, at *7-8 (trebling where all but eighth *Read* factor favor enhancement); *Innovention Toys, LLC* v. *MGA Ent.*, 2017 WL 3206687, at *3-4 (E.D. La. Mar. 8, 2017) (trebling where all but ninth *Read* factor favor enhancement).[15] Here, all of the applicable *Read* factors favor enhancement and the Court should exercise its discretion under § 284 to treble damages—which will tell Norton that its behavior before and during this litigation was not acceptable.

## CONCLUSION

Norton's willful infringement as found by the jury, copying, lack of investigation of Columbia's patents, lack of remediation, clear lack of respect for Columbia's and others' intellectual property, extraordinary litigation misconduct, and weak non-infringement defenses— among other factors—warrant the strongest possible deterrence. Columbia respectfully requests that the Court grant this motion and treble the jury's damages award.

---

[15] *See also Stryker*, 2017 WL 4286412, at *3 (trebling where all applicable *Read* factors favor enhancement); *EagleView Tech.*, 522 F. Supp. 3d at 56 (same).

Dated:  June 3, 2022

Respectfully submitted,

*/s/ John M. Erbach*

Dana D. McDaniel (VSB No. 25419)
John M. Erbach (VSB No. 76695)
SPOTTS FAIN, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia  23219
Tel.: (804) 697-2065
Fax: (804) 697-2165
dmcdaniel@spottsfain.com
jerbach@spottsfain.com

Garrard R. Beeney (*pro hac vice*)
Dustin F. Guzior (*pro hac vice*)
Stephen J. Elliott (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel.: (212) 558-4000
Fax: (212) 558-3588
beeneyg@sullcrom.com
guziord@sullcrom.com
elliotts@sullcrom.com

*Counsel for Plaintiff The Trustees of
Columbia University in the City of New
York*