**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW
YORK,

           *Plaintiff*,

    v.

NORTONLIFELOCK INC.,

           *Defendant*.

Civil Action No. 3:13-cv-00808-MHL

REDACTED

**MEMORANDUM IN SUPPORT OF COLUMBIA'S MOTION FOR
ATTORNEYS' FEES UNDER 35 U.S.C. § 285**

# TABLE OF CONTENTS

*Page*

FACTUAL BACKGROUND ........................................................................................ 2

    A.    Extraordinary Misconduct:  Dr. Marc Dacier ......................................... 3

    B.    Norton's Pattern of Litigation Misconduct:  2018-2022........................... 7

        1.    Norton Repeatedly Re-Argued Decided Issues ........................... 7

        2.    Norton's Improper Cross-Examinations at Trial ..................... 10

        3.    Norton Failed to Cooperate on Pre-Trial and Trial Matters ................... 13

    C.    Norton's Litigating Positions Were Exceptionally Weak.................... 16

APPLICABLE LAW .............................................................................................. 20

ARGUMENT ........................................................................................................ 21

    A.    Norton's Extraordinary Misconduct With Regard to Dr. Dacier Makes This Case Exceptional Under § 285........................................................ 22

    B.    Norton's Weak Litigating Positions, Unmeritorious Arguments, and Re-Argument of Decided Issues Made This Case Exceptional ........................... 24

    C.    Norton's Misconduct During Trial Was Exceptional ........................... 28

    D.    Norton's Pattern of Litigation Tactics Was Exceptional ..................... 29

    E.    Norton's Willful Infringement Supports an Exceptional Case Finding................ 30

CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Agio Int'l Co.* v. *Zhejiang Longda Force Co.*,
  2019 WL 1302634 (W.D.N.C. Mar. 21, 2019) ..................................................................23

*BookIT Oy* v. *Bank of Am. Corp.*,
  2019 WL 13156599 (N.D. Tex. Nov. 21, 2019) ................................................................25

*Cargill, Inc.* v. *Sears Petroleum & Transp. Corp.*,
  388 F. Supp. 2d 37 (N.D.N.Y. 2005) ...............................................................................23

*Drop Stop LLC* v. *Zhu*,
  757 F. App'x 994 (Fed. Cir. 2019) .............................................................................21, 29

*Drop Stop LLC* v. *Zhu*,
  2018 WL 1407031 (C.D. Cal. Jan. 22, 2018) ..................................................................24

*EagleView Techs., Inc.* v. *Xactware Sols., Inc.*,
  522 F. Supp. 3d 40 (D.N.J. 2021) ....................................................................................25

*Genes Indus., Inc.* v. *Custom Blinds and Components, Inc.*,
  2018 WL 11354574 (C.D. Cal. Jan. 29, 2018) ................................................................26

*Georgetown Rail Equip. Co.* v. *Holland L.P.*,
  2016 WL 3346084 (E.D. Tex. June 16, 2016) ..............................................................25, 27

*Hunter Douglas Inc.* v. *Great Lake Woods, Inc.*,
  2019 WL 1375675 (D. Colo. Mar. 27, 2019) ...................................................................25

*Innovation Scis., LLC* v. *Amazon.com, Inc.*,
  2020 WL 4934272 (E.D. Va. Feb. 18, 2020) ..............................................................21, 24

*Intell. Ventures I LLC* v. *Trend Micro In*c.,
  944 F.3d 1380 (Fed. Cir. 2019) ...................................................................................21, 24

*Intex Recreation Corp.* v. *Team Worldwide Corp.*,
  77 F. Supp. 3d 212 (D.D.C. 2015) ....................................................................................26

*Large Audience Display Sys., LLC* v. *Tennman Prods., LLC*,
  745 F. App'x 153 (Fed. Cir. 2018) .............................................................................21, 29

*MarcTec, LLC* v. *Johnson & Johnson*,
  2010 WL 680490 (S.D. Ill. Feb. 23, 2010) .......................................................................26

*Monolithic Power Sys., Inc.* v. *O2 Micro Int'l Ltd.*,
726 F.3d 1359 (Fed. Cir. 2013)..................................................................21, 23, 25

*Niazi Licensing Corp.* v. *St. Jude Medical S.C., Inc.*,
2021 WL 4947712 (D. Minn. Oct. 25, 2021) ..........................................................23

*NTP Inc.* v. *Rsch. in Motion, Ltd.*,
270 F. Supp. 2d 751 (E.D. Va. 2003) ......................................................................28

*Octane Fitness, LLC* v. *ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014)..............................................................................1, 2, 20, 21

*Raniere* v. *Microsoft Corp.*,
887 F.3d 1298 (Fed. Cir. 2018)................................................................................20

*Regeneron Pharms., Inc.* v. *Merus N.V.*,
2018 WL 1472507 (S.D.N.Y. Mar. 26, 2018) .............................................21, 22, 24

*In re Rembrandt Techs. LP Patent Litig.*,
899 F.3d 1254 (Fed. Cir. 2018)................................................................................23

*Shipping & Transit, LLC* v. *Hall Enters., Inc.*,
2017 WL 3485782 (C.D. Cal. July 5, 2017) ..............................................................2

*Saint-Gobain Autover USA, Inc.* v. *Xinyi Glass N. Am., Inc.*,
707 F. Supp. 2d 737 (N.D. Ohio 2010).....................................................................26

*SiOnyx LLC* v. *Hamamatsu Photonics K.K.*,
981 F.3d 1339 (Fed. Cir. 2020)................................................................................30

*SRI Int'l, Inc.* v. *Cisco Sys., Inc.*,
14 F.4th 1323 (Fed. Cir. 2021) ...................................................................24, 26, 30

*Taurus IP, LLC* v. *DaimlerChrysler Corp.*,
726 F.3d 1306 (Fed. Cir. 2013)........................................................................23, 27

*Tinnus Enters., LLC* v. *Telebrands Corp.*,
369 F. Supp. 3d 704 (E.D. Tex. 2019)............................................................ *passim*

*Trs. of Columbia Univ. in the City of New York* v. *Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016)........................................................................10, 16

*VirnetX Inc.* v. *Apple Inc.*,
324 F. Supp. 3d 836 (E.D. Tex. 2017)........................................................23, 27, 28, 30

*z4 Techs., Inc.* v. *Microsoft Corp.*,
2006 WL 2401099 (E.D. Tex. Aug. 18, 2006) ..........................................................30

**Statutes**

35 U.S.C. § 285 ............................................................................................................ *passim*

35 U.S.C. § 315(e)(2) ................................................................................................... 7, 8

"Section 285 of the Patent Act authorizes a district court to award attorney's fees in patent litigation." *Octane Fitness, LLC* v. *ICON Health & Fitness, Inc.*, 572 U.S. 545, 548 (2014).   A court should award attorneys' fees under 35 U.S.C. § 285 ("§ 285") if the court finds that the case is exceptional, *i.e.*, it "stands out from others with respect to the substantive strength of a party's litigating position . . . ***or*** the unreasonable manner in which the case was litigated." *Octane*, 572 U.S. at 554 (emphasis added).   Trial courts make that determination in "the case-by-case exercise of their discretion, considering the totality of the circumstances," *id.*, and the Court need not find that a litigant's conduct was "independently sanctionable" or in "bad faith" to conclude that an award of attorneys' fees is appropriate, *id.* at 555.   In contrast to enhanced damages under 35 U.S.C. § 284—which is not directed to addressing the costs a patentee incurs because of an infringer's litigation misconduct—fee-shifting provisions like § 285 advance considerations of both deterrence and compensation because unreasonable litigation conduct can impose substantial, unnecessary costs on the other party.   *See Octane*, 572 U.S. at 554 n.6; *Tinnus Enters., LLC* v. *Telebrands Corp.*, 369 F. Supp. 3d 704, 745 (E.D. Tex. 2019) (awarding fees under § 285 where defendant's litigation conduct required "unnecessarily expending significant resources of the parties and the Court").

The unreasonable manner in which Norton chose to litigate and Norton's weak positions on the merits made this case exceptional, wasting judicial resources and unjustifiably raising Columbia's costs.   After this case returned to the District Court in 2018, the record shows that Norton (i) engaged in "gamesmanship" and "appalling," "███████████████," and "facial[ly] bad faith conduct" (Ex. A ("Apr. 7, 2022 Tr.")) 88:4-10, 90:8-9; Dkt. 889 at 13-14), (ii) made "███████████" statements to a potential witness and "troubling" misrepresentations to Columbia and the Court (Dkt. 889 at 13; Ex. B ("Apr. 8, 2022 Tr.") at 5:8-10), (iii) repeatedly filed

motions that were "███████" or "inappropriately s[ought] to 'rehash'" decided issues (Dkt. 889 at 13, 19; Dkt. 703 at 11), (iv) engaged in "utterly improper" trial conduct that "misrepresent[ed] the record and . . . misle[d] the jury" (Dkt. 1155 at 6-7), and (v) attempted to "make a messy record" to obscure the merits (Ex. C ("Mar. 17, 2022 Tr.") 10:17-18).  In short, this case readily "stands out from others," *Octane*, 572 U.S. at 554, and thus Columbia respectfully requests an award of its attorneys' fees for the period after this case returned to the District Court in 2018.[1] Here, an award of attorneys' fees would both deter future misconduct and compensate Columbia for substantial costs incurred solely because of Norton's unjustified litigation choices.

