**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>_Plaintiff_<br><br>v.<br><br>NORTONLIFELOCK INC.,<br><br>_Defendant._ | Civil Action No. 3:13-cv-00808-MHL |

<u>**NORTONLIFELOCK'S RESPONSE TO COLUMBIA'S MOTION**</u>
<u>**FOR ENHANCED DAMAGES UNDER 35 U.S.C. § 284**</u>

## **<u>TABLE OF CONTENTS</u>**

**Page**

Introduction ...........................................................................................................................1

I.     Legal Standard ...........................................................................................................2

II.    Factual Background ....................................................................................................3

     A.    The Litigation...................................................................................................3
           1.    Columbia's Original Claims ...................................................................3
           2.    Initial Dismissal, CAFC Appeal, And PTAB Proceeding .........................4
           3.    Proceedings Following Remand In 2018 .................................................5
           4.    Trial And The Jury's Verdict...................................................................6
     B.    Norton's Independent Development Of SONAR/BASH ......................................6
     C.    The Parties' Licensing Discussions ...................................................................7

III.    Argument .................................................................................................................10

     A.    There Can Be No Willful Pre-Suit Infringement Of Patents That Had Not Yet Issued.......................................................................................................10
     B.    Norton's Post-Suit Defenses Were Overwhelmingly Successful ........................13
           1.    Norton Defeated The Vast Majority of Columbia's Allegations of Infringement.......................................................................................13
           2.    Norton Prevailed On The Vast Majority of Columbia's Claims Relating To The '643 Patent ..................................................................14
     C.    Columbia Has No Evidence That Norton Refused Any "Modest" Royalty Payment.........................................................................................................14
     D.    The Read Factors Strongly Favor No Enhancement..............................................14
           1.    Factor 1 – Norton Did Not Copy ...........................................................14
           2.    Factor 2 – Norton Had Good-Faith Defenses When It Learned Of Infringement.......................................................................................18
           3.    Factor 3 – Norton's Litigation Conduct Was Reasonable .........................20
           4.    Factor 4 – Norton's Pocket-Size Is Inapposite; The Overwhelming Majority Of Value Of Its Products Stems From Non-Accused Aspects...............................................................................................22
           5.    Factor 5 – The Contested Issues Post-2018 Were Indisputably Close ..................................................................................................23
           6.    Factor 6 – Columbia's Meritless Claims Prolonged This Action .............25
           7.    Factor 7 – Norton Behaved Appropriately And Remedial Action Was Unnecessary...............................................................................26
           8.    Factor 8 – Norton Was Not Motivated To Harm Columbia ......................26
           9.    Factor 9 – Norton Did Not Conceal Its Alleged Willful Infringement.......................................................................................27
     E.    Damages Awards Are Typically Enhanced Only In The Most Egregious Cases ..............................................................................................................27

IV.    Conclusion ..................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Acantha LLC v. DePuy Synthes Sales Inc.*,
    406 F. Supp. 3d 742 (E.D. Wis. 2019)........................................................................19

*Am. Original Corp. v. Jenkins Food Corp.*,
    774 F.2d 459 (Fed. Cir. 1985)..................................................................................16

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
    967 F. Supp. 861 (E.D. Va. 1997) .............................................................................24

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
    No. 2:09-CV-13 TS, 2015 WL 4727955 (D. Utah Aug. 10, 2015) ........................................28

*Barry v. Medtronic, Inc.*,
    250 F. Supp. 3d 107, 113-14 (E.D. Tex. 2017).......................................................17

*Boundaries Sols. Inc. v. CoreLogic, Inc.*,
    No. 5:14-cv-00761-PSG, 2014 WL 7463708 (N.D. Cal. Dec. 30, 2014)..............................10

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
    492 F. Supp. 3d 495 (E.D. Va. 2020) .....................................................................21

*Corephotonics, Ltd. v. Apple, Inc.*,
    No. 17-CV-06457-LHK, 2018 WL 4772340 (N.D. Cal. Oct. 1, 2018)..................................11

*Cyntec Co., Ltd. v. Chilisin Electronics. Corp.*,
    No. 18-CV-00939-PJH, 2022 WL 1443232 (N.D. Cal. May 6, 2022)...................................22

*EagleView Techs., Inc. v. Xactware Sols., Inc.*,
    522 F. Supp. 3d 40 (D.N.J. 2021) .........................................................................30

*Green Mountain Glass L.L.C. v. Saint-Gobain Containers, Inc.*,
    300 F. Supp. 3d 610 (D. Del. 2018).......................................................................28

*Gustafson, Inc. v. Intersystems Indus. Prod., Inc.*,
    897 F.2d 508 (Fed. Cir. 1990)...............................................................................20

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
    579 U.S. 93 (2016) ............................................................................... *passim*

*Harris Corp. v. Fed. Express Corp.*,
    No. 6:07-cv-1819-Orl-28 (KRS), 2011 WL 13141674 (M.D. Fla. Feb. 28, 2011) ................27

*Hutchins v. Zoll Med. Corp.*,
    492 F.3d 1377 (Fed. Cir. 2007)........................................................................................25

*i4i Ltd. P'ship v. Microsoft Corp.*,
    670 F. Supp. 2d 568 (E.D. Tex. 2009) ............................................................................30

*Idenix Pharms. LLC v. Gilead Scis., Inc.*,
    271 F. Supp. 3d 694 (D. Del. 2017)................................................................................24

*Informatica Corp. v. Bus. Objects Data Integration, Inc.*,
    489 F. Supp. 2d 1075 (N.D. Cal. 2007) .........................................................................29

*Itron, Inc. v. Benghiat*,
    No. CIV.99-501(JRT/FLN), 2003 WL 21402608 (D. Minn. June 16, 2003).........................16

*Jurgens v. CBK, Ltd.*,
    80 F.3d 1566 (Fed. Cir. 1996).........................................................................................2

*Krippelz v. Ford Motor Co.*,
    670 F. Supp. 2d 815 (N.D. Ill. 2009) ..............................................................................23

*MercExchange, L.L.C. v. eBay, Inc.*,
    275 F. Supp. 2d 695 (E.D. Va. 2003) ........................................................................16, 23

*Nox Med. Ehf v. Natus Neurology Inc.*,
    No. CV 15-709-RGA, 2018 WL 4062626 (D. Del. Aug. 27, 2018)...................................28

*NTP Inc. v. Rsch. in Motion, Ltd.*,
    270 F. Supp. 2d 751 (E.D. Va. 2003) .............................................................................19

*Odetics, Inc. v. Storage Tech. Corp.*,
    14 F. Supp. 2d 800 (E.D. Va. 1998) ....................................................................19, 25, 27

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    No. CV 08-309-LPS, 2019 WL 3290369 (D. Del. July 22, 2019) ...................................28

*Read Corp. v. Portec Inc.*,
    970 F.2d 816 (Fed. Cir. 1992)...................................................................................2, 19, 27

*Riles v. Shell Expl. & Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002)......................................................................................24

*Sears, Roebuck & Co. v. Stiffel Co.*,
    376 U.S. 225 (1964)......................................................................................................16

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*,
    No. CV 16-284-LPS, 2019 WL 3240521 (D. Del. July 18, 2019) ...................................28

*Sprint Commc'ns Co. L.P. v. Time Warner Cable, Inc.*,
No. 11-2686-JWL, 2017 WL 978107 (D. Kan. Mar. 14, 2017) .........................................3, 28

*SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*,
127 F.3d 1462 (Fed. Cir. 1997)..................................................................................15

*SRI International, Inc. v. Cisco Systems, Inc.*,
254 F. Supp. 3d 680 (D. Del. 2017)............................................................................22

*State Indus., Inc. v. A.O. Smith Corp.*,
751 F.2d 1226 (Fed. Cir. 1985)..................................................................................10

*Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*,
32 F.4th 1161 (Fed. Cir. 2022) ..............................................................................20, 21

*TecSec, Inc. v. Adobe Inc.*,
No. 1:10-CV-115, 2019 WL 1233882 (E.D. Va. Mar. 14, 2019).........................................13

*Top Lighting Corp. v. Linco, Inc.*,
No. SACV 15-01589 JVS, 2019 WL 13020830 (C.D. Cal. Aug. 26, 2019) ...........................22

*Vectura Ltd. v. GlaxoSmithKline*,
No. CV 16-638-RGA, 2019 WL 4346502 (D. Del. Sept. 12, 2019) ....................................28

*Veracode, Inc. v. Appthority, Inc.*,
137 F. Supp. 3d 17 (D. Mass. 2015) .......................................................................28, 29

*VirnetX Inc. v. Apple Inc.*,
324 F. Supp. 3d 836 (E.D. Tex. 2017).........................................................................30

*Virnetx, Inc. v. Cisco Systems, Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)..................................................................................23

*VLSI Tech. LLC v. Intel Corp.*,
No. CV 18-0966-CFC, 2020 WL 3488584 (D. Del. June 26, 2020).....................................12

*Wapp Tech Ltd. P'ship v. Seattle SpinCo, Inc.*,
No. 4:18-CV-469, 2021 WL 1574714 (E.D. Tex. Apr. 22, 2021)....................................20, 29

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016)..................................................................................12

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
837 F.3d 1358 (Fed. Cir. 2016)..................................................................................19

*z4 Techs., Inc. v. Microsoft Corp.*,
No. 6:06-CV-142, 2006 WL 2401099 (E.D. Tex. Aug. 18, 2006)........................................29

## INTRODUCTION

Enhanced damages are rarely granted in patent cases.  In *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 103-104 (2016), the Supreme Court held that enhanced damages should be reserved for the most egregious acts:  "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."  This was a close case and Norton's conduct over this decade-long litigation does not approach that level of culpability.

