# COLUMBIA'S REPLY REGARDING ATTORNEYS' FEES UNDER 35 U.S.C § 285
## EXHIBIT V

1

1       IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
2                 RICHMOND DIVISION

3

      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
4                                      )
      TRUSTEES OF COLUMBIA UNIVERSITY )
5     IN THE CITY OF NEW YORK          )
                                       )   Civil Case
6     v.                               )   No. 3:13CV808
                                       )
7     NORTONLIFELOCK INC.              )   April 7, 2022
      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)

8

9      COMPLETE TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
            BEFORE THE HONORABLE M. HANNAH LAUCK
10             UNITED STATES DISTRICT JUDGE

11

12

13

14    APPEARANCES:

15    Dana D. McDaniel, Esquire
      John M. Erbach, Esquire
16    Spotts Fain PC
      411 E. Franklin Street, Suite 600
17    P.O. Box 1555
      Richmond, Virginia   23218-1555
18
      Garrard R. Beeney, Esquire
19    Dustin Guzior, Esquire
      Christopher A. Graham, Esquire
20    Alexander N. Gross, Esquire
      Jessica Ecker, Esquire
21    Sullivan & Cromwell
      125 Broad Street
22    New York, New York   10004-2498

23          Counsel for the Plaintiff

24          DIANE J. DAFFRON, RPR
             OFFICIAL COURT REPORTER
25          UNITED STATES DISTRICT COURT

```
 1     APPEARANCES:   (Continued)

 2

 3     Dabney J. Carr, IV, Esquire
       Troutman Pepper Hamilton Sanders LLP
       1001 Haxall Point
 4     Richmond, Virginia   23219

 5     Nathaniel A. Hamstra, Esquire
       Quinn Emanuel Urquhart & Sullivan
 6     500 Madison Street
       Suite 2450
 7     Chicago, Illinois   60661

 8     Melissa Sherry, Esquire
       Susan Tull, Esquire
 9     Douglas Lumish, Esquire
       Richard Lowry, Esquire
10     Latham & Watkins

11              Counsel for the defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  her to be heard.  And I don't believe she can be here

2  tomorrow.  And so I'd love to take advantage of her

3  expertise and wisdom on that issue.  Other than that,

4  we're happy to follow whatever process Your Honor

5  thinks is so most efficient.

6       THE COURT:  I don't want to prevent you all

7  from giving your argument.  And normally I am ready to

8  rule, and I've just moved these around more than

9  normal, and I want to give you an opportunity to look

10 at them, too.  But I'm aware that you all prepared for

11 today, and I apologize for that.

12      MR. GUZIOR:  And, Your Honor, I think we

13 would just have a couple of issues on the verdict form

14 that we want to make Your Honor aware of, because

15 there are significant errors, we think.  But,

16 otherwise, we'd be happy to wait until you issue your

17 proposed instructions and address them tomorrow or

18 whenever works for opposing counsel.

19      THE COURT:  All right.  Well, why don't we

20 speak to Mr. Dossier, the missing witness instruction,

21 and then we can decide how to proceed from there.

22      MS. SHERRY:  Thank you, Your Honor.

23      THE COURT:  Now, with respect to argument, if

24 you're going to go present an argument, I think go

25 ahead and approach.  I just told you otherwise, so --

1           MS. SHERRY:  I'm much more comfortable

2   standing at the podium.  So thanks for that.

3           THE COURT:  Sure.

4           MS. SHERRY:  Good morning.  Melissa Arbus

5   Sherry from Latham on behalf of Norton.

6           So, you know, we fully appreciate that you

7   have ruled that you are going to give a missing

8   witness instruction, but that was in the context of

9   the motion in limine.  It was at a time where there

10  was no specific jury instruction before the Court.  It

11  was before Quinn withdrew from representing Dossier.

12  And I think maybe, most importantly, it was at a time

13  where I don't think the Court had the model jury

14  instruction before it.  And I do think that model jury

15  instruction is really significant not just for what

16  the actual instruction is, but maybe even more than

17  that, from the caution that comes underneath it.

18          THE COURT:  Now, I'm going to -- I'm sorry.

19  I'm going to interrupt you, but we have Quinn

20  attorneys here.  So is Quinn still participating?

21          MS. SHERRY:  I believe there's a difference

22  between -- he's is no longer representing Dossier.

23          THE COURT:  I'm sorry.  I thought --

24          MS. SHERRY:  Sorry.

25          THE COURT:  I thought you said he was no

1  longer representing Norton.

2         MS. SHERRY:  No, I'm sorry.  On March 28, I

3  believe a letter was filed with the Court that Quinn

4  is no longer representing Dr. Dossier.

5         THE COURT:  I misheard you.  I thought you

6  said Norton.

7         MS. SHERRY:  And so I think the model jury

8  instructions are really significant.  If you look at

9  the model instructions, a couple things really stand

10 out.  Underneath the instruction itself, there is a

11 caution.  It is in all caps, and it says, "This

12 instruction shall rarely be given."

13        We've looked through the model instructions.

14 I believe that caution only appears at one other time

15 in all of the 500-plus instructions.  So I think

16 that's quite significant.

17        The other thing you will see is at the end of

18 that statement it will refer you to the alerts that

19 come afterwards, and the alerts very much read like

20 the objections that we filed with this Court.  It

21 relies heavily on what Justice Russell said in the

22 *Harper* case in his concurrence.  And what the

23 committee focuses on is the fact that while this

24 instruction has a long pedigree, it comes out of the

25 days of trial by ambush, and it basically has outlived

1    its purpose.

2           And what the committee also says in the alert

3    is that this is proven ripe for reversal by the

4    appellate courts.  And so we think that alert's

5    significant.

6           The other thing I'd point out, and I haven't

7    quite pinned down exactly when that alert included

8    that language, but --

9           THE COURT:  So, I can tell my court reporter

10   is leaning in.  That means you're talking quickly.

11          MS. SHERRY:  Oh, okay.

12          THE COURT:  Slow down a little bit, please.

13          MS. SHERRY:  That's a good clue.

14          So I haven't figured out exactly when that

15   alert language changed, but it's recent.  It's after

16   2018 that they, you know -- it always had the

17   cautionary language or at least has had that for

18   sometime, but the really strong language in the alert

19   is pretty new.

20          And then looking at the case law, it has been

21   a long time since a court has affirmed a missing

22   witness instruction when applying Virginia law.  The

23   most recent one I've seen is 2013.  So nearly a decade

24   ago.  And that's the *Scott* case, and we can talk more

25   about that decision.

1          But looking at the Virginia Supreme Court

2     decisions, and you can go back four decades, maybe

3     even more before you find an affirmance, the ones that

4     are most often cited, *Harper*, *Banks*, those are all

5     cases saying that there should have been no missing

6     witness instruction.

7          And so I think that is really significant.  I

8     guess it raises the question, number one, should the

9     instruction ever be given.  I think there's a good

10    argument that the answer today is no.  But at the very

11    least, we know that it should be a very rare

12    occurrence.  And, you know, this is not that rare a

13    case.  And it's not so rare a case for a couple of

14    different reasons, any one of which, on its own, I

15    think, would be a reason not to give the instruction.

16    But, certainly, looking at them collectively, I do

17    think it would make this an unprecedented use of a

18    missing witness instruction.

19         So, the first thing I would point the Court

20    to, and I know you are quite familiar with it, but the

21    2014 deposition testimony.  And so you have a

22    situation where Columbia is asking to give this

23    instruction about the witness being missing

24    immediately before playing the testimony of the

25    missing witness.

1          That is, you know, a significant difference,

2     and it's a significant difference from other cases

3     where there is no witness testimony coming in.

4          And I think it's also significant that

5     whenever Dossier spoke of him coming to testify at

6     trial, he was pretty consistent in saying that he's

7     being asking to repeat, quote, unquote, repeat his

8     2014 testimony.  That's in a number of different

9     places in the record, but the two I'd point the Court

10    to is the November 2019 emails.  And then also the

11    April 10, 2020 email talks about him coming to repeat

12    his testimony.

13         Now, I know that obviously the 2004

14    deposition testimony didn't cover statements made

15    after 2014, but there was ample opportunity for

16    Columbia to supplement the record in that respect, to

17    get an additional deposition, to fill in whatever the

18    2014 deposition didn't cover.  Since at least

19    October 2021, they were told that he would not be

20    coming to testify.

21         As far -- you know, I don't think there's

22    anything showing that they reached out to Quinn, that

23    they reached out to this Court, that they sought to

24    supplement it and provide an additional deposition

25    that, you know, could be played to the jury and would

1   fill in that particular blank in the testimony.  So

2   there's that.

3          There's also the need for there to be a

4   relationship, and not just any relationship, but this

5   very unique relationship between the party and the

6   witness.  And I want to emphasize party because that

7   really is the critical link here.  I think in your

8   motion in limine decision, you were very careful when

9   you were talking about the acts that happened and

10  walking through the facts in saying Norton's counsel,

11  or Quinn specifically, and I think you can go through

12  your decision, and you say -- you talk about the

13  actions, the interaction between Quinn and Dossier

14  being peculiar.  You talked about the email being from

15  counsel by Norton that Quinn exerted improper control

16  over Dossier, that there was gamesmanship by Quinn,

17  that Quinn rendered the defendant unavailable, and

18  there was only one conclusion that could be reached,

19  and I think that is an important distinction, because

20  what the cases are looking at is whether there's this

21  very unique control relationship between the party and

22  the witness, certainly not between party's counsel.

23  And I think blurring that line and imputing counsel's

24  action in these circumstances to Norton really results

25  in a bit of a mismatch between the findings Your Honor

 1  made and the remedy, the idea that there would be a

 2  missing witness instruction that would go against the

 3  party, would go against Norton.

 4       THE COURT:  So isn't it the case, though,

 5  that there were Norton employees and representatives

 6  who were made aware of this issue going on, right?  It

 7  was a Norton person who ignored the email twice and

 8  then received it, right?

 9       MS. SHERRY:  Well, I think your first point

10  is right.  It was sent in November 2019 to a Norton

11  representative.  As you note, there is no response to

12  that in the record.  But I think the things that Your

13  Honor focused most on, at least in the motion in

14  limine decision, were the conflict that you found.

15  And, of course, it's the conflict of counsel between

16  having both representations going on at the same time.

17  And so I think there really is some tension in

18  imputing a conflict to one of the two clients.

19       But then the other thing I think you pointed

20  to was a more recent email reporting out on Your

21  Honor's decision, and when you spoke about that, you

22  know, it was coming from Norton's counsel, I don't

23  believe there was anyone from the company on that

24  email chain.

25       THE COURT:  So you're saying Mr. Erwine

1    doesn't represent Norton?  He's done an awful lot for

2    it.

3              MS. SHERRY:  No.  Obviously, he -- I mean,

4    obviously, they -- Quinn represented Norton.

5              THE COURT:  I'm talking about you're saying

6    that that email, the later email, goes against Quinn

7    but not Norton, but he's Norton's counsel.

8              MS. SHERRY:  You're talking about -- I'm

9    talking about the same email.  I think it's coming

10   from Quinn, if we're talking about the more recent

11   November, I think, 2021 email.  And I will check

12   myself on that, but I'm pretty sure that it's a

13   correspondence between Quinn and Sullivan & Cromwell

14   about Your Honor's order.  And so I do think there's

15   an important distinction here --

16             THE COURT:  So wait.  I don't think you

17   understand my question.

18             MS. SHERRY:  Sure.

19             THE COURT:  It is from Quinn.

20             MS. SHERRY:  It is, yes.

21             THE COURT:  It is from Quinn and it's to

22   Columbia counsel.

23             MS. SHERRY:  Yes.

24             THE COURT:  And it is about ongoing matters

25   in this litigation.

1          MS. SHERRY:  Yes.

2          THE COURT:  And he says -- Mr. Erwine, I

3    think, is who it is.  He says, Yes, we've told them --

4    we've told him about the order and that the Court

5    found that we represented him.  But Mr. Erwine is

6    not -- there's no -- I don't know what a proper phrase

7    would be.  There's no wall to him only representing

8    Mr. Dossier.  He's done depositions in this case.

9          MS. SHERRY:  I think that goes directly to

10   the conflict issue that you discussed in the motion in

11   limine.

12         THE COURT:  No, it goes to the fact that

13   Norton has knowledge through their counsel that this

14   is going on.

15         MS. SHERRY:  But I guess I don't think

16   knowledge is enough.  I mean, just to get back to what

17   the test is.  You know, we're dealing with a rare

18   instruction, and we're almost dealing with an even

19   more rare portion of when the instruction should be

20   given in these very unique circumstances where there's

21   such a close relationship that the party, Norton, is

22   actually exercising control over the witness.

23         And so, I mean, I think if we just look at

24   the cases where courts have found that, and there

25   aren't that many, there certainly aren't that many

1    recent ones, these are circumstances that are almost
2    always either employer/employee relationships, current
3    existing relationships between the parties, or it's
4    actually the party itself.
5           And so I had mentioned *Scott* earlier.  I
6    think it's an important decision to look at, both
7    because it's the only one applying Virginia law in
8    recent years that has upheld it, but also just because
9    of the facts of the case because --
10          THE COURT:  Right.  I know it's different.  I
11   know there's a difference.
12          MS. SHERRY:  Okay.  And so, you know, moving
13   beyond that, I don't think the relationship here
14   between Norton and Dossier is remotely close to what
15   courts have found sufficient to find this level of
16   unique control.
17          But the third point I would make -- so
18   there's the fact that the deposition testimony is
19   going to be played.  It's a fact that the relationship
20   here is not the type of relationship the courts have
21   found to be sufficient.  The third point I would make
22   is there's no unfair surprise here.  And I think if
23   you look at the cases where instructions have been
24   given, virtually every one has this element of
25   literally like at trial, last minute surprise, where

1    it shows up on the party's witness list.  Everyone

2    thinks this person is going to be called.  Sometimes

3    the Court even thinks the party is going to be called.

4    And lo and behold, they duck out during recess, or

5    there's something along those lines that happens in

6    these cases.

7            And, you know, that makes a lot of sense if

8    you think about the origins of this rule.  And this

9    goes back to, you know, what's talked about in the

10   model rules commentary itself --

11           THE COURT:  Are you saying I should just

12   sanction Quinn?  Is that what you're saying?  If I'm

13   making a finding that there is improper conduct, which

14   I have, are you saying Norton's in the clear, and I

15   just sanction Quinn?  What do I do to Quinn?  Is this

16   any kind of discovery violation?  Is this something

17   that comes under any Rule 30 issue that would go