### FACTUAL BACKGROUND

Below, Columbia provides factual background to establish three primary points.  *First*, Norton engaged in extraordinary misconduct that on its own should lead to a finding that this case was exceptional.  *Second*, Norton engaged in other litigation misconduct—from mid-2018 through trial in 2022—that, although no single instance would necessarily be sanctionable on its own, amounted to an exceptional pattern of meritless arguments and tactics.  *Third*, after this case returned to the District Court, Norton again-and-again advanced meritless arguments, expert opinions, motions, and defenses.  Each of these three primary points supports an exceptional case finding under § 285, and together they virtually compel that conclusion.

---

[1] The parties are working to reach agreement on the amount of attorneys' fees Columbia should recover if the Court concludes that the § 285 standard is met.  Pursuant to the parties' May 27, 2022 stipulation (Dkt. 1233) and the Court' June 3, 2022 order (Dkt. 1238), if the parties cannot reach agreement, Columbia proposes to address the amount of the fee award at a time that will not delay entry of final judgment, which—if the Court grants this motion—would specify only that Columbia is entitled to recover its reasonable attorneys' fees for the period after this case returned to the District Court in 2018.  That is consistent with the Federal Rules of Civil Procedure and precedent cases.  Fed. R. Civ. Pro. 54(d)(2)(c) ("The court may decide issues of liability for fees before receiving submissions on the value of services."); *see, e.g.*, *Shipping & Transit, LLC* v. *Hall Enters., Inc.*, 2017 WL 3485782, at *2, 8 (C.D. Cal. July 5, 2017) (finding entitlement to attorneys' fees under § 285 and directing party to identify amount requested in a subsequent submission).

## A.    Extraordinary Misconduct:  Dr. Marc Dacier

Dr. Marc Dacier is a former Norton executive who had first-hand knowledge of facts relevant to Columbia's federal patent law claim for correction of inventorship and related state law claim for fraudulent concealment.  Dr. Dacier told Columbia that he wanted to testify at trial in support of Columbia's case because he had first-hand knowledge of facts that he believed were relevant to Columbia's claims.  (Dkts. 547-1 ¶¶ 12, 547-2 ¶ 4, 16, 547-11 at 2-3, 1084-1 at 1.)  But after Norton learned that Dr. Dacier would testify in Columbia's case at trial, Norton appreciated the risk to its defenses and took deliberate steps to ensure that Dr. Dacier would not testify.

More specifically, Norton engaged in "███████████████████████████" by filing a "████████" motion for sanctions, which "████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████." (Dkt. 889 at 13-14.)  Then, after the Court denied Norton's motion for sanctions in its entirety and explicitly left open the question of whether Norton's counsel represented Dr. Dacier, Norton falsely represented to Dr. Dacier that "the Court concluded he is represented by Norton's counsel." (*Id.* at 13.)  As the Court observed, that representation was improper, incorrect, and "appalling" (Apr. 7, 2022 Tr. at 90:3-9), but it had the desired effect of keeping Dr. Dacier away.

Moreover, it was only on the rarest of occasions that evidence was submitted from Dr. Dacier himself; Norton regularly purported to speak for him.  And Norton took advantage of the situation.  Norton repeatedly told the Court and Columbia that Dr. Dacier had changed his mind and no longer wanted to testify at trial, suggesting that he was unwilling to make the trip from Saudi Arabia or otherwise make himself available.  (Dkts. 769 at 20-21, 803-44 at 4-5, 852 at 16, 1048-1 at 14, 1090-1; Apr. 7, 2022 Tr. 47:18-20.)  But in light of the e-mail correspondence that came to light immediately before trial (Dkt. 1084-1), it is beyond dispute that Norton's

repeated representations that Dr. Dacier no longer was willing to testify were false, and were made only to serve Norton's interests.

Having achieved its primary objective—preventing Dr. Dacier from testifying at trial—Norton sought to erase all traces of his harmful statements by filing motions *in limine* (i) to exclude statements that Dr. Dacier made to Drs. Stolfo and Keromytis, and (ii) preemptively arguing that the Court should not give a missing witness instruction. Finding that "exceptional circumstances are before the Court," including Norton's "████████" and "████████" statements to Dr. Dacier about the Court's findings, the Court denied Norton's motions. (Dkt. 889 at 13-14, 17-19.) Instead, the Court concluded that ████████████████████████████████████████████████████████████████████" and that, on this "███" record, a missing witness instruction was warranted. (*Id.* at 17.) The Court also ordered Norton and its counsel to disclose "any information garnered from Dr. Dacier" since 2017. (Dkt. 890.)

In a response to the Court's order that is—to say the least—exceptional, Norton continued its pattern of blaming others for the situation it created—this time blaming the Court. In a submission on behalf of Norton, Norton and its counsel refused to comply, purporting to invoke Dr. Dacier's privilege—a privilege that it had no power to invoke. Characteristically, there was no suggestion from Dr. Dacier that he wished to invoke any such privilege; rather, the submission did not even suggest that Dr. Dacier had been consulted about Norton's and its counsel's refusal to comply with the order. (Dkt. 892.) As the Court observed, Norton's willingness to "say[] that they do represent Dr. [Dacier] when they don't want to produce him [] or information from him[,] [a]nd [] say they don't represent him when it is the case that they're going to get in trouble" was "just facial bad faith" (Apr. 7, 2022 Tr. 88:4-10), and Norton's continued argument against a

missing witness instruction was "extraordinary or exceptional" (Apr. 8, 2022 Tr. 4:13-15).  To this day, Norton and its counsel have refused to comply with the Court's order.  (Dkt. 1229 at 2-4.)

Not accepting that the Court had ruled on the missing witness instruction, Norton raised the issue again and again.  On March 22, 2022, Norton filed a meritless motion for reconsideration (Dkt. 933), which the Court denied that same day, finding that it "raise[d] nothing material or worth reconsidering."  (Dkt. 945 at 5-6.)  On April 7, Norton yet again re-argued the issue by ambush at the pre-trial conference.  The most remarkable part of Norton's April 7 argument was not what was said, but rather what Norton failed to say.  While arguing to the Court that Dr. Dacier might be available to testify at trial—and that blame should be laid at Columbia's feet for not asking (Apr. 7, 2022 Tr. 47:21–48:2, 60:1-11)—Norton **knew** that Dr. Dacier could not testify because—unbeknownst to Columbia and the Court—Norton had been in communication with Dr. Dacier immediately before the April 7 conference, and Dr. Dacier had said that although he was "happy to help the judicial process [], as [he] ha[d] continuously said so far," he could not clear his calendar on "extremely short notice."  (Dkt. 1084-1 at 3.)  Dr. Dacier also expressed confusion because of "the several calls with the Quinn team in which they repeatedly told [him] that there was no need for [him] to do anything [and] that they **did not want [him] to do anything**."  (*Id.* (emphasis added).)

As a result of these April 2022 e-mails purportedly requesting his presence in light of the Court's missing witness ruling, Dr. Dacier finally understood Norton's game and responded: "I have nothing against Norton, per se, but the facts, stated in my testimony are, indeed, in my opinion, harmful for Norton's case.  I am no fool and I can see now why the Quinn team has done what they have done over the years, while pretending to 'represent' me."  (Dkt. 1084-1 at 1.)  Norton's April 7 arguments to the Court—while withholding the material information in these

emails—were disingenuous at best, and Dr. Dacier's e-mail responses show unequivocally that Norton's prior representations to the Court and Columbia—*i.e.*, that Dr. Dacier had changed his mind and was unwilling to testify at trial (*e.g.*, Dkt. 803-44 at 4, 889 at 12-13)—were fabrications.[2]

Dr. Dacier was a whistle-blower witness who had material testimony to provide in support of, *e.g.*, Columbia's inventorship claim, and Norton's efforts to keep that witness away from the courthouse presented an "extraordinary [] situation" that created a "serious impression of gamesmanship" and "facial[ly] bad faith conduct." (Apr. 7, 2022 Tr. 55:25-56:2, 88:4-10, 94:5-6.) And the worst part is that Norton's misconduct appears to have succeeded, at least in part, causing irreparable prejudice to Columbia's trial presentation. (*See* Ex. D ("Trial Tr.") 2484:13-15 ("I don't think there is a way to make, frankly, Columbia whole. I just don't think there is.").) Although the jury found that Columbia proved that Drs. Stolfo and Keromytis were inventors of U.S. Patent No. 8,549,643 (the "'643 Patent") by clear and convincing evidence, the jury was not able to conclude that Norton's Darren Shou made no inventive contribution to the patent—*i.e.*, the fact that Dr. Dacier's testimony would have confirmed in support of Columbia's claim.[3]

In addition to substantively prejudicing Columbia's case, Norton's conduct also caused unnecessary expenditure of Court and party resources immediately before and during trial. Put simply, Norton's misconduct with respect to Dr. Dacier is exceptional, and, as explained below,

---

[2] As explained in the Second Declaration of Leslie A.T. Haley, the correspondence between Dr. Dacier and Norton's counsel also demonstrates that "Norton improperly coerced Dr. Dacier to accept Quinn Emanuel as his counsel to Norton's benefit," and that Norton's counsel thereby violated the Virginia Rules of Professional Conduct. (Dkt. 1102-2 at 3-4.)