Norton did not copy Columbia's technology.  Nor could it.  Columbia presents no evidence to support its copying claim and Norton could not have copied Columbia's asserted patents, because it launched SONAR/BASH in 2009 *before* either patent existed.

Norton's conduct and good-faith defenses were reasonable.  When Columbia sued in 2013, it accused Norton of infringing 167 claims across six patents by selling eleven separate functionalities.  After five years of effort and expense, Norton defeated 90% of those claims, leaving Columbia with only 18 claims in two patents.  Norton won summary judgment on multiple state-law claims, as well as a number of *in limine* and *Daubert* motions.  At trial, Columbia presented only four claims of two patents against only *one* of the eleven functionalities it originally accused of infringing.

The trial was close.  The jury deliberated for more than three days, and reached a verdict only after the Court issued an *Allen* charge pressing the jurors to resolve their deadlock.  And that verdict was split; the jury rejected Columbia's fraudulent concealment claim, and while it concluded that Norton willfully infringed, it gave Columbia 20% less than what it sought in damages.  That all weighs against enhancement of Columbia's already substantial damages award.

Columbia's other arguments are unsupported by evidence.  The licensing negotiations between the parties were high-level and devoid of any technical details, and Columbia cannot point

1

to any pre-suit communication that accuses Norton of infringement.  Columbia instead waited *four years after* Norton launched SONAR/BASH before accusing Norton of infringing.  Columbia identifies no evidence that justifies enhancing the award the jury found suitable to make Columbia whole, and certainly not trebling it.

## I.    LEGAL STANDARD

Enhanced damages "are generally reserved for egregious cases of culpable behavior." *Halo*, 579 U.S. at 104.  They "are *not* to be meted out in a typical infringement case," *id.* at 103-04 (emphasis added), or in cases where a party simply "shows a lack of respect for intellectual property."  Mot. 5.  Nor is the standard simply "whether the particular facts demonstrate culpability that warrants deterrence," Mot. 7, which would include "garden-variety" infringement, *Halo*, 579 U.S. at 109.  Enhanced damages are "instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior."  *Id.* at 103.  The kind of conduct warranting enhancement has been described as "wanton, malicious, bad-faith, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."  *Id.* at 103-04.

"The paramount determination in deciding enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances."  *Read Corp. v. Portec Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992).  The focus is on the underlying act of infringement, not litigation misconduct.  *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996) (acts of "misconduct during litigation" are not "by themselves" "sufficient for an increased damages award under section 284 because they are not related to the underlying act of infringement").  Nor is a jury finding of willful infringement reason alone to award enhanced damages.  *Read*, 970 F.2d at 826 ("[A] finding of willful infringement does not mandate that damages be enhanced, much less mandate treble damages.").  And the Court may decline to enhance damages even if a jury finds willful infringement and some *Read* factors favor

enhancement.  *Sprint Commc'ns Co. L.P. v. Time Warner Cable, Inc.*, No. 11-2686-JWL, 2017 WL 978107, at *13-14 (D. Kan. Mar. 14, 2017) (not enhancing damages where three *Read* factors favored enhancement because there was no "especially egregious case of infringement").

The Supreme Court recognized in *Halo* that there is "no precise rule or formula for awarding damages under § 284," and while the nine *Read* factors noted in Columbia's brief may be considered, a court must weigh the totality of the circumstances to determine whether the conduct at issue rises to the level of egregiousness that warrants enhancement.  *See* Mot. 6; *Halo*, 579 U.S. at 93, 106.  *Halo* offers two examples of egregious misconduct:  (1) "intentionally" infringing when the patent is clearly valid without "any notion of a defense" for the sole purpose of "steal[ing] the patentee's business," and (2) "plunder[ing]" a patent—i.e., infringing without any reason to believe the conduct is "arguably defensible."  *Halo*, 579 U.S. at 104-05.  The inquiry aims to punish the wanton offender who intentionally infringes, focusing on the "knowledge of the actor at the time of the challenged conduct."  *Id.* at 105.

## II.    FACTUAL BACKGROUND

### A.    The Litigation

#### 1.    *Columbia's Original Claims*

Columbia's December 2013 Amended Complaint accused Norton of infringing 167 claims of six patents, including the '115 and the '322 patents ("Asserted Patents").  Dkt. 12 at 17-36. Columbia also alleged claims for fraudulent concealment, unjust enrichment, and conversion relating to Columbia's "decoy" technology, along with claims for correction of inventorship with respect to the '643 patent.  *Id.* at 36-44.  Columbia accused eleven Norton systems of infringing all 167 claims:  SONAR/BASH, Global Intelligence Network, Probe Network, DeepSight,

Insight/Mr. Clean, Skeptic, WINE, Polonium, Bloodhound, and MalHeur.[1]  Ex. 4 at 4, 6-7, 9-11,

13.  Norton denied infringing and alleged the patents were not valid.  Dkt. 20.

## 2.     *Initial Dismissal, CAFC Appeal, And PTAB Proceeding*

Columbia's motion ignores *entirely* the first five years of this case, during which this Court,

the Federal Circuit, and the Patent Trial and Appeal Board (PTAB) validated nearly all of Norton's

defenses.  After claim construction briefing and a hearing in 2014, this Court issued an Order that

forced Columbia to stipulate to non-infringement of all claims against all accused products.  Dkt.

147; Dkt. 151 at 6.  The Court also agreed with Norton's indefiniteness arguments, forcing

Columbia to stipulate that claims 1-5 and 16-27 of the '544 patent were invalid.  Dkt. 151 at 2-3;

Dkt. 147 at 1-2, 5.

On appeal, the Federal Circuit affirmed the vast majority of Norton's defenses (Dkt. 164

at 2), including non-infringement of the '544 patent, the '907 patent, the '084 patent, and the '306

patent.  *Id.*  The Federal Circuit also affirmed this Court's judgment that claims 1 and 16 of the

'544 patent were indefinite.  *Id.*  The Federal Circuit remanded the case only to address

construction of the term "anomalous."  *Id.*

Norton also succeeded at the PTAB, which instituted two petitions for *inter partes* review

challenging all claims of the Asserted Patents, recognizing that Norton's arguments "establish[d]

that there is a reasonable likelihood that [Norton] would prevail" on *all* challenged claims.  Ex. 12

at 19; Ex. 13 at 18.  The PTAB found 51 of the 69 claims at issue unpatentable.  Ex. 14 at 40-41;

Ex. 15 at 32-33.  After the PTAB proceeding, Norton had prevailed on *nearly 90%* (149/167) of

Columbia's initial claims.  Norton spent the first five years of this case successfully disproving

claims that Columbia never should have brought in the first place.

---

[1] Later that year, Columbia accused MutantX in Dr. Sullivan's October 17, 2014 Report.

### 3.    *Proceedings Following Remand In 2018*

Columbia claims that in 2018, on the heels of Columbia losing 90%+ of its originally asserted claims, Norton refused to pay even a "modest" licensing fee.  Columbia cites no evidence to support this claim.

As the case proceeded, Columbia amended its infringement contentions to reflect what it had left:  12 claims of the '115 patent and 6 claims of the '322 patent.  Ex. 5 at 3, 5.  And nearly eight years into this case, Columbia dropped all but two of the eleven initially-accused functionalities, MutantX and SONAR/BASH.  *Id*. at 4, 6.

After the close of discovery, Norton won summary judgment on Columbia's unjust enrichment and conversion claims (Dkt. 684), and won multiple motions in *limine* related to the amount Broadcom paid for Norton's enterprise business and the loan value secured by Norton's patents, as well as reference to IPR proceedings or Final Written Decisions.  Dkt. 907, 914.  Norton also prevailed on portions of both of Columbia's *Daubert* motions (Dkt. 717, 740, 907, 908), as well as numerous evidentiary objections regarding high priority exhibits.  *See* Dkt. 1006, 1104.