18   against Norton or are you just saying I need to

19   sanction Quinn?

20           MS. SHERRY:  I'm saying -- and, you know,

21   obviously, I'm not here representing Quinn, and they,

22   you know, may have something to say about it, but I am

23   here representing Norton.  And I think the improper

24   conduct you found, I think whatever it is, the remedy

25   cannot be a missing witness instruction, whether it's

54

1   a sanction against Quinn, whether it's something else,

2   I think I'll let others maybe speak more to that.

3            It's just there's a fundamental mismatch

4   between the improper conduct that you found and the

5   remedy of this missing witness instruction.

6            THE COURT:  So you do need to address to me

7   if it is the same person, if it is somebody who has

8   represented Norton in depositions, and who is saying

9   on Mr. Dossier's behalf that he's been told that he is

10   represented by this same firm, it's the same person.

11   How does that not go against Norton also?  He's their

12   lawyer, and he's saying it on their behalf.

13            MS. SHERRY:  Well, maybe that latter part of

14   the question is one of the key questions.  I actually

15   don't think it's the only question, but if Quinn is in

16   this dual representation, joint representation, you

17   know, I assume they would say that they're advising

18   Dossier with respect to his testimony as his

19   representative, as his personal representative.  But I

20   think, you know -- I don't think there is evidence in

21   the record, and I think this is what you would need.

22   I think you would need more than this, but I think you

23   would actually need to be able to show that the

24   party -- and especially in this dual representation

25   context -- but that the party actually directed the

 1    witness and had control over the witness in a way

 2    where the witness, you know, wasn't just going to say,

 3    you know, I'm going to do what I want but actually had

 4    that sort of control.  I think that's why the only

 5    cases that tend to come up in this particular

 6    exception are where you're dealing with a current

 7    employer/employee.  And what they said in the *Scott*

 8    case when it was a plaintiff, it's like that's the

 9    prototypical case.  Of course, a plaintiff can decide

10    whether or not he or she is going to testify.

11         And when you're talking about third party

12    witnesses, like, there's a reason why this control

13    idea is really narrow because, you know, especially in

14    the modern era, the idea that parties control

15    witnesses, you know, is a bit of a historic relic.

16    And so there's a reason why it's very narrowly focused

17    on circumstances where this is --

18         THE COURT:  Well, tell me -- so tell me what

19    I should do.  If I don't give them a missing witness

20    instruction, is it a discovery violation that deserves

21    a sanction?  Do I strike Quinn from the case because

22    they improperly represented two parties and it's not

23    Norton's fault, it's their fault, and I found a

24    conflict?

25         So I'll tell you, the issue is there is a

56

1  serious, serious impression of gamesmanship, serious,

2  which I found.  Right?

3          MS. SHERRY:  (Nodded head.)

4          THE COURT:  Norton didn't care.  Nobody cared

5  about Mr. Dossier until he emailed Norton and said

6  "I'm going to testify against you."

7          And then Norton's counsel contacted him and

8  said, You can't testify, or we represent you for

9  purposes of testifying, and then it's a black hole.

10         So Norton is in the mix.  And it is the case

11 that Mr. Dossier, I think, pretty inexplicably changed

12 when he was not asking for counsel when his daughter,

13 who's a lawyer said "You're not represented," and he

14 was ready to talk.

15         So even if he was ready to talk about his

16 repeat of 2014 testimony, he was ready to talk.  And

17 Dr. Keromytis says he was ready to talk about more.

18 Right?  So I'm taking that as the evidence I have in

19 front of me.

20         I see that the emails say "repeat," but

21 there's other emails that he's talking with other

22 folks, and it is clear that he's not necessarily

23 anticipating just the 2014 testimony.  So I'm going to

24 ask you to step away from that.

25         So the gamesmanship comes in when immediately

1    there's a motion for sanctions.  There's a motion for

2    sanctions against an attorney in my court for improper

3    behavior talking to a represented party where the

4    record couldn't be more clear that this attorney was

5    trying to abide by every single rule.  And then I put

6    on notice that this is an issue.  I wrote an opinion

7    this is an issue.

8            And so you can say that Columbia had all the

9    time in the world, but Norton had all the time in the

10    world.  Quinn had all the time in the world to clarify

11    things.  And no one brought him before me, but I

12    essentially said there's a conflict.  I was not going

13    to make the finding without allowing folks to make

14    their record.  And Columbia didn't have the conflict.

15            So I want to hear from you what I should do.

16    What is the repercussion?  All of a sudden, he's not

17    available.  And then they say, Oh, yeah, he's not

18    available for purposes of deposition, but, actually,

19    you know, you have to get in touch with us.  He's not

20    our employee.  Excuse me.  He's not our employee.  We

21    don't have any control.  We can't do anything with him

22    except that you have to somehow contact the exact same

23    firm, who is Norton's firm, to try to get in touch

24    with him.

25            And there's no differential.  It's not as if

58

1  they said, Why don't you contact Judge Lauck, because

2  Judge Lauck, in our firm, is a person representing

3  Dossier, right?  That didn't happen.

4       MS. SHERRY:  And, I mean, I don't want to

5  relitigate all of that with you.  That's not why I'm

6  here today.

7       THE COURT:  I know, but I'm --

8       MS. SHERRY:  You want there to be --

9       THE COURT:  Don't talk over me.  What is the

10 repercussion presuming there is a problem?  What are

11 you advocating?  I want you to advocate what the

12 remedy should be.

13      MS. SHERRY:  I think the remedy should be --

14 I know what I think the remedy should not be.

15      THE COURT:  No --

16      MS. SHERRY:  I would like the opportunity to

17 brief what the appropriate sanction --

18      THE COURT:  You can't talk over.  I want you

19 to answer the question, not say "I don't want the

20 missing witness instruction."  I want you to say what

21 do I do.

22      MS. SHERRY:  Okay.  I'm not trying to evade

23 your question.  I just don't want to commit to a

24 position when I am not, you know, permanent trial

25 counsel in this case.  So I think there are a host of

1   measures that are available for the Court that it

2   could take.  There could be monetary sanctions.

3        THE COURT:  Monetary sanctions against whom?

4   Norton?  Because you're saying Norton is not at fault.

5   Why do I give sanctions against them?

6        MS. SHERRY:  I think there could be sanctions

7   against Quinn.  When I say "Norton is not at fault,"

8   I'm focused on what the standard is for the

9   instruction, that that is what I am talking about.

10  I'm speaking about it in that context.

11       I understand that you made these findings of

12  improperly conduct, and I think there's a number of

13  things that the Court can do as a remedy for that,

14  whether it's monetary sanctions, whether it's ordering

15  a deposition.  I think the critical point is that it

16  shouldn't be a remedy that prejudices the jury.

17       THE COURT:  I'm sorry, who?  I didn't hear

18  you.

19       MS. SHERRY:  I think, you know, there could

20  be sanctions.  There could be depositions.  There

21  could be other sanctions, you know, things that this

22  Court can do to remedy the misconduct, but I don't

23  think it should be or can be something that would

24  prejudice the jury in this way.  And that is the

25  primary concern.

1          And I know you made the point that I pointed

2     out that, you know, Columbia could have contacted, and

3     there's this sort of tough situation where it's this,

4     you know, contacting Quinn who was representing both

5     Norton and Dossier at this time.  But when it comes

6     to, you know, looking to see if there's a missing

7     witness instruction, the fact that they could have

8     asked Quinn and said, you know, we want your client

9     Dossier to testify.  We'd like you to ask him to

10    testify.  They could have come to this court in

11    October, in November, in December.

12          THE COURT:  I know that.

13          MS. SHERRY:  And so -- and, again, I'm

14    speaking really specifically to this instruction, but

15    I think that's a really significant --

16          THE COURT:  So I understand that you're

17    speaking, Ms. Sherry, to this instruction, but it is

18    happening within the context of the trial, right?  And

19    so -- it is.  So what if I were to give the

20    instruction, which is the model civil jury

21    instruction, that if you believe that a party, without

22    explanation, failed to call an available witness who

23    has knowledge of necessary material facts, you may,

24    but are not required, to infer that witness's

25    testimony would have been unfavorable to the party who

61

1  failed to call the witness, right?  Aren't you

2  partially asking me to give that instruction?

3         MS. SHERRY:  That is very much a -- if you

4  disagree with us and overrule our objection that you

5  shouldn't give any.  So I just want to make that very

6  clear.  But yes, if we're in a world where you're

7  going to give an instruction, the model instruction is

8  the one to give.

9         The one additional point I'd make with that

10  is when to give it.

11         THE COURT:  Okay.  We're not talking about

12  timing.  This is my issue with the question is that if

13  it is the case that I am allowing in residual hearsay,

14  but Dr. Dossier is not coming about saying what he is

15  saying or is said to have said, not which I found is

16  coming into evidence, isn't it possible that as that

17  is phrased, it could run against Columbia because the

18  party, without explanation, fails to call an available

19  witness, which the jury doesn't know one way or the

20  other, has knowledge of necessary material facts.

21  They will have heard that Dr. Dossier had positive

22  testimony for Columbia, and they didn't call him.  So

23  how would I --

24         You really don't have to say "I don't want

25  you to give the instruction every time."  I know that.

1    I know you don't want me to give the instruction at

2    all.  So just presume that when I ask questions that

3    might involve something different, that I know you're

4    not conceding that I'm going to give the instruction

5    or that you want me to.

6            So with that foundation, tell me how the

7    standard instruction could not be confusing if it is

8    the fact that really what I'm saying is that Norton

9    should have produced the witness.

10            MS. SHERRY:  So I think what has happened, at

11    least in the Virginia cases I've seen where they've

12    given the instruction, maybe they haven't had to

13    confront that, because it was, you know, even with the

14    standard instruction, it doesn't specify it was

15    obvious from who the witness was which party the

16    inference was being taken against.  If that's not

17    obvious here, I think the question is what additional

18    factual predicate or introduction to give the jury

19    that is purely factual and doesn't leave the Court

20    commenting on the evidence.  I think that's the

21    primary concern.

22            And so, you know, identifying who the witness

23    is, I think, is a possibility, identifying the

24    relationship that he is a former employee of Norton

25    might be enough to do it.  I worry that going beyond

63

1    those really basic facts would stray into commenting

2    on the evidence, and that was, you know, our primary

3    objection to the alternative proposed instruction that

4    came from Columbia here.

5            THE COURT:  Right.  So I asked that question

6    in part because I think it may drive -- and I'll tell

7    you, I'm open not to giving the instruction in trial.

8    I think that's unusual.  So I'm open to that.  But I

9    believe, and I shouldn't impute what the other side

10   might raise, but I believe that part of the reason

11   that Columbia wanted it played then is so it was clear

12   that when Dr. K testified -- I keep calling him Dr. K.

13   I should call him Dr. Keromytis, I'm sorry.  When he

14   testified to what somebody else said, that it was not

15   able for Columbia to bring that person, not that

16   Norton -- there would be less of an implication that

17   Columbia was failing to bring the witness.  Do you

18   understand that?

19           MS. SHERRY:  I do.

20           THE COURT:  So presuming the issue of the

21   missing instruction, missing witness instruction,

22   that, I think, is the concern about giving it in

23   trial.  And so -- and I want to give as close to a

24   model instruction as possible, presuming I give it,

25   and that would be my concern about giving this only at

64

1    the end.

2            MS. SHERRY:  I understand that.  I guess the

3    concern with doing it in trial, besides the fact that

4    it's not common, is there's a, you know, there's a

5    confusion factor between, you know, saying this

6    witness is missing and then playing the deposition

7    testimony of that witness.  And if it's just to give

8    the context of who -- this is the difficulty, and this

9    is what I'm struggling with.  I think -- and I promise

10   I'm not going back to say we don't want the

11   instruction, but I do think the concern that underlies

12   the instruction is to avoid having a situation where

13   the Court is commenting on the evidence.

14           And so I think the courts have said either --

15   you know, I think Virginia courts actually have said

16   it is important to maybe identify who the witness is

17   because there can be circumstances -- I mean, here,

18   like, there's other deposition testimony that's going

19   to be played during trial.  And I know there's at

20   least a proposed joint instruction to that effect.

21   And so, you know, courts have said sometimes you

22   should identify who the witness is, and so the jury

23   doesn't draw an inference from other witnesses.  And

24   so I think providing some factual specificity in that

25   respect could make sense.

1          I think that the real difficulty is the more

2    you go down that line, it leads to commenting on the

3    evidence, and that's our concern.

4          THE COURT:  So while you're reading notes

5    from co-counsel, what if it is the case that the

6    instruction says the witness has not been available

7    after August 2014?  I can't remember when the

8    deposition was taken.

9          MS. SHERRY:  2014.  I'm actually blanking on

10   the date as well, but it was in 2014.  I think that --

11   I don't -- I guess I'm not sure if that solves the

12   problem you're identifying in terms of who to

13   attribute the inference to.

14          Another way maybe to do it so it avoids the

15   Court commenting on the evidence is to say something

16   like Columbia alleges -- put something in the

17   instruction so it's not coming from the Court, it's

18   coming from the party.  It's a little maybe odd to do

19   that because it's a third party argument, but that

20   might be one way to frame it where it doesn't seem

21   like it's the Court instructing the jury on the

22   evidence.

23          THE COURT:  Okay.  All right.  So I'll hear

24   from the other side.  Thank you.

25          MS. SHERRY:  All right.

1          MR. GUZIOR:  Thank you, Your Honor.

2          I think where I would start is the issue has

3    now been briefed and argued many times.  We hear that

4    Norton is unhappy with the conclusion, but we're

5    unsure what the avenue is for the continuous

6    reargument of the issue.  It's the law of the case.

7    It's decided.

8          THE COURT:  I mean, to be fair, they're

9    raising it in the context of jury instructions.  So

10   they're creating an appellate record.  So that's

11   not -- I don't have any problem with that.

12         MR. GUZIOR:  That's fair, Your Honor.  I just

13   want to make the point that they decided to raise the

14   jury instruction in the context of a motion in limine.

15   And we had said this is a jury instruction issue, and

16   they said, no, it's not.  We're going to file a motion