[3] Norton advanced virtually no defense to Columbia's claim that Drs. Stolfo and Keromytis at least were joint inventors of the '643 Patent along with Norton's Mr. Shou. Thus, even in the absence of a critical trial witness (Dr. Dacier), Columbia clearly and convincingly proved co-inventorship. With regard to Mr. Shou's purported inventive contribution, Mr. Shou flatly admitted that he had no documents or other corroborating evidence to support his testimony. (Trial Tr. 2437:5-12.) And in that respect, Dr. Dacier's absence from trial was consequential. Dr. Dacier was the only witness in a position to directly refute Mr. Shou's testimony.

-6-

the law provides that such litigation misconduct on its own forms the basis for finding this case exceptional under § 285.[4]

### B.   Norton's Pattern of Litigation Misconduct:  2018-2022

Wholly apart from Dr. Dacier, Norton's conduct consistently crossed the line from zealous advocacy into gamesmanship, and forced Columbia and the Court to expend substantial resources. Norton (1) repeatedly attempted to re-argue issues that the Court had resolved, (2) engaged in improper conduct when cross-examining Columbia's trial witnesses, and (3) did not engage with Columbia on pre-trial matters in good faith.  Although none of these individual instances of misconduct would necessarily render this case exceptional, the pattern of misconduct does.

#### 1.   Norton Repeatedly Re-Argued Decided Issues

Norton repeatedly sought to re-argue issues after this case returned to the District Court in 2018—from prior art invalidity, to claim construction, to Section 101 patentability, to pre-trial evidence rulings regarding damages.  Here, Columbia focuses on two issues that permeated the proceedings:  (i) invalidity and *inter partes* review ("IPR"), and (ii) claim construction.

***Invalidity and IPR***.  In July 2019, Norton argued that it could assert prior art that it had identified in its May 2014 invalidity contentions but had not raised during IPR, notwithstanding that the plain language of 35 U.S.C. § 315(e)(2) prohibited Norton from doing so.  Norton's conduct required Columbia to file a motion for partial summary judgment in response to which the Court found that Norton sought a "second bite at the apple" by trying to "hold a second-string invalidity case in reserve."  (Dkt. 251 at 23 (citations omitted).)  The Court held that Norton was

---

[4] In many cases, notwithstanding their separate purpose, a finding of egregiousness for the purposes of enhanced damages under 35 U.S.C. § 284 substantially overlaps with an exceptional case finding under § 285.  Although Columbia has addressed § 284 and § 285 in separate motions, many of the facts recited in the § 285 motion equally apply to the § 284 motion and *vice versa*.

statutorily estopped from asserting a prior art invalidity defense, and Norton's contrary position conflicted with both § 315(e)(2) and "fundamental principles of fairness." (*Id.* at 24.)

Although Norton's opposition to Columbia's motion for summary judgment was not exceptional on its own, Norton's refusal to accept the Court's ruling was quite exceptional.  After the Court's decision, Norton repeatedly sought to inject prior art invalidity into the case, framing it incorrectly as everything from "technical background" to a purported damages analysis. (Dkts. 420 at 16-30, 425 at 19-20, 793 at 1-5.)  And even after the Court's pre-trial evidentiary rulings made it clear that prior art and IPR invalidity were not relevant to the trial issues (Dkts. 741, 717, 907), Norton continued to seek loopholes through which it could improperly present prior art to the jury and evade the Court's orders.  Notwithstanding the Court's decisions, Norton filed a prior art notice purporting to identify the prior art it would present at trial (Dkt. 706), and included several prior art references on its High-Priority Exhibit List (all but two of which were withdrawn the night before argument on Columbia's objections).  Norton also repeatedly sought to introduce the IPR certificates of correction that could have had only one purpose:  to emphasize to the jury the irrelevant fact that certain non-asserted claims had been cancelled.  (Dkt. 938 at 6-7; Ex. E ("Mar. 29, 2022 Tr.") 50:25-55:8.)  In sustaining Columbia's objection to the IPR certificates of correction, the Court observed:  "I have heard prior art argued 360 degrees.  I've ruled on it I don't know how many times . . . I don't know how I can say it in any different way that the claims canceled through the IPR are not relevant."  (Mar. 29, 2022 Tr. 54:11-15.)

In another example of refusing to accept the Court's rulings, on June 4, 2020, the day before the parties submitted their proposed joint pre-trial order (the "2020 PTO"), Norton for the first time raised Section 101 patentability as a "triable issue," even though Norton had done nothing to

develop that defense after the Court denied its Rule 12(c) motion (*see* Dkt. 288).[5]   Norton had offered no expert opinions or contentions for a Section 101 defense, which thus would have failed as a matter of law in any event.   Responding to yet another exceptionally wasteful exercise by Norton, the Court *sua sponte* struck Norton's Section 101 invalidity defense.   (Dkt. 683.)   Here again, the issue is not that Norton raised a Section 101 defense in the first place, but rather Norton's refusal to accept the Court's decision and tactics in seeking to raise an abandoned defense as a trial issue at the last minute, which forced Columbia and the Court to expend resources.

*__Claim Construction__*.   In October 2018—after appeal to the Federal Circuit specifically to address claim construction issues—Norton belatedly raised a purported dispute regarding the term "model of function calls for the at least a [part/portion] of the program."   What Norton positioned as a claim construction dispute ended up being another wasteful exercise in which Norton "virtually flipped its position" from the claim construction on which it had prevailed during IPR. (Dkt. 306 at 5 n.6.)   Recognizing Norton's gamesmanship—when Norton's "interests have changed as th[e] Court considers infringement"—the Court concluded not only that Norton's new claim construction position was wrong, but also that judicial estoppel precluded Norton from obtaining an "unfair advantage."   (*Id.* at 10.)

Norton took a similarly meritless position with regard to the construction of the claim term "anomalous."   After the Court asked for a simple stipulation memorializing the parties' agreed construction (Dkt. 684 at 77 n.55), Norton took the indefensible position that the parties' stipulation abrogated, *sub silentio*, the Federal Circuit's holding that the term anomalous "cannot

---

[5] In the 2020 PTO, Norton also contended for the first time that the Court should hold a bench trial on *additional* prosecution history estoppel arguments that Norton had never disclosed.   (Dkt. 555 at 62-71.)   But after extensive briefing (Dkts. 555, 631, 640, 678), Norton withdrew its untenable position without explanation.   It is not coincidence that withdrawal occurred just before the Court indicated that it was about to rule.   (Dkt. 682.)

be read to limit the type of data used to model to only attack-free data." *Trs. of Columbia Univ. in the City of New York* v. *Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016).  In ruling on this wasteful argument, the Court acknowledged that "Norton, not Columbia, [was] improperly attempting to reopen claim construction disputes that Norton kn[ew] the Court might not tolerate," and clarified that, consistent with the Federal Circuit's ruling, "the 'model of function calls' may be built using only attack data, only attack-free data, or both."  (Dkt. 713 at 2, 7, 9.)  This dispute, like many others Norton manufactured, was unnecessary and, in a word, exceptional.

Norton's attempts to rehash claim constructions continued at trial.  The day before Norton's Dr. Jaeger was expected to testify, Norton disclosed demonstratives showing that he was primed to present to the jury a construction of the term "emulator" based on the exact same evidence and arguments the Court had rejected in 2014.  (Trial Tr. 1883:22-1887:12.)  The Court excluded the at-issue slides and expert testimony which sought to argue to the jury what the Court had already rejected.  (*Id*. 2045:7-2050:20, 2065:21-2066:17.)  Dr. Jaeger also was primed to argue specialized constructions of the term "model" and "notifying the application community" (*id.* 1887:25-1888:22, 1902:25-1907:3, 2024:20-2025:12), which again amounted to improper claim construction (*see* Dkt. 253 at 2 n.6, 18).  In short, Norton was dissatisfied with its exceptionally weak non-infringement defenses, so it repeatedly sought to improperly re-argue claim construction from the moment the case returned to the District Court in 2018 through trial in 2022.

## 2. Norton's Improper Cross-Examinations at Trial

During cross-examinations at trial, Norton's counsel repeatedly misrepresented witness testimony or asked improper questions:

- During the cross-examination of Orin Herskowitz, Norton's counsel misrepresented Mr. Herskowitz's testimony concerning an invention report, which "resulted in a cross-examination centering on testimony that had not been given."  (Dkt. 1155 at 8 n.4 (citing Trial Tr. 486-88).)