Columbia never sought summary judgment on the claims it now says were not close.  And Columbia's infringement position has shifted over time; as detailed in Norton's 50(b) motion, after two expert reports clearly took the position that SONAR/BASH was the "emulator" in the claims, Columbia was forced abandon that contention in a third report to allege that the entire "computing environment" was now the emulator.  Dkt. 1254 at 4.  Then, only months before trial, Columbia dismissed portions of its case that it had maintained for more than eight years.  Columbia dropped fourteen additional patent claims.  Dkt. 745.  Columbia also withdrew its infringement claim against MutantX in May 2020.  Trial Tr. (Ex. 20) 2228:7-2230:2.  By trial, Columbia was down to 4 of its originally asserted 167 claims and a single accused instrumentality (from the eleven it originally accused).  Ex. 1 (illustrating success of Norton's defenses).

### 4.   *Trial And The Jury's Verdict*

Trial was hard-fought and a "close case."  Trial Tr. 2998:25-2999:2 (Court stating "I do think this has been a really hard trial, well tried with vigor and with heart, and that's what we want in the justice system.").  Each party won and lost evidentiary objections.  *See, e.g.*, Dkt. 1166; Trial Tr. 1086:13-1096:21.  The jury was unable to return a verdict after deliberating for more than three days.  Trial Tr. 2964:17-2965:13; Dkt. 1204-1 (Jury writing to the Court that "[w]e have reached an impasse regarding one of the questions on the verdict form and are unable to reach a consensus/unanimous decision.").  The jury was able to complete its work only after the Court gave the jury a rare *Allen* charge, requiring the jurors to "carefully reexamine and reconsider all the evidence in the case bearing upon the questions before you in the light of the Court's instructions on the law."  Dkt. 1204-2 at 3.

The jury found for Norton on Columbia's claim of fraudulent concealment and rejected Columbia's claim that Professors Stolfo and Keromytis were the sole inventors of the '643 patent. Dkt. 1206 at 5-6.  While the jury found infringement and willfulness as to the sole remaining feature Columbia accused, it awarded Columbia 20% less in damages than it sought.  *Id.* at 4; Trial Tr. 2641:20-23 (requesting $227 million as a reasonable royalty).

### B.   **Norton's Independent Development Of SONAR/BASH**

It is undisputed that Norton independently developed and released SONAR/BASH to the public in 2009—before the Asserted Patents issued and before their applications were made public.[2]  Trial Tr. 1837:13-1838:3, 1615:19-1616:1, 1450:10-16, 233:14-15, 260:15-18; Mot. 19. This was *more than two years before* Columbia filed for the '322 patent, and the accused

---

[2] The '115 application published on January 27, 2010 and issued on December 6, 2011.  The '322 application published on June 14, 2012 and issued on December 3, 2013.

functionality has not changed since 2009.  Trial Tr. 1071:3-9; Mot. 12 (Columbia admitting  that "all Accused Products since [the 2009 release] have included the same infringing functionality.").

SONAR/BASH had already received industry acclaim before the '115 patent application was even published.  *See, e.g.*, Ex. 7 at 1-2 (ranking Norton 360 Version 4.0 as "Excellent," recognizing that "[p]rograms flagged by [Symantec's] Quorum [technology] undergo sharper scrutiny from Symantec's SONAR 2 behavior-analysis technology") (November 17, 2010); Ex. 8 at 1, 3 (ranking Norton Internet Security 2010 as "Excellent," recognizing that "[i]f Quorum reports a good reputation, then SONAR2 is more forgiving; if Quorum finds the file suspicious, SONAR2 turns up the heat. In testing, this really seemed to work") (October 13, 2010).

### C.    The Parties' Licensing Discussions

In a 2005 email exchange, Brian Witten, Norton's then-Director of Government Research, told Columbia that Norton was "*considering* integrating [application communities research] with existing products," contingent on "trials" in which Columbia would prove its technology actually worked.  Mot. Ex. H (PX-83) at 3-4 (emphasis added).  There was never a "promise" to license. Mot. 1-2.  Any potential license would be capped at no more than $50 million for Columbia's *entire* portfolio (far more technology than the four claims of the '115 and '322 patents), and a license would be considered only "if the research [was] fully successful" and "the resulting technology [could] impact [Norton's] sales."  Mot. Ex. H at 3.  Norton was clear that a 1% royalty "per institution" was too high because the potential license was (1) non-exclusive (and could therefore be offered to Norton's competitors), and (2) did not include the "full-suite of complimentary [sic] technologies," some of which were sold off to other companies like IBM.  *Id.* at 1-2.  These discussions ultimately dissolved.  *See* Mot. 12.

Dr. Stolfo's 2005 e-mail references a "brief conversation" with Mr. Witten "concerning the IPR of the technology involved with the Application Communities work."  PX-83 at 8.  But

"IPR" cannot refer to "Intellectual Property Rights" related to the Asserted Patents because the patents had not yet issued and Columbia *had no intellectual property rights* in the application communities technology until 2011.  Trial Tr. 577:24-578:18; Mot. 8, 14.  A week earlier, Columbia had filed a provisional application, but admits that this is a "placeholder or save the date" that conveys no intellectual property rights.  *See* PX-83 at 7-8; Mot. 8; Trial Tr. 922:18-22 (Columbia's expert Dr. Bailey confirming), 2546:25-2547:6.  And Dr. Stolfo admitted that PX-83 does not mention the provisional application that led to the Asserted Patents.[3]  Trial Tr. at 627:3-628:25, 630:16-21 (Dr. Stolfo admitting that "there was no way to have a conversation about something that didn't exist at the time").  No evidence suggests that Columbia provided Norton with this provisional application, or any other technical details related to the application communities research.[4]

The 2010-2011 meetings between the parties occurred well after Norton launched SONAR/BASH, and Columbia never mentioned the Asserted Patents because they did not exist then either.  Nor did Columbia provide to Norton applications or publications relevant to the Asserted Patents.  And to the extent Columbia mentioned application communities, it was at such a high level that knowledge of how to replicate it could not be imputed to Norton.  For example:

- *June 2010* – Columbia pitched Norton on Columbia Technology Ventures, seeking to monetize faculty research.  Mot. Ex. J (PX-426) at 18.  The presentation merely mentions "anomaly detection."  *Id.* at 24.

  o Columbia initially claimed to "leave-behind" a technology brief at the June 2010 meeting, but admitted it did not know whether the document was left behind or even whether Columbia showed it to Norton at all.  Trial Tr. 376:12-377:19, 469:4-472:3; *see id.* at 375:9-23, 385:18-20, 477:16-19, 473:16-476:5 (Mr. Herskowitz admitting that he was "a little fuzzy" on meeting details; that he did not "have any

---

[3] Dr. Stolfo is also not a patent attorney.  Trial Tr. 569:24-570:5, 621:7-10.

[4] This is also true for the 2005 workshop and conversation between Dr. Stolfo and Mr. Witten regarding "application communities."  Mot. 8.

recollection of actually discussing [the technology brief] with Symantec"; and that the technology brief "was not about the patents-in-suit").

- *August 2010* – Columbia sent "backgrounders" that included high-level profiles of Drs. Stolfo and Keromytis, but like the June 2010 presentation, there is no detail beyond the mere phrase "anomaly detection." Mot. Ex. L (PX-77) at 4-5. There is also no mention of "application communities."

- *January 2011* – Columbia points to an internal meeting agenda that scheduled a 45 minute discussion on "[p]otential collaborations & licensing opportunities (requires reviewing IP portfolio)." Mot. 11; Mot. Ex. N (PX-37) at 2. There is no evidence that this agenda was sent to Norton; that Drs. Stolfo and Keromytis attended this portion of the discussion; or that any intellectual property regarding application communities was discussed. PX-37 at 2; *see* Trial Tr. 484:14-18, 2419:20-2420:1, 2451:1-8.

  o Columbia provided a "mind map" document to Norton at the meeting that listed general categories of technology for "[p]otential [c]ollaborations" (e.g., "Trust and Privacy," "Encryption," and "Anomaly Detection"). Mot. Ex. O (PX-72) at 1. Under these categories were high-level descriptions of reports, such as "Spectrogram" and "Distributed data cleaning (STAND)." *Id.* Columbia claims that anyone receiving this document could determine related patents, Mot. 11, but Mr. Herskowitz testified that Norton could not do so "from the physical document itself." Trial Tr. 395:4-8. There is also no mention of application communities research.