17   in limine.  We want it briefed and decided now.  And

18   the Court decided the issue as Norton requested.  They

19   then filed a motion for reconsideration, which the

20   Court properly denied the same day that it was filed.

21   And I think what we're hearing is a second motion for

22   reconsideration on whether the instruction should be

23   given at all.  And we think that it should be given,

24   Your Honor.

25         We do think that this is an exceptional case.

1   Dr. Dossier was not only willing, but quite happy to

2   come to trial to support Columbia's case, to speak out

3   against his former employer.  As the Court knows, the

4   one thing that Dr. Dossier did tell me was he was

5   quite concerned for himself that he would face

6   consequences from Norton if he did that admirable

7   thing that he was willing to do.  And that's exactly

8   what happened, Your Honor.

9        And I think it's -- I forgive our new

10  colleagues for maybe not knowing the record fully, but

11  I think it's surprising to hear that Norton had

12  nothing to do with this.

13       And setting aside Your Honor's good

14  observation that the actions and knowledge of a

15  party's counsel is the action and knowledge of the

16  principal in typical cases.  Norton was directly

17  involved in giving Dr. Dossier what I call the bear

18  hug that scared him.  And what I'm referring to is

19  Exhibit 9 to Norton's motion for sanctions where on

20  the 10th of April, 2020, David Majors, who is senior

21  counsel of litigation at NortonLifeLock, said, "Mark,

22  my name is David Majors.  As you may recall, I am

23  in-house litigation counsel at NortonLifeLock, Inc.,

24  formerly known as Symantec Corporation.  We spoke

25  several times in the 2014 time frame.  I recently

1  learned that you sent some emails to Hugh Thompson
2  regarding whether NortonLifeLock counsel at Quinn
3  Emannuel continues to represent you in this matter.  I
4  want to confirm that they do in fact continue to
5  represent you related to this matter.  Please let me
6  know if you have any questions.  And if contacted by
7  anyone in connection with this matter, including
8  counsel for Columbia, please direct them to Dave
9  Nelson and Nate Hamstra at Quinn Emannuel."
10          And Dr. Dossier, Your Honor, in response to
11  that email, copied me and said, "You need to speak
12  with Mr. Guzior."
13          Dr. Dossier then sent me an email that Your
14  Honor has had in connection with the sanctions
15  briefing saying, "I copied you because I wanted to
16  prevent this kind of interference."
17          And I felt badly when this email was sent,
18  Your Honor, because this man was going to come, speak
19  out against his former employer, and support our case,
20  and he said the one thing he didn't want was
21  contractual trouble from his former employer.  And I
22  felt like I had put him in the situation where that
23  was what he was getting.
24          Now, I don't know what happened after because
25  a motion for sanctions was filed that threatened my

69

1    livelihood at the start of a pandemic, which was a

2    great experience.  And I don't know what Norton did or

3    did not say to Dr. Dossier.  All I know is they put a

4    shield down, and that shield has been down until two

5    days ago when Norton filed its objections to the jury

6    instructions saying, Well, why hasn't Columbia

7    contacted Dr. Dossier?

8            And in that respect, I'd like to raise that

9    on March 22, after Your Honor's ruling finding that

10   Quinn Emanuel had a conflict issue, we wrote to Quinn

11   Emanuel to see if there was some way to fix this

12   situation and perhaps even get Dr. Dossier to trial.

13   And I said, writing to Mr. Hamstra, please provide

14   answers to the following questions:  Who does Quinn

15   Emanuel claim to represent presently; Norton,      Dr.

16   Dossier or both?  Two, does Quinn Emanuel object to us

17   contacting Dr. Dossier to provide him with a copy of

18   the Court's opinions that purportedly contained his

19   "confidential information"?  And if so, on what basis?

20   Three, on whose behalf was Quinn Emanuel acting when

21   it made filings and sent communications last week,

22   yesterday, and today; Norton's, Dr. Dossier's or both

23   parties?  Please answer these questions today.

24           And you know what the answer was to this

25   email, Your Honor?  Nothing.  We did not receive a

1 response on the 22nd of March, and we have not

2 received a response even sitting here today.

3       So the idea that Columbia has somehow rested

4 and not sought to contact Dr. Dossier, it's because we

5 want clarification.  The last thing I want is the

6 people from Quinn Emanuel running into the New York

7 State Bar Association saying I'm continuing to have

8 contact with a represented party.  We sought

9 clarification.

10       And maybe on the 22nd of March, we could have

11 gotten back in touch with Dr. Dossier in Saudi Arabia

12 and tried to fix this mess.  But we can't do that now,

13 Your Honor, with the trial starting in a matter of

14 days.  We have to get ready for trial.  We can't try

15 to get in touch with Dr. Dossier in Saudi Arabia, get

16 him to fly over here to come to trial.

17       Norton has made him unavailable, Your Honor.

18 It's not Quinn Emanuel.  You saw from the email I read

19 to you, Exhibit 9 to the motion for sanctions.

20       THE COURT:  All right.  So I'm going to

21 interrupt you, Mr. Guzior, and I'm going to ask you

22 to -- those two documents, I want them made into

23 physical documents and marked as evidence in this

24 hearing.

25       MR. GUZIOR:  Yes, Your Honor.  I have copies

1    of the March 22nd email.  We will have to get hard

2    copies of Exhibit 9 to the sanctions motion.  Would

3    you like me to hand up the hard copies of the email

4    now?

5          THE COURT:  Yes, please.

6          MR. GUZIOR:  Oh, I apologize, Your Honor.

7    The David Majors email is Exhibit 9 to the opposition

8    to the motion for sanctions.

9          THE COURT:  So just give me the ECF number.

10          MR. GUZIOR:  ECF 547-13.

11          THE COURT:  All right.  I'm marking -- you

12    just gave me four copies of the same document.  I'm

13    marking the Tuesday, March 22, 6:58 p.m. email from

14    Dustin Guzior to Nathanial Hamstra, Alexander Gross,

15    Christopher Graham, and Jessica Ecker asking the

16    questions that counsel just indicated on the record.

17    So that will be Exhibit 1 that's entered for plaintiff

18    in this hearing.

19          (Plaintiff's Exhibit No. 1 is admitted into

20    evidence.)

21          MR. GUZIOR:  Thank you, Your Honor.

22          THE COURT:  Do you all have copies?

23          MS. SHERRY:  Yes.

24          THE COURT:  Okay.  I'll keep one.  And I'm

25    sorry, the ECF number is?

 1          MR. GUZIOR:  547-13.

 2          THE COURT:  All right.  We're going to see if

 3     we can print out a copy just so we're all talking

 4     apples to apples.  I'm a paper person.

 5          MR. GUZIOR:  I am, too, Your Honor.  I had to

 6     grab this laptop.  And I apologize.  We didn't expect

 7     it to come up today.

 8          THE COURT:  No, that's fine.  I want it

 9     separately entered as an exhibit in this hearing.  I

10     think it will be a better record.

11          All right.  Please continue.

12          MR. GUZIOR:  So, Your Honor, we think that

13     this is an exceptional case.  We appreciate

14     Ms. Sherry's comments that there is a warning at the

15     bottom of the model instruction.  We think this is an

16     exceptional case where a missing witness instruction

17     is warranted.

18          Norton clearly had a degree of control over

19     Dr. Dossier to appear and not appear, depending on

20     what they thought was in Norton's best interests,

21     exercised directly through Norton's in-house counsel

22     David Majors, and exercised through Norton's

23     representatives at Quinn Emanuel.

24          Columbia has tried hard to remedy the

25     situation that Norton created, but we can't fix it

1   now.  And so we think the missing witness instruction

2   is appropriate.

3            On the question of Norton's direct

4   involvement in what happened with Dr. Dossier, Your

5   Honor, we also would like to point out that on the

6   15th of March, the Court ordered Norton to disclose

7   certain communications with Dr. Dossier.

8            On the 16th of March, which was the due date

9   for the disclosure, Norton filed a notice - Norton,

10  not Quinn Emanuel - saying we are going to defy that

11  order.  We're not going to do it.  That's contempt.

12           And as we learn in Remedies in law school, if

13  you disagree with the Court order, you can file a

14  motion for reconsideration, you can take other action

15  for review, but you don't have the choice not to

16  comply, because that is called contempt.  And they

17  have been in contempt every day since the 16th of

18  March.

19           Now, why do I bring that up?  Well, because

20  we would like to know what those disclosures would

21  look like to respond to Ms. Sherry's arguments,

22  because we don't know to what degree Norton itself was

23  directly involved in communications with Dr. Dossier

24  after the conflict arose, and we don't know what it is

25  that Dr. Dossier did or did not say to Quinn Emanuel

1   after the conflict arose.

2           And so, Your Honor, we believe that the

3   evidence, Exhibit 9 to our opposition to the motion

4   for sanctions, shows that Norton was directly

5   involved.  And if Norton would comply with the Court's

6   order for March 16, we may have additional evidence.

7           Now, on the content of the missing witness

8   instruction, Your Honor, Your Honor was correct.  With

9   regard to both the requested placement in the trial of

10  the missing witness instruction and the content, our

11  concern is that the jury understood to what witness

12  the instruction pertained.

13          We thought that proximity to the playing of

14  the videotaped deposition of Dr. Dossier in addition

15  to a reference to the fact that the instruction was

16  pertaining to Dr. Dossier would avoid confusion among

17  the jurors and avoid prejudice to Columbia.

18          Indeed, Norton's proposed missing witness

19  instruction perversely would convert the instruction

20  into something that appears to be a net positive for

21  Norton.

22          We have suggested what I respectfully submit

23  is a tame version of the missing witness instruction

24  on ECF 1048-1 at page 11, Columbia's proposed jury

25  instructions No. 21, where the only reason we have

 1    added the first paragraph is so that the jury

 2    understands that this instruction pertains to

 3    Dr. Dossier.

 4           And I would add, Your Honor, that in addition

 5    to potentially confusing the jury about whether

 6    Columbia should be faulted for failing to call

 7    Dr. Dossier, we also have concerns that this

 8    instruction without context could be misinterpreted by

 9    the jury to apply to other witnesses.  For example,

10    the third named inventor on the '115 and '322 patents,

11    Stylianos Sidiroglou, who is at MIT and has suffered

12    extremely serious negative health events and cannot

13    appear at trial for that reason, nor has Norton

14    requested that he appear.  And we're concerned that

15    Norton would turn a generic missing witness

16    instruction into a sword to try to suggest that the

17    instruction was directed to the third inventor or any

18    other witness who does not appear at trial.

19           So to conclude, Your Honor, we think the

20    instruction is appropriate, and we think that the

21    proposal that we've put forth for jury instruction

22    No. 21 gives the jurors appropriate context and avoids

23    prejudice to Columbia.

24           THE COURT:  All right.  Thank you.

25           MS. SHERRY:  Thank you, Your Honor.  I just

1    want to address a few points that came up.  Let me

2    start with Exhibit 9, since that's where the argument

3    started.  I read this exhibit several times in the

4    last couple of days.  It doesn't say --

5              THE COURT:  I don't have a copy of it yet.

6              MS. SHERRY:  I have a clean copy.  Do you

7    want me to pass it up?

8              THE COURT:  Yes.

9              MS. SHERRY:  I don't have an extra for

10   myself, but I do have a copy.

11             THE COURT:  I have one now.  My deputy clerk

12   is ahead of me.

13             MS. SHERRY:  Okay.  I'll take it back so I

14   can --

15             THE COURT:  We're going to mark this as an

16   exhibit too.

17             MS. SHERRY:  Absolutely.  So looking at what

18   was Exhibit 9 at the time, this is from in-house

19   counsel for Norton, but you have to look at what it

20   says.  There is nothing in this email that says don't

21   testify, we don't want you to go to court.  Anything

22   having to do with what is truly irrelevant for the

23   type of control you need for a missing witness

24   instruction.

25             It is focused very specifically on the

1  question that Dossier raised in the November emails in

2  terms of whether he is still represented by counsel.

3  That is the question that is being answered there.  It

4  does not show the degree of control or any attempt to

5  keep him from testifying at trial.  So that's my point

6  on Exhibit 9.

7          THE COURT:  Well, obviously, their point is

8  that Dr. Dossier said this is what I wanted to avoid

9  when he --

10          MS. SHERRY:  Yeah, so I want to talk about

11  that, too.  If you give me one second, I just want to

12  grab Exhibit 7, which we talked about too, which is

13  the April 10, 2020, email that was discussed.  And I

14  have an extra copy, I believe.  I can pass this up if

15  you don't have a copy.

16          THE COURT:  All right.  We'll mark that as --

17  I don't know.  Whose exhibit, plaintiff or defense?

18  That's a question.  Whose exhibit?

19          MS. SHERRY:  It can be our exhibit.

20          THE COURT:  Okay.  It's Defense Exhibit 1.

21          (Defense Exhibit No. 1 is admitted into

22  evidence.)

23          MS. SHERRY:  So I think part of this email

24  chain that maybe wasn't read to the Court is Dossier's

25  response.  And this is the Friday, April 10, 2020,

1    email, 2:05 a.m., starting with "Hi, Dustin."  And

2    what it actually says in the third paragraph is "I

3    won't say that they have tried to discourage or direct

4    my participation so far."

5         And if you look back at the November emails

6    that Dossier sent to the company asking whether or not

7    he was still represented and talking about not wanting

8    to create trouble, what he was focused on is whether

9    there was any sort of contractual employment agreement

10   that would inhibit him participating in this manner.

11        And not to jump back and forth between

12   exhibits, but to the extent Exhibit 9 was the company

13   responding to his initial inquiry in November, it

14   doesn't point to anything -- any employment agreement,

15   contractual agreement, or anything else that would

16   inhibit him from participating in the matter.

17        So I think looking at all those pieces

18   together, there's nothing in there showing that

19   Norton, you know, in those communications said

20   anything to Dossier to try to control him or prevent

21   him from testifying at trial.

22        The other main point I wanted to address is

23   sort of the more recent timing.

24        THE COURT:  Well, let's go back to the

25   April 10 email.  And so Dr. -- is it Dassier or

1   Dossier?

2          MS. SHERRY:  I'm told it's Dossier, but

3   someone else can correct me if I'm wrong.

4          MR. HAMSTRA:  I think it's Dossier.

5          THE COURT:  Dossier.  All right.

6          So to the extent that Dr. Dossier is told

7   whether or not he's represented, he's told to contact

8   Dave Nelson and Nate Hamstra.  Those are Norton's

9   counsel, identifiably.  And, you know, David Nelson

10  was the person who defended his deposition.  David

11  Nelson is the person who is the lead counsel for

12  Norton.

13         MS. SHERRY:  Absolutely.  And that just goes

14  back to the joint representation issue.  I took my

15  friends on the other side to be trying to suggest that

16  this Exhibit 9 email from -- or even if we look at

17  Exhibit 7 email, but the Exhibit 9 email for Norton --

18         THE COURT:  You have to use the new numbers.

19  That's part of the reason I'm numbering them is

20  because we're going to mess them up.  So if you're

21  talking about the April 10th email, it is Plaintiff's

22  Exhibit 2 here.

23         MS. SHERRY:  Okay.  There are two April

24  10ths. So the one from Norton.

25         THE COURT:  I'm sorry.  The April 10th email