- During the cross-examination of Professor Stolfo, Norton's counsel repeatedly asked questions "based on premises that really aren't before this court" and "continued to ask [Professor Stolfo] questions he can't possibly know." (Trial Tr. 690:17-20; *see also id.* 673:23-24, 697:1-5.) Worse, when Norton's counsel unsuccessfully tried to impeach Professor Stolfo with his financial interest in this litigation, Norton's counsel made a "pretty big presumption" about litigation costs and used numbers "that have no basis." (*Id.* 700:24-701:18.)

- During the cross-examination of Professor Keromytis, Norton's counsel repeatedly misrepresented Professor Keromytis's testimony and had to be cautioned by the Court several times. (*See* Trial Tr. 844:5-17, 846:21-25 (Norton's question "really almost puts words in his mouth"), 878:14-20 ("I want you to be careful about how you characterize the witness's testimony on cross. Okay? . . . you said what he said, and it was wrong.").)

- During the cross-examination of Dr. Bailey, Norton's counsel misrepresented which portions of a document Dr. Bailey had highlighted and had to be cautioned not to have "foundational statements that are incorrect placed in front of the jury." (Trial Tr. 1373:7-18; *see also* Dkt. 1155 at 8 n.4 (this "muddled the record as to [Dr. Bailey's] testimony").)

In light of Norton's repeated improper cross-examination of Columbia's witnesses, on the morning before Dr. Cole testified and outside the presence of the jury, the Court admonished Norton to cease presenting during cross-examination facts not in evidence, or misrepresenting what a witness had said:

> I'm a little concerned about how you have presented some of your questions to the witnesses. Cross-examination is fair, but it is not fair if you misrepresent what a witness has said. . . . And maybe it's just an error, but I'm just putting you on notice it has been very consistent in my mind, and that's why I've started correcting what I think are not accurate factual predicates. . . . But it just has to stop, especially with experts. Do not present things as a predicate of a question that are inaccurate.

(Trial Tr. 1412:6-1413:19.) The Court also reminded Norton that, due to its *Daubert* and motion *in limine* rulings, "Norton cannot offer any ultimate apportionment percentage." (*Id.* 1407:22-23.)

The Court's instructions were ignored. Later the same day, during cross-examination of Dr. Cole, Norton (i) published misleading demonstratives to the jury that had no basis in evidence, and (ii) repeatedly misrepresented the basis for Dr. Cole's opinions. The first demonstrative misleadingly suggested that Norton Antivirus included certain additional features, which was "factually wrong." (Dkt. 1155 at 7.) At the Court's insistence, Norton corrected the misleading

-11-

demonstrative in front of the jury.  (Trial Tr. 1626:15-1629:14.)  But minutes later, Norton created a demonstrative containing a "contrived irrelevant, inadmissible, and unsupported apportionment number" in "what amounted to an utterly improper alternate form of apportionment analysis" (Dkt. 1155 at 6-7) that violated the Court's orders and earlier warning.  In doing so, Norton wrongly stated that Dr. Cole's opinions depended on deposition testimony from a Norton fact witness, Carey Nachenberg, which Dr. Cole and the Court repeatedly had to correct.  (*See*, *e.g.*, Trial Tr. 1645:1-1646:8.)  Dr. Cole also repeatedly objected to the demonstrative created by counsel "on the fly" as "very misleading" (*id.* 1645:15-17) and stated "for the record, I don't agree with those numbers.  You're mixing apples and oranges and just sort of putting random numbers on the screen" (*id.* 1652:14-17) and "there's no foundation for what you just put up there" (*id.* 1653:19-22).  Norton's counsel acknowledged that Dr. Cole "disagree[d] with the premise" of the questions and that the numbers lacked evidentiary foundation (*id.* 1651:24-1652:1, 1653:19-23), but nonetheless persisted in "misrepresent[ing] the record and the core issues at bar, mislead[ing] the jury, and unfairly prejudic[ing] Columbia's damages case" (Dkt. 1155 at 7).  The misleading and unnecessary conduct resulted in motion practice, a full day of delay of the jury trial, and the need for the Court to issue an opinion and order.

Norton's conduct was all the more exceptional because it was part of a strategy.  Although Norton fought to present at trial certain of Dr. Jaeger's apportionment and certain of Mr. Hosfield's damages opinions (Trial Tr. 1387:5-1398:23, Apr. 7, 2022 Tr. 118:12-121:6)—issues that were briefed, argued, and decided by the Court—at the last minute, Norton withdrew each witness's apportionment and damages testimony entirely (Ex. F, Apr. 19, 2022 E-mail from D. Carr to L. Deskins; Trial Tr. 1867:2-9).  Norton presented no damages case at trial and instead attempted to introduce its excluded near-zero damages figure through improper cross-examination, including

heavy reliance on speculative testimony from a fact witness—Mr. Nachenberg's self-proclaimed guess that 4% of the product value should be attributed to the "BASH engine"—which no expert had adopted or relied on. (Trial Tr. 1643:10-1646:14, 1652:2-1654:9; Dkt. 1155 at 5.) Although the Court issued a curative instruction to the jury (Trial Tr. 1683:21-1684:13), this conduct was exceptional—especially in light of the Court's warnings and instructions (*see*, *e.g.*, *id.* 1412:6-1413:25, 1646:2-13, 1652:24-1653:3, 1655:15-1657:2)—and there is a likelihood that Norton's misconduct impacted the jury's damages decision, awarding Columbia approximately 82% of the patent damages sought.

3.     <u>Norton Failed to Cooperate on Pre-Trial and Trial Matters</u>

Norton repeatedly refused to engage with Columbia in good faith concerning pre-trial matters. As an example, the February 23, 2022 Pretrial Order described the parties' as-filed Written Stipulations of Uncontroverted Facts (Dkt. 705, 705-1) as "grossly inadequate," and ordered the parties to file "[n]ew, properly negotiated" stipulations. (Dkt. 743 at 6-7.) After substantial progress on a new, compromise version of written stipulations, Norton declared the exercise futile—without a single discussion or meet-and-confer. (*See* Dkt. 763, 763-1–4.) In light of Norton's conduct, the parties submitted separate filings that did not comply with the Court's order, and made no progress on written stipulations, including on non-contested issues that should have been part of the stipulations and which in many cases Norton failed to contest at trial.[6]

The Pretrial Order also required the parties to file narrowed "high-priority" deposition designations and counter-designations. In violation of the Pretrial Order, Norton (i) failed to narrow its designations and (ii) made only two very minor alterations to its counter-designations,

---

[6] Norton also routinely refused to respond to e-mails coordinating filings or requesting information that was necessary to comply with Court-ordered deadlines for joint submissions. (*See*, *e.g.*, Dkt. 699; Apr. 7, 2022 Tr. 69:8-70:2.)

even though Columbia had substantially reduced its designations.  (*See* Ex. G, Mar. 15, 2022 Ltr. from A. Gross to N. Hamstra.)[7]  In addition, the counter-designations that Norton filed suffered numerous defects, including that many of Norton's purported counter-designations did not have any relationship to Columbia's designations.  (*Id.*)  Columbia and the Court repeatedly had to address Norton's failures to abide by simple instructions issued by the Court.

Norton's conduct was no better when it came to exhibits.  On March 4, 2022, each party filed its objections to the other party's high-priority exhibit list.  Norton filed objections to 108 exhibits.  (Dkt. 809-3.)  The night before the March 17, 2022 hearing concerning the parties' objections, Norton withdrew nearly half of its objections, including five entire categories of objections, and Norton also withdrew several of the exhibits on its own high-priority exhibit list.  (Ex. I, Mar. 16, 2022 E-mail from K. Sheehan to A. Gross.)  Of course, Columbia had to prepare to address the withdrawn objections, and due to Norton's untimely withdrawals, the Court decided not to hear oral argument on any of the parties' objections, resulting in what the Court correctly called a "colossal waste of time" and resources.[8]  (Mar. 17, 2022 Tr. 11:10-21, 14:23-17:16.)

---

[7] This was not the first time that Columbia put Norton on notice that its pre-trial submissions were overbroad and "did not reflect a good faith effort by Norton to identify" exhibits and deposition designations that Norton likely would introduce at trial.  (*See* Ex. H, Columbia's Apr. 17, 2020 Objections at 2, 4.)