Columbia only first *mentioned* an asserted patent in an August 2012 letter (years after Norton introduced SONAR/BASH) in which it sought to monetize its technology, not alert Norton to any alleged infringement. Mot. Ex. X (PX-331) at 1 ("Our mission is to facilitate the transfer of relevant new technologies to companies like yours."). Specifically, the letter mentions the '115 patent in a list of 14 others, but it was not one of the three attached patents that Columbia deemed most important. PX-331 at 2. Most importantly for this motion, Columbia's letter does not allege that Norton infringed *any* patent, let alone that SONAR/BASH infringed the '115 patent.

Like every other company in the industry, Norton ultimately decided not to license the application communities research.[5] *See, e.g.*, Trial Tr. 583:1-584:17 (Dr. Stolfo testifying that the

---

[5] *See, e.g.*, Trial Tr. 453:1-6 (Q. "Right. And we can agree that even after publication, and actually even after the issuance of the '115 patent in 2011, still, none of those companies thought it was

9

application communities research was "not licensed to anyone"); Mot. Ex. I (PX-776) at 2.  Mr. Witten asked Dr. Stolfo to let Norton know when Columbia "start[s] finding new [zero-]day" solutions regarding the application communities research.  PX-776 at 2.

## III.    ARGUMENT

Norton's conduct does not come close to the level of culpability necessary for an award of enhanced damages.  Adhering to the Supreme Court's guidance in *Halo* and the *Read* factors, this Court should deny Columbia's motion.  Norton did not copy Columbia's technology or patents; Norton's good-faith arguments eliminated the vast majority of Columbia's claims making this a close case; and Norton neither concealed its actions nor tried to harm Columbia.

### A.    There Can Be No Willful *Pre-Suit* Infringement Of Patents That Had Not Yet Issued

After *Halo*, it remains the law that "to willfully infringe a *patent*, the patent must exist and one must have knowledge of it."  *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985); *Boundaries Sols. Inc. v. CoreLogic, Inc.,* No. 5:14-cv-00761-PSG, 2014 WL 7463708, at *3 (N.D. Cal. Dec. 30, 2014) ("[T]he law is clear that knowledge of a patent application does not suffice to show willful blindness.").

*First*, it is undisputed that Norton released SONAR/BASH in 2009 without knowledge of the Asserted Patents, and long before they issued.  *See supra* Section II.B.  The Supreme Court recognized in *Halo* that "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct."  *Halo*, 579 U.S. at 105-06.  Here, contrary to Columbia's unsupported contention, Norton *could not have* known about the '115 and '322 patent applications before it released SONAR/BASH in 2009.  But even if it did, that would not be enough.

---

valuable enough to take a license. Not McAfee, not IBM, not EMC, not Dell, none of those companies, right?" A. "We did not execute any licenses for these patents.").

*Corephotonics, Ltd. v. Apple, Inc.*, No. 17-CV-06457-LHK, 2018 WL 4772340, at *8 (N.D. Cal. Oct. 1, 2018) ("[I]t has been well-established both before and after the *Halo* decision that knowledge of a pending patent application does not confer knowledge of an existing patent."). Without the requisite knowledge at the time of the challenged conduct, Norton could not have *willfully* infringed either patent as a matter of law.  And it is undisputed that the alleged infringing functionality of SONAR/BASH did not change after initial release in 2009.  Trial Tr. 1071:3-9.

*Second*, Norton lacked knowledge of infringement of the Asserted Patents necessary to establish pre-suit willful infringement.  *See* Dkt. 1254 at 16-19.  Norton began investigating the patents when Columbia first said Norton infringed—the day Columbia filed its complaint.  Dkt. 1.

For the '115 patent, Columbia relies on an August 2012 letter (years after Norton introduced SONAR/BASH), which mentions the patent in a list of 14 others, but does not allege infringement of *any* patent, let alone that SONAR/BASH infringes the '115 patent.  Mot. 12-13; Mot. Ex. X (PX-331) at 1-2.  On its face, it is clear that Columbia's mention of the '115 patent was meant to be an example of one of the broad areas of technology available to license, not an allegation of infringement.  PX-331 at 1-2.  And for the '322 patent, Norton could not have "investigate[d] the scope" or "design[ed] around" the patent "before Columbia was forced to sue" because Norton did not know of the '322 patent until Columbia sued.  *See* Mot. 13.  Norton first learned of the '322 patent—which issued two days before Columbia sued—when Columbia sent a notice letter *the day after* Columbia filed suit.  *See* Mot. Ex. Y (PX-22); Dkt. 1; Ex. 6 (PX-831) at 3.  Flowing from this lack of notice of alleged infringement, Columbia has no evidence that Norton somehow nonetheless knew its conduct was infringing, a prerequisite to establish the intent required for willfulness.  *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016); *see Halo*, 579 U.S. at 110 ("[T]he Court's references to 'willful misconduct' do not mean that a court

may award enhanced damages simply because the evidence shows that the infringer knew about the patent *and nothing more*.") (Breyer, J., concurring) (emphasis added).

*Third*, Norton was not willfully blind to patents that had not yet issued when it developed and released SONAR/BASH in 2009.  Columbia's reliance on Mr. Laffoon's testimony does not prove otherwise.  Mot. 12-14.  On October 3, 2014, Mr. Laffoon testified in his personal capacity that he was "not aware of the specific patents."  Ex. 16 (Laffoon 2014 Dep. Tr.) at 41:8-22, 47:3-9; *see* Dkt. 1254 (Norton's JMOL) at 17-19.  *Norton* was well aware of the Asserted Patents in 2013 when Columbia filed its complaint, at which point *Norton* determined it did not infringe and developed defenses that led to Columbia's stipulation to final judgment of non-infringement on all relevant allegations.  *See* Dkt. 147.  Mr. Laffoon testified only that he "wouldn't be able to say if [Norton is] trying to design around it or not."  Ex. 16 at 104:7-15; *see* Ex. 17 (Laffoon 2019 Dep. Tr.) at 67:2-24, 69:6-18; *see also VLSI Tech. LLC v. Intel Corp.*, No. CV 18-0966-CFC, 2020 WL 3488584, at *5 (D. Del. June 26, 2020) ("[H]aving a general policy with respect to thousands of patents in a field of technology does not plausibly establish or imply that [defendant] subjectively believed there was a high probability that its acts constituted infringement of two specific patents.").  This Court has found no willful infringement under such circumstances.  *See* Dkt. 1254 at 18.

Finally, Columbia's argument that Norton offered no defense to willfulness at trial is wrong.  *See* Mot. 14.  For one, as discussed above, and as established in Norton's JMOL (Dkt. 1254 at 16-19), Columbia failed to adduce sufficient evidence to establish willfulness as a matter of law, and Norton had no burden to disprove willfulness.  Regardless, Norton did offer a defense and showed that it was not willful.  In particular, Mr. Kane and Mr. Pereira, the architects of SONAR/BASH, testified as to the its functionality including the several ways in which it differs

from the limitations of the claims of the patents-in-suit.  *See, e.g.*, Trial Tr. 1941:22-1942:16.  For example, Mr. Kane testified that programs do not execute or run in SONAR/BASH, function calls are not made in SONAR/BASH, and SONAR/BASH's "decision tree is not a combination of models."  Trial Tr. 2035:5-21, 2070:3-13, 1969:12-18; *see* Dt. 1254 at 4-9.  And Mr. Pereira testified that, while *Columbia* incorrectly asked him to "*assume*[] [Norton was] creating models of valids and malicious," SONAR/BASH does not actually work in this way.  Ex. 19 (Pereira Dep. Tr.) at 250:7-22 (emphasis added); Trial Tr. 2084:3-20.  Mr. Pereira also testified that Norton takes good and bad information as training data and "spits out this single tree," which is the one and only model used in SONAR/BASH.  Ex. 19 at 301:2-18; Trial Tr. 2222:14-2223:24 (Dr. Jaeger discussing Mr. Pereira's testimony).[6]  This testimony from the two technologists most responsible for SONAR/BASH is fundamentally incompatible with the requisite showing that Norton somehow knows it infringes—Norton has always firmly believed SONAR/BASH is critically different from the patent claims and that it does not infringe those claims.