1  that is the email chain, is that what you're talking

2  about?

3          MS. SHERRY:  Well, no.  I think you're right.

4  So Plaintiff's Exhibit 2, if I'm correct, is the email

5  on April 10th, but it's the one from David Majors.  Is

6  that right?

7          THE COURT:  Yes.

8          MS. SHERRY:  Okay.  So what I took Columbia

9  to be saying is to be using this particular email to

10  say, look, Norton was the one controlling what Dossier

11  did or telling him not to testify or what have you,

12  and my point was just that that's not what the email

13  says.

14          And then with respect to the fact that he's

15  telling them to contact counsel for -- you know,

16  contact Quinn, I think that's just in the nature of

17  the joint representation.  The point being that he was

18  responding to the question from Dossier, "Am I still

19  represented by the same counsel from the 2014

20  deposition?"  So it's just answering that question.

21          THE COURT:  That is Norton's counsel.  So

22  you're saying Norton has no responsibility.  So Norton

23  is not -- there's no action made by Norton through its

24  lead counsel or through its in-house counsel?

25          MS. SHERRY:  Again, I want to separate out

81

1  two points.  I don't think this is a broader sort of

2  question of responsibility.  It's very specifically

3  focused on what the standard is for the instruction

4  here and what the courts look to as to whether there

5  is a unique relationship between the party, Norton,

6  and the witness such that the party is exercising

7  control over what the witness does.

8           THE COURT:  So my finding, I think, was that

9  there was a peculiar relationship because Norton was

10  doing that through the same counsel, the very same

11  people.

12           MS. SHERRY:  And so what you've actually said

13  in the decision is that there was a peculiar

14  relationship, but the peculiar interaction was between

15  Quinn and Dossier.

16           THE COURT:  From someone at Quinn who also

17  was talking to someone at Norton in the very same time

18  frame, the same lawyer.  So you are saying that Norton

19  can absolve itself of any responsibility for what

20  David Nelson does because they send Dr. Dossier to

21  David Nelson, but then David Nelson says, "We

22  represent you," and perhaps says, you know -- so,

23  first of all, let me say no one is or most folks are

24  not quite dumb enough to absolutely say in an email

25  "you can't testify."  So that's one thing.

1          So this email from in-house counsel, I think

2     that there are reasonable inferences that can be drawn

3     from it, and I think that that's what Dr. Dossier drew

4     when he said "I was trying to avoid this kind of

5     interference."

6          But my issue is I don't know -- sir, do you

7     want to just argue this?

8          MR. LUMISH:  I'm sorry, Your Honor.  No, I do

9     not.  I apologize.

10         THE COURT:  You can give her hints.  It's

11    just pretty unusual.  Go ahead and give her the hint.

12         MR. LUMISH:  I apologize, Your Honor.  I will

13    sit down.

14         MS. SHERRY:  Your Honor, I understand what

15    you're saying, and I don't want to belabor this point

16    too much.  Just looking at that same email chain, and

17    this is Defendant's Exhibit 1 from today, so this is

18    jumping back and forth a little between these two.

19         THE COURT:  That's all right.

20         MS. SHERRY:  But when -- I want to focus on

21    what the email says as opposed to characterizations of

22    the email.  What Dossier says in response to -- well,

23    actually, let me back up.  What happens in this email

24    chain is that, you know, there's a reach out to

25    Dossier from Quinn.  Dossier responds and CCs Sullivan

1    & Cromwell on it.  Sullivan & Cromwell separately

2    responds -- I think it's the next one up -- to

3    Dossier.  And what's in that response is counsel's

4    characterization regarding whether it's proper to

5    discourage or direct your participation.  There's

6    nothing intervening between the two that says that

7    that's what happening.  And then Dossier's response,

8    which is where I had started, is that "I won't say

9    that they have tried to discourage or direct my

10   participation so far."

11        So I want to, you know, just focus on what

12   that says.  The other part of this chain, since we're

13   looking at this, is this may be a side point but I

14   think an important one, if you look at the email that

15   Dossier initially sent, and I think Your Honor maybe

16   focused on this in the decision when you said that

17   it's clear that --

18        THE COURT:  Now, you're going a little fast,

19   and so I need to keep up with you.  I'm sorry.

20        MS. SHERRY:  Sure.  Just one other part while

21   we have this chain out and we're looking at it, and I

22   think Your Honor focused on this in the motion in

23   limine decision on page 8 where you said it was

24   crystal clear that he was willing to come and testify

25   during the pandemic, you know, to travel to New York

1    to testify during the pandemic.  And just to -- I

2    think this is what Your Honor was relying on, but just

3    to focus on the language in that February, April 10,

4    and this is the 1:39 a.m. email, what Dosser says

5    regarding his willingness to testify at this time.  So

6    this is April.  This is a month in.  "As a follow-up,

7    I had indicated that I had no problem to come repeat

8    my testimony if needed."  And then the next paragraph

9    says, "A coronavirus pandemic and a travel ban later,

10   things are on hold, and I have no idea how things will

11   unfold.  As of now, clearly, New York would not be my

12   favorite travel destination, but hopefully things

13   would get better soon."

14          So that's the context in which, you know,

15   this conversation is happening where he said, I had

16   indicated that I had no problem testifying, but, you

17   know, things are somewhat different now.  We'll see

18   what happens.

19          I want to -- I don't want to transition if

20   you want to talk more about that, but I do want to

21   focus on something else that came up during the prior

22   argument, which is fast-forwarding a bit to today.

23   And this is, you know, what has happened in March, and

24   I think it goes to whether Columbia could have or

25   should have done something sooner to try to get any

1    additional testimony from Dossier before the jury.

2            And I believe this is the March 22 email, and

3    I'm guessing that's Plaintiff's Exhibit 1 today.  So

4    that is on March 22.  And I believe counsel said, you

5    know, had we gotten an answer to that March 22 email,

6    we could have reached out to Dossier.  We might have

7    been able to get him to come testify today.  But just

8    to go through the timing a little, so that was on

9    March 22.  I believe on March 25th, Quinn filed

10   something with the Court saying they are working on

11   withdrawing from representing Dossier.

12           THE COURT:  I'm sorry.  Say that again.

13           MS. SHERRY:  I believe -- so that was

14   March 22, the email chain.  I think it was on March 25

15   Quinn filed something with the Court saying, We are

16   working on withdrawing from our representation of

17   Dossier.  And then on March 28, Quinn filed papers

18   with the Court saying, We have withdrawn from our

19   representation of Dossier.

20           So starting on March 28th, six days later,

21   Columbia was absolutely free to contact Dossier and to

22   ask him to come and testify at trial.  So that's sort

23   of that time frame.

24           Going back, I had also made the point that

25   from at least October 2021 onward, they absolutely

1    could have used discovery tools to try to depose him

2    again.  I don't think they responded to that.  I don't

3    think there was any attempt to do that.  And

4    especially when what we're talking about here is, you

5    know, there is already testimony.  The gaffe that

6    everyone seems to be focused on are these

7    conversations that happened a few years later.

8            It would not have been all that difficult to

9    supplement the deposition testimony.  That is

10   something that can be done.  It's certainly something

11   that would have been worth trying.  And I don't think

12   there's any indication that efforts were made.  And so

13   while, you know, I don't want to be in a position of

14   pointing fingers or what have you, but we are at a

15   place where we're --

16           THE COURT:  Well, I tell you, that's all

17   you're doing.  Norton is pointing fingers at Columbia

18   and at Quinn Emannuel.  That's all Norton is doing.

19   Norton is saying, you know what?  Our lawyers don't

20   really -- somehow we didn't know that there was some

21   problem, even though you wrote in an opinion you're

22   not making that finding yet, we had no idea these same

23   lawyers could be a problem when I made a finding

24   saying I'm not deciding that.  And the whole record in

25   that opinion, in that hearing, was about a conflict.

1    That was the whole thing.

2         And here, on March 16, I ordered that you all

3    submit records of communications.  And you say, Norton

4    says, through David Nelson, Nina Tallon, and Richard

5    Erwine, signed by Dabney Carr, you say the Court's

6    order outside of the parties' adversarial process on

7    an incomplete record, a one-sided record, and without

8    basis in fact or law, sua sponte raised a potential

9    conflict of interest between Quinn Emmanuel's

10   representation of Norton and its representation of

11   Dr. Dossier as a basis for my findings in motions in

12   limine 5 and 6.

13        Thus, rather than ruling on the issues

14   actually presented by the parties, the Court then

15   ordered that counsel for Norton must disclose on the

16   record, in writing, any information garnered from

17   Dr. Dossier during the period of their representation

18   of Dr. Dossier when it was a conflict.

19        And you respond – by that, I mean Dabney

20   Carr, David Nelson, Nina Tallon, and Richard Erwine –

21   "The Court's order demands a disclosure of privileged

22   communications between Quinn Emannuel and its client,

23   Dr. Dossier."  Despite -- and he did write, which I

24   addressed in my opinion, his sworn declaration that he

25   is represented by Quinn Emannuel and has been so

1    represented throughout this litigation.  And that I

2    have exceeded my authority, especially because

3    Dr. Dossier is not a party before the Court.

4            So this is the issue.  Norton, through the

5    same counsel, the actual same human beings, says that

6    they do represent Dr. Dossier when they don't want to

7    produce him and -- or information from him.  And they

8    say they don't represent him when it is the case that

9    they're going to get in trouble.  And it's just facial

10   bad faith.

11           And so I think that if you think you're not

12   telling me I need to strike Quinn Emannuel or sanction

13   them in some fashion, I think you're not being

14   forthcoming.  If that's what Norton wants, but it's

15   the very same people.  And you can't step back from

16   that.  You just can't.

17           And so I make a finding, and you say, okay,

18   March 28th, before a trial that starts 14 days later

19   in a case that has been pending for eight years and

20   gone to the federal circuit twice, that based on the

21   conduct of counsel, Columbia, it lays at their feet to

22   try to get this witness that has been obscured from

23   them, kept from them, for years to scramble and get it

24   done despite any action by counsel that is less

25   than -- I'm trying to avoid these words -- good faith.

1   It's less than good faith.

2          MS. SHERRY:  And I would -- I mean, to the

3   what's the right remedy point, which I know we talked

4   about a lot before, and I think I said it before, I

5   think sanctions -- based on Your Honor's findings,

6   sanctions against Quinn would be the more appropriate

7   remedy as opposed to what -- you know, the recent

8   letter.  I would cede the podium in terms of, you

9   know, more details, but my understanding is it was an

10  assertion of attorney-client privilege with respect to

11  the relationship between Quinn and Dossier.

12          And then, you know, we can put the March 28th

13  to today date range to the side.  I still think

14  there's a longer time here.  If the objective is to

15  get Dossier to testify at trial and to have the jury

16  hear not only what's going to be before the jury, but

17  the later conversations, there were ways to make that

18  happen, and --

19          THE COURT:  You've said that.  So I get it.

20  You're saying they could have done it months and

21  months ago, and that Norton successfully sat on its

22  hands not addressing the conflict issue, and so shame

23  on Columbia.  I hear what you're saying.

24          Why isn't the remedy to strike Quinn

25  altogether?  Why should a company that had -- a law

 1    firm that had a conflict for a very long period of

 2    time who chose not to address it, even though the

 3    Court identified it, and who told improperly,

 4    incorrectly, falsely, that particular witness, who has

 5    been a big issue in this case, that he was represented

 6    by Quinn Emannuel, even though there was no such

 7    finding -- and he didn't just say he was represented.

 8    He said, "I said he was represented."  Now, I can tell

 9    you, I find that appalling.

10             So why is it the case that this law firm

11    should still be -- if you're saying, Listen, Norton

12    had nothing do with it, it's all Quinn, I'm struggling

13    with that, I'll tell you.  Because it's all the same

14    people.  And, you know, I'm not stupid.  It's all the

15    same people.

16             There is no pretense of creating

17    noncommunication or separate groups that deal with

18    things.  There's not even a pretense.  So I don't know

19    how that doesn't inure to the knowledge of Norton.

20             But presuming what your position is here, why

21    would I let that law firm still participate if Norton

22    is saying, Go ahead and sanction them?

23             MS. SHERRY:  I know you commented about my

24    colleagues coming up with notes before on that

25    question, because I am not going to be the one trying

1   the case I am going to cede the podium so we can

2   actually give you --

3             THE COURT:  All right.  What we're going to

4   do is take a recess.  I don't mean to be too

5   particular about going back and forth.  And I do

6   appreciate that you're probably a partner at the firm.

7   Are you?

8             MS. SHERRY:  I am.

9             THE COURT:  That folks get an opportunity to

10  argue things that I wish more firms did, that they

11  gave different people opportunity to argue different

12  things.  It is problematic if it is too much back and

13  forth, and I'm also taking into account that you all

14  have been in the case for what now?  Five days?  So

15  I'm not trying to be too demonstrative about that, but

16  I will tell you it's extremely distracting.  And

17  usually in our court, we're super formal.  We don't

18  walk around without permission from the Court.  You

19  ask permission.  You say, "My counsel wants to reach

20  me."  It goes on the record.

21            You know, Judge Merhige wouldn't let you talk

22  if you didn't have your jacket buttoned.  That's how I

23  was raised.  So I don't do that.  I don't look at you

24  and say "I can't hear you," which is what Judge

25  Merhige did.

1            But I think I'm going -- what we're going to

2      do, it's been a long time anyhow.  My poor court

3      reporter.  We're going to take a recess still 12:30.

4      And I'm going to allow you all just to take into

5      account the discussions we've had, and I will look at

6      these documents.

7            I do want you to know that there is not a

8      small amount of truth in the fact that I have ruled on

9      this repeatedly, and I know this is the first time

10     you've taken a shot at it, your firm, but it's not

11     your client's first time.  And, you know, probably all

12     along rational arguments might have prevailed, but

13     this is a problem.  I've never had the feeling that a

14     company hid a witness and was untruthful to the

15     witness about what I said about it.

16            MS. SHERRY:  I understand.

17            THE COURT:  I don't -- I've been in trial

18     litigation a long time.  I've never seen it.  Never.

19            All right.  We're going to take a recess

20     before I keep talking.

21            (The hearing resumes on the next page.)

22

23

24

25