[8] As the Court observed at the March 17 hearing, withdrawing objections was not the only way in which Norton's conduct leading up to the hearing was unproductive and wasteful.  Norton also (i) presented its objections in a way that was "almost impossible to follow" (Mar. 17, 2022 Tr. 3:17-21), (ii) failed to provide the Court with the information it requested regarding the number and pages of exhibits and discovery designations (*id.* 6:15-17, 8:11-9:4), (iii) "inexplicably" did not organize its objections by type, requiring Columbia and the Court to cross-reference various documents to make sense of them (*id.* 9:13-24), and (iv) submitted courtesy copies of its exhibits in a blatantly "[dis]respectful" and "ridiculous" way—"in rubber bands without three-hole punches in a box" (*id.* 9:25-10:19).  The Court recognized that Norton's goal appeared to be to "make a messy record" rather than to cogently present issues on which the Court could rule.  (*Id.*)

Norton engaged in similarly wasteful conduct during trial, repeatedly raising unsupportable arguments only to withdraw them at the last moment.  For example, prior to Dr. Bailey's testimony, Norton objected to several slides and an exhibit that Dr. Bailey planned to use.  During a series of meet-and-confers on the evening of April 13, 2022, Columbia thoroughly explained its position, but Norton maintained its objections.  The parties then extensively argued these objections the following morning, and the Court requested briefing later that day.  (*See* Trial Tr. 723-753, 756-63.)  Before the first trial break, Norton withdrew the majority of its objections (*id.* 768:11-769:15) and Norton withdrew its remaining objections after that break (*id.* 772:6-16).  Similarly (i) Norton included several objectionable slides in Dr. Jaeger's proposed demonstratives, but then withdrew several of them immediately before and during oral argument (*id.* 1864:21-1865:10, 1887:13-18, 1889:3-24, 1901:18-1903:22, 1934:13-18, 2045:2-2050:20), and (ii) Norton persistently argued that it was permitted to present at trial the majority of Dr. Jaeger's apportionment opinions and Mr. Hosfield's rebuttals to Columbia's damages case (*id.* 1387:5-1398:23; Apr. 7, 2022 Tr. 107:2-124:25), but then unceremoniously informed Columbia and the Court that it was not going to introduce ***any*** of that expert testimony and was not even going to call Mr. Hosfield (Ex. F, Apr. 19, 2022 E-mail from D. Carr to L. Deskins; Trial Tr. 1867:2-9; Apr. 7, 2022 Tr. 118:12-20).  But—before Norton's last-minute notice—Columbia had to waste valuable time preparing cross-examinations on damages topics.  Norton's persistent approach of arguing issues right up to a ruling—and then withdrawing them—caused Columbia and the Court to waste resources.

Although no individual instance—standing on its own—would make this case exceptional, taken together, Norton's multiple decisions amount to an exceptional pattern of litigation misconduct that causes this case to stand out from others.  Norton and its counsel chose to make

each and every step of this litigation unnecessarily contentious and costly by asserting positions that frequently were frivolous and Norton should bear the consequences of those tactical decisions.

### C.   Norton's Litigating Positions Were Exceptionally Weak

This case also was exceptional because of the weakness of Norton's defenses on virtually every patent infringement issue:  (i) infringement of U.S. Patent Nos. 8,074,115 (the "'115 Patent") and 8,601,322 (the "'322 Patent"), (ii) willful infringement, and (iii) reasonable royalty damages. Many of Norton's unmeritorious defenses were excluded before trial or abandoned at trial, and the few defenses that Norton raised at trial were conclusory and unsupported by evidence, as explained below.  Moreover, the weakness of Norton's litigating positions was further demonstrated by Norton's persistent attempts to re-argue decided issues over and over, as explained above.

**Infringement**.  Norton's main non-infringement defenses either (i) were excluded by the Court as improper, or (ii) vanished from Norton's trial presentation.  Norton's primary non-infringement defense, after this case returned to the District Court in 2018, was that the claims of the '115 and '322 Patents require an anomaly detector built only with attack-free data.  (Ex. J ("Jaeger Rep.") ¶¶ 259-76; Dkts. 420 at 36-37, 687 at 5-7.)  This defense was facially baseless in light of the Federal Circuit's holding that the claims "cannot be read to limit the type of data used to model to only attack-free data." *Trs. of Columbia Univ.*, 811 F.3d at 1370.  As the Court correctly observed, Dr. Jaeger's 2019 non-infringement opinion amounted to a "shell game" in which the phrase "anomaly detector" was used as a proxy for the claim construction argument that the Federal Circuit rejected.  (Dkts. 713, 717 at 16-19.)

Norton's second main non-infringement defense—that the antecedent basis rule applied to the Court's construction of the term "application community"—was also exceptionally weak. Norton had made its antecedent basis argument—*i.e.*, that the program run by the application community had to be the program executing in the emulator—before the Court in 2014 and lost.

-16-

(Dkts. 107 at 28-30, 123.)  The PTAB similarly rejected the argument.  (Ex. K, IPR Hr'g Tr. at 69:17-20; Dkt. 703 at 15 n.13.)  Yet Norton advanced this argument again through Dr. Jaeger (Jaeger Rep. ¶¶ 325-27) and through a motion to exclude Dr. Bailey's testimony (Dkt. 361).  The Court properly concluded that Norton "inappropriately s[ought] to 'rehash' previously dismissed claim construction arguments" (Dkt. 703 at 11), and denied the motion to exclude Dr. Bailey's opinion and granted the motion to exclude Dr. Jaeger's opinion.  Norton could not have forgotten that the Court rejected its argument in 2014, and this non-infringement argument was frivolous.

Norton's other main non-infringement defenses were dropped at the last minute by Norton's new trial counsel.  Until trial, Dr. Jaeger had argued (i) that SONAR/BASH monitored "library calls" and "system calls," which were not "function calls" (Ex. L, Jaeger Dep. Tr. 71:14-73:15, 85:14-95:9; Jaeger Rep. ¶ 256), (ii) that SONAR/BASH decision trees were not "models of function calls for the at least a part of the program" (*id.* ¶¶ 294-318), and (iii) that SONAR/BASH did not permit selective execution of part, or all, of a program (*id.* ¶¶ 278-87).  But at trial, Norton's witnesses readily conceded that each point lacked viability:  (i) Dr. Jaeger testified that he believed SONAR/BASH monitored function calls, notwithstanding his protestations during his deposition (Trial Tr. 2122:9-25), (ii) Dr. Jaeger testified that he believed SONAR/BASH decision trees were a "model of function calls" as required by the claims (*id.* 2072:14-25, 2138:22-2139:2), and (iii) Dr. Jaeger and David Kane admitted that SONAR/BASH permitted selective execution of part, or all, of a program (*id.* 1999:14-2000:12, 2067:13-17).  After the parties expended enormous resources litigating these meritless defenses, Norton's new trial counsel apparently concluded what had been obvious all along:  these non-infringement defenses were frivolous.

Having lost or jettisoned all of its main non-infringement defenses, at trial, Norton advanced three non-infringement defenses that—at best—were tertiary whispers in Dr. Jaeger's

-17-

report.  Its first argument—that Norton's products do not execute a program "in" an emulator—
had no support in evidence and amounted to a redo of a failed 2014 claim construction argument.
(Trial Tr. 2063:16-2066:18.)  Stripped of improper claim construction arguments, Dr. Jaeger's
testimony on this issue was exceptionally short and conclusory and he admitted that he provided
no response to one of Dr. Bailey's main infringement opinions regarding execution of a program
"in" an emulator.[9]  (Trial Tr. 2126:16-2132:10.)  Norton's second argument—that SONAR/BASH
decision trees do not represent a combination of models—was directly contradicted by Norton's
30(b)(6) deposition testimony and ordinary-course documents.  (*Compare* Trial Tr. 2071:16-22,
2073:14-2075:25, 2204:5-2206:6 *with id.* 1416:17-1417:14; Ex. M, JX0004 (Pereira) 251:19-21,
251:24-25, 252:14-19, 252:23-24; Ex. N, PX0236 at 003.)  Moreover, Dr. Jaeger's testimony was
conclusory and discredited on cross-examination when Columbia's counsel showed unequivocally
that Dr. Jaeger's trial position was inconsistent with his own 2017 published research paper.  (Trial
Tr. 2215:10-2217:23.)  And Dr. Jaeger conceded that he offered the jury no plain and ordinary
meaning of "model" that would support a non-infringement finding.  (*Id.* 2198:13-2199:2.)

  With regard to the '115 Patent, Norton's sole additional defense was that Norton's
distribution of a new decision tree did not constitute notification to an application community.  (*Id.*
2087:25-2094:14.)  But on cross-examination, Dr. Jaeger admitted that he had provided deposition
testimony directly at odds with that trial defense:  use of an intermediary is within the scope of the
asserted patent claims.  (*Id.* 2138:11-21.)  In each case, Norton's defense was conclusory, and
Norton made no serious attempt to explain away contradictory witness testimony from its own
employees and 30(b)(6) witnesses and its own ordinary course documents that stated, for example,

---

[9] Although Dr. Jaeger testified that he had an opinion to provide on that issue (Trial Tr.
2132:2-10)—perhaps agreement with Dr. Bailey—Norton's counsel strangely did not broach the
topic with Dr. Jaeger on re-direct examination.