### B.     Norton's Post-Suit Defenses Were Overwhelmingly Successful

#### 1.     *Norton Defeated The Vast Majority of Columbia's Allegations of Infringement*

As a result of Norton's reasonable noninfringement and invalidity positions—which this Court, the Federal Circuit, and the PTAB validated—Norton ultimately prevailed as to more than 97% of the infringement claims brought by Columbia.  *See TecSec, Inc. v. Adobe Inc.*, No. 1:10-CV-115, 2019 WL 1233882, at *2 (E.D. Va. Mar. 14, 2019) (recognizing that nonfrivolous defenses weigh against enhancement); *see supra* Section II.A.  Having started by asserting 167

---

[6] That Mr. Pereira did not appear in person at trial is of no relevance.  Mr. Pereira is a third party who no longer works at Norton (or Broadcom), he testified fully in deposition, and Mr. Kane testified at trial.

patent claims against eleven separate functionalities, Columbia was left with only four claims against one functionality in its case to the jury.  Trial Tr. 191:1-17.

### 2. *Norton Prevailed On The Vast Majority of Columbia's Claims Relating To The '643 Patent*

As with Columbia's infringement claims, Norton's reasonable positions during this litigation prevailed over four of Columbia's five claims related to the '643 patent—claims that the Court and jury agreed were unfounded.  Specifically, Columbia originally asserted five claims related to the '643 patent:  fraudulent concealment, unjust enrichment, conversion, sole inventorship, and joint inventorship.  Dkt. 12 at 36-44.  The Court agreed with Norton on summary judgment that Columbia's claims of unjust enrichment and conversion were without merit.  Dkt. 684 at 77.  At trial, the jury agreed with Norton that Drs. Stolfo and Keromytis were not the sole inventors of the '643 patent and that Norton did not commit fraudulent concealment.  Dkt. 1206 at 5-6.  Norton's success on these claims further reflect Norton's reasonable conduct in this litigation.

### C. Columbia Has No Evidence That Norton Refused Any "Modest" Royalty Payment

Columbia claims it had no choice but to file this lawsuit because of Norton's "refusal to pay a modest royalty."  Mot. 1, 3.  But Columbia offers no support for this statement.  Columbia argues in essence that Norton should have paid, before any discovery or litigation, a huge license payment for patents it was not yet even accused of infringing and which, after learning of them, Norton has always believed were invalid and not infringed—reasonable positions that ultimately proved to be substantially correct.  And after Columbia spent five years watching nearly 90% of its original case disappear, Columbia presented no evidence that in 2018 a "modest" royalty (Mot. 2, 3) was ever on the table.

### D. The *Read* Factors Strongly Favor No Enhancement

#### 1. *Factor 1 – Norton Did Not Copy*

This factor weighs heavily against enhancement.  The undisputed facts show that Norton independently developed and released SONAR/BASH long before it ever knew about the Asserted Patents and, indeed, before they even existed.  *See* Section III.A; *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1465 (Fed. Cir. 1997) ("[I]ndependent invention … or any other factors tending to show good faith, should be taken into account and given appropriate weight.").

Norton did not copy Columbia's technology.  When Norton developed and released SONAR/BASH, Norton had no knowledge of the technical details of the applications communities research, the publications of the '115 and '322 patent applications, or the Asserted Patents themselves.[7]  *See* Section III.A.  The Supreme Court recognized in *Halo* that "culpability is generally measured against the knowledge of the actor *at the time of the challenged conduct*," which here is during the development and release of SONAR/BASH in 2009.  579 U.S. at 105-06 (emphasis added).  At no point during that time did Columbia ever disclose to Norton the substance of the technology embodied in the asserted claims.  Columbia instead asks this Court to assume (without evidence) that its vague disclosure of the "application communities invention" is coextensive with the Asserted Patents.  *See* Mot. 19; *MercExchange, L.L.C. v. eBay, Inc.*, 275 F. Supp. 2d 695, 720 (E.D. Va. 2003) (finding no copying where plaintiff's "patents offer no business or engineering guidance which the defendants could copy").  And although Norton did not copy at all, it is black letter law that, before a patent issues, copying is an "exercise of a right possessed by all."  *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964); Trial Tr. 1028:1-4 (Dr.

---

[7] Nor have Norton's acquisitions imputed a "culture" of copying (Mot. 2, 3, 12), particularly because the technology was often rebuilt.  Ex. 18 (Mutu Dep. Tr.) at 107:15-109:2; Trial Tr. 2274:15-2275:3.

15

Bailey noting that "infringement does not officially begin until the patents themselves … are actually awarded").[8]

Columbia claims several pieces of evidence support its contention that Norton copied, including a 2005 email (Mot. Ex. H (PX-83)), a 2007 patent application publication (Ex. 3), a June 2010 "leave-behind" (Mot. Ex. K (PX-836)), and Norton's internal documents (Mot. Ex. U (PX-504), Mot. Ex. V (PX-530)).  None has merit.  The 2005 email lacks any technical detail necessary to support an allegation of copying.  Mot. 8-12, 18-19.  For example, no documents or testimony suggest that Dr. Stolfo disclosed any particularized details to Mr. Witten or anyone at Norton.  *See* Mot. Ex. H (PX-83) at 8.  Columbia also never provided Norton with the provisional application to the Asserted Patents in the 2005 email or otherwise.  Trial Tr. 510:15-25 (Q. "You never gave Norton the number for the patent application so they could have look it up?" A. "As far as I know.").  Dr. Stolfo conceded that the 2005 email does not even hint at the core limitations of the Asserted Patents such as "executing a program in an emulator, function calls in an emulator, and a combined model."  Trial Tr. 628:15-25.  In this way, the 2005 email is silent on the technology in the asserted claims that allowed them to survive IPR (*e.g.*, the "combined model" limitation).  Ex. 14 at 34-37 (claim 2 of '115 patent); Ex. 15 at 22-25 (claims 2, 11, and 27 of '322 patent).

Next, Columbia claims—for the *first* time—that a 2007 published international patent *application* discloses the relevant research and establishes that Norton copied.  Mot. 19; *see id.* at 12 n.5; *see* Ex. 3 (WO2007/050667).  Columbia, however, offers no proof that Norton actually

---

[8] *See also Am. Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459, 465 (Fed. Cir. 1985) (finding defendant "could not have copied" because the patent issued when the accused device was first installed); *Itron, Inc. v. Benghiat*, No. CIV.99-501(JRT/FLN), 2003 WL 21402608, at *8 (D. Minn. June 16, 2003) (recognizing as "[m]ost important" the fact that "during the time that [plaintiff] alleges the copying took place, he had no patent").

knew of this publication before it developed SONAR/BASH, and no such evidence exists.[9]  The existence of a patent application, without any evidence of Norton's knowledge of that application, cannot support a finding of copying.[10]  And the publication differs significantly from the issued '115 patent due to amendments and other changes made during prosecution of that patent.  *See, e.g.*, Ex. 9 (PX-78) (adding the "upon identifying …" limitation to claim 1 of the '115 patent).

Columbia then relies on a "leave-behind" from a June 2010 meeting to claim that Norton knew it was infringing the patents-in-suit.  But that meeting occurred *after* Norton independently launched SONAR/BASH.  *See* Mot. Ex. K (PX-836).  And this "leave-behind" was not *actually left behind* for (or even discussed with) Norton.  In addition, Mr. Herskowitz admitted that the document (1) did not include the Asserted Patents on a list of twenty Columbia inventions and (2) included only "a random selection of stuff" which "were about things totally unrelated to" the Asserted Patents.  Trial Tr. 469:19-21, 470:19-471:1, 474:12-20, 477:7-19.  Notably, here again the described technology lacked any mention of key limitations of the Asserted Patents, including, use of an "emulator," a "model of function calls," and "creating a combined model from at least two models created using different computers," among others.  Mot. Ex. W (PX-830) at 24.

Columbia errs in claiming that "the 'onslaught' of new malware" motivated Norton to copy Columbia's technology.  Mot. 11-12.  Norton—like every other competitor in the space—needed to adapt to the surge of malware from 2005-2010.  *See* Trial Tr. 1948:15-1950:18; *see id.* at

---

[9] Columbia errs by relying on Norton's own patents to show Norton knew about the 2007 publication through a later 2010 publication (2010/0023810 (Ex. 2)), which published after release of SONAR/BASH in 2009.  Mot. 12 n.5.  Moreover, Norton's U.S. Patent Nos. 8,429,744 and 9,953,158 were filed in 2010 and 2015, respectively, after the 2009 release.

[10] This case is not like the *Medtronic* case where the court found copying because, although no patent had issued, defendant received technical details of plaintiff's idea, took credit for plaintiff's inventions, and filed a patent application nearly identical to plaintiff's patent application.  *See* Mot. 19; *Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 113-14 (E.D. Tex. 2017).  There was no such conduct here.