```
 1              THE COURT:  All right.  So I realize we actually
 2   had a lunch time and I'm so unaware of time passing that I
 3   did not give you a full lunch break.  And if you folks
 4   need it, I'm happy to do that.  I'm not sure what else is
 5   going on much beyond this.
 6              I welcome to hear any final comments that
 7   you-all might have.  As you can see, I'm troubled by what
 8   is happening here.  And I'm troubled by what has happened.
 9   And I'm looking for a just solution.
10              So it is -- this is -- so I have one -- you
11   wouldn't say this.  I have Latham arguing on behalf of
12   Norton that Quinn, who represents Norton, should maybe --
13   that's not your first argument.  You want to get rid of
14   the missing witness thing.  Maybe you should have some
15   consequence because it's clear I am troubled by what has
16   happened.
17              I feel so sorry for Mr. Hamstra.  I don't know
18   why he's the only Quinn lawyer here.  He is in the thick
19   of it, but there are a lot of other people who could be
20   sitting here and I don't know why they're sending just
21   him.
22              So I want you to know, Mr. Hamstra, none of this
23   is personal to you.  It's not.
24              MR. HAMSTRA:  Thank you, Your Honor.
25              THE COURT:  And I see the circumstance you're in
```

1  which, frankly, is even more bothersome on Norton's

2  behalf, on Quinn Emanuel's behalf.

3          So I am not going to tell you that the missing

4  witness instruction is not extraordinary.  I know it is.

5  I am facing an extraordinary litigated situation, and I

6  want to try a just case.  I have been saying for years now

7  just try your case.  Just try the case you have.  Stop

8  monkeying around.  It's not to your client's benefit.

9  It's not to the Court's benefit.  It is not to the benefit

10 of the justice system.

11         And I'm clearly expressing frustration, and so I

12 don't want that to drive any decision I make.  It won't,

13 but if I keep talking I might get revved up because

14 Mr. Guzior is right.  I've hit this issue so many times.

15 It is the case that initially Columbia said this is an

16 issue for jury instructions.  And Norton said, nope, we

17 want a motion *in limine*.  And then we had a motion *in*

18 *limine*, and then I ruled and then we had a motion for

19 reconsideration, and I ruled again and here we are again.

20         So my focus, I would have to say, is on the

21 remedy.  So it is possible that an instruction in the

22 middle of testimony is too much.  I do think it breaks up

23 testimony.  I'm not sure I've done that before.  And I

24 just want the case to go forward about what the case is

25 really about, but you are not going to convince me that

1  Norton had no knowledge what was going on when these very

2  same lawyers - sorry, Mr. Hamstra, - but some of whom have

3  been in my court ever since.  Mr. Nelson all over it,

4  Mr. Erwine all over it.  And I'll tell you, this may be

5  the first time I have ever called out any attorney by name

6  in the history of being a Judge.  I am so aware of how it

7  matters that we keep a collegial relationship with each

8  other.

9         And when I first became a Judge, I didn't

10 realize how much it mattered what you said in your

11 opinions or what you said out loud because lawyers do hear

12 it as a professional commentary, which is why,

13 Mr. Hamstra, I'm saying it's not a professional

14 commentary.  I know you're here doing your lawyerly job.

15 But it's unjust, and I need a proper remedy.

16         I think it is the case that Norton knew because

17 the same lawyer was talking to them and was talking to

18 Mr. Dacier.  I don't know how that doesn't flow down to

19 Norton being involved.  So I think as far as the missing

20 witness, I'm aware it's unusual.  It's usually the

21 plaintiff not showing up.  I've read the cases.  But I

22 clearly am flummoxed by what is happening here.

23         And, you know, you all are such good lawyers.  I

24 can't believe we're in this circumstance.  So I'm going to

25 ask you all -- I'm going to give you an opportunity to

96

1  speak to me about possible remedies.

2          You know, people appear in this Court *pro hac*

3  because I let them.  I sign you in and I can sign you out.

4  This is not behavior that normally happens in the Eastern

5  District of Virginia, and I've never had that thought

6  cross my mind.

7          So if you-all have anything you want to add, I

8  think go ahead and do it.  I'm not going to rule today

9  because I don't want to rule without having a good thought

10 and reading cases and following the law and the facts that

11 I have in front of me.  But whatever it is that you have

12 to add, I'll hear it now.

13         MS. SHERRY:  Your Honor, I don't want to take

14 more of your time and, you know, we can go back and talk

15 about remedy, like you said.  I just wanted to maybe

16 briefly address it, but then just say one other thing.

17         You know, first, I think we took a recess

18 because you had asked me a question about striking, you

19 know, Quinn as representation in the case, and that is

20 what I went back to consult and, you know, come back to

21 you on and I didn't want to leave that hanging.

22         THE COURT:  Sure.

23         So I'm sorry to interrupt you, but if you can

24 move the microphone a little closer to you.

25         MS. SHERRY:  Sorry.  My voice is leaving me,

1    too.

2           THE COURT:  Well, if you can hear yourself

3    outside then it's working.  I'm just hearing you normally,

4    which is fine, but it can be tougher for the court

5    reporter.

6           MS. SHERRY:  Okay.

7           So I did take that back and, you know, if you

8    think that -- that striking Quinn as counsel is an

9    appropriate sanction for, you know, what Your Honor just

10   talked through, and that would be very difficult, but we

11   would be prepared to go forward with the trial as planned.

12   And that would be far preferable to what we have been

13   talking about all morning - the missing witness

14   instruction.

15          You know, if Your Honor thinks it is appropriate

16   to sanction Norton, I think there's other sanctions

17   available, again, and far short of a missing witness

18   instruction.  Whether they be, you know, monitary

19   sanctions -- you know, I sort of asked my colleagues what

20   are the common sanctions.  I didn't have time to do

21   research for you on that, but I think monetary sanctions,

22   we think sometimes shortening trial time, things to that

23   effect.  And so I don't want you to think we're being

24   unresponsive to your request for an alternative to what

25   really started today.