-18-

that Norton's behavioral detection feature "use[s] many models and combine[s] them in a good way." (*Id.* 2020:2-2022:19; Ex. N, PX0236 at 003.)[10]

**Willful Infringement**. The jury found that Norton willfully infringed Columbia's patents, which is another factor that, on its own, can support a finding that this case is exceptional, as explained below (*infra* at 30). Notably, Norton presented ***no defense*** to willful infringement at trial. Although Norton's counsel told the jury in his opening that he knew "for sure" that a Norton executive's November 2005 e-mail exchange offering to pay to license Columbia technology (PX0083) was "not about [the] two patents" asserted in the case (Trial Tr. 334:15-18), Norton adduced no evidence to substantiate that representation to the jury, and all of the evidence confirmed that the November 2005 e-mail ***was*** about the relevant provisional patent application, filed in October 2005, which ripened into the patents-in-suit. Norton also offered no explanation of its own 30(b)(6) testimony—from Barry Laffoon in both 2014 and 2019—that Norton had done nothing to investigate whether it infringed Columbia's patents, which is something Norton does not do as a matter of corporate policy. (*Id.* 1417:16-1418:14; Ex. O, JX0005 (Laffoon (2014)) 45:14–46:2, 46:17-19, 46:24-47:1, 104:7-8, 104:13-19, 104:21-105:3; Ex. O, JX0005 (Laffoon (2019)) 67:2-12, 67:18-20, 67:24.) Although Norton repeatedly argued to the jury that they should not find willful infringement, it relied entirely on lawyer arguments without evidence.

**Damages**. With regard to damages, Norton "swung for the fences" and missed. (Trial Tr. 1394:1-9.) Applying unreliable and incomplete data—and methodologies that contravened established Federal Circuit law—Dr. Jaeger provided a damages apportionment opinion that drove the value of Columbia's patented technology to decimal points that approached zero. (Dkt. 905

---

[10] Additional reasons that Norton's trial presentation was exceptionally weak are set forth in Columbia's contemporaneous Motion for Enhanced Damages Under 35 U.S.C. § 284 at 15-18, 25-26 and Columbia does not restate them here in the interest of judicial economy.

at 1-2.)  Mr. Hosfield then relied on Dr. Jaeger, non-comparable license agreements, and other improper evidence and methodologies to convert Dr. Jaeger's near-zero apportionment into a "reasonable" royalty of 0.00008% for Norton's use of Columbia technology in a product feature that Norton described as the "heart" of its malware detection capability.  (Dkt. 741 at 15-23; Apr. 7, 2022 Tr. 107:2-116:3, 118:7-20; Ex. P, PX0170 at 001.)  The Court readily concluded that the vast majority of Norton's near-zero damages assessment was improper and legally impermissible. (Dkts. 739 at 17-29, 741 at 15-27, 900, 905, 907, 1086.)  After extensive briefing and argument on what portions of its experts' damages opinions could be presented to the jury, Norton ultimately chose to withdraw its damages case entirely in the middle of the trial.  (*Supra* at 15.)

## APPLICABLE LAW

Pursuant to 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  In *Octane*, the Supreme Court rejected a narrow framework the Federal Circuit had created for application of § 285, and broadened the analysis, emphasizing that a trial court has broad discretion to determine whether a case is exceptional.  572 U.S. at 554, 557, *see also Raniere* v. *Microsoft Corp.*, 887 F.3d 1298, 1308-09 (Fed. Cir. 2018) ("Because the district court lives with the case over a prolonged period of time, it is in a better position to determine whether a case is exceptional and it has discretion to evaluate the facts on a case-by-case basis.") (citation omitted).  The Supreme Court held that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane*, 572 U.S. at 554.  The Supreme Court stated that "'[t]here is no precise rule or formula for making these determinations'" and district courts should "determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."  *Id.* (citation omitted).

In applying *Octane*, the Federal Circuit has explained that "[d]efendants' conduct over the course of the entire litigation" can justify an award of attorneys' fees even if the "individual acts of misconduct might not make [d]efendants' conduct look exceptional." *Drop Stop LLC* v. *Zhu*, 757 F. App'x 994, 999 (Fed. Cir. 2019) (quotation marks omitted).   In other words, repeated misconduct can form the basis for an award of attorneys' fees under § 285 even if no isolated act on its own would have led to that conclusion or to other sanctions.   *See Large Audience Display Sys., LLC* v. *Tennman Prods., LLC*, 745 F. App'x 153, 157 (Fed. Cir. 2018); *Monolithic Power Sys., Inc.* v. *O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1369 (Fed. Cir. 2013).   On the other hand, although a single act of egregious conduct is not ***necessary*** to find a case exceptional under § 285, such conduct has been found to be ***sufficient*** to support such a finding.   *Intell. Ventures I LLC* v. *Trend Micro Inc.*, 944 F.3d 1380, 1384 (Fed. Cir. 2019) ("[A] district court has discretion, in an appropriate case, to find a case exceptional based on a single, isolated act.").

## ARGUMENT

"[C]onsidering the totality of the circumstances," this case plainly "stands out from others with respect to . . . the unreasonable manner in which the case was litigated." *Octane*, 572 U.S. at 554.   That alone is sufficient for the Court to find this case exceptional under § 285.   *See Regeneron Pharms., Inc.* v. *Merus N.V.*, 2018 WL 1472507, at *13 (S.D.N.Y. Mar. 26, 2018) (finding case exceptional based solely on litigation misconduct).   This case also stands out because of the exceptional weakness of Norton's litigating positions.   *Octane*, 572 U.S. at 554.   That too is sufficient on its own for the Court to find this case exceptional.   *See Innovation Scis., LLC* v. *Amazon.com, Inc.*, 2020 WL 4934272, at *3 (E.D. Va. Feb. 18, 2020), *aff'd*, 842 F. App'x 555 (Fed. Cir. 2021) (finding the case exceptional solely because the party's "litigation positions were so substantively weak . . . that this case stands out from others").   Taken together, there is a more than a sufficient basis for the Court to deem this case exceptional under § 285.   As the prevailing

party, Columbia thus is entitled to an award of its attorneys' fees, which Columbia respectfully requests for the period after this case returned to the District Court in 2018.

A. **Norton's Extraordinary Misconduct With Regard to Dr. Dacier Makes This Case Exceptional Under § 285.**

As demonstrated above (*supra* at 3-6), Norton's conduct with regard to Dr. Dacier amounted to a two-year campaign of "███████████████████" that resulted in Norton "███████████████" (Dkt. 889 at 13-14)—for which the Court has recognized there is no remedy that would truly make Columbia whole (Trial Tr. 2484:13-15). Norton's misconduct with regard to Dr. Dacier is similar to misconduct that other courts have found sufficient to deem a case exceptional under § 285.

As an initial matter, much of Norton's conduct with regard to Dr. Dacier is the type that could be sanctioned wholly apart from § 285. (*See* Trial Tr. 2484:17-19 ("I have reserved sanctions against Quinn Emanuel"); Apr. 8, 2022 Tr. 4:5-6 ("It's quite possible [Norton withholding the April 2022 Dacier e-mails] could be the basis for sanctions.").) Although independently sanctionable conduct is not necessary to award attorneys' fees, when it occurs, courts frequently have found that it satisfies § 285. *See Regeneron*, 2018 WL 1472507, at *14 (finding case exceptional, in part, based on litigation misconduct that resulted in sanctions); *Tinnus*, 369 F. Supp. 3d at 745 (declaring case exceptional based on, *inter alia*, "sanctionable discovery misconduct"). Columbia respectfully submits that the seriousness of Norton's misconduct, likely sanctionable apart from § 285, should be taken into account in the analysis, and an award of attorneys' fees, in part, would serve the purpose of deterring future similar misconduct.[11]

---

[11] It bears emphasis that Norton's willingness to file an utterly meritless but very serious motion for sanctions against a relatively young attorney "where the record couldn't be more clear that this attorney was trying to abide by every single rule" (Apr. 7, 2022 Tr. 57:1-7) exhibits a degree of callousness that warrants deterrence.

Additionally, courts have found cases exceptional where a party engaged in misconduct with witnesses, such as witness tampering, as occurred here. *See Taurus IP, LLC* v. *DaimlerChrysler Corp.*, 726 F.3d 1306, 1319-20 (Fed. Cir. 2013) (witness tampering); *Cargill, Inc.* v. *Sears Petroleum & Transp. Corp.*, 388 F. Supp. 2d 37, 78-79 (N.D.N.Y. 2005) (conduct that would have warranted a missing witness instruction). Similarly, courts have found cases to be exceptional where a party violated a court order, which Norton did by failing to comply with the Court's March 15, 2022 order, or violated ethical rules of conduct, as Norton's counsel did by forcing representation on Dr. Dacier and failing to withdraw when that representation created a conflict of interest.[12] *See In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1265-67 (Fed. Cir. 2018) (party "violat[ed] ethical rules of conduct"); *Niazi Licensing Corp.* v. *St. Jude Med. S.C., Inc.*, 2021 WL 4947712, at *4 (D. Minn. Oct. 25, 2021) ("violating the Court's orders"); *Agio Int'l Co.* v. *Zhejiang Longda Force Co.*, 2019 WL 1302634, at *5 (W.D.N.C. Mar. 21, 2019) ("Attorney fees should be awarded for 'willful disobedience of a court order.'").