1434:14-1435:19 ("I experienced [the malware problem] firsthand at McAfee.").  But Columbia provides *zero* evidence that this problem made Norton "turn[] back to Columbia's invention." Mot. 12.  Rather, as in most competitive industries, Norton's protection "evolved and with it a new generation of behavioral protection [was] released in the form of BASH."  Mot. Ex. S (PX-490) at 1; Trial Tr. 1941:22-1944:25, 1949:5-1951:23.  Seeing that TruScan technology was "long in the tooth"—monitoring only 30-40 process attributes periodically—Norton developed SONAR/BASH which monitored 400 attributes in real time.  Mot. Ex. V (PX-530) at 2-13.

Finally, Columbia claims, citing two documents, that Columbia's technology enabled Norton products to detect zero-day malware.  *See* Mot. 12; Mot. Ex. U (PX-504), Mot. Ex. V (PX-530).  But Norton's products detected zero-day attacks before SONAR/BASH.  Trial Tr. 1946:6-1947:12.  And PX-504 is merely an internal Norton email thread indicating customer interest in SONAR/BASH, while PX-530 outlines SONAR/BASH technology, including an architectural design of the system's component interaction.  PX-530 at 10.  Neither document suggests in any way that Norton's SONAR/BASH technology originated at Columbia.  And it bears repeating that, because Columbia does not practice the patents, Columbia had no product on the market for Norton to copy.

### 2.    *Factor 2 – Norton Had Good-Faith Defenses When It Learned Of Infringement*

This factor also favors Norton, and is about more than just considering whether "Norton Infringed in Bad Faith," as Columbia suggests.  Mot. 19.  It looks instead at "whether the infringer, *when he knew of the other's patent protection*, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed."  *Read*, 970 F.2d at 827 (emphasis added).

After first learning of Columbia's infringement allegations upon being sued, as discussed above, Norton formed good-faith noninfringement and invalidity positions—positions that this Court, the Federal Circuit, and the PTAB agreed with to an overwhelming degree. *See* Section II.A; *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1363 (Fed. Cir. 2016) ("After *Halo*, the objective reasonableness of the accused infringer's positions can still be relevant for the district court to consider when exercising its discretion.").

As discussed above, Norton's noninfringement and invalidity arguments got rid of 97% of Columbia's original claims. *See Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 800, 804-05 (E.D. Va. 1998) (finding no enhancement where defendant mounted a "substantial challenge to infringement"); *Acantha LLC v. DePuy Synthes Sales Inc.*, 406 F. Supp. 3d 742, 760 (E.D. Wis. 2019) ("[I]t would be difficult to conjure up a defense which would be more 'reasonable' than one expressly adopted by a federal judge."). Norton's defenses also forced Columbia to change its contention concerning the alleged "emulator" in the accused products so that it could continue to make out the infringement claim on which it ultimately prevailed. Dkt. 1254 at 4; *see NTP Inc. v. Rsch. in Motion, Ltd.*, 270 F. Supp. 2d 751, 758 (E.D. Va. 2003) ("Enhanced damages should not be awarded if the defendant puts forth a meritorious good faith defense and a substantial challenge to infringement.") (citation omitted). Norton's reasonable and good-faith arguments are not made less so because they ultimately "prove[d] unsuccessful." *See Gustafson, Inc. v. Intersystems Indus. Prod., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990). And Columbia's failure to even move for summary judgment suggests Norton's defenses were not frivolous. *See Wapp Tech Ltd. P'ship v. Seattle SpinCo, Inc.*, No. 4:18-CV-469, 2021 WL 1574714, at *2-3 (E.D. Tex. Apr. 22, 2021) (finding plaintiff's failure to move for summary judgment suggests defendant had reasonable, good-faith defenses).

19

Columbia also argues that Norton failed to seek advice of counsel on three separate occasions.  Mot. 20-21.  None withstands scrutiny.  Columbia says Norton should have sought advice "before copying Columbia's ideas" and "before launching the infringing product feature," but these arguments fail for the reasons discussed above:  Norton did not copy Columbia's ideas and Columbia has no evidence to prove otherwise.  Mot. 20; *see supra* Section III.D.1.  And because Columbia did not *accuse Norton of infringing* until filing suit in 2013, Norton had no reason to seek legal advice when launching SONAR/BASH years earlier in 2009.  Columbia also alleges that Norton should have sought advice of counsel "when Columbia notified Norton of the need to take a license before this litigation started."  Mot. 20.  It is unclear what "notification" Columbia is referring to and, in any event, an offer to license patents is not an infringement allegation.  Columbia can cite no authority compelling Norton to seek advice from counsel before it was ever even accused of infringement.

### 3. *Factor 3 – Norton's Litigation Conduct Was Reasonable*

Contrary to Columbia's contentions (Mot. 5, 22), litigation misconduct alone is not sufficient to support enhancing damages.  *See Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1179 (Fed. Cir. 2022) ("[A]cts of litigation misconduct standing alone 'are not sufficient for an increased damages award … because they are not related to the underlying act of infringement and say nothing about the culpability of the infringer.'" (citation omitted)).  And Norton's litigation conduct was reasonable in any event.  *See* Section II.A, III.D.2.  After remand from the Federal Circuit, Norton further continued to winnow down Columbia's flawed case by prevailing in *Daubert*, *in limine*, and summary judgment motions, as well as other pre-trial matters.  *Id.*  At trial, both parties cooperated with each other and conducted themselves professionally.  Trial Tr. 2998:25-2999:5; *see Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 492

F. Supp. 3d 495, 603 (E.D. Va. 2020) (recognizing professional conduct as weighing against enhanced damages).

Columbia points to Norton's actions regarding Dr. Dacier as "misconduct," but that was "not related to the underlying act of infringement" and says "nothing about the culpability of" Norton. *Sunoco*, 32 F.4th at 1179. Columbia repeatedly argued that it wanted to bring Dr. Dacier to trial so he could testify to late 2017 conversations (taking place after Dr. Dacier's 2014 deposition) with the Columbia Professors regarding the '643 patent. Trial Tr. 617:16-618:10, 824:20-825:12; Dkt. 801 at 19-20. Those conversations, and any testimony Dr. Dacier may have given about them, have no connection whatsoever to infringement of the '115 and '322 patents. *See* Dkt. 801 at 19-20 (Columbia stating that Dr. Dacier is "at the heart of the conduct underlying Columbia's fraudulent concealment claim").

Columbia's other arguments regarding Norton's conduct similarly have no merit. *See* Mot. 21. As described in Section IV.A.2 of Norton's Opposition to Columbia's § 285 Motion, Norton (1) provided invalidity and IPR arguments based on good law at the time and addressed the Court's tentative positions (Dkt. 741 at 23 ("The Court Will *Reserve Ruling* on Hosfield's Mentions of the IPR Proceedings and *Prior Art*")); (2) raised claim construction issues at the appropriate time (*see* Dkt. 204, 253); (3) has already been sanctioned for conduct relating to Dr. Dacier through issuance of a missing witness instruction and the admission of hearsay by Dr. Keromytis; (4) cooperated with Columbia on all pre-trial tasks and briefing to narrow the case for trial; (5) advanced the best possible case for its client by cross-examining within the typically broad discretion attorneys are allowed; and (6) provided good-faith non-infringement positions supported by factual evidence.[11]

---

[11] Columbia mischaracterizes the non-infringement positions set forth by Dr. Jaeger. Mot. 16-17. Dr. Jaeger provided proper expert testimony consistent with the Court's claim construction orders that (1) program and function calls are not executed in SONAR/BASH (the alleged emulator) as

Norton's litigation conduct does not approach that of the cases on which Columbia relies. Mot. 21.  The defendant in *Cyntec Co., Ltd. v. Chilisin Electronics. Corp.*, No. 18-CV-00939-PJH, 2022 WL 1443232, at *14 (N.D. Cal. May 6, 2022), raised two distinct claim construction arguments *multiple* times after the court issued its claim construction order.  And the court in *Top Lighting Corp. v. Linco, Inc.*, No. SACV 15-01589 JVS (KKX), 2019 WL 13020830, at *5 (C.D. Cal. Aug. 26, 2019) found defendant's "repeated litigation misconduct in failing to submit required pretrial documents and respond to discovery weighs in favor of trebling damages."

*SRI International, Inc. v. Cisco Systems, Inc.*, 254 F. Supp. 3d 680, 722-25 (D. Del. 2017) is similarly off base.  Columbia points to a laundry list of conduct by Cisco that bears no resemblance to Norton's conduct in this case.  Mot. 22.  For example, Cisco raised at trial multiple noninfringement theories contrary to the court's settled interpretation of the claims, defendant's internal documents, customer testimony, and third-party documents—Norton did not.  *SRI*, 254 F. Supp. 3d at 721-23.  And Cisco over-designated deposition testimony to the tune of "53 separate transcripts consisting of nearly 48,000 lines of testimony" while presenting only "22 lines of testimony from a single transcript at trial"—Norton did not.  *Id.* at 722.  Finally, Cisco lost all of its summary judgment motions and filed three letter briefs disputing portions of the summary judgment order.  *Id.* at 722.  Norton, by contrast, *won* several of its pre-trial motions regarding evidentiary issues and summary judgment.  *See* Dkt. 1006, 1104.  Although both Norton and Cisco lost a motion for sanctions, this one similarity does not support the increase of an already substantial infringement award.  *See infra* Section III.E.