```
1               And then the only other thing I wanted to say, I
2   mean, I thank you for your time.  I know we started this
3   morning where we weren't going to even do jury instruction
4   arguments this morning, and I know this has a long history
5   and that this is a tough issue that you've been living for
6   a while now, and so I just appreciate you taking the time
7   to hear us out on it.
8               THE COURT:  Well, you don't -- this is my job.
9   Doing my job eight times over, the same thing eight times
10  over, you know, I don't run an assembly line, so that's
11  when I started expressing concern.
12              But it is my job, and I do want us to have a
13  good trial together.  We're not going to not have a trial.
14  There is no doubt that we are have having a trial, so
15  don't worry about that.  Whatever comes from this is going
16  to be that in a trial.  So don't worry about it.
17              MS. SHERRY:  Thank you.
18              THE COURT:  And I'll tell you also, I'm not
19  going to shorten the trial because you-all asked for less
20  time and they wanted more, and that would be a sanction
21  against Columbia.  Maybe I could give you another 27
22  hours.  I'm kidding.
23              Thank you very much.
24              MS. SHERRY:  Thank you.
25              MR. GUZIOR:  I would button my jacket, but the
```

1  pandemic has been unkind to my torso.

2          THE COURT:  So you know what used to happen,

3  right?  He would say, "I can't hear you," and people would

4  talk louder.  And he would say, "I can't hear you," and

5  people would talk louder.  And that would go on until some

6  CSO -- look, the court reporter is shaking her head.  The

7  CSO would be gracious enough to quietly walk up and say,

8  "Button your jacket."

9          But I can hear you, sir.

10          MR. GUZIOR:  Well, Your Honor, first, you know,

11  I took your comments to heart about sort of the things we

12  say to each other matter.  And, you know, I too am

13  troubled that Mr. Hamstra is the only person who is sent

14  here.  And we get to know the people we spar with, and

15  it's not about him only.

16          THE COURT:  I presume everybody knows that, but

17  I would like it on the record.  So I presume that was true

18  of you also.

19          MR. GUZIOR:  On the remedy, what Ms. Sherry

20  suggested does nothing to help us with the problem that

21  they've created.  We would have had a witness at the trial

22  who was in the room when the bad thing happened, saying

23  what happened, and that it was bad.  And we're not going

24  to have that.

25          And we're not going to have that because Norton

1    - Norton itself - and Norton acting through its counsel,

2    Quinn Emanuel, took steps to make sure that wouldn't

3    happen.

4              Now, maybe *pro hac* should be revoked, maybe

5    monetary sanctions should be awarded as Norton is now

6    suggesting, frankly throwing their counsel under the bus,

7    Quinn Emanuel, but that's not going to help us in the case

8    that we would have had.

9              And so my final comment on this would be Your

10   Honor's ruling on the missing witness instruction is

11   right:  This is an exceptional case.  And I want to set a

12   motion aside for a moment and just look at the legal test.

13   There is a peculiar relationship between Norton and

14   Dr. Dacier.  When they want him to show up, he shows up.

15   When they interjected themselves into his plans to come to

16   trial, even though he said in that email they haven't yet

17   interfered, but I want to make sure they don't, a cone of

18   silence fell around him and then suddenly, without

19   evidence to support it, he's no longer coming.

20             And as Your Honor says, the direct evidence is

21   rarely there.  It's usually circumstantial.

22             And finally, Your Honor, why go into contempt?

23   If what they said to Dr. Dacier was come to trial, and he

24   said I've thought about it and I don't want to come to

25   trial anymore, why go into contempt?  So I think, Your

1  Honor, we do believe there is prejudice to our case

2  because of what Norton chose to do.  And we believe the

3  missing instruction witness is right when you apply the

4  legal test.  There is a peculiar relationship.  Dr. Dacier

5  could come if they asked, and he's no longer coming.

6           Thank you, Your Honor.

7           THE COURT:  All right.

8           MR. HAMSTRA:  Your Honor, if I may say just a

9  couple words on that point?

10          THE COURT:  Sure.  Of course, Mr. Hamstra.

11          MR. HAMSTRA:  Again, I'm not advocating this

12  argument on behalf of Norton, but just for when Emanuel

13  has come up today.  I want to just briefly note that, you

14  know, for the reasons we stated in our motion for

15  reconsideration, we don't believe that a conflict existed

16  or that, you know, any sanctionable conduct has occurred.

17          That said, as we all set out in the motion for

18  reconsideration, the normal outcome of a conflict in a

19  joint representation is that attorneys must withdraw from

20  both sides of that representation.  We presented that to

21  Your Honor, and she disagreed in denying the motion for

22  reconsideration, but we --

23          THE COURT:  Now, wait a minute.  What I said was

24  I didn't tell you you had to withdraw from both.  I said

25  you could withdraw from one or the other.  And what I

1 expected is that you would withdraw from one, but I didn't

2 say you couldn't withdraw from both.

3          MR. HAMSTRA:  I understand.  So when you're

4 speaking about, you know, whatever we're referring to when

5 you're referring to striking Quinn Emanuel, you know, in

6 effect we thought that was what the outcome should have

7 been.

8          And then just, lastly, if Your Honor does

9 sanction Quinn or strike us from the case for whatever

10 reason, we just would like an order setting out the basis

11 for that just so we have something that we can take up to

12 the appellate court to clear our name, if that is Your

13 Honor's ultimate choice.

14          Thank you.

15          THE COURT:  Well, that's unusual.  Sounds like

16 everyone wants Quinn out, including Quinn.  This is the

17 weirdest case I've ever had.

18          I want to make it crystal-clear, just like I

19 made it crystal-clear that representation was not decided

20 about Dr. Dacier, that it was not decided that Quinn had

21 to stay in.  I had no idea that Latham was coming in.  I

22 don't know why Latham came in.  And Latham's counsel was

23 correct in saying that it's pretty rare, and never for

24 that counsel, that they get brought into a case for trial

25 two weeks before trial.

1       So I'm going to require that each of you write

2  on the record what the remedy you think is appropriate in

3  this case.  I'm going to ask you to address both if the

4  witness and missing witness instruction is given, and if

5  it's not.

6       In this unusual circumstance, I'm going to order

7  that Latham file one thing and Quinn file something, also.

8  And I'm going to order that you don't talk about what you

9  file.  I don't know if I can do that.  Can I do that?

10      Go ahead and talk about it, I guess.  But Quinn

11  has to file something separately from Latham because this

12  is now -- although it was an odd thing.  We've had two

13  hearings together, and it -- twice I've now heard Latham

14  say something a little bit different than what Quinn has

15  said.  And I certainly can't go through a trial with that.

16      But if Quinn wants me on the record ruling, I'm

17  going to have you on the record asking me -- I always go

18  on the record.  I'm not going to do it orally.  But I'm --

19  and I'm on the record with the motion *in limine*.  I am not

20  shy of making a record.  But I want you-all to submit to

21  me what the remedy should be, and why, and the legal basis

22  for it and then I will rule on it.

23      I honestly don't know what that does with

24  respect to our timing.  So it's 1:00 on Thursday.  What do

25  you all propose about timing, including jury instructions

 1  and other things?

 2              Just have a seat.

 3              MR. BEENEY:  Oh, I'm sorry.

 4              THE COURT:  No.  That's okay.  It's a habit.

 5              MR. BEENEY:  So I think we have -- and Your

 6  Honor was referring to the rest of the pretrial

 7  conference?

 8              THE COURT:  Yes.

 9              MR. BEENEY:  And I think we have some

10  housekeeping, which will take a few minutes.  We have

11  Hosfield, and we have jury instructions, I think.

12              As to the jury instructions, we conferred, Your

13  Honor, and I think what we think may be most productive is

14  to take up Your Honor's offer to provide us with the

15  draft, allow us to confer and see if we can't come to

16  narrowing, if not eliminating, issues and then perhaps

17  addressing it Monday afternoon?  That would be our

18  proposal.

19              And as to Mr. Hosfield, we can address that now,

20  if the Court please.  And as to the other minor issues,

21  they can certainly wait until Monday as well.  None of

22  them impact the jury selection.

23              THE COURT:  And the verdict form?

24              MR. BEENEY:  And the verdict form as well.

25              THE COURT:  Until Monday?