Courts also have found cases exceptional where a party made misrepresentations or withheld material information—as Norton did when it repeatedly misrepresented Dr. Dacier's willingness to testify at trial, refused to comply with the Court's March 15 order, and made arguments to the Court on April 7 that were contradicted by undisclosed correspondence that Norton's counsel had with Dr. Dacier (*see supra* at 3-6). *See VirnetX Inc.* v. *Apple Inc.*, 324 F. Supp. 3d 836, 872 (E.D. Tex. 2017) ("refusing to give [plaintiff] even basic discovery" on a conflict of interest issue), *aff'd sub nom. VirnetX Inc.* v. *Cisco Sys., Inc.*, 748 F. App'x 332 (Fed. Cir. 2019); *Monolithic Power Sys.*, 726 F.3d at 1367 (party made repeated

---

[12] As described in the Second Declaration of Leslie A.T. Haley, substantial evidence supports the conclusion that Norton and its counsel have violated several Virginia Rules of Professional Conduct, including Rules 1.16(a)(1), 1.2(a), 1.7, 3.3(a)(1), and 3.4.  (*See* Dkt. 1102-2 ¶¶ 3-11.)

misrepresentations and "sought, through motion practice, to mask its proffer of false testimony"); *Regeneron*, 2018 WL 1472507, at *13 (misrepresenting facts to the court and other party).

In addition, courts have found cases to be exceptional where a party made unmeritorious arguments or filed frivolous motions, such as Norton's baseless motions for sanctions and repeated re-argument of the Court's opinion regarding the missing witness instruction.  *See SRI Int'l, Inc.* v. *Cisco Sys., Inc.*, 14 F.4th 1323, 1332 (Fed. Cir. 2021) (creating work that "was needlessly repetitive or irrelevant or frivolous"), *cert. denied*, 2022 WL 1528531 (May 16, 2022); *Tinnus*, 369 F. Supp. 3d at 745 (filing "numerous unmeritorious motions"); *Drop Stop LLC* v. *Zhu*, 2018 WL 1407031, at *6 (C.D. Cal. Jan. 22, 2018) ("continuing to raise stricken or waived arguments"), *aff'd*, 757 F. App'x 994 (Fed. Cir. 2019).

The Federal Circuit has held that "a district court has discretion, in an appropriate case, to find a case exceptional based on a single, isolated act" where that act renders the case as a whole exceptional.  *Intell. Ventures*, 944 F.3d at 1384.  Norton's conduct with respect to Dr. Dacier was far more than an "isolated act"; it was a campaign of bad-faith conduct that makes this case stand out from others.  Columbia respectfully submits that the Court could find this case exceptional based solely on Norton's conduct with regard to Dr. Dacier, although there are several other reasons to reach that conclusion, as explained below.

### B. Norton's Weak Litigating Positions, Unmeritorious Arguments, and Re-Argument of Decided Issues Made This Case Exceptional.

As demonstrated above (*supra* at 16-20), Norton made arguments and motions, provided expert opinions, and maintained trial defenses that were exceptionally weak and, in some cases, frivolous.  Many courts have found cases to be exceptional due to the weakness of a party's litigation positions, like the ones that Norton advanced here.  *See Innovation Scis.*, 2020 WL 4934272 at *3 (case was exceptional because the party's "litigation positions were so substantively

weak" and continuing to litigate them was "unreasonable"); *EagleView Techs., Inc.* v. *Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 69 (D.N.J. 2021) (defendants "litigated [] case in a manner that ignored the weaknesses of their own positions, advanced unreasonable arguments, and forced [p]laintiffs to spend significant sums rebutting those unreasonable positions and arguments.").

Courts have previously found a case exceptional based on each of the weaknesses in Norton's case.  Among other infirmities, Norton advanced unreasonable claim construction positions, including the frivolous argument that the parties' stipulated construction of "anomalous" effectively abrogated the Federal Circuit's holding.[13]  (*Supra* at 9-10, 16.)  Norton also advanced clearly improper non-infringement opinions, including (i) a shell game opinion regarding the claim term "anomalous" that directly violated the Federal Circuit's claim construction decision, and (ii) an antecedent basis argument regarding the claim term "application community" that this Court and the PTAB previously rejected.[14]  (*Supra* at 16-17.)  In addition, Norton filed an unprofessional and meritless motion to sanction Columbia's counsel for appropriate contact with a potential trial witness, which was a motion that Norton ironically used as a vehicle for its own unethical conduct.[15]  (*Supra* at 3-6.)  Norton also "swung for the fences" and missed with near-zero damages

---

[13] *See BookIT Oy* v. *Bank of Am. Corp.*, 2019 WL 13156599, at *4 (N.D. Tex. Nov. 21, 2019) (instead of "presenting a claim construction dispute in good faith," a party "create[d] a purely litigation driven claim construction"); *Hunter Douglas Inc.* v. *Great Lake Woods, Inc.*, 2019 WL 1375675, at *15-16 (D. Colo. Mar. 27, 2019) ("shifting and baseless claim construction positions of the defendants resulted in unnecessary expenditure of legal fees by [plaintiff]").

[14] *See EagleView*, 522 F. Supp. 3d at 61 & n.15 ("[d]efendants repeatedly tried to advance an argument that was inconsistent with the Court's claim construction" and "tried to backdoor a construction that [the judge] had rejected"); *Georgetown Rail Equip. Co.* v. *Holland L.P.*, 2016 WL 3346084, at *22, 24 (E.D. Tex. June 16, 2016), *aff'd*, 867 F.3d 1229 (Fed. Cir. 2017) ("even after the Court clearly rejected [defendant]'s [non-infringement] theories, [defendant] continued to assert them throughout trial").

[15] *See Monolithic Power Sys.*, 726 F.3d at 1364, 1369 ("baseless motions" filed as part of "an abusive 'pattern' or a vexatious 'strategy'" "needlessly prolong[ed] the litigation" and rendered it

opinions that plainly were based on incomplete and unreliable data and that clearly contravened Federal Circuit precedent regarding, *e.g.*, non-comparable license agreements.[16]  (*Supra* at 19-20.) Moreover, Norton abandoned at trial (i) three of Norton's main non-infringement arguments—choosing instead to concede each issue without explanation, and (ii) Norton's entire damages case—strategically choosing not to offer any apportionment testimony from Dr. Jaeger and not to even call Mr. Hosfield, instead relying on counsel's "testimony" for alternative damages theories.[17] (*Supra* at 15, 17-20.)  Finally, Norton offered no defense to (i) willful infringement, (ii) the amount of the reasonable royalty, or (iii) co-inventorship of the '643 Patent, and offered only conclusory and obviously deficient defenses with regard to infringement of the '115 and '322 Patents.[18] (*Supra* at 6 n.3, 16-20.)

In addition to Norton's pattern of raising arguments that were weak or frivolous, Norton also persistently attempted to re-argue decided issues.  For example, (i) after the Court ruled that

---

"anything but usual"); *Tinnus*, 369 F. Supp. 3d at 745 (bringing "numerous unmeritorious motions, thereby unnecessarily expending significant resources of the parties and the Court.").

[16] *See Intex Recreation Corp.* v. *Team Worldwide Corp.*, 77 F. Supp. 3d 212, 217 (D.D.C. 2015) ("fil[ing] a conclusory expert report and advanced flawed, nonsensical, and baseless arguments, which lacked factual support"); *MarcTec, LLC* v. *Johnson & Johnson*, 2010 WL 680490, at *5-6, 10 (S.D. Ill. Feb. 23, 2010), *aff'd*, 665 F. 3d 907 (Fed. Cir. 2012) (relying on "untested and untestable theory that is neither reliable nor relevant to the issues at hand" and "did not meet the requirements for scientific reliability or relevance required by FRE 702 and *Daubert*").

[17] *See Saint-Gobain Autover USA, Inc.* v. *Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 752-53, 757 (N.D. Ohio 2010), *as corrected* (Apr. 13, 2010) (defendant "dropped its invalidity defense . . . immediately prior to trial" and "utilized a trial strategy of advancing and then withdrawing untenable defenses"); *SRI Int'l*, 14 F.4th at 1332 ("aggressive tactics, including maintaining nineteen invalidity theories until the eve of trial but ultimately presenting only two at trial").

[18] *See Cognex Corp.* v. *Microscan Sys., Inc.*, 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014) (finding case exceptional where "the defenses that were offered at trial were particularly weak and lacked support"); *Genes Indus., Inc.* v. *Custom Blinds and Components, Inc.*, 2018 WL 11354574, at *7 (C.D. Cal. Jan. 29, 2018) ("[d]efendant maintained invalidity defenses through the course of litigation, only to completely fail to present any evidence to support those defenses at trial").