   **4.**  ***Factor 4 – Norton's Pocket-Size Is Inapposite; The Overwhelming Majority Of Value Of Its Products Stems From Non-Accused Aspects***

---

required; (2) BASH submissions are not "models" consistent with the plain and ordinary meaning of a "model"; and (3) SONAR/BASH does not notify an application community upon identifying an anomalous function call as required by the '115 patent.  *See* Dkt. 1254 at 3-11.

This Court has given this factor minimal consideration because relying on a party's "deep pocket" is improper. *MercExchange*, 275 F. Supp. 2d at 720. And Norton is not a giant corporation with the enormous resources of other technology titans. The "statutory maximum" Columbia argues is necessary would wipe out Norton's entire net income in 2021. Ex. 10 at 31 (Norton's 2021 Annual Report). The current damages award is already substantial and carries significant deterrence, standing out as an outlier in comparison to other cases. *See infra* Section III.E. Moreover, *Columbia* is the meaningfully larger party, with 18,000 employees, an annual operating budget of $3 billion, and an endowment of $14 billion. Trial Tr. 423:12-23; *see Krippelz v. Ford Motor Co.*, 670 F. Supp. 2d 815, 822 (N.D. Ill. 2009) (recognizing that defendant's size and financial condition should be compared to plaintiff's).

Columbia argues that damages should be trebled because the infringing products are responsible for a large percentage of Norton's revenue. Mot. 23-24. But Columbia's analysis does not focus on income apportioned to the SONAR/BASH feature of the infringing products; it looks to the infringing products as a whole, improperly including non-infringing components. *See* Mot. 24; *Virnetx, Inc. v. Cisco Systems, Inc*., 767 F.3d 1308, 1327 (Fed. Cir. 2014) (recognizing that the smallest salable unit approach is intended to avoid a "royalty base claim encompassing a product with significant non-infringing components"); Trial Tr. 1464:8-21, 1637:13-1638:6. This factor also counsels against enhancement.

### 5. *Factor 5 – The Contested Issues Post-2018 Were Indisputably Close*

This factor strongly weighs against enhancement. When considering the "totality" of the circumstances, Norton won nearly everything for the first five years. *See Idenix Pharms. LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 697 (D. Del. 2017) (noting "it is entirely appropriate, even required, for the Court to consider … the entire course of [the] case, as well as what it observed at trial" in determining whether to exercise its discretion to award enhanced damages); Section II.A.

23

That the jury returned a verdict only after long deliberations and the Court's *Allen* charge, indicates the closeness of this case on infringement and willfulness. *See Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1314 (Fed. Cir. 2002) (finding a close case because "the case was hard-fought, and [] the jury could have found for [defendant] on the infringement and willfulness issues and could have awarded substantially less damages"); Section II.A.4.

The split verdict is further evidence that this case was close. The jury agreed with Norton that there was no fraudulent concealment and that Professors Stolfo and Keromytis were not the sole inventors of the '643 patent. Dkt. 1206 at 6. Although the jury ruled in Columbia's favor with respect to infringement, the jury awarded 20% less damages than Columbia requested, and only after more than three days of deliberation. *Id.* at 4; Trial Tr. 2641:20-23 (requesting $227 million as a reasonable royalty); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 967 F. Supp. 861, 865 (E.D. Va. 1997) (recognizing that plaintiff's win "does not compel the conclusion that questions resolved by the jury were not closely balanced and hotly contested").

Columbia argues that this case was not close because it "prevailed on every single substantive motion relating to infringement since 2018" and because Norton's litigation defenses "were not the product of a good faith investigation" of Columbia's patents. Mot. 25-26. This is misleading at best. As discussed regarding the second factor, after Columbia sued, Norton's investigation and defenses were repeatedly validated in this Court and others. *See* Section III.D.2. Columbia dropped 14 of its 18 surviving claims before trial. Dkt. 745. Columbia also dropped its infringement allegations against MutantX before trial; in total Columbia had 36 individual allegations of infringement in 2018 (18 claims against 2 products), but went to trial on only 4. Trial Tr. 2228:7-2230:2. And Columbia (which filed scores of other motions in the case) did not file a motion for summary judgment of infringement, demonstrating that it knew this to be a close

case and that it was not asserting a single claim that was not fact-intensive or close enough to be jury-worthy.  *See Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1380 (Fed. Cir. 2007) (summary judgment granted only when there is "no reasonable view of material facts … whereby a reasonable jury could find for the non-movant").  And Columbia's infringement read was strained, as demonstrated by its expert's fluid infringement positions.  In particular, Dr. Bailey called SONAR/BASH an "emulator" in his two expert reports, but, realizing this position assured noninfringement, later shifted to calling the entire computing "operating environment" the "emulator" in his third report.  Dkt. 1254 at 3-5; *see Odetics*, 14 F. Supp. 2d at 805 n.9 (the court admitting it would have denied enhancement due to closeness of the case even if defendant had failed to "mount[] a good faith and substantial challenge" to infringement).

### 6. *Factor 6 – Columbia's Meritless Claims Prolonged This Action*

This case took nearly ten years through no fault of Norton's but because of the myriad failed claims *Columbia* brought, resulting in an initial dismissal of the entire case and subsequent appeal, followed by a lengthy PTAB process that wiped out scores of unpatentable claims.  *See* Section II.A.  Norton should not be punished with enhanced damages for spending years and millions defending itself against Columbia's meritless claims.  Moreover, the length of the case has already been addressed by the parties' stipulation to a process by which Columbia will receive pre-judgment interest at the rate Columbia suggested, and a process to address any additional revenues for the accused products for the time period between March 1, 2022 and the entry of judgment.  Dkt. 1265 at 3.

Columbia's arguments are again unpersuasive.  Mot. 26-27.  Norton had no notice of Columbia's "patent-pending invention" in 2005, and Norton's launch of SONAR/BASH in 2009 was not "infringing" because there were no patents to infringe.  *See* Section III.A.  Norton's investigation of Columbia's patents after it was accused of infringement is reflected in the

overwhelming success of those arguments before this Court, the Federal Circuit, and the PTAB. Section II.A.  And, finally, the fact that Norton did not design around Columbia's patents reflects only Norton's continued good-faith belief in its noninfringement.  There is, of course, no obligation to redesign an accused product every time a patentee alleges infringement—if there were, Norton would have had to redesign its technology for each of the four failed patents and hundred-plus failed claims Columbia initially asserted, even though those claims were invalid and not infringed.

### 7.    *Factor 7 – Norton Behaved Appropriately And Remedial Action Was Unnecessary*

Norton developed and released SONAR/BASH over a year before the '115 patent issued. Norton did not, and could not, copy Columbia's scant disclosure of applications community research.  *See* Sections II.C, III.A.  When Columbia filed suit, without first reaching out to Norton to discuss infringement allegations, Norton developed strong grounds to establish that it did not infringe Columbia's patents and that the patents were invalid—grounds that proved overwhelmingly successful as explained above.  Noticeably missing from Columbia's motion is evidence that Norton acted in a malicious or consciously wrongful way or that Norton lacked a facially reasonable defense to each allegation of infringement.  This factor favors no enhancement.

### 8.    *Factor 8 – Norton Was Not Motivated To Harm Columbia*

Norton never set out to harm Columbia, which is not a competitor.  *See* Mot. 27-28 (Columbia admitting it "does not sell commercial products"); *see Harris Corp. v. Fed. Express Corp.*, No. 6:07-cv-1819-Orl-28 (KRS), 2011 WL 13141674, at *7 (M.D. Fla. Feb. 28, 2011) (weighing the eighth factor against enhancement when parties "are not direct competitors").  On the contrary, the record shows that Norton's motivation was to develop and sell high-quality products that protect its customers from crippling malware attacks, and nothing more.  *Odetics*, 14 F. Supp. 2d at 804 (finding eighth factor weighs against enhancement when "[t]here is no evidence

that [defendant] sought to harm [non-competitor plaintiff]"); *Read*, 970 F.2d at 827 (noting defendant's infringement was not "pernicious" when it resulted from "prevailing economic pressure in the form of customer dissatisfaction.") (citation omitted).   This factor disfavors enhancement.