```
1                  THE COURT:  All right.

2                  So the verdict form and the jury instructions we

3     will do Monday afternoon.  I'll give you drafts.

4                  And so with Mr. Hosfield, I'll proceed as

5     you-all see fit.  Maybe you can put your arguments --

6     however it is you want to do it.

7                  Do you-all want to address that today?

8                  MR. BEENEY:  We're prepared to move forward with

9     that today.  It, obviously, it is not something that must

10    be done before Monday, but we could also do that on Monday

11    if Your Honor would prefer.

12                 THE COURT:  Well, why don't we at least argue it

13    and then we can figure out the timing of how things will

14    go forward.  So I'll hear about Mr. Hosfield.

15                 MR. BEENEY:  Your Honor, I plan to make a brief

16    reference to Mr. Hosfield's deposition and his report, and

17    have the two copies for the Court.  And also -- also brief

18    reference to some case law.  With apologies, I only have

19    one copy for the Court.

20                 And I've handed the cases to counsel, Your

21    Honor.

22                 THE COURT:  So, Mr. Beeney, as you're standing,

23    I am -- it's really for my court reporter.  So either -- I

24    know you are gathering information, but maybe just finish

25    your commentary at the lectern, please.
```

```
 1              MR. BEENEY:  Thank you.

 2              So, again, thank you, Your Honor.  So I think as

 3   Your Honor knows, the damage experts in this case for both

 4   parts of the case are Mr. Hosfield for Norton and

 5   Dr. Sullivan for Columbia.  And the issue that we would

 6   like to address is whether Mr. Hosfield can comment on the

 7   level of reasonable royalty for the infringement of the

 8   two Columbia patents.  Your Honor, both experts start

 9   their analysis with Norton's gross revenue.  That is what

10   Norton received for the sale of the accused products.

11              There is no dispute.  Certainly Columbia does

12   not dispute that there are noninfringing functionalities

13   in those products; and, therefore, under established

14   Federal Circuit law, economics and common sense, you need

15   to apportion the value of the patents to the entire Norton

16   product.  We don't want, and would not be permitted, to

17   have a portion of the entire value of the product because

18   there are noninfringing functionalities in that product.

19              The way the Federal Circuit has repeatedly said

20   to do that, and the way economists typically do that, is

21   to go through an apportionment analysis.  And both

22   Columbia and Norton have done that.

23              You cannot get to what the level of a reasonable

24   royalty is under these circumstances without the

25   apportionment step.  It's kind of like asking you to get
```

1  to the third story of a building without there being a

2  first and second story.  You just can't get there.

3          But Mr. Hosfield, with respect to the

4  apportionment analysis, relied entirely on Dr. Jaeger.  He

5  -- if there's anything that's clear from his deposition,

6  he bought what Dr. Jaeger said lock, stock and barrel

7  without question.

8          And I'll just, if I may -- Mr. Hosfield actually

9  got annoyed at me at the deposition because I asked him

10  this question so many times he said to me I've told you so

11  many times I am relying on Dr. Jaeger.  But in any event,

12  let me just show one place where I was probably of asking

13  Mr. Hosfield more than once.

14          If I can direct attention, Your Honor, to the

15  second tab under the binder, Page 61 of Mr. Hosfield's

16  deposition, at Lines 6 through 9.

17          THE COURT:  For what it's worth, I think the

18  transcript is the first tab.

19          MR. BEENEY:  I'm sorry, Your Honor.  I've got a

20  different binder.

21          THE COURT:  That's fine.

22          Page 69?

23          MR. BEENEY:  Page 61, Lines 6 through 9.  Just

24  those three lines -- four lines.

25          "QUESTION:  But in using the percentages of

1          Those that you attribute to the patented.

2          Inventions, was that all Dr. Jaeger's work?"

3          And the answers was:  "Really quite simple.

4  Yes."

5          And then just one other of the many references,

6  Your Honor, if I can direct the Court's attention to

7  Page 59, and I'm not going to read the whole context, but

8  just Line 16.

9          "But I didn't do any of that analysis myself."

10          THE COURT:  What page are you on?

11          MR. BEENEY:  I'm on Page 59.  And I was just

12  reading a section of Mr. Hosfield's answers when we were

13  talking about the apportionment.

14          THE COURT:  Got it.

15          MR. BEENEY:  And he says on Line 16 to 17:  "I

16  didn't do any of that analysis myself."

17          And perhaps even further, if we turn to Page 57,

18  Lines 5 to 14, Dr. Jaeger -- excuse me, Mr. Hosfield

19  admits that anything that Dr. Jaeger did, quote, flows

20  through Mr. Hosfield's opinion.

21          "QUESTION:  And in connection with that

22          apportionment analysis, as you just described

23          it in this case, do you take into account

24          whether any of the asserted claim elements are

25          found in the prior art?

```
 1              "ANSWER:  Again, as I told you when you asked
 2              me that a little earlier, I said Dr. Jaeger to
 3              the extent that they're included in Dr. Jaeger's
 4              analysis, yes, it would flow through my analysis
 5              as well because I relied on him for that."
 6              Now, turning to Mr. Hosfield's report, Your
 7    Honor, the next tab.  If I can just direct your attention
 8    to Page 42.  And six lines from the bottom of the page,
 9    Mr. Hosfield talks about the fact that I understand from
10    Dr. Jaeger that the technology of the patent in suit
11    contribute only 1 percent of the value to SONAR/BASH.  And
12    that's the foundation for Mr. Hosfield's opinion.
13              In Docket 905 on March 21st, the Court ruled as
14    a matter of law that Dr. Jaeger's apportionment to
15    1 percent, or .07 or .09 was out under Rule 402 because
16    this 15 infringing attributes as compared to the purported
17    214 attributes in the Norton decision tree was done on
18    2019 data without any hint as to what that would have to
19    do with the hypothetical negotiation at which the
20    reasonable royalty as a matter of law must be determined.
21              So the 1 percent relied on Mr. Hosfield is out.
22    And that was a major foundation for Mr. Hosfield's
23    opinion.
24              Moreover, in Columbia's motion in limine Number
25    1, the Court excluded under 402 and 403 other data that
```

111

1    Dr. Jaeger relied on his apportionment.  That is the

2    percentage of SONAR/BASH blocks.  Also something that

3    Mr. Hosfield specifically cites in his report, and form

4    the basis of the apportionment analysis.

5              I apologize for not having the transcript, but

6    Your Honor may recall when we were here arguing the

7    *Daubert* motions that counsel for Norton said that however

8    Your Honor rules on the *Daubert* is what will happen is

9    that then the experts will seek leave to revise their

10   opinions to comply with the Court's orders.

11             Well, it's been 17 days since the Court ruled on

12   these motions, and there's been no requests either to

13   amend Dr. Jaeger's opinion or Mr. Hosfield's opinion.  And

14   I think the bottom line, Your Honor, is that without

15   Dr. Jaeger's opinion, without apportionment which

16   Dr. Jaeger can no longer offer, then Mr. Hosfield's

17   analysis of what the reasonable royalty should be has to

18   fall because you must have an apportionment analysis and

19   now he no longer has one.

20             And it is not a step that you can substitute the

21   other things that Mr. Hosfield has done:  Calculating

22   profit, and calculating allocation of profit, and which

23   party should share in that profit.

24             You don't get to the things that Mr. Hosfield

25   did until you apportion the revenue that's attributed to

112

1  the patented invention.

2          And I would respectfully submit that that's

3  enough to rule that Mr. Hosfield cannot comment on the

4  amount of a reasonable royalty, but if I may just very

5  briefly walk Your Honor through other factors that

6  Mr. Hosfield himself says are the basis for his opinion on

7  Page 63 of his report.  And going over from Page 63 to 67,

8  Mr. Hosfield specifically lists seven factors that helped

9  him determine the royalty that would come out of the

10 hypothetical negotiation.

11         And so you start with the first, which is the

12 relative importance of the patents, the patented

13 technically to Symantec.  And he talks about that that's a

14 small portion of the benefits.  But we've already

15 addressed that.  So factor number one is out.

16         Second, he talks about the availability of

17 noninfringing alternatives.  And I won't cite it to Your

18 Honor, but in his deposition, that is Mr. Hosfield's

19 deposition, at Page 151 Line 22 to Page 152 Line 8, with

20 respect to noninfringing alternatives, Mr. Hosfield says I

21 didn't do any of it.  I'm not qualified to do any of it.

22 I relied entirely on Dr. Jaeger.

23         And that then brings us to Your Honor's

24 March 21st opinion at Docket 904 in which Your Honor ruled

25 that Dr. Jaeger's noninfringing alternative argument

 1   having to do with BPE is out for good and sufficient

 2   reasons.  So the first two bases are you pulled out from

 3   Mr. Hosfield.

 4          The third thing that Mr. Hosfield says at the

 5   bottom of Page 63 of his report is Dr. Sullivan's

 6   apportionment analysis adjusted.  And what that means, if

 7   you look at Mr. Hosfield's report, is really just

 8   substituting Dr. Jaeger's apportionment for Dr. Sullivan's

 9   apportionment.

10          And that brings us to the next ground, which is

11   the Snakeyes license on the top of Page 64 of

12   Mr. Hosfield's report.  And as Your Honor knows in Docket

13   900 on March 18th, the Court ruled that that was not a

14   comparable license that was appropriate for an expert to

15   rely on.  So all four of the first four bases of

16   Mr. Hosfield's opinion are out.

17          And then we get to the fifth, the commercial

18   relationship of the parties.  And certainly Mr. Hosfield

19   can talk about that.

20          And then we get to the sixth, the total

21   royalties Columbia earned from licensing any of its

22   security-related patents.  That also is out under Your

23   Honor's opinion that the Red Balloon, the TCS Security and

24   the other licenses were out in the same motion *in limine*

25   order on March 18th, Docket 900.

114