Norton was estopped from raising prior art invalidity in this case and that the IPR proceedings were not relevant to the issues for trial, Norton ceaselessly attempted to find ways to inject prior art and the IPR proceedings into the case (*supra* at 7-8), (ii) after the Court ruled against Norton's Section 101 and prosecution history estoppel defenses, Norton sought to raise them as "triable issues" (*supra* at 8-9), and (iii) after the Court ruled that a missing witness instruction would be provided with regard to Dr. Dacier—in response to ***Norton's*** motion seeking a pre-trial *in limine* ruling on that issue—Norton repeatedly re-argued the issue before and during trial (*supra* at 5).

The *VirnetX* and *Tinnus* cases are particularly analogous.[19]  In *VirnetX*, the court found the case exceptional where the defendant attempted "to inject evidence of [PTAB] proceedings into the trial, even after receiving adverse rulings from the Court . . . and despite the fact that invalidity was no longer in the case."  *VirnetX Inc.*, 324 F. Supp. 3d at 872.  Similarly, in *Tinnus*, the court explained that "the most common theme throughout this litigation [] was Defendants' constant re-urging of issues already decided by the Court," including motions that the court had "already admonished the parties" against filing.  *Tinnus*, 369 F. Supp. 3d at 745.  For example, after the court repeatedly rejected defendants' claim construction arguments and cautioned defendants against continuing to raise them, defendants "found creative ways to reassert their rejected positions."  *Id.* at 719-20.  Much like the defendants in *VirnetX* and *Tinnus*, Norton repeatedly attempted to (i) inject prior art and the IPRs into this case (*see supra* at 7-8), notwithstanding the Court's numerous opinions finding that invalidity was not at issue and that Norton and its experts could not rely on prior art, cancelled claims, or documents relating to the IPRs (*see* Dkts. 251, 741, 717, 907) and (ii) find "creative ways" to reargue the Court's claim constructions (*see supra*

---

[19] *See also Georgetown Rail*, 2016 WL 3346084 at *24 (declaring case exceptional where party "continue[d] to raise rejected arguments that are found to be objectively unreasonable"); *Taurus*, 726 F.3d at 1319-20 (declaring case exceptional where party filed "repetitive motions").

at 9-10)—including as late as Dr. Jaeger's proposed trial demonstratives—notwithstanding the Court's admonishment that such arguments "will not be tolerated" (Dkt. 253 at 18).

In short, the clear weakness of Norton's litigating positions is another independent reason that this case should be deemed exceptional under § 285.

### C. Norton's Misconduct During Trial Was Exceptional.

Courts have found cases to be exceptional based on trial misconduct. *See, e.g.*, *VirnetX*, 324 F. Supp. 3d at 872; *NTP Inc.* v. *Rsch. in Motion, Ltd.*, 270 F. Supp. 2d 751, 758, 761 (E.D. Va. 2003) (defendant attempted to "confuse and mislead the jury by conducting a demonstration" of a prior art system), *amended*, 2003 WL 22746080 (E.D. Va. Aug. 5, 2003). Norton's misconduct during trial further supports a finding that this case is exceptional under § 285. Despite the Court's repeated admonishments, Norton engaged in improper cross-examination with every Columbia witness, and sought to use the cross-examination of Dr. Cole to circumvent the Court's ruling that Norton's near-zero damages number was improper and excluded. (*Supra* at 10-13.)

The *Tinnus* case is again instructive. In *Tinnus*, the court found the case exceptional based on, *inter alia*, defendants' "unacceptable trial conduct," including "flagrantly and continuously violat[ing] motions *in limine* and sustained objections," which "was so egregious the Court admonished Defendants on the record." *Tinnus*, 369 F. Supp. 3d at 745. In particular, after the court excluded any mention of PTAB proceedings in a motion *in limine*, defendants repeatedly violated that order and attempted to elicit testimony on this subject. *Id.* at 720-21.

Here, through *Daubert* and *in limine* rulings, the Court precluded Norton from offering an ultimate apportionment figure. (*See* Dkts. 905, 908.) After Norton engaged in inappropriate cross-examination with each of Columbia's first four witnesses, the Court admonished Norton's counsel to cease "present[ing] things as a predicate of a question that are inaccurate" "especially with experts" and reminded Norton that, due to the Court's *Daubert* and *in limine* rulings, "Norton

cannot offer any ultimate apportionment percentage." (Trial Tr. 1407:22-23, 1413:16-19; *supra* at 10-11.) But the very next time they took the podium, Norton's counsel violated the Court's unambiguous instructions, misrepresenting the witness's opinion and creating a demonstrative that "misrepresent[ed] the record and the core issues at bar, misle[d] the jury, and unfairly prejudice[d] Columbia[]" by presenting "what amounted to an utterly improper alternate form of apportionment analysis." (Dkt. 1155 at 6-7; *supra* at 11-12.) This line of questioning and demonstrative violated the Court's *Daubert* and *in limine* rulings and flouted the Court's repeated warnings.

Even worse, Norton's counsel proceeded to apply his flawed apportionment figure to suggest to the jury that damages—by his calculation—should be "less than $30 million" (Trial Tr. 1653:23-1654:3)—a figure unsupported by any expert testimony or other evidence, which "improperly speculated about what the contrived irrelevant, inadmissible, and unsupported apportionment number might mean" (Dkt. 1155 at 6). As in the *Tinnus* case, Norton's trial misconduct, which violated the Court's orders, further supports finding this case exceptional.

**D.    Norton's Pattern of Litigation Tactics Was Exceptional.**

In evaluating a case under § 285, certain "individual acts of misconduct [] might not make [a party's] conduct look exceptional," but a pattern of unreasonable "conduct over the course of the entire litigation" can cause the case to stand out from others. *Drop Stop*, 757 F. App'x at 999; *see also Large Audience Display*, 745 F. App'x at 157 (misconduct that "'permeated' the entire litigation" made the case exceptional). The manner in which Norton and its counsel approached nearly every issue in this case—from big to small—was unnecessarily contentious and costly, and although no individual instance on its own may be egregious, this pattern of uncooperative and often unprofessional conduct makes this case stand out from others. This was particularly true in the run-up to trial, during which Norton's submissions often were not "user friendly" and were "completely nontransparent." (March 17, 2022 Tr. 17:17-18, 19:11-13.) While there are many

examples of Norton's failure to cooperate in good faith on pre-trial issues, three were particularly egregious, as described in detail above:  (i) Norton's repeated withdrawal, after briefing and/or oral argument of objections or objected to evidence (*supra* at 14-15), (ii) Norton's overbroad and wasteful deposition designations (*supra* at 13-14), and (iii) Norton's consistent failure to work with Columbia in good faith on pre-trial case administration (*supra* at 13).  Considering the totality of the circumstances, Norton's failure to cooperate in good faith and overbroad approach to pre-trial disclosures further demonstrates that this case is exceptional.[20]

### E.  Norton's Willful Infringement Supports an Exceptional Case Finding.

Finally, the jury found that Norton willfully infringed the '115 and '322 Patents.  Although that alone is not dispositive of the exceptional case inquiry, that is a factor that can and should be taken into account as part of the totality of the circumstances.  *SiOnyx LLC* v. *Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020); *see also VirnetX Inc.*, 324 F. Supp. 3d at 871 ("[W]illfulness . . . may be a sufficient basis in a particular case for finding the case 'exceptional.'").  Norton's willful infringement—which was supported by overwhelming and uncontroverted evidence at trial (*see* Columbia's Motion for Enhanced Damages Under 35 U.S.C. § 284 at 7-14, 18-21)—is further support for an exceptional case finding here.

### CONCLUSION

Considering the totality of the circumstances, this case easily stands out from others.  Columbia thus respectfully requests that the Court exercise its discretion to find this case exceptional under § 285 and award Columbia its attorneys' fees for the period after this case returned to the District Court in 2018.

---

[20] *See SRI Int'l*, 14 F.4th at 1332 (affirming exceptional case finding based on "over-designation of deposition testimony for trial"); *z4 Techs., Inc.* v. *Microsoft Corp.*, 2006 WL 2401099, at *24 (E.D. Tex. Aug. 18, 2006) ("voluminous" disclosure "conceal[ed] [defendants'] trial evidence in a massive pile of decoys," "creat[ing] unnecessary work"), *aff'd*, 507 F.3d 1340 (Fed. Cir. 2007).

Dated:  June 3, 2022

Respectfully submitted,

*/s/ John M. Erbach*

Dana D. McDaniel (VSB No. 25419)
John M. Erbach (VSB No. 76695)
SPOTTS FAIN, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia  23219
Tel.: (804) 697-2065
Fax: (804) 697-2165
dmcdaniel@spottsfain.com
jerbach@spottsfain.com

Garrard R. Beeney (*pro hac vice*)
Dustin F. Guzior (*pro hac vice*)
Stephen J. Elliott (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel.: (212) 558-4000
Fax: (212) 558-3588
beeneyg@sullcrom.com
guziord@sullcrom.com
elliotts@sullcrom.com

*Counsel for Plaintiff The Trustees of
Columbia University in the City of New
York*