### 9.    *Factor 9 – Norton Did Not Conceal Its Alleged Willful Infringement*

Norton has not concealed any infringement.   Norton promoted the accused devices and won accolades from industry critics like PC Magazine.  *See* Section II.B; *Odetics*, 14 F. Supp. 2d at 804 (finding this factor weighs against enhancement because defendant "widely publicized" its accused products).  Norton also cooperated and produced all non-privileged, responsive documents in its possession, including source code of features that Columbia accused of infringement.

Columbia is wrong to claim that Norton withheld documents relevant to licensing and prevented Mr. Witten—a third party who left Norton in 2018—from testifying.   Mot. 28-29. Columbia did not identify any of Mr. Witten's documents as relevant until after the close of fact discovery.  *See* Dkt. 768 at 9-15 (noting that Columbia's willfulness theories relied on events in 2010 and later until pre-trial preparations).   And Norton produced all of Mr. Witten's communications in its possession, but did not have emails going back to 2005.   Norton also produced or logged all relevant emails from Mr. Shou in the relevant time frame.  Columbia never moved to compel and has no basis now to contend that documents were improperly withheld. Moreover, Columbia's position that Mr. Witten should have testified at trial belies its initial disclosures, which identified Mr. Witten as relevant only to issues regarding "decoy technology," and its choice not to depose Mr. Witten.  Ex. 11 at 6.

### E.    Damages Awards Are Typically Enhanced Only In The Most Egregious Cases

In cases where the jury finds willful infringement, district courts routinely decline to enhance damages when the adjudged infringer's conduct was not egregious.  *See, e.g.*, *Veracode, Inc. v. Appthority, Inc.*, 137 F. Supp. 3d 17, 85-87 (D. Mass. 2015) (*no enhancement even with willful infringement and four Read factors in favor*); *Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, No. CV 16-284-LPS, 2019 WL 3240521, at *8-9 (D. Del. July 18, 2019) (same); *Aqua Shield, Inc. v. Inter Pool Cover Team*, No. 2:09-CV-13 TS, 2015 WL 4727955, at *7 (D. Utah Aug. 10, 2015) (same); *Green Mountain Glass LLC v. Saint-Gobain Containers, Inc.*, 300 F. Supp. 3d 610, 628-31 (D. Del. 2018) (*no enhancement even with willful infringement and three Read factors in favor*); *Vectura Ltd. v. GlaxoSmithKline*, No. CV 16-638-RGA, 2019 WL 4346502, at *3-4 (D. Del. Sept. 12, 2019) (same); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. CV 08-309-LPS, 2019 WL 3290369, at *8-10 (D. Del. July 22, 2019) (same); *Sprint Commc'ns*, 2017 WL 978107, at *13-14 (same); *Nox Med. Ehf v. Natus Neurology Inc.*, No. CV 15-709-RGA, 2018 WL 4062626, at *3-6 (D. Del. Aug. 27, 2018) (same).

*Veracode, Inc. v. Appthority, Inc.* is instructive.  In that case, the court declined to enhance damages even though four *Read* factors weighed "significantly in favor of enhancement."  137 F. Supp. 3d at 87.  In particular, the *Veracode* court found that Appthority copied using its knowledge of Veracode's product, failed to obtain an opinion of counsel, and failed to remediate by leaving its product on the market, thereby increasing Appthority's duration of infringement.  *Id.* at 85-86.  However, the court recognized that a split verdict indicated the case was close and Appthority's defenses were reasonable.  *Id.* at 86.  Although Appthority and Veracode were direct competitors, the court found the motivation to harm and attempt to conceal factors were neutral due to lack of evidence.  *Id.* at 86-87.  Finally, the court viewed Appthority's financial position as mostly neutral, slightly against enhanced damages, because Appthority was one-tenth the size of Veracode.  *Id.*

28

The Court here should deny enhancement as in *Veracode* because Norton's conduct is even less culpable than Appthority's conduct.  Contrary to Appthority, Norton did not copy, sought advice of counsel upon learning of Columbia's claim of infringement, did not need to remediate because development occurred before patent issuance, infringed over a period of time as a consequence of Columbia's meritless claims, and was not motivated to harm Columbia, a non-competitor.  Sections III.D.1, III.D.2, III.D.6, III.D.7, III.D.8.  But as in *Veracode*, the jury here returned a split verdict, validating the closeness of this case and Norton's positions.  Sections III.D.3, III.D.5.  And there is similarly no evidence that Norton concealed alleged infringement.  Sections III.D.8, III.D.9.  Finally, if the Court decides to consider it, Norton's financial position counsels against enhancement given Columbia's financial size.  Section III.D.4.

Even in cases granting enhancement, which is not warranted here, district courts often find that very little enhancement is necessary for deterrence when the damages award is uncommonly large, as here.  *See Informatica Corp. v. Bus. Objects Data Integration, Inc.*, 489 F. Supp. 2d 1075, 1085 (N.D. Cal. 2007) ("In the totality of facts and circumstances, the Court may consider the size of the damages award upon ruling on enhancement."); *Wapp Tech*, 2021 WL 1574714, at *4 (recognizing a damages award of $172.5 million as "a significant liability finding" and "[f]urther punishment is not necessary"); *z4 Techs., Inc. v. Microsoft Corp.*, No. 6:06-CV-142, 2006 WL 2401099, at *26 (E.D. Tex. Aug. 18, 2006) ($25 million enhancement of $115 million initial damages); *i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 596 (E.D. Tex. 2009) ($40 million enhancement of $200 million initial damages); *VirnetX Inc. v. Apple Inc.*, 324 F. Supp. 3d 836, 844, 870 (E.D. Tex. 2017) ($41 million enhancement of $302 million initial damages).

Of eight cases with initial damages over $80 million and an enhancement that has survived appeal, only a single case was trebled.  *See EagleView Techs., Inc. v. Xactware Sols., Inc.*, 522 F.

Supp. 3d 40 (D.N.J. 2021). And *EagleView* is nothing like this case. There, the court enhanced an initial award of $125 million by the maximum $250 million because all *Read* factors favored enhancement. The court was "largely guided by the scope and severity of [Xactware's] misconduct," including Xactware's deliberate copying of EagleView's competing product and email evidence of Xactware's strategy to "develop similar solutions internally and compete with [EagleView]," even after recognizing it may "require overcoming [EagleView's] IP protection and may involve patent related litigation." *Id.* at *48-51, 56. The court found Xactware was motivated to harm EagleView and the case was not close because EagleView won on every significant issue after the jury deliberated for two hours. *Id.* at *52-54 ("We need to erode their market share by selling [the infringing product] right now."). Norton's conduct is nothing like that in *EagleView*—Norton did not deliberately copy or intend to harm Columbia, and this case was close.

## IV.    CONCLUSION

The Court should consider the totality of the circumstances—which show that Norton's conduct has not been egregious and so does not warrant enhancement. Norton did not copy. Norton's good-faith defenses prevailed in the vast majority of this litigation. Norton neither concealed its actions nor tried to harm Columbia. And a jury trial reaching a split verdict only after an *Allen* charge can only be defined as "close." Norton respectfully requests the Court deny Columbia's motion for enhanced damages.

July 1, 2022                                    NORTONLIFELOCK INC.


                                               By:  ____/s/_____
                                                        Of Counsel

                                               Dabney J. Carr, IV, VSB #28679
                                               Robert A. Angle, VSB #37691
                                               Laura Anne Kuykendall, VSB #82318
                                               TROUTMAN PEPPER HAMILTON SANDERS
                                               LLP

P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
la.kuykendall@troutmansanders.com

Douglas E. Lumish (*pro hac vice*)
Srinivas Pathmanaban (*pro hac vice*)
Ryan T. Banks (*pro hac vice*)
140 Scott Drive
Menlo Park, CA 94025
Telephone:  650.463.4600
doug.lumish@lw.com
giri.pathmanaban@lw.com
ryan.banks@lw.com
LATHAM & WATKINS LLP

David Callahan (*pro hac vice*)
330 North Wabash Ave., Ste. 2800
Chicago, IL 60611
Telephone: 312.876.7700
david.callahan@lw.com
LATHAM & WATKINS LLP

Michael Morin (*pro hac vice*)
Susan Yates Tull (*pro hac vice*)
Richard A. Lowry (*pro hac vice*)
Benjamin J. Behrendt (*pro hac vice*)
Laura Nguyen (*pro hac vice*)
555 Eleventh St., NW, Ste. 1000
Washington, DC 20004
Telephone:  202.637.2200
michael.morin@lw.com
susan.tull@lw.com
richard.lowry@lw.com
benjamin.behrendt@lw.com
laura.nguyen@lw.com
LATHAM & WATKINS LLP

*Counsel for Defendant NortonLifeLock Inc.*

31