```
 1           And then finally, Mr. Hosfield relies on
 2   Symantec's investment in the development of SONAR/BASH.
 3           So at the end of the day, Your Honor, anything
 4   that Mr. Hosfield has to say about apportionment is out of
 5   the case for good and sufficient reason.  And as I've said
 6   before, once that apportionment is out, Mr. Hosfield has
 7   nothing to say about what the level of the reasonable
 8   royalty is because it is not only required by economics,
 9   it is required by Federal Circuit law.
10           And if I may just quickly conclude, Your Honor,
11   I -- I always edit younger lawyer's briefs when they say
12   court opinions are routine, but it is true that it is
13   routine for courts to draw the line between one expert's
14   opinion if it relies on excluded testimony of another
15   expert, then the second expert's opinion is out.
16           And I will just cite a few cases to Your Honor,
17   all of which I have handed up to Your Honor.  And I have
18   given copies to Norton's counsel.  In *Apple* against
19   *Motorola* in the Federal Circuit, quote -- and I'm
20   replacing expert with names.
21           Quote, The second expert incorporated the first
22   expert's testimony into her own once she relied on the
23   proposed testimony to opine about damages.  The substance
24   of the first expert's testimony is now more reliable when
25   admitted through the second expert than through the first.
```

1          And if ever I've seen a case, Your Honor, and I
2     hope this is not hyperbole, but if I've seen a case that
3     is on all fours with the situation that I'm addressing to
4     the Court, it is the *M2M Solutions* decision out of the
5     District of Delaware at jump cite seven where one expert's
6     opinion, quote, Provides the foundation for a reasonable
7     royalty analysis by a damages expert.  Without the first
8     expert's conclusion, that foundation crumbles and the
9     damage expert's testimony must be excluded as well.
10          And we've given to Your Honor four other cases,
11     including one from the Fifth Circuit that say exactly the
12     same.  The Fifth Circuit in the *Simms* case, since the
13     District Court had already deemed expert number one's
14     testimony inadmissible, it concluded that expert's two
15     testimony was also inadmissible.  The District Court
16     properly excluded expert's two theory because it relied on
17     expert's one inadmissible theory.
18          We have been through the record, Your Honor, and
19     just do not see how Mr. Hosfield can probably comment on
20     the reasonable royalty.
21          And just a final thought, Your Honor.  You know,
22     parties and their experts make decisions about how they're
23     going to put together their reports, and they make
24     decisions about what they're going to rely on.  And this
25     is, you know, a bed of Norton's own making.  And to use

1  the expression, they now are forced to lie in it.  And I

2  just don't see how Mr. Hosfield could conceivably comment

3  on the amount of a reasonable royalty.

4       THE COURT:  Now let me just confirm.  Are you

5  seeking to exclude his testimony all together?

6       MR. BEENEY:  No, Your Honor.  He can comment on

7  Dr. Sullivan's analysis, I believe.  And, you know, he can

8  comment on other things about Norton's investment in the

9  technology.  But in terms of with a number, with an

10  adjective, or with anything else, commenting on the amount

11  of a reasonable royalty, that simply can't be done because

12  there is no apportionment analysis by Norton in this

13  record.

14       THE COURT:  So in your answer I want to be

15  specific.  I asked questions about certain factual

16  contentions that were in the pretrial order, so one of the

17  contentions talked about whether there were dominiums

18  damages or -- I don't want to misquote it.  Are you saying

19  that those adjectives cannot be used?

20       MR. BEENEY:  They can't, Your Honor, because you

21  can't get there unless you apportion the value of the

22  patented technology to the product.  You just -- what the

23  reason reasonable royalty should be is a complete and

24  total black box until you determine what the value of the

25  patents is to the product given the fact that everybody

1  starts with gross revenue.  And without an apportionment,

2  without the ability to say here is what the value of these

3  patents are to the accused product, you can't comment on

4  the royalty.

5          Now, I know in Your Honor's motion *in limine*

6  ruling I believe Your Honor said that Dr. Jaeger could

7  testify about the technology.  And we're not taking issue

8  with that.  But that doesn't get you to what the Federal

9  Circuit requires to apportion a number or a range or a

10  value to the reasonable royalty.

11          THE COURT:  I'm trying to look for the exact

12  paragraph, but I understand your argument.

13          MR. BEENEY:  Okay.  Thank you.

14          THE COURT:  You're saying, obviously, that

15  Dr. Jaeger can't do the same thing?

16          MR. BEENEY:  Correct, Your Honor.

17          THE COURT:  Okay.  Thank you.

18          MR. BEENEY:  Thank you.

19          MS. TULL:  Good afternoon.  Can Your Honor hear

20  me?

21          THE COURT:  That's rough.

22          MS. TULL:  It is.  I apologize to everybody.

23          THE COURT:  Are you well?

24          MS. TULL:  Just a loss of voice from allergies.

25          THE COURT:  Okay.  Not a HIPA question.

```
 1            MS. TULL:  No, no.  That's fine.

 2            So, fortunately, particularly for my voice, I

 3  think this will be a short argument.

 4            With respect to Mr. Hosfield --

 5            THE COURT:  Can you introduce yourself for the

 6  record?

 7            MS. TULL:  I apologize, Your Honor.  Susan Tull,

 8  Your Honor, on behalf of Norton.

 9            So we do maintain our objections, of course, to

10  Your Honor's in limine and Daubert rulings, but we do

11  recognize and abide by those orders.  And in light of the

12  Court's -- in light of the Court's rulings on the motions

13  in limine, and Daubert rulings with respect to both

14  Dr. Jaeger's apportionment analysis and the portions of

15  Mr. Hosfield's report that were addressed by the Court and

16  identified by counsel, we agree with the Court and with

17  Columbia that Mr. Hosfield cannot present an ultimate

18  damages number, and so he will not be providing the $1.5

19  million number that appears in his report, nor will he be

20  saying nominal de minimis, or a related adjective.

21            THE COURT:  Or, I'm sorry?

22            MS. TULL:  Or a related adjective.

23            THE COURT:  Okay.

24            MS. TULL:  We do, again, maintain all rights for

25  appeal.  We will seek to make proffers of evidence outside
```

```
 1  of the jury's presence.

 2          Again, we do agree with counsel that there are

 3  other aspects of both expert's reports and opinions that

 4  were not excluded and that we will be presenting to the

 5  Court.

 6          THE COURT:  Right.  Okay.

 7          I understand that you-all are preserving your

 8  objections, but because they were in the factual

 9  contentions I just want to make sure we didn't have any

10  argument.

11          You may have a seat, Ms. Tull.

12          Factual contention 17 of ECF 1076 says if Norton

13  is found to infringe the '115 and '332 patents, Columbia

14  is entitled to only a de minimis royalty.

15          So that's not going to be presented through

16  testimony of any expert or even implied?

17          MS. TULL:  Correct, Your Honor.

18          THE COURT:  And I'm trying to look for the other

19  one.  Can someone help me?  There were two.  I marked up

20  the old version.  It's in my order, I think.

21          Well, with respect to the '643 patient, --

22          MS. TULL:  If I may interject, Your Honor?

23          Mr. Hosfield did not offer an express damages

24  number on the '643 patent.  So we maintain our arguments

25  and present evidence that Columbia will not meet its
```

120

 1  burden of proof on damages.  But there was, in that

 2  instance, no specific number that he was presenting.  And

 3  it doesn't involve the same apportionment issues, I

 4  believe.

 5          THE COURT:  Right.  I agree.

 6          But Paragraph 34 says there's no support for the

 7  patent royalty approach.  And even if applied, Columbia

 8  would be entitled to no damages for the '643 patent.

 9          Is there any concern about how that comes in?

10  That's Paragraph 34.  I don't know how that comes in.

11          MS. TULL:  I don't believe that's implicated by

12  the arguments that counsel raised or the 1.5 or de minimis

13  numbers, Your Honor.  It's more an absence of showing the

14  damage.

15          MR. BEENEY:  Your Honor, I think any

16  quantification, including none, is out.  Certainly, you

17  know, a lawyer can say to Your Honor in posttrial briefing

18  as to what the burden of proof has been and whether it's

19  met, but I don't see how you can have a fact witness who

20  did not provide an opinion in their report as to what the

21  damages would be to say none.  None is a quantification.

22          MS. TULL:  We will not -- and Mr. Hosfield will

23  not be testifying contrary or outside the scope of his

24  report.  But certainly, Your Honor, we should be able to

25  tell the jury that if there is no -- if there is no

1    liability, there are no damages as well.

2            So counsel's arguments with respect to

3    Mr. Hosfield did not -- the motions *in limine* that he

4    addressed, and the *Daubert* rulings, did not impact on

5    Mr. Hosfield's opinions on the '643 report.  And, again,

6    we will certainly stay within the scope of his report.

7            THE COURT:  Did you want to say something?

8            MR. BEENEY:  I apologize, Your Honor.

9            As long as there's no quantification of the

10   number, whether it be zero or otherwise.  Again, we do

11   believe that Mr. Hosfield is free to criticize

12   Dr. Sullivan, but not, again, with adjective, range, or a

13   number comment on the amount of damages.

14           THE COURT:  So this is my concern is that if the

15   phrase, even if applied, they would be entitled to no

16   damages.  So if the only basis for saying even if applied

17   is that because they're -- they're not going to prevail

18   overall, then that's fine.  But as I read this in the

19   first instance, I thought there might be some kind of

20   alternate evaluation using their process.  And so that's

21   what I was trying to get at.

22           MS. TULL:  That is not the case, Your Honor.  It

23   relies -- and this would not be coming through

24   Mr. Hosfield.  But it's solely the fact that the burden is

25   on the plaintiffs in this case to prove, at least by a

1  reasonable basis, that they're entitled to damages and

2  whether -- you know, we could argue whether or not they

3  have met their burden in this case.

4          MR. GUZIOR:  Your Honor, there's one other issue

5  related to damages.

6          THE COURT:  I actually think that as long as

7  that is sort of the basis.  So the problem is once you

8  have an expert saying no damages, it carries weight.  If

9  it's a legal argument then it sounds like a calculation.

10  If it's an expert -- and that's what I'm trying to work

11  around.  You can make a legal argument, of course.  And my

12  concern was who was going to be saying this.

13          So you're saying that no expert is going to say

14  that, correct?

15          MS. TULL:  Correct.

16          THE COURT:  And that will be a legal argument

17  that you present?

18          MS. TULL:  Correct.

19          THE COURT:  Go ahead.

20          MR. BEENEY:  So this is another paragraph, Your

21  Honor, because I think counsel's representation is pretty

22  much where we are.

23          THE COURT:  Okay.

24          MR. BEENEY:  Nothing from the experts or the

25  fact witnesses about a quantification of damages,

1  adjectives, range, numbers.  But, of course, posttrial,

2  counsel can make whatever argument they want to make as to

3  whether we've met our legal burden.

4          THE COURT:  Correct.

5          MS. TULL:  And just to be clear, Your Honor,

6  that would also include closing argument, is that correct?

7  That we should be able to make that argument in closing to

8  the jury, though it would not come in via an expert, for

9  example, that they had not met their burden.

10         THE COURT:  So you're going to argue that they

11 haven't met their burden?

12         MS. TULL:  Correct.

13         THE COURT:  So I think it's fair argument to say

14 that if you don't meet the burden then you don't collect

15 anything.

16         MR. BEENEY:  I guess off the top of my head,

17 Your Honor, the only distinction that I think about is

18 that while I think it's fair to say, you know, Columbia

19 has not proved they they're entitled to $228 million in

20 damages or 1.24 percent of the $17 billion in products

21 that Norton sold, but the next clause, and therefore it

22 should be zero, I do have problems with because there will

23 be no evidence as to what the "therefore it should be" if

24 the jury feels we haven't met the burden.

25         THE COURT:  So you're saying if they use a

```
 1  number, and then say they didn't prove that number, and so
 2  they should get nothing, that's different from saying that
 3  they didn't meet their burden.  And so because they didn't
 4  meet their burden, they can't get any damages, is that
 5  right?
 6          MR. BEENEY:  Yes.
 7          THE COURT:  Do you-all object to making that
 8  distinction?  It strikes me as close, but what do you-all
 9  think?
10          MR. LUMISH:  If I may, Your Honor?  I just want
11  to be able to say to the jury we didn't infringe so we
12  don't owe them anything.  We didn't fraudulently conceal
13  anything, so we don't owe them anything.
14          I think we should be allowed to say that there's
15  no liability and no damages at all in the case.  And
16  that's, I think, what we're trying to protect here.
17          THE COURT:  Right.  I am perfectly fine with
18  that.  And this, again, may be an issue I raised in a
19  different context.
20          But I do agree that making that argument right
21  after a number feels a little different than just saying
22  there's no liability and so there's no damages.  So I
23  would ask you to be mindful of that.
24          MR. LUMISH:  We will, Your Honor.
25          THE COURT:  All right.
```

1          MR. BEENEY:  So just one other bit about the

2    pretrial order facts, if Mr. Guzior may address that, Your

3    Honor?

4          THE COURT:  Of course.

5          MR. GUZIOR:  Your Honor, I'm looking at

6    Paragraph 13, ECF 1076, Page 36.  And Norton says Claim 1

7    of the '115 patent represents an unasserted claim against

8    which the alleged improvement in the asserted claims

9    should be measured in calculating a reasonable royalty.

10          Now what they're getting at here is something

11   called a noninfringing alternative.  When you would say a

12   system configured with the limitations of Claim 1, but not

13   having the combined models limitation, is an alternative

14   that is noninfringing and needs to be taken into account.

15          And as Your Honor knows from the briefing as to

16   the infringement theory that Columbia has to present at

17   trial, Dr. Jaeger offered one, and only one, noninfringing

18   alternative which was take SONAR/BASH out.  And at the

19   deposition I gave him the opportunity to change his mind

20   and said, Is that the only noninfringing alternative?

21          And as we put in the briefing, he said "Yes."

22          And we're seeing an entirely new noninfringing

23   alternative in Paragraph 13, which is just configure the

24   system as in Claim 1.

25          But Norton will not be able to show